IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— x
                                          :
AMER MOHAMMON, *et al.*,                   :
                                          :
                    Petitioners,           :
                                          :
          v.                               :     Civil Action No. 05 CV 2386 (RBW) (AK)
                                          :
GEORGE W. BUSH, *et al.*,                   :
                                          :
                    Respondents.           :
                                          :
                                          :
———————————————————— x

**MOTION OF PETITIONERS ABDUL GHAFFAR AND ADEL NOORI
FOR EXPEDITED ENTRY OF THE AMENDED PROTECTIVE ORDER**

**ORAL ARGUMENT REQUESTED**

KL3:2526384.4

Petitioners Abdul Rahman a/k/a Abdul Ghaffar (ISN 281) ("Ghaffar"), and Adel LNU a/k/a Adel Noori (ISN 584) ("Noori") (together, "Petitioners"), by and through their undersigned counsel, respectfully submit this motion for expedited entry of the Amended Protective Order previously entered by Judge Joyce Hens Green in *Ab-dah v. Bush*, No. 04 CV 1254 (HHK) (D.D.C.), and other coordinated Guantánamo detainee cases.[1]  Petitioners' motion should be granted for the following reasons.[2]

## Preliminary Statement

Petitioners are Uyghurs, a Turkic Muslim minority group native to western China. They are being held virtually *incommunicado* in military custody at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"), without charge, without access to counsel, and without being afforded any fair process by which they might challenge their detentions.   Due to restrictions imposed by Respondents on access to and communication with Guantánamo detainees, Petitioners have not yet been able to visit or otherwise communicate with their counsel.  Because they have no meaningful way of securing legal representation for themselves, Petitioners filed a habeas corpus petition through their next friend, Usama Hasan Abu Kabir, dated December 12, 2005 (the "Petition").

Undersigned counsel appeared in this proceeding on June 15, 2006 on behalf of Petitioners.  We also represent five other current and former Guantánamo detainees who are also Uyghurs in *Mamet v. Bush*, No. 05 CV 1886 (EGS) (D.D.C.), and *Razakah v. Bush*, No. 05 CV

---

[1]  The "Amended Protective Order" specifically includes the following orders: (i) Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba, issued November 8, 2004 (344 F. Supp. 2d 174 (D.D.C. 2004)); (ii) Order Addressing Designation Procedures for "Protected Information," issued November 10, 2004; and (iii) Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order, issued December 13, 2004.

[2]  This motion may properly be referred to Magistrate Judge Alan Kay because it concerns logistical issues involving counsel access to detainees.

2370 (EGS) (D.D.C.).  On June 21, 2006, undersigned counsel requested that Respondents' counsel consent to expedited entry of the Amended Protective Order.  Alternatively, we requested that during our upcoming visit to Guantánamo, scheduled for July 24 through July 28, 2006, during which we will meet with the *Razakah* petitioners, we also be permitted to meet with Petitioners here based on our representation that we would abide by the terms of the Amended Protective Order entered in our other detainee cases.[3]  Respondents' counsel refused to consent to entry of the Amended Protective Order or to permit us to meet with Petitioners during our upcoming visit. *See* Ex. A (attached hereto).  Accordingly, Petitioners now file this motion for expedited entry of the Amended Protective Order.  The Court should grant this motion because there is no lawful basis for Respondents to continue to detain Petitioners virtually *incommunicado* and without immediate access to their counsel.

### Background

Petitioners are citizens of the Xinjiang Autonomous Region, a western province of China also commonly referred to as "Turkistan" or "East Turkistan."  They are Uyghurs, a Muslim ethnic group that has been brutally oppressed by the communist Chinese government.  Based on Petitioners' ISNs – 281 and 584 – there can be no dispute as to their identities.  Nor is there any good reason why they should not be allowed immediate access to their counsel.

Petitioner Ghaffar is among a group of uniquely-situated Uyghur prisoners seized by mistake in Pakistan.  This group includes our three clients in *Mamet v. Bush*, No. 05 CV 1886 (EGS), and the two petitioners in *Qassim v. Bush*, No. 05 CV 5477 (D.C. Cir.), all of whom were released from Guantánamo and transferred by Respondents to Albania on May 5, 2006.  This group also includes one of our clients in *Razakah v. Bush*, No. 05 CV 2370 (EGS), Abdur

---

[3] We have obtained the necessary security clearances to meet with our other detainee clients, and indeed previously visited the base in March 2006.

Razakah, who we are scheduled to meet with during our upcoming visit to the base. These men, including Ghaffar, were living in a Uyghur community in Afghanistan after the United States began military operations in that country in October 2001. They did not take up arms against the United States or its coalition allies and did not support forces hostile to or engaged in armed conflict with the United States. They fled from Afghanistan after their village was bombed by United States forces, eventually making their way to Pakistan with a large number of other refugees. There, they were detained by Pakistani bounty hunters and sold to the United States military for a bounty of $5,000 each. Respondents do not dispute these facts, which have been widely reported by the news media since the *Mamet* and *Qassim* petitioners were transferred to Albania. *See, e.g.*, Ex. B (recent *Wall Street Journal* article). *Qassim* petitioner Adel Abdul Al Hakim – who was released last month to Albania after the military determined, more than a year ago, that he was not an enemy combatant – testified that Ghaffar was among those with him in Afghanistan and Pakistan when he appeared as a witness for Ghaffar during his CSRT hearing. *See* Ex. C (Ghaffar's CSRT transcript).

We are also informed and believe that Petitioner Noori fled from China to Almata, Kazakhstan, and later to Afghanistan, in order to escape persecution based on his religious and ethnic identity. In particular, we understand that he faced political persecution in China because of his formal religious education and his extensive knowledge and practice of Islam, a crime apparently punishable by death in China. In addition, we believe that Noori was captured on a bus in Pakistan – not on a battlefield – as he fled coalition bombing in Afghanistan with other refugees. Finally, we are not aware of any allegations or evidence that he presents a threat to the United States or its coalition allies, or has any intelligence value, that purportedly could justify his continuing indefinite, *incommunicado* detention.

Respondents continue to detain Petitioners despite their repeated acknowledgement that many – if not most – of the Uyghurs held in Guantánamo do not threaten the security of the United States, are of no intelligence value, and, at least in the case of the *Mamet* and *Qassim* petitioners, were determined not to be "enemy combatants." Indeed, many of the Uyghurs have twice been cleared for release from Guantánamo, once after a Pentagon review in late 2003 and again in March 2005. *See* Robin Wright, "*Chinese Detainees are Men without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantánamo with Nowhere to Go*," WASH. POST, Aug. 24, 2005, at A1 ("15 Uighurs have actually been cleared for release from Guantánamo Bay twice, once after a Pentagon review in late 2003 and again last March, U.S. officials said."). But Respondents continue to assert their authority to detain these men indefinitely until they can be transferred to a foreign country. At a minimum, it is imperative that Petitioners, who cannot be repatriated to China, where they would likely be tortured or killed based on their religious and ethnic identity, have access to their counsel in order to discuss their expected transfer to a third country.[4]

## Argument

The only obstacle to Petitioners meeting with their counsel is entry of the Amended Protective Order, to which Respondents have refused to consent. As this Court and other courts have held, Respondents' intransigence is without any legal basis. It is intended merely to perpetuate Petitioners' continued isolation and should not be countenanced any further.

This Court recently held in *Nasrullah v. Bush* that the Detainee Treatment Act of 2005 ("DTA") does not divest the District Court of jurisdiction to enter the Amended Protective Order or otherwise deprive detainees of their right to be represented by counsel. *See* Order,

---

[4] Respondents have repeatedly represented to judges in this District that the Uyghur detainees will not be repatriated to China for fear that they would be subject to mistreatment.

KL3:2526384.4

*Nasrullah v. Bush*, No. 05 CV 891 (RBW) (D.D.C.) (June 12, 2006) (attached hereto as Ex. D), at 2-3 ("This Court is absolutely not persuaded, absent contrary direction by the District of Columbia Circuit, that the DTA has divested the Court of its authority, recognized in *Al Odah v. United States*, to appoint counsel to represent Guantanamo Bay detainees."). Nor does the Court's January 11, 2006 stay order preclude it from granting the limited relief requested by Petitioners. *See id.* at 2. In fact, courts in this District have repeatedly entered the Amended Protective Order in detainee cases like this one, over Respondents' objections, both before and after enactment of the DTA, and after the proceedings had been stayed pending decisions in other detainee cases by the Court of Appeals. *See id.* at 2-3 (citing numerous decisions).

We also note in particular that Judge Sullivan recently entered the Amended Protective Order in *Razakah*, which again involves other Uyghur detainees who also appear on the next-friend authorization of Usama Hasan Abu Kabir. In that case, Respondents opposed the *Razakah* petitioners' motion for entry of the Amended Protective Order on the ground that the court lacked jurisdiction to grant the requested relief pursuant to the DTA. Respondents also suggested – without explicitly moving – that the court should dismiss the petition for lack of proper next-friend standing. *See Razakah v. Bush*, No. 05 CV 2370 (EGS) (D.D.C.) (dkt. no. 6). On March 17, 2006, the court granted the *Razakah* petitioners' motion and entered the Amended Protective Order, implicitly rejecting Respondents' DTA and next-friend objections. *See* Minute Order, *Razakah v. Bush*, No. 05 CV 2370 (EGS) (D.D.C. Mar. 17, 2006). Nevertheless, Respondents continued to refuse the *Razakah* petitioners access to counsel. On May 18, 2006, in response to the *Razakah* petitioners' motion for contempt the court ordered Respondents "to comply with the Protective Order and allow petitioners' counsel to visit with petitioners as soon as possible." *Razakah v. Bush*, No. 05 CV 2370 (EGS) (D.D.C. May 18, 2006) (attached hereto

as Ex. E). Because of Respondents' intransigence, however, seven months will have elapsed between the filing of their habeas petition and the *Razakah* petitioners' first meeting with counsel.

Given this Court's decision in *Nasrullah* and the entry of the Amended Protective Order in *Razakah*, Respondents' refusal to consent to entry of the order in this case can only be construed as part of a continuing campaign of delay. Indeed, it appears that by their refusal to consent to entry of the order and permit Petitioners to meet with their counsel, Respondents simply seek to keep these men in total isolation until they are able to remove them from this Court's jurisdiction without ever disclosing that they are innocent.

## Conclusion

For all of these reasons, we respectfully request that the Court grant expedited entry of the Amended Protective Order and order Respondents to permit Petitioners access to their counsel while they are at Guantánamo between July 24 and July 28, 2006.

Dated:     New York, New York
           June 23, 2006

                              Respectfully submitted,

                              Counsel for Petitioners:

                              /s/ Paul Schoeman
                              Paul Schoeman (Pursuant to LCvR 83.2(g))
                              J. Wells Dixon (Pursuant to LCvR 83.2(g))
                              Joel Taylor (Pursuant to LCvR 83.2(g))
                              Michael J. Sternhell (Pursuant to LCvR 83.2(g))
                              Darren LaVerne(Pursuant to LCvR 83.2(g))
                              KRAMER LEVIN NAFTALIS & FRANKEL LLP
                              1177 Avenue of the Americas
                              New York, New York 10036
                              Tel:  (212) 715-9100
                              Fax: (212) 715-8000

EXHIBIT A

## Dixon, J. Wells

**From:**      Andrew.Warden@usdoj.gov
**Sent:**      Thursday, June 22, 2006 4:01 PM
**To:**        Dixon, J. Wells
**Subject:**   RE: Mohammon v. Bush, No. 05 CV 2386 (RBW)


Wells,

Thanks for conferring with us, but we cannot consent to entry of the protective order in
the Mohammon case.  We also cannot consent to meetings with the Mohammon petitioners as if
the protective order was entered in the case.  Entry of the protective order by the Court
is one of the prerequisites that must be established before counsel visits at Guantanamo
may occur.

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470

-----Original Message-----
From: JDixon@KRAMERLEVIN.com [mailto:JDixon@KRAMERLEVIN.com]
Sent: Wednesday, June 21, 2006 6:56 PM
To: Warden, Andrew (CIV)
Subject: Mohammon v. Bush, No. 05 CV 2386 (RBW)

Andrew,

We represent petitioners Abdul Rahman a/k/a Abdul Ghaffar (ISN 281), and Adel LNU a/k/a
Adel Noori (ISN 584), in the above-captioned case.  I am writing to request that the
government consent to entry of the Amended Protective Order in this case as to those two
Uyghur petitioners. Alternatively, we request permission to visit these men while we are
at GTMO between July 24 and July 28, 2006, based on our representation that we would abide
by the terms of the Amended Protective Order entered in our other cases, Razakah v. Bush,
No. 05 CV 2370 (EGS), and Mamet v. Bush, No. 05 CV 1886 (EGS), each of which involves
Uyghur detainees (or former detainees) whose circumstances we believe may be similar to
those of Abdul Ghaffar and/or Adel Noori.

Please let me know as soon as possible.

Thanks,

Wells


J. Wells  Dixon
Associate
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: 212-715-9491
Fax: 212-715-8000
Email: JDixon@KRAMERLEVIN.com
http://www.kramerlevin.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

# EXHIBIT B

 

### June 2, 2006

## PAGE ONE

**DOW JONES REPRINTS**

(R) This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

*Free and Uneasy*

# Tale of 5 Muslims: Out of Guantanamo And Into Limbo

### Cleared by U.S. of Terror Ties, They Won't Return Home Due to Fear of Punishment

### China Demands Repatriation

**By ANDREW HIGGINS**
*June 2, 2006; Page A1*

TIRANA, Albania -- After four years in Guantanamo Bay, Abu Bakker Qassim, a former terror suspect cleared last year of having ties to al Qaeda, got word last month that he finally would be set free.

He and four fellow Muslims from China were loaded onto a U.S. military transport plane in the middle of the night, shackled to the floor and flown for 12 hours to their new home: a converted military barracks in Tirana, the capital of Albania.



The compound is located on a potholed road strewn with garbage. It has high walls, bars on the windows and a guard at the gate. The five men occasionally leave but don't venture far. They've found no one in this small Balkan country who knows their native language, a Turkic tongue spoken by the Uighur (pronounced WEE-gur) people of China.

"I think Allah must be testing our patience," says Mr. Qassim, a 37-year-old father of three from Xinjiang, a historically Muslim region of deserts and mountains in western China. Pointing to strands of rusty barbed wire outside his window, he rolls his eyes. Freedom, he says, "is not what we expected."

***Abu Bakker Qassim***

The U.S. is also in a predicament it never expected: What should it do with Guantanamo inmates who have been found deserving of release but who face jail or execution if returned to their homelands?

It's a question that has grown urgent in recent weeks as the United Nations and even stalwart ally Britain have turned up the heat on Washington over Guantanamo prison. Critics say the camp stains America's reputation, upends the Geneva Convention governing treatment of prisoners and

fuels Muslim anger. Eighty-nine inmates are now staging a hunger strike, drawing further attention to their plight.

Washington's hesitation to repatriate some detainees reflects its growing unease with authoritarian states it initially enlisted as partners in the post-9/11 war on terror. U.S. forces used an air base in Uzbekistan during the war in Afghanistan, but Washington strongly criticized the former Soviet republic last year when Uzbek security forces killed scores of unarmed protesters. Uzbekistan then evicted the U.S. military.

Fear of being sent home is so strong that an exonerated Egyptian detainee, Ala Abdel Maqsud Muhammad Salim, had his U.S. lawyers ask a federal court in January to block his release to avoid his being sent to Egypt, where he expected harm. The U.S. dropped a plan to return the sickly and nearly blind prisoner. He's still in Guantanamo.



Uighurs, formerly U.S. prisoners, are now in Albania. Back row, left to right: Abu Bakker Qassim, Ahtar Qassim, Adel Abdu Al-Hakim. Front row: Ahmet Adil, Ayup Hajimemet.

U.S. officials say they scouted for two years for a country ready to take Mr. Qassim and his companions, beginning the search even before their exoneration. The U.S. was wary of sending them to China. Beijing severely punishes Muslims from the far west who criticize the Communist government or advocate independence. Unwilling to let the men live in the U.S., American officials say they approached more than 100 countries. All said no or waffled, fearful of upsetting China and reluctant to take on America's problem. Then Albania, an impoverished land with a large Muslim populace and a brutal communist past, said yes in April.

**Messy Struggle**

The decision pushed the country of some 3.5 million into a messy big-power struggle. Soon after the five Uighurs reached Tirana, China accused Washington of hypocrisy for letting them go. Beijing demanded that Albania hand over the men, whom it calls terror suspects. Prime Minister Sali Berisha says he was harangued by China's ambassador. Mr. Berisha says he's glad he gave the five Uighurs a haven, but regrets that it "has become very noisy around here." The Chinese Embassy in Tirana declined to comment.

Guantanamo Bay now holds around 460 detainees. These include four who have been declared "no longer enemy combatants" -- bureaucratic jargon for innocent. About 116 others, though not exonerated, are no longer considered a serious threat or valuable to U.S. intelligence.

Among those who have been cleared but remain at Guantanamo is Zakirjan Hassam, an Uzbek dissident desperate to avoid going back to Uzbekistan. Like China, Uzbekistan rallied early to the "war on terror," viewing it as a vindication of its own harsh measures against restive Muslims.

Before sending detainees home, U.S. officials seek guarantees they will be treated humanely and prevented from causing trouble for America in the future. Those issues have slowed U.S. negotiations with Saudi Arabia over the repatriation of Saudi nationals at Guantanamo, although 15 Saudis there were sent home last month.

Secretary of State Condoleezza Rice has cited such complications in explaining why the

Guantanamo prison can't simply be closed. The U.S. is working "almost daily" with foreign governments to reduce the number of prisoners, she has said. On a visit to Britain in April, Ms. Rice said: "We don't want to be the world's jailer."

Guantanamo critics blame the dilemma on the Bush administration's refusal to adopt swift and transparent procedures for judging guilt or innocence. They say lengthy incarceration leaves people with the stigma of terrorism even if they eventually get cleared. Lawyers for Mr. Qassim and other absolved detainees say those who are found innocent should be allowed to settle in America.

"The U.S. made this mistake," says Sabin Willett, a Boston corporate lawyer who early last year volunteered to defend Mr. Qassim and another Uighur detainee. "After four years at the Guantanamo prison, America owes them better than to be swept under an Albanian rug."

Unlike many of the world's Muslims, China's Uighurs often like America. Chafing at rule by Beijing and a flood of ethnic Chinese into their region, many Uighurs look to the U.S. for help. Calls for outright independence from China have faded but anger at police heavy-handedness and restrictions on religious worship have triggered sporadic bouts of unrest.

Mr. Qassim says that before leaving China in 2000 he used to listen to U.S.-funded Radio Free Asia, which broadcasts news in Uighur and other Asian languages. "It was very sad and disappointing to have a country we respect treat us in the way we've been treated," he says.

A native of Yining, a town near China's border with Kazakhstan, he used to work in a state leather factory and as a small-time trader. He ran into trouble after anti-Chinese riots in his hometown in 1997. Mr. Qassim says he didn't take part in the turmoil, which left at least nine dead, but he began to speak out against Chinese rule. Mr. Qassim says he also grew more interested in Islam, and was jailed for seven months on suspicion of anti-Chinese activities.

In 2000 he moved to neighboring Kyrgyzstan, hustling for work in a big bazaar. There he met a fellow Uighur from Yining, Adel Abdu Al-Hakim, now with him in Albania. The two later decided to move to Turkey, hoping to work at a leather-jacket factory run by a ethnic Uighur living there.

With no money for air tickets, they headed overland for Pakistan, where they say they intended to get visas for Iran. Discovering this would take months -- and fearful of staying on in Chinese ally Pakistan -- they opted to wait in Afghanistan.

The two men say they left Pakistan in the summer of 2001 to join some 30 anti-Chinese Uighurs living near the Afghan city of Jalalabad. The U.S. would subsequently describe their settlement as a "training camp."

The Uighurs in Guantanamo strongly denied that description in their tribunals. According to transcripts, each insisted the place was just a cluster of ramshackle buildings. Mr. Qassim says he studied the Quran and occasionally took pot shots with a Kalashnikov rifle, but received no "terrorist" training. Both he and Mr. Abdu Al-Hakim say they had never heard of the Afghan-based Osama bin Laden and had no intention of joining him.

After the attacks of Sept. 11, 2001, Mr. Abdu Al-Hakim heard reports of a likely U.S. attack on Afghanistan from a Uighur who listened to Radio Free Asia. He says he didn't expect any trouble,

as the Uighurs had no quarrel with America.

Late at night a few days later, U.S. planes bombed their settlement. Ayup Hajimemet, now 23 and the youngest of the five Uighurs in Albania, says he arrived at the village just as the bombing started. He joined a group of fleeing residents, including Mr. Qassim, and headed for the mountains. They later discovered their destination was called Tora Bora, the focus of a failed U.S. hunt for Mr. bin Laden.

Hungry and frightened, they say they sought shelter in a cave, only to be driven out by wild monkeys throwing stones. "We don't fit in anywhere in the world. Even monkeys don't want us," says Mr. Qassim.

**Betrayed by Locals**

After some two months of foraging and begging for food, Mr. Qassim and other Uighurs decided to get out of Afghanistan. They made a three-day trek across snow-covered peaks into Pakistan. Upon arriving, they say, local tribesmen gave them a warm welcome -- and then betrayed them.

After a lamb feast, the 18 Uighurs were taken to a mosque, herded into vehicles, driven to a jail and handed over to U.S. forces, who flew them to an American prison in Afghanistan. Mr. Abdu Al-Hakim says the 18 were captured by Pakistani bounty hunters. He overheard people saying the hunters received $5,000 each for the captives from the U.S. A Pentagon spokesman said he couldn't discuss "tactics, techniques and procedures" used to combat terrorism.

After some six months of interrogation in Afghanistan, the 18 Uighurs captured in Pakistan were put on a plane to Guantanamo, their heads hooded, their arms and legs tethered. Upon arrival in Cuba, they say they were each given an orange jumpsuit, a copy of the Quran and an "internment serial number." Mr. Qassim became ISN #283.

China cheered the U.S. invasion of Afghanistan, linking it to its own crackdown in Xinjiang. Beijing soon issued a report claiming the Uighur activists were "supported and directed by Osama bin Laden." It named as an al Qaeda affiliate a small Uighur group called the East Turkistan Islamic Movement.

At Guantanamo, much of the interrogation of the Uighurs focused on the movement, which the U.S. in late 2002 declared a terrorist organization. The Uighurs in Guantanamo denied any involvement with the group.

The U.S. let Chinese interrogators interview Mr. Qassim and other Chinese nationals at Guantanamo, according to the men and court documents. Most refused to talk, but they were rattled: Mr. Qassim says the Chinese made veiled threats against their families back in Xinjiang and appeared to have had access to information the Uighurs had given U.S. interrogators. A Pentagon spokesman said the U.S. "works with a variety of nations to try and determine the status of detainees."

Out of 22 Uighurs with Chinese nationality sent to Guantanamo, U.S. officials concluded early on that Mr. Qassim and the four now with him in Albania weren't terrorists. But for reasons that remain unclear, U.S. authorities failed to inform the five Uighurs of that. In early 2004, the Pentagon asked the State Department to start looking for a possible home for them abroad.

Case 1:05-cv-02386-UNA     Document 63     Filed 06/23/2006     Page 16 of 44
Page 5 of 7
WSJ.com - Tale of 5 Muslims: Out of Guantanamo And Into Limbo

Later that year, the Uighurs and hundreds of others got their first chance to formally contest their status as "enemy combatants." This followed a 2004 Supreme Court decision that prompted the Pentagon to set up so-called Combatant Status Review Tribunals. Detainees appeared before the secret panels shackled and without lawyers, but were allowed to defend themselves. Remarks in declassified transcripts suggest the Uighurs' hearings took place in late 2004.

"Treating a person like me this way is not fair," Mr. Qassim told the tribunal, claiming that he opposed China, not America. The U.S., he complained, "was to help young Uighur people, and now they are saying we are the enemy.... We Uighurs have more than one billion enemies and that is enough for us."

Mr. Hajimemet, the young man who reached Afghanistan just as bombs were falling, was the only one of the five Uighurs to learn much English. While in prison, he says, he sometimes lashed out in response to taunts from American guards and to the daily humiliations of "being treated like an animal." He spat at a guard. "Even a donkey kicks back," he says. He wasn't tortured, he says, but on one occasion was thrown against a metal bed, leaving him with a lingering back injury.

The review tribunals set up in 2004 examined 558 cases in all and ruled that 38 detainees should be reclassified as "no longer enemy combatants." Among them were the five Uighurs now in Albania. The 13 other Uighurs who had been seized with them in Pakistan are all still "enemy combatants" and remain in Guantanamo.

In March 2005, Mr. Willett, the Boston lawyer, filed a petition in the U.S. to force the government to bring Mr. Qassim and Mr. Abdu Al-Hakim to court. U.S. officials declined to inform him that his clients already had been cleared. "The whole approach has been to keep Guantanamo a great big secret," says Mr. Willett, a partner at Bingham McCutchen LLP. "In the fog of war, mistakes are made," he adds. "The dishonor comes of hiding them."

Four months later, in July, Mr. Willett got permission to visit Mr. Qassim and Mr. Abdu Al-Hakim in Cuba. The two men were chained to the floor in a tiny plywood hut, the lawyer says. Only at this meeting was he finally told they had been exonerated. Mr. Willett returned to the U.S. and filed an emergency motion demanding their immediate release.

About a month later, Mr. Qassim and the other exonerated Uighurs were moved to less-severe quarters in nearby Camp Iguana. They could walk around without chains and were allowed to watch nature videos. News broadcasts were banned. Mr. Willett requested permission to send a Uighur-English dictionary and other language materials but was told this was forbidden. Defense Department rules bar inmates from developing any skill, even English, that might be used against the U.S.

At a U.S. court hearing last August on Mr. Willett's call for the prisoners' release, a federal judge denounced the term "no longer enemy combatant" as "Kafkaesque." When assured by a government lawyer that the case would be resolved "soon," the judge snapped, "Define soon." In a December ruling, he declared the continued detention of Mr. Qassim and Mr. Abdu Al-Hakim was "unlawful" but said he couldn't order the release of the innocent men because this would involve immigration issues outside of his purview.

Mr. Willett appealed, and a hearing was set for May 8. With the legal pressure mounting, the government stepped up previously fruitless efforts to find the Uighurs a home. U.S. officials at one time considered letting the Uighurs into America, but that option was rejected "at a senior

policy level" out of concerns over possible litigation and security, says a senior State Department official.

Sending the Uighurs back to China was never an option, say U.S. officials. The State Department's annual report on global human rights, released in March, concluded that China had "used counter-terrorism as an excuse for religious repression of Uighur Muslims." It also reported that a Uighur sent back to China from Nepal against his will had been executed. The State Department's latest report on global terrorism, issued in April, now lists the East Turkistan Islamic Movement as a group of "concern."

Albania was first approached about taking the Uighurs late last year, and initially balked. In April, the U.S. ambassador to Tirana went to see Prime Minister Berisha. Mr. Berisha had assisted the U.S. in the 1990s, helping the Central Intelligence Agency hunt down alleged Islamic militants in Albania. The militants were later expelled to Egypt and, in two cases, hanged. Albania was also seeking U.S. backing to join the North Atlantic Treaty Organization.

Mr. Berisha says he told the ambassador that Albania would take the Uighurs as a "favor to a friend," so long as America was sure they weren't terrorists. The U.S. agreed to cover the costs of their resettlement. Albania, he says, owes a lot to America, most recently for its 1999 military intervention in Kosovo, populated largely by ethnic Albanians.

China, which under Mao Zedong was a close ally of Albania, heard of the plan and was livid. A scheduled visit in May to Beijing by Albania's foreign minister was called off.

Three days before the May 8 U.S. court hearing on the Uighurs, Mr. Qassim and the four others were bundled onto the transport plane. Though told they were going to Albania, they were terrified the flight might end in China. Mr. Qassim says he calmed down only when the door of the plane opened and he saw European faces.

**'Pay Any Price'**

Local newspapers splashed their arrival across the front pages. The opposition blasted the government for upsetting China. Two days after the Uighurs landed, Prime Minister Berisha met with Vice President Dick Cheney in Croatia at a gathering of three countries hoping to join NATO. The prime minister said Albania was ready to "pay any price" to join the alliance. Mr. Cheney said he endorsed the entry of Albania, Croatia and Macedonia.

In Tirana last week, Mr. Berisha said he was baffled that so many major nations declined to take the Uighurs, including the U.S. itself and the European countries that call for Guantanamo's closure. "Big countries don't like to deal with small problems," he said.

Mr. Qassim and his companions, meanwhile, have shaved off the long beards they had grown in jail to fit in with zealously devout Arab inmates. They now have a driver to take them around Tirana, and have found a Turkish restaurant where Turkish-speaking waiters can just about make out their orders. China's official news agency, Xinhua, says the five men are "faring poorer than rats crossing the street."

On a visit last week to an Internet cafe, the five men searched for news about their case in their native tongue. Then they watched footage from the 9/11 attacks in New York. They'd never seen the images of hijacked planes flying into the World Trade Center before, and they wanted to know

WSJ.com - Tale of 5 Muslims: Out of Guantanamo And Into Limbo

what got America so angry.

Mr. Qassim groaned as he saw the jets slam into the towers. "This is awful, really awful," he said. "If this hadn't happened, we would never have gone to Guantanamo."

**Write to** Andrew Higgins at andrew.higgins@wsj.com[1]

**URL for this article:**
http://online.wsj.com/article/SB114921008318169383.html

**Hyperlinks in this Article:**
**(1)** mailto:andrew.higgins@wsj.com

**Copyright 2006 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact **Dow Jones** Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

# EXHIBIT C

UNCLASSIFIED//FOUO

**Summarized Unsworn Detainee Statement**

*The Tribunal President read the hearing instructions to the detainee. The detainee confirmed that he understood the process and had no questions.*

*The Recorder presented Exhibits R-2 and R-3 into evidence and gave a brief description of the contents of the Unclassified Summary of Evidence (Exhibit R-1).*

*The Recorder confirmed that he had no further unclassified evidence or witnesses and requested a closed Tribunal session to present classified evidence.*

*The Personal Representative read the allegations to the detainee so that he could respond to the allegations. The allegations appear in italics, below.*

*The Detainee did not want to take any oath.*

*a. The detainee is associated with the Taliban and supported hostilities against the United States and it coalition partners.*

*a.1. The detainee traveled to Afghanistan because he heard Uighur people could receive military training there.*

Detainee: That is right. I heard there were Uighur people there, that is why I went there. I went there for my own best interests; I didn't go there for the fight against the U.S. government.

*a.2. The detainee arrived in Afghanistan from China via Pakistan and Kyrgyzstan in June 2001.*

Detainee: That is true.

*a.3. The detainee stayed at a Uighur guesthouse in Pakistan.*

Detainee: What do you mean stayed, I went there at night and left in the morning.

*a.4. The detainee attended a Uighur training camp in Afghanistan.*

Detainee: I didn't attend the training camp. If they call that the training camp, I wasn't in the training camp. I stayed in the place where the Uighur people stayed.

*a.5. The detainee received training in the use of the Kalashnikov rifle and a type of pistol.*

Detainee: Are you saying training? Do you mean when you use the weapons or when you see the weapons?

UNCLASSIFIED//FOUO

Tribunal President: To further explain that, did you handle a Kalashnikov weapon? Did they show you how to use it? Did they show you how to disassemble it and put it back together?

Detainee: I was shown the weapon by the other people because I was interested. Since I wasn't in my country, I had just seen it in the movies and I didn't see it in real life. Then I was happy. That's the thing that dictates to us in our home country, so I looked at it and how to use it and how to hold it but I didn't really use the weapon.

Tribunal President: What about the pistol?

Detainee: Both of them the same.

I've been told many times in the interrogation that I was a new comer. What I heard is that if we decide to stay it was kind of a test for us: are we going to continue and go to the next level or not? If we chose to stay at this place then what I heard is they are going to take us to other places, but I don't know where they are located and what exactly they do.

*a.6. The detainee decided to travel to Afghanistan and join the Islamic Movement of Uzbekistan.*

Detainee: That is true, I went to Afghanistan. The reason is because number one: I am scared of the torture from my home country. Second: if I go there I will get some training to fight back against the Chinese government. I don't know if there is an Uzbekistan organization. I don't know any of them; why would I join the Uzbekistan movement? I only know them since I got to this base, then I found out there were some Uzbek people. I didn't know them before I came to this camp.

*a.7. Islamic Movement of Uzbekistan is a terrorist organization.*

Detainee: I know what is my goal because my country and my own people and my own family are being tortured under the Chinese government and there is too much pressure. Why would I join and drop my own problem on the side to help other person? That doesn't make any sense. I said this many times.

*a.8. The detainee was captured in Pakistan after crossing the border from Afghanistan.*

Detainee: It shows in here that I am a Detainee; a Detainee is someone who fought against another government or force. Then, if they are captured, they should be called a Detainee. I wasn't fighting against any government or other forces. We were in a mountain and we had no more food. We just stayed in a mountain because of the continuation of bombing going on. We didn't know the road and so we followed some other people into Pakistan. We crossed the border and there were lots of people. They took us into their homes and fed us. On the second day they took us to a mosque and

UNCLASSIFIED//FOUO

there were a lot of people at the mosque. Then they called the Pakistan police. Then we found out, after a few days, that they sold us to the US government.

*b.1. The detainee supported military operations against the coalition.*

Detainee: I wasn't injured; if I was injured there should be marks on my body.

*b.2. The detainee worked construction and improvements of the Uighur camp while in Afghanistan.*

Detainee: I helped build the toilet and fix the wall from the kitchen. I was helping bring stones and stuff, it was kind of construction work.

*b.3. The detainee was in the Tora Bora mountains during the U.S. air campaign.*

Detainee: I heard the name of Tora Bora when I came here from my interrogator. Is that the place we stayed, or are all the mountains called Tora Bora?

Tribunal President: According to the unclassified summary, it says that you were in the Tora Bora Mountains during the US air campaign.

Detainee: The place we stayed was kind of like a village. After the bombing started, then one or two Uighurs were dead and one guy had a broken arm. The place was completely destroyed so we ran to the mountains to stay in a safer place.

Tribunal President: Does that conclude your statement?

Detainee: It mentioned earlier that I was supporting Taliban.

Tribunal President: That is the very first allegation, that the detainee is associated with the Taliban and supported hostilities against the United States and it coalition partners.

Detainee: The first day, I left Pakistan and came to Jalalabad. Then the people I met took me to the place where they lived. During that time, I didn't see any Taliban. If I didn't see any Taliban people, how can I associate with the Taliban? I have never seen American forces or coalition forces. If I don't see those people, how can I associate with the Taliban and fight against the US and the coalition people?

Tribunal President: Do you have anything else to add?

Tribunal President: Abdul we can ask you some question that can assist you in telling the rest of your story.

Detainee: Ok, you can ask.

UNCLASSIFIED//FOUO

Tribunal President:  Personal Representative do you have any questions?

Personal Representative:  I have just s few.

Personal Representative:  Was it your intent when you were training to fight against the US or its allies?

Detainee:  I have one point, a billion Chinese enemies, that is enough for me.  Why would I get more enemies?  I need help.  If I need help, how can I drop my goal and decide and go help another person?

Personal Representative:  That sums up my other question.

Tribunal President:  What was the question?

Personal Representative:  What was his intent on doing with the training.

Tribunal President:  OK.

Tribunal Member:  The Personal Representative asked: when you went to the training, did you intend to fight the US? And the answer was:  Why would I want more enemies? In my opinion the question has not been answered yet.

Tribunal President:  Please translate.

Detainee:  I know my goal; I was never going to fight.  I've never seen Americans; why would I fight against the US government?

*The Personal Representative and the Recorder had no further questions.*

Tribunal Members' questions

Q. At the camp, were there any Afghanistan, Pakistan, Talibans or Al Qaida?
A. No, Only Uighur people

Q. Who was in charge of the camp?  Was it Uighur?
A. Yes, his name was Abdul Hakh (Haq).

Q. Who paid for your travel from home to the camp?
A. I paid my own expenses.

Q. What was your employment or job at home?
A. It was doing business.

UNCLASSIFIED//FOUO

Q. What personal effects or paper work did you have with you when you got captured?
A. All my documents were destroyed during the bombing. When I was captured, I only had my clothing.

Q. Did you ever fire a weapon?
A. Yes, I shot 3 bullets from the Kalashnikov at the camp.

Q. For training or against an enemy?
A. There wasn't an enemy there; I shot just it to try it.

Q. You went to Afghanistan for the purpose of receiving training on how to fight right?
A. Yes, that was my goal.

Q. You did not receive any training according to your testimony. Why is that?
A. The place was new for all Uighurs. Many people that went there stayed for a while for the test. Our leader would look at the people because the place was in real bad shape and there is not enough food and the house is in really bad condition. If we can continue to stay during the harsh environment then their leader will decide whom they will pick to go for the next level of training camp. That is why we stayed and never got any real training.

Q. It is my understanding what you said earlier you stayed in the village until it got bombed. That is when we went to the mountains. I don't understand how you got from the camp to the village?
A. It's not a village; it's kind of a farm. There are just a few houses not enough houses for us to stay in. You could not really grow anything there.

Q. Those are the same place?
A. Yes.

<u>Tribunal President's questions.</u>

Q. What country were you coming from or leaving when you went to Pakistan?
A. I went to Pakistan through Kyrgyzstan.

Q. What country are you from?
A. Turkistan.

Q. How did you travel from Turkistan into Kyrgyzstan then into Pakistan then into Afghanistan? Did you use a car, plane, train?
A. From Turkistan to a city called Rimchi (ph.). Then I traveled by airplane to Kyrgyzstan. Then I also traveled by airplane from Kyrgyzstan to Pakistan. Then from Pakistan to Afghanistan by car.

UNCLASSIFIED//FOUO

Q. Did someone assist you with your travel, as in which way to go?
A. I left from China to Turkistan to Kyrgyzstan, I understood some of the Kyrgyz's language because it is a little closer to my native language. Then I found some Uighur people in Kyrgyzstan, but I didn't know those people. I told those people that I wanted to go to Afghanistan. Then they helped me to get a plane ticket and they gave me an address to a guesthouse in Pakistan. When I got to Pakistan, the people there sent me to Afghanistan.

Q. Did you know anyone in Afghanistan before going there?
A. No. I only knew the Uighur people were there.

Tribunal President: I need to clarify a statement you made earlier when you were responding to allegations on the unclassified summary.

Q. Did you join the Islamic Movement of Uzbekistan?
A. I saw Uzbekistan people at this camp in Cuba. I've never seen Uzbekistan people in Afghanistan, but in our country Uzbekistan people speak Uighur language. I never saw any Uzbekistan people in Afghanistan.

Q. My question is, did you join the Islamic group of Uzbekistan?
A. No, I didn't join.

Q. You said you had a business in your country before you left. What kind of business was it?
A. A shoe business.

Q. Was Afghanistan the only country you could have gone to, to receive the training you needed?
A. In our country people are being punished and tortured, a lot of Uighur are dying every single year by the torture. Now every one, not only me, are trying to escape the country and go somewhere else. They are all trying to do that. Because I found the easy way of getting out of the country and going to Afghanistan, it was less expensive to travel. Also Turkistan, Kyrgyzstan and Pakistan border on us and they will turn us back into China. So, I didn't want to stay in those countries.

Q. After you received the training you participated in, in Afghanistan, what were you going to do with that training?
A. After, I would want to go back to my country.

Q. You gave me the impression that you were escaping your country? Then you wanted to go back. I don't understand.
A. I won't go back to my country until I get the power I need to fight my government.

Q. Do you know how long you were in Afghanistan?
A. Since June 2001.

UNCLASSIFIED//FOUO

*The Personal Representative called the witness, Abdul Hehim, Adel, ISN 293*

Tribunal President:  you are Adel Abdul Hehim.

Witness:  Mohammad.

Tribunal President:  Give me your full name.

Witness:  When I got to Afghanistan I changed my name to Mohammad.

Tribunal President:  You are here to act as a witness for Abdul Gappher (Detainee).  I want to make sure that you understand this is not your tribunal.

Witness:  I understand.

Tribunal President:  This panel will ask you questions as well as the Abdul Gappher (Detainee) may ask you some questions.

*The witness took the Muslim Oath.*

*The Personal Representative and the Recorder had no questions.*

<u>Tribunal Members' questions</u>

Q.  Mohammad (Witness) when did you met Abdul Gappher (Detainee)?
A.  I met him in 2000 at a place where we stayed in Afghanistan.

Q.  Do you remember what month in 2000?
A.  Probably July.

Q.  Were you together when the bombing started?
A.  Yes, we were together.

Q.  What did you see Abdul (Detainee) doing at the camp?
A.  I saw him fixing houses that were destroyed.

Q.  Ever any military training?
A.  Some time in the early morning we would run together but I didn't see anyone else.

Q.  Were there any other people other than Uighur at the camp? Afghanis, Pakistanis; anyone else?
A.  I only saw Uighur people, no one else.

Q.  Who long were you in the camp?
A.  I arrived at the end of June, until the start of bombing.

UNCLASSIFIED//FOUO

Q. I find it strange in a number of months you didn't do anything you thought you would do. Why is that?
A. The place was a really an old place, it was not big enough, so we fixed the bathroom and we fixed the houses and the roads. In Turkistan we don't have the freedom to learn Koran. We don't have religious freedoms and we learned to read the Koran.

Q. When you fled into the mountains, were you armed?
A. No, no weapons.

Tribunal President's questions.

Q. Do you know if Abdul Ghapper (Detainee) was a member of the Islamic Movement of Uzbekistan?
A. No, I don't think he would join another organization because there were only Uighur people in that place. How can he drop that organization to join another organization?

Q. Did you see Abdul Ghapper (Detainee) receive any kind of military or weapon training?
A. There was a guy named Abdul Mahsen, he was the one that trained me on the Kalashnikov. I don't know who gave Abdul Ghapper (detainee) the weapons training. I never seen him have weapons or military training.

Q. You were at the camp from July to about October, November?
A. It is possible, when the first bomb dropped at our camp we left.

Q. Where were you going when you left the camp?
A. We didn't know the road so we ran into the mountains. We stayed there for a while. We were waiting for someone to help us. We stayed in the mountains until we saw some people going to Pakistan, so we followed them to Pakistan.

Q. Did Abdul Ghapper (Detainee) go with you?
A. Yes, there were 18 people with us.

Q. How long were you in Pakistan before you were turned over to American forces?
A. We arrived in Pakistan. The people of the tribe came to us they welcomed us. They fed us. We stayed there for two days. Then they promised that they would take care of us; it was a nice place and not to worry about it. They took us to a mosque. Then they turned us over to the Pakistan police. We stayed in prison for 12 or 13 days. Then the U.S. interrogated us.

Q. Do you consider the place you were staying in Afghanistan a training camp?
A. I didn't look at the place as a training camp, but I was expecting the place to be a big training camp. When I got there it was little it was located by a mountain. You can barely run to exercise.

ISN# 281
Enclosure (3)
Page 8 of 12

002851

UNCLASSIFIED//FOUO

Q. Did you have to protect yourself from the Northern Alliances?
A. No, I didn't do anything to protect my life from the Northern alliance or the U.S. forces. Then, when the bombing started, we decided this fight had nothing to do with us. We had our enemies and so we ran into Pakistan.

Q. Do you know who supported the camp you stayed in?
A. I don't know who supported the camp.

Q. How many months were you at the camp?
A. Approximately 3 months. I used to know the numbers. It has been 3 years; I forgot the numbers.

Tribunal President: Abdul you have the right to ask the witness any questions.

Detainee: What I had to ask was talked about already.

Tribunal President: Mohammad do you have anything else you would like to add?

Witness: I want to clear one thing. A lot of Uighur went to that place because we have no chance to use weapons or learn how to read Koran in our own country. We would like to take advantage of the chance that was given to us to train so that, in the future, if something happened, we would go fight against the Chinese government. We have nothing to do with the Taliban or Arabs. We have nothing to do with the U.S. government or coalition forces. We never thought about fighting with the Americans. I want you to understand what our goal is: just to fight against the Chinese government. If there is nothing happening in the future, we would like to stay where ever, abroad, to do our business.

Tribunal President: Ok.

*The Personal Representative called the witness, Abdulahat , Emam, ISN*

Tribunal President: is your name Eman?

Witness: Yes

Tribunal President: You are here to act as a witness for Abdul Gappher (Detainee). I want to make sure that you understand this is not your tribunal.

*The Witness did not want to take the Muslim oath.*

*The Personal Representative and the Recorder had no questions.*

UNCLASSIFIED//FOUO

Tribunal Members' questions

Q. Eman when did you meet Abdul Gappher?
A. When I arrived to Afghanistan.

Q. Do you remember when? What month? What year?
A. When I arrived at that place in August 2001. When I arrived there he was there.

Q. When you say that place you mean the training area?
A. Yes.

Q. What did you see Abdul Gappher do at the camp? What was his responsibility?
A. I didn't see him individually, but we all did jobs together.

Q. What kind of jobs?
A. We brought stones from the mountains. We took them to camp to build the kitchens.

Q. Who else was at the camp other than Uighurs?
A. No one, only Uighurs.

Q. Ever any military training with weapons or guns?
A. No.

Q. To follow up on that, you said there was no military training at that camp?
A. Are you saying just individual or all the people?

Q. All the people?
A. No.

Q. Do you know what the Islamic Movement of Uzbekistan is?
A. I do not.

Q. Were there any members of that camp there?
A. No. There was only one nationality at the camp.

Q. Did you come across any members of this group when you moved into Pakistan?
A. No.

Q. Did you meet any of the members of this organization before you got to Afghanistan?
A. No.

Tribunal President's questions.

Q. Where was the camp located?
A. The camp was just outside Jalalabad, it was located in the foothills of the mountains, by some housing area.

UNCLASSIFIED//FOUO

Q. Do you know who managed the camp?
A. Abdul Hakh.

Q. Do you know who supported the camp?
A. I'm not sure. What do you mean by "supporting"?

Q. Who paid for the training? All the food? The housing you were building?
A. I don't know who did that.

Q. Did you have to pay to attend the training?
A. No.

Q. Did you travel with Abdul when you were ready to leave the camp?
A. Yes.

Q. Why did you leave the camp?
A. We didn't have any food and we were forced to leave that place.

Q. When did you leave the camp?
A. I don't remember exactly. I do remember it was the end of Ramadan.

Q. Did you see Abdul receive any injuries while you were leaving the camp?
A. I never saw that he had been injured.

Q. Where did you go after you left the camp?
A. Pakistan.

Q. Did you have to go through any mountains like the Tora Bora Mountains?
A. I don't know what mountains they were. We passed through the mountains. I don't know what Tora Bora is.

Q. One you reached Pakistan what happened?
A. When we passed into Pakistan, the local people turned us into the Pakistan Police.

Q. Did any of the people traveling with you have weapons?
A. I didn't see any.

Q. Did you see or hear any bombing in the region you were in?
A. Yes, we heard some bombing. We didn't see it.

Q. Did you have to protect yourself while you were at the camp or leaving the camp into Pakistan?
A. Yes, we were hiding inside the mountains because we were afraid of the bombing.

UNCLASSIFIED//FOUO

Q. Did you have to have any weapons while you were there in the mountains?
A. No.

Witness made a comment to the Detainee.

Tribunal President: The witness is not authorized to talk directly to the detainee.

Translator: (Witness) They brought me here as a witness, but they are asking me a lot of questions.

Tribunal President: We needed to clarify to make sure we were hearing the same story.

Tribunal President: Abdul, would you like to ask the witness any questions?

Detainee: I wanted to clarify one thing; the witness didn't say one thing clear. Because we left our camp when the bomb started. Then we ran into the mountains.

Q. Eman(witness), is that true, do you agree with that?
A. That is true.

Personal Representative: Eman was talking about training with weapons, did you see individuals training with them?

Witness: No

*No further questions were asked of the witness.*

*The Tribunal President confirms that the detainee had no further evidence or witnesses to present to the Tribunal. The Tribunal President explains the remainder of the Tribunal process to the detainee and adjourns the Tribunal.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, United States Army
Tribunal President

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NASRULLAH,                              )
                                       )
              Petitioner,              )
                                       )        Civil Action No. 05-891 (RBW)
GEORGE W. BUSH, et al.,                )
                                       )
              Respondents.             )
_____)

## ORDER

Currently before the Court is the petitioner's Motion for Entry of Protective Order. The respondents oppose this motion on two grounds. The respondents first argue that the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 ("DTA"), deprives this Court of jurisdiction to enter the protective order sought by the petitioner. See Respondents' Memorandum in Opposition to Petitioner's Motion for Entry of Protective Order ("Resps.' Opp.") at 1-2. The respondents specifically contend that because the DTA vests exclusive jurisdiction "to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant" in the United States Court of Appeals for the District of Columbia Circuit, DTA § 1005(e)(1), any action by this Court, including granting the petitioner's instant motion for a protective order, "might infringe upon the Court of Appeals' exclusive jurisdiction." Resps.' Opp. at 2. Moreover, the respondents argue that the Court's decision to stay all proceedings in this case pending guidance from the Court of Appeals as to the effect of the DTA on this Court's jurisdiction warrants denial of the petitioner's present motion. Resps.' Opp. at 2. The Court cannot agree with either position.

Until instructed by the Court of Appeals that the DTA has divested this Court of jurisdiction over this and similar Guantanamo cases, the Court concludes that it is not powerless to take any action whatsoever with the case in its current posture. While the Court did, by its Orders of September 30, 2005 and January 11, 2006, stay all action in the present case to await resolution of the appeals in In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005) and Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), those Orders by no means preclude the Court from granting the limited relief requested by the petitioner here. Moreover, the Court is not persuaded that granting a protective order enabling the petitioner to have access to counsel would in any way intrude or infringe upon the Court of Appeals' exclusive jurisdiction (if indeed the Court of Appeals determines that it does possess exclusive jurisdiction over this and other similarly situated cases).

Other members of this Court have repeatedly issued protective orders in similar cases, despite the government's opposition, both after the DTA came into effect and after the proceedings had been stayed pending decisions by the Court of Appeals in the aforementioned cases. See, e.g., Khan v. Bush, Civ. No. 05-1491 (JR) (D.D.C. Apr. 12, 2006) (granting motion for protective order, over objections raised by the government similar to those it raises here, despite passage of the DTA and after the court had imposed a stay); Awad v. Bush, Civ. No. 05-2379 (JR) (D.D.C. Apr. 11, 2006) (same); Razakah v. Bush, Civ. No. 05-2370 (EGS) (D.D.C. Mar. 17, 2006) (same). Protective orders have also been issued, despite opposition by the government, in numerous cases where the Court had not yet stayed the proceedings. See, e.g., Al Salami v. Bush, Civ. No. 05-2452 (PLF) (D.D.C. Apr. 13, 2006) (granting motion for protective order, after the DTA came into effect and over government objections very similar to those raised

2

here, where no stay had been imposed); <u>Al Shareef v. Bush</u>, Civ. No. 05-2458 (RWR) (D.D.C.

Apr. 12, 2006) (same); <u>Said v. Bush</u>, Civ. No. 05-2384 (RWR) (D.D.C. Apr. 12, 2006) (same);

<u>Alsaaei v. Bush</u>, Civ. No. 05-2369 (RWR) (D.D.C. Apr. 12, 2006) (same).

     The respondents also assert that "the petitioner possesses no separate right to counsel that

warrants the [entry] of the protective order" the petitioner is seeking. Resps.' Opp. at 2-3. This

contention is unpersuasive. The Court is absolutely not persuaded, absent contrary direction by

the District of Columbia Circuit, that the DTA has divested the Court of its authority, recognized

in <u>Al Odah v. United States</u>, to appoint counsel to represent Guantanamo Bay detainees. 346 F.

Supp. 2d 1, 7 (D.D.C. 2004); <u>see also</u> <u>Al Salami</u>, Civ. No. 05-2452 (PLF) (D.D.C. Apr. 13, 2006)

(stating that the "[d]etainees' right to meet with counsel under the Protective Order is

independent of the (still-unresolved) question of the Court's jurisdiction to rule on their <u>habeas</u>

petitions.").

     Additionally, in other similar cases pending before this Court, the respondents have not

opposed identical motions for protective orders, both where a stay had already been imposed, <u>see,</u>

<u>e.g.</u>, <u>Bostan v. Bush</u>, Civ. No. 05-883 (RBW) (D.D.C. Jan. 9, 2006) (granting motion for

protective order, with the government's consent, after the DTA came into effect and after the

Court had stayed the proceedings), <u>Mohammad v. Bush</u>, Civ. No. 05-879 (RBW) (D.D.C. Jan. 9,

2006) (same), <u>Khiali-Gul v. Bush</u>, Civ. No. 05-877 (JR) (D.D.C. Jan. 6, 2006) (same), and where

the Court had not yet stayed the proceedings, <u>see, e.g.</u>, <u>Zadran v. Bush</u>, Civ. No. 05-2367 (RWR)

(D.D.C. Apr. 12, 2006) (granting motion for protective order, with the government's consent,

after the DTA came into effect but where the Court had not stayed the proceedings), <u>Wahab v.</u>

<u>Bush</u>, Civ. No. 05-886 (EGS) (D.D.C. Jan. 10, 2006) (same).

3

In fact, in their April 2005 motion seeking to stay proceedings pending the Court of

Appeals' resolution of In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, and Khalid, 355

F. Supp. 2d 311, in Adem v. Bush, Civ. No. 05-723 (RWR)—a similar case in which the

petitioner's habeas petition was also filed prior to the enactment of the DTA—the respondents

stated explicitly that

> [i]n seeking a stay . . . [the] respondents do not intend thereby to block counsel access
> to properly represented petitioners.  To that end, respondents do not object to entry
> in these cases of the protective order previously entered in other Guantanamo
> detainee cases, along with appropriate supplementary orders, to permit such access.

Adem, Civ. No. 05-723 (RWR), Respondents' Motion to Stay Proceedings Pending Related

Proceedings Pending Related Appeals at 2 (Apr. 13, 2005).

Likewise, in their motion to stay the instant case,[1] the respondents indicated that because

Guantanamo Bay detainees, such as the petitioner here, "are likely unfamiliar with United States

law and the American legal system, typically do not speak or write English, and have access to

the Court only through mail and not the Court's electronic filing system. . . ., recruitment of

volunteer counsel for petitioners who desire counsel may be appropriate," and thus an order

staying the proceedings "would permit any such efforts to go forward."  See Respondents'

Motion to Stay Proceedings Pending Related Appeals and for Coordination at 5-6 (June 3, 2005).

Thus, in light of the respondents' earlier acknowledgments regarding the Guantanamo Bay

detainees' right of access to, and need for, counsel in this and similar cases, and given the

respondents' decision not to contest protective orders in nearly identical circumstances, it seems

---

[1] The respondents moved for an order staying the present case on June 3, 2005, which the Court granted on
September 30, 2005.  The Court subsequently issued a second stay, sua sponte, in this and other cases involving
habeas petitions by Guantanamo Bay detainees, on January 11, 2006.

4

somewhat disingenuous for the government to challenge the detainees' right to have access to counsel because the case is in its current posture. In any event, regardless of how the Circuit Court ultimately rules, it seems inconceivable that it will conclude that the detainees will not have the right to the assistance of counsel.

The Court thus concludes that both of the respondents' objections to the petitioner's motion lack merit. Accordingly, upon the petitioner's motion, it is, this 12th day of June, 2006, hereby

**ORDERED** that the petitioner's Motion for Entry of Protective Order is GRANTED; and it is further

**ORDERED** that the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first issued on November 8, 2004, in In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174 (D.D.C. 2004), the Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order, first issued on December 13, 2004, in In re Guantanamo Detainee Cases, and the Order Addressing Designation Procedures for "Protected Information," first issued on November 10, 2004, in In re Guantanamo Detainee Cases, shall also apply to this case.

**SO ORDERED.**

REGGIE B. WALTON
United States District Judge

5

EXHIBIT E

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ABDURE RAZAKAH, *et al.*, | ) ) ) |
| Petitioners, | ) ) |
| v. | ) Civ. No. 05-2370 (EGS) ) ) |
| GEORGE W. BUSH, *et al.*, | ) ) |
| Respondents. | ) ) ) |

### ORDER

This matter is before the Court on petitioners' Motion for an Order to Show Cause Why Respondents Should Not be Held in Contempt.  Upon consideration of the motion, the response and reply thereto, petitioner's motion is **GRANTED in part** and **DENIED in part.**  Respondents are ordered to comply with the Protective Order and allow petitioners' counsel to visit with the petitioners as soon as possible.  However, petitioners' request that the respondents be sanctioned by contempt is denied as not warranted. *See Armstrong v. Executive Office of the President, Office of Admin.*, 1 F.3d. 1274, 1289 (D.C. Cir. 1993).

On December 12, 2005, counsel for petitioners filed a petition for *writ of habeas corpus* on behalf of detainees Abdur Razakah and Ahmad Doe, submitted through a next friend, detainee Usama Hasan Abu Kabir.  On January 12, 2006, petitioners filed a

1

motion for expedited entry of the Amended Protective Order, first
entered by Judge Joyce Hens Green in *Ab-dah, et. al., v. Bush et
al.*, No. 04-CV-1254 (HHK)(D.D.C.), and other coordinated
Guantanamo detainee cases to make it possible for petitioners to
meet with their counsel.  On March 17, 2006, the Court entered
the Protective Order and related, supplementary orders, to this
case.[1]  On April 4, 2006, petitioners' counsel submitted a
request to respondents for permission to visit petitioners at
Guantanamo between May 15 and 18, 2006.  Respondents denied
counsel's request.  To date, petitioners' counsel have yet to
visit or speak with their clients.  Petitioners request that the
Court hold respondents in contempt of the Protective Order and
order them to permit petitioners access to their counsel.

   Respondents contend that petitioners' requested relief of
this Court should be denied because the Detainee Treatment Act of
2005 ("DTA") withdraws jurisdiction from the Court to grant such
relief, and, notwithstanding the withdrawal of the Court's
jurisdiction, respondents are not in contempt of the Protective

---

   [1] *See* the Minute Order in this case, dated March 17, 2006,
entering the Amended Protective Order and Procedures for Counsel
Access to Detainees at the United States Naval Base in Guantanamo
Bay, Cuba, issued on November 8, 2004, (344 F. Supp. 2d 174
(D.D.C. 2004)); the Order Addressing Designation Procedures for
"Protected Information," issued on November 10, 2004; and the
Order Supplementing and Amending Filing Procedures Contained in
November 8, 2004 Amended Protective Order, issued on December 13,
2004, in the *In re Guantanamo Bay Detainee Cases*, No. 02-CV-299,
*et al.*

Order in this case. The Protective Order, by setting certain

terms, conditions and limitations for counsel visits, certainly

contemplates and permits counsel visits; however, the Protective

Order does not order respondents to provide a visit on demand of

counsel. Also, petitioners' counsel have yet to satisfy the

prerequisites of being granted access to petitioners under the

Protective Order. Specifically, counsel have not provided

appropriate evidence of their authority to represent the

petitioners. Finally, respondents argue, given that this case

was filed through a "next friend" and they are challenging the

standing of this "next friend," this case is jurisdictionally

improper. Accordingly, respondents argue that there is no basis

for contempt.

Central to the Protective Order is its provisions for access

to counsel. Guantanamo detainees' rights to meet with counsel

under the Protective Order is independent of the question of the

Court's jurisdiction to rule on their *habeas* petitions. *See Saleh*

*Ali Abdullah Al Salami, et al., v. Bush, et al.*, No. 05-CV-2452,

Order (D.D.C. Apr. 13, 2006) (finding the entrance of the

Protective Order appropriate post-DTA); *Salim Muhood Adem v. Bush*

*et al.*, 2006 WL 751309 (D.D.C. Mar. 21, 2006) (holding that

access to counsel issues pursuant to the Protective Order do not

implicate any jurisdictional questions currently pending).

Accordingly, because the Court has inherent powers to enforce its

3

own lawful orders, *Broderick v. Donaldson*, 437 F.3d 1226, 1234
(D.C. Cir. 2006), and because enforcing the terms of the
protective order does not pose a danger of exceeding the Court's
jurisdiction, *Salim Muhood Adem v. Bush et al.*, No. 05-CV-723,
Memorandum Opinion and Order (D.D.C. Apr. 28, 2006), the Court
will address the merits of petitioners' requested relief.

Substantially for the reasons articulated by Magistrate
Judge Alan Kay in *Adem*, 2006 WL 751309 (affirmed by Judge
Roberts, 05-CV-723, Memorandum Opinion and Order (D.D.C. Apr. 28,
2006) and *Sadar Doe, et al., v. Bush, et al.*, No. 05-CV-1704,
Memorandum Order (D.D.C. May 11, 2006), the Court finds that a
plain reading of the Protective Order dictates that petitioners'
counsel be allowed to meet with their clients in order to obtain
the very authorization of representation that respondents insist
be provided prior to any visits.  The Protective Order does not
require evidence of authority to represent a detainee as a
prerequisite to counsel meeting with a detainee. *Adem*, 2006 WL
751309, *2.  Rather, the Protective Order provides that counsel,
who purportedly represent a particular detainee, must provide
evidence of his authority to represent that detainee within 10
days of counsel's second visit with the detainee. *Id. See also*
Protective Order, Ex. A. § III.C.2.  In short, as articulated by
Judge Kay in *Adem*, the only information that counsel must submit
to respondents before being permitted to meet with a detainee is

4

the "Notification of Representation." *See* Protective Order, Ex.
A. § III.C.1.

Further, even though petitioners' *habeas* petition was filed
through Usama Hasan Abu Kabir as "next friend," the Protective
Order still grants counsel two visits with petitioners directly,
plus ten days, before any challenge to Kabir's standing as next
friend would be ripe. *See Adem*, 2006 WL 751309, *12.  The fact
that the pending *habeas* petition was filed through a "next
friend" does not stand in the way of counsel visits under the
Protective Order.[2]  Accordingly, it is hereby

**ORDERED** that petitioners' Motion for an Order to Show Cause
Why Respondents Should Not be Held in Contempt is **GRANTED in part**
and **DENIED in part**; and it is

**FURTHER ORDERED** that respondents are to comply with the
Protective Order and allow petitioners' counsel to meet with them
in person as soon as possible; and it is

**FURTHER ORDERED** that petitioners' request to hold

---

[2] In fact, as explained in *Adem*, if a detainee's *habeas*
petition was filed through a "next friend," after counsel visit
and upon receiving evidence of counsel's authority to represent
the detainee, the court would simply convert the "next friend"
petition into a direct petition.  On the other hand, if evidence
of counsel's authority to represent the detainee is not
forthcoming within ten days of counsel's second visit with the
detainee, then, and only then, would a motion to dismiss for lack
of proper "next friend" standing be appropriate.  2006 WL 751309,
*2.

5

respondents in contempt of the Protective Order is denied.

    **SO ORDERED.**


**SIGNED:**    **Emmet G. Sullivan**
            **United States District Court**
            **May 18, 2006**