IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|                                      |   |                      |
|--------------------------------------|---|----------------------|
| AMER MOHAMMON, et al.                | ) |                      |
| (ABDAL RAZAK ALI)                    | ) |                      |
|                                      | ) |                      |
| Petitioners/Plaintiffs               | ) |                      |
|                                      | ) | CIVIL ACTION         |
| v.                                   | ) |                      |
|                                      | ) | NO. 05-2386 (RBW)    |
|                                      | ) |                      |
| GEORGE W. BUSH, et al.               | ) |                      |
|                                      | ) |                      |
| Respondents/Defendants               | ) |                      |
|                                      | ) |                      |

_____


**PETITIONER ABDAL RAZAK ALI'S MEMORANDUM IN OPPOSITION TO
RESPONDENTS' MOTION TO EXAMINE PRIVILEGED COMMUNICATIONS
SEIZED WITHOUT NOTICE OR APPROVAL AND RESPONDENT'S "NOTICE"**

## I.  INTRODUCTION

As the Court is aware, Counsel for Mr. Abdal Razak Ali (hereinafter Razak Ali)

had her first trip to Guantanamo Saturday, July 15 returning from the base on July 20th.

This Court, in an Order dated July 14th, 2006, responded to counsel's emergency

motion to see Mr. Razak Ali while at the base visiting another client, Ordering that the

visit be allowed to take place.  Counsel asked for that emergency relief in part so that

she could respond to the government's Motion and notice and also so that she could

visit with her client in a cost effective way, since the other visit was also taking place

and counsel is a sole practitioner footing all of the costs of the litigation personally.

Unfortunately, the military apparently does not understand the significance of a court

1

order.  Counsel was told by one official that "judges' orders don't work here, we consider those only *advisory*."  Apparently the military elected not to take this Court's *advice* as Counsel was not allowed to see Mr. Razak Ali during the visit.

As of this date, the only way that Mr. Razak Ali and his attorney are allowed to communicate is through letters sent and received through the legal mail system. Now the government wants to view those letters. Those communications must be protected by the sanctity of the attorney client privilege not only because this is the law, but also because these are the only communications between counsel and her client. Mr. Razak Ali and his attorney must be allowed to freely discuss legal strategy in their written communications.  To hold otherwise eviscerates the already precarious attorney client relationship.

The government's motion, which seeks the Court's post-hoc rubber stamp on their illegal and unsupportable violation of both the attorney-client privilege and the Protective Order entered in this case, and also seeks authorization for future seizure and review of Mr. Razak Ali's privileged materials that the Respondents may carry out for any reason, must be denied.[1]  Respondents' sole justification for their prior actions and their proposed plan seems to rest on the fact that detainees who are now deceased wrote their last words on the back of letters from some counsel to their clients.  These

---

[1] The American Bar Association has called for an investigation of the military's violation of the attorney-client privilege. *See* Letter from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy (July 11, 2006) (attached hereto as Exhibit A).

2

facts, even if taken as true, should not be used to strip all detainees of their fundamental right to have privileged communications with their counsel.

Upon information and belief, Mr. Razak Ali was not even in the same camp where the unfortunate deaths took place. His papers were not used by other detainees and indeed the government does not in its motion suggest that there was any conduct on the part of Mr. Razak Ali that imperiled anyone or anything at the Guantánamo base. If this Court accepts Respondents' argument that the legal rights and protections afforded to Mr. Razak Ali are completely subject to Respondent's discretion, then the four years of court battles to secure these basic rights will be for naught. Mr. Razak Ali should have the right to expect that the protections of the attorney-client privilege will be respected, and certainly will not be disturbed without grave justification and prior review by the Court. As further discussed below, abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. Respondents have not even attempted to demonstrate any connection between the three deaths and Mr. Razak Ali that would justify this seizure. Indeed, under these circumstances, it is hard to resist the conclusion that Respondents' purpose in seizing and reviewing the detainees' privileged communications is driven by the opportunistic interest in eavesdropping on attorney-client communication, and chilling the attorney-client relationships.

This Court should order the government to return Mr. Razak Ali's legal papers to him, destroy any copies and to refrain from any future seizure of attorney-client

privileged documents without first making a clear and convincing *individualized* showing to the Court that justifies such an invasion. The Court should deny Respondents' motion, and do so in terms that clearly and finally shut the door on the persistent threat of Respondents' interference with Mr. Razak Ali's attorney-client relationship. If the Court decides to allow any further review, any such review should be conducted in the first instance by the Court or a special master without the involvement of the military or the Department of Justice to prevent any further breach of the attorney-client privilege.

## II.  BACKGROUND

Petitioner relies on and adopts the factual background and introductory statements of the briefs filed by Petitioners in related cases in opposition to the Respondents' Motion, namely the <u>Petitioners' Opposition to Respondents' Motion for Procedures Related to Review of Certain Detainees' Materials</u> filed in *Almurbati, et al., v. Bush, et al.*, 04-1227, Docket No.   p. 3-4 and briefs in opposition to the government's motion filed on behalf of other *Mohammon* petitioners.

## III.  RESPONDENTS HAVE FAILED TO OFFER ANY REASONS SUPPORTED BY LAW FOR THEIR SEIZURE OF MR. RAZAK ALI'S PAPERS.

### A. Mr. Razak Ali and Counsel have an Attorney Client Relationship

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public

4

interests in the observance of law and administration of justice."[2] Despite the government's contrary claim, the privilege has Constitutional significance, given that it is key to the constitutional guarantees of the right to effective assistance of counsel and a fair trial. *Coplon v. United States,* 191 F.2d 749, 757 (D.C. Cir. 1951). As the Circuit Court for this district has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[3] It is well-established that incarcerated or detained individuals do not forfeit the attorney client privilege upon detention. *United States v. Defonte*, 441 F.3d 92, 94 (2d Cir. 2006). The right to this privilege does not diminish when the clients stand accused of terrorism charges that implicate national security. For instance, in *Lonegan v. Hasty*, 2006 WL 1707258 (E.D.N.Y.June 22, 2006), the court found that a terrorism suspect and his attorney had a "constitutionally protected reasonable expectation of privacy in their communications." *Id.* at *18. Recognizing and protecting the attorney-client privilege of prisoners, courts have acted with "heightened concern" when prison officials open and read mail that "has import for . . . the attorney-client privilege." *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003).

---

[2] Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also Swidler & Berlin v.United States, 524 U.S. 399, 403 (1998) (quoting Upjohn); Lanza v. State of New York, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.")..
[3] *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004), *appeal argued*, No. 05- 5096 (D.C. Cir. Mar. 22, 2006).

Mr. Razak Ali has been held for almost five years without *any* charges filed against him and without any notice as to what he is accused of doing. During pre-trial detention, the protection of the privilege is especially necessary to ensure effective assistance of counsel: "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[4] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[5] Even for prisoners *convicted* of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[6] Furthermore, the Supreme Court has ruled that prisoners held at Guantánamo have a right to representation by and access to counsel.

This Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has protected that privilege by creating Access Procedures, which created avenues of confidential communication between prisoners and their attorneys by laying the ground rules for in-person meetings, and for written communication between these parties. The government sought the ability to monitor these communications, but that request was

---

[4] *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pretrial confinement, the ultimate fairness of their eventual trial can be compromised.").
[5] *Bach*, 504 F.2d at 1102.
[6] Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 407-414 (1989).

squarely rejected by the court in Al Odah. There, the government sought to justify the

abrogation of the attorney-client privilege (in order to inspect attorney notes of

conversations with clients) on the grounds that: (1) national security concerns justified

intervention by the government; (2) detainees might manipulate the privileged

communications system in order to pass sensitive information to outsiders; and (3) the

mere possibility that communications might be used for intelligence or criminal

investigation purposes would not undermine the privilege, as long as such information

was not used in connection with the underlying habeas legal proceedings. *See Al Odah*

*v. U.S.*, 346 F. Supp. 2d 1. 9-10, n. 12 (D.D.C. 2004) The court rejected all of these

arguments – as it should now – because they were (and are) "both thinly supported and

fail[] to fully consider the nature of the attorney-client privilege." *Id.* at 10

 The threat of losing the confidential nature of the attorney client privilege is

particularly troubling in Mr. Razak Ali's situation because he is apparently a native

Libyan (although counsel does not know how long he has been gone from his native

Libya). While being held at Guantánamo, the U.S. military has repeatedly allowed

Libyan *thugs* to interrogate the Libyan prisoners, and upon information and belief Mr.

Razak Ali was interviewed by those thugs. Although counsel does not know for certain

what threats were made to Mr. Razak Ali, counsel can point to another detainee from

Libya who has elaborated and counsel directs this Court's attention to that detainee's

pleadings. (Omar Deghayes 04-2215, Motion for Entry of 30 Day Order pgs. 7-12[7] ,

Reply Pgs.3-4 (doc. Entry 16) and Court Order (doc. Entry 18 pgs. 7-10))  Since these

interrogations have been allowed for several years (long before the recent

reestablishment of diplomatic ties between the U.S. and Libya this spring), it does not

take any great leap to conclude that the attorney client letters will also be shared with

the brutal dictatorship of Omar Ghadafi and will be used in future "interrogation"

sessions with the Libyan thugs.

　　　　This Court should not now ratify the government's blatant disregard of this

Court's orders by permitting further review of privileged communications. This Court

should consider the government's recent actions, and its instant motion, in light of its

fierce five-year effort to deny detainees access to counsel and to undermine the

attorney-client relationship. These principles are reinforced by the Court's entry of the

Protective Order, which allows for confidential communications despite the conditions

of confinement. Seizure of legal papers is particularly egregious because it strikes at the

heart of the attorney-client relationship and interferes with access to the courts. "The

taking of legal papers will often (though perhaps not always) interfere with an inmate's

right of access to the courts. . . . [T]he destruction or withholding of inmates' legal

---

[7] The Motion itself is apparently filed under seal but the reply brief and the government's response brief refer to the five pages of allegations in that Motion that describe the interrogations by the Libyan thugs. Counsel believes that this Court is allowed to review that document if it so chooses.

papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[8]

### B. The Respondents Have Made No Showing to Justify Seizing and Reviewing Mr. Razak Ali's Materials

Respondents' alleged justification for the confiscation of Mr. Razak Ali's legal materials rests in the purported discovery of notes written by the deceased on paper bearing an attorney-client designation that were discovered when NCIS searched the cells of prisoners in the same cell block as the deceased individuals. Petitioner relies on and adopts the detailed discussion of the additional documents cited by the Respondents in <u>Petitioners' Opposition</u> filed in *Almurbati, et al., v. Bush, et al.*, 04-1227, Docket No.  p. 13-15.. In any event, none of these notes is related in any way to Mr. Razak Ali, and Respondents do not suggest otherwise. The government's vague allegations of notes found in a dead prisoners' cell written by another prisoner cannot rise to the level of providing a "legitimate penological  interest" in seizing *all* legal documents from *all* prisoners.  Indeed, seizing Mr. Razak Ali's legal papers chills the giving, receiving, and continued possession of communications between Mr.Razak Ali and his attorney.  The government does not attempt to justify its actions under the

_____

[8] *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted) ; *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers, if proven, may have denied plaintiff access to the courts).

Protective Order, but rather admits that the seized materials "will likely include some

number of attorney-client communications potentially subject to attorney-client

privilege."[9]  But the government's unilateral abrogation of the privilege would have

been unlawful even if it had not directly violated a Court order.  Courts have

consistently held that abrogation of the attorney-client privilege in any context requires

the government to make a specific, *individualized* showing that there is sufficiently

compelling justification for invading the privilege. For example, where the government

invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of

making an adequate showing that the exception applies to *that* client.[10]  Similarly, when

the government seizes materials from a location that likely contains privileged papers,

that seizure must be supported by probable cause and a warrant, and it still must

employ appropriate means of screening out privileged materials.[11]

Respondents bear the burden of making a particularized factual showing that the

protections of the attorney-client privilege should yield. The government has not cited

any cases that suggest the privilege may be invaded without an *individualized*,

sufficiently rigorous showing that materials of a particular client or particular attorney

---

[9]  Resps.' Mot. at 9.

[10]  *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[11]  *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

are likely to have been abused in furtherance of a crime.[12]  Even when such documents

will be reviewed *in camera* by the court – and not by the government – "the judge

should require a showing of a factual basis adequate to support a good faith belief by a

reasonable person that *in camera* review of the materials may reveal evidence to

establish the claim that the crime-fraud exception applies."[13]

The government has presented no specific evidence that Mr. Razak Ali has

misused his attorney-client materials.  Indeed, the government does not even purport to

do so.  Respondents' motion contains no allegations that Mr. Razak Ali had any

relationship with the three detainees who died or that his privileged material had been

linked to those detainees. Respondents do not allege that the notes described in its

motion were in Mr. Razak Ali's possession, in his handwriting, or refer to him.

Respondents do not even allege that Mr. Razak Ali was held in the cellblock or camp

where the deaths occurred. Respondents have presented no specific evidence that Mr.

Razak Ali misused his attorney client materials in furtherance of such a "plot" or for

any other purpose. There is certainly no basis for invading Mr. Razak Ali's fundamental

attorney-client privilege.

As for the government's speculation that Petitioners' counsel are improperly

sharing classified information with their clients, this Court long ago reminded the

---

[12]  *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of
attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and
execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y.
Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding
of probable cause").

[13]  *Zolin*, 491 U.S. at 572 (quotations and citations omitted).

government that "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[14]

## IV. THE GOVERNMENT'S PROPOSED PROCEDURES ARE INAPPROPRIATE AND THEIR PROPOSAL OF A FILTER TEAM SHOULD BE DENIED

If further review of Mr. Razak Ali's legal papers is allowed, the use of a Department of Defense Filter Team is inappropriate here.  As the government hints in its filing, see Resps.' Mot. 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental teams.  Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts,"[15]  including quite recently by the U.S. Court of Appeals for the District of Columbia in a case that concerned a "Filter Team" nearly identical to that proposed here.[16]

On July 28, 2006, the Court of Appeals summarily rejected a plan that had been approved by the District Court, for the creation of a Justice Department "Filter Team" to

---

[14] *Al Odah*, 346 F. Supp. 2d at 14.

[15] *In re Search of the Scranton Hous. Auth.*, No. ___, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006). *See, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege"); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[16] *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

review potentially privileged documents that had been seized by the government during a criminal investigation of Congressman William J. Jefferson.[17]  The government's proposal to utilize a "Filter Team" to review Petitioners' attorney-client materials is materially indistinguishable from that repudiated by the Court of Appeals. On May 18, 2006, the government filed an application for a warrant to search Congressman Jefferson's office for documents and computer files related to an alleged bribery scheme.  The warrant application "set forth a set of 'special search procedures' to be used in an effort to 'minimize the likelihood that any potentially politically sensitive, non-responsive items' would be disclosed," and also to "prevent investigators and prosecutors from obtaining documents or files 'that may fall within the purview of the Speech of Debate clause … or any other pertinent privilege.'"[18]  The government proposed, and the District Court authorized, the use of a "Filter Team" to determine "first whether each document was responsive, and second whether it fell within the purview" of any pertinent privilege.[19]  Non-responsive documents were to be returned to Congressman Jefferson, while potentially privileged documents were to be copied, logged, provided to the Congressman's counsel, and submitted to the District Court for a final determination of privilege.[20]  Copies of documents that the Filter Team alone

---

[17] *United States v. Rayburn House Office Building, Room 2113*, No. 06-3105, slip op. at 1–2 (D.C. Cir. July 28, 2006) (Ex. B hereto).

[18] *In re Search of the Rayburn Office Building Room Number 2113*, No. 06-0231 M-01, slip op. at 3 (D.D.C. July 10, 2006) (Ex. C hereto).

[19] *Id.*

[20] *Id.* at 3–4.

determined were responsive and unprivileged were to be provided directly to
prosecutors.[21]  These procedures, of course, are nearly identical to those proposed in the
instant motion by the government.

In response to an emergency motion for stay pending appeal, the Court of
Appeals rejected this scheme outright.  The Court remanded the matter to the District
Court with instructions that the government was not to be involved in any review
process.  The District Court was ordered to have a judicial officer or special master
provide copies of all documents to Congressman Jefferson, after which the
Congressman was to submit to the District Court *ex parte* any claims that specific
documents were privileged.[22]  The District Court, in turn, was to review the
Congressman's claims of privilege *in camera*.[23]  Finally, the government was "enjoined
from reviewing any documents or records seized from Congressman Jefferson's office"
pending further order of the Court of Appeals.[24]

Also recently, the Sixth Circuit overruled a district court's decision to permit
review of potentially privileged documents by an independent government "taint
team" because the review posed unacceptable risks to the attorney-client privilege.[25]
Even when such teams have been authorized, "at least three courts that have allowed

---

[21] *Id.* at 4.

[22] *See United States v. Rayburn House*, slip op. at 1.

[23] *Id.*

[24] *Id.*

[25] See In re Grand Jury Subpoenas 04 -124-03 and 04-124-05, Nos. 05-2274/2275, slip op. at 6 (6th Cir.
July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[26] Although it may lessen the burden on Respondents to use a filter team, we submit it is inappropriate to have team members associated with, employed by, and beholden to the Respondents.

Although Counsel vigorously contests the justification and need for the review of Mr. Razak Ali's legal materials, to the extent that the government can make a specific, individualized showing that Mr. Razak Ali has used his attorney-client materials for illegal ends, the Court at most should order that Mr. Razak Ali's documents to be reviewed *in camera* by the court, in the presence of habeas counsel and without government lawyers. This procedure would reduce the appearance of impropriety and relieve some of the concern about sharing Mr. Razak Ali's privileged papers with a party who is not his legal representative.

Moreover, to the extent that the documents have been reviewed, Respondents bear the burden to rebut the presumption that the material was provided to the prosecution team. As stated by Judge Green in *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997), "where the government chooses to take matters into its own hand rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed

---

[26] *United States v. Stewart*, No. 02 Cr. 395, 2002 WL 1300059, at *19 (S.D.N.Y. June 11, 2002)

special master, it bears the burden to rebut the presumption that tainted material was provided to the prosecution team." *Id.* at 839.

Finally, the Court should reject the Respondents' suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they think the documents were properly "privileged" in nature, regardless of the document's relevance to the NCIS suicide-plot investigation.[27] If the filter team determines that the documents are not privileged, the government proposes, then they will be "returned . . . to JTF-Guantánamo for appropriate action."[28] This thinly veiled threat to habeas counsel is obviously designed to deter counsel from communicating effectively with their clients. Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, those with access to the legal papers have security clearances, and they are all officers of the Court. There is no warrant for a new team of Department of Defense lawyers to begin scouring the prisoners' legal papers in search of documents that *they* believe are not properly privileged. Such a ploy would surely be followed by the government's next round of distractions, which would clearly involve attacks on individual habeas counsel.

## IV. RESPONDENTS' ASSERTION THAT, NOTWITHSTANDING *HAMDAN*, THE DTA DIVESTS THIS COURT OF JURISDICTION SHOULD BE REJECTED

---

[27] (*See* Mot. at 11.)

[28] (*Id.*)

Respondents apparently believe they can avoid the inconsistency of their actions merely by including in their Motion for Procedures a statement that the Motion is filed "without prejudice to respondents' position that the Court lacks jurisdiction."  (Motion for Procedures at 2 n. 3.) Respondents' insistance that the DTA applies to this petition is frivolous because Mr. Razak Ali apparently has never even had a CSRT.  The government asserts that this Court's jurisdiction is barred by the provision that vests the District of Columbia Circuit Court of Appeals with exclusive authority to review  "the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant."  § 1005(e)(2).[29]  However, as the *Hamdan* Court recognized, "subsections (e)(2) and (e)(3) grant jurisdiction only over actions 'to determine the validity of any final decision' of a CSRT or commission."  126 S. Ct. at 2768-69.   Thus, a petitioner, like Mr. Razak Ali who never had a CSRT cannot be deemed to be "contesting any 'final decision' of a CSRT or military commission (and). . . does not fall within the scope of subsection (e)(2) or (e)(3)."  *Id*. at 2769.   Expanding on this point, the Court indicated that, while a challenge to the final decision of the CSRT would be subject to the exclusive review requirement of Section 1005(e)(2), *habeas* actions seeking more fundamental relief would not. *Id.*

Mr. Razak Ali asserts numerous causes of action, alleges that the Executive's conduct and policies exceed the bounds of Article II of the Constitution, and seeks, in addition to declaratory and injunctive relief, *habeas corpus* – the remedy that permits him to demand either release or legal justification for imprisonment.  Accordingly,

---

[29] Section 1005(e)(3) pertains to review of the decision of any military commission concerning the detainee.  Petitioner has not been the subject of any such commission. Therefore, Section 1005(e)(3) has no bearing on Mr. Al-Ghizzawi's case.

Respondents' attempt to recast Petitioner's action as nothing more than a challenge to the validity of the CSRT that he has never had is ridiculous.  Based upon the foregoing, Respondents' assertion that this Court lacks jurisdiction over this matter is clearly erroneous and should be rejected.[30]Moreover, Respondents have themselves recognized the continued authority of this Court to exercise its jurisdiction over these matters.

**CONCLUSION**

Despite the Stay that has been entered in this case, the Respondents filed their "Notice" and Motion for Procedures Relating to Review of Certain Detainee Materials. Obviously Respondents believe that the Stay is only in place to keep the Petitioners from filing motions. Respondents should not be allowed to have it both ways: requesting the assistance of this Court when it suits their needs, and simultaneously denying the authority of the Court to act on any request for relief filed by Petitioners. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

For the reasons discussed herein, Respondents' Motion should be denied. Moreover, Petitioners respectfully request that Respondents' breach of the Protective Order be remedied by an Order providing the following relief:

(1)     Pending resolution of this motion as to each Petitioner, Respondents are directed to transfer by secure means all impounded materials belonging to Petitioners

---

[30] Petitioners respectfully request the opportunity to fully brief the issues should the Court conclude that the DTA divests it of jurisdiction over this action.

to the Court Security Officer, an such materials shall be maintained at the Secure

Facility designated under the Protective Order;

(2)     Within ten days of the Court's Order, Respondents must determine, with

respect to each individual Petitioner, whether it contends there are sufficient,

particularized grounds for continued impoundment and review of that Petitioner's

seized attorney-client materials; and, to the extent Respondents contend such

particularized grounds exist, Respondents must file a supplemental memorandum and

supporting affidavit purporting to demonstrate such grounds with respect to that

Petitioner.   A Petitioner's response to any such supplemental memorandum and

affidavit shall be due within ten days of service, except as otherwise directed by the

Court.  To the extent a Petitioner's response requires his counsel to visit Petitioner at the

base, the Court will hear requests for adjournments of the response deadline on

that basis;

(3)     To the extent Respondents file no supplemental memorandum or affidavit with

respect to a Petitioner, Respondents' motion shall be denied with prejudice as to that

Petitioner.  In that event, counsel for Petitioner shall review Petitioner's impounded

materials at the secure facility and arrange for the immediate return of all attorney-

client material to Petitioner through the procedures for Legal Mail set forth in the

Protective Order.

(4)     In the event the Court determines that Respondents have sufficiently

demonstrated a need to review a Petitioner's seized attorney-client materials as part of

the NCIS investigation, a Special Master or other third party appointed by the Court

will review such seized material in accordance with further instructions from the Court.

(5)    Upon completion of this review by the Special Master and upon further order

by the Court, counsel for each Petitioner subject to the motion shall review Petitioner's

seized materials and arrange for the immediate return of all attorney-client material to

Petitioner (except to the extent certain materials are retained pursuant to further orders

from the Court).

Dated:  August 3, 2006                              Respectfully Submitted,


                                                    /s/ H. Candace Gorman

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman
Elizabeth Popolis
542 S. Dearborn St., Suite 1060
Chicago, IL 60605

20

## <u>CERTIFICATE OF SERVICE</u>

I, H. Candace Gorman, certify that I today caused a true and accurate copy of

PETITIONER RAZAK ALI'S MEMORANDUM IN OPPOSITION TO RESPONDENTS'

MOTION TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED WITHOUT

NOTICE OR APPROVAL AND RESPONDENT'S NOTICE to be served upon the

following persons through service that automatically occurs by virtue of my electronic

filing of the above listed document:

> Terry Henry, Esq., Senior Trial Attorney
> Andrew I. Warden, Esq., Trial Attorney
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., NW, Room 7144
> Washington, DC  20530

This 3rd day of August, 2006.

> /s/ H. Candace Gorman
> Counsel for Petitioner

Law Office of H. Candace Gorman
H. Candace Gorman (IL Bar #6184278)
Elizabeth Popolis  (IL Bar #6285095)
542 S. Dearborn Street -  Suite 1060
Chicago, IL 60605
Tel:  (312) 427-2313