# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| AMER MOHAMMON, et al. | ) |
| (ABDAL RAZAK ALI) | ) |
| | ) |
| Petitioners/Plaintiffs | ) |
| | )    CIVIL ACTION |
| v. | ) |
| | )    NO. 05-2386 (RBW) |
| | ) |
| GEORGE W. BUSH, et al. | ) |
| | ) |
| Respondents/Defendants | ) |
| | ) |

_____


## AFFIDAVIT OF H. CANDACE GORMAN

**I, H. Candace Gorman, swear as follows:**

1.  That I am counsel for Mr. Abdal Razak Ali, ISN 685 (hereinafter Razak
    Ali).

2.  That I have never met or talked with JAGC Patrick McCarthy.

3.  That I had never heard the name of JAGC Patrick McCarthy until I
    received the government's filing the evening of August 21, 2006.

4.  That the declaration attested to By JAGC Patrick McCarthy is replete
    with inaccurate information including but not limited to: Paragraphs 4
    (to the extent it claims my client was made available to meet with me by

the JAG office), 6, 7, 8 (to the extent it claims I was informed that ISN 685 was my client, Mr. Razak Ali, this is inaccurate), 9, 10, 11, 12, 13, 14, 15.  I have insufficient information to know whether or not paragraphs 1-4 and 8 are accurate.  Paragraph 5 is accurate, although is most likely based on an educated guess as no one ever asked me if I speak Arabic, therefore it is not "according to Ms. Gorman".

5.  Although Respondents now state that they began an investigation on August 1st, 2006 when attorney Andrew Warden advised the Navy of my inability to meet with my client,  Exhibit E to my Rule to Show Cause includes an email from Andrew Warden to Attorney David Bradford at the Jenner and Block law firm on July 27, 2006, in which Warden firmly states that I did in fact meet with my client, but I was disputing his identification after the fact of that meeting.

6.  Respondents never mentioned the language issue until it's filing on August 21, 2006.  However, prior to my filing the emergency Motion to see my client, I had ascertained through the Center for Constitutional Rights that Mr. Razak Ali spoke English.  In addition, my escort on Wednesday July 19th told me that ISN 685, who had a totally different name and nationality did in fact speak English.

7.  During my conversations with personnel at the base, I consistently referred to my client by the name Abdal Razak Ali or by ISN number

685. I never referred to my client as "Amer Mohammon," who is the named Petitioner in the mass Habeas filing in which my client Mr Razak Ali is one Petitioner.

I state the following under penalty of perjury.


_____

H. Candace Gorman

# EXHIBIT C



Slip Copy                                                                                           Page 1
Slip Copy, 2006 WL 2092637 (D.D.C.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
PRO-FOOTBALL, INC., Plaintiff,
v.
Suzan Shown HARJO, et al., Defendants.
**Civil Action No. 99-1385 (CKK).**

July 26, 2006.

Carolyn Beth Lamm, Francis A. Vasquez, Jr., White & Case LLP, Jack McKay, Pillsbury Winthrop Shaw Pittman LLP, Washington, DC, Marc E. Ackerman, White & Case, Robert Lloyd Raskopf, Quinn Emanuel Urguhart Oliver & Hedges, LLP, New York, NY, for Plaintiff.
Brian Arthur Coleman, Drinker Biddle & Reath, Washington, DC, for Defendants.

### MEMORANDUM OPINION

COLLEEN KOLLAR-KOTELLY, District Judge.

**\*1** This case arises from the petitions of seven Native Americans ("the Native American Defendants" or "Defendants") to cancel the registrations of six trademarks used by the Washington Redskins, a longtime professional football franchise, and owned by Plaintiff Pro-Football, Inc. ("Pro-Football"). Following a limited remand of this Court's September 30, 2006 Memorandum Opinion and Order, *see Pro-Football, Inc. v. Harjo,* 284 F.Supp.2d 96 (D.D.C.2003), this Court is to evaluate whether the doctrine of laches bars the claim of Mr. Mateo Romero, the youngest of the seven Native American Defendants in this case. *See* 415 F.3d 44, 50 (D.C.Cir.2005). Allegedly pursuant to the D.C. Circuit's limited remand in this case, the Native American Defendants have filed a Motion to Conduct Limited Discovery Related to Laches and Memorandum in Support Thereof, to which Pro-Football has filed an Opposition. Upon a searching examination of the parties' filings, the D.C. Circuit's explicit instructions, the relevant case law, and the entire record herein, the Court-pursuant to its considered discretion-shall deny the Native American Defendants' Motion to Conduct Limited Discovery.

### I: BACKGROUND

Pro-Football, Plaintiff in the current action and Respondent in the trademark action below before the Trial Trademark and Appeal Board ("TTAB" or the "Board"), holds six trademarks containing the word, or a derivative of the word, "redskin(s)" that are registered with the Patent and Trademark Office ("PTO"). In September 1992, seven Native Americans-Suzan Shown Harjo, Raymond D. Apodaca, Vine Deloria, Jr., Norbert S. Hill, Jr., Mateo Romero, William A. Means, and Manley A. Begay, Jr.-collectively petitioned the TTAB to cancel the six trademarks, arguing that the use of the word "redskin(s)" is "scandalous," "may ... disparage" Native Americans, and may cast Native Americans into "contempt, or disrepute" in violation of Section 2(a) of the Lanham Trademark Act of 1946 ("Lanham Act" or "Act"). Compl. ¶ 13 (citing 15 U.S.C. § 1052(a)). In a pretrial order issued in March of 1994, the TTAB struck all defenses raised by Pro-Football. *Harjo v. Pro-Football, Inc.,* 30 U.S.P.Q.2d 1828, 1833, 1994 WL 262249 (Trademark Tr. & App. Bd.1994). The TTAB dismissed Pro-Football's constitutional defenses (which included a First Amendment assertion of speech rights, and a Fifth Amendment assertion of due process rights) based on a determination that assessing the constitutionality of a statute is "beyond the Board's authority." *Id.* The TTAB also held that the laches defense forwarded by Pro-Football was also unavailing, after determining that the Native American Petitioners advocated on behalf of a broad, public interest while Pro-Football's interests were distinctly private. *Id.* at 1831, 1994 WL 262249.

Five years after issuing its pre-trial order, the TTAB issued a cancellation order on April 2, 1999 in which it scheduled the cancellation of the six contested "redskin(s)" trademarks. *Harjo v. Pro-Football, Inc.,* 50 U.S.P.Q.2d at 1748, 1999 WL 375907. The TTAB based its decision on the conclusion that the trademarks "may be disparaging of Native Americans to a substantial composite of this group of people," and "may bring Native Americans into contempt or disrepute." *Id.* Following this decision, Pro-Football filed its Complaint with this Court on June 1, 1999, seeking *de novo* review, pursuant to 15 U.S.C. § 1071(b), of [the TTAB's] unprecedented administrative decision." Compl. ¶ 1. Following a period in which the Native American Defendants filed a motion to dismiss certain claims, which was denied by this Court, *see Pro-Football v. Harjo,* 57

U.S.P.Q.2d 1140, 1142-43, 2000 WL 1923326 (D.D.C.2000), and a protracted period of discovery around the issue of laches, both parties filed cross-motions for summary judgment before the Court. In a ruling dated September 30, 2003, this Court issued an extensive Memorandum Opinion and Order on the cross-motions, holding that (1) the TTAB's finding of disparagement was not supported by substantial evidence; and, in the alternative, (2) the Native American Defendants' original trademark action was properly barred by laches. *See* 284 F.Supp.2d 96 (D.D.C.2003). Following this ruling, the Native American Defendants promptly appealed to the D.C. Circuit, seeking relief.

**\*2** Upon appeal, the D.C. Circuit focused solely upon the issue of laches, leaving the Court's first, and primary, holding regarding the "lack of substantial evidence" for another day. *See* 415 F .3d 44, 47-50 (D.C.Cir.2005). In its decision, the D.C. Circuit agreed with this Court that laches was an available defense for Pro-Football against the Native American Petitioners' trademark claims. However, noting that the doctrine of laches "runs only from the time a party has reached his majority," *see id.* at 48 (citing cases), the Court of Appeals-"[w]hile retaining jurisdiction over the case"-decided upon a limited remand to this Court such that it could "address both trial and economic prejudice" with respect to the claim of Mr. Mateo Romero, the youngest of the seven Native American Defendants, who was born in 1966 (and therefore reached the age of majority in 1984). *See id.* at 48-50. According to the D.C. Circuit,

Here, Romero has brought his own claim, and there should be no reason why the laches of others should be imputed to him. In accordance with the context-specific approach required by equity, the district court should have measured both his delay and the resulting prejudice to Pro-Football based on the period between his attainment of majority [i.e., 1984] and the filing of the 1992 cancellation petition [before the TTAB].

*Id.* at 49-50.

Following the D.C. Circuit's limited remand, this Court asked the parties to jointly agree upon a briefing schedule to deal with the remaining Romero-related laches issue. *See Pro-Football, Inc. v. Harjo,* Civ. No. 99-1385(CKK) (D.D.C. Aug. 2, 2005); *id.* (D.D.C. Jan. 30, 2006) (minute orders asking for information and briefing from the parties). Indeed, the D.C. Circuit itself had requested that the Court take such a step, noting:

We encourage the district court to take briefing on whether economic prejudice should be measured based on the owner's investment in the marks during the relevant years, on whether the owner would have taken a different course of action-e.g., abandoned the marks-had the petitioner acted more diligently in seeking cancellation, or on some other measure.

415 F.3d at 50.

Rather than brief the laches issue, the Native American Defendants have filed a Motion to Conduct Limited Discovery Related to Laches and Memorandum in Support Thereof, to which Pro-Football has filed an Opposition. Defendants seek Rule 30(b)(6) depositions and documents "related to 1) whether Pro-Football would have abandoned the marks (i.e., change the team name) had Mr. Romero brought his petition in 1984; and 2) any trial prejudice suffered by Pro-Football suffer [sic] between 1984 and 1992." Defs'. Mot. for Disc. at 3. Pro-Football opposes the Defendants' motion, contending that such additional discovery was not contemplated by the D.C. Circuit in its limited remand, would be entirely duplicative of previous discovery, and would add nothing new to the record.

## II: DISCUSSION

**\*3** Upon a thorough consideration of the Native American Defendants' request to conduct further, limited discovery, three fatal flaws become evident and weigh in favor of denying Defendants' motion. Accordingly, the Court shall-pursuant to its considered discretion-deny Defendants' request for additional discovery. *See Stella v. Mineta,* 284 F.3d 135, 147 (D.C.Cir.2002) (whether the circumstances warrant a continuance to permit discovery is a decision that falls within the discretion of the district court). The Court shall discuss each specific concern in turn.

### 1. *Defendants' Motion is Procedurally Defective*

First, the Native American Defendants' Motion to Conduct Limited Discovery Related to Laches is procedurally defective. Simply, Defendants have failed to come forward with any affidavits or other admissible evidence showing that any specific facts are unavailable to them. To the extent that they seek to avoid possible summary judgment on the Romero Delay Period (i.e., 1984-1992) laches claim,

Defendants are required to comply with the "affidavit" requirements of Federal Rule of Civil Procedure 56(f), which provides:

Should it appear from the *affidavits* of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f) (emphasis added); *see also id.* advisory committee's note (1963) ("And summary judgment may be inappropriate where the party opposing it shows under subdivision (f) that he cannot at the time present facts essential to justify his opposition ."). Indeed, numerous courts have stressed that a party moving for further discovery or to avoid summary judgment must, by affidavit, show a detailed nexus between the information requested and the development of facts essential to justify the party's opposition. *See Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.,* 699 F.2d 1274, 1278 n. 6 (D.C.Cir.1983); *see also Hotel & Rest. Employees Union, Local 25 v. Att'y Gen.,* 804 F.2d 1256, 1269 (D.C.Cir.1986) (noting that this affidavit requirement helps "prevent fishing expeditions"), *vacated on other grounds,* 808 F.2d 847 (D.C.Cir.1987). As the Second Circuit has stressed, a party seeking additional discovery under Rule 56(f) must inform the court by affidavit "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995) (citation omitted).

Here, the Native American Defendants have failed to comply with these basic requirements. They have failed to attach or provide any affidavit; moreover, they have failed to specify what efforts were made to obtain the information in question *or* why such previous efforts were unsuccessful. Accordingly, Defendants' request for additional discovery-on top of the "protracted period of discovery on the issue of laches" that has already occurred, *see Harjo,* 284 F.Supp.2d at 101-is facially deficient and should be denied.

2. *The Limited Remand from the D.C. Circuit Did Not Provide for Further Discovery*

**\*4** Even assuming *arguendo* that it was proper to reach the merits of Defendants' motion for further discovery, it appears relatively clear that further discovery was not completed by the D.C. Circuit in its limited remand to this Court. Importantly, in the concluding section of its remand, i.e., Section III, the D.C. Circuit noted: "*While retaining jurisdiction over the case,* we remand the record to the district court for the purpose of evaluating whether laches bars Mateo Romero's claim." 415 F.3d at 50 (emphasis added). The precise wording of this final section makes it clear that further discovery was not entertained: expressly retaining appellate jurisdiction, the panel simply requested a legal "evaluation" of the record before the Court of Appeals and this Court. Because the Court of Appeals retained jurisdiction, this Court is limited by the mandate and must not exceed the scope of that remand by re-opening long-closed discovery. *See Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance-it confers jurisdiction on the court of appeals and it divests the district court of its control over those aspects of the case involved in the appeal.") (citations omitted).

A review of the D.C. Circuit's remand opinion confirms this interpretation-i.e., that the Court of Appeals did not contemplate further discovery at the district court level. For example, the Court of Appeals apparently believed that they already had sufficient evidence in the record on appeal to make a determination of Romero's laches themselves, but declined to do so for procedural reasons. As the panel noted, "[f]or several reasons, we prefer not to undertake our own analysis of Romero's laches." *Harjo,* 415 F.3d at 50. The panel then listed three reasons, observing that (1) this Court had never "*addressed* th[e] issue" of Romero's laches; (2) the parties had "*briefed* it minimally at best" to the Court of Appeals; and (3) "most significantly, we may owe deference to the district court's *assessment* of laches." 415 F .3d at 50 (emphasis added). As this language makes evident, the D.C. Circuit anticipated only that the parties will "brief" the issue spotted by the Court of Appeals, and this Court will "address" and "assess" it. No further discovery is necessary to deal with these issues, and the D.C. Circuit's opinion itself makes no explicit mention that further discovery is in order.

Indeed, the D.C. Circuit's opinion also emphasizes that the district court is "encourage[d]" to "*take briefing on* " which measure of economic prejudice should be used for purposes of the laches doctrine in this trademark cancellation proceeding. 415 F.3d at 50 (emphasis added). Such wording indicates that the Circuit wants this Court to make a *legal* determination, in the first instance, of which measure of economic prejudice is appropriate in this case. As this Court has stressed, in assessing laches in a trademark cancellation proceeding where a litigant is faced not with the loss of the use of the name, but rather the loss of the registration, "[e]conomic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weigh to the evidence of prejudice." *Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Ouest De La France,* 245 F.3d 1359, 1363 (Fed.Cir.2001) (cited by this Court, *see* 284 F.Supp.2d at 143, and by the Court of Appeals, *see* 415 F.3d at 48). According, the "new" discovery sought by Defendants on economic prejudice, seeking to know whether Pro-Football would have changed the Redskins' name during the Romero Delay Period, does not advance the ball at this point in the proceeding-the question whether the name would have been changed is irrelevant; rather, the question is how much investment there has been in the commercial exploitation of the mark.

### 3. Extensive Discovery Has Already Occurred on This Issue, and the Discovery Sought By Defendants Will Add Nothing New to the Record

**\*5** In addition to the fact that Defendants' motion is procedurally deficient and goes beyond the scope of the D.C. Circuit's limited remand, it is also clear that extensive discovery has already occurred on the issue of laches during the Romero Delay Period, and that the discovery sought by Defendants will add nothing new to the record. As noted, Defendants seek Rule 30(b)(6) depositions and documents "related to 1) whether Pro-Football would have abandoned the marks (i.e., change the team name) had Mr. Romero brought his petition in 1984; and 2) any trial prejudice suffered by Pro-Football suffer [sic] between 1984 and 1992." Defs.' Mot. for Disc. at 3. In order to understand the lack of foundation for such a request at this point, it is important to review what discovery has actually occurred thus far in this action.

### a. Prior Discovery

Following this Court's December 11, 2000 denial without prejudice of Defendants' motion seeking to dismiss, *inter alia,* Pro-Football's laches claim, *see* 57 U.S.P.Q.2d at 1145-46, 2000 WL 1923326, discovery commenced in this case-including discovery on the issue of whether Defendants (Mr. Romero among them) were guilty of laches. In their first set of document requests, served on March 6, 2001, Defendants requested, in part:

Document Request No. 2

All documents that constitute or refer or relate to communications with any person that in any way refer or relate to ... *changing the name of the Washington Team* [.]

4/10/06 Decl. of Robert L. Raskopf in Opp'n to Defs.' Mot. for Disc., Ex. A (Defs.' Interrogs. & Doc. Reqs. (Set 1)) at 7 (emphasis added). Pursuant to this request, Pro-Football produced over 800 pages of documents on April 5, 2001, followed by a supplemental set of documents on May 3, 2002. *Id.,* Ex. B (Pr-Football's Fourth Revised Resps. & Objections to Defs.' First Set of Doc. Reqs.) at 4. Of the approximately 836 pages of documents produced by Pro-Football in response to this request, approximately 223 relate to the Romero Delay Period. *See* Pl.'s Opp'n at 3. In total, Defendants served 33 document requests covering all aspects of the value of the trademarks at issue, including the potential prejudice to Pro-Football in the event of cancellation of the trademarks. *Id.* Defendants also noticed and took the deposition of the Redskins' current principal owner, Dan Synder. *Id.*

Following the close of discovery in April 2003, the parties cross-moved for summary judgment. In support of these cross-motions, Defendants filed 181 exhibits, 51 of which concerned the Romero Delay Period, while Pro-Football filed 327 exhibits, 59 of which concerned the Romero Delay Period. *Id.* Following the Court's September 30, 2003 decision, which ruled in favor of Pro-Football, Defendants shifted counsel, replacing their previous attorney with new counsel from the firm of Drinker Biddle & Reath LLP. While Defendants' current counsel was not present during the above-described discovery process, such an absence hardly weighs in favor of forcing Pro-Football to incur the time and expense of repeated discovery. Rather, the record is clear that substantial discovery on the issue of laches in general-and the Romero Delay Period in particular-has already occurred, and Pro-Football should not be compelled to repeat such a performance; rather, Defendants' present counsel should obtain all

materials from their former counsel.

b. *The Requested Information is Either Redundant or Will Fail to Shed New Light on the Relevant Analysis*

**\*6** In addition to the fact that significant discovery occurred around these issues during the protracted discovery period in this case, a review of the specifics of Defendants' discovery request reveals that the information sought is either redundant or will plainly fail to shed new light on the forthcoming laches decision relating to Mr. Romero. In order to illustrate this point, the Court will review each of Defendants' current requests.

*Media Quotations:* As the first subject matter for their proposed Rule 30(b)(6) Notice of Deposition, Defendants list a series of quotations from various news media sources, and propose to ask a Pro-Football representative whether "the quotation is accurate" and whether Pro-Football or anyone else attempted to "have the relevant publication correct, modify or retract the quotation." Defs.' Mot. for Disc., Ex. 1 (Proposed Rule 30(b)(6) Notice of Deposition Decum of Pro-Football) at 2.

Such a request is plainly deficient. Given that the late Jack Kent Cooke [FN1] was the sole, principal owner of the Washington Redskins franchise during the Romero Delay Period (1984-1992), only quotations from Mr. Cooke would be relevant. Because Mr. Cooke is no longer able to confirm the accuracy of the quotations, Defendants would have to turn elsewhere for such confirmation. However, as a matter of law, no Pro-Football representative would be competent to make such a confirmation, *see* Fed.R.Evid. 602 ("A witness may not testify to such a matter unless ... the witness has personal knowledge of the matter."), and Pro-Football itself could not make such a representation, given that such matters would no longer be "known or reasonably available to" Pro-Football as an organization, *see* Fed.R.Civ.P. 30(b)(6).

> FN1. It is undisputed that Mr. Cooke died on April 6, 1997.

Moreover, in their first proposed document request, Defendants further seek "documents ... relating to ... any attempt by Pro-Football to have the relevant publication ... modify or retract the quotations ... or any consideration of making such an attempt." Defs.' Mot. for Disc., Ex. 1 (Proposed Rule 30(b)(6) Notice

of Deposition Decum Tecum of Pro-Football) at 4. Such a request is clearly duplicative of Defendants' initial Document Request No. 2, made on March 6, 2001, in response to which Pro-Football has already produced documents within its possession, custody, and control. *See* Raskopf Decl., Ex. A-B.

*Whether Pro-Football Might Have Changed the Redskins' Name:* As their second "subject matter" for the proposed deposition, and in their second and third document requests, Defendants purport to seek new information and evidence on whether
Pro-Football would have or might have changed the name of the Washington, D.C. football team, abandoned the relevant trademarks, or taken other action to mitigate its losses in response to a petition to cancel its trademarks with the TTAB filed [within the Romero Delay Period], or in response to a decision by the TTAB or a court of such petition.

**\*7** Defs.' Mot. for Disc., Ex. 1 (Proposed Rule 30(b)(6) Notice of Deposition Decum Tecum of Pro-Football) at 3-4.

Such a request is ill-considered for three reasons. First, as discussed *supra* Section II(2), such a request does not advance the ball at this stage, given that the relevant economic prejudice analysis focuses on investment and development of the trademark, and the continued commercial use and economic promotion of the trademark-not whether Pro-Football would have changed the franchise's name during the Romero Delay Period. Second, such a request already duplicates Document Request No. 2, served over five years ago on Pro-Football. Third, and finally, any deposition testimony by a Pro-Football representative today concerning Pro-Football's "state of mind" during the Romero Delay Period would be inadmissible for the purposes of summary judgment or trial, *see* Fed.R.Evid. 602 ("lack of personal knowledge"), nor would such information be "reasonably available" beyond any documents already produced, *see* Fed.R.Civ.P. 30(b)(6). As such, this proposed testimony is both redundant and irrelevant, and cannot assist the Court in the determination directed by the D.C. Circuit in its remand opinion.

*Trial Prejudice During the Romero Delay Period:* As the third subject matter for their proposed Rule 30(b)(6) deposition, and their fourth document request, Defendants seek evidence "supporting any allegation that material evidence available on December 9, 1984 became unavailable by September 10, 1992." Defs.' Mot. for Disc., Ex. 1 (Proposed

Slip Copy                                                                                                Page 6
Slip Copy, 2006 WL 2092637 (D.D.C.)
**(Cite as: Slip Copy)**

Rule 30(b)(6) Notice of Deposition Decus Tecum of Pro-Football) at 4-5.

Two problems undermine such a request. First, the request is duplicative, as Pro-Football has already produced evidence of trial prejudice within the Romero Delay Period. For instance, Pro-Football has shown that the Redskins club is missing financial records from 1988 and 1991-92 (as well as earlier periods), and that NFL Properties is missing sponsorship lists in connection with the trademarks at issue from 1967-1988. *See* Decl. of David Pauken in Supp. of Pl.'s Mot. for Summ. J. (7/11/2002) ¶ 26. Moreover, Edward Bennett Williams-the longtime President of the Redskins, from 1965-1980, when the trademarks were originally registered-died on August 13, 1988, during the Romero Delay Period. *Id.* ¶ 10. Second, such information-i.e., when lost information was actually lost-could not be based on matters known or reasonably available to Pro-Football today. Indeed, forcing Pro-Football to specify exactly when the documents went missing, or to provide documents evidencing the loss of the documents themselves, would make it impossible for a party such as Pro-Football to be able to assert a laches defense, even when the defense itself was valid-i.e., it is impossible to assert trial prejudice when the evidence necessary to make the prejudice showing itself was the victim of passing time. According, like Defendants' other proposed requests, Defendants' request for Romero Delay Period evidence relating to trial prejudice is both duplicative and ill-formed at this time.

### III: CONCLUSION

**\*8** For the reasons set forth above, the Court-pursuant to its considered discretion-shall deny the Native American Defendants' Motion to Conduct Limited Discovery. An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2006.
Pro-Football, Inc. v. Harjo
Slip Copy, 2006 WL 2092637 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:99cv01385 (Docket) (Jun. 1, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Slip Copy                                                                                                                    Page 1
Slip Copy, 2005 WL 3244192 (D.D.C.)
**(Cite as: Slip Copy)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Larmartia POULLARD, Plaintiff,
v.
SMITHKLINE BEECHAM CORP. t/a
Glaxosmithkline, Defendant.
**No. Civ.A. 02-1590(CKK).**

Nov. 30, 2005.

Gregory L. Lattimer, Law Office of Gregory L. Lattimer, Washington, DC, for Plaintiff.
Eric H. Holder, Thomas S. Williamson, Jr., Covington & Burling, Washington, DC, for Defendant.

MEMORANDUM OPINION
KOLLARKOTELLY, J.
**\*1** Plaintiff Larmartia Poullard filed this suit against her former employer, Defendant Smithkline Beecham Corporation, t/a GlaxoSmithKline ("GSK"), alleging, *inter alia,* intentional infliction of emotional distress (Count II), breach of contract (Count III), breach of good faith and fair dealing (Count IV), wrongful discharge (Count V), and defamation (Count VI) stemming from her belief that her termination was the result of impermissible gender-based discrimination. In addition to denying liability for the claims asserted by Plaintiff, GSK has filed a Counterclaim in this action, seeking S8, 850.00 from Plaintiff for wrongful conversion of GSK funds during her time as a pharmaceutical consultant with the company.

Through a Memorandum Opinion and Order dated December 3, 2004, this Court dismissed for lack of subject matter jurisdiction Count I of Plaintiff's Complaint, in which Plaintiff alleged that her termination violated her rights against gender discrimination under the District of Columbia Human Rights Act, D.C.Code § 1-2501 *et seq.* Currently before the Court is Defendant's Motion for Summary Judgment as to the remaining counts in Plaintiff's lawsuit, i.e., Counts II-VI, and as to Defendant's Counterclaim for unlawful conversion. Upon a searching examination of Defendant's Motion, Plaintiff's Opposition, Defendant's Reply, the relevant case law, and the entire record herein, the

Court shall grant in full Defendant's Motion for Summary Judgment.

**I: BACKGROUND**

GSK is a research-based pharmaceutical and health care company that provides products ranging from vaccines to cancer medications to customers around the world. Def.'s Stmt. of Mat. Facts ¶ 1; Pl.'s Response to Def.'s Stmt. ¶ 1. As part of its marketing effort in the United States, GSK employs pharmaceutical consultants, or sales representatives, who provide clinical data and other information to physicians and promote the use of GSK products for approved purposes. Def.'s Stmt. of Mat. Facts ¶ 2; Pl.'s Response to Def.'s Stmt. ¶ 2. Each consultant is assigned a particular "territory," within which he or she travels daily, meeting with doctors and other health care professionals to discuss GSK products. Def.'s Stmt. of Mat. Facts ¶ 3; Pl.'s Response to Def.'s Stmt. ¶ 3. The normal business hours during which GSK expects sales representatives to be promoting GSK's products in physicians offices are 8:30 a.m. to 5:00 p.m. *See* Def.'s Mot. for Summ. J., Ex. 2 (Declaration of Brian Krebs (hereinafter, "Krebs Decl.")) ¶ 6; *id.,* Ex. 3 (Deposition of Brian Krebs (hereinafter, "Krebs Dep.")) at 92-93, 94, 158, 286-87, 304-06; *id.,* Ex. 4 (Deposition of Alexia Knight (hereinafter, "Knight Dep.")) at 58:4-13; *but see* Pl.'s Response to Def.'s Stmt. ¶ 24 (Plaintiff claims that she was never given a set schedule, and that the Employee Handbook makes it look like the fixed day was from 9:15 a.m. to 3:00 p.m., with "flex time" before and after) (citing Pl.'s Opp'n, Ex. 2 (Employee Handbook) at 1).

*A. Plaintiff Joins GSK as a Pharmaceutical Consultant*

**\*2** On June 8, 2000, Plaintiff applied for a GSK sales position by filling out and signing a four-page employment application. Def.'s Stmt. of Mat. Facts ¶ 4; Pl.'s Response to Def.'s Stmt. ¶ 4. On the final page of the application, in the paragraph immediately preceding her certification that she had read and agreed to all of the stated terms, the following statement appears:
In consideration of my employment, I agree to conform to the rules and regulations of the Company

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 2
Slip Copy, 2005 WL 3244192 (D.D.C.)
(Cite as: Slip Copy)

and further agree that my employment and compensation can be terminated at any time, with or without cause or notice, at the option of either the Company or myself.

Def.'s Mot. for Summ. J., Ex. 22 (Pl.'s Employment Application) at 4. Below this statement appears Plaintiff's signed certification that she had "read and agree[d] to all terms as stated above." *Id.; see also* Def.'s Stmt. of Mat. Facts ¶¶ 12-15; Pl.'s Response to Def.'s Stmt. ¶¶ 12-15.

Following her application, Plaintiff was interviewed by several GSK employees in the ensuing weeks, including then-District Sales Manager Brian Krebs ("Krebs") and Regional Vice President Sandra Weatherly ("Weatherly"). Def.'s Stmt. of Mat. Facts ¶ 5; Pl.'s Response to Def.'s Stmt. ¶ 5. In late June 2000, Krebs, in consultation with Weatherly, hired Plaintiff as a GSK pharmaceutical consultant. *See* Def.'s Mot. for Summ. J., Ex. 1 (Weatherly Decl.) ¶ 6; *id.,* Ex. 2 (Krebs Decl.) ¶ 4; *see also* Def.'s Stmt. of Mat. Facts ¶ 19; Pl's Response to Def.'s Stmt. ¶ 19. A June 26, 2000 letter sent to Plaintiff confirmed her acceptance of employment. *Id.,* Ex. 23 (Confirmation Letter). This letter expressly stated:
Please understand that neither this letter nor our offer of employment to you is intended to create or constitute an employment agreement or contract of any kind. It is also not intended as a guarantee of employment.

*Id.* at 2; *see also* Def.'s Stmt. of Mat. Facts ¶ 16; Pl's Response to Def.'s Stmt. ¶ 16.

Upon Plaintiff's confirmed acceptance, she signed GSK's one-page "Conditions of Employment on June 30, 2000. *Id.,* Ex. 24 (Conditions of Employment). Pursuant to this document, Plaintiff agreed:
That this document is not a contract guaranteeing employment for any specific duration. The Company or I may terminate this relationship at any time, for any reason with or without cause or notice. I understand that no supervisor, manager, or representative of SmithKline Beecham, other than the Chief Executive, has the authority to enter into any agreement with me for employment for any specified period or to make any promises or commitments which guarantee continued employment. Any employment agreement entered into by the Chief Executive shall not be enforceable unless it is in writing and approved by the Chairman of the Board of SmithKline Beecham.

*Id.* at 1; *see also* Def.'s Stmt. of Mat. Facts ¶¶ 17-18;

Pl.'s Response to Def.'s Stmt. ¶¶ 17-18 (Plaintiff did not enter into any employment agreement with the Chief Executive of GSK).

**\*3** Around this same time, Plaintiff was provided with a copy of the company's Employee Handbook, by which GSK provided her the following notice:
*This Handbook is not a contract guaranteeing employment for any specific duration. Either you or the company may terminate this relationship at any time, for any reason, with or without cause or notice.*

*Id.,* Ex. 12 (Suppl. Weatherly Decl.) ¶ 10 & attachment C (Employee Handbook) at 1 (emphasis in original); *see also* Def.'s Stmt. of Mat. Facts ¶¶ 8-9; Pl.'s Response to Def.'s Stmt. ¶¶ 8-9. Plaintiff read the one-page introduction to the Employee Handbook containing this notice when she was hired. Def.'s Stmt. of Mat. Facts ¶ 9; Pl.'s Response to Def.'s Stmt. ¶ 9.

These writings represent the sum of all materials provided to Plaintiff relating to the terms and conditions of her employment with GSK. There was never a written contract of employment in place between Plaintiff and GSK. Def.'s Stmt. of Mat. Facts ¶ 6; Pl.'s Response to Def.'s Stmt. ¶ 6; Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 18:23-19:3 (Q: When you were first employed by GSK, did you sign any employment contract? A: No, I did not. Q: After you started working at GSK were you ever offered an employment contract? A: No, I was not."). Plaintiff was hired by GSK with no guarantee that she would remain employed for any specific period of time. Def.'s Stmt. of Mat. Facts ¶ 11; Pl.'s Response to Def.'s Stmt. ¶ 11.

### B. Plaintiff's Obligations as a Pharmaceutical Consultant at GSK

After her hiring at GSK, Plaintiff was assigned to a territory comprising Laurel, Bowie, and Greenbelt, Maryland, and was placed on Krebs's sales team. Def.'s Stmt. of Mat. Facts ¶ 20; Pl.'s Response to Def.'s Stmt. ¶ 20 (claiming that the territory also included Lanham, Crofton, Hyattsville, and Bladensburg, in Prince George's County, Maryland). As a District Sales Manager, Krebs oversaw ten to twelve GSK pharmaceutical consultants, who worked as a "team" and were assigned to a southern Maryland territory. Def.'s Stmt. of Mat. Facts ¶¶ 21-22; Pl.'s Response to Def.'s Stmt. ¶¶ 21-22.[FN1] From the summer of 2000 to the summer of 2001, Plaintiff's job was to travel throughout the territory,

meeting with physicians and distributing GSK product information and samples. Def.'s Stmt. of Mat. Facts ¶ 23; Pl.'s Response to Def.'s Stmt. ¶ 23. During her tenure, Plaintiff understood that GSK expects its sales representatives to be in the field visiting doctors' offices during their regular business hours. Def.'s Stmt. of Mat. Facts ¶ 25; Pl.'s Response to Def.'s Stmt. ¶ 25. Plaintiff met with her supervisor, Krebs, several times every other month to review business issues. Def.'s Stmt. of Mat. Facts ¶ 26; Pl.'s Response to Def.'s Stmt. ¶ 26. Such meetings either took place at GSK's field office in Greenbelt, Maryland, or took the form of "work contacts," in which Krebs joined Plaintiff for the day as she canvassed her Maryland territory. *Id.*

> FN1. To certain paragraphs of Defendant's Statement of Material Facts Not in Dispute, Plaintiff responds only that "the alleged facts asserted herein are neither relevant nor material to any issue that has ever been in this litigation." *See* Pl.'s Response to Def.'s Stmt. ¶ ¶ 21-22, 26, 29, 34, 36-41, 43-45, 56-57, 65-67. Local Civil Rule 56.1 provides that "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues file[d] in opposition to the motion." *See* LCvR 56.1. Plaintiff's response is insufficient under the local rule, as Plaintiff has not controverted or rebutted the paragraphs listed. As such, the Court deems the cited paragraphs admitted by Plaintiff. Moreover, upon an analysis, it is clear that the information in question is material and relevant to the claims involved in the case-whether in Plaintiff's Complaint or Defendant's Counterclaim-and GSK has certainly introduced uncontested admissible evidence supporting the statements listed in these paragraphs.

**\*4** In addition to her field duties as a salesperson, Plaintiff was expected to perform several important administrative tasks. *See* Def.'s Mot. for Summ. J., Ex. 3 (Krebs Dep.) at 238-39. For instance, as Krebs spelled out in his "Expectations for 2001" memo, Plaintiff was required to input her physician call activity, or "call notes," daily into GSK's computer system through her laptop provided by GSK. Def.'s Stmt. of Mat. Facts ¶ 27; Pl.'s Response to Def.'s Stmt. ¶ 27 (Plaintiff claims that her understanding

was that call activity was to be input anywhere from a couple of times a week to a couple of times a month); *but see* Def.'s Mot. for Summ. J., Ex. 6 (Krebs's "Expectations for 2001" presented to Plaintiff on January 3, 2001); *id.,* Ex. 5 (Poullard Dep.) at 54:7-8 (Plaintiff recalls having seen the "Expectations for 2001"). As Krebs noted in his "Expectations for 2001," call reporting was to be "[d]one on a daily basis and should be after each call." *Id.* "This is company policy," he added, "and I feel very strongly about this!." *Id.; see also* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 31-32 (Plaintiff recalls that at another meeting, Krebs stressed that he wanted call reporting at least three times a week); Def.'s Stmt. of Mat. Facts ¶ ¶ 28-30; Pl.'s Response to Def.'s Stmt. ¶ ¶ 28-30. In addition to the "call notes," Plaintiff was also required to submit expense reports to Krebs promptly after each expense period; in particular, the reports were to be submitted to Krebs by the Wednesday following each expense period, with no exceptions permitted. Def.'s Mot. for Summ. J., Ex. 3 (Krebs Dep.) at 62:8-9. While expense reports were to be submitted electronically, the supporting receipts were to be mailed contemporaneously to GSK in order to substantiate the expenses incurred by the pharmaceutical consultant. Def.'s Stmt. of Mat. Facts ¶ 62; Pl.'s Response to Def.'s Stmt. ¶ 62.

### C. Problems Arise With Plaintiff's Compliance

Over the course of Plaintiff's tenure at GSK, Krebs developed serious concerns regarding Plaintiff's compliance with GSK's administrative requirements, leading to "ongoing discussions" about what Krebs saw as Plaintiff's "lack of administrative efforts." Def.'s Stmt. of Mat. Facts ¶ 31; Pl.'s Response to Def.'s Stmt. ¶ 31.[FN2] Krebs's first area of concern centered on a lack of timely call reporting by Plaintiff. On February 28, 2001, Plaintiff acknowledged in an email message to Krebs that he had contacted her to express his concerns about her call notes. Def.'s Stmt. of Mat. Facts ¶ 32; Pl.'s Response to Def.'s Stmt. ¶ 32. Plaintiff admitted that she "ha[d] been less than timely in updating [her] call activity," and she promised "to make a conscious effort to input [her] calls during the day, as we discussed." *Id.* In June and July 2001, Plaintiff fell significantly behind in her call reporting, waiting until "July 19, 2001 at 4:00am" to "input [her] unreported call activity for the month[s] of June and July." Def.'s Stmt. of Mat. Facts ¶ 35; Pl.'s Response to Def.'s Stmt. ¶ 35; *see also* Def.'s Mot. for Summ. J., Ex. 10 (Grievance Letter) at 3.

FN2. Plaintiff claims that she refutes this "allegation" on page 30 of her deposition. *See* Pl.'s Response to Def.'s Stmt. ¶ 31. A reading of this page undermines Plaintiff's claim: during this portion of her testimony, Plaintiff simply reviews company procedure, and notes that calls were to be recorded on the laptop computer provided by the company. *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 30. Nowhere does Plaintiff contest that she and Krebs had discussions concerning her administrative obligations. Plaintiff's dispute as to this point seems even more specious given her admission that she and Krebs had discussed her "less than timely updating" of her call activity in a February 28, 2001 email to Krebs. *See* Def.'s Stmt. of Mat. Facts ¶ 32; Pl.'s Response to Def.'s Stmt. ¶ 32.

**\*5** Krebs also became concerned about lapses in Plaintiff's expense reporting by the spring of 2001. Specifically, in a March 16, 2001 letter to Plaintiff, Krebs raised expense reporting problems and noted that he had "spoken to [Plaintiff] about this in the past and we are clear with expectations involving this subject." Def.'s Stmt. of Mat. Facts ¶ 39; Pl.'s Response to Def.'s Stmt. ¶ 39; Def.'s Mot. for Summ. J., Ex. 11 (Mar. 16, 2001 letter from Krebs to Plaintiff). Plaintiff acknowledged in a March 26, 2001 letter that Krebs had alerted her both by letter and in conversations of problems with her expense reporting. Def.'s Stmt. of Mat. Facts ¶ 40; Pl.'s Response to Def.'s Stmt. ¶ 40; Def.'s Mot. for Summ. J., Ex. 8 (Mar. 26, 2001 letter from Poullard to Krebs).

Upon a more searching scrutiny of Plaintiff's activities, Krebs found that, according to Plaintiff's call notes, Plaintiff had on multiple workdays recorded few or no calls to physicians' offices, Def.'s Stmt. of Mat. Facts ¶ 41; Pl.'s Response to Def.'s Stmt. ¶ 41, and that, according to Plaintiff's gas purchase records, Plaintiff had on numerous occasions left her assigned territory during normal business hours, Def.'s Stmt. of Mat. Facts ¶ 42; Pl.'s Response to Def.'s Stmt. ¶ 42. Importantly, the GSK manual for sales representatives makes clear that failure to work a full day during normal business hours is regarded as a sufficiently serious violation of the company policy that immediate discharge may be imposed as a disciplinary action. Def.'s Stmt. of Mat. Facts ¶ 43; Pl.'s Response to Def.'s Stmt. ¶ 43.

*D. The Decision to Terminate Plaintiff's Employment With GSK*

After consultation with Sandra Weatherly, and with Weatherly's approval, Krebs ultimately recommended that GSK terminate Plaintiff's employment. Def.'s Stmt. of Mat. Facts ¶ 45; Pl.'s Response to Def.'s Stmt. ¶ 45. On August 9, 2001, Plaintiff's employment was terminated for "[v]iolation of company regulations," including "[i]naccurate call reporting" and being "out of territory numerous times during business hours without notifying manager." Def.'s Stmt. of Mat. Facts ¶¶ 46-47; Pl.'s Response to Def.'s Stmt. ¶¶ 46-47. The GSK manual for sales representatives also makes clear that inaccurate call reporting is regarded as a sufficiently serious violation of company policy that immediate discharge may be imposed as a disciplinary action. Def.'s Stmt. of Mat. Facts ¶ 44; Pl.'s Response to Def.'s Stmt. ¶ 44.

As Plaintiff herself recounted in an August 12, 2001 letter entitled "Formal Grievances of Wrongful Termination of Employment with GSK," Krebs and another GSK employee present at the August 9, 2001 termination meeting brought to her attention numerous instances of low or no call activity, as well as discrepancies between her call reports and email communications to her immediate supervisor, Brian Krebs. Def.'s Stmt. of Mat. Facts ¶ 48; Pl.'s Response to Def.'s Stmt. ¶ 48. Specifically, Krebs (1) showed Plaintiff a record of receipts indicating that she had purchased gas out of her territory during work hours, Def.'s Stmt. of Mat. Facts ¶ 49; Pl.'s Response to Def.'s Stmt. ¶ 49; and (2) questioned Plaintiff about numerous instances where her Weekly Activity Report ("WAR") showed little or no call activity during the period from mid-April to mid-July, 2001, Def.'s Stmt. of Mat. Facts ¶ 50; Pl.'s Response to Def.'s Stmt. ¶ 50. In doing so, Krebs questioned Plaintiff about her activities on April 16-20, April 23, April 24, May 7, May 9, May 11, May 18, May 21-25, and May 28. Def.'s Stmt. of Mat. Facts ¶ 51; Pl.'s Response to Def.'s Stmt. ¶ 51. Krebs further pointed out discrepancies where Plaintiff had informed management that she was out of the area on vacation, but then reported that she was engaging in sales activity or taking clients to lunch-e.g., June 5, June 25, and July 5, 2001. Def.'s Stmt. of Mat. Facts ¶ 52; Pl.'s Response to Def.'s Stmt. ¶ 52. Despite being provided the opportunity to fully respond, Plaintiff elected to respond only with respect to two of the various dates about which GSK

Slip Copy                                                                                                                    Page 5
Slip Copy, 2005 WL 3244192 (D.D.C.)
(Cite as: Slip Copy)

had concerns: June 18 and June 25, 2001. Def.'s Stmt. of Mat. Facts ¶ ¶ 48, 53; Pl.'s Response to Def.'s Stmt. ¶ ¶ 48, 53. Moreover, Plaintiff offered no response of any kind at the meeting regarding the record of receipts showing that she had purchased gas out of her territory during work hours. Def.'s Stmt. of Mat. Facts ¶ 49; Pl.'s Response to Def.'s Stmt. ¶ 49.

**\*6** On August 12, 2001, Plaintiff filed a detailed "Formal Grievance" document with GSK wherein she proffered explanations of three or four of the many questioned dates, in addition to June 18 and 25, 2001. Def.'s Stmt. of Mat. Facts ¶ 54; Pl.'s Response to Def.'s Stmt. ¶ 54. On August 23, 2001, GSK responded to Plaintiff's "Grievance Letter" with a letter informing Plaintiff that a grievance committee would be formed to investigate the claims outlined in her letter, and providing her with a list of trained panel members among whom to select. Def.'s Stmt. of Mat. Facts ¶ 55; Pl.'s Response to Def.'s Stmt. ¶ 55. Plaintiff subsequently retained counsel, and on September 27, 2001, GSK contacted Plaintiff's counsel and advised him that the company was still waiting to hear from Plaintiff so that they might continue the grievance process. Def.'s Stmt. of Mat. Facts ¶ 56; Pl.'s Response to Def.'s Stmt. ¶ 56. While Plaintiff's counsel received GSK's September 27, 2001 letter, GSK never received any response from either Plaintiff or her counsel. *Id.*

### E. The Aftermath

#### 1. *Expense-Reimbursement Issues Arise*

In the weeks following Plaintiff's August 9, 2001 termination, GSK discovered after the fact that Plaintiff had not followed the required procedures for GSK's expense-reimbursement system; this discovery came too late to play any role in Plaintiff's termination. Def.'s Stmt. of Mat. Facts ¶ 70; Pl.'s Response to Def.'s Stmt. ¶ 70 (Plaintiff notes that the earliest she found out about the expense issues was in September 2001).

GSK's pharmaceutical consultants or sales representatives regularly incur reimbursable expenses in the performance of their duties. Def.'s Stmt. of Mat. Facts ¶ 58; Pl.'s Response to Def.'s Stmt. ¶ 58. For example, such expenses may include, but are not limited to, the purchase of office supplies. *Id.* Throughout the period during which Plaintiff was employed by GSK, sales representatives were expected to cover such expenses by advancing themselves cash, as needed, through a system of "drafts." Def.'s Stmt. of Mat. Facts ¶ 59; Pl.'s Response to Def.'s Stmt. ¶ 59. Under the drafts system, GSK issued each sales representative books of drafts payable through Mellon Bank in Pittsburgh, Pennsylvania. Def.'s Stmt. of Mat. Facts ¶ 60; Pl.'s Response to Def.'s Stmt. ¶ 60. Each book contained twenty drafts, and each draft could be cashed for any amount up to five hundred dollars. *Id.* GSK pre-printed on the drafts the name of the particular employee to whom they were issued, thereby rendering them payable only to the recipient employee. *Id.* Each draft also bore the employee's identification number and territory number, as well as a draft number. *Id.* When an employee incurred or anticipated incurring expenses, she would fill in both a sum and the date, sign the draft on the front and endorse it on the back, and then simply cash it like a check. Def.'s Stmt. of Mat. Facts ¶ 61; Pl.'s Response to Def.'s Stmt. ¶ 61.

**\*7** The employee was then expected to account for each cashed draft on regular expense reports, and to submit receipts substantiating the claimed expenses. *Id.* Expense reports were submitted electronically and supporting receipts were mailed to GSK. Def.'s Stmt. of Mat. Facts ¶ 62; Pl.'s Response to Def.'s Stmt. ¶ 62. As the then-applicable Sales Force "Answers" manual explained, drafts were to be used "only for business expenses." Def.'s Stmt. of Mat. Facts ¶ 63; Pl.'s Response to Def.'s Stmt. ¶ 63. Using drafts for personal expenses was "a serious violation of company regulations and c[ould] lead to termination." *Id.* While employees were to cash drafts as needed, they were advised that "[a]n entire book of drafts should not be cashed at once." *Id.*

Plaintiff employed the drafts system to cover certain of her business expenses while she was employed at GSK. Def.'s Stmt. of Mat. Facts ¶ 64; Pl.'s Response to Def.'s Stmt. ¶ 64. On May 31, 2001, just days before leaving on her June 4-11, 2001 vacation, Plaintiff cashed eighteen (18) drafts worth a total of $8,850. Def.'s Stmt. of Mat. Facts ¶ 65; Pl.'s Response to Def.'s Stmt. ¶ 65. These drafts were numbered 255545, 255546, 255547, 255548, 255549, 255550, 255551, 255552, 255553, 255554, 255555, 255556, 255557, 255558, 255559, 255560, 255561, and 255562. *Id.; see also* Def.'s Mot. for Summ. J., Ex. 16 (Edwards Decl.) at ¶ ¶ 11-13 & Attach. A, B (copies of the cashed drafts). On June 18, 2001, Plaintiff cashed another two drafts, numbered 255563 and 255564, together worth $1,000. Def.'s Stmt. of Mat. Facts ¶ 66; Pl.'s Response to Def.'s Stmt. ¶ 66; *see also* Def.'s Mot. for Summ. J., Ex. 16 (Edwards

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6
Slip Copy, 2005 WL 3244192 (D.D.C.)
(Cite as: Slip Copy)

Decl.) at ¶ ¶ 11-20 & Attach. A-C (copies of the cashed drafts and expense report records).

Of the $9,850 that Plaintiff withdrew on May 31 and June 18, 2001, Plaintiff later accounted for only the $1,000 withdrawn on drafts 255545 and 255546. Def.'s Stmt. of Mat. Facts ¶ 67 (noting that Plaintiff accounted for this total on her July 2-13 and July 16-27 expense reports); Pl.'s Response to Def.'s Stmt. ¶ 67. Plaintiff never submitted documentation to prove that the remaining $8,850 was expended for company business. Def.'s Stmt. of Mat. Facts ¶ 68; Pl.'s Response to Def.'s Stmt. ¶ 68. Plaintiff never acknowledged on her expense reports that she had cashed the eighteen (18) drafts in question-i.e., draft numbers 255547 through 255564. Def.'s Stmt. of Mat. Facts ¶ 69; Pl.'s Response to Def.'s Stmt. ¶ 69. Through an October 28, 2002 facsimile to her counsel, GSK made a demand to Plaintiff for the return of previous "draft" advances amounting to $8,850. Def.'s Stmt. of Mat. Facts ¶ 71; Pl.'s Response to Def.'s Stmt. ¶ 71. Given Plaintiff's failure to respond to GSK's October 28, 2002 demand letter, Def.'s Stmt. of Mat. Facts ¶ 72; Pl.'s Response to Def.'s Stmt. ¶ 72, GSK brought a Counterclaim against Plaintiff, asserting that she wrongfully converted GSK funds by cashing company checks and neither repaying the funds nor accounting for them as business expenses. *See* Def.'s Answer to Compl. and Counterclaim at 7-8, ¶ ¶ 1-15.

### 2. *Plaintiff is Hired as a Senior Sales Professional by Sanofi-Synthelabo*

**\*8** On August 29, 2001, less than three weeks after her termination by GSK, Plaintiff was offered a position as a Senior Sales Professional at the pharmaceutical company Sanofi-Synthelabo Inc. ("Sanofi"). Def.'s Stmt. of Mat. Facts ¶ 73; Pl.'s Response to Def.'s Stmt. ¶ 73. On September 4, 2001, Plaintiff began work at Sanofi, where she has operated as a "top performer." Def.'s Stmt. of Mat. Facts ¶ 74; Pl.'s Response to Def.'s Stmt. ¶ 74. Sanofi gave Plaintiff a starting base salary of $55,000 per year-approximately $1,700 more than her ending base salary at GSK-and, in 2002, Plaintiff earned from Sanofi an additional sales bonus of $17,496.85. Def.'s Stmt. of Mat. Facts ¶ 75; Pl.'s Response to Def.'s Stmt. ¶ 75. In September 2003, Sanofi promoted Plaintiff to the position of "Specialty Sales Professional," and by October 2004, Plaintiff's base salary had increased to $68,200 per annum. Def.'s Stmt. of Mat. Facts ¶ 76; Pl.'s Response to Def.'s Stmt. ¶ 76. In December 2003, Sanofi offered-but

Plaintiff declined-a further promotion by which Plaintiff would have become a training manager in New York. Def.'s Stmt. of Mat. Facts ¶ 77; Pl.'s Response to Def.'s Stmt. ¶ 77. This promotion would have provided her with a salary increase of somewhere between $10,000 and $12,000 per year. *Id.*

### 3. *Plaintiff Brings a Civil Complaint in this Action*

On August 9, 2002, Plaintiff filed a Complaint before this Court, alleging (1) wrongful termination by GSK based upon her gender in contravention of the D.C. Human Rights Act; (2) intentional infliction of emotional distress; (3) breach of contract; (4) breach of good faith and fair dealing; and (5) wrongful discharge. *See* Compl., Counts I-V. In addition, Plaintiff's Complaint alleges that GSK defamed her by making false statements to Plaintiff's former clients and colleagues regarding the reasons for her termination. *See id.,* Count VI. Plaintiff's Complaint asks that this Court award her actual damages relating to lost salary and benefits; foreseeable damages from GSK; compensatory damages in the amount of $1,000,000 for damage to her professional reputation; punitive damages in the amount of $2,500,000 for GSK's alleged deliberate, willful, and wanton disregard for her rights, and for its intentional infliction of emotional distress and defamation; and costs and attorney's fees as may be allowed by law. *Id.* at 7 (Prayer for Relief).

### 4. *Plaintiff Claims that She Was Defamed by GSK*

As set forth in Count VI of her Complaint, subsequent to her termination by GSK, Plaintiff contends that GSK "advised former clients and colleagues of the plaintiff that she had been terminated because she embezzled $8,000.00 from GSK," even though GSK at the time "knew that [such statements] were false and slanderous." Compl. ¶ ¶ 32-33. Plaintiff asserts that GSK "made defamatory statements to further cloak its discriminatory conduct by subjecting plaintiff to disgrace ... and to elevate the defendant's own reputation and credibility." *Id.* ¶ 34. Plaintiff believes that Weatherly and Krebs are the two GSK management officials who informed her former GSK clients and colleagues that Plaintiff had embezzled GSK funds. Def.'s Stmt. of Mat. Facts ¶ 81; Pl.'s Response to Def.'s Stmt. ¶ 81.

**\*9** In a response to an Interrogatory from GSK,

Plaintiff listed Alexia Knight, Dr. Richard Ashby, and Michael McGhee as "all persons who have any knowledge" concerning the allegation that GSK circulated to Plaintiff's former client and colleagues that she had been terminated for "embezzling" from GSK, "including ... the particular former clients and colleagues who allegedly received such information." *See* Def.'s First Set of Interrog. to Pl. In her deposition testimony, Plaintiff added Dr. David Gooray as a fourth recipient of the defamatory statements from Krebs and Weatherly. *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 144:11-18, 145:8-17, 146:19-25.

During the deposition process in this case, Weatherly and Krebs both categorically denied that they ever informed Plaintiff's former clients or colleagues of the company's belief that Plaintiff had wrongfully converted GSK funds or engaged in any financial impropriety. Def.'s Stmt. of Mat. Facts ¶ 82; Pl.'s Response to Def.'s Stmt. ¶ 82. Dr. Richard Ashby and Dr. David Gooray signed declarations indicating that they were not informed by any GSK manager or employee-including Weatherly and Krebs-of the specific reasons for Plaintiff's departure from GSK; Drs. Ashby and Gooray also indicated that neither of them was ever informed by any GSK manager or employee-including Weatherly and Krebs-that Plaintiff, while she was employed by GSK, engaged in any financial impropriety. Def.'s Stmt. of Mat. Facts ¶ 84; *but see* Pl.'s Response to Def.'s Stmt. ¶ 84 (Plaintiff claims that Dr. Ashby admitted to her that Weatherly called him and informed him that Plaintiff was terminated because she stole $8,000 from the company); Pl.'s Response to Def.'s Stmt., Ex. 4 (Weatherly Dep.) at 66 (Weatherly admits speaking with Dr. Ashby and discussing Plaintiff's termination, but denies informing Dr. Ashby that her termination resulted from financial improprieties). During her testimony, Ms. Knight stated that she never received from Weatherly or Krebs any information indicating that Plaintiff had been terminated for stealing money from GSK. Def.'s Stmt. of Mat. Facts ¶ 83. However, Knight admitted that she heard a rumor that Plaintiff had stolen money from GSK from a therapeutic specialist by the name of Nicole Cavanaugh. Pl.'s Response to Def.'s Stmt. ¶ 83. In contrast, Ms. Cavanaugh has signed a declaration stating that (1) no GSK manager, including Weatherly and Krebs, ever informed her of the reasons for Plaintiff's departure from GSK, and (2) no GSK manager, including Weatherly and Krebs, ever informed her that Plaintiff had engaged in any financial impropriety. *See* Def.'s Mot. for Summ. J., Ex. 30 (Cavanaugh Decl.) ¶¶ 3-4. During

discovery, GSK was unable to locate Michael McGhee, and neither party deposed Mr. McGhee or offered any evidence as to any information that he may have received from Weatherly or Krebs. *See* Def.'s Mot. for Summ. J. at 37 & n. 84.

### 5. *Plaintiff Receives Psychological Counseling*

**\*10** In her Complaint, Plaintiff claimed that GSK's decision to terminate her caused her significant emotional distress. *See* Compl. (Count II) ¶ 20 ("She has also been caused great distress, humiliation, and mental anguish."), (Count V) ¶ 30 (same). In an effort to substantiate these claims, Plaintiff noted during her deposition that her termination caused her "mental anguish and distress to the point that [she] sought counseling about it" and "still see[s] counseling about it." *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 163:2-4. During discovery, it was revealed that Plaintiff did not seek professional counseling until November 19, 2003. Def.'s Stmt. of Mat. Facts ¶ 78; Pl.'s Response to Def.'s Stmt. ¶ 78. The notes of Plaintiff's counselor, Saundra Walker-Harris, reveal that Plaintiff sought counseling to address concerns relating to her relationship with her boyfriend and issues with her current employer, Sanofi. Def.'s Stmt. of Mat. Facts ¶ 79; Pl.'s Response to Def.'s Stmt. ¶ 79. Ms. Walker-Harris's counseling notes do not indicate that the counseling sessions addressed Plaintiff's termination from GSK. Def.'s Stmt. of Mat. Facts ¶ 80; Pl.'s Response to Def.'s Stmt. ¶ 80.

### II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 8
Slip Copy, 2005 WL 3244192 (D.D.C.)
**(Cite as: Slip Copy)**

to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial." ' *Id.* at 587, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

### III: DISCUSSION

**\*11** Defendant's lengthy Motion for Summary Judgment contends that summary judgment is appropriate in favor of GSK on all remaining counts alleged in Plaintiff's Complaint (Counts II-VI), as well as on Defendant's Counterclaim for unlawful conversion of GSK funds. *See generally* Def.'s Mot. for Summ. J. Specifically, as to Count III of Plaintiff's Complaint (breach of contract), Defendant argues that Plaintiff cannot establish a *prima facie* case for breach of contract, given her clear status as

an "at-will" employee who could be terminated at any time by GSK. *See id.* at 15-24. Moreover, even assuming *arguendo* that a contract for term could be implied between the parties, GSK emphasizes that it had ample cause for Plaintiff's termination due to her failure to timely report her calls and her travels outside of her sales territory during normal business hours. *Id.* at 24-28. As to Count V of Plaintiff's Complaint (wrongful discharge), GSK points out that the District of Columbia does not generally recognize a tort action for wrongful discharge of an "at-will" employee, *id.* at 28 (citing *Downey v. Firestone Tire & Rubber Co.,* 630 F.Supp. 676, 681 (D.D.C.1986) (applying D.C. law)), and Plaintiff has adduced no evidence that would allow her to proceed under the narrow exception recognized in *Adams v. George W. Cochran & Co.,* 597 A.2d 28, 34 (D.C.1991) ("a very narrow exception to the at-will doctrine under which a discharged at-will employee may sue his or her former employer for wrongful discharge is when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation").

Further, GSK asserts that it is entitled to summary judgment as to Count IV of Plaintiff's Complaint (breach of duty of good faith and fair dealing), as it rests upon an implied covenant not recognized for "at-will" employees within the District of Columbia. Def.'s Mot. for Summ. J. at 30-31 (citing *Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 625-27 (D.C.1997)). Finally, GSK contends that Count II of Plaintiff's Complaint (intentional infliction of emotional distress), must fail as a matter of law because "[e]ven were every one of [Plaintiff's] allegations true, the conduct that [Plaintiff] attributes to GSK would not be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." ' *Id.* at 32-33 (citing *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998)).

Despite the extensive arguments and evidence proffered by GSK relating to Counts II-V of Plaintiff's Amended Complaint, Plaintiff's Opposition offers absolutely no response to these contentions. Rather, Plaintiff's Opposition begins by stressing, "As will be shown below, however, there are material facts in dispute as to Count VI of plaintiff's complaint and most certainly as to the counterclaim of the defendant." Pl.'s Opp'n at 1. Plaintiff concludes her Opposition by stating that she "respectfully submits that defendant's motion must be denied as to Defendant's Counterclaim and Count VI of plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint, defamation." *Id.* at 7. Given the plain limiting language in Plaintiff's Opposition and her failure to offer any argument with regard to Counts II through V of her Complaint, the Court finds that Plaintiff has effectively conceded these claims, and awards summary judgment in favor of GSK as to Counts II-V of Plaintiff's Complaint.

**\*12** Plaintiff's explicit and implicit concession of certain claims leaves only two issues currently before this Court for potential resolution on GSK's Motion for Summary Judgment: (1) Defendant's Counterclaim, which asserts that Plaintiff unlawfully converted GSK funds by "cash[ing] at least $8,850 of GlaxoSmithKline's funds without submitting adequate proof that the funds were expended for company business," Def.'s Answer to Compl. and Counterclaim at 8, ¶ 9; (2) Count VI of Plaintiff's Complaint, which alleges that GSK defamed Plaintiff by "advis[ing] former clients and colleagues of the plaintiff that she had been terminated because she had embezzled $8,000.00 from GSK," Compl. ¶ 32. The Court shall conduct a searching review of each remaining claim in turn.

### A. Defendant's Counterclaim for Unlawful Conversion

For its Counterclaim, GSK has alleged that Plaintiff cashed $8,850 in GSK funds in May and June 2001 without submitting any proof or documentation that the sum was expended for company business. Def.'s Answer to Compl. and Counterclaim at 7-8, ¶¶ 1-15. According to GSK, "[b]ecause it is indisputable that [Plaintiff] cashed drafts worth $8,850, and that she never accounted for those funds as business expenses nor repaid them, summary judgment is appropriate in favor of GSK." Def.'s Mot. for Summ. J. at 12.

Pursuant to District of Columbia law, a party will be liable for conversion if the movant establishes that the individual participated in "(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto." *Gov't of Rwanda v. Rwanda Working Group,* 227 F.Supp.2d 45, 62 (D.D.C.2002) (citing cases); *see also Kaempe v. Myers,* 367 F.3d 958, 964 (D.C.Cir.2004) (citing *Shea v. Fridley,* 123 A.2d 358, 361 (D.C.1956)); *Flocco v. State Farm Mut. Auto. Ins. Co.,* 752 A.2d 147, 158 (D.C.2000). The burden of proof for a conversion claim is a preponderance of the evidence. *R.A. Weaver & Assoc., Inc. v. Haas & Haynie Corp.,* 663 F.2d 168, 172-74 (D.C.Cir.1980); *Landise v.*

*Mauro,* 725 A.2d 445, 450 (D.C.1998). When the initial possession is lawful, the movant must make a demand for the return of the coverted goods to demonstrate the adverse nature of the possession. *Furash & Co. v. McClave,* 130 F.Supp.2d 48, 58 (D.D.C.2001) (citing *Shea,* 123 A.2d at 361). "Money can be the subject of a conversion claim when the plaintiff has the right to a specific identifiable fund of money." *Gov't of Rwanda,* 227 F.Supp.2d at 62-63 (citing *Curaflex Health Serv. v. Bruni,* 877 F.Supp. 30, 32 (D.D.C.1995)).

In this case, Plaintiff employed GSK's draft system to cash eighteen (18) drafts worth a total of $8,850 on May 31, 2001, and another two (2) drafts worth a total of $1,000 on June 18, 2001. Def.'s Stmt. of Mat. Facts ¶¶ 65-66; Pl.'s Response to Def.'s Stmt. ¶¶ 65-66. However, of the $9,850 that Plaintiff withdrew on May 31 and June 18, 2001, Plaintiff later accounted only for the $1,000 withdrawn on drafts 255545 and 255546 in her July 2-13 and July 16-27 expense reports. Def.'s Stmt. of Mat. Facts ¶ 67; Pl.'s Response to Def.'s Stmt. ¶ 67. Plaintiff never submitted documentation to prove that the remaining $8,850 was expended for company business, Def.'s Stmt. of Mat. Facts ¶ 68; Pl.'s Response to Def.'s Stmt. ¶ 68, and never acknowledged on any of her expense reports that she had cashed the eighteen (18) remaining drafts in question-draft numbers 255547 through 255564, Def.'s Stmt. of Mat. Facts ¶ 69; Pl.'s Response to Def.'s Stmt. ¶ 69. Accordingly, GSK was faced with a situation where Plaintiff did not submit expense reports detailing how the $8,850 was spent, or any supporting receipts, despite having over three months to do so and having already submitted expense reports which covered the relevant time period. Indeed, Plaintiff did not offer any explanation as to how the money was spent, and did not direct GSK to any third parties from whom more information could be obtained. *See* Def.'s Stmt. of Mat. Facts ¶¶ 67-69; Pl.'s Response to Def.'s Stmt. ¶¶ 67-69. As such, GSK relayed these failures to Plaintiff's counsel in a letter sent via facsimile and first class mail on October 28, 2002, and concluded the letter by stressing:

**\*13** Although the company considered forgiving the amount due in an effort to settle the matter, the parties have been unable to reach settlement. Therefore, I am writing to clarify that GlaxoSmithKline requests repayment of the $8,850.00 for which drafts were cashed as promptly as possible.

Def.'s Stmt. of Mat. Facts ¶ 70; Pl.'s Response to

Def.'s Stmt. ¶ 70; Pl.'s Mot. for Summ. J., Ex. 21 (letter from Thomas S. Williamson, Jr. to Gregory L. Lattimer (Oct. 28, 2002)).

Plaintiff makes three arguments in opposition to summary judgment on GSK's Counterclaim for unlawful conversion. *See* Pl.'s Opp'n at 4-5. First, Plaintiff contends that GSK is the reason Plaintiff has not been able to provide supporting documentation for the $8,850 in advances, as GSK expense reports are normally transmitted electronically and GSK required Plaintiff to return her company computer at the time of her termination on August 9, 2001. *Id.* at 5. Second, Plaintiff claims that GSK did not make a timely demand for the $8,850 because GSK's demand letter is dated the same day that the company filed its Counterclaim-October 28, 2002. *Id.* Third, Plaintiff asserts that there is no evidence that she used the $8,850 for non-business purposes, and she further argues that GSK will not be able to prove that she did so. *Id.* Each of Plaintiff's arguments is fundamentally without merit.

### 1. *Plaintiff's Claim that She Was Prevented from Submitting Supporting Documentation*

Plaintiff first attempts to escape liability under GSK's Counterclaim for conversion by asserting that "expenses reports were generated on her computer, her computer was confiscated on the day she was terminated, because of that, she was unable to generate a final expense report." Pl.'s Opp'n at 5. In addition to the fact that this argument implicitly concedes GSK's claim that Plaintiff did not submit any supporting documentation for the $8,850 in question, Plaintiff's argument fails for three reasons.

First, Plaintiff's central premise-that lack of access to a GSK computer precludes a former sales representative from submitting supporting documentation for expenses-is transparently faulty. Plaintiff has admitted that the normal procedure for a GSK sales representative was that "expense reports were submitted electronically and supporting receipts were mailed to GSK." Def.'s Stmt. of Mat. Facts ¶ 62; Pl.'s Response to Def.'s Stmt. ¶ 62. It is undisputed that at no time, either in the weeks following her termination or any time since, has Plaintiff mailed or otherwise provided-or even offered to provide-any receipts or other documentation supporting specific expenses paid for with the $8,850 in cash advances. Def.'s Stmt. of Mat. Facts ¶ 68; Pl.'s Response to Def.'s Stmt. ¶ 68. Indeed, given that Plaintiff maintained a home office

at her residence for the purposes of her employment with GSK, *see* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 2-3, the fact that Plaintiff was terminated by GSK would not have affected her access to supporting receipts that could be mailed to GSK. Moreover, it is undisputed that Plaintiff has never identified how the money was used, even without supporting receipts, and Plaintiff has made no effort to direct GSK to third parties who might supply more information or supporting documentation vis-á-vis the expenses in question.

**\*14** Second, Plaintiff was certainly provided sufficient time by GSK to submit expense reports concerning these drafts and any supporting documentation before her firing on August 9, 2001. The bulk of the $8,850 in question ($7,850) was advanced to Plaintiff on May 31, 2001, and the remaining $1,000 was advanced to her on June 18, 2001. Plaintiff has acknowledged that her GSK manager expected her to submit her expense reports within a week after each expense period. *See* Def.'s Mot. for Summ. J., Ex. 6 ("Expectations for 2001") at 1 ("Expense reports to me by Wednesday after expense period-No exceptions."); *id.,* Ex. 5 (Poullard Dep.) at 139:1-16. As such, Plaintiff certainly had sufficient time under normal GSK practice to submit her expense report for these drafts between late June and early August 2001. Moreover, Plaintiff *actually* did electronically submit four expense reports to GSK to obtain reimbursement for business expenses that she incurred during the period from June 4-July 27, 2001. *See id.,* Ex. 16 (Declaration of James J. Edwards (hereinafter, "Edwards Decl.")) at ¶¶ 11-20 & Attach. A-C. Those reports make reference to $1,000 of the drafts signed by Plaintiff on May 31, 2001 for which she provided supporting documentation; however, the reports make no reference to any of the drafts that constitute the $8,850 despite the fact that such a reference would be warranted given the circumstances and the opportunity provided. *Id.* Accordingly, Plaintiff certainly had the opportunity to submit expense reports and supporting documentation concerning the drafts in question while at GSK, but consciously chose only to deal with some drafts while ignoring the bulk of the expenditures.

Third, GSK provided Plaintiff another opportunity to submit supporting documentation during discovery in this case. Importantly, GSK asked Plaintiff to produce substantiating documents in discovery, and Plaintiff produced no such documents. For example, GSK specifically requested production of "all" receipts or other documents that would support any

claim for business expenses that Plaintiff had incurred on behalf of GSK during her period of employment. *See* Def.'s Reply, Ex. 1 (Def.'s First Requests for Produc. of Docs.) at Nos. 18-19. Plaintiff's response merely referred to "Attachment 4" of Plaintiff's document production, which does not contain any documents that show Plaintiff used the drafts at issue for business purposes. *Id.,* Ex. 1 (Pl.'s Responses to Def.'s First Requests for Produc. of Docs.) at Nos. 18-19; *see also id.,* Attach. 4 (email correspondence between Plaintiff and GSK re: missing product samples and Plaintiff's expenses incurred prior to March 9, 2001). Indeed, Plaintiff failed to produce any receipts indicating expenses during June, July, or the first week of August 2001, missing another opportunity to point the Court or GSK to any documents to show how Plaintiff spent the $8,850 provided to her by GSK for business expenditures.

**\*15** Given these three factors, the Court finds Plaintiff's claim that GSK somehow prevented her from obtaining and/or submitting supporting documentation for the expenses in question to be without foundation.

### 2. *Plaintiff's Claim that Defendant's Demand Was Untimely*

Without citing to any legal authority, Plaintiff also argues that GSK's claim for conversion must fail because its October 22, 2002 demand letter was "untimely," as it was sent to Plaintiff's counsel on the same day that GSK filed its Counterclaim. Pl.'s Opp'n at 5. Plaintiff's argument again fails for three reasons.

First, as a threshold matter, GSK was not required to serve a demand letter to substantiate its conversion claim under District of Columbia law. Rather, a demand letter "is necessary only when there are no 'other facts and circumstances independently establishing conversion." ' *Bowler v. Joyner,* 562 A.2d 1210, 1212-13 (D.C.1989) (quoting *Shea,* 123 A.2d at 361). Here, it is undisputed that Plaintiff received $8,850 from GSK, but never properly accounted for the funds pursuant to GSK policy. Accordingly, GSK can establish conversion independent of any demand letter, obviating the need for a demand letter under the law. Second, Plaintiff has cited no authority for her proposition that a demand letter must be sent prior to the filing of any claim or counterclaim. Third, and finally, Plaintiff can show no prejudice from any "delay" by GSK, as she waited more than one year to file her Answer to

Defendant's Counterclaim. Plaintiff, by waiting until November 3, 2003 to respond to Defendant's October 28, 2002 Counterclaim, had over one year to moot Plaintiff's Counterclaim by repaying the amount or providing supporting receipts before having to proceed with the instant litigation. As such, Plaintiff's "timeliness" defense must fail as a matter of law.[FN3]

> FN3. In Plaintiff's Answer to Defendant's Counterclaim, Plaintiff raises the defense of the applicable statute of limitations, but does not specifically discuss this defense in her Opposition to Defendant's Motion for Summary Judgment. *See* Pl.'s Answer at 2. To the extent that Plaintiff's "timeliness" defense can be construed as an argument based upon the relevant statute of limitations, Plaintiff's argument is without foundation. Under District of Columbia law, a three-year statute of limitations applies to claims for conversion. *See Kuwait Airways Corp. v. Am. Sec. Bank, N.A.,* 890 F.2d 456, 460-61 (D.C.Cir.1990); *Forte v. Goldstein,* 461 A.2d 469, 472 (D.C.1983) (per curium). Defendant's Counterclaim arose, at the earliest, in May 2001, and Defendant filed a Counterclaim regarding its claim for conversion on October 28, 2002, *see* Def.'s Answer to Compl. and Counterclaim. Accordingly, Defendant's Counterclaim is well within the applicable statute of limitations.

### 3. *Plaintiff's Claim that No Evidence Suggests She Used the Funds for Non-Business Purposes*

Plaintiff's final "defense" to GSK's Counterclaim for unlawful conversion is her contention that "[t]here is absolutely no evidence of record that plaintiff did not use the funds in question for business-related expenses and there is no chance that GSK will ever be able to prove that plaintiff did not so use the subject funds." Pl.'s Opp'n at 5. Plaintiff's only support for her assertion is her own affidavit that states, "At no time did I ever use the funds provided to me by GSK for anything other than GSK business related matters." *See* Pl.'s Opp'n, Ex. 5 (Poullard Decl.) at ¶ 9. Plaintiff makes no effort to identify how the funds in question were spent, nor does she identify any third parties that may be the source of any relevant information concerning the expenses. Plaintiff's conclusory affidavit, supported by no evidence within the record, is insufficient to avoid summary judgment. *See Johnson v. U.S. Capitol*

Slip Copy                                                                                                      Page 12
Slip Copy, 2005 WL 3244192 (D.D.C.)
(Cite as: Slip Copy)

*Police Bd.,* Civ. No. 03-614(HHK), 2005 WL 486743, at *2 (D.D.C. Mar. 2, 2005) (finding that an affidavit submitted in opposition to a summary judgment motion did not meet the standard under Rule 56 because it was "unsupported by any record evidence"); *Hastie v. Henderson,* 121 F.Supp.2d 72, 81 (D.D.C.2000), *aff'd sub. nom., Hastie v. Potter,* Civ. No. 00-5423, 2001 WL 793715, at *1 (D.C.Cir. June 28, 2001) (no genuine issue of material fact where sole evidence plaintiff provided was "her own self-serving and conclusory statement"); *Phillips v. Holladay Prop. Serv., Inc.,* 937 F.Supp. 32, 35 n. 2 (D.D.C.1996), *aff'd,* 1997 WL 411695 (D.C.Cir.1997) ("[A] plaintiff's denial ... without producing substantiation for the denial is insufficient to withstand a motion for summary judgment."); *Matthews v. Hesburgh,* 504 F.Supp. 108, 114 n. 16 (D.D.C.1980) ("Mere allegations even in an affidavit, unsupported by specific facts, are insufficient to resist a motion for summary judgment."), *aff'd,* 672 F.2d 895 (D.C.Cir.1981).

**\*16** Here, it is undisputed that Plaintiff was required by GSK policy to provide an accounting for the business purposes of the cash advance at issue. Plaintiff failed to do so, despite numerous opportunities before her termination, after GSK's initial demand letter, after GSK's Counterclaim, and after discovery in this case. Plaintiff's expense reports do not account for the cash advances during the relevant time period, and Plaintiff was required in written discovery to produce the receipts showing the business purpose of the cash advances. By failing to provide any admissible evidence to support her defense that she "did not use the funds in question for business-related expenses," Pl.'s Opp'n at 5, Plaintiff's possession of the $8,850 is in violation of GSK policy and is therefore de facto unlawful. Plaintiff has clearly "unlawful[ly] exercise[d] ... ownership, dominion and control" over GSK property, in "denial or repudiation" of GSK's right to such property. *Blanken v. Harris, Upham & Co.,* 359 A.2d 281, 283 (D.C.1976) (per curium). GSK is entitled to summary judgment based on this proof regardless of whether GSK can establish the precise non-business purposes for which Plaintiff expended the $8,850. Accordingly, finding no remaining issue of material fact, the Court shall grant GSK's Counterclaim against Plaintiff and award compensatory damages of $8,850, plus lost expenses and interest, to GSK.

*B. Count VI of Plaintiff's Complaint-Defamation*

Given Plaintiff's explicit and implied concession of Counts II-V of her Complaint, only Count VI remains for the Court's consideration under Defendant's Motion for Summary Judgment. While GSK contends that summary judgment in its favor is appropriate as to this count, because Plaintiff "has proffered not a shred of evidence to support her accusation that her former supervisors at GSK informed any former colleague or client of" Plaintiff's alleged "embezzlement," Def.'s Mot. for Summ. J. at 37, Plaintiff points to several pieces of "evidence" that allegedly support her claim for defamation. *See* Pl.'s Opp'n at 6-7. Specifically, Plaintiff cites as support (1) her deposition testimony, wherein she noted that "Drs. Gooray and Ashby contacted her and advised her of the allegations being made and she indicated that Dr. Ashby advised her that he had contacted Ms. Weatherly," *id.* at 6 (citing Plaintiff's deposition at 144-151); (2) the deposition of Sandra Weatherly, who confirmed that she received a call from Dr. Ashby and discussed Plaintiff's termination, *id.* (citing Weatherly's deposition at 66); and (3) the deposition of Alexia Knight, who testified that she heard from Nicole Cavanaugh, a therapeutic specialist with GSK, that Plaintiff had stolen money from GSK, *id.* (citing Knight's deposition at 69-70). In addition to this "evidence," Plaintiff contends that defamation can be inferred from the fact that Plaintiff was aware of the alleged embezzlement by September 2001, more than a year prior to GSK's Counterclaim and demand for repayment, meaning that Krebs or Weatherly must have told her "friends, colleagues and business contacts about such a claim which was then passed on to her." *Id.* at 7.

**\*17** To establish a defamation claim in the District of Columbia, a plaintiff must prove the following elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) that either the statement was actionable as a matter of law irrespective of special harm or its publication caused the plaintiff special harm." *Klayman v. Segal,* 783 A.2d 607, 613 n. 4 (D.C.2001); *Benic v. Reuters America, Inc.,* 357 F.Supp.2d 216, 220-21 (D.D.C.2004). A statement is defamatory "if it tends to injure [a] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Olinger v. Am. Sav. & Loan Ass'n,* 409 F.2d 142, 144 (D.C.Cir.1969). To qualify as defamation, a statement must cause the plaintiff to appear " 'odious, infamous, or ridiculous.' " *Howard Univ. v. Best,* 484

Slip Copy                                                                                    Page 13
Slip Copy, 2005 WL 3244192 (D.D.C.)
**(Cite as: Slip Copy)**

A.2d 958, 989 (1984) (quoting *Johnson v. Johnson Publ'g Co.,* 271 A.2d 696, 697 (D.C.1970)).

Viewed through the prism of these legal requirements, it is plain that Plaintiff's defamation must fail for three reasons. First, it is well established that truth is an absolute defense to a defamation claim. *Benic,* 357 F.Supp.2d at 221 (citing *Olinger,* 409 F.2d at 144). This defense may be established by demonstrating that the statements in question are "substantially true." *Lohrenz v. Donnelly,* 223 F.Supp.2d 25, 29 (D.D.C.2002). "Substantially true" means that "the gist" of the statement is true or that the statement is substantially true, as it would be understood by its intended audience. *Benic,* 357 F.Supp.2d at 221 (citing *Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C.1990)). Here, the undisputed facts show-and the Court has concluded, *see supra* Section III(A)-that Plaintiff cashed $8,850 in GSK draft advances, but failed to provide any supporting documentation that those monies were used for GSK business-related purposes, as required by GSK policy. Accordingly, even if Krebs or Weatherly informed Plaintiff's colleagues or clients that she "embezzled" GSK funds, such a statement would be "substantially true" and GSK could not be held liable for defamation.

Second, even assuming *arguendo* that GSK somehow made false or defamatory statements concerning Plaintiff, Plaintiff can offer no direct evidence that such defamatory statements harmed her reputation or caused her personal harm. Rather, it is uncontested that Plaintiff was hired as a pharmaceutical sales representative with Sanofi within a few short weeks of her termination from GSK on August 9, 2001. This position has provided Plaintiff a higher base salary, and Plaintiff has been a "top performer" at her new employer from the outset, benefitting from promotion and bonus opportunities while working for her new employer. Plaintiff has simply produced no evidence showing that she was injured either professionally or personally from any such statements stemming from GSK. Moreover, Plaintiff has presented no evidence supporting her contention that such statements somehow caused her mental anguish. Rather, while Plaintiff has received psychological counseling, such counseling occurred over two years after her termination, and the records of her counselor-Ms. Walker-Harris-reveal that the counseling sessions never addressed her termination from GSK. Def.'s Stmt. of Mat. Facts ¶¶ 78-80; Pl.'s Response to Def.'s Stmt. ¶¶ 78-80. Accordingly, even if Plaintiff could prove that defamatory statements were made by GSK, Plaintiff cannot establish the "harm"

necessary to substantiate a cause-of-action for defamation.

**\*18** Third, and finally, GSK is correct that Plaintiff has produced no admissible evidence to support her allegation that Krebs and/or Weatherly made defamatory statements to her colleagues or former clients concerning any alleged "embezzlement" on her part. As related in her deposition, Plaintiff claims that three of her former sales-representative colleagues at GSK-Michael McGhee, Stacy Taylor, and Alexia Knight-informed her that Krebs and Weatherly stated to two of Plaintiff's former GSK customers-Drs. Ashby and Gooray-that she had been terminated for embezzling $8,000 from GSK. *See* Def.'s Mot. for Summ. J., Ex. 5 (Poullard Dep.) at 144:11-18, 145:8-17, 146:19-25. Here, Plaintiff purports to rely on double hearsay. Specifically, her contentions stem from what she alleges her coworkers say that they claim to have heard managers, Brian Krebs and Sandra Weatherly, say to Drs. Ashby and Gooray. In advancing these claims, Plaintiff does not point to any sworn declaration or any deposition testimony by Mr. McGhee, Ms. Taylor, or Ms. Knight that supports Plaintiff's contention that Krebs and Weatherly made defamatory statements about her to Drs. Ashby and Gooray.

To the extent the information relied upon by Plaintiff is based on second or third-hand statements, rather than personal knowledge, the Court notes that such testimony consists of inadmissible hearsay. *See* Fed.R.Evid. 801(c) ( " 'Hearsay' is a statement, other than one made by the declarant while testifying at the ... proceeding, offered in evidence to prove the truth of the matter asserted."); Fed.R.Evid. 802 ("Hearsay is not admissible."). Because "[o]nly that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion," any hearsay statements relied upon by Plaintiff are legally insufficient to support her defamation claim. 10A Charles a. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2722, at 371-72 (3d ed.1998); *see also Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C.Cir.2000) (hearsay evidence is insufficient to defeat summary judgment, as "[v]erdicts cannot rest on inadmissible evidence."); *Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 6 (D.C.Cir.1998) ("An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to defeat summary judgment.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Moreover, Plaintiff's Opposition glosses over the fact that both Dr. Ashby and Dr. Gooray signed declarations stating under oath that they "had not been informed by any GSK manager or employee of the specific reasons for [Plaintiff's] departure from GSK," and-similarly-they had "not been informed by any GSK manager or employee that [Plaintiff], while she was employed by GSK, engaged in any financial impropriety." *See* Def.'s Mot. for Summ. J., Ex. 28 (Ashby Decl.) ¶¶ 5-6; *id.*, Ex. 29 (Gooray Decl.) ¶¶ 5-6. Plaintiff's GSK supervisors, Ms. Weatherly and Mr. Krebs, also denied in sworn testimony that they made defamatory statements to Dr. Ashby or Dr. Gooray. Def.'s Stmt. of Mat. Facts ¶ 82; Pl.'s Response to Def.'s Stmt. ¶ 82. Moreover, while Ms. Knight, in her deposition, stated that she heard another GSK employee, Nicole Cavanaugh, "mention[ ]" a rumor that Plaintiff had stolen money from GSK, *see* Pl.'s Opp'n at 6 (citing Knight Dep. at 69-70), Ms. Cavanaugh signed a declaration stating under oath that (1) no GSK manager, including Weatherly and Krebs, ever informed her of the reasons for Plaintiff's departure from GSK, and (2) no GSK manager, including Weatherly and Krebs, ever informed her Ms. Cavanaugh that Plaintiff had engaged in any financial impropriety. *See* Def.'s Mot. for Summ. J., Ex. 30 (Cavanaugh Decl.) at ¶¶ 3-4. As such, the evidence of direct testimony by all relevant parties definitively rebuts Plaintiff's double hearsay-based allegations of defamation. Given Plaintiff's total reliance on indirect, inadmissible evidence and the wealth of evidence supporting a finding that no defamatory statements were made by Krebs and Weatherly, Plaintiff simply cannot establish defamation as a matter of law. *See Szot v. Allstate Ins. Co.,* 161 F.Supp.2d 596, 608 (D.Md.2001) ("Plaintiff's references to the 'rumor mill' created by her former peers' sheer speculation as to the grounds for her termination, without more, is insufficient to establish a claim of defamation against ... the employer."; Plaintiff had no evidence that her supervisor was responsible for the rumors).

**\*19** Accordingly, given that truth is a defense, Plaintiff has failed to produce evidence showing professional or reputational harm, and Plaintiff's counter-argument relies solely on inadmissible hearsay, no issue of material facts remains before the Court on Count VI of Plaintiff's Complaint. Rather, Plaintiff is unable to make a showing of defamation as a matter of law, and Defendant's Motion for Summary Judgment as to Count VI must therefore be granted.

### IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary Judgment, and shall award Defendant $8,850, plus expenses and post-judgment interest, as compensatory damages for Plaintiff's unlawful conversion of GSK funds. An Order accompanies this Memorandum Opinion.

D.D.C.,2005.
Poullard v. Smithkline Beecham Corp.
Slip Copy, 2005 WL 3244192 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:02cv01590 (Docket) (Aug. 09, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Slip Copy                                                                                                    Page 1
Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Julio MATTA, Plaintiff,
v.
John W. SNOW, Secretary of the Treasury,
Defendant.
**No. Civ.A. 02-862(CKK).**

Dec. 16, 2005.

Lawrence Bain Manley, Washington, DC, for Plaintiff.
Daria Jean Zane, Stratton Christopher Strand, United States Attorney's Office, Washington, DC, for Defendant.

MEMORANDUM OPINION
KOLLAR-KOTELLY, J.
**\*1** Plaintiff, a former employee of the United States Treasury Department Bureau of Engraving and Printing ("BEP"), brings the above-captioned action against Defendant John W. Snow in his official capacity as Secretary of the Treasury pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* as amended ("Title VII"), alleging, *inter alia,* that he was subjected to a hostile work environment based on his national origin-Hispanic-and in retaliation for his activities as a Senior Equal Employment Opportunity ("EEO") Specialist in the BEP's EEO office. *See* Compl. at 13-15 (Count I). Currently before the Court is Defendant's Motion for Summary Judgment, which contends that (1) Plaintiff has failed to establish that any of the actions about which he complains occurred "because of" his national origin or his opposition to discriminatory practices; (2) the negative interactions identified by Plaintiff are insufficient as a matter of law to constitute a severely abusive or hostile work environment; and (3) the BEP acted promptly and appropriately in addressing Plaintiff's concerns and "preventing" any future problems, thereby negating any potential liability.

Upon a searching examination of Defendant's Motion for Summary Judgment, Plaintiff's Opposition, Defendant's Reply, the relevant case law, the attached exhibits, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment.

## I: BACKGROUND

### A. Procedural Background

On May 3, 2002, Plaintiff, who identifies himself as "an African-Hispanic American," Pl.'s Disputed Mat. Facts ¶ 1, filed the above-captioned action. Named as Defendants were Paul O'Neill, then-Secretary of the Treasury,[FN1] and the following who are sued individually and in their capacities as employees of the Department of the Treasury: Brian Saxe, Robert Erbe, Russell U. Carpenter, and George B. Boyer (collectively "Individual Defendants").[FN2] Compl. at 1. Defendants Saxe, Boyer and Carpenter were at the time of the alleged incidents BEP Labor Management Relations ("LMR") managers, and Defendant Erbe was a BEP attorney. *Id.* ¶¶ 10-13; Def.'s Stmt. of Mat. Facts Not in Dispute ("Def.'s Stmt. of Mat. Facts") ¶¶ 11-13. Defendants Erbe, Boyer and Saxe are white males, and Defendant Carpenter is a Black, non-Hispanic male. *Id.*

> FN1. During the course of this litigation, the Court substituted current Secretary of the Treasury, John Snow, as lead Defendant.

> FN2. On July 19, 2002, the United States filed a notice, substituting itself as Defendant for the Individual Defendants.

Plaintiff's Complaint contains seven counts. Count I alleges unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964. *Id.* at 13. Count II alleges unlawful discrimination in violation of 29 C.F.R. § § 1614.101(b), 1614.102(a)(3), (5), (6), and (13), and 1614.102(b)(4). *Id.* at 15. Count III alleges defamation of character. *Id.* at 16. Count IV alleges misrepresentation and fraud. *Id.* at 19. Count V alleges intentional infliction of emotional distress. *Id.* at 21. Count VI alleges conspiracy in violation of 42 U.S.C. § 1985(3). Finally, Count VII alleges that Plaintiff is entitled to attorney's fees and costs under the Equal Access to Justice Act. *Id.*

**\*2** In a Memorandum Opinion dated September 29, 2003, this Court granted-in-part and denied-in-part Defendants' Motion to Dismiss and for Summary

Judgment. *See Matta v. O'Neill,* Civ. No. 02-862 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and denying-in-part Defendants' Motion to Dismiss and for Summary Judgment). Specifically, the Court (1) accepted the certification of the Assistant United States Attorney and substituted the United States for the Individual Defendants pursuant to Title 28 U.S.C. § 2679, *id.* at 23, and (2) dismissed for lack of jurisdiction and/or failure to state a claim Counts II, III, IV, V, VI, and VII of Plaintiff's Complaint, *id.* at 23-25,31-32. Moreover, given the fact that "[t]he only proper defendant in a Title VII suit ... is the 'head of the department, agency, or unit' in which the allegedly discriminatory acts transpired," *Hackley v. Roudebush,* 520 F.2d 108, 115 n. 17 (D.C.Cir.1975), the Court dismissed Plaintiff's Title VII claims as they related to the Individual Defendants. *Id.* at 26. However, the Court denied Defendants' motion as it related to Plaintiff's hostile work environment claim (Count I) against the agency, finding that "[t]he factual record at this time is not developed fully enough for this court to determine whether or not Plaintiff is able to make out a hostile work environment claim." *Id.* at 30. The Court did limit this claim somewhat, as it concluded that Plaintiff had failed to provide a sufficient evidentiary basis upon which a reasonable jury could conclude that he was constructively discharged from the BEP, *id.* at 30-31, and pointed out that Plaintiff "has not alleged or even alluded to a claim for failure to promote," *id.* at 30.

### B. Relevant Factual History

Upon the completion of discovery, the following material facts are undisputed. [FN3]

> FN3. The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)). As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the

parties' statements.

### 1. *Plaintiff's Duties and Responsibilities at the BEP's EEO Office*

Plaintiff, Julio Matta ("Plaintiff" or "Matta"), worked as a Senior EEO Specialist, GS-13, for the BEP's EEO office from September 25, 2000, until on or about October 20, 2001. Def.'s Stmt. of Mat. Facts ¶ 2.[FN4] As a Senior EEO Specialist, Plaintiff was required to "[c]ounsel employees and applicants who feel they have been discriminated against in the more complex and difficult cases." *Id.* ¶ 3 (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 1; *id.,* Ex. D (Pl.'s Third Dep. Vol.) at 5:1-9). Plaintiff's official contacts were with "supervisors and managers from first-line supervisors to Office Chiefs with representations from the Bureau, unions, EEO Specialists, personnel management specialists, etc." *Id.* (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3). The purpose of these contacts was to "resolve difficult and emotionally charged employment problems [, and] to obtain agreement and/or necessary action on the part of Bureau managers concerning employment policies and practices affecting Equal Employment Opportunity." *Id.* (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3-4; Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 5:13-6:8).

> FN4. Plaintiff's Statement of Disputed Material Facts fails to address the following of Defendant's factual statements: ¶ ¶ 2-13, 19-21, 26-31, 33-34, 37-38, 40, and 47. *See generally* Pl.'s Disputed Mat. Facts. Having failed to contest these facts, Plaintiff is deemed to have conceded them. *See* LCvR 7(h); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 151 (D.C.Cir.1996); *Twist v. Meese,* 854 F.2d 1421, 1423-24 (D.C.Cir.1988); *Heasley v. Dist. of Columbia Gen. Hosp.,* 180 F.Supp.2d 158, 163 (D.D.C.2002); *Trawick v. Hantman,* 151 F.Supp.2d 54, 58-59 (D.D.C.2001).

**\*3** Throughout Plaintiff's thirteen-month tenure at the BEP, Jean Pitts, an African-American female, was Chief of the BEP's EEO office. *Id.* ¶ 4. Ms. Pitts reported directly to Tom Ferguson, a white male, who was the Director of the BEP. *Id.* Plaintiff was initially hired as a Senior EEO Specialist; as such, his

Slip Copy                                                                                              Page 3
Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

first-line supervisor was Sandra Mathews, an African-American female, who was the Supervisory EEO Specialist, while his second-line supervisor was Ms. Pitts. *Id.* ¶ 5. In early November 2000, less than two months after his hiring, Ms. Pitts reassigned Plaintiff to the position of Technical Adviser to the Chief ("Technical Adviser"), another GS-13 position within the EEO office. *Id.* ¶ 6. Plaintiff served as a Technical Advisr until he left the agency in October 2001, with Ms. Pitts serving as his first-line supervisor. *Id.*

As a Technical Adviser, Plaintiff continued to work as a full-time informal counselor, but also served as an "in house expert ... on EEO matters." *Id.* ¶ 7 (citing Def.'s Mot. for Summ. J., Ex. E (Decl. of Jean Pitts (hereinafter, "Pitts Decl.")) ¶ 4; *id.,* Ex. B (Pl.'s First Dep. Vol.) at 39:22-40:21). In addition, Plaintiff's position as a Technical Adviser required the creation of orientation and training materials concerning EEO rights and responsibilities, and the provision of regular training to both the workforce and management on EEO rights and responsibilities. *Id.* Given these wide-ranging duties, Plaintiff was required to maintain "positive" work relationships with both "staff members"-including managers-and "customers"-i.e., those who sought EEO counseling. *Id.* ¶ 8 (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 6:9-9:19; *id.,* Ex. F (Performance Standards and Elements for EEO Specialist/Technical Adviser) at 3). Moreover, Plaintiff, in his position as Technical Adviser, was required to display sensitivity to managers and customers, and maintain neutrality both in investigating informal complaints and in advising managers on EEO questions. *Id.*

Adherence to these carefully-outlined duties and responsibilities was crucial, because the EEO office was responsible for the informal counseling stage of the discrimination complaint process, which included processing informal complaints, while formal complaints were to be investigated by the Regional Complaint Center. *Id.* ¶ 9. Importantly, the EEO office did not have the authority to file a complaint on behalf of an employee with the Regional Complaint Center. *Id.* As such, Plaintiff's role in processing an informal complaint was to impartially "find the facts" and then recommend appropriate action to the EEO Chief. *Id.* ¶ 10. Plaintiff's role as the Technical Adviser was not to make final determinations as to whether discrimination had or had not occurred. *Id.*

### 2. *Relevant Communications Between Plaintiff and His Colleagues*

During his thirteen-month tenure at the BEP, Plaintiff's correspondence with his colleagues indicates that a certain level of tension and contentiousness existed between Plaintiff and his cohorts. Discovery in this case focused on eight separate written exchanges between Plaintiff and his colleagues. According to Defendant, these eight communications highlight certain inappropriate behavior by Plaintiff, and provide the foundation for later concerns about Plaintiff by some of his colleagues.

**\*4** First, on November 14, 2000, Plaintiff wrote an email to his first-line supervisor at the time, Sandra Mathews, on which he cc'd Ms. Pitts, stating:
I notice that you have assigned Mr. Crawford James Case to me in the EEO Log. I am requesting that you log this entry correctly and assign that EEO Counseling to Mr. James Malloy.... *I am not responsible for the case nor am I going to be monitoring such case.* [T]his is the supervisor['s] job .... you need to keep abreast of the case .... to insure timeliness by our office. So, in the spirit of correctness, please reassign this case to the proper individual to wit: Mr. James Malloy.

Def.'s Stmt. of Mat. Facts ¶ 15 (emphasis added); Pl.'s Disputed Mat. Facts ¶ 15 (explaining that he was not supervised by Ms. Mathews after November 29, 2000, and he was concerned that Mr. Malloy was not being assigned sufficient cases); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 15 (Ms. Mathews was Plaintiff's supervisor at the time of this email).

Second, on November 29, 2000, Don Jamerson, a BEP manager, sent an email to Ms. Pitts expressing his concern that Plaintiff had "quizzed" two of his employees about alleged racial harassment before even giving Mr. Jamerson notice that an EEO complaint had been filed. Def.'s Stmt. of Mat. Facts ¶ 16; Pl.'s Disputed Mat. Facts ¶ 16 (attempting to explain his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 16 (noting that Plaintiff's explanation did not dispute that he followed this course of conduct, and pointing out that Plaintiff's explanation is based upon incompetent evidence). Ms. Pitts then forwarded this email to Plaintiff, who responded via an email in which he attempted to explain his actions. *Id.* Plaintiff cc'd Mr. Jamerson on his email to Ms. Pitts. *Id.* Plaintiff, in the email, described Mr. Jamerson's employees as "twist[ing] issues somewhat." *Id.* (quoting Def.'s Mot. for Summ. J.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 4
Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

Ex. I (Pl.'s Nov. 20, 2000 email) at 1). Plaintiff also said that it would be a "direct violation of [29 C.F.R.] 1614" for Mr. Jamerson to have Mr. Boyer investigate the alleged racial incident to determine whether disciplinary action was warranted. *Id.* In response, Ms. Pitts cautioned Plaintiff about cc'ing someone outside the EEO office (Mr. Jamerson) on what should have been an internal communication. *Id.* Upon receipt of Ms. Pitts' response, Plaintiff pledged that he would "use more care in judgment before using cc next time." *Id.* (quoting Def.'s Mot. for Summ. J., Ex. J (Pl.'s Nov. 30, 2000 email) at 1).

Third, on February 10, 2001, Plaintiff distributed a memorandum to the Joint Apprenticeship Advisory Committee ("JAAC") concerning the possible removal of an African-American employee from the apprenticeship program who failed two program-related courses. Def.'s Stmt. of Mat. Facts ¶ 17; Pl.'s Disputed Mat. Facts ¶ 17 (explaining his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 17 (noting that Plaintiff's explanation is without citation to the record, and Plaintiff concedes the underlying facts). In his memorandum, Plaintiff argued for the employee's placement on "academic probation," and concluded:
**\*5** If Mr. _____ [redacted] is terminated from the program and in the future, [and] other apprentices are provided with the opportunity for remedial training or retraining, Mr. \_\_\_\_\_ [redacted] will have sufficient evidence to raise the inference of Discrimination. Also, if his participation came as the result of an EEO decision, his dismissal without the stipulated benefit of remedial training or retraining set forth by this policy can and will be seen as Retaliation by the U.S. Equal Employment Opportunity Commission.

*Id.* This memorandum caused significant consternation among Plaintiff's colleagues, as he was not authorized to speak for the EEOC in making this representation, nor had he performed an investigation into whether there were any similarly-situated white employees. *Id.*

Fourth, on March 14, 2001, Plaintiff distributed another memorandum to the JAAC. This memorandum asserted that the JAAC earlier had made a "binding agreement" to retain the employee who had failed two courses. Def.'s Stmt. of Mat. Facts ¶ 18; Pl.'s Disputed Mat. Facts ¶ 18 (offering explanation for his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 18 (noting that Plaintiff's explanation lacks any citations to the record, and arguing that it provides further evidence of Plaintiff's lack of neutrality, in that he argues that "[t]here was

no need" to investigate whether there were similarly-situated white employees before making the pronouncement that his office would consider the removal of the employee from the program "as a discriminatory act of Pretext"). Plaintiff concluded that terminating the employee from the apprenticeship program would be a breach of the purported agreement, and further stated that: "As the representative of the Equal Employment Opportunity Office, any such breech [sic] would be interpreted as a discriminatory act of Pretext to eliminate this individual from the program." *Id.* (quoting Def.'s Mot. for Summ. J., Ex. L (Pl.'s Mar. 14, 2001 JAAC Mem.) at 1-3). At the time Plaintiff wrote the memorandum making these assertions, Plaintiff had not done an investigation into whether there were similarly-situated white employees. *Id.* Moreover, Plaintiff took the extraordinary step of providing the employee in question a blind copy of this memorandum. *Id.*

Fifth, on April 9, 2001, Plaintiff wrote an email to Shawn Thompson, a member of the Electrical Appliance Committee, on which he cc'd Ms. Pitts and Sondra Hutchinson, an African-American female who served as the agency's HR Director. Def.'s Stmt. of Mat. Facts ¶¶ 12, 19. Plaintiff's email expressed his "concern and disapproval" that a meeting of the committee had taken place in his absence, emphasizing:
As with many other committee meetings ... (four to be exact) .... when Mr. Phil Boyer has not been able to attend at the last minute, all meetings have been rescheduled. If I was unable to attend, or in the future when I am unable to attend, I expect no less Professional Courtesy or Respect than any of the Committee Members and the meeting should be reschedule [sic].... No other committee member should have a privilege of rescheduling [a] Committee meeting because they can't attend, and others are just overlooked. I resent such professional disrespect....

**\*6** *Id.* (quoting Def.'s Mot. for Summ. J., Ex. M (Pl.'s First Apr. 2, 2001 Email) at 1). Ms. Pitts wrote back to Plaintiff, reminding him: "Julio, you're getting emotional on the email again with ccs to myself and Hutchinson. I thought we agreed we would talk before you sent another one of these without my knowledge." *Id.* (quoting Def.'s Mot. for Summ. J., Ex. M (Pitts' First Apr. 2, 2001 Email)); *see also* Def.'s Stmt. of Mat. Facts ¶ 21 (Plaintiff acknowledged in his deposition that Ms. Pitts cautioned him "once or twice, maybe three times" about his being too emotional in his communications

with other BEP offices). Ms. Pitts then wrote to Shawn Thompson, explaining that she had "just spoke with Julio and explained that I'm sure you did not mean any disrespect by continuing on with the meeting that he was unable to attend.... I trust that the email message ... will not change the excellent long-standing relationship our offices have established over the years." *Id.* (quoting Def.'s Mot. for Summ. J., Ex. N (Pitts' Second Apr. 2, 2001 Email)). Ms. Pitts then instructed Plaintiff to apologize to Mr. Thompson; Plaintiff did so, admitting that "the issues and situations which lead [sic] me to acknowledge my disappointment were with another committee and not this one, and I lost sight of that." *Id.* (quoting Def.'s Mot. for Summ. J., Ex. O (Pl.'s Second Apr. 2, 2001 Email)).

Sixth, on May 3, 2001, Officer Susan Vandergriff approached Plaintiff about a reasonable accommodation issue, informing Plaintiff that Commander Ashton had requested additional medical information in connection with her request for a reasonable accommodation "because she [Commander Ashton] was not satisfied with" the documentation that Officer Vandergriff already had submitted. Def.'s Stmt. of Mat. Facts ¶¶ 22-24; Pl.'s Disputed Mat. Facts ¶¶ 22-24 (attempting to explain his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶¶ 22-24 (noting that Plaintiff does not dispute the facts asserted, and instead purports to offer explanations for his conduct-as well as other non-responsive allegations-without citing to any relevant record evidence). Ms. Vandergriff was also upset that Commander Ashton was apparently keeping "a file on all her medical documentation in the privacy of her [Commander Ashton's] office." *Id.*

While Office Vandergriff was still in Plaintiff's office, Plaintiff called Mr. Saxe and advised him-in Office Vandergriff's presence-that: (1) "at least five Police Officers have alleged that Commander Ashton was requesting an enormous amount of medical documentation, and that she had informed these officers that she had the right[ ] to keep all medical documentation in a private file cabinet in her office"; (2) Commander Ashton was "in violation of the ADA and/or Section 501 of the Rehabilitation Act"; and (3) "the only other means to stop this discriminatory practice would be to file for assistance with the Office of Federal Operations, Equal Employment Opportunity Commission, because if any other these incidents would reach the floor of a federal court, it would be costly to BEP." *Id.* (citing Def.'s Mot. for Summ. J., Ex. P (Formal EEO Compl.) at Bates # 000013-14; *id.,* Ex. A (Pl.'s Second Dep. Vol.) at

82:18-83:2). Indeed, before May 3, 2001, Plaintiff had advised Commander Ashton "on several occasion[s]," of the "potential Per Se violation of illegally withholding medical documentation outside of Human Resources or the Medical department." *Id.* ¶ 23 (citing Def.'s Mot. for Summ. J., Ex. P (Formal EEO Compl.) at Bates # 000014; *id.,* Ex. A (Pl.'s Second Dep. Vol.) at 61:15-63:21). Plaintiff also called Mr. Saxe because he was concerned about Commander Ashton deciding for herself whether medical documentation was sufficient to support an accommodation request-an action that he opined is illegal for a supervisor to take. *Id.* ¶ 24 (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 51:14-53:24).

**\*7** Seventh, on May 8, 2001, Sandra Mathews-Plaintiff's former first-line supervisor and the Supervisory EEO Specialist-left an assignment on Plaintiff's desk. Def.'s Stmt. of Mat. Facts ¶ 25; Pl.'s Disputed Mat. Facts ¶ 25 (attempting to explain his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 25 (noting, once again, the Plaintiff concedes the underlying facts, only attempts to explain his conduct, and his explanation is devoid of any citation to record evidence). Plaintiff responded with an email, which stated in relevant part:
I received the ... case, I will study the documents and call her in. Also, I would greatly appreciate if next time you have something for me to please place it in my inbox. I don't have any outstanding Counselors Reports due to you or the RCC, so I don't understand the need for you to go into my office unless it is an emergency.

*Id.* (citing Def.'s Mot. for Summ. J., Ex. Q (Pl.'s May 8, 2001 Email) at 1).

Eighth, and finally, on May 24, 2001, Ms. Pitts presented Plaintiff with his mid-year progress review. The review stated:
I have reviewed your assignment and/or projects as they relate to your standards and elements during this half of the rating period. At this time, there are no elements that fall below the achieved standards level. Take this opportunity to review your standards and elements to assist you in achieving the best evaluation you can through the goals you've set for yourself. I look forward to working with you during the second half of this assessment/evaluation period.

*Id.* ¶ 26 (quoting Def.'s Mot. for Summ. J., Ex R (Mid-Year Progress Review)). Despite this favorable review, Plaintiff wrote back to Ms. Pitts on May 29, 2001, to complain about his Mid-Year Progress

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                           Page 6
Slip Copy, 2005 WL 3454334 (D.D.C.)
(Cite as: Slip Copy)

Review. *Id.* ¶ 27. Despite acknowledging that Ms. Pitts had informed him that everyone in the EEO office received the same type of mid-year review, Plaintiff wrote:To indicate that my assignments and project[s] have only presented such marginal critic [sic] is an insult to me as a professional and discriminatory on your part.... To diminish my ability in this manner is to subject me to unequal terms, conditions and privileges of employment since I have been rated the same as individuals who work extremely less than me and are extremely less qualified than me.... I have been loyal, professional, efficient, trustworthy, and honorable since the first day I met you. This misrepresentation of my first 8 months of work is truly unfair, unjust and discriminatory.... That no elements have fallen below achieve is the most egregious illustration of my abilities since there is a preponderance of evidence that will clearly show that all my elements (achievement) have surpass [sic] achieve and are clearly outstanding. I am sincerely hurt and in shock that you, especially you who I have held in such [a] special place and pedestal, would disrespect me in such manner.

*Id.* (quoting Def.'s Mot. for Summ. J., Ex. S (Pl.'s May 29, 2001 Mem.) at 1-2); *see also* Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 47:11-52:5 (Plaintiff later testified that he used the word "discriminatory" in this memorandum even though he did not believe that Ms. Pitts was discriminating against him on the basis of any protected category, but merely because he believed she was being unfair).

### 3. *Plaintiff's Interactions With Messrs. Saxe, Boyer, Carpenter, and Erbe*

**\*8** As noted previously, *see supra* Section I(A), Plaintiff has identified four specific BEP employees that he claims harassed him: Brian Saxe, Robert Erbe, Russell U. Carpenter, and George B. Boyer. *See* Def.'s Stmt. of Mat. Facts ¶ 11; *see also* Def.'s Mot. for Summ. J., Ex. B (Pl.'s First Dep. Vol.) at 80:11-81:10 (these are the only BEP employees that Plaintiff claims harassed him). None of these individuals was in Plaintiff's chain of command, and none had supervisory authority over him. Def.'s Stmt. of Mat. Facts ¶ 14; Pl.'s Disputed Mat. Facts ¶ 14 (disputing only whether these individuals had the power to take an adverse personnel action against him); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 14. As illuminated in the record by the discovery process in this case, Plaintiff had the following interactions

with these individuals:

#### i. *Mr. Saxe*

Plaintiff recalls having only one conversation with Brian Saxe during the entire time that he was employed at the BEP-the May 3, 2001 telephone conversation regarding Commander Ashton where Plaintiff had Officer Vandergriff in his office. Def.'s Stmt. of Mat. Facts ¶ 28. According to Plaintiff, that telephone conversation "was not confrontational," and Mr. Saxe did not use any type of derogatory terms with regard to Plaintiff. *Id.* (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 81:2-4, 81:13-24). Indeed, although Plaintiff saw Mr. Saxe around the office, he never personally met him. *Id.* ¶ 29. Mr. Saxe never physically attacked Plaintiff, and never physically or verbally threatened him in any way. *Id.* Moreover, Plaintiff never personally heard Mr. Saxe make a derogatory comment about him based on his national origin, nor did he ever hear from someone else that Mr. Saxe had made such a comment. *Id.* ¶ 30 (citing Def.'s Mot. for Summ. J., Ex. D (Pl.'s Third Dep. Vol.) at 33:10-18).

#### ii. *Mr. Boyer*

Plaintiff recalls interacting with George B. Boyer on only three occasions. *Id.* ¶ 31. The first two occasions were meetings of the JAAC on February 12, 2001, and March 13, 2001. *Id.* At these meetings, which included individuals other than Plaintiff and Mr. Boyer, no harsh words or rude statements were exchanged between Mr. Boyer and Plaintiff, and there was no overt hostility between the two individuals. *Id.* The third occasion was a one-on-one meeting sometime before July 20, 2001, in which Mr. Boyer and Plaintiff met to discuss a joint effort by the EEO office and LMR to draft a reasonable accommodation policy. *Id.* ¶ 32. Once again, there was nothing hostile in the interaction between the two individuals at that meeting. *Id.* Indeed, whenever they saw each other in the hallway, Plaintiff would say hello, and Mr. Boyer would nod. *Id.* ¶ 33. Plaintiff never had any hostile face-to-face interactions with Mr. Boyer, and never personally heard Mr. Boyer make a derogatory comment about him based on his national origin. *Id.* ¶¶ 34-35. Plaintiff also never heard from anyone else that Mr. Boyer had made a derogatory comment about him based on his national origin. Def.'s Stmt. of Mat. Facts ¶ 35; Pl.'s Disputed Mat. Facts ¶¶ 32, 35 (contending that while "Mr. Boyer never subjected

plaintiff to a discriminatory action in person" he "continued to do so throughout the workforce" based upon Mr. Cole's belief that Mr. Boyer "was trying to accuse plaintiff of initiating a dispute on pay and soliciting the approval of Mr. Cole" and that "said incident ... was race related"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶¶ 32, 35 (noting that Plaintiff lacks competent evidence for his "conclusory allegation," as Mr. Cole's purported belief is immaterial-given that Plaintiff complains of discrimination based on national origin, not race-and based on worthless speculation).

### iii. Mr. Carpenter

*9 The only direct interactions that Plaintiff had with Russell U. Carpenter occurred in two face-to-face meetings in February or March, 2001. Def.'s Stmt. of Mat. Facts ¶ 36. The purpose of these meetings was to discuss reasonable accommodation for a police officer. Id. In one of the meetings, there was no overt hostility between the two individuals. Id. ¶ 37. However, in the other meeting, Plaintiff and Mr. Carpenter had a disagreement about the law, and Plaintiff left the meeting feeling that Mr. Carpenter's tone got "a little aggressive." Def.'s Stmt. of Mat. Facts ¶ 36; Pl.'s Disputed Mat. Facts ¶ 36 (asserting that Mr. Carpenter defamed him in two ways: (1) he advised management officials that Plaintiff's interpretation of the law was in error, but actually Carpenter was incorrect; (2) he once remarked to Brian Thompson that Plaintiff had no business participating in collective bargaining negotiations); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 36 (noting that a disagreement about the law does not constitute discrimination, and that Carpenter's purported statement to Thompson does not constitute defamation). It is undisputed that Mr. Carpenter did not insult Plaintiff, accuse him of being incompetent, call him names, or make any national origin-based derogatory comments to him at the meeting. Def.'s Stmt. of Mat. Facts ¶ 36. Moreover, Plaintiff never personally heard Mr. Carpenter make a derogatory comment about him based on his national origin, nor did he ever hear from someone else that Mr. Carpenter made a derogatory comment about him based on his national origin. Id. ¶¶ 36, 38.

### iv. Mr. Erbe

Plaintiff recalls having three face-to-face meetings with Robert Erbe, all of which occurred in the context of the apprenticeship program. Id. ¶ 39. At two of those meetings, Plaintiff feels that Mr. Erbe acted with hostility towards him. Id. The first of these incidents occurred at a meeting on March 13, 2001, when Plaintiff felt that Mr. Erbe spoke to him in an angry tone of voice and was dismissive of his input. Id. However, Mr. Erbe did not call Plaintiff any names, and backed off from his comments when the apprenticeship chairman requested that he do so. Def.'s Stmt. of Mat. Facts ¶ 39; Pl.'s Disputed Mat. Facts ¶ 39 (admitting that "Mr. Erbe did in fact backed off [sic] after showing his discriminatory behavior in front of witnesses based on plaintiff's input to the Committee and their agreement to adhere by his recommendation in his capacity of Technical Adviser to the Chief of EEO"). The only other meeting at which Plaintiff felt that Mr. Erbe acted with hostility towards him occurred in May or June 2001. Def.'s Stmt. of Mat. Facts ¶ 40. According to Plaintiff, when he entered the room, Mr. Erbe said-in a very negative voice-"What is he doing here? We don't need EEO here." Id. However, once the committee persuaded Mr. Erbe that Plaintiff was at the meeting properly, Mr. Erbe said nothing else that Plaintiff considered rude or dismissive. Id. Ultimately, Plaintiff never personally heard Mr. Erbe make a derogatory comment about him based on his national origin, and never heard from someone else that Mr. Erbe had made such a comment. Def.'s Stmt. of Mat. Facts ¶ 41; Pl.'s Disputed Mat. Facts ¶ 41 (citing to the testimony of Messrs. Thompson and Malloy, who believed that incidents that occurred outside of Plaintiff's presence were race-related); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 41 (noting that the testimony of Thompson and Malloy is both immaterial, as Plaintiff complains not of race-based discrimination but national origin-based discrimination, and inadmissible speculation that is incompetent to raise a genuine issue of material fact).

### 4. Alleged Negative Oral Comments About Plaintiff Made Outside of His Presence

*10 In addition to alleged hostilities between Plaintiff and Messrs. Saxe, Boyer, Carpenter, and Erbe during various face-to-face meetings, Plaintiff cites to four incidents in which these individuals allegedly made unflattering comments about his work performance outside of his presence. Def.'s Stmt. of Mat. Facts ¶ 46.

First, within a week of the May 3, 2001 telephone conversation that Plaintiff had with Mr. Saxe about Officer Vandergriff's situation, the officer had a meeting with Mr. Saxe. Id. ¶ 42. At the meeting with

Officer Vandergriff, Mr. Saxe stated that Plaintiff did not know what he was talking about with respect to what Commander Ashton could ask for in terms of medical documentation. *Id.; see also id.* (Mr. Saxe did not say that Plaintiff did not know what he was talking about in general) (citing Def.'s Mot. for Summ. J., Ex. T (Vandergriff Dep.) at 69:5-70:7). Mr. Saxe also told Officer Vandergriff that Plaintiff was "in trouble and a complaint had been filed," but did not specify the nature of the trouble. *Id.* At the end of the meeting, Mr. Saxe said, in a whispering tone, something to the effect of, "I wouldn't go over there [to Plaintiff's office] for a couple weeks until things have cooled down." *Id.* However, Mr. Saxe did not threaten Officer Vandergriff with retaliation if she did go to see Plaintiff. Def.'s Stmt. of Mat. Facts ¶ 42; Pl.'s Disputed Mat. Facts ¶ 42 (contending that Officer Vandergriff was told that "she would suffer consequences if she continued to seek [Plaintiff's] guidance as Technical Adviser in EEO Matters"); Def.'s Reply to Pl.'s Disputed Facts ¶ 42 (Officer Vandergriff specifically testified that Mr. Saxe did not threaten her with retaliation if she went back to see Plaintiff) (citing Def.'s Mot. for Summ. J., Ex. T (Vandergriff Dep.) at 70:15-71:4). Mr. Saxe did not use any other "unprofessional language" when speaking about Plaintiff. Def.'s Stmt. of Mat. Facts ¶ 42. Ultimately, Officer Vandergriff was granted the reasonable accommodation that she sought. Def.'s Stmt. of Mat. Facts ¶ 42; Pl.'s Disputed Mat. Facts ¶ 42 (arguing that Mr. Saxe's actions "had a chilling effect on [Officer Vandergriff's] exercise [of] her rights to file a complaint or seek counseling"); Def.'s Mot. for Summ. J., Ex. T (Vandergriff Dep.) at 73:7-74:2 (testifying that she received the sought-after accommodation).

Second, on May 10, 2001, at a collective bargaining negotiation attended by Local 32 union representatives Brian Thompson and Chris Madden and LMR Managers Saxe and Carpenter, Mr. Thompson presented a pamphlet that he had obtained from Plaintiff entitled "Collective Bargaining and Equal Employment Opportunity Laws." Def.'s Stmt. of Mat. Facts ¶ 43; Def.'s Mot. for Summ. J., Ex. X (copy of the pamphlet presented). When Saxe and Carpenter learned that Mr. Thompson had obtained this information, they stopped contract talks for the day, although the talks resumed roughly one week later. *Id* . At the May 10 meeting, Mr. Thompson also asked "for Mr. Matta to come to the next meeting to oversee the two articles in our contract that deal directly with EEO policy and laws." *Id.* However, while stating nothing degrading about Plaintiff, Messrs. Saxe and Carpenter responded that "Mr.

Matta has no business in any contract talks and Mr. Matta is doing things outside of his jurisdiction." Def.'s Stmt. of Mat. Facts ¶ 43 (citing Def.'s Mot. for Summ. J., Ex. V (Thompson Aff.) at 2); Pl.'s Disputed Mat. Facts ¶ 43 (contending that the response of the LMR Managers violated 29 C.F.R. § 1614, as Plaintiff's position allowed him to participate when guidance was requested by union stewards); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 43 (pointing out that Plaintiff's argument that this incident "caused a chilling effect of union members to exercise their right to seek EEO guidance" is made without citation to any record evidence; and arguing that it would be inappropriate for Plaintiff-an ostensibly neutral counselor-to involve himself in contract negotiations on behalf of the union).

*11 Third, on May 25, 2001, Officer Lawrence Smith and his union representative, Arthur Haynesworth, met with Mr. Erbe to discuss Officer Smith's reasonable accommodation request. Def.'s Stmt. of Mat. Facts ¶ 44. At this meeting, Mr. Erbe suggested that he and Officer Smith schedule a later meeting with management to clarify what medical documentation would be required to support Officer Smith's accommodation request. *Id.* Mr. Erbe then suggested that the meeting occur on June 5, 2001, and should include Commander Ashton (the commander of the shift to which Officer Smith was assigned), Mr. Saxe, and union officials. *Id.* Officer Smith responded that he would like to have Plaintiff present at the June 5, 2001 meeting. *Id.* Mr. Erbe then replied that having Plaintiff there "wouldn't be a good idea because Julio Matta and I have different views of the law." *Id.* (citing Def.'s Mot. for Summ. J., Ex. Z (Smith Aff.) at 2). Mr. Erbe further noted that "any question in reference to reasonable accommodation [sic] he can answer them at the meeting and that Julio Matta didn't have to be there." *Id.* (citing Def.'s Mot. for Summ. J., Ex. Z (Smith Aff.) at 2). However, Mr. Erbe did not say anything negative about Plaintiff's race or national origin, did not call Plaintiff any names, and did not refuse to have the meeting if Plaintiff was present. Def.'s Stmt. of Mat. Facts ¶ 44 (citing Def.'s Mot. for Summ. J., Ex. Y (Smith Dep.) at 70:6-15, 70:21-71:11, 76:20-77:4); Pl.'s Disputed Mat. Facts ¶ 44 (contending that "Mr. Erbe was defaming Plaintiff's ability to interpret the law as it pertained to Reasonable Accommodation"). Ultimately, Officer Smith was granted the reasonable accommodation that he sought. Def.'s Stmt. of Mat. Facts ¶ 44.

Fourth and finally, in August 2001, Eric Cole, a BEP technician, attended a meeting with Messrs. Boyer,

Carpenter, and Saxe to discuss pay issues. *Id.* ¶ 45. When the employees stated their belief that their pay should have been increased in June, the LMR managers responded: "Where did you [hear] that from [,] Julio Matta [?]" Def.'s Stmt. of Mat. Facts ¶ 45 (quoting Def.'s Mot. for Summ. J., Ex. AA (Cole Aff.) at 1); Pl.'s Disputed Mat. Facts ¶ 45 (asserting that "Mr. Cole was a witness to the continuous negative and hostile behavior plaintiff was being subjected to by Mr. Saxs [sic], Carpenter, and Boyer").

### 5. *Alleged Negative Written Statements Concerning Plaintiff*

In addition to the four negative oral comments made outside of his presence, Plaintiff has also identified three documents that he claims defamed him regarding his professional abilities. Def.'s Stmt. of Mat. Facts ¶ 47. These documents were: (1) Mr. Saxe's May 11, 2001 memorandum for the record regarding "Incidents Involving Mr. Motta [sic]"; (2) Mr. Boyer's draft memorandum regarding "Response to Memorandum of Julio Matta"; and (3) Mr. Erbe's email of June 19, 2001. *Id.; see also* Def.'s Mot. for Summ. J., Ex. BB (summaries from Boyer and Saxe); Def.'s Mot. for Summ. J., Ex. DD (Erbe's June 19, 2001 Email). Mr. Saxe's and Mr. Boyer's memoranda were provided to Mr. Carpenter, who then forwarded them to Ms. Hutchinson-the HR Director-under a cover memorandum stating: "Per our conversation and for your review, attached are the summaries from Phillip Boyer and Brian Saxe, of the incidents that occurred with Julio Motta [sic]." Def.'s Stmt. of Mat. Facts ¶ 48. Ms. Hutchinson then relayed the concerns raised in these memoranda to Ms. Pitts, who shared copies with Plaintiff on or about May 11, 2001. *Id.* A review of the memoranda indicates that the documents consist mainly of the recollections of Mr. Saxe and Mr. Boyer in dealing with Plaintiff, and their rebuttal to Plaintiff's "number of serious and unfounded allegations." *See* Def.'s Mot. for Summ. J., Ex. BB (summaries from Boyer and Saxe); *see also* Pl.'s Disputed Mat. Facts ¶ 48 (arguing, without any citation to the record, that Boyer and Saxe "exaggerated and misrepresented issues, lied to the workforce, retaliated against the workforce for seeking my guidance, and were so arrogant that they put it in writing to the workforce of the BEP").

**\*12** The third document identified by Plaintiff was Mr. Erbe's June 19, 2001 email, which stated to Gregory Davis, a union official, that "a recent publication issued by the EEO Office entitled

'Collective Bargaining and EEO' does not represent the views of the Department of Treasury or the Bureau. In fact, our office as well as LMR believe that the publication contains numerous statements that are totally inaccurate and misrepresent the law with respect to that subject." Def.'s Stmt. of Mat. Facts ¶ 49; Pl.'s Disputed Mat. Facts ¶ 49 (contending that the information in the pamphlet was not erroneous, and arguing that "[t]his in writing was a deliberate act to defame my person and create a chilling affect [sic] throughout the workforce not to seek counseling from my [sic] as the in-house EEO technical expert"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 49 (noting (1) Plaintiff's non-responsive, unsubstantiated, and conclusory allegations are incompetent to raise a genuine issue of material fact; (2) there is no competent evidence that Mr. Davis actually sent the email to anyone else in the workforce, negating any possible "chilling effect"; (3) the email referred only to "a recent publication by the EEO Office," and did not refer to Plaintiff by name, therefore ensuring that no "defamation" occurred; and (4) the publication did in fact contain material misstatements of the law).

### 6. *BEP's Efforts to Support Plaintiff and Respond to His Concerns*

#### i. *Concerns Regarding Plaintiff Are Resolved*

HR Director Hutchinson contacted Ms. Pitts in May 2001 to discuss her concerns about Plaintiff. Def.'s Stmt. of Mat. Facts ¶ 50; Pl.'s Disputed Mat. Facts ¶ 50 (not disputing underlying fact, but simply arguing that Ms. Hutchinson's expression of "her department's dislike of my participation in protected activity" was "a violation" and that she "defamed my ability by trying to insinuate that the information was incorrect and in fact it was precisely correct"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 50 (pointing out that Plaintiff's conclusory allegations fail to comply with LCvR 7(h) and are incompetent to raise a genuine issue of material fact). Ms. Pitts immediately set up a meeting with Ms. Hutchinson, and the two spent close to two hours discussing Ms. Hutchinson's concerns. Def.'s Stmt. of Mat. Facts ¶ 50. Ms. Hutchinson emphasized that she was primarily concerned about the union incident-specifically, the accuracy of the information that Plaintiff had provided to the union-because the negotiations had to be stopped. *Id.* At no time did Ms. Hutchinson mention anything about Plaintiff's national origin. *Id.* That same day, Ms. Pitts relayed Ms. Hutchinson's

Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

concerns to Plaintiff. *Id.*

In addition to expressing her concerns to Ms. Pitts, Ms. Hutchinson also informed Director Thomas Ferguson that members of the LMR staff felt that Plaintiff was "inappropriately involving himself in union business and dispensing incorrect information about EEO laws and how they applied in the collective bargaining process." *Id.* ¶ 51 (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) at ¶ 2). At about the same time, Director Ferguson also received concerns from the Office of Chief Counsel that Plaintiff was "acting as an advocate for discrimination complainants, rather than as a neutral Informal Counselor, and was giving out incorrect information concerning EEO requirements." *Id* . (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl) ¶ 3); Pl.'s Disputed Mat. Facts ¶ 51 (contending that Plaintiff was simply doing the job for which he was hired, and "was acting under the protection of 29 C.F.R. § 1614, Title VII, Title I of the ADA, and ... [the] anti-discrimination policies issued by the Director of the Agency"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 51 (noting that Plaintiff does not dispute the facts asserted, which are based on Director Ferguson's testimony, but instead "offers unrelated factual assertions and legal conclusions" in a manner that fails to comply with LCvR 7(h)).

**\*13** Having received concerns from two separate offices, Director Ferguson called a meeting with Ms. Pitts, which occurred on June 12, 2001. Def.'s Stmt. of Mat. Facts ¶ 52. With respect to the document Plaintiff had provided Brian Thompson entitled "Collective Bargaining and Equal Employment Opportunity Laws," Ms. Pitts took Director Ferguson through both Plaintiff's document and the Federal Labor Relations Authority ("FLRA") document upon which it was based. *Id.* Ms. Pitts ultimately convinced Director Ferguson that Plaintiff's document was largely true to the FLRA document. *Id.;* Pl.'s Disputed Mat. Facts ¶ 52 (arguing that this means that "[t]he information presented by plaintiff was correct" and that "LMR and the Legal Department's actions were motivated by [Plaintiff's] protected activity"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 52 (pointing out that Director Ferguson testified only that the publication was "largely" true to the FLRA document, noting that the publication contained uncontested misstatements of the law, and arguing that Plaintiff's conclusory allegation fails to comply with LCvR 7(h)). Accordingly, Director Ferguson told Ms. Pitts: "Tell Julio if I'm not worried about it, then he shouldn't worry about it." Def.'s

Stmt. of Mat. Facts ¶ 52 (quoting Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) ¶ 5). Ms. Pitts considered this a "strong statement coming from the head of the agency," *id.* (quoting Def.'s Mot. for Summ. J., Ex. FF (Pitts Dep.) at 98:21-99:16), and told Plaintiff that she had defended him at the meeting and he had nothing to worry about, *id.* Based upon Ms. Pitts's report to him, Plaintiff understood that he had nothing to worry about from a management perspective. *Id.* (citing Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 82:9-84:11).

In response to Mr. Erbe's email of June 19, 2001, Ms. Pitts sent an email to Gregory Davis, the union representative, on June 27, 2001, which stated her position as to the EEO office's authority to issue publications on EEO matters without the prior approval of the Legal Department, and defended the accuracy of the "Collective Bargaining and EEO" document. Def.'s Stmt. of Mat. Facts ¶ 53. Plaintiff considered Ms. Pitts email to be sticking up for both him and the EEO office. *Id.* (citing Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 76:3-5). Ms. Pitts also met with Mr. Erbe to personally resolve these issues, and informed Plaintiff that she had done so. *Id.;* Pl.'s Disputed Mat. Facts ¶ 53 (contending that "[a]fter said meeting between Pitts and Erbe, the hostility continued and never stopped until plaintiff's departure"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 53 (noting that Plaintiff does not dispute the facts asserted, and instead makes an unrelated and conclusory allegation that fails to comply with LCvR 7(h) and is incompetent to raise a genuine issue of material fact).

ii. *Institutional Remedies Created to Stifle Potential Problems*

**\*14** Director Ferguson felt that the disagreements among the three offices-i.e., LMR, Legal, and EEO-should be addressed through a cooperative dialogue among the offices. Def.'s Stmt. of Mat. Facts ¶ 54. Accordingly, Ferguson met individually with the chief of each office and informed them that he expected them to resolve the issues among themselves. *Id.* He also instructed them that they were to meet on a weekly basis "to discuss any issues that might arise concerning interactions among the offices or concerning the offices' interactions with the workforce." *Id.* (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) ¶¶ 8-9); Pl.'s Disputed Mat. Facts ¶ 54 (contending that "email exist were [sic] Ms. Pitts clearly indicated to Mr. Furgerson [sic] that

Ms. Hutchinson was declining to meet"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 54 (pointing out that Plaintiff provided no record support for this allegation, and has failed to produce the purported email; moreover, Ms. Pitts specifically testified that the weekly meetings did take place) (citing Def.'s Mot. for Summ. J., Ex. CC (Pitts Aff.) at 4 of 6). The weekly meetings of the three offices began immediately and continued for at least the next three to four months. Def.'s Stmt. of Mat. Facts ¶ 55. Director Ferguson kept abreast of these meetings through regular reports received from Ms. Pitts, Mr. Kinsey (the head of the Legal Department), and Joel Taub (Ms. Hutchinson's supervisor). Id. Based on these reports, Director Ferguson felt that the weekly meetings "had succeeded in resolving the disagreements among the offices and fostering a climate of cooperation." Id. (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) ¶ ¶ 10-11). Ms. Pitts generally agreed with this assessment, finding that the meetings resulted in "some open discussions around ways to improve the relationship between our offices." Id. (citing Def.'s Mot. for Summ. J., Ex. CC (Pitts Aff.) at 4 of 6).

Further, in response to a concern that Plaintiff had raised through Ms. Pitts that some bureau managers were not cooperating fully in EEO investigations, Director Ferguson issued a bureau-wide memorandum on August 22, 2001, which re-stated his expectation that all employees would fully cooperate with the EEO office. Id. ¶ 56; Pl.'s Disputed Mat. Facts ¶ 56 (arguing that this shows that "as far as August 2001, Legal and LMR were still enticing management not to cooperate with the EEO office or myself in my capacity of Technical Adviser"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 56 (noting that Plaintiff's allegation is non-responsive, devoid of citation to the record or the support of competent evidence, and the fact is that the memorandum was issued *solely* in response to Plaintiff's "representation," not in response to any proven flaws) (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) at ¶ 12). Plaintiff himself felt that this memorandum constituted strong support both for the EEO office and for himself in particular. Id. ¶ 57 (citing Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 84:12-85:3); *see also* Def.'s Mot. for Summ. J., Ex. GG (Director Ferguson's Mem.). It is uncontested that Plaintiff did not have any run-ins with Messrs. Saxe, Boyer, Carpenter, or Erbc-whether face-to-face, by email, or over the telephone-after Director Ferguson's bureau-wide memorandum was issued on August 22, 2001. Id.

### iii. *Plaintiff Leaves the BEP*

**\*15** Ms. Pitts learned in April or May 2001 that Plaintiff was applying for a position with another agency. Id. ¶ 58. Upon gaining awareness of Plaintiff's application, Ms. Pitts wrote a letter of recommendation for Plaintiff. *Id.; see also* Def.'s Mot. for Summ. J., Ex. HH (Pitts's Letter of Recommendation for Plaintiff); Pl.'s Disputed Mat. Facts ¶ 58 (contending that he was thinking of leaving the BEP because "he was told that it would take a divine intervention to get him promoted"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 58 (pointing out that Plaintiff's "non-responsive allegation" is "unsupported by competent record evidence" and that his statement fails to comply with LCvR 7(h)). Ultimately, several months later., Plaintiff was selected for a position at the Department of Defense before receiving his first year-end performance evaluation at BEP. Def.'s Stmt. of Mat. Facts ¶ 59. However, Plaintiff told Ms. Pitts that he still wished to receive a performance evaluation because he had left his previous job before receiving such an evaluation and did not want his record to reflect a two-year period without an evaluation. Id. Ms. Pitts prepared a year-end evaluation for Plaintiff, *see* Def.'s Mot. for Summ. J., Ex. E (Pitts Decl.) ¶ 9, in which she rated Plaintiff as "Exceeded Standards," the highest rating possible. Def.'s Stmt. of Mat. Facts ¶ 59; Pl.'s Disputed Mat. Facts ¶ 59 (arguing that despite the alleged "hostilities," Plaintiff "clearly" "was doing an outstanding job in all his duties as the in-house expert"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 59 (pointing out that Plaintiff's argument lends further support to Defendant's argument that he did not suffer from an actionable hostile work environment).

### iv. *Plaintiff Brings This Action*

Prior to leaving the BEP, Plaintiff filed an informal EEO complaint on July 20, 2001, Def.'s Mot. for Summ. J., Ex. JJ (Pl.'s Informal EEO Compl.), and a formal EEO complaint on August 31, 2001, id., Ex. P (Pl.'s Formal EEO Compl.). Plaintiff's EEO complaint alleges that he
was subjected to a hostile work environment because of discrimination based on his national origin (Hispanic) and in retaliation for involvement in the EEO process (opposition to potential discriminatory practices while serving as an EEO Specialist). In support of his claim, the Complainant states that commencing May 2001 to June 19, 2001: 1) he was

subjected to degrading remarks about his ability to perform his duties; 2) he has been denied opportunities to perform his duties; 3) he has been denied access to EEO related meetings; 4) he has been falsely accused of impropriety and the misrepresentation of law; and 5) he has been subjected to continual, intentional, and a malicious defamation of his character regarding his professional abilities.

*Id.* On May 3, 2002, Plaintiff filed a seven count Complaint alleging similar violations. *See generally* Compl. As noted previously, following this Court's September 29, 2003 Memorandum Opinion and Order, only Count I of Plaintiff's Complaint remains for consideration. *See Matta v. O'Neill,* Civ. No. 02-862 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and denying-in-part Defendants' Motion to Dismiss and for Summary Judgment). Count I alleges that Plaintiff was subject to a hostile work environment based upon his national origin (Hispanic) [FN5] and in retaliation for his activities as an EEO Counselor. *See* Compl. at 13-15 (Count I). As a remedy for these alleged violations, Plaintiff seeks a declaratory judgment, an injunction, compensatory damages, and attorney's fees. *Id.* at 22-23.

> FN5. Plaintiff does not claim that he was harassed on the basis of his race. *See* Def.'s Mot. for Summ. J., Ex. D (Pl.'s Third Dep. Vol.) at 34:10-35:1.

## II: LEGAL STANDARDS

### A. Summary Judgment

*16 A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to

Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*' ' *Id.* at 587, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.,* 172 F.Supp.2d 98, 104 (D.D.C.2001) (quoting *Calhoun v. Johnson,* No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar.31, 1998) (internal citation omitted), *aff'd,* No. 99-5126, 1999 WL 825425, at *1 (D.C.Cir. Sept.27, 2000)); *see also Marshall v.*

Slip Copy                                                                                           Page 13
Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

*James,* 276 F.Supp.2d 41, 47 (D.D.C.2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall,* 276 F.Supp.2d at 47 (quoting *Celotex Corp.,* 477 U.S. at 327). Accordingly, the Court reviews the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.1997) (internal quotations omitted), overturned on other grounds, 156 F.3d 1284 (D.C.Cir.1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

### B. Title VII's Burden-Shifting Framework

**\*17** Plaintiff brings this action pursuant to Title VII, which states that all personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). It is uncontested that Plaintiff was an employee during the relevant time period and the Agency is an employer within the meaning of Title VII. The Court exercises jurisdiction over Plaintiff's Title VII claim according to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the Agency were "more likely than not based on the consideration of impermissible factors" such as race or gender. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted). Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala,* 199 F.3d 512, 516 (D.C.Cir.2000) (citing *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C.Cir.1996) (internal

citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a *"prima facie"* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. If he succeeds, the burden shifts to the Agency to articulate some legitimate, non-discriminatory reason for Plaintiff's non-selection or termination, and to produce credible evidence supporting its claim. *Id.* The Agency's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089, 67 L.Ed.2d 207; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp. .,* 328 F.3d 647, 651 (D.C.Cir.2003), *cert. denied,* 540 U.S. 881, 124 S.Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207.

If Defendant is successful, then "the *McDonnell Douglas* framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is] discrimination *vel non."* *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that the Agency's proffered reason was not the true reason for the employment decision. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089, 67 L.Ed.2d 207. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207; *see also Reeves,* 530 U.S. at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (citing *St. Mary's Honor Ctr.,* 590 U.S. at 517, 113 S.Ct. 2742) ("[P]roving the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1290 (D.C.Cir.1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

**\*18** Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097, 147 L.Ed.2d 105. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207). The Court of Appeals has distilled this analysis, noting that the jury can infer discrimination from the combination of:
(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka,* 156 F.3d at 1289. However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 27-28 (D.C.Cir.1997). "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination." *Aka,* 156 F.3d at 1290.

### III: DISCUSSION

Upon a review of the record, it is plain that

Defendant's Motion for Summary Judgment must be granted for several reasons. First, Plaintiff has failed to show that the challenged conduct occurred "because of" his national origin or his opposition to discriminatory practices. Rather, all evidence indicates that the conduct, statements, and writings at issue reflected simple professional disagreements between Plaintiff and his colleagues.[FN6] Accordingly, Plaintiff cannot establish an inference that the challenged conduct was discriminatory or retaliatory in nature. Second, even if Plaintiff could meet this requirement, Plaintiff has failed to make a showing of any of the relevant factors used to support a finding that he suffered an actionable hostile work environment. As such, Plaintiff cannot establish that the work environment at the BEP's EEO office was sufficiently hostile to be actionable under Title VII. Third, and finally, Plaintiff has failed to show that the BEP knew or should have known about the harassment but failed to take prompt and appropriate corrective action. Instead, the BEP clearly took a variety of appropriate steps to immediately address Plaintiff's concerns such that it cannot be held vicariously liable for the conduct Plaintiff challenges herein.

> FN6. Indeed, the record is essentially devoid of conflict between Plaintiff and his superiors and/or supervisors.

### A. None of the Relevant Incidents Are Clearly Related to Plaintiff's National Origin or His EEO Activity

**\*19** To establish a viable claim of harassment in violation of Title VII, Plaintiff must be able to show a nexus between his protected category or his EEO activity and the alleged harassing behavior. *See, e.g., Singh v. U.S. House of Representatives,* 300 F.Supp.2d 48, 57 (D.D.C.2004) (plaintiff must make the necessary causal connection between her race, color, or national origin and the alleged mistreatment; "[t]he mere fact that [plaintiff] was the sole non-Caucasian on the committee does not, without something more, suffice to make the necessary causal connection between [plaintiff's] race, color, and national origin and the alleged mistreatment"); *Lester v. Natsios,* 290 F Supp.2d 11, 22 (D.D.C.2003) ("it must be clear that the hostile work environment was the result of discrimination based on a protected status"); *Jones v. Billington,* 12 F.Supp.2d 1, 12 (D.D.C.1997) ("In the instant case, the Plaintiff has not demonstrated that any of the conduct about which he complains was related to his race, or that his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 15

workplace was permeated with racially discriminatory behavior."). As the Second Circuit has emphasized,

Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir.2002); *see also Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir.1999) ("to sustain a hostile work environment claim ... [plaintiff] must produce evidence that she was discriminated against because of her [status]").

A review of the record indicates that Plaintiff relies upon seven incidents to prove harassment. *See* Pl.'s Opp'n at 12-14. Specifically, these seven incidents include: (1) one meeting in February/March 2001 in which Plaintiff and Mr. Carpenter disagreed about the law and Plaintiff felt that Mr. Carpenter's tone got "a little aggressive," *see* Def.'s Stmt. of Mat. Facts ¶ 36; (2) a meeting on March 13, 2001 in which Mr. Erbe spoke to Plaintiff in an angry tone of voice and was dismissive of his input, *id.* ¶ 39; (3) one meeting in May/June 2001 in which Mr. Erbe stated, at the beginning of the meeting, "What is he doing here? We don't need EEO here," *id.* ¶ 40; (4) one instance in mid-May 2001 in which Mr. Saxe-outside of Plaintiff's presence-told Officer Vandergriff that Plaintiff "did not know what he was talking about" regarding medical documentation to support a reasonable accommodation request, *id.* ¶ 42; (5) one meeting on May 10, 2001, without Plaintiff present, during which Mr. Saxe and Mr. Carpenter told union representatives in a collective bargaining negotiation that "Mr. Matta has no business in any contract talks and Mr. Matta is doing things outside his jurisdiction," *id.* ¶ 43; (6) one instance on May 25, 2001, outside of Plaintiff's presence when Mr. Erbe suggested to Lawrence Smith that Plaintiff need not attend a subsequent meeting because "Julio Matta and him have different views of the law," *id.* ¶ 44; and (7) one instance in August 2001 in which LMR Managers stated to Eric Cole: "Where did you [hear] that from[,] Julio Matta[?]," *id.* ¶ 45 .[FN7] Plaintiff also relies upon three written statements in his quest to establish harassment: (1) and (2) the May 2001 memoranda by Mr. Saxe and Mr. Boyer that described what the authors considered to be instances of Plaintiff acting in disregard of his duties as a

neutral Informal EEO Counselor, *id.* ¶¶ 48-49; and (3) Mr. Erbe's June 19, 2001 email in which he complained of inaccuracies in a "recent publication of the EEO Office" without even mentioning Plaintiff's name, *id.* ¶ 49.

> FN7. Plaintiff attempts to rely on two more incidents. First, he seeks to rely on testimony from James Malloy that Malloy heard unnamed union officials tell Plaintiff that LMR representatives told them that Plaintiff's information was incorrect. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss, Ex. 4. Second, Plaintiff seeks to rely on testimony from James Jackson that his managers told him that LMR advised them not to follow Plaintiff's advice. *Id.*, Ex. 7. To the extent the information relied upon by Plaintiff is based on second or third-hand statements, rather than personal knowledge, the Court notes that such testimony consists of inadmissible hearsay. *See* Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the ... proceeding, offered in evidence to prove the truth of the matter asserted."); Fed.R.Evid. 802 ("Hearsay is not admissible."). Because "[o]nly that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion," any hearsay statements relied upon by Plaintiff are legally insufficient to support his harassment/ hostile work environment claim. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2722, at 371-72 (3d ed.1998); *see also Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C.Cir.2000) (hearsay evidence is insufficient to defeat summary judgment, as "[v]erdicts cannot rest on inadmissible evidence."); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C.Cir.1998) ("An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to defeat summary judgment.").

**\*20** Upon an examination of these ten collected "incidents" and writings, and the entire record herein, it is clear that Plaintiff cannot establish the required causation. Rather, none of the identified incidents are "clearly related" to Plaintiff's national origin or his

EEO activity.

### 1. *Plaintiff's National Origin*

None of these comments or statements contain any reference whatsoever to Plaintiff's national origin. Indeed, Plaintiff has testified specifically that he never heard Messrs. Saxe, Boyer, Carpenter, or Erbe make a single derogatory comment based on his race or national origin. *See* Def.'s Stmt. of Mat. Facts ¶ ¶ 30, 35, 38, 41 (citing to Plaintiff's deposition). Moreover, Plaintiff has presented no competent evidence that anyone else heard these individuals make a derogatory comment about Plaintiff based on his national origin. *Id.* ¶ ¶ 42-45. Indeed, a plain review of the incidents and statements at issue reveals that simple workplace and professional disagreements were at the heart of these incidents, and Messrs. Saxe, Boyer, Carpenter, and Erbe largely believed that (1) Plaintiff was misstating the applicable law and/or (2) Plaintiff was overstepping the bounds of his office, acting in the role of a partial advocate, and involving himself in matters outside of his jurisdiction.

Plaintiff does attempt to preserve his national origin harassment claim by citing to some "evidence" in the record in order to establish causation. However, Plaintiff's effort fails in light of the fact that the testimony to which he cites is incompetent for the purposes of a summary judgment motion, in that it relies upon inadmissible hearsay or constitutes a series of conclusory allegations without factual support. Specifically, Plaintiff cites to these four separate pieces of insufficient evidence.

First, Plaintiff contends that Mr. Eric Cole provides testimony indicating that Plaintiff was harassed by Mr. Boyer because of his race, when Mr. Boyer was allegedly "trying to accuse Plaintiff of initiating a dispute on pay and soliciting the approval of Mr. Cole." Pl.'s Disputed Mat. Facts ¶ ¶ 32, 35. However, a review of Mr. Cole's Affidavit highlights its insufficiency: Mr. Cole simply answers the question, "Was the Complainant's race a factor in LMR treatment towards the Complainant?," by indicating that *"I think* that Complainant knew his job very well. He was also a very proud person. Because of his work ethics [sic][,] *I think* that the staff in LMR was afraid of Complainant and yes I think race was a factor." Pl.'s Opp'n, Ex. JJ (Cole Aff.) ¶ 6 (emphasis added). Leaving aside that Plaintiff's Complaint identifies "national origin" rather than "race" as the source of his harassment,

Mr. Cole's Affidavit is worthless in the summary judgment context, as it relies solely on his purported belief based on his own speculation, while citing no evidence to substantiate that belief. *See* Fed.R.Civ.P. 56(e) (requiring that affidavits shall set forth such facts "as would be admissible in evidence" at trial); *see also supra* n. 7.

**\*21** The second "evidence" Plaintiff cites to substantiate his claim that certain incidents that occurred outside the presence of Plaintiff were racially motivated is the deposition testimony of Brian Thompson. *See* Pl.'s Disputed Mat. Facts ¶ 41. In the portion of his testimony cited by Plaintiff, Mr. Thompson merely opines:

Like I said, because of the distinct correlation of me being a minority and understanding how you have to hurdle over certain things in place, yes.

There are just certain things that I *personally believe* if he was of another color, it would not have been an issue. Or if he would have played ball, it would not have been an issue.

*That's my opinion.*

Pl.'s Opp'n, Ex. F (Thompson Dep.) at 40:17-41:3 (emphasis added). Once again, even leaving aside the "national origin" v. "race" distinction for the purposes of materiality, Mr. Thompson simply offers his "opinion" using his own experience as a guide rather than citing to any specific incidents involving Plaintiff. His testimony is simply his own belief, with no citations to any events within his own personal knowledge. As such, it is inadmissible hearsay and not considered for the purposes of summary judgment. *See Gleklen,* 199 F.3d at 1369 ("Gleklen's evidence about the conversation is sheer hearsay; she would not be permitted to testify about the conversation at trial.... It therefore counts for nothing.").

Third, Plaintiff cites to the testimony of James Malloy in support of his contention that the "harassment" that he experienced was connected to his race. *See* Pl.'s Disputed Mat. Facts ¶ 41 (citing to Pl.'s Opp'n Ex. H (Malloy Dep.) at 47:15-48:18 (race is a factor)). Earlier in this litigation, Plaintiff introduced an Affidavit from Mr. Malloy, which stated that he believed "race and national origin was a major factor in the treatment" of Plaintiff by the individual Defendants. Pl.'s Opp'n to Def.'s Mot. to Dismiss, Ex. 4 (Malloy Aff.) at 3. The only basis Malloy provided for this conclusion is that one other minority EEO specialist "also had problems with the LMR office." *Id.* Mr. Malloy was also deposed during the discovery process, wherein he expounded

Slip Copy                                                                                                                Page 17
Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

on his theories by stating:
Well, based on my experience in the EEO office and based on the past experiences that the EEO office had with LMR, basically it was white males against black males or Hispanic males or Hispanic African Americans in that case.
And yes, I think it's race. You look at the color of his skin and you just like-the rest of the two, the other two males in my opinion whose jobs were being interfered with by in that particular office. And that's the only way I could see it.
It had to be with race because they don't want anyone-you know, when you find African American men who are strong, who are very, very self-reliant, smart, you know, confident, and know their craft, it's hard to deal with them. It's hard to deal with them because then you have to match your wits with theirs. And that was threatening.
**\*22** A smart-in my opinion what I have-and I hate to turn-but a smart black African American male is a danger in the workplace, especially if he's trying to do his job. It's a danger because then it's hard to by [sic] him off. It's hard to curb him from doing right. That's what's been my experience.

Def.'s Reply to Pl.'s Opp'n, Ex. 4 (Malloy Dep.) at 47:15-48:18. Upon a review of these statements, it is clear that Mr. Malloy lacks any personal knowledge of any connection between Plaintiff's race or national origin and his treatment at the BEP. Rather, he bases his testimony solely upon an inference that another minority "had problems" with the LMR office and his belief that intelligent African-American men are commonly viewed as general threat to their Caucasian superiors. Mr. Malloy's testimony is therefore inadmissible hearsay and speculation, and is insufficient to create a genuine issue of material fact. *Commercial Drapery Contractors,* 133 F.3d at 6 (affidavit consisting entirely of inadmissible hearsay is not sufficient to defeat summary judgment).

Fourth, and finally, Plaintiff relies upon his own deposition testimony, in which he testified that Ms. Pitts told him that "defendants from Labor Management have always harassed her minority men employees. She referred to Defendant's as 'a bunch of racist s.o.b.'s." ' Pl.'s Opp'n at 13 (citing Pl.'s Opp'n, Ex. B (Matta Second Dep. Vol.) at 73:18-75:16); *see also* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 75:21-76:6 (testifying that Mr. Malloy witnessed Ms. Pitts's comment). Three major problems exist to undermine this "evidence." First, the complete purported comment, as related by Plaintiff in his deposition, was: "what she basically told me ... is that she was very annoyed of [sic] how

LMR was always bumping heads with her people in EEO. She also referred to them at that time as racist SOBs.... She didn't specifically say who but, you know, Those people are a bunch of racist SOBs and they are always ... treating my African American men in this fashion." Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 73:5-73:17. In light of the complete statement, it is evident that Ms. Pitts's purported comment is inadmissible hearsay, based solely upon her personal speculation without any citation to the record or any specific event. Indeed, her alleged comment does not even identify who in the LMR was the subject behind the discriminatory conduct. The comment is therefore incompetent to imply any discriminatory motivations to Messrs. Saxe, Boyer, or Carpenter.[FN8] Second, in her deposition, Ms. Pitts categorically denied having made this statement, ensuring that Plaintiff's testimony is incompetent hearsay. *See* Def.'s Reply to Pl.'s Opp'n, Ex. 9 (Pitts Dep.) at 91:16-92:8. Third, Mr. Malloy also contradicts Plaintiff's testimony, in that he testified only that Ms. Pitts said "the white SOB's over in labor relations need to minds [sic] their business and stay out of mine." Def.'s Reply to Pl.'s Opp'n, Ex. 4 (Malloy Dep.) at 44:21-46:5.

> FN8. Given that Mr. Erbe worked for the Legal Department, not LMR, he could not have been the subject of the comment.

**\*23** Accordingly, Plaintiff's Title VII national origin harassment claim must fail because he fails to establish any causal connection between the incidents cited to and his race or national origin. Rather, (1) none of these comments or statements contain any reference whatsoever to Plaintiff's race or national origin; (2) Plaintiff himself testified specifically that he never heard Messrs. Saxe, Boyer, Carpenter, or Erbe make a single derogatory comment based on his race or national origin; and (3) Plaintiff has presented no competent evidence that anyone else heard these individuals make a derogatory comment about Plaintiff based on his race or national origin. As such, Plaintiff cannot make out a *prima facie* case of discriminatory national origin harassment and cannot even raise an inference that the challenged conduct was discriminatory in nature. Defendant's Motion for Summary Judgment must be granted on this point.

2. *Plaintiff's EEO Activity*

Title 42 U.S.C. § 2000e-3(a) provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Id.* Under this provision, a plaintiff may bring a "participation claim," i.e., plaintiff participated in EEO activity and then experienced harassment or retaliation, or an "opposition claim," i.e., plaintiff opposed an unlawful employment practice that others experienced and then suffered certain actionable consequences. Plaintiff here brings both types of claim, and each assertion is without foundation and devoid of evidentiary support.

### i. *Plaintiff's Participation Claim*

Defendant, in its Motion for Summary Judgment, points out that Plaintiff filed his informal EEO complaint on July 20, 2001. Def.'s Mot. for Summ. J. at 9 (citing Def.'s Mot. for Summ. J., Ex. JJ (Pl.'s Informal EEO Compl.)). However, Defendant notes that according to Plaintiff, Messrs. Saxe, Boyer, Carpenter, and Erbe began their harassing behavior in May 2001. *Id.* (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 20:5-21:13; *id.,* Ex. JJ (Pl.'s Informal EEO Compl.)). As such, Defendant contends that the incidents on which Plaintiff relies cannot have been related to the filing of his EEO complaint because virtually all of the incidents pre-dated the complaint. Def.'s Mot. for Summ. J. at 9.

In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff fails to address this argument, and fails to revive his participation claim. *See generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J. It is well-settled in this Circuit that when a plaintiff files an opposition addressing only certain arguments raised by the defendant, "a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries,* 238 F.Supp.2d 174, 178 (D.D.C.2002) (citing *FDIC v. Bender,* 127 F.3d 58, 67-68 (D.C.Cir.1997); *see also United States v. Real Property Identified as: Parcel No. 03179-005R,* 287 F.Supp.2d 45, 61 (D.D.C.2003); *Bancoult v. McNamara,* 227 F.Supp.2d 144, 149 (D.D.C.2002). Accordingly, the Court shall grant Defendant's Motion for Summary Judgment as it applies to Plaintiff's "participation claim," as Plaintiff has failed

to cite to any material fact supporting his allegation and has failed to respond to the arguments made in Defendant's Motion for Summary Judgment.

### ii. *Plaintiff's Opposition Claim*

**\*24** To the extent that Plaintiff seeks to show that Messrs. Saxe, Boyer, Carpenter, and Erbe behaved towards him as they did because of the manner in which he performed his EEO Counselor duties, i.e., his "opposition claim," Plaintiff's claim fails for two central reasons.

### 1. *No* Prima Facie *Showing of Oppositional Activity*

Importantly, Plaintiff has not actually established that he was engaged in "oppositional activity" for the purposes of Title VII. While Plaintiff frequently makes the conclusory assertion that he was opposing discriminatory practices, he has failed to identify any *specific* oppositional activity in which he was engaged. A reading of Plaintiff's Opposition makes plain that Plaintiff simply assumes that by performing his duties as an EEO Counselor/Technical Adviser, he was engaged in "opposition" within the meaning of 42 U .S.C. § 2000e-3(a). *See, e.g.,* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 2 (without citation to the record, Plaintiff describes his role as "to review, evaluate and *control managerial and supervisory performance* in such a manner as to ensure continuing affirmative application and vigorous enforcement of the policy of equal opportunity") (emphasis added); *id.* at 27 (ascribing the conduct of his alleged harassers to an "animus toward Plaintiff's *position* as Technical Adviser to the Chief of EEO") (emphasis added).

Plaintiff's unsubstantiated, conclusory assumption is belied by his specific position description. As a Senior EEO Specialist, Plaintiff was required to "[c]ounsel employees and applicants who feel they have been discriminated against in the more complex and difficult cases." Def.'s Stmt. of Mat. Facts ¶ 3 (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 1; *id.,* Ex. D (Pl.'s Third Dep. Vol.) at 5:1-9). Plaintiff's official contacts were with "supervisors and managers from first-line supervisors to Office Chiefs with representations from the Bureau, unions, EEO Specialists, personnel management specialists, etc." *Id.* (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3). The purpose of these contacts was to "resolve difficult

and emotionally charged employment problems to obtain agreement and/or necessary action on the part of Bureau managers concerning employment policies and practices affecting Equal Employment Opportunity." *Id.* (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3-4; Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 5:13-6:8).

Once Plaintiff took his additional position as a Technical Adviser, Plaintiff continued to work as a full-time informal counselor, but also served as an "in house expert ... on EEO matters." *Id.* ¶ 7 (citing Def.'s Mot. for Summ. J., Ex. E (Decl. of Jean Pitts (hereinafter, "Pitts Decl.")) ¶ 4; *id.*, Ex. B (Pl.'s First Dep. Vol.) at 39:22-40:21). The Technical Adviser position required that Plaintiff help create orientation and training materials concerning EEO rights and responsibilities, and provide regular training to both the workforce and management on EEO rights and responsibilities. *Id.* Given these wide-ranging duties, Plaintiff was required to maintain "positive" work relationships with both "staff members"-including managers-and "customers"-i.e., those who sought EEO counseling. *Id.* ¶ 8 (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 6:9-9:19; *id.*, Ex. F (Performance Standards and Elements for EEO Specialist/Technical Adviser) at 3). Moreover, Plaintiff, in his position as Technical Adviser, was required to display sensitivity to managers and customers, and maintain neutrality both in investigating informal complaints and in advising managers on EEO questions. *Id.* Adherence to these carefully-outlined duties and responsibilities was crucial, because the EEO office was responsible for the informal counseling stage of the discrimination complaint process, which included processing informal complaints, while formal complaints were to be investigated by the Regional Complaint Center. *Id.* ¶ 9. Importantly, the EEO office did not have the authority to file a complaint on behalf of an employee with the Regional Complaint Center. *Id.* As such, Plaintiff's role in processing an informal complaint was to impartially "find the facts" and then recommend appropriate action to the EEO Chief. *Id .* ¶ 10. Plaintiff's role as the Technical Adviser was not to make final determinations as to whether discrimination had or had not occurred. *Id.*

**\*25** It is evident from the Position Descriptions of an EEO Counselor and a Technical Adviser that Plaintiff's duties required that he be an impartial fact-finder: neither Plaintiff nor his office had the authority to file a complaint on behalf of an employee, and his role did not involve making final

determinations as to whether discrimination had or had not occurred. Plaintiff's position clearly contemplated that he be a neutral arbiter and dependable source for EEO information for supervisors, managers, Office Chiefs, representations from the Bureau, unions, EEO Specialists, personnel management specialists, and covered employees. Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3. Based on the relevant Position Descriptions, the Court concludes that Plaintiff-having failed to identify any specific oppositional activity in which he was engaged-cannot rely upon his position as an EEO Counselor alone to provide the *prima facie* basis for his opposition claim. *See Pendleton v. Rumsfeld,* 628 F.2d 102, 108-09 (D.C.Cir.1980) (contemplating that the activities of an EEO Counselor do not necessarily constitute "protected activity" or oppositional activity). Moreover, in none of the incidents that Plaintiff relies upon, *see* Def.'s Stmt. of Mat. Facts ¶ ¶ 36, 39-40, 42-45, 48-49, has he identified either a discriminatory practice in which the BEP allegedly was engaged or oppositional conduct on his part-as opposed to merely providing consultation on EEO requirements. As such, the Court finds that Plaintiff cannot establish that he was engaged in oppositional activity within the meaning of 42 U.S.C. § 2000e-3(a), let alone subject to illegitimate harassment and a hostile work environment based on that activity.

### 2. *Criticisms of Plaintiff Were Valid; Plaintiff Cannot Establish Pretext*

Even assuming *arguendo* that Plaintiff was somehow actively "opposing" unlawful discrimination during his tenure at the BEP, he clearly fails to present sufficient evidence to rebut Defendant's wealth of evidence establishing that any criticisms directed at him were the result of his colleagues' legitimate concerns about his neutrality and the accuracy of the information that he provided. While Plaintiff claims that his alleged harassers-Messrs. Saxe, Boyer, Carpenter, and Erbe-"interfered with [his] opportunities to perform his duties as Technical Adviser to the Chief, in opposition to discrimination," Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 12, Plaintiff's claim is terminally undermined by his failure to rebut Defendant's showing that the conduct of the alleged harassers was based on valid fears regarding Plaintiff's job performance. Two points are significant and noteworthy.

First, Plaintiff, in his Opposition, failed to contest much of Defendant's evidence of his disruptive and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

non-neutral behavior. *See* Def.'s Stmt. of Mat. Facts ¶ ¶ 15-27. The instances of such behavior include Plaintiff's writing two memoranda to the JAAC in which he stated that a proposed removal of an employee from the program "would" be viewed as retaliation by the EEOC and as discrimination by the BEP's EEO office, even though (1) Plaintiff was not authorized to speak for the EEOC and (2) Plaintiff had not investigated whether there were similarly-situated white employees. *Id.* ¶ ¶ 17-18. Such instances also include Plaintiff's providing the JAAC apprentice in question a blind copy of the second of the two highly questionable memoranda. *Id.* ¶ 18. Plaintiff acknowledges having engaged in all of these behaviors.

**\*26** Second, Plaintiff has failed to rebut Defendant's evidence that he repeatedly provided inaccurate information concerning EEO laws and requirements. Indeed, Plaintiff's attempts to show that his advice was correct often lead him to contradict his binding testimony and backpedal from his assertions of accuracy. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 19 ("Even if the interpretation was erroneous ...."), at 21 ("Even if his interpretation was in error...."). Defendant has conclusively identified five inaccuracies in the information provided by Plaintiff vis-á-vis EEO laws and requirements:

1. In a November 29, 2000 email on which he cc'd Don Jamerson, Plaintiff opined that it would be a "direct violation of [29 C.F.R. § ] 1614" for Mr. Jamerson to have Mr. Boyer investigate an alleged racial incident to determine whether *disciplinary* action was warranted. *See* Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 15:21:15; *id.*, Ex. I (Pl.'s Email); *id.*, Ex. I (Mr. Jamerson's Email) ("I asked Mr. Boyer to investigate the accusations and if it was determined that they were substantiated, I would initiate the proper *disciplinary* action.") (emphasis added). Plaintiff contends that his advice was correct, because "[b]y allowing LMR to conduct such investigation of an EEO allegation, is [sic] a conflict and violation of 19 CFR 1614[sic] and MD-110." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 17. However, a plain reading of 29 C.F.R. § 1614 and EEOC Management Director ("MD") 110 reveals that these provisions state only that an agency's EEO and personnel functions should be kept separate. The provisions do not prohibit management from investigating allegations of workplace misconduct to determine whether disciplinary action is warranted.

2. On May 3, 2001, Plaintiff called Mr. Saxe and advised him-in Officer Vandergriff's presence-that Commander Ashton was "in violation of the ADA and/or Section 501 of the Rehabilitation Act" for keeping reasonable accommodation-related medical documentation "in a private file cabinet in her office." *See* Def.'s Mot. for Summ. J., Ex. P (Pl.'s Formal EEO Compl.) at Bates # 000013-14; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 82:18-83:2. However, Plaintiff acknowledged in his deposition that there is nothing illegal about this practice; rather, the only prohibition is in co-mingling medical records with personnel files, and the provisions of the ADA cited by Plaintiff in his Opposition confirms this. *See* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 51:2-5; Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 18-19 (citing 42 U.S.C. § 12112(d)(3)(B)).

3. Before May 3, 2001, Plaintiff had advised Commander Ashton "on several occassion[s]," of the "potential Per Se violation of illegally withholding medical documentation outside of Human Resources of the Medical department." Def.'s Mot. for Summ. J., Ex. P (Pl.'s Formal EEO Compl.) at Bates # 000014; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 61:15-63:21. However, in Plaintiff's Opposition, he cites no authority whatsoever that requires reasonable accommodation-related medical documentation to be maintained solely in an agency's human resources office or its medical department. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 19-20.

**\*27** 4. Plaintiff also called Saxe because he was concerned about Commander Ashton deciding for herself whether medical documentation was sufficient to support an accommodation request. *See* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 51:14-53:24. However, nothing in the Rehabilitation Act prohibits a supervisor from making such judgments. Moreover, the EEOC's policy guidance specifically encourages such an action. *See* Def.'s Mot. for Summ. J., Ex. KK (Excerpt from 2001 EEOC publication, "Establishing Procedures to Facilitate the Provision of Reasonable Accommodation") ("To eliminate unnecessary levels of review, agencies should authorize first-line supervisors to approve requests for reasonable accommodation whenever possible."). In attempting to circumvent this fact, Plaintiff cites to Executive Order 13164 to substantiate his claim that a supervisor *must* consult a medical expert in evaluating the sufficiency of medical documentation. However, a review of Executive Order 13164 reveals that it is the agency's *option* to have medical information reviewed by a medical expert of the agency's choosing-not that the agency is *required* to do so. *See* Exec. Order 13, 164 § 1(b)(6), 2000 WL 1114943 (Pres.Exec.Order July 26, 2000), 65 F.R. 46655.

5. It is uncontested that Plaintiff's pamphlet entitled "Collective Bargaining and Equal Employment

Opportunity Laws," which he gave to union representative Brian Thompson for use at a collective bargaining negotiation, *see* Def.'s Mot. for Summ. J., Ex. W (Thompson Dep.) at 53:18-56:22; *id.,* Ex. X (Pl.'s pamphlet), contains two direct misstatements of law. *See* Def.'s Mot. for Summ. J., Ex. KK (Erbe Aff.); *see generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J. (failing to dispute this point). Specifically, Part IV of Plaintiff's pamphlet contains two statements that were overruled in *Luke Air Force Base v. Fed. Labor Relations Auth.,* 208 F.3d 221 (9th Cir.1999) (table desc.), *cert. denied,* 531 U.S. 819, 121 S.Ct. 60, 148 L.Ed.2d 26 (2000). *Compare* Def.'s Mot. for Summ. J., Ex. KK (copy of Plaintiff's pamphlet) at Bates # 00298 (claiming (1) "[a] union has a right to be represented at a formal discussion within the meaning of section 7114(a)(2)(A) of the statute, even if the matter discussed concerns an EEO complaint being processed as part of an EEO proceeding"; and (2) "[a]n informal EEO complaint, unlike a formal EEO complaint, does not constitute a grievance for section 7114(a)(2)(A) formal discussion purposes.... You must remember that representation is a choice by the individual member who is filing his/her EEO complaint"). Moreover, this pamphlet caused rightful consternation because Plaintiff frequently inserted misleading phrases such as "in my professional opinion," *see* Def.'s Mot. for Summ. J., Ex. X (Pl.'s pamphlet) at 5, and because Plaintiff lifted large portions of the pamphlet verbatim from the FLRA General Counsel Guidance without citation-an act that Erbe considered to be plagiarism and an incorrect adoption of the FLRA's views to the BEP. *See* Def.'s Mot. for Summ. J., Ex. KK (Erbe Aff.) at Bates # 000277.

**\*28** Ultimately, given the uncontested evidence of Plaintiff's disruptive and non-neutral behavior and the clear evidence showing Plaintiff's penchant for misstating the law, it is clear that the negative comments upon which Plaintiff relies to show harassment-e.g., (1) Mr. Boyer's memorandum to Mr. Carpenter outlining his concerns about Plaintiff's conduct on several occasions, *see* Def.'s Stmt. of Mat. Facts ¶ ¶ 47-48; (2) Mr. Saxe telling Officer Vandergriff that Plaintiff did not know what he was talking about with respect to what medical documentation Commander Ashton could request, *id.* ¶ 42; (3) Mr. Erbe telling Officer Smith that "Julio Matta and him have different views of the law," *id.* ¶ 44; and (4) Mr. Erbe's email stating that Plaintiff's "Collective Bargaining and Equal Employment Opportunity Laws" pamphlet contained misstatements of the law, *id.* ¶ 49-were clearly

legitimate statements of concern about Plaintiff by his colleagues. *See Pendleton,* 628 F.2d at 108 (rejecting retaliation claim of two EEO Counselors for participating in on-the-job demonstration because such conduct suggested that they had "fatally compromised their ability to gain the confidence of middle management, as spelled out in the Handbook, and that they were lacking in ability to appreciate management's point of view or see the facts as management saw them.... The decision to remove any employee must be made primarily in light of that employee's duties. A question of retaliation is not raised by a removal for conduct inconsistent with those duties, unless its use as a mere pretext is clear."); *see also B.T. Jones v. Flagship Int'l,* 793 F.2d 714, 729 (5th Cir.1986) (upholding dismissal, even if plaintiff acted with "sincere opposition to unlawful employment practices under Title VII," because plaintiff's activities "rendered [her] ineffective in the position for which she was employed," wherein she "played a crucial role in equal employment matters involving the company"); *Smith v. Singer Co.,* 650 F.2d 214, 217 (9th Cir.1982) (rejecting opposition claim by plaintiff because "by filing complaints against Singer because he disagreed with their choice of policies, appellant placed himself in a position squarely adversary [sic] to his company. In so doing he wholly disabled himself from continuing to represent the company's interests....").

Here, Plaintiff cannot show that any of the incidents he relies on reasonably can be construed as having occurred "because of" his national origin or alleged opposition to illegal practices. All competent evidence-including numerous admissions by Plaintiff demonstrating that he acted non-neutrally and gave incorrect advice on occasion-points to the conduct of Messrs. Saxe, Boyer, Carpenter, and Erbe as being motivated solely by their legitimate concerns about the manner in which Plaintiff was conducting his duties. Lacking this important characteristic, Plaintiff's allegations and competent evidence cannot support a claim of hostile work environment. Summary judgment in Defendant's favor is therefore warranted.

### *B. Plaintiff Has Failed to Show that He Was Subjected to a Severely Hostile or Abusive Work Environment*

**\*29** Even assuming *arguendo* that Plaintiff could raise an inference that he was criticized or circumvented "because of" his national origin, race, or opposition to discriminatory practices, Plaintiff's

claims must fail because he cannot establish that he was subjected to a work environment sufficiently hostile to be actionable under Title VII. *See* Compl. at 13-15 (Count I) (Plaintiff alleges that he was subjected to a hostile work environment based on his national origin and in retaliation for his activities as an EEO Specialist).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Terms, conditions, or privileges" encompass tangible as well as psychological harm. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In addition, the Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation omitted). As such, the plaintiff must demonstrate: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *See Baloch v. Norton,* 355 F.Supp.2d 246, 259 (D.D.C.2005) (citing cases); *Gustave-Schmidt v. Chao,* 360 F.Supp.2d 105, 120 (D.D.C.2004) (citing cases). In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including " 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris,* 510 U.S. at 23). While the plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim. *See Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000).

In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code." ' *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (citations omitted). Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." ' *Id.* (citations omitted). "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C.Cir.2002) (citing *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 753 (4th Cir.1996) ("holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish [ ] Title VII liability"); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995) ("holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched employee and incidents were not sufficiently severe or pervasive")).

**\*30** In this case, Plaintiff has alleged ten (10) instances of co-workers making negative comments about his job performance, most of which occurred from May through July 2001. *See* Def.'s Stmt. of Mat. Facts ¶ ¶ 36, 39-40, 42-45, 47; *see also* Def.'s Mot. for Summ. J., Ex. JJ (Pl.'s Informal EEO Compl.). Upon a review of these incidents, it is clear that these comments-whether oral or written-amount to nothing more than simple professional disagreements, which Title VII obviously does not forbid. *See Brodetski v. Duffey,* 141 F.Supp.2d 35, 48-49 (D.D.C.2001) ("Many of the alleged incidents, while unpleasant, amounted to little more than everyday workplace disputes."). No slurs of any kind were directed at Plaintiff. *See* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 140:1-14. Plaintiff was not physically or verbally threatened. *Id.* The only incidents that occurred in Plaintiff's presence involved what he himself described as Mr. Carpenter or Mr. Erbe being "rude" or "dismissive." *See* Def.'s Stmt. of Mat. Facts ¶ ¶ 36, 39, 40. The rest of the other "negative" comments about which Plaintiff complains were made outside of his presence; as a matter of law, such comments cannot be considered particularly severe-especially where, as here, the comments were not explicitly discriminatory. *See* Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 100:23-102:14; *compare Lester,* 290 F.Supp.2d at 31 (noting importance of the fact that incidents of vandalism did not happen to the plaintiff, but occurred in the workplace around her); *Jones,* 12

F.Supp.2d at 12 (holding that plaintiff's report to a nurse that he heard that racial remarks were being made against him, but not in his presence, was not sufficiently severe as to create a hostile working environment); *Mason v. Southern Ill. Univ. at Carbondale,* 233 F.3d 1036, 1046 (7th Cir.2000) (holding no hostile environment where co-worker told plaintiff that other employees had used racial epithets, because "through the grapevine" or "second-hand" conduct is not sufficiently severe or pervasive); *Ngeunjuntr v. Metro. Life Ins. Co.,* 146 F.3d 464, 467 (7th Cir.1998) (while employee comment was offensive, it did not rise to the level of discrimination because it was made outside of the plaintiff's presence). Finally, the alleged negative comments occurred over a short period of time; according to Plaintiff, the harassment occurred "over a period of roughly four months." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 4. Given all of these factors, it is evident that even if the incidents cited by Plaintiff were somehow motivated by his national origin or oppositional activity, the incidents are insufficiently severe to create a hostile work environment.

Plaintiff attempts to escape this logical conclusion by making unsubstantiated, conclusory allegations that the alleged harassers created a hostile work environment by so thoroughly defaming him throughout the workforce and so continually blocking his access to EEO-related meetings that he was prevented from functioning as a Technical Adviser. Plaintiff's argument is without foundation for numerous reasons. First, Plaintiff himself has acknowledged that despite the alleged harassment, he continued to do an "outstanding job in all his duties as the in-house expert." Pl.'s Opp'n at 29; Def.'s Mot. for Summ. J., Ex. E (Pitts Decl.) ¶ 9 (rating that Plaintiff "Exceeds Standards," the highest rating possible, in his year-end evaluation). As such, Plaintiff concedes that any "harassment" did not interfere with his performance and did not affect a term, condition, or privilege of his employment. *See Faragher,* 524 U.S. at 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (noting that a major factor to consider for the purposes of a hostile work environment claim is whether the conduct reasonably interferes with the employee's performance); *Holbrook v. Reno,* 196 F.3d 255, 263 (D.C.Cir.1999) (affirming judgment as a matter of law because record indicated only that plaintiff returned to the position and continued to perform exceptionally well). Second, virtually all of Plaintiff's allegations are not supported by competent evidence of record. *See* Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ ¶ 14, 39. Third, and more importantly,

at most, Messrs. Saxe, Boyer, Carpenter, and Erbe denied Plaintiff access to two meetings, meaning that their conduct was neither frequent nor severe. *See* Def.'s Reply to Pl.'s Opp'n., Ex. 6 (Smith Dep.) at 69:7-69:14 (on May 25, 2001, Erbe suggested to Officer Smith, but did not insist, that Plaintiff not attend the June 5, 2001 meeting); *id.,* Ex. V (Thompson Aff.) at 2 (on May 10, 2001, Messrs. Saxe and Carpenter rejected Mr. Thompson's suggestion that Plaintiff "come to the next meeting [of the collective bargaining negotiations] to oversee the two articles in [the union's] contract that deal directly with EEO policy and laws").

**\*31** In a final effort to identify some negative impact that might be considered severe or extreme, Plaintiff alleges that the purported conduct of Messrs. Saxe, Boyer, Carpenter, and Erbe created a "chilling effect" that cost him a promotion to a GS-14 position and ultimately forced him to resign from the agency. Pl.'s Opp'n at 26. Two problems doom this allegation. First, Plaintiff alleges that it was Ms. Pitts who denied him the promotion. *Id.* at 28. Leaving aside the point that Plaintiff worked in the BEP for roughly one year, making a promotion claim somewhat hasty, Plaintiff has acknowledged that Ms. Pitts was not among the persons he claims harassed him. *See* Def.'s Mot. for Summ. J., Ex. B (Pl.'s First Dep. Vol.) at 80:11-81:10. As such, Plaintiff fails to show how the alleged harassment by Messrs. Saxe, Boyer, Carpenter, and Erbe-who were his colleagues and not supervisors or superiors-resulted in the denial of a due promotion. Second, this Court has already considered this final allegation and rejected it. In the Court's September 29, 2003 Memorandum Opinion, the Court dismissed with prejudice Plaintiff's Title VII constructive discharge claim, holding that "Plaintiff has failed to provide a sufficient evidentiary basis upon which a reasonable jury could conclude that his employer tolerated or created the allegedly discriminatory working conditions." *See Matta v. O'Neill,* Civ. No. 02-862, at 30-31 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and denying-in-part Defendants' Motion to Dismiss and for Summary Judgment). Moreover, the Court also dismissed Plaintiff's purported Title VII failure-to-promote claim. *Id.* at 30.

Ultimately, considering *in toto* all incidents cited by Plaintiff, the Court concludes that Plaintiff cannot meet the standards necessary for proving an actionable national origin-based or retaliation-based hostile work environment. Rather, these incidents were infrequent; occurred over a short period of time; were the product of Plaintiff's interactions with his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

colleagues, not superiors or supervisors; were not physically threatening; and were not extreme. The incidents focused on by Plaintiff reveal that he was at the center of several professional disagreements and conduct which is certainly permissible under the strictures of Title VII. Accordingly, even if Plaintiff could somehow raise an inference that he was harassed "because of" his national origin and/or his "opposition" to discriminatory practices, Plaintiff's Title VII hostile work environment claim would still fail.

*C. Plaintiff Has Failed to Show that Defendant Knew or Should Have Known of the Alleged Harassment But Failed to Take Prompt and Appropriate Corrective Action*

Even if Plaintiff could prove an actionable work environment, Defendant would still be entitled to summary judgment, as Plaintiff cannot prove that Defendant knew or should have known of the alleged harassment but failed to take prompt and appropriate action. Importantly, when Plaintiff reported his concerns to his supervisors, Ms. Pitts and Director Ferguson, they both took "prompt and appropriate corrective action." *Curry v. Dist. of Columbia,* 195 F.3d 654, 660 (D.C.Cir.1999).

**\*32** Under Title VII, "[a]n employee may be held liable for the actions of its employees if the employer knew or should have known about the actions of the employees that caused the hostile environment and if the employer did not take appropriate and timely steps to correct the problem." *Hodges v. Washington Tennis Sports Serv. Intern., Inc.,* 870 F.Supp. 386, 388 (D.D.C.1994) (citing cases). To assess whether an employer's response is adequate, courts should look to "the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment." *Curry,* 195 F.3d at 662 n. 17 (quoting *Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999)). For instance, in *Curry,* the D.C. Circuit found that two clear, prompt verbal admonitions were an effective response to the initial report of a co-worker's blatantly sexual remarks and that the defendant did not need to take formal disciplinary action. *Id.* at 660. In contrast, where a plaintiff alleged having reported sexual harassment several times and the supervisor's *only* response was to suggest that plaintiff ignore or accept the harassment,

the response was not considered adequate. *See Lucero-Nelson v. Washington Metro. Area Transit Auth.,* 1 F.Supp.2d 1, 6 (D.D.C.1998).

A review of the record indicates that Plaintiff has failed to show that Defendant's substantial actions taken in response to his complaints were inadequate. Upon Plaintiff's expression of his concerns to Ms. Pitts in May 2001, *see* Def.'s Mot. for Summ. J., Ex. E (Pitts Decl.) ¶ 5; *id.,* Ex. A (Pl.'s Second Dep. Vol.) at 21:14-16, Ms. Pitts and Director Ferguson immediately took five steps to attempt to address Plaintiff's concerns. Specifically, (1) Ms. Pitts met with Ms. Hutchinson, the LMR officials' supervisor; (2) Ms. Pitts met with Mr. Erbe; (3) Director Ferguson met with the chiefs of all three offices in question and ordered them to resolve the issues; (4) Director Ferguson directed the heads of the three offices to meet on a weekly basis to establish a cooperative dialogue; and (5) Director Ferguson issued a bureau-wide memorandum that set forth his expectation that everyone would cooperate with the EEO office. Def.'s Stmt. of Mat. Facts ¶¶ 50-56.

These actions were not only prompt and appropriate, but also effective in resolving the situation. While Plaintiff now tries to argue that, despite these efforts, "[t]he hostilities continued against Plaintiff, as witnessed by the workforce," Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 31, Plaintiff is left with his binding deposition testimony in which he acknowledged that he had no further run-ins with Messrs. Saxe, Boyer, Carpenter, or Erbe-whether face-to-face, by email, or over the telephone-after Director Ferguson issued his bureau-wide memorandum on August 22, 2001. *See* Def.'s Mot. for Summ. J., Ex H (Pl.'s Fourth Dep. Vol.) at 99:18-23. Clearly, the agency responded reasonably to the concerns reported by Plaintiff, a consideration that led this Court to dismiss Plaintiff's constructive discharge claim in its earlier opinion. *See Matta v. O'Neill,* Civ. No. 02-862, at 31 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and denying-in-part Defendants' Motion to Dismiss and for Summary Judgment) (holding that, "in light of the undisputed evidence regarding the efforts Defendant took to address Plaintiff's complaints, ... [no] reasonable jury could conclude that his employer tolerated or created the allegedly discriminatory working condition"). Accordingly, even if Plaintiff could make out an actionable hostile work environment, Defendant cannot be held vicariously liable for it. As such, once again, Defendant is entitled to summary judgment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 25
Slip Copy, 2005 WL 3454334 (D.D.C.)
**(Cite as: Slip Copy)**

IV: CONCLUSION

**\*33** For the reasons set forth above, the Court shall grant Defendant's Motion for Summary Judgment in full. An Order accompanies this Memorandum Opinion.

D.D.C.,2005.
Matta v. Snow
Slip Copy, 2005 WL 3454334 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:02cv00862 (Docket) (May. 03, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# F

Westlaw.

Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Orlando R. WOOD, Plaintiff,
v.
John H. DALTON, Secretary, Department of the
Navy, Defendant.
**No. CIV. A. 99-1(JMF).**

July 7, 2000.

MEMORANDUM ORDER

FACCIOLA

**\*1** Proof of a discriminatory or retaliatory motive or
intent may be found in what people say and what
they do. In this case, plaintiff relies on what his
superiors made him do or did to him to establish that
they discriminated against him on the basis of his
race and he can unquestionably testify to what they
directed him to do and what he saw them do. He also
intends to rely on statements which immediately raise
hearsay questions.

First, it is obvious that statements which disclose a
discriminatory or retaliatory motive are not tendered
to establish the truth of their contents. It is absurd to
suggest that an employer's saying that women are
better off barefoot and pregnant is being offered to
prove the truth of the matter asserted. The truth or
falsity of that statement is irrelevant. It is being
offered, irrespective of its truth or falsity, to prove
discriminatory or retaliatory motive. *Talley v. Bravo
Pitino Restaurant Ltd.,* 61 F.3d 1241, 1249 (6th
Cir.1995). Alternatively, even if such statements are
hearsay, they may be admissible as statements
expressing a state of mind. *Id.* Thus, statements
uttered by a supervisor which are probative of such a
discriminatory or retaliatory motive are admissible
and plaintiff or any other witness may testify to
having heard the supervisor utter them. *See e.g.,
Griffin v. Washington Convention Center,* 142 F.3d
1308 (D.C.Cir.1998); *Abrams v. Lightolier Inc.,* 50
F.3d 1203, 1214 (3d Cir.1995). Once, however,
plaintiff calls a witness who did not hear the
supervisor utter the words but has heard from
someone else that the supervisor uttered the words, a
hearsay problem arises. The statement by the witness
as to what sh heard from someone other than the
supervisor is being offered to prove she heard it

which means that is being offered for the truth of the
matter asserted.

Since there are now two links in the chain of
admissibility, and one is hearsay, the hearsay link is
admissible only if there is some exception which
permits it. Fed.R.Evid. 805. The only possible
exception would be Fed.R.Evid 801(d)(2)(D) which
permits the admission against a party of "a statement
by the party's agent or servant concerning a matter
within the scope of the agency or employment, made
during the existence of the relationship." Thus
plaintiff argues that statements by co-workers
asserting that they heard from some one else that a
supervisor said a certain thing are admissible under
this exception. Unfortunately for plaintiff, the courts
have uniformly disagreed.

First, as a preliminary matter, the plaintiff is required
to identify by name the supervisor who made the
statement before an analysis of the application of this
exception can even commence. Efforts by co-workers
to testify that some unidentified "they"in
management want, for example, younger people or
who did not like women have been universally
rebuffed. *Vazquez v. Lopez-Rosario,* 134 F.3d 28, 34
( 5th Cir.1998); *Zaben v. Air Products & Chemicals
Inc.,* 129 F.3d 1453, 1457 (11th Cir.1997); *Carden v.
Westinghouse Electric Corp.,* 850 F,2d 996, 1002 (3d
Cir.1988); *Cedeck v. Hamiltonian Federal Savings
and Loan Association,* 551 F.2d 1136, 1138 (8th
Cir.1977).

**\*2** Second, even if the supervisor uttering the
statement is identified, the courts have uniformly
rejected the contention that a statement by any
employee reporting what someone else hears a
supervisor say is a statement by that employee within
the scope of his agency or employment. Since it is
not, the employee's report of what he heard some one
else say a supervisor say is hearsay and inadmissible.
*Jacklyn v. Schering-Plough Healthcare Products
Sales Corp.,* 176 F.3d 921, 927-8 (6th Cir.1999);
*Vasquez v. Lopez-Rosario,* 134 F.3d at 34; *Zaben v.
Air Products and Chemicals Inc.,* 129 F.3d at 1456-
1457; *Breneman v. Kennecott Corp.,* 799 F.2d 470,
473 (9th Cir.1986); *Hill v. Speigel, Inc.,* 708 F.2d
233, 236 (6th Cir.1983); *Cedeck v. Hamiltonian
Federal Savings and Loan Association,* 551 F.2d
1136, 1138 (8th Cir .1977); *Shepley v. E.I. DuPont
Nemours and Co.,* 722 F.Supp. 506, 515

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1174985 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

(C.D.Ill.1989); *Cebula v. General Electric Co.,* 614 F.Supp. 260, 266 (N.D.Ill.1985). *Cf. Gleklen v. Democratic Congresssional Campaign Committe, Inc.,* 199 F.3d 1365, 1368 (D.C.Cir.2000); *Compare Abrams v, Lightolier, Inc.,* 50 F.3d at 1215 (when supervisor authorized to speak about criteria used by management in making hiring and firing decision statement is admissible because it falls within the scope of her authority).

It therefore follows that plaintiff may testify as to any relevant statement he heard a supervisor say which is relevant to a discriminatory or retaliatory motive and call witnesses who may testify to any such relevant statement the witness heard a supervisor say. Any statements, claimed to be probative of a discriminatory or retaliatory motive, which do not meet this qualification are inadmissible hearsay and the *Defendant's Motion in Limine to Exclude Plaintiff's Hearsay Allegations* is to this effect granted.

D.D.C.,2000.
Wood v. Dalton
Not Reported in F.Supp.2d, 2000 WL 1174985 (D.D.C.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# G

Not Reported in F.Supp.                                                                                                      Page 1
Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

C

Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
CEARFOSS CONSTRUCTION CORPORATION,
Petitioner
v.
SABRE CONSTRUCTION CORPORATION,
Respondent
**Civ. A. No. 89-1223.**

Aug. 14, 1989.

Charlis M. English, Jr. Ober Kalei, Crimes & Shuter, Washington, DC., for plaintiff Cearfoss Const.
Cerald I Katz Katz. & Stone, Vienna, VA, for defendant Sabre.

*MEMORANDUM OPINION*
THOMAS F. HOGAN, District Judge.
**\*1** On April 18, 1989, an arbitrator awarded Cearfoss Construction Corporation (hereinafter "Cearfoss") $61,421.28 stemming from a construction contract dispute with Sabre Construction Corporation (hereinafter "Sabre"). The matter is now before this Court pursuant to 28 U.S.C. § 1332.[FN1] In the instant action, petitioner Cearfoss has filed a motion to strike the affidavit of Gerald I. Katz, Sabre's counsel, and to confirm the arbitration award under the Federal Arbitration Act, 9 U.S.C. § 9 (1982). Respondent Sabre has filed a motion to vacate the award, and has requested an oral hearing on the matter.

For the reasons stated herein, the Court shall grant in part petitioner's motion to strike the affidavit of Gerald I. Katz, grant petitioner's motion to confirm the arbitral award, deny Sabre's motion to vacate the award, and deny Sabre's request for an oral hearing.

*I. BACKGROUND*

In June, 1987, Sabre contracted with Cearfoss to erect a prefabricated metal building to be used as a racquet and health club facility in McLean, Virginia. The subcontract provided, in part, that Cearfoss would erect a pre-engineered metal building manufactured by Varco-Pruden Buildings (hereinafter "Varco-Pruden"), and Sabre would pay $135,000 to Cearfoss for the work. Sabre was to obtain the metal building from Varco-Pruden.

Cearfoss alleges that during the course of performance, Cearfoss incurred increased costs due to Sabre's actions[FN2] and due to the misfabrication of the metal building caused by Varco-Pruden, the building materials supplier. On December 16, 1987, Cearfoss sent Sabre a claim letter seeking $124,404.62 for the unpaid contract balance and for increased costs. Part of Cearfoss's claim pertained to the misfabrication by Varco-Pruden. Varco-Pruden paid $50,000 to Sabre in settlement of Varco-Pruden's liability for the misfabrication. In January, 1988, at Cearfoss's direction, Sabre paid $46,161.50 to two of Cearfoss's subcontractors.

In April, 1988, Sabre filed a demand for arbitration with the American Arbitration Association ("AAA"), seeking to recover $50,000 from Cearfoss for its alleged failure to perform according to the terms of the subcontract. Cearfoss then counterclaimed, seeking approximately $38,000 in unpaid contract balance and approximately $92,000 in other damages.

The arbitration proceeding took place between March 20, 1989, and March 22, 1989. The proceedings were governed by the Construction Industry Arbitration Rules. Only the first day of the proceeding was transcribed. A central issue at arbitration was whether the $50,000 Varco-Pruden payment that Sabre passed on, in part, to Cearfoss's subcontractors represented a complete settlement of all of Cearfoss's claims, or only a partial settlement. Cearfoss produced four witnesses on its behalf which Sabre cross-examined. Sabre also produced witnesses in support of its case. The arbitrator found that the $46,161.50 was only in partial settlement, and on April 18, 1989, awarded Cearfoss an additional award of $61,421.28.

**\*2** During Cearfoss's portion of the case the arbitrator urged the parties to expedite the proceedings, and limited testimony regarding the misfabrication claim. Accordingly, the arbitrator accepted exhibits into evidence, without testimony, concerning the misfabrication. Sabre requested no opportunity for rebuttal and made no oral or written objection or exception at any time over the ruling.

On May 5, 1989, pursuant to 9 U.S.C. § 9 (1982), Cearfoss filed a motion to confirm the arbitration award in this Court. Sabre filed a motion to vacate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

the award, arguing that it was prejudiced during the arbitration proceedings because it did not have an opportunity to cross-examine the witnesses on the misfabrication issue, nor could it put on its own rebuttal evidence.

In support of its claim, Sabre now submits an affidavit of Gerald I. Katz, Sabre's attorney in the arbitration and in the present litigation. While there is no record of the hearing that pertains to the issues raised by Sabre, because only the first day of the hearing was transcribed, the affidavit recites statements allegedly made by the arbitrator. Attached to the affidavit are notes made by Sabre's counsel at the time of the arbitrator's ruling.

## II. DISCUSSION

Petitioner has moved to strike the affidavit of Gerald I. Katz and to confirm the arbitration award. Sabre has moved to vacate the award on the basis that the arbitrator denied it a fair and full hearing under § 10(c) of the Federal Arbitration Act, or that the arbitrator acted in manifest disregard of the law. The Court shall first address the motion to strike and then turn to the motions to confirm and vacate.

### A. Motion to Strike the Affidavit

In support of its allegations, Sabre has submitted an affidavit of Gerald I. Katz, Sabre's attorney in the arbitration and in the present litigation. The affidavit, based on counsel's handwritten notes which have also been offered into evidence, recites statements allegedly made by the arbitrator. Cearfoss argues that the affidavit should be stricken because it is multiple hearsay that does not fall under Rule 805 of the Federal Rules of Evidence.[FN3]

Pursuant to Rule 802 of the Federal Rules of Evidence, the affidavit *itself* is not inadmissible hearsay. Rule 802 provides that "[h]earsay is not admissible *except as provided* by these rules or *by other rules prescribed by the Supreme Court* pursuant to statutory authority or by Act of Congress." Fed. R. Evid. 802 (emphasis added). The Notes of Advisory Committee on Proposed Rules following the text of Rule 802 list examples of admissible hearsay from the Federal Rules of Civil Procedure that fall within the exception. Included within the list are "Rule 43(e): affidavits when motion based on facts not appearing of record" and "Rule 56: affidavits in

summary judgment proceedings." Mr. Katz's affidavit itself clearly falls within the Rule 43(e) exception. In addition, the affidavit may fall within the Rule 56 exception, as Sabre's motion to vacate the arbitration awarded is, in effect, a motion for summary judgment. Nevertheless, while the affidavit *itself* is not inadmissible hearsay, the affidavit *contains* inadmissible hearsay. In the affidavit, Mr. Katz quotes statements allegedly made by the arbitrator in conversations between the arbitrator and counsel for both parties. These statements are out-of-court statements of a declarant offered into evidence to prove the truth of the matter asserted. They thus constitute inadmissible hearsay and shall be stricken from the record.

**\*3** Moreover, Mr. Katz's handwritten notes attached to his affidavit constitute inadmissible hearsay, and the apparent quotations of the arbitrator contained within the notes constitute inadmissible multiple hearsay. *Cf. United States Football League v. National Football League,* 842 F.2d 1335, 1376 (2d Cir. 1988) (handwritten notes of an NFL official allegedly reflecting the comments of an NFL players union official at an NFL meeting, that were being offered for their truth, were properly excluded as multiple hearsay). The notes, including all statements quoted therein, do not satisfy any exceptions to the hearsay rule and therefore shall be stricken from the record.

### B. Motion to Confirm and Motion to Vacate

It is well-established that only upon a clear showing of exceptional circumstances may a District Court overturn an arbitration award.[FN4] The Court may vacate the arbitrator's award in this case only if Sabre provides clear and convincing evidence of one of the statutory grounds for vacating an award set forth in 9 U.S.C. § 10[FN5], or if the arbitrator has acted in manifest disregard of the law. *See Transit Casualty Co. v. Trenwick Reinsurance Co.,* 659 F. Supp. 1346, 1351 (S.D.N.Y. 1987), *aff'd mem.,* 841 F.2d 1117 (2d Cir. 1987). Sabre contends that it was denied a full and fair hearing under § 10(c) of the Act, and that the arbitrator acted in manifest disregard of the law of accord and satisfaction. The Court finds both of these arguments unconvincing.

### 1. Arbitrator's Alleged Misconduct under Section 10(c)

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Sabre alleges that the arbitrator's evidentiary ruling prejudiced Sabre and created an unfair hearing under § 10(c). Specifically, Sabre contends that the arbitrator denied it the right of cross-examination on the misfabrication issue.

Arbitrators are responsible for making evidentiary rulings. *See Fairchild & Co. v. Richmond, F. & P. R.R.,* 516 F. Supp. 1305, 1314 (D.D.C. 1981). However, arbitrators are not bound by the Federal Rules of Evidence.[FN6] *Id.* at 1315. While an arbitrator may err in his determinations, failure to receive relevant evidence does not necessarily constitute misconduct under the Act so as to require vacating an award. Rather, error that would constitute misconduct that would justify vacating an award must not simply be an error of law, but one which so affects the rights of a party that it may be said to deprive him of a fair hearing. *See Barker v. Government Employees Ins. Co.,* 339 F. Supp. 1064, 1068 (D.D.C. 1972) ("[n]either errors of fact nor of law provide a sufficient basis for overturning an arbitration award under 9 U.S.C. § 10.") *See also Newark Stereotypers Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3d Cir.), *cert. denied,* 393 U.S. 954 (1968).

Sabre's allegation of misconduct rests on its contention that the arbitrator denied it the right of cross-examination. The Court, however, must determine whether such a restriction of testimony on the misfabrication issue denied Sabre a full and fair hearing, not simply whether an error occurred. Sabre was allowed to present its case in full prior to the ruling. Sabre cross-examined all four of Cearfoss's witnesses. Furthermore, Sabre did not object to the arbitrator's ruling on the need for foundation testimony for some of Cearfoss's exhibits. Nor did Sabre request a rebuttal. Finally, Sabre did not assert this alleged error in any post-arbitration submission, and Sabre failed to preserve this point, as required under arbitration law.[FN7] *See Barker,* 339 F. Supp. at 1066-1067 (D.D.C. 1972).

**\*4** In challenging the arbitrator's evidentiary ruling, Sabre merely suggests the possibility that the arbitrator committed a simple error of law or procedure. Sabre, however, has not shown that the arbitrator engaged in conduct that undermined the fairness of the proceedings. Arbitrators may exclude evidence which is merely cumulative. Indeed, arbitrators must be expected to take actions which will expedite the proceedings. *See Ballantine Books, Inc. v. Capital Distributing Co.,* 302 F.2d 17, 21 (2d Cir. 1962); *Fairchild,* 516 F. Supp. at 1313 ("since

the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him"). The Court is not persuaded that the arbitrator's attempt in this case to simplify and expedite the presentation of testimony amounts to misconduct striking at the fundamental fairness of the hearing. Instead, it merely represents a discretionary decision by the arbitrator as to how to receive evidence. The Court concludes that in restricting oral testimony on the misfabrication issue, the arbitrator acted with the discretion given to him by law and did not deprive Sabre of a fair hearing.

### 2. Arbitrator's Alleged Manifest Disregard of the Law

Finally, Sabre contends that the arbitrator acted in manifest disregard of the law of accord and satisfaction in reaching his decision. Petitioner's Memorandum in Opposition to Motion to Vacate and in Support of Motion to Strike, at 15.

The Supreme Court has held that an award may be set aside if made by an arbitrator in manifest disregard of the law. *See Wilko v. Swan,* 346 U.S. 427, 436 (1953). *See also Revere Copper & Brass, Inc. v. Overseas Private Investment Corp.,* 628 F.2d 81, 84 (D.C. Cir.), *cert. denied,* 446 U.S. 983 (1980). Manifest disregard of the law, however, must go beyond a simple error in law or a failure on the part of the arbitrator to fully understand or apply the law before it will serve as grounds for vacating an award. In this case, Sabre's allegations concerning the arbitrator's conduct do not rise to the level of manifest disregard of the law.

A central issue at arbitration was whether the $50,000 Varco-Pruden payment that Sabre passed on, in part, to Cearfoss's subcontractors was in full settlement of all of Cearfoss's claims, or only in partial settlement.[FN8] Sabre alleges that Cearfoss, having received the indirect benefit of Sabre's $46,161.50 payment to Cearfoss's subcontractors, settled its claims in full, and that the arbitrator awarded Cearfoss duplicative misfabrication damages in the final award. Cearfoss counters that the $46,161.50 payment represented only a portion of all damages suffered by Cearfoss, and that the arbitrator did not include duplicative misfabrication damages in the final award.

In presenting its written summary of damages at arbitration, Cearfoss clearly took into account the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Varco-Pruden payment to Sabre that was passed on to Cearfoss's subcontractors. Memorandum in Opposition to Motion to Vacate and in Support of Motion to Strike, Exhibit 3. In addition, in the final arbitration award to Cearfoss, the arbitrator explained his own calculations, stating that:

**\*5** This payment [of $61,421.28] represents full compensation for: the settlement of all claims brought against the [Sabre] in this arbitration; retained payments withheld by [Sabre] from [Cearfoss] for work performed on the original contract; *and it recognizes the previous settlement of a portion of [[[Cearfoss's] counterclaim for misfabrication by a third party,* the steel supplier (Vorco-Pruden) [sic].

*Id.,* Exhibit 1. Moreover, in clarifying the award, the arbitrator clearly indicated that the misfabrication claim was included in the $80,466 sub-figure for damages, constituting the raw award to Cearfoss. *Id.,* Exhibit 4. *See also Id.,* Exhibit 1. Nevertheless, the amount was *also* apparently included in the "Payments made by Claimant to Respondent and Respondent's sub-contractors and suppliers" figure that was *subtracted* from adjusted contract amount to arrive at the $61,421,28 final award to Cearfoss.[FN9] Therefore, the amount is a wash and the arbitrator did not award Cearfoss funds that had already been paid to its subcontractors as a result of the initial settlement between Varco-Pruden and Sabre. Thus, the arbitrator did not act in manifest disregard of the legal principles advanced by Sabre.

### CONCLUSION

The arbitrator's decision that the $50,000 payment was in full settlement of Varco-Pruden's liability to Sabre, but not in full settlement of Sabre's liability to Cearfoss, is a reasonable conclusion based on the evidence. The arbitrator's evidentiary and procedural rulings regarding testimony on the misfabrication issue did not deprive Sabre of a full and fair hearing, nor was it made in manifest disregard of the law. Only upon a clear showing of exceptional circumstances may a district court vacate an arbitration award. Such exceptional circumstances do not exist in this case.

Accordingly, the Court shall GRANT IN PART Cearfoss's motion to strike the affidavit of Gerald I. Katz, with respect to statements in the affidavit attributed to the arbitrator, and with respect to the handwritten notes attached to the affidavit; GRANT Cearfoss's motion to confirm the arbitration award of

April 18, 1989; DENY Sabre's motion to vacate the arbitration award; DENY Sabre's request for an oral hearing; and DISMISS this case.

FN1. Petitioner is a Maryland corporation, and respondent is a Virginia corporation. Petitioner initially relied solely on the Federal Arbitration Act, 9 U.S.C. § 9 (1982), and the general federal-question statute, 28 U.S.C. § 1331, as conferring subject matter jurisdiction in this Court. The Federal Arbitration Act, however, "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 ... or otherwise." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 25 n.32 (1983). Rather, an independent basis for jurisdiction must exist. Here, the parties' diversity of citizenship constitutes an independent basis for jurisdiction, under 28 U.S.C. § 1332.

FN2. Cearfoss alleges that:
[a]s proved in the arbitration by Cearfoss, Sabre: (1) provided incorrect site access information; (2) provided no scheduling information; (3) provided an outdated, incorrect version of plans to Cearfoss for bidding purposes; (4) supplied misfabricated items for erection; (5) approved or selected improper materials and design; (6) ordered materials incapable of installation without field modification; (7) accelerated Cearfoss' work without compensation to Cearfoss; (8) failed to coordinate the work of its other subcontractors, with the general contractor and the Owner; and (9) otherwise caused or contributed to the delay of the completion of the project and increased costs incurred by Cearfoss.
Petitioner's Memorandum in Opposition to Motion to Vacate and in Support of Motion to Strike Affidavit, at 3.

FN3. Rule 805 provides that "[h]earsay included within hearsay is not excluded if each part to the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed. R. Evid. 805.

FN4. The Federal Arbitration Act establishes the desirability of arbitration as an alternative to litigation. *See Wilko v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

*Swan,* 346 U.S. 427, 431 (1953). In keeping with this preference, judicial review of arbitration awards is limited. *Devine v. White,* 697 F.2d 421, 436 (D.C. Cir. 1983) (citing *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960)); *Revere Copper & Brass, Inc. v. Overseas Private Investment Corp.,* 628 F.2d 81 (D.C. Cir.), *cert. denied,* 446 U.S. 983 (1980). Accordingly, this Circuit has held that "[a]n arbitration award must stand if *some* support for its basis exists in the record." *Devine,* 697 F.2d at 436 n. 80 (emphasis added), *quoted in, Washington-Baltimore Newspaper Guild, Local 35 v. The Washington Post Co.,* 621 F. Supp. 998, 1004 (D.D.C. 1985).

FN5.  Section 10 provides that an arbitration award may be set aside:
(a)  Where the award was procured by corruption, fraud, or undue means.
(b)  Where there was evident partiality or corruption in the arbitrators, or either of them.
(c)  Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or *in refusing to hear evidence pertinent and material to the controversy;* or of any other misbehavior by which the rights of any party have been prejudiced.
(d)  Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §  10 (emphasis added).

FN6.    Section 29 of the Construction Industry Arbitration Rules, provides in part that: "[t]he arbitrator has the discretion to vary [the] procedure but shall afford full and equal opportunity to the parties for the presentation of any material or relevant proofs." Section 31 provides, in part, that: "conformity to legal rules of evidence shall not be necessary." Construction Industry Arbitration Rules § §  29 and 31.

FN7.    Section 38 of the Construction Industry Arbitration Rules provides:
Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection thereto in writing shall be deemed to have waived the right to object.

FN8.    This Court shall not relitigate the merits of the case. *See John T. Brady & Co. v. Form-Eze Systems, Inc.,* 623 F.2d 261, 264 (2d Cir.), *cert. denied,* 449 U.S. 1062 (1980); *Reynolds Securities, Inc. v. Macquown,* 459 F. Supp. 943, 945 (W.D. Pa. 1978) (difference of interpretation of award is insufficient grounds for upsetting decision rendered by arbitrator).

FN9.  In the award, the arbitrator states that the dollar amount of the ordered payment was derived as follows:

|  |  |  |  |
|---|---|---|---|
| | Original Contract amount. | | .$135,000.00 |
| les s: | Arbitration Award to Claimant. | .-$ 4,950.00 | |
| | sub-total. | | .$130,050.00 |
| pl us: | Arbitration Award to Respondent. | .+$ 80,466.00 | |
| | Total. | | .$210,516.00 |
| les s: | Payments made by Claimant to Respondent and Respondent's sub-contractors | .- $149,094.72 | |

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 6
Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

and suppliers.

| | |
|---|---|
| Total ordered payment of Claimant to Respondent. | .$ 61,421. 28 |

*Id.,* Exhibit 1. The payment by Varco-Pruden to Sabre that was then transferred, in part, by Sabre to Cearfoss's subcontractors is included in both the $80,466.00 figure and the $149,094.72 figure.

D.D.C.,1989.

Cearfoss Const. Corp. v. Sabre Const. Corp.

Not Reported in F.Supp., 1989 WL 516375 (D.D.C.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.