IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMER MOHAMMON, *et al.*,<br>(Jabbarov Oybek Jamolivich)<br>   Petitioners,<br><br>   *v.*<br><br>GEORGE W. BUSH, *et al.*,<br>   Respondents. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-2386-RBW<br>)<br>)<br>)<br>)<br>)<br>) |

MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR
PETITIONER, JABBAROV OYBEK JAMOLIVICH, AND THE COURT WITH
30-DAYS ADVANCE NOTICE OF ANY INTENDED REMOVAL OF
PETITIONER FROM GUANTÁNAMO

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner, Jabbarov Oybek Jamolivich, respectfully moves for an Order requiring Respondents to provide undersigned counsel for Petitioner and the Court with advance notice of any intended removal of Petitioner from the U.S. Naval Base at Guantánamo Bay, Cuba. On information and belief, Respondents have contemplated or are contemplating removal of Petitioner from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law. Petitioner is requesting the advance notice to enable undersigned counsel to contest any such removal from Guantánamo and preserve the jurisdiction of the Court in this matter. Counsel for Respondents have indicated they will oppose this motion.

## STATEMENT OF FACTS

Petitioner is a citizen of Uzbekistan who is being detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba. As detailed in the habeas petition he has filed, he denies being an "enemy combatant" and contends he is being detained in violation of the Constitution, treaties and laws of the United States.

Petitioner in the instant case has reason to fear he will be transferred to a country -- even his home country of Uzbekistan -- where he will be tortured and/or detained indefinitely without due process of law. Upon information and belief, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries, including Uzbekistan, for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture.

According to reports by American and foreign news organizations, including the *Washington Post*, the *Los Angeles Times* and the British Broadcasting Corporation, the United States Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques. According to an article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, at http://www.newyorker.com/fact/content/?050214fa_fact6, ¶ 7. According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing

> extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, [2002], at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* Wash. Post, Dec. 26, 2002, at A1. The countries to which detainees may be brought are known to practice torture. *See*, *e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.").

Even if "transferred," "released," or "rendered" to his native country of Uzbekistan, Petitioner has reason to fear that he will face continued illegal detention and possibly torture. The former British Ambassador to Uzbekistan alleges that from 2002 to 2005 the United States government routinely handed over dozens of low-level terrorism suspects to Uzbekistan and that the CIA and the British intelligence agency MI6 routinely cited information in their regular intelligence briefings that had been passed on by Uzbek authorities and was almost certainly obtained under torture. Farah Stockman, *U.S. Handling Of Terror Suspects Questioned*, Boston Globe, March 24, 2005, at A10.

According to published reports, the Respondents have already decided not to return three Uzbek prisoners deemed eligible for release from Guantánamo home to Uzbekistan because of the Uzbek government's deplorable human rights record, as evidenced most pointedly by the

deadly crackdown in May 2005 against hundreds of protesters in the city of Andijan. See Charlie Savage and Farah Stockman, *Repatriation of Uzbeks From Guantánamo Halted*, Boston Globe, June 11, 2005, at A1. Once an ally in the war on terror, the Government of Uzbekistan has been roundly criticized for its human rights violations, including beatings, torture, and murder. See, e.g., *Uzbek Outrage*, Boston Globe, May 19, 2005, at A10. The United States Department of State has conceded that Uzbekistan's already poor human rights record became considerably worse during 2005. See "2005 Country Report on Human Rights Practices in Uzbekistan" available at http://www.state.gov/g/drl/rls/hrrpt/2005/61684.htm. The State Department notes in its 2005 Country Report on Uzbekistan that "torture was common in prisons, pretrial facilities and local police and security service precincts." The report also indicated that "police, prison officials, and the [Uzbek National Security Service] allegedly used suffocation, electric shock, deprivation of food and water, and sexual abuse, with beating being the most commonly reported method of abuse." As noted by the State Department, a 2003 United Nations Special Rapporteur on Torture report concluded torture and abuse was systemic throughout the investigative process in Uzbekistan. Id. at §1 ¶ c. Clearly, Petitioner faces a possible threat of harm if he is unlawfully rendered or released to Uzbekistan.

Respondents have accused petitioner of being a member of the Islamic Movement of Uzbekistan ("IMU"), which the United States Department of Homeland Security has designated as a terrorist organization. See Combatant Status Review Tribunal transcript, Set 51, bates 3490-3642, at 3609, available at http://www.dod.mil/pubs/foi/detainees/csrt/index.html. Petitioner denies this allegation, stating at his CSRT hearing:

> "[…] I served in the national army of Uzbekistan; and I've been fighting against this IMU and these Islamic terrorist organizations. I agree the IMU is a terrorist organization, but I have nothing to do with them. As a soldier in Uzbekistan, I have been fighting

against these groups. I took the oath and I swear it, that I will fight these groups, as a soldier, I took the oath." Id.

Unfortunately, the mere accusation of being a member of the IMU is sufficient to place Petitioner's life in danger, should he be returned to Uzbekistan. See "2005 Country Report on Human Rights Practices in Uzbekistan" at §1 ¶ c ("Authorities treated individuals suspected of extreme Islamist political sympathies […] more harshly than ordinary criminals.")

Petitioner also has reason to fear that he will be transferred into the custody of the government of Afghanistan or a third country for continued illegal detention without due process of law. On information and belief, a number of detainees have been removed to countries – including Pakistan and Kuwait – where they have been imprisoned and denied access to the courts. Moreover, news reports indicate that the United States government has contemplated transferring "large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantánamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries." Dana Priest, *Long-Term Plan Sought For Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1.

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner are likely

to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture.  *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Petitioner stands to suffer immeasurable and irreparable harm -- from to torture to possible death -- at the hands of a foreign or his native government.  Transfer to another country, even if "only" for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality of his detention in this Court.  By contrast, Respondents, who have already held Petitioner for several years, are asked only to provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo.  Respondents can suffer no conceivable harm from complying with such a request.

Petitioner is likely to succeed on the merits of his claims.  Petitioner has properly invoked the jurisdiction of this Court.  *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004).  Judge Green has already ruled that detainees in similar circumstances to Petitioner have stated actionable claims under the Due Process Clause and the Geneva Conventions.  For the United States Government to remove Petitioner to countries that would afford no such protections would be to flout Judge Green's ruling and defeat the Court's jurisdiction. Such a transfer would also violate basic international legal norms embodied not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction.  No matter how

satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant -- properly before the Court and represented by counsel -- be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

For the reasons discussed above, the motion should be granted.

>Respectfully submitted,
>PETITIONER,
>JABBAROV OYBEK JAMOLIVICH,
>By his attorney,
>
> / s / Michael E. Mone, Jr.
>Michael E. Mone, Jr., Esquire
>Esdaile, Barrett & Esdaile
>75 Federal Street
>Boston, MA 02110
>(617) 482-0333

Dated: September 15, 2006