**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMER MOHAMMON, et al.,

          Petitioners,

   v.

GEORGE W. BUSH, et al.,

          Respondents.

Civil Action No. 05-2386 (RBW)

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO THE MOTION OF
PETITIONER JABBAROV OYBEK JAMOLIVICH FOR PRELIMINARY
INJUNCTION REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR
PETITIONER AND THE COURT WITH 30-DAYS ADVANCE NOTICE OF ANY
INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO**

       Respondents hereby oppose petitioner Jabbarov Oybek Jamolivich's motion for

preliminary injunction requiring respondents to provide counsel for petitioner and the Court with

30 days' advance notice of any intended removal of petitioner from Guantanamo Bay, Cuba

("Petr. Mot.").

       Petitioner's motion should be denied, as a threshold matter, because the Detainee

Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 ("the Act"), vests exclusive

jurisdiction over this action in the Court of Appeals. The Act, among other things, amends 28

U.S.C. § 2241 to eliminate court jurisdiction to consider petitions for writ of habeas corpus and

other claims by aliens held as enemy combatants at Guantanamo Bay, id., § 1005(e)(1), and

creates an exclusive review mechanism in the D.C. Circuit to address the validity of the

detention of such aliens and final decisions of any military commissions, id., § 1005(e)(1),

(e)(2), (e)(3). Section 1005(e)(2) of the Act states that the D.C. Circuit "shall have exclusive

jurisdiction to determine the validity of any final decision of a Combatant Status Review

Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the

scope and intensiveness of that review.  While the Supreme Court in <u>Hamdan v. Rumsfeld,</u> 126 S. Ct. 2749, 2762-2769 (2006), held that § 1005(e)(1) of the Detainee Treatment Act did not apply to habeas petitions pending prior to the enactment of the Act, it recognized that the exclusive review provisions of the Act did expressly apply to cases pending prior to enactment. Although the petitioner in <u>Hamdan</u> escaped the Act because his challenge did not involve a final decision of a military commission within the exclusive jurisdiction of the Court of Appeals under § 1005(e)(3), the Court reserved the question of the effect of the exclusive review provisions of the Act on other cases, stating that "[t]here may be habeas cases that were pending in the lower courts at the time the DTA was enacted that do qualify as challenges to 'final decision[s]' within the meaning of subsection (e)(2) or (e)(3).  We express no view about whether the DTA would require transfer of such an action to the District of Columbia Circuit."  <u>Hamdan</u>, 126 S. Ct. at 2769 n.14.

        The above-captioned case is such a case, <u>i.e.</u>, challenging petitioner's designation as an enemy combatant through the Combatant Status Review Tribunal.  Indeed, petitioner states that as "detailed in the habeas petition he has filed, he denies being an 'enemy combatant.'"  Petr. Mot. at 2.  Given the Act's investment of exclusive review in the Court of Appeals, the District Court lacks jurisdiction over this case for it is well-settled that an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction, including habeas corpus.  <u>Cf.</u>, <u>e.g.</u>, 5 U.S.C. § 703 ("form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for . . . writs of . . . habeas corpus"); <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200, 207-09

(1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); FCC v. ITT World Commc'ns, Inc., 466 U.S. 463, 468 (1984) (Hobbs Act) ("The appropriate procedure for obtaining judicial review of the agency's disposition of these issues was appeal to the Court of Appeals as provided by statute."); Laing v. Ashcroft, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); Lopez v. Heinauer, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial review was available . . . the district court was not authorized to hear this § 2241 habeas petition.").  See also Telecomm. Research and Action Ctr. v. FCC, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute") (footnote omitted); id. at 75, 78-79 (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals).

The relief requested by petitioner would require an assertion of jurisdiction and authority in the case inconsistent with the Act's investment of exclusive jurisdiction in the Court of Appeals, and respondents' argument in this regard is in no way immaterial or premature.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("Without jurisdiction [a] court cannot proceed at all in any cause."); see also Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

Thus, the Supreme Court's decision in Hamdan has not resolved the issue of whether this Court may exercise jurisdiction in this case in light of the Act.  The effect of the Act on cases

like this remains pending before the Court of Appeals in the pending Guantanamo detainee appeals (see Boumediene v. Bush, Nos. 05-5062 and Al Odah v. United States, No. 05-5064), and the effect of Hamdan on this issue was addressed in supplemental briefing to the Court of Appeals that was completed on August 15, 2006. Furthermore, the issue of whether advance notice orders such as the one sought by petitioner are proper is also currently pending at the D.C. Circuit, oral argument having been held on September 11, 2006. See Kiyemba v. Bush, No. 05-1509 (RMU) (D.D.C. Sept. 13, 2005), appeal petition from interlocutory appeal, No. 05-5487 (D.C. Cir.). Accordingly, while petitioner's request for relief should be denied, at a minimum, a stay of proceedings in this case including with respect to petitioner's request for relief, is appropriate pending action by the Court of Appeals. For these reasons, respondents oppose petitioner's request for relief.

Furthermore, respondents also oppose petitioner's request for relief for the reasons discussed below. Petitioner's legal arguments and factual predicates in this motion are substantially identical to those that this Court rejected in denying similar motions in two other cases. See Battayav v. Bush, No. 05-714 (RBW) (dkt. no. 9); Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005). Petitioner makes no attempt to distinguish Battayav or Almurbati from the present case, and there is no significant difference between those cases and the instant case. The Court should likewise deny petitioner's motion in this case.

## BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo.**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military

4

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at Guantanamo.

**B.**      **Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo.**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals

longer than necessary.  See Decl. of then Deputy Assistant Secretary of Defense for Detainee

Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Decl. of then

Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[1]  The

Department of Defense ("DoD") conducts at least annual reviews of each Guantanamo detainee

to determine whether continued detention is warranted based on factors such as whether the

detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7;

Prosper Decl. ¶ 2.  Those annual reviews include those currently being conducted through

Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[2]  As part of the Administrative

---

[1] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005).  While Mr. Waxman and Mr. Prosper have both recently left office, the policies and practices set forth in their prior declarations remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  See infra note 3.

[2] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004,

(continued...)

Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Several hundred Guantanamo detainees have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[3]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such

---

[2](...continued)
re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518 gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

[3]  As an update to certain information provided in the attached declarations well over 300 detainees have been transferred by the DoD from Guantanamo, of which approximately 190 were transferred for release.  See, e.g., DoD News Releases available at <<http://www.defenselink.mil/news/nrdgb.html>>.

governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id. In fact, most of the Guantanamo detainees who have been transferred by the DoD to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances

regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Waxman Decl. ¶ 6; Prosper Decl. ¶ 5. Once the DoD approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned. Waxman Decl. ¶ 6; Prosper Decl. ¶ 6. Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer. Id. Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant. Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7. Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy. Prosper Decl. ¶ 7. When evaluating the adequacy of assurances, State Department officials consider the

identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where the DoD decided not to transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States

concerning such issues in the future.[4]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result,

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD.

It is well-established that a request for preliminary injunctive relief "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion."  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v.

Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction,

a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he]

would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be furthered by

the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction

"must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against

---

[4] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such <u>imminence</u> that there is a clear and present need for equitable relief to prevent irreparable harm." <u>Id.</u> (citations and internal quotation marks omitted; emphasis in original).[5]

## II.    PETITIONER FAILS TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction.

Petitioner argues that a preliminary injunction requiring advance notice is necessary 1) in order for the Court to "preserve" its jurisdiction, reasoning that a transfer would or could curtail the Court's review of the legality of his detention, and 2) for counsel to contest any such removal from Guantanamo. <u>See</u> Petr. Mot. at 1, 6. Petitioner's argument, however, rests on faulty logic. The ultimate relief sought by petitioner in this habeas case is obviously release from custody. Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is

---

[5] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals. However, as one Judge of this Court has concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." <u>Al-Anazi v. Bush</u>, 370 F. Supp. 2d 188, 199 n.11 (D.D.C. 2005) (citing <u>Laborers' Int'l Union of N. Am. v. Nat'l Post Office Mail Handlers</u>, Civ. A. No. 8801731-OG, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)). Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioners should be required to satisfy the preliminary injunction standard in order to justify that relief.

interested in maintaining.[6]  "The ultimate objective of a habeas petition is release from custody."
Almurbati v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005).  As this Court previously stated,
"once the respondents release the petitioners from United States custody . . . they will have
obtained the result requested and at that point there will be no further need for this Court to
maintain jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas
petition, including this one, is ultimately about obtaining release from detention, and where, as
here, the United States will relinquish custody of the detainee to the home government there is
nothing more the Court could provide to petitioners.") (citation omitted).

That release from United States custody will give petitioner all the relief he can seek
through habeas is not altered by the fact that, upon being released from the custody of the United
States, former detainees may be taken into custody and detained in the receiving country based
on that country's independent interests and determinations.  As respondents' declarations make
clear, when the DoD transfers detainees to the control of other governments, the detainees are no
longer subject to the custody or control of the United States, and any subsequent confinement in
the receiving country is based on the receiving government's independent decision, based on its
domestic laws, that the individual should be detained.  Waxman Decl. ¶ 5.  Indeed, even if the

---

[6] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction
of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October
2002, long before the Supreme Court's decision in Rasul v. Bush, 524 U.S. 466 (2004), and the
proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  It
has been noted that 131 transfers (i.e., more than half of the transfers to date) had occurred three
months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that
DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-
Anazi, 370 F. Supp. 2d at 196 n.7 (citing DoD, Transfer of Afghani and Pakistani Detainees
Complete (Mar. 15, 2004)); see also supra note 3 (citing documents showing that administrative
review process for considering transfers and repatriations predates the filing of this and most
other detainee habeas petitions).

United States transfers a detainee to his home government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws. The Court should therefore reject petitioner's suggestion that the possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.

> **B.      Speculation that the United States Will Defy its Own Policy by Transferring Detainee to Countries in Circumstances Where it is Believed He Will be Tortured Does Not Warrant a Preliminary Injunction.**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send petitioner to a foreign country under circumstances where he will be tortured. Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. This policy is implemented through a process that contains several levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext. There is no valid basis for such an assumption.

Rather, as this Court has previously found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention

to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78.

Moreover, another Judge of this Court found that the assortment of magazine and newspaper

stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate

justifying an injunction, noting that, among other problems with relying on such materials,

"[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees

out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioner

has failed to show that either the prospect of relinquishment from United States custody or

unfounded speculation about possible torture in a foreign country constitutes irreparable harm

that must be remedied by a preliminary injunction.

**III.  PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS
      IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
      OR RELEASE IN ACCORDANCE WITH THE POLICIES
      EXPRESSED IN RESPONDENTS' DECLARATIONS.**

Petitioner fares no better on the second prong of the preliminary injunction analysis,

which requires him to show that he is likely to succeed in preventing a transfer from

Guantanamo.

To be clear, aside from the withdrawal of district court habeas jurisdiction in this case

under the Detainee Treatment Act, see supra, whatever the merits of petitioner's substantive

claims that he is wrongfully detained, it is not the likelihood of success on those claims that

matters for purposes of the instant motion for preliminary injunction.  Rather, as two Judges of

this Court (who reached opposite outcomes on the bottom line of whether to require advance

notice) have agreed, the likelihood of success analysis must focus on the legal basis for petitioner

to obtain an order preventing termination of detention by the United States in the manner

described in the declarations submitted herewith.  See Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he

14

presence of a sound basis to challenge the legality of one's <u>detention</u> does not at all imply that

there exists a sound basis to challenge the legality of one's <u>transfer</u>.  Put differently, the 'merits,'

if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is

petitioners' challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at Guantanamo")

(emphasis in original); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u> there are no circumstances under

which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary

injunction should not be granted") (emphasis in original).

 Petitioner fails to identify any valid source of legal authority for such an order; instead,

he ignores the above teaching and simply insists that he is likely to succeed on the types of

claims challenging <u>detention</u> that were raised in the cases before Judge Green in <u>In re</u>

<u>Guantanamo Detainee Cases</u>, 355 F. Supp. 2d 443 (D.D.C. 2005), <u>appeal on pet. from</u>

<u>interlocutory appeal</u>, No. 05-5064 (D.C. Cir)  Moreover, even if a valid source of legal authority

existed for an order prohibiting a <u>transfer</u>, the Rule of Non-Inquiry, which bars judicial inquiry

into the fairness of a foreign nation's justice system and the procedures or treatment that an

individual may experience in a foreign nation, weighs heavily against petitioner's likelihood of

success in contesting a transfer or repatriation.

  **A. No Valid Legal Basis Exists for a Judicial Order**
    **Enjoining Transfer or Repatriation of an Individual**
    **Previously Detained by the United States as an Enemy Combatant.**

 As discussed above in the context of irreparable harm, <u>see</u> <u>supra</u> Section II. A,

preservation of the Court's jurisdiction would not be an appropriate legal rationale for an order

forbidding transfer or repatriation of an individual detained at Guantanamo, because

relinquishment from United States custody (which occurs in every such transfer or repatriation)

represents the full extent of relief that petitioner could obtain from a habeas petition.  As this Court has previously explained "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."  See Almurbati, 366 F. Supp. 2d at 80; see also Al-Anazi, 370 F. Supp. 2d at 198.[7]  Indeed, it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now – with the respondents taking steps to transfer those individuals out of United States control, and the petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to an 'undesirable' country."  Al-Anazi, 370 F. Supp. 2d at 196.  Thus, petitioner does not enjoy a likelihood of success in obtaining an order barring a transfer in order to "preserve" the Court's jurisdiction.

---

[7] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-2035, 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioner may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

B.     **Principles Underlying the Rule of Non-Inquiry Militate
        Heavily Against Petitioner's Likelihood of Success.**

Even if some valid claim or other legal basis existed for judicial involvement in transfer

or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice

requirement to support and facilitate such involvement, the separation of powers would bar such

relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the

Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999)

(citing Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see

also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he

controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them [the courts] must move with the circumspection appropriate

when [a court] is adjudicating issues inevitably entangled in the conduct of our international

relations.'") (quoting Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 383 (1959)).[8]  If the

Court were to entertain petitioner's claim to a right to contest repatriation or removal from

Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review

of a transfer or repatriation decision could involve scrutiny of United States officials' judgments

and assessments on the likelihood of torture in a foreign country, including judgments on the

reliability of information and representations or the adequacy of assurances provided, and

_____

[8] In Holmes, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."
459 F.2d at 1225.

confidential communications with the foreign government and/or sources therein.  Prosper Decl.

¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of

information and interfere with our ability to interact effectively with foreign governments.

Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as

well as other governments, would likely be reluctant to communicate frankly with the United

States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This

chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper

Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the

analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a

requesting nation's justice system'" and "'the procedures or treatment which await a surrendered

fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));

see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

18

laws and the manner in which they are enforced." Id. at 1067. "It is the function of the

Secretary of State to determine whether extradition should be denied on humanitarian grounds."

Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch") (internal quotation marks

omitted); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of

Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to

Albania were solely for the Secretary of State to weigh, and not an appropriate subject for

judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal

Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings,

76 Cornell L. Rev. 1198 (1991).

  The force of these principles is not diminished by the fact that petitioner seeks judicial

review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely

trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

powers.[9] See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

---

[9] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of
Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of
Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard
was characterized as dicta by the First Circuit in a subsequent decision. See Kin-Hong, 110 F.3d
at 111 n.12. In that later case, while pretermitting the question "[w]hether the doctrine is
constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-
(continued...)

("Undergirding this principle is the notion that courts are ill-equipped as institutions and

ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into

and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F.

Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has

exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23

(holding, in a non-extradition context, that considerations similar to those embodied in the Rule

of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a

foreign nation's trial of a U.S. citizen).  Thus, petitioner cannot turn to the courts to second-

guess Executive judgments about matters such as custodial conditions and/or the adequacy of

legal procedures in a foreign country, as well as the credibility and adequacy of a foreign

government's assurances.  Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of

courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor

responsibility and have long been held to belong in the domain of political power not subject to

---

[9](...continued)
state doctrine and described the doctrine using language imbued with constitutional significance.
See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by
concerns about institutional competence and by notions of separation of powers.  It is not that
questions about what awaits the relator in the requesting country are irrelevant to extradition; it
is that there is another branch of government, which has both final say and greater discretion in
these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to
repatriate him would be pursuant to an extradition treaty or statute, such a contention would be
wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v.
Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997)
(reversing lower court's holding, Civ. A. No. 93-1465, 1995 WL 2292, *11 (E.D. La. Jan. 3,
1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an
arrested person to the government of Haiti, unless the extradition laws of the United States were
followed").

judicial intrusion or inquiry'") (quoting <u>Chicago & S. Air Lines</u>, 333 U.S. at 111)).

    C.    **AN INJUNCTION REQUIRING ADVANCE NOTICE**
                **WOULD TRAMPLE ON THE SEPARATION OF POWERS.**

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question. Indeed, petitioner states that he is seeking a preliminary injunction so that he will be provided with an "opportunity to contest his transfer." Petr. Mot. at 7. Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of then Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. <u>See</u> Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. <u>See</u> <u>supra</u> Section III.B (describing interests that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. <u>See</u> <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the

Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers.  As this Court has previously stated, this "Court simply does not have authority to require the Executive Branch to provide thirty day notices prior to effecting the transfer of the petitioners."  Almurbati, 366 F. Supp. 2d at 81.

***

Thus, there is no basis in law for an injunction requiring that petitioner's counsel and this Court be given advance notice of any upcoming transfer or release.  Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.  Accordingly, because "the Court does not have the authority to grant the relief requested," petitioner has "failed to satisfy the likelihood of success prong of the preliminary injunction standard."  Almurbati, 366 F. Supp. 2d at 81.

## IV.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.[10]  As one Judge of this Court has held:

---

[10] While two Judges, in granting preliminary injunctions, have relied on the general

(continued...)

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199. As this Court has previously stated, these significant government interests "surely trump" petitioner's interests concerning why he should not be transferred without advance notice, which are "based on innuendo, speculation and second hand media reports." Almurbati, 366 F. Supp. 2d at 82. Thus, the public interest disfavors an injunction.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for preliminary injunction be denied.

---

[10](...continued)
statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Joudi v. Bush, Civ. A. No. 05-0301 (GK), 2005 WL 774847, at *6 (D.D.C. Apr. 4, 2005); Abdah, 2005 WL 711814, at *6, that formulation leaves the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction. As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioner may have, constitutional or otherwise. The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

Dated: September 25, 2006                    Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             DOUGLAS N. LETTER
                                             Terrorism Litigation Counsel


                                             ___/s/ Nicholas J. Patterson_____
                                             JOSEPH H. HUNT (D.C. Bar No. 431134)
                                             VINCENT M. GARVEY (D.C. Bar No. 127191)
                                             TERRY M. HENRY
                                             JAMES J. SCHWARTZ
                                             PREEYA M. NORONHA
                                             ROBERT J. KATERBERG
                                             ANDREW I. WARDEN
                                             NICHOLAS J. PATTERSON
                                             EDWARD H. WHITE
                                             Attorneys
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W.
                                             Washington, DC  20530
                                             Tel:  (202) 514-4523
                                             Fax:  (202) 616-8470

                                             Attorneys for Respondents