**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| AMER MOHAMMON, et al., |
| |
| Petitioners, |
| v. |
| |
| GEORGE W. BUSH, et al., |
| |
| Respondents. |

Civil Action No. 05-2386 (RBW)

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONER'S
MOTION TO MODIFY STAY ORDER AND TO PROVIDE 30-DAYS' ADVANCE
NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO**

Respondents hereby oppose petitioner Maher El Falesteny's motion seeking to require

respondents to provide the Court and petitioner's counsel with 30 days' advance notice of any

intended removal of petitioner from Guantanamo Bay Naval Base in Cuba ("Guantanamo").

Preliminarily, petitioner's motion should be denied because the Military Commissions Act

of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA"), which became law on October 17, 2006,

and the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 ("DTA"),

vests exclusive jurisdiction over this action in the D.C. Circuit.  The MCA amends 28 U.S.C.

§ 2241 to provide that "[n]o court, justice, or judge shall have jurisdiction" to consider either (1)

habeas petitions filed by aliens detained by the United States as enemy combatants, or (2) any

other action "relating to any aspect of the detention, transfer, treatment, trial, or conditions of

confinement" of such aliens, except for the exclusive review mechanism in the D.C. Circuit

created under the DTA, for addressing the validity of the detention of such aliens.  See MCA § 7.

This new amendment to § 2241 takes effect on the date of enactment and applies specifically "to

all cases, without exception, pending on or after the date of the enactment of this Act which

relates to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." *Id.*

The review mechanism created by the DTA, in turn, invests the D.C. Circuit with exclusive jurisdiction to address the validity of the detention of aliens as enemy combatants by the United States, including at Guantanamo, and of final decisions of any military commissions. See DTA § 1005(e)(2), (e)(3), as amended by MCA. Section 1005(e)(2) of the DTA states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.

While the Supreme Court in Hamdan held that the provision of the DTA ousting district court jurisdiction, see DTA § 1005(e)(1), did not apply to habeas petitions such as this pending prior to the enactment of the DTA, see Hamdan v. Rumsfeld, 548 U.S. –, 126 S. Ct. 2749, 2762-69 (U.S. June 29, 2006), Congress has now addressed the matter through passage of the MCA, which unambiguously withdraws district court jurisdiction in all pending cases such as this, in favor of the exclusive review mechanism available in the Court of Appeals. See MCA § 7.

Moreover, even prior to enactment of the MCA, the DTA invested the Court of Appeals with the same "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," see DTA § 1005(e)(2), (e)(3), which, standing alone, deprives the district court of jurisdiction in cases where, as here, the petitioner challenges his detention as an enemy combatant. It is well-settled that an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction including habeas corpus. See, e.g., Thunder Basin Coal

Co. v. Reich, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act

precludes assertion of district court jurisdiction); FCC v. ITT World Commc'ns, Inc., 466 U.S.

463, 468 (1984) ("The appropriate procedure for obtaining judicial review of the agency's

disposition of these issues was appeal to the Court of Appeals as provided by statute."); Laing v.

Ashcroft, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in

which no other judicial remedy is available"); Lopez v. Heinauer, 332 F.3d 507, 511 (8th Cir.

2003) ("Because judicial review was available . . . the district court was not authorized to hear

this § 2241 habeas petition."); Telecomm. Research & Action Ctr. v. FCC, 750 F.2d 70, 77 (D.C.

Cir. 1984) ("By lodging review of agency action in the Court of Appeals, Congress manifested an

intent that the appellate court exercise sole jurisdiction over the class of claims covered by the

statutory grant of review power."); id. at 75, 78-79 (request for relief in district court that might

affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the

Court of Appeals).

The Supreme Court in Hamdan recognized that the exclusive review provisions of the

DTA expressly applied to cases pending prior to enactment. Although the petitioner in Hamdan

escaped the DTA because his challenge did not involve a final decision within the exclusive

jurisdiction of the Court of Appeals under § 1005(e)(2) or (e)(3), the Court reserved the question

of the effect of the exclusive review provisions of the DTA on other cases, stating that "[t]here

may be habeas cases that were pending in the lower courts at the time the DTA was enacted that

do qualify as challenges to 'final decision[s]' within the meaning of subsection (e)(2) or (e)(3).

We express no view about whether the DTA would require transfer of such an action to the

District of Columbia Circuit." Hamdan, 548 U.S. –, 126 S. Ct. at 2769 & 2769 n.14. In any event, district court jurisdiction has been unambiguously withdrawn with passage of the MCA.

The relief requested by petitioner would, therefore, require an assertion of jurisdiction and authority in this case inconsistent with the DTA's investment of exclusive jurisdiction in the Court of Appeals and the MCA's withdrawal of other forms of jurisdiction, and respondents' jurisdictional argument is in no way immaterial or premature. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (" 'Without jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.' " (quoting Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868)).

Further, the issue of the effect of the DTA and the MCA on this Court's jurisdiction over Guantanamo detainee habeas cases, including the instant case, remains pending before the Court of Appeals. Indeed, the MCA is the subject of supplemental briefing in the Court of Appeals that is scheduled to be completed on November 20, 2006. Accordingly, while petitioner's request for relief should be denied for lack of jurisdiction, at a minimum, a continued stay of proceedings in this case (see Order, dkt. no. 6), including with respect to petitioner's request for relief, is appropriate pending the resolution of the effect of the DTA and MCA by the Court of Appeals. For these reasons, respondents oppose petitioner's request for relief.

Respondents also oppose petitioner's request for relief for the reasons discussed below and as explained in this Court's prior decisions on the issue, which petitioner fails even to acknowledge. E.g., Almurbati v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005); Order (dkt. no. 9), Battayav v. Bush, Civ. A. No. 05-714 (RBW) (D.D.C. May 3, 2005).

**BACKGROUND**

A.    **Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it. In the course of those hostilities, the United States has captured or taken custody of a number of foreign nationals as enemy combatants, some of whom are being held at Guantanamo.

B.    **Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention for the duration of hostilities, the United States has no interest in detaining any individuals longer than necessary. See Decl. of then Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3, attached hereto as Exhibit 1; Decl. of then Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2, attached hereto as Exhibit 2.[1] The Department of Defense ("DoD") conducts at least an annual review of each Guantanamo detainee to determine whether continued detention is warranted

---

[1] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases. See Waxman Decl. ¶ 1. The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005). While Mr. Waxman and Mr. Prosper have both left office, the policies and practices set forth in their prior declarations remain in effect and are applicable to the instant case. Certain numerical information in the declarations is subject to updating. See infra note 3.

based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  The annual reviews include those currently being conducted through Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[2]  As part of the Administrative Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation.

Following consultation with various agencies, a senior DoD official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  As of the time of Mr. Waxman's Declaration, 234 Guantanamo detainees had been so transferred, over a period spanning several years, including 167 transferred for release.  Waxman Decl. ¶ 4; see also Prosper Decl. ¶ 2.[3]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of

_____

[2]  See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518 gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf>>; Memorandum dated July 14, 2006, re: Revised Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, <<http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf>>.

[3]  The numbers of detainees transferred from Guantanamo in respondents' declarations were accurate as of the dates of the declarations.  As of the date of this brief, approximately 340 detainees had been transferred by the DoD from Guantanamo.  See, e.g., DoD News Releases available at <<http://www.defenselink.mil/news/nrdgb.html>>.

citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government.  Waxman Decl. ¶ 5.  The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States.  Id.  Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the DoD to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer.  Id.

7

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the DoD approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant.  Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7. Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy. Prosper Decl. ¶ 7. When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8. In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored. Id. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8. Indeed, circumstances have arisen in the past where the DoD decided not to transfer detainees to their country of origin because of mistreatment concerns. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[4]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

**I.     PRELIMINARY INJUNCTION STANDARD**

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

---

[4] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.' " See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).[5]

---

[5] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings pending appeals. Here, petitioner seeks his requested relief embodied in an order to modify the stay and as a preliminary injunction. See Pet'r's Br. at 4 & n.3, dkt. no 199; see also id. at 3-7 (arguing that the elements of a preliminary injunction are satisfied). Regardless of the form of the order, it is clear that petitioner's requested relief is inherently injunctive in nature. Cf. Al-Anazi v. Bush, 370 F. Supp. 2d 188, 192 (D.D.C. 2005) ("Because such advance notice would be provided only after DOD has decided to transfer a detainee, petitioners concede, as they must, that they are essentially requesting an order preventing the United States from transferring any Guantanamo detainee for 30 days."). As one Judge of this Court has concluded, " the 'standards for evaluating a motion for stay pending appeal are substantially the same as those for issuing a preliminary injunction,' and so if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (D.D.C. 2005) (quoting Laborers' Int'l Union of N. Am. v. Nat'l Post Office Mail Handlers, Civ. A. No. 8801731-OG, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)). Thus, regardless of how petitioner casts his motion for relief, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.

## II.     PETITIONERS FAILS TO SHOW IRREPARABLE INJURY

### A.     The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Petitioner argues that advance notice is necessary in order to "protect" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention.  See Pet'r's Br. at 7-8. Petitioner's argument, however, rests on faulty logic, as the D.C. Circuit has recently made clear. See Qassim v. Bush, – F.3d –, 2006 WL 2933322, at *1, 3-4 (D.C. Cir. Aug. 14, 2006) (per curiam) (granting appellees' emergency motion to dismiss because petitioners' habeas petition was rendered moot when petitioners were voluntarily released from Guantanamo to Albania).[6] The ultimate relief sought by petitioner in this habeas case is obviously release from custody. Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[7]  "The ultimate objective of a habeas petition is release from custody."

_____

[6] Although the D.C. Circuit initially directed that its opinion not be published pursuant to D.C. Circuit Rule 36, Qassim, – F.3d –, 2006 WL 2933322, at *1, the court subsequently granted appellees' motion to publish the opinion on October 13, 2006.  Order, Qassim v. Bush, No. 05-5477 (D.C. Cir.).

[7] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the Supreme Court's decision in Rasul v. Bush, 524 U.S. 466 (2004), and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  It has been noted that 131 transfers had occurred three months or longer before Rasul was decided,

(continued...)

12

Almurbati, 366 F. Supp. 2d at 78. As one Judge of this Court stated, "once the respondents

release the petitioners from United States custody . . . they will have obtained the result requested

and at that point there will be no further need for this Court to maintain jurisdiction." Id. at 80;

see also Al-Anazi v. Bush, 370 F. Supp. 2d 188, 198 (D.D.C. 2005) ("Every habeas petition,

including this one, is ultimately about obtaining release from detention, and where, as here, the

United States will relinquish custody of the detainee to the home government there is nothing

more the Court could provide to petitioners.") (citation omitted).

      That release from United States custody will give petitioner all the relief he can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

States, former detainees may be taken into custody and detained in the receiving country based on

that country's independent interests and determinations. As respondents' declarations make clear,

when the DoD transfers detainees to the control of other governments, the detainees are no longer

subject to the custody or control of the United States, and any subsequent confinement in the

receiving country is based on the receiving government's independent decision, based on its

domestic laws, that the individual should be detained. Waxman Decl. ¶ 5. Indeed, even if the

United States transfers a detainee to his home government with the understanding that, from the

United States' perspective, he can be released, the home government may well subsequently take

any law enforcement or investigatory action against the former detainee that it may deem

---

     [7](...continued)
"thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in
order to thwart the jurisdiction of the courts." Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing DoD,
Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004)); see also supra note 2
(citing documents showing that administrative review process for considering transfers and
repatriations predates the filing of this and most other detainee habeas petitions).

appropriate under its laws.  The Court should therefore reject petitioner's suggestion that the possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.

Petitioner also relies on FRAP 23(a), which states that "[p]ending review of a decision in a habeas corpus proceeding . . ., the person having custody of the [habeas] prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule."  Pet'r's Br. at 5-6.  Inexplicably, petitioner fails to cite on point, binding D.C. Circuit precedent.  In Qassim, the D.C. Circuit held that the DoD's release of several detainees from Guantanamo to Albania rendered the detainees' habeas petitions moot notwithstanding the provisions of FRAP 23.  "Rule 23(a) does not apply because the [petitioners'] release is not a 'transfer' of custody" within the scope of the Rule, "the plain language of the Rule applies only to the transfer of a habeas petitioner from one custodian to another."  Qassim, 2006 WL 2933322, at *3 (emphasis in original).  To put it another way, "[n]othing in the Rule indicates a desire to extend it to situations where the United states . . . is transferring an individual out of federal or state custody entirely."  Id. (citation and internal quotation marks omitted).

> **B.      Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries in Circumstances Where it is Believed They Will be Tortured Does Not Warrant a Preliminary Injunction**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation and incredible accusations that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send him to a foreign country under circumstances where he will be tortured.

Petitioner, a Palestinian, submits his counsel's declaration that petitioner told counsel he was interrogated by an individual who called himself "Torture," who showed him "apparently an official communication from Israel" stating that "Israel wanted all Palestinians at Guantanamo returned to Israel pursuant to a security agreement between the two countries," and falsely accused petitioner of being the director of intelligence for Hamas.  See Decl. of Stephen M. Truitt dated October 31, 2006 ¶ 2, attached to Pet'r's Br. as Exhibit 1; see also Pet'r's Br. at 2.  Further, petitioner relies on a hodgepodge of allegations supported only by media reports and "information and belief" that the DoD has transferred and plans to transfer large numbers of detainees to other countries who torture the detainees.  Pet'r's Br. at 2-3.

These assertions are directly contradicted by the attached Waxman and Prosper Declarations, which provide detailed descriptions of the United States' policies and processes for transferring Guantanamo detainees.  The declarations conclusively and unmistakably demonstrate that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  This policy is implemented through a process that contains several levels of precautions and safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to assume that the United States' policy and practice is somehow a sham or pretext.  There is no valid basis for such an assumption.[8]

---

[8] Nor does petitioner's cited experience during an interrogation, even if assumed to be true, somehow outweigh or override the official policy and practice of the United States with regard to transfers reflected in respondents' declarations.

Rather, as this Court has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78. Moreover, another Judge found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196. Thus, petitioner has failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitutes irreparable harm that must be remedied by a preliminary injunction.

**III.     PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER OR RELEASE IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS**

Petitioner fares no better on the second prong of the preliminary injunction analysis, which requires him to show that he is likely to succeed in preventing a transfer from Guantanamo.

To be clear, aside from the withdrawal of district court habeas jurisdiction in this case under the MCA and DTA, whatever the merits of petitioner's substantive claims that he is wrongfully detained, see Pet'r's Br. at 1-2, it is not the likelihood of success on those claims that matters for purposes of the instant motion for preliminary injunction. Rather, as two Judges of this Court (who reached opposite outcomes on the bottom line of whether to require advance notice) have agreed, the likelihood of success analysis must focus on the legal basis for petitioner to obtain an order preventing termination of detention by the United States in the manner

16

described in the declarations submitted herewith.  See Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he

presence of a sound basis to challenge the legality of one's detention does not at all imply that

there exists a sound basis to challenge the legality of one's transfer.  Put differently, the 'merits,'

if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is

petitioners' challenge to their transfer from Guantanamo, not to their detention at Guantanamo.")

(emphasis in original); Abdah v. Bush, 2005 WL 711814, at *4 (D.D.C. March 29, 2005) ("if

there are no circumstances under which Petitioners could obtain a court order preventing a

contemplated transfer, a preliminary injunction should not be granted") (emphasis in original).

Petitioner recognizes as much, stating that the purpose of the advance notice is to "to enable his

counsel to contest any removal from Guantanamo and preserve the jurisdiction of the Court in

this matter."  Pet'r's Br. at 1, 5.

      Nevertheless, petitioner fails to identify any valid source of legal authority for an order

preventing termination of detention.  And even if a valid source of legal authority existed for an

order prohibiting a transfer, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness

of a foreign nation's justice system and the procedures or treatment that an individual may

experience in a foreign nation, weighs heavily against petitioner's likelihood of success in

contesting a transfer or repatriation.

    **A.**    **No Valid Legal Basis Exists for a Judicial Order**
               **Enjoining Transfer or Repatriation of an Individual**
               **Previously Detained by the United States as an Enemy Combatant**

           **1.**    **Protection of the Court's Jurisdiction**

      As discussed above in the context of irreparable harm, see supra Section II. A,  protection

of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding

transfer or repatriation of an individual detained at Guantanamo, because relinquishment from
United States custody (which occurs in every such transfer or repatriation) represents the full
extent of relief that petitioners could obtain from a habeas petition.  See Almurbati, 366 F. Supp.
2d at 80 ("[O]nce the respondents release the petitioners from United States custody . . . they will
have obtained the result requested and at that point there will be no further need for this Court to
maintain jurisdiction."); see also Qassim, – F.3d –, 2006 WL 2933322, at *3-4 (release from
custody rendered petitioners' habeas petitions moot); Al-Anazi, 370 F. Supp. 2d at 198.[9]  Indeed,
it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and
ultimately determine that the United States may no longer detain the petitioners, the parties and
the Court would find themselves in precisely the same position in which they find themselves
now – with the respondents taking steps to transfer those individuals out of United States control,
and the petitioners compelled to come forward with some legal or evidentiary basis to prevent
transfer to an 'undesirable' country."  Al-Anazi, 370 F. Supp. 2d at 196.  Thus, petitioner does not
enjoy a likelihood of success in obtaining an order barring a transfer in order to "protect" the
Court's jurisdiction.

---

[9] One of the previous decisions on a similar motion in another Guantanamo detainee case
criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total
freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-
2035, 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioners may ultimately
seek, however, a court of the United States clearly does not have jurisdiction to award a foreign
national the relief of "freedom from all custody" worldwide, in the sense of immunity from
detention in his home or a third country pursuant to its own domestic laws and independent
determinations.  It is beyond cavil that the courts of the United States would have no authority to
interfere with any decision a foreign sovereign nation may make to detain, investigate, or
prosecute its own nationals being returned to it.

### 2.     International Treaties

Petitioner also cannot argue that a transfer or repatriation would violate certain international treaties such as the Geneva Conventions.  These claims are not valid, have not been recognized even by the courts that have ordered advance notice, and do not provide a basis for finding a likelihood of success in obtaining an order barring a transfer or repatriation.  The D.C. Circuit has held that "the 1949 Geneva Convention does not confer upon [a detainee] a right to enforce its provisions in court."  Hamdan v. Rumsfeld, 415 F.3d 33, 40 (D.C. Cir. 2005), rev'd on other grounds Hamdan, 548 U.S. –, 126 S. Ct. at 2794.[10]  In any event, neither this petitioner nor any others have identified any provision in any treaty that is in conflict with the United States' policy governing transfers and repatriations of individuals detained at Guantanamo by the DoD, or that would be violated by a transfer or repatriation undertaken in accordance with that policy.[11]

---

[10] The Supreme Court's recent holding in Hamdan is not to the contrary.  In Hamdan, the Court concluded that the petitioner in that case could invoke Article 3 of the 1949 Geneva Convention, not because the Convention's provisions provided the petitioner with enforceable rights, but because Article 3 was incorporated into a provision of the Uniform Code of Military Justice governing military commissions.  See Hamdan, 548 U.S. –, 126 S. Ct. at 2794 (assuming that the 1949 Conventions "would, absent some other provision of law, preclude [petitioner's] invocation of the Convention's provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right").

[11] Several other petitioners have also pointed to the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT") as legal bases for an order requiring advance notice of a transfer.  However, no Judge has adopted those arguments, and, indeed, numerous courts have held, just as the D.C. Circuit has held with respect to the Geneva Conventions, that those treaties do not give rise to judicially enforceable rights.  See, e.g., Sosa  v. Alvarez-Machain, 542 U.S. 692, 734-35 (2004) (ICCPR); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); see also Al-Anazi, 370 F. Supp. 2d at 194 (rejecting petitioners' argument that Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as legal basis for prohibiting or limiting transfer of wartime

(continued...)

**B.    Principles Underlying the Rule of Non-Inquiry Militate
Heavily Against Petitioner's Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance

notice requirement to support and facilitate such involvement, the separation of powers would bar

such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of

the Executive Branch."  People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 23 (D.C.

Cir. 1999) (citing Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103

(1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as

this, 'the controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them [the courts] must move with the circumspection appropriate

when [a court] is adjudicating issues inevitably entangled in the conduct of our international

relations.' ") (quoting Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 383 (1959)).[12]  If

the Court were to entertain petitioner's claim to a right to contest repatriation or removal from

Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review

of a transfer or repatriation decision could involve scrutiny of United States officials' judgments

---

[11](...continued)
detainees to other countries); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas
petition).

[12] In Holmes, U.S. citizen service members sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."
459 F.2d at 1225.

and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into " 'the fairness of a requesting nation's justice system' " and " 'the procedures or treatment which await a surrendered fugitive in the requesting country.' "  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "[c]ounsel[s] even further against judicial interference").  This principle is sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack.  While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." Id. at 1067. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch") (internal quotation marks omitted); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); In re Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 465 F.3d 554, 564-65 (3d Cir. 2006) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[13] See In re Smyth, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding this principle is the

---

[13] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. See Kin-Hong, 110 F.3d at 111 n.12. In

(continued...)

22

notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen).  Thus, petitioner cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a foreign government's assurances.  Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters " 'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in

---

[13](...continued)
that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance.  See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted). Moreover, to the extent that petitioner may contend that the only possible way to repatriate him would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, Civ. A. No. 93-1465, 1995 WL 2292, at *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

the domain of political power not subject to judicial intrusion or inquiry' ") (quoting <u>Chicago & S. Air Lines</u>, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring that petitioner's counsel and this Court be given advance notice of any upcoming transfer or release. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable them to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question. Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of then Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. <u>See</u> Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. <u>See</u> <u>supra</u> Section III.B (describing interests that underlie the Rule of Non-Inquiry); Waxman

24

Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as exemplified

by an advance notice requirement, causes separation-of-powers harm by undermining the ability

of the Executive Branch to speak with one voice in its dealings with foreign nations.  See Crosby

v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that

"compromise the very capacity of the President to speak for the nation with one voice in dealing

with other governments").  An advance notice requirement, after all, would make the results of

diplomatic dialogue between the Executive Branch and a foreign government regarding

repatriations or transfers inherently contingent because the effective acquiescence of another

Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such

a requirement would also inject delays into future transfers.  These harms weigh heavily against

entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within

its constitutional sphere of responsibility.[14]  As one Judge of this Court has held:

---

[14] While two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Joudi v. Bush, Civ. A. No. 05-0301 (GK), 2005 WL 774847, at *6 (D.D.C. Apr. 4, 2005); Abdah, 2005 WL 711814, at *6, that formulation leaves the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005), are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have,

(continued...)

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.


## **CONCLUSION**

For the reasons stated above, respondents respectfully request that petitioner's motion be denied.

---

[14](...continued)

constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

Dated: November 13, 2006                Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        DOUGLAS N. LETTER
                                        Terrorism Litigation Counsel

                                        ___/s/ Nicholas A. Oldham_____
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        TERRY M. HENRY
                                        JAMES J. SCHWARTZ
                                        PREEYA M. NORONHA
                                        ROBERT J. KATERBERG
                                        ANDREW I. WARDEN
                                        NICHOLAS J. PATTERSON
                                        EDWARD H. WHITE
                                        NICHOLAS A. OLDHAM
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., N.W.
                                        Washington, DC  20530
                                        Tel:  (202) 514-2000
                                        Fax:  (202) 616-8470

                                        Attorneys for Respondents