PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMER MOHAMMON, *et al.*, | ) |
| | ) |
| *Petitioners/Plaintiffs*, | ) |
| | ) |
| v. | ) Civil No. 05-2386 (RBW) |
| | ) |
| GEORGE W. BUSH, *et al.*, | ) |
| | ) |
| *Respondents/Defendants*. | ) |

**REPLY MEMORANDUM SUPPORTING REQUEST FOR
30-DAYS' ADVANCE NOTICE OF ANY INTENDED
REMOVAL OF PETITIONER FROM GUANTANAMO**

While imprisoned at Guantanamo, Maher El Falsteny, a Palestinian, was

threatened by Respondents' interrogators with being sent to prison in Israel, a country which has

a known record of abusive treatment of Palestinian prisoners.  In light of this, he has a special

need to be advised of any plans to remove him from Guantanamo.  His fears, as a stateless

person, are not fanciful but based on explicit threats.

Respondents' answering materials do not remotely traverse or impeach this

showing.  The stale Prosper and Waxman declarations are not only tardy, they are little more

than self-congratulatory descriptions of Respondents' repatriation procedures, larded with

declarations of concern with torture of prisoners by receiving states and fatuous invocation of the

rule of evidence that federal officials are presumed to obey the law.[1]  The declarations have

nothing to do with Petitioner except as another chattel under declarants' dominion.  The

---

[1] *As Wigmore of Evidence* notes, "This presumption is more often mentioned than enforced."
*Wigmore*, §2534, Vol. IX, p. 625.  The preconditions noted by *Wigmore* are absent here: that the matter is
in the past and proof of it difficult to obtain; that it involves a mere formality or matter of routine; that it
involves some aspect of the security of vested rights; and finally that "the circumstances of the particular
case add some element of probability." *Id.*  The reverse is true here, given the self-serving nature of the
declarants' averments.

declarations' wholesome themes are belied by the images of Abu Ghraib, admitted kidnappings

(renditions), the operation of "ghost camps," other badges of a dirty war, and indeed the quite

specific threat of harm made to Petitioner in this case.  Equally, the bureaucratic red tape Prosper

and Waxman describe makes clear that no injury whatever can arise from a delay of thirty days

as requested: the process is well nigh interminable in any event owing to the extreme solicitude,

if the declarants are credited, of federal officials to ensure that transferred prisoners are not

mistreated in their new situation.

Respondents' central legal contentions are:

- The Military Commissions Act deprives this Court of jurisdiction by stripping it of the

power to hear *habeas* petitions by prisoners at Guantanamo.

- The doctrine of separation of powers and/or judicial non-inquiry prevents the court

from granting relief.

- Petitioner cannot show irreparable injury.

We discuss these points *seriatim*.

## DISCUSSION

Respondents urge that this Court lacks jurisdiction over El Falesteny's *habeas*

petition by virtue of the recent Military Commissions Act (MCA).[2]  Substituted for this Court's

jurisdiction under 28 U.S.C. 2241 is a new remedy in the Circuit said to be "exclusive" under the

combined effect of the Detainee Treatment Act and the MCA.  The government's position rests

on the efficacy of section 7 of the MCA, which works the "jurisdiction-stripping," which in turn

---

[2]  This is said to follow from either the Detainee Treatment Act ("DTA") or the recently enacted Military Commissions Act (Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA").  As both acts, according to the government, purport to remove this Court's jurisdiction and substitute therefor a very limited review of CSRT determinations in the Circuit on the "record" compiled at Guantanamo, we treat their effect as the same in so far as this Court's jurisdiction is concerned.

depends upon the equivalence of the new Circuit remedy provided for the *habeas* action

eliminated. In short, if the new remedy is *not* the equivalent of the *habeas* remedy eliminated,

the "jurisdiction strip" is void. *INS v. St. Cyr*, 533 U.S. 289, 305 (2001) *Swain v. Pressley*, 430

U.S. 372, 386 (1977) This follows from the text of the Constitution and leading Supreme Court

cases, as we now show.

      The Suspension Clause, U.S. Const. Art. I, §2, cl. 3,  guarantees that, unless Congress

*validly* acts to suspend the writ, the core of the Great Writ at common law, which would issue to

test the legality of Executive detention, must remain available. Since neither preconditions of a

valid suspension – domestic rebellion or invasion – are here present there can be no valid

suspension and § 2241 remains intact, assuming, of course, that the *in lieu* circuit remedy is not

the equivalent of the *habeas* remedy eliminated. There is, however, a preliminary question of

whether the Jurisdiction strip applies to pending cases, the question to which we now turn.

      A.      The Jurisdictional Strip Provisions Of The MCA Do Not Apply To This *Habeas* Petition

      This Court should under familiar canons avoid a construction of the MCA

presenting troubling Constitutional questions. In *Hamdan*, the Supreme Court faced a similar

question regarding the application of the DTA to pending cases. Applying "[o]rdinary principles

of statutory construction," the Court concluded that the Detainee Treatment Act of 2005

("DTA") did not divest the federal courts of jurisdiction over Hamdan's *habeas* challenge.

*Hamdan*, 126 S. Ct. at 2765-69. Because the jurisdictional provision of the MCA (§ 7) follows

the same pattern seen in the DTA, those principles of statutory construction lead to the same

result when applied to the MCA.

      Section 7(a) adds a new subsection (e) to the federal *habeas* statute. Subsection

(e) is divided into two subparts. Subpart (1) divests courts of jurisdiction over *habeas*

applications filed by aliens determined to be enemy combatants, or awaiting such determination. Subpart (2) divests courts of jurisdiction, except as preserved in the DTA, over any other actions "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien" determined to be an enemy combatant, or awaiting such determination.

Section 7(b) of the MCA provides that § 7(a) takes effect on the date of enactment (which was October 17, 2006) and applies to "all cases, without exception, pending on or after the date of enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien detained by the United States since September 11, 2001." MCA § 7(b).

Significantly, subsection 7(b) does not expressly refer to *habeas* cases pending on the date of enactment. Instead, the language of § 7(b) tracks, virtually word for word, the language used in (e)(2) to refer to "other actions" relating to detention, transfer, treatment, *et cetera*. In determining that similar jurisdictional provisions of the DTA did not apply to this case because it was pending on the date of enactment of the DTA, the Supreme Court relied on a "negative inference [that] may be drawn from the exclusion of language from one statutory provision [when that language] is included in other provisions of the same statute." *Hamdan*, 126 S. Ct. 2765 (citations omitted). Here, the same negative inference may be drawn from the absence of any express reference to a pending *habeas* application in § 7(b), in contrast to § 7(b)'s use of exactly the same terms as (e)(2) to identify the cases to which it applies. This indicates that the pending cases to which the new statute is intended to apply are precisely those described in (e)(2).

In addition, § 7(b) applies to pending *habeas* cases only if *habeas* actions are included within the category of cases "which relate to any aspect of the detention, transfer,

treatment, trial, or conditions of detention." But if *habeas* cases are included in that language of

§ 7(b), there would have been no reason for Congress to add a new subsection (e)(1) dealing

separately with *habeas* cases – the language of subsection (e)(2) would have covered them.

Thus, construing § 7(b) to include *habeas* cases renders subsection (e)(1) superfluous, in

violation of the principle that "[a] statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v.

Winn*, 542 U.S. 88, 101 (2004) (citation omitted). Subsection (e)(1) is necessary and has

independent meaning only if § 7(b) does not refer to *habeas* cases. But if § 7(b) does not refer to

*habeas* cases, then the jurisdictional strip in (e)(1) does not apply to pending *habeas* cases such

as this one. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994) (statutes "will not be

construed to have retroactive effect unless their language requires this result"). The Supreme

Court's "longstanding rule requiring a clear statement of congressional intent to repeal *habeas*,"

*St. Cyr*, 533 U.S. at 298, also militates strongly against an interpretation of the MCA that strips

the Court of jurisdiction over this case. Implications from intentional ambiguity – which all the

relevant canons of construction and judicial precedents indicate must be read against finding a

repeal of pending *habeas* cases here. Moreover, as in *St. Cyr*, this clear statement requirement is

reinforced by an additional canon of construction, namely, the principle that "if an otherwise

acceptable construction of a statute would raise serious constitutional problems, and where an

alternative interpretation of the statute is fairly possible, [the court is] obligated to construe the

statute to avoid such problems." 533 U.S. at 299-300. Here, the Government's contention that

the MCA strips the Court of *habeas* jurisdiction raises serious Constitutional problems, which

can easily be avoided by the same rules of statutory construction employed by the Supreme

Court *Hamdan*, 126 S. Ct. at 2765-69.

It follows that the MCA does not, as a textual matter, apply to deprive this Court of *habeas* jurisdiction as urged by Respondents.

B.       The Habeas Corpus Remedy as of the Adoption of the Constitution

The Founders ensured that the availability of the writ was not dependent upon executive or legislative grace. *See St. Cyr*, 533 U.S. at 304 n.24 (the Suspension Clause "was intended to preclude any possibility that the privilege itself would be lost by either the inaction or the action of Congress"). Thus, the Constitutional right to *habeas* relief exists even in the absence of statutory authorization, and may be suspended only by explicit Congressional action under strictly limited conditions. *See Johnson v. Eisentrager*, 339 U.S. 763, 767-68 (1950) (assuming that, in absence of a statutory right of *habeas*, petitioners could seek the writ directly under the Constitution to the extent their claims fell within the scope of *habeas* protected by the Suspension Clause).

*Habeas corpus* has long provided a searching factual and legal inquiry into the basis for a prisoner's detention.[3] This basic purpose of the writ crystallized in response to the seminal, *Darnel's Case*, 3 How. St. Tr. 1 (K.B. 1627). There, the king had indefinitely detained suspected enemies of state based solely upon his "special command," *id*. at 37, and sought to block any inquiry into the factual and legal basis for their confinement. When the court upheld the Crown, it sparked a Constitutional crisis that firmly established *habeas* as the pre-eminent safeguard of common law process and personal liberty with the enactment of the Petition of Right, 3 Car. 1, c.1 (1628); the Habeas Corpus Act of 1641, 16 Car. 1, c.10 (1641); and the Habeas Corpus Act of 1679, 31 Car. 2, c.2 (1679). By the late 1600s, *habeas* corpus had become, and would remain, "the great and efficacious writ, in all manners of illegal

_____

[3] We lay out the history of the writ as it existed in 1789 and was known to the framers of the Constitution.

confinement," 3 William Blackstone, Commentaries *131, and the most "effective remedy for

executive detention," Dallin H. Oaks, *Legal History in the High Court – Habeas Corpus*, 64

Mich. L. Rev. 451, 460 (1966).

At common law, *habeas* courts did not simply accept the government's return to a

prisoner's petition; rather, they often probed the return and examined additional evidence

submitted by both sides to ensure the factual and legal sufficiency of the commitment.  *See, e.g*.,

*Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778) (judges temporarily discharge impressed

sailor, refusing to "shut their eyes" to facts in petitioner's affidavits showing he was legally

exempt from impressment); *R. v. Delaval*, 97 Eng. Rep. 913, 915- (K.B. 1763) (scrutinizing

affidavits and concluding that girl had been fraudulently indentured as an apprentice and was

being misused as a prostitute); *R. v. Turlington*, 97 Eng. Rep. 741, 741 (K.B. 1761) (discharging

woman from "mad-house" after ordering medical inspection, reviewing doctor's affidavit, and

inspecting women who "appeared to be absolutely free from the least appearance of insanity");

*Eleanor Archer's Case* 1701, Lincoln's Inn, MS Misc. 713, p.164 (K.B. 1701) (Holt, C.J.)

("court upon oath examined [woman]" to assess claim of mistreatment by her father); *Barney's

Case*, 87 Eng. Rep. 683 (K.B. 1701) (allowing bail after affidavits proved malicious

prosecution); *R. v. Lee*, 83 Eng. Rep. 482, 482 (K.B. 1676) (reviewing affidavits to adjudicate

wife's assertion of "ill usage, imprisonment and danger of her life" by husband); *see also

Goldswain's Case*, 96 Eng. Rep. at 712 (Gould, J.) ("I do not conceive, that either the Court or

the party are concluded by the return of a *habeas corpus*, but may plead to it any special matter

necessary to regain his liberty"); *Bushell's Case*, 124 Eng. Rep. 1006, 1010 (C.P. 1670)

(Vaughan, C.J.) (deeming return insufficient because it lacked "full and manifest" evidence

necessary to sustain commitment); *see generally, e.g.*, R.J. Sharpe, *The Law of Habeas Corpus*

66-68 (1989) (citing *habeas* cases involving factual inquiries); *Oaks, supra*, at 454 n.20

(observing that the instances where *habeas* courts conducted fact-finding in non-criminal cases

are "sufficiently comprehensive to include most . . . cases").

Indeed, alleged enemy aliens could also challenge the factual basis of their

commitment on *habeas* to ensure it was within the bounds prescribed by law. *Three Spanish*

*Sailors' Case*, 96 Eng. Rep. 775 (C.P. 1779) (examining affidavit detailing facts supporting

petitioners' release, but concluding that, "upon their own showing," they are alien enemies)

(emphasis added); *accord R. v. Schiever*, 97 Eng. Rep. 551 (KB. 1759).

Further, *habeas* courts exercised broad equitable powers to fashion remedies as

the circumstances required. *See, e.g.*, *Earl of Aylesbury's Case*, Harv. L. Sch. MS 1071, fol. 52

(K.B. 1696) (bailing prisoner suspected of treason because it was "just and reasonable" to do so,

and "within [the court's] power by the common law"). [4]

The very essence of *habeas* – its substance – was a searching inquiry by neutral

judges into the factual and legal validity of the jailer's proffered justification for the detention.

And, to the extent that the lawfulness of the detention turned upon disputed issues of fact, the

courts conducted adversary hearings in which the parties presented evidence for courtroom

---

[4] The occasional general statement that at common law the petitioner could not controvert the truth of a return to a *habeas* petition must be read in the specific context in which it was made: criminal cases. Rollin C. Hurd, *A Treatise on the Right of Personal Liberty, and on the Writ of Habeas Corpus,* 270-71 (1876) (hereinafter "*Hurd*"). The reason is simple: In criminal cases, the prisoner either had already been convicted at a trial that provided full common law process, including the opportunity to confront and cross-examine any witnesses against him, *Crawford v. Washington*, 541 U.S. 36, 49 (2004), or was confined pending such trial, in which case *habeas* guaranteed that he would receive that process without delay. *Habeas Corpus* Act of 1679, 31 Car. 2, c.2, § 7 (1679) (securing right to speedy trial); *see also Hurd* at 266 ("It was the hateful oppressiveness of long and close confinement, and not the dread of a trial by his peers, which made the suffering prisoner of state exclaim: 'The writ of *habeas corpus* is the water of life to revive from the death of imprisonment'") (emphasis omitted). By contrast, in non-criminal cases, including and especially cases of executive detention without trial, the *habeas* court itself supplied common law process by undertaking a factual inquiry into the basis of detention in the first instance.

examination.  It was these broad equitable features, not the technicalities of pleading, that made

the Great Writ of Liberty great.

      C.      The Writ as Developed in the United States

        The Supreme Court has described *habeas corpus* as "a writ antecedent to statute,

. . . throwing its roots deep into the genius of our common law."  *Rasul v. Bush*, 542 U.S. 466,

472 (2004) (internal quotations marks omitted; alterations in the original). "It was brought to

America by the colonists, and claimed as among the immemorial rights descended to them from

their ancestors . . . this great writ found prominent sanction in the Constitution."  *Ex parte*

*Yerger*, 75 U.S. (8 Wall.) 85, 95 (1869).

        The negative phraseology of the Suspension Clause itself reflects the Framers'

understanding that the privilege of the writ of *habeas corpus* is not something for Congress to

give.  Article 1, § 9, cl. 2 of the Constitution (the "Suspension Clause") provides that "[t]he

Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of

Rebellion or Invasion, the public Safety may require it."  The exercise of this authority to

suspend the Great Writ is justly hailed as the "highest safeguard of liberty," *Smith v. Bennett*,

365 U.S. 708, 712 (1961), is a momentous step, and the Supreme Court has reiterated its

hesitation to conclude that Congress has exercised its authority to suspend the Great Writ.  *See*

*INS v. St. Cyr*, 533 U.S. 289, 305 (2001) ("[A] serious Suspension Clause issue would be

presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that

power from federal judges and provided no adequate substitute for its exercise."); *Ex Parte*

*Bollman*, 8 U.S. (4 Cranch) 75, 101 (1807) ("[u]ntil the legislative will [to suspend the writ] be

expressed, this court can only see its duty" to issue the writ).  Congress, too, has historically been

extremely sparing in its exercise of the suspension power, acting to suspend the writ on only four

prior occasions, when the country was facing actual or imminent hostilities on its territory.

Assuming *arguendo*, however, Congress' intent to eliminate the writ for prisoners

at Guantanamo is clear, the validity of the Suspension must be directly faced.

Thus we now examine if the alternative provided by Congress *in lieu* of *habeas* is

its equivalent.  Although today the writ is most frequently employed as a post-conviction

collateral remedy for an unlawful criminal conviction, its "historical core" served "as a means of

reviewing the legality of Executive detention, and it is in that context that its protections have

been strongest."  *Rasul*, 542 U.S. at 474 (quoting *St. Cyr*, 533 U.S. at 301); *Swain v. Pressley*,

430 U.S. 372, 386 (1977) (Burger, C.J., concurring) ("[T]he traditional Great Writ was largely a

remedy against executive detention.").  From its earliest *habeas corpus* cases, this Court has

made clear that the writ should issue for the benefit of a petitioner who challenges the

Executive's authority to bring him to trial, even before a final conviction is had at such a trial.

Thus, in *Ex Parte Bollman*, 8 U.S. (4 Cranch) 75 (1807), and *Ex Parte Burford*, 7 U.S. (3

Cranch) 448 (1806), the Court issued the writ for the benefit of a prisoner who contended that the

government had an inadequate basis to detain him for criminal proceedings.  *See also United*

*States v. Hamilton*, 3 U.S. (3 Dall.) 17 (1795).  Similarly, in *United States v. Villato*, 2 U.S. (2

Dall.) 370 (C.C.D. Pa. 1797), the defendant, committed by the district judge on a charge of high

treason, persuaded the court that he had never been validly naturalized, and therefore could not

be prosecuted for treason for acts committed abroad.

These decisions were reaffirmed after the Civil War.  In *Ex parte Yerger*, the

Court held that it had jurisdiction to issue the writ to determine whether Yerger's impending trial

by a military commission was lawful.  *See Yerger*, 75 U.S. (8 Wall.) at 106; *see also id*. at 88

(statement of the case) (noting that Yerger was awaiting trial). The Court expressed no doubt

that, if Yerger had (as he claimed) a right not to be tried by the military commission, he was

entitled to release from the custody of the commission. The petitioner in *Ex parte McCardle,* 74

U.S. (7 Wall.) 506 (1868) was in the same position; he brought a pre-conviction *habeas* petition

challenging the constitutionality of his military detention. Although the Court ultimately ruled in

*McCardle* that it lacked jurisdiction over McCardle's appeal from the circuit court's decision to

remand him to military custody, the Court expressed no doubt that the circuit court could have

issued a writ to prevent McCardle's trial by a military commission, had McCardle established a

right not to be so tried (74 U.S. (7 Wall.) at 515).

These decisions also establish that, when a *habeas* petitioner challenges the

authority or jurisdiction of the body that lays claim to try or detain him, the petitioner is entitled

to be heard on the merits of that challenge even before any contemplated trial is completed.

Here, Petitioner contends, in essence, that he has a right not to be classified by the Combatant

Status Review Tribunal ("CSRT") process (challenged as violating due process) that the military

authorities, acting under the direction of the President, have convened. In addition, he seeks a

hearing on whether his detention is lawful. If the writ were completely unavailable to challenge

this procedure, the right not to be classified by an entity with no authority over the petitioner

would become a nullity.

In assessing the Suspension question, the view of Kenneth Starr, former Solicitor

General, Circuit Court judge, and Independent Counsel, is of more than passing interest.

Mr. Starr neither had reason to mince words nor act for any particular interest. He is also

qualified to opine. In the debates on the MCA, Mr. Starr wrote a one-page letter to Senator

Specter succinctly establishing the invalidity of the jurisdiction-stripping provision relied on by

the government here.  (Ex. A annexed hereto.)  Mr. Starr concluded with respect to Guantanamo

prisoners, citing Article I, Section 9, clause 2, "[t]he United States is neither in a state of

rebellion nor invasion.  Consequently it would [be] problematic for Congress to modify the

constitutionally protected writ of *habeas corpus* under current events."  (*Id*.)

The opposing view seems to have been based on the idea that prisoners at

Guantanamo have no constitutional rights so that their *habeas* rights *cannot* be suspended, as

they have none.  Mr. Starr addressed this point in observing that as to Guantanamo, *Rasul*, not

*Eisentrager*, was good law.  (*Id*.)  There are, we submit, five Supreme Court votes *for* the

proposition that Guantanamo is within the jurisdiction of the United States for Constitutional

purposes, not just statutory analysis.  It follows that Mr. El Falesteny has constitutional rights

and that the suspension question cannot be brushed aside as respondents urge.

D.    The *In Lieu* Circuit Remedy is not the Equivalent of the Writ

If the jurisdiction-stripping provisions of the DTA and MTA are bad, it will be

because the Circuit remedy *in lieu* of *habeas* is not its equivalent.  As a corollary, this means that

whatever role the Circuit may have, it does not affect this Court's power to act under § 2241.

But is the *in lieu* Circuit remedy the equivalent to *habeas*?  To that question we now turn.  We

first sketch the *in lieu* rights before the Circuit court and then compare them to *habeas*.

Under the DTA and MCA, a prisoner's entitlement to judicial review of the

legality of his detention is entirely predicated on the government's decision to institute

proceedings against him, either in the form of a CSRT or a military commission.  Section

1005(e)(2) of the DTA, MCA § 7(a).  If the government simply does nothing, the detainee has no

means of challenging the legality of his detention.  Naturally, this provides an incentive for the

-12-

government to delay, or not institute proceedings at all, which would effectively deprive

detainees of any judicial forum.  This is simple despotism.

Further, as Judge Green has already found, the CSRT procedures are deficient in

at least three respects.  *In Re Guantanamo Detainee Cases*, 355 F. Supp. 122, 443 (D.D.C.

2005).  First she noted the general defect in all CSRT proceedings, namely the failure to provide

detainees access to material evidence on which their "enemy combatant" status was affirmed and

the absence of counsel.  Next she identified reliance on statements obtained by torture or other

coercive measures as a grotesque shortcoming of the CSRT procedures.  Finally, she observed

the overly broad definition of "Enemy Combatant" was problematic.  Each of these defects in the

CSRT proceedings affect petitioner here and each was found by Judge Green to be of

constitutional significance.  We do not repeat her findings in detail but suffice it to say they

indicate the CSRT proceedings deviated markedly from a fair fact-finding procedure such as

*habeas* entails, and the review provided by the DTA in the Circuit will not allow challenges to

the composition and functioning of the CSRTs themselves.

Thus none of the infirmities identified by Judge Green can be pressed before the

Circuit.  Rather, that review is limited to:

> (i) whether the status determination of the Combatant Status Review
> Tribunal with regard to such alien was consistent with the standards and
> procedures specified by the Secretary of Defense for Combatant Status
> Review Tribunals (including the requirement that the conclusion of the
> Tribunal be supported by a preponderance of the evidence and allowing a
> rebuttable presumption in favor of the Government's evidence)[5]

---

[5]  The Detainee Treatment Act of 2005 was enacted as Title X of Division A of Public Law No. 109-148, which was signed into law by the President on December 30, 2005.  An identical version of the Detainee Treatment Act appears at Title XIV of the National Defense Authorization Act, H.R. 1815, 109th Cong., 1st Sess., which has passed both Houses of Congress but has not yet been signed by the President.

This amounts to saying that review is limited to determining if the CSRT has followed its own deeply flawed playbook. Even if the Government promptly conducts a CSRT to make a status determination, the DTA does not permit the Court to engage in the sort of factual inquiry that has long been available via *habeas*. Section 1005(e)(2) does not allow petitioners to engage in discovery (including discovery into whether evidence against them was obtained by coercion), "traverse" the return, or obtain a hearing, as provided by 28 U.S.C. §§ 2243 – 2248.

Thus in no sense is the Circuit remedy provided *in lieu* of *habeas* the equivalent of *habeas*.

E.      Separation of Powers

Familiar prudential considerations strongly militate against addressing Respondents' reflexive incantation of the foreign relations power, war power, and rule of non-inquiry at this stage of the proceedings. It simply is not necessary in granting the relief here sought to consider these matters. The possibility of the courts running the War or the State Department cannot arise on the present limited motion. Respondents seek to frighten the Court into inaction, a tactic they unsuccessfully employed at the Supreme Court in *Rasul*, as they struggled to defeat *habeas* jurisdiction:

> The intelligence-gathering operations at Guantanamo are an integral component of the military's efforts to "repel and defeat the enemy" (*Quirin*, 317 U.S. at 28) in the ongoing military campaign being waged not only in Afghanistan but around the globe. Any judicial review of the military's operations at Guantanamo would directly intrude on those important intelligence-gathering operations. Moreover*, any judicial demand that the Guantanamo detainees be granted access to counsel to maintain a habeas action would in all likelihood put an end to those operations — a result that not only would be very damaging to the military's ability to win the war, but no doubt be "highly comforting to enemies of the United States."*

*Eisentrager*, 339 U.S. at 779, Brief in Opposition at 54 (emphasis supplied).

This is the view that the Court rejected when it allowed *Rasul* to proceed, holding that "What is presently at stake is only whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing. Answering that question in the affirmative, we reverse . . . and remand for the District Court to consider in the first instance the merits of petitioners' claims." *Rasul* at 21. The Supreme Court properly rejected that judicial review invaded the sacred domain of the executive. So too here.

Likewise the rule of "non-inquiry " is inextricably tied to the existence and terms of an extradition treaty, is not involved here, and in any event cannot affect *habeas* jurisdiction. *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911), (Holmes, J.) ("We are bound by the *existence of an extradition treaty* to assume that the trial will be fair.") *Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933) (emphasis added).

F.    Irreparable Injury

In our opening motion we showed that the prisoner had been threatened with transfer to Israel, a country known to have abused Palestinian prisoners. Respondents do not contest this but believe it is irrelevant to the great matters of state they concern themselves with. It is not irrelevant to Mr. El Falesteny, however; it is terrifying and poses a genuine threat. To this the government assures that should the prisoner be sent to some country in violation of a relevant treaty such as the Convention against Torture, too bad – the treaty is not enforceable. While we disagree with this view, it is a chilling reminder of Respondents' ethics and sensitivity to the prisoner. Giving Mr. El Falesteny notice of any intended transfer will allow him to consult with counsel and get meaningful advice on the choices available. The complementary or balancing concern – imposing on Respondents is quite weak. Many counsel have been advised

of an impending transfer and, at the direction of the client, have interposed no objection.  This

has posed absolutely no burden on Respondents whatever.  And they do not aver that it has.

It is the height of formalism to argue that a transfer is a release from custody and

therefore cannot be a form of irreparable injury.  If the Respondents procure the incarceration of

a prisoner as a term of their "release," just why they consider it a release defies logic.  It is

precisely such terms which must remain subject to judicial scrutiny, Respondents' view to the

contrary notwithstanding.

Respectfully submitted,

/s/ Stephen M. Truitt

Barbara Olshansky (NY #0057
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

*Of Counsel for Petitioner*

Stephen M. Truitt (DC # 13235 )
600 Fourteenth Street, N.W.
Suite 500, Hamilton Square
Washington, DC  20005-2004
Tel: (202) 220-1452
Fax: (202) 220-1665

Charles H. Carpenter (DC #432004)
PEPPER HAMILTON LLP
600 Fourteenth Street, N.W.
Suite 500, Hamilton Square
Washington, DC  20005-2004
Tel: (202) 220-1452
Fax: (202) 220-1665

Christopher J. Huber
Benjamin P. Cooper
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799
Tel: (215) 981-4000
Fax: (215) 981-4750

Dated:  November 22, 2006

*Counsel for Petitioner*