PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMER MOHAMMON, *et al.*, | ) |
| | ) |
|     *Petitioners/Plaintiffs*, | ) |
| | ) |
| v. | )    Civil No. 05-2386 (RBW) |
| | ) |
| GEORGE W. BUSH, *et al.*, | ) |
| | ) |
|     *Respondents/Defendants*. | ) |

**REPLY MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION
FOR ORDER REQUIRING RESPONDENTS TO PROVIDE FACTUAL RETURNS**

Respondents refuse to provide the most basic factual information regarding Petitioner Maher El Falesteny and the reasons for his imprisonment at Guantanamo Bay Naval Base for four years. Other than incorrectly suggesting that the Military Commissions Act of 2006 divests this Court of jurisdiction, Respondents' Opposition Brief completely fails to provide any basis for this Court to deny the requested relief.

**I.   ARGUMENT**

    **A.   The Military Commissions Act Does Not Strip This Court of Jurisdiction[1]**

Respondents claim that this Court lacks jurisdiction over Mr. El Falesteny's *habeas* petition by virtue of the recent Military Commissions Act of 2006 ("MCA").[2]

---

[1] This section tracks a similar section in Petitioner's Reply Brief in Support of Request For 30-Days' Advance Notice of Any Intended Removal of Petitioner From Guantanamo (Docket No. 219).

[2] This is said to follow from either the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680, 2739-44 ("DTA") or the MCA itself. *See* MCA, Pub. L. No. 109-366, 120 Stat. 2600. As both acts, according to Respondents, purport to remove this Court's jurisdiction and substitute a very limited review of Combatant Status Review Tribunal ("CSRT") determinations in the Circuit on the "record" compiled at Guantanamo, Mr. El Falesteny treats those acts' effect as the same insofar as this Court's jurisdiction is concerned.

Substituted for this Court's jurisdiction under 28 U.S.C. § 2241 is a new remedy in the Circuit said to be "exclusive" under the combined effect of the Detainee Treatment Act of 2005 ("DTA")[3] and the MCA.  Respondents' position rests on the efficacy of Section 7 of the MCA, which works the "jurisdiction-stripping," which in turn depends upon the equivalence of the new Circuit remedy provided for the *habeas* action eliminated.  In short, if the new remedy is *not* the equivalent of the *habeas* remedy eliminated, the "jurisdiction strip" is void.  *See INS v. St. Cyr*, 533 U.S. 289, 305 (2001) (holding that statutory withdrawal of judicial authority to issue a habeas writ without an "adequate substitute" for such authority raises a "serious Suspension Clause" issue).  This follows from the text of the Constitution and leading Supreme Court cases, as we now show.

       The Suspension Clause, U.S. Const. art. I, § 9, cl. 2, guarantees that, unless Congress *validly* acts to suspend the writ, the core of the Great Writ at common law, which would issue to test the legality of Executive detention, must remain available.  Since neither preconditions of a valid suspension – domestic rebellion or invasion – are here present, there can be no valid suspension and Section 2241 remains intact, assuming, of course, that the *in lieu* Circuit remedy is not the equivalent of the *habeas* remedy eliminated.  There is, however, a preliminary question of whether the jurisdiction strip applies to pending cases, the question to which we now turn.

---

[3] The statutory provision cited here as the Detainee Treatment Act of 2005 was enacted as title X of the Department of Defense Appropriations Act of 2006, an Act the President signed into law on December 30, 2005.  *See* Pub. L. 109-148, §§ 1001-1006, 119 Stat. 2739-44 (2005).  Six days later, Congress passed and the President signed into law the National Defense Authorization Act For Fiscal Year 2006, title XIV of which contains a nearly identical version of the Detainee Treatment Act.  *See* Pub. L. 109-163, §§ 1401-1406, 119 Stat. 3163, 3474-80.  References made herein to the Detainee Treatment Act are intended as references to title X of Public Law 109-148.

### 1. The Jurisdictional Strip Provisions of the MCA Do Not Apply to This *Habeas* Petition

Under familiar canons of statutory construction, this Court should avoid a construction of the MCA that presents troubling constitutional questions. In *Hamdan v. Rumsfeld*, the Supreme Court faced a similar question regarding the application of the DTA to pending cases. *See* 126 S. Ct. 2749 (2006). Applying "[o]rdinary principles of statutory construction," the Court concluded that the DTA did not divest the federal courts of jurisdiction over Hamdan's *habeas* challenge. *Id*. at 2764, 2765-69. Because the jurisdictional provision of the MCA's Section 7 follows the same pattern seen in the DTA, those principles of statutory construction lead to the same result when applied to the MCA.

Section 7(a) of the MCA adds a new subsection (e) to 28 U.S.C. § 2241, the relevant federal *habeas* statute:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents <u>relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States</u> and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

MCA § 7(a) (emphasis added); 28 U.S.C. § 2241(e). Subpart (1) divests courts of jurisdiction over *habeas* applications filed by aliens determined to be enemy combatants, or awaiting such determination. Subpart (2) divests courts of jurisdiction, except as preserved in the DTA, over any other actions "relating to any aspect of the detention, transfer, treatment, trial, or conditions

of confinement of an alien" determined to be an enemy combatant, or awaiting such determination.

> Section 7(b) of the MCA provides:
>
> (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which <u>relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States</u> since September 11, 2001.

MCA § 7(b) (emphasis added). Thus, Section 7(a) takes effect on the date of enactment (which was October 17, 2006) and applies to "all cases, without exception, pending on or after the date of enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien detained by the United States since September 11, 2001." *Id.*

Significantly, however, Section 7(b) does not expressly refer to *habeas* cases pending on the date of enactment. Instead, the language of Section 7(b) tracks, virtually word for word, the language used in Section 2241(e)(2) to refer to "other actions" relating to "detention, transfer, treatment, trial, or conditions of confinement" – specifically actions other than *habeas* actions, which are addressed in Section 2241(e)(1). In determining that similar jurisdictional provisions of the DTA did not apply to the case before it because the case was pending on the DTA's enactment date, the Supreme Court relied on a "negative inference [that] may be drawn from the exclusion of language from one statutory provision [when that language] is included in other provisions of the same statute." *Hamdan*, 126 S. Ct. at 2765 (citations omitted). Here, the same negative inference may be drawn from the absence of any express reference to a pending *habeas* application in Section 7(b), in contrast to Section 7(b)'s use of exactly the same terms as Section 2241(e)(2) to identify the cases to which it applies. This

-4-

demonstrates that the pending cases to which the new statute is intended to apply are precisely those described in Section 2241(e)(2), and therefore not *habeas* actions.

In addition, Section 7(b) applies to pending *habeas* cases only if *habeas* actions are included within the category of cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention." But if *habeas* cases are included in that language of Section 7(b), there would have been no reason for Congress to add a new subsection (e)(1) to Section 2241 dealing separately with *habeas* cases – they would have been covered by the language of subsection (e)(2). Thus, construing Section 7(b) to include *habeas* cases renders subsection (e)(1) superfluous, violating the principle that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted). Subsection (e)(1) is necessary and has independent meaning only if Section 7(b) does not refer to *habeas* cases. But if Section 7(b) does not refer to *habeas* cases, then the jurisdictional strip in (e)(1) does not apply to pending *habeas* cases such as this one. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994) (statutes "will not be construed to have retroactive effect unless their language requires this result") (internal quotes and citations omitted). The Supreme Court's "longstanding rule requiring a clear statement of congressional intent to repeal *habeas*," *St. Cyr*, 533 U.S. at 298, also militates strongly against an interpretation of the MCA that strips the Court of jurisdiction over this case. Implications from intentional ambiguity – which all the relevant canons of construction and judicial precedents indicate must be read against finding a repeal of pending *habeas* cases here. Moreover, as in *St. Cyr*, this clear statement requirement is reinforced by an additional canon of construction, namely, the principle that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative

interpretation of the statute is fairly possible, [the court is] obligated to construe the statute to avoid such problems." 533 U.S. at 299-300 (internal quotes and citation omitted). Here, Respondents' contention that the MCA strips the Court of *habeas* jurisdiction raises serious constitutional problems, which can easily be avoided by the same rules of statutory construction the Supreme Court employed in *Hamdan*, 126 S. Ct. at 2765-69.

It follows that the MCA does not, as a textual matter, apply to deprive this Court of *habeas* jurisdiction as urged by Respondents.

### 2. The MCA Is Unconstitutional If It Eliminates Mr. El Falesteny's Ability to Seek *Habeas*

Even if the language of the MCA was effective to strip this Court of jurisdiction over Mr. El Falesteny's *habeas* claim, the MCA is unconstitutional and thus cannot form the basis for this Court to deny Mr. El Falesteny's motion.

#### (a) The Habeas Corpus Remedy as of the Adoption of the Constitution

The Founders ensured that the availability of the writ was not dependent upon executive or legislative grace. *See St. Cyr*, 533 U.S. at 304 n.24 (the Suspension Clause "was intended to preclude any possibility that the privilege itself would be lost by either the inaction or the action of Congress") (internal quotes omitted). Thus, the constitutional right to *habeas* relief exists even in the absence of statutory authorization, and may be suspended only by explicit congressional action under strictly limited conditions. *See Johnson v. Eisentrager*, 339 U.S. 763, 767-68 (1950) (assuming that, in absence of a statutory right of *habeas*, petitioners could seek the writ directly under the Constitution to the extent their claims fell within the scope of *habeas* protected by the Suspension Clause).

*Habeas corpus* has long provided a searching factual and legal inquiry into the basis for a prisoner's detention.[4]  This basic purpose of the writ crystallized in response to the seminal, *Darnel's Case*, 3 How. St. Tr. 1 (K.B. 1627).  There, the king had indefinitely detained suspected enemies of state based solely upon his "special command," *id*. at 37, and sought to block any inquiry into the factual and legal basis for their confinement.  When the court upheld the Crown, it sparked a constitutional crisis that firmly established *habeas* as the pre-eminent safeguard of common law process and personal liberty with the enactment of the Petition of Right, 3 Car. 1, c.1 (1628); the Habeas Corpus Act of 1641, 16 Car. 1, c.10 (1641); and the Habeas Corpus Act of 1679, 31 Car. 2, c.2 (1679).  By the late 1600s, *habeas* corpus had become, and would remain, "the great and efficacious writ, in all manners of illegal confinement," 3 William Blackstone, Commentaries *131, and the most "effective remedy for executive detention," Dallin H. Oaks, *Legal History in the High Court – Habeas Corpus*, 64 Mich. L. Rev. 451, 460 (1966).

At common law, *habeas* courts did not simply accept the government's return to a prisoner's petition; rather, they often probed the return and examined additional evidence submitted by both sides to ensure the factual and legal sufficiency of the commitment.  *See, e.g.*, *Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778) (judges temporarily discharge impressed sailor, refusing to "shut their eyes" to facts in petitioner's affidavits showing he was legally exempt from impressment); *R. v. Delaval*, 97 Eng. Rep. 913, 915 (K.B. 1763) (scrutinizing affidavits and concluding that a girl had been fraudulently indentured as an apprentice and was being misused as a prostitute); *R. v. Turlington*, 97 Eng. Rep. 741, 741 (K.B. 1761) (discharging

---

[4] Mr. El Falesteny lays out the history of the writ as it existed in 1789 and was known to the framers of the Constitution.

a woman from "mad-house" after ordering medical inspection, reviewing a doctor's affidavit, and inspecting women who "appeared to be absolutely free from the least appearance of insanity"); *Eleanor Archer's Case* 1701, Lincoln's Inn, MS Misc. 713, p.164 (K.B. 1701) (Holt, C.J.) ("court upon oath examined [woman]" to assess claim of mistreatment by her father); *Barney's Case*, 87 Eng. Rep. 683 (K.B. 1701) (allowing bail after affidavits proved malicious prosecution); *R. v. Lee*, 83 Eng. Rep. 482, 482 (K.B. 1676) (reviewing affidavits to adjudicate a wife's assertion of "ill usage, imprisonment and danger of her life" by her husband); *see also Goldswain's Case*, 96 Eng. Rep. at 712 (Gould, J.) ("I do not conceive, that either the Court or the party are concluded by the return of a *habeas corpus*, but may plead to it any special matter necessary to regain his liberty"); *Bushell's Case*, 124 Eng. Rep. 1006, 1010 (C.P. 1670) (Vaughan, C.J.) (deeming a return insufficient because it lacked "full and manifest" evidence necessary to sustain commitment); *see generally, e.g.*, R.J. Sharpe, *The Law of Habeas Corpus* 66-68 (1989) (citing *habeas* cases involving factual inquiries); *Oaks, supra*, at 454 n.20 (observing that the instances where *habeas* courts conducted fact-finding in non-criminal cases are "sufficiently comprehensive to include most . . . cases").

Indeed, alleged enemy aliens could also challenge the factual basis of their commitment on *habeas* to ensure that the commitment was within the bounds prescribed by law. *Three Spanish Sailors' Case*, 96 Eng. Rep. 775 (C.P. 1779) (examining affidavit detailing facts supporting petitioners' release, but concluding that, "upon their own showing," they are alien enemies); *accord R. v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759).

Further, *habeas* courts exercised broad equitable powers to fashion remedies as the circumstances required. *See, e.g.*, *Earl of Aylesbury's Case*, Harv. L. Sch. MS 1071, fol. 52

(K.B. 1696) (bailing prisoner suspected of treason because it was "just and reasonable" to do so, and "within [the court's] power by the common law").[5]

The very essence of *habeas* – its substance – was a searching inquiry by neutral judges into the factual and legal validity of the jailer's proffered justification for the detention. And, to the extent that the lawfulness of the detention turned upon disputed issues of fact, the courts conducted adversary hearings in which the parties presented evidence for courtroom examination. It was these broad equitable features, not the technicalities of pleading, that made the Great Writ of Liberty great.

### (b)    The Writ as Developed In the United States

The Supreme Court has described *habeas corpus* as "a writ antecedent to statute, . . . throwing its roots deep into the genius of our common law." *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (internal quotations marks omitted; alterations in original). "It was brought to America by the colonists, and claimed as among the immemorial rights descended to them from their ancestors . . . this great writ found prominent sanction in the Constitution." *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 95 (1869).

The negative phraseology of the Suspension Clause itself reflects the Framers' understanding that the privilege of the writ of *habeas corpus* is not something for Congress to

---

[5] The occasional general statement that at common law the petitioner could not controvert the truth of a return to a *habeas* petition must be read in the specific context in which it was made: criminal cases. Rollin C. Hurd, *A Treatise on the Right of Personal Liberty, and on the Writ of Habeas Corpus,* 270-71 (1876) (hereinafter "*Hurd*"). The reason is simple: in criminal cases, the prisoner either had already been convicted at a trial that provided full common law process, including the opportunity to confront and cross-examine any witnesses against him, *Crawford v. Washington*, 541 U.S. 36, 49 (2004), or was confined pending such trial, in which case *habeas* guaranteed that he would receive that process without delay. *Habeas Corpus* Act of 1679, 31 Car. 2, c.2, § 7 (1679) (securing right to speedy trial); *see also Hurd* at 266 ("It was the hateful oppressiveness of long and close confinement, and not the dread of a trial by his peers, which made the suffering prisoner of state exclaim: 'The writ of *habeas corpus* is the water of life to revive from the death of imprisonment'") (emphasis omitted). By contrast, in non-criminal cases, including and especially cases of executive detention without trial, the *habeas* court itself supplied common law process by undertaking a factual inquiry into the basis of detention in the first instance.

give. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion, the public Safety may require it." U.S. Const. art. I, § 9, cl.2. The exercise of this authority to suspend the Great Writ is justly hailed as the "highest safeguard of liberty," *Smith v. Bennett*, 365 U.S. 708, 712 (1961), and is a momentous step. The Supreme Court has reiterated its hesitation to conclude that Congress has exercised its authority to suspend the Great Writ. *See St. Cyr*, 533 U.S. at 305 ("[A] serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise."); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 101 (1807) ("[u]ntil the legislative will [to suspend the writ] be expressed, this court can only see its duty" to issue the writ). Congress, too, has historically been extremely sparing in its exercise of the suspension power, acting to suspend the writ on only four prior occasions, when the country was facing actual or imminent hostilities on its territory. *See* Thomas C. O'Bryant, *The Great Unobtainable Writ: Indigent Pro Se Litigation After the Antiterrorism and Effective Death Penalty Act of 1996*, 41 Harv. C.R.-C.L.L. Rev. 299, 302 n.18 (Summer 2006); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 562-63 (2004).

Assuming *arguendo*, however, Congress' intent to eliminate the writ for prisoners at Guantanamo is clear, the validity of the Suspension must be directly faced.

Thus we now examine if the alternative provided by Congress *in lieu* of *habeas* is the equivalent of *habeas*. Although today the writ is most frequently employed as a post-conviction collateral remedy for an unlawful criminal conviction, its "historical core" served "as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Rasul*, 542 U.S. at 474 (quoting *St. Cyr*, 533 U.S. at 301);

*Swain v. Pressley*, 430 U.S. 372, 386 (1977) (Burger, C.J., concurring) ("[T]he traditional Great Writ was largely a remedy against executive detention."). From its earliest *habeas corpus* cases, the Supreme Court has made clear that the writ should issue for the benefit of a petitioner who challenges the Executive's authority to bring him to trial, even before a final conviction at such a trial. Thus, in *Bollman* and *Ex parte Burford*, 7 U.S. (3 Cranch) 448 (1806), the Court issued the writ for the benefit of prisoners who contended that the government had an inadequate basis to detain them for criminal proceedings. *See also United States v. Hamilton*, 3 U.S. (3 Dall.) 17 (1795). Similarly, in *United States v. Villato*, 2 U.S. (2 Dall.) 370 (C.C.D. Pa. 1797), the defendant, committed by the district judge on a charge of high treason, persuaded the court that he had never been validly naturalized and therefore could not be prosecuted for treason for acts committed abroad.

    These decisions were reaffirmed after the Civil War. In *Ex parte Yerger*, the Supreme Court held that it had jurisdiction to issue the writ to determine whether Yerger's impending trial by a military commission was lawful. *See Yerger*, 75 U.S. (8 Wall.) at 106; *see also id*. at 101-02 (noting that the writ extends to cases in which a petitioner was awaiting trial before a court of the United States). The Court expressed no doubt that, if Yerger had (as he claimed) a right not to be tried by the military commission, he was entitled to release from the custody of the commission. The petitioner in *Ex parte McCardle,* 74 U.S. (7 Wall.) 506 (1868), was in the same position; he brought a pre-conviction *habeas* petition challenging the constitutionality of his military detention. Although the Court ultimately ruled in *McCardle* that it lacked jurisdiction over the petitioner's appeal from the circuit court's decision to remand him to military custody, the Court expressed no doubt that the circuit court could have issued a writ

to prevent the petitioner's trial by a military commission, had the petitioner established a right not to be so tried. *See id.* at 515.

These decisions also establish that, when a *habeas* petitioner challenges the authority or jurisdiction of the body that lays claim to try or detain him, the petitioner is entitled to be heard on the merits of that challenge even before any contemplated trial is completed. Here, Mr. El Falesteny contends, in essence, that he has a right not to be classified by the Combatant Status Review Tribunal ("CSRT") process (challenged as violating due process) that the military authorities, acting under the direction of the President, have convened. In addition, he seeks a hearing on whether his detention is lawful. If the writ were completely unavailable to challenge this procedure, the right not to be classified by an entity with no authority over the petitioner would become a nullity.

In assessing the suspension question, the view of Kenneth Starr, former Solicitor General, Circuit Court judge, and Independent Counsel, is of more than passing interest. Mr. Starr neither had reason to mince words nor act for any particular interest. He is also qualified to opine. In the debates on the MCA, Mr. Starr wrote a one-page letter to Senator Specter succinctly establishing the invalidity of the jurisdiction-stripping provision that Respondents rely on here. Letter from Kenneth Starr to Sen. Arlen Specter, Chairman, Senate Judiciary Committee (Sept. 24, 2006) (attached as Exhibit 1). Mr. Starr concluded with respect to Guantanamo prisoners, citing Article I, Section 9, clause 2, that "[t]he United States is neither in a state of rebellion nor invasion. Consequently it would [be] problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events." *Id*.

The opposing view seems to have been based on the idea that prisoners at Guantanamo have no constitutional rights so that their *habeas* rights *cannot* be suspended, as

they have none.  Mr. Starr addressed this point in observing that as to Guantanamo, *Rasul*, not *Eisentrager*, was good law.  *Id*.  There are, Mr. El Falesteny submits, five Supreme Court votes *for* the proposition that Guantanamo is within the jurisdiction of the United States for constitutional purposes, not just statutory analysis.  It follows that Mr. El Falesteny has constitutional rights and the suspension question cannot be brushed aside as Respondents urge.

### (c) The *In Lieu* Circuit Remedy Is Not the Equivalent of the Writ

If the jurisdiction-stripping provisions of the DTA and MTA are bad, it will be because the Circuit remedy *in lieu* of *habeas* is not its equivalent.  As a corollary, this means that whatever role the Circuit may have, it does not affect this Court's power to act under Section 2241.  But is the *in lieu* Circuit remedy the equivalent to *habeas*?  To that question we now turn.  We first sketch the *in lieu* rights before the Circuit court and then compare them to *habeas*.

Under the DTA and MCA, a prisoner's entitlement to judicial review of the legality of his detention is entirely predicated on the government's decision to institute proceedings against him, either in the form of a CSRT or a military commission.  *See* DTA § 1005(e)(2); MCA § 7(a).  If the government simply does nothing, the detainee has no means of challenging the legality of his detention.  Naturally, this provides an incentive for the government to delay, or not institute proceedings at all, which would effectively deprive detainees of any judicial forum.  This is simple despotism.

Further, as Judge Green has already found, the CSRT procedures are deficient in at least three respects.  *In Re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005).  First, Judge Green noted the general defect in all CSRT proceedings, namely the failure to provide detainees access to material evidence on which their "enemy combatant" status was

-13-

affirmed and the failure to permit assistance of counsel. *Id.* at 468-72. Next, she identified reliance on statements obtained by torture or other coercive measures as a grotesque shortcoming of the CSRT procedures. *Id.* at 472-74. Finally, she observed the overly broad definition of "enemy combatant" was problematic. *Id.* at 474-77. Each of these defects in the CSRT proceedings affect Mr. El Falesteny here, and Judge Green found each to be of constitutional significance. *See id.* at 468-78. We do not repeat her findings in detail but suffice it to say those findings indicate the CSRT proceedings deviated markedly from a fair fact-finding procedure such as the one *habeas* entails, and the review provided by the DTA in the Circuit will not allow challenges to the composition and functioning of the CSRTs themselves.

Thus none of the infirmities that Judge Green identified can be pressed before the Circuit. Rather, that review is limited to:

> (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence) . . . .

DTA § 1005(e)(2)(C)(i).

This amounts to saying that review is limited to determining if the CSRT has followed its own deeply flawed playbook. Even if the government promptly conducts a CSRT to make a status determination, the DTA does not permit the Circuit Court to engage in the sort of factual inquiry that has long been available via *habeas*. Section 1005(e)(2) does not allow petitioners to engage in discovery (including discovery into whether evidence against them was obtained by coercion), "traverse" the return, or obtain a hearing, as provided by 28 U.S.C. §§ 2243 – 2248.

Thus in no sense is the Circuit remedy provided *in lieu* of *habeas* the equivalent of *habeas*. This Court should find that it has jurisdiction over Mr. El Falesteny's *habeas* claim and jurisdiction to require production of a factual return.

### B. Ordering a Factual Return Is Appropriate

Respondents suggest that there has not been a change of circumstances that would justify ordering the production of a factual return. Respondents are wrong. First, they ignore Mr. El Falesteny's opening brief and the supporting declaration of Stephen Truitt which demonstrated that the government has changed its justification for holding Mr. El Falesteny. As discussed in that brief, the most recent ARB held for Mr. El Falesteny listed different charges against Mr. El Falesteny than did his original CSRT. Mr. El Falesteny and his counsel must know the factual basis for his imprisonment in order to adequately challenge that imprisonment.

Second, Respondents claim that the stay in this action was entered "'pending the jurisdictional ruling' of the United States Court of Appeals for the District of Columbia Circuit in *In Re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) and *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005)." Respondents' Br. at 4. But, these cases dealt with issue of the District Court's power to frame relief in habeas actions as to prisoners held at Guantanamo. The Supreme Court in *Hamdan* has settled that question. *Hamdan* framed its relief in the *habeas* context. The pendency of the *Al Odah* and *Boumedienne* appeals, then, no longer affords the slightest justification for continuing the stay. Liberty ought not to be a matter of housekeeping judicial entries. Because *Hamdan* has resolved the critical issues in those cases and because the *habeas* statute contemplates a prompt hearing, *see* 28 U.S.C. § 2243, the justification for the stay is no longer present and it should not be a barrier to ordering factual returns. Moreover, given the Circuit's rulings in *Rasul* and *Hamdan*, both of which were reversed by the Supreme Court,

the proper question is what the Supreme Court might do, not what the Circuit is likely to hold. See *supra* at 12-13.

### C.   The Burden on Respondents Would Be Trivial

Finally, Respondents argue that certain "logistical burdens" should stop this Court from ordering factual returns at all. Of course, Respondents provide no factual support for this contention – no affidavit, no documentary evidence, no testimony – and it should be rejected by this Court. As discussed in Mr. El Falesteny's opening brief, multiple other judges have ordered the production of factual returns even after the DTA and MCA. Indeed, in *Al Amin v. Bush*, the respondents produced a factual return after the MCA was signed into law.[6]

Respondents undoubtedly possess documents, and have other evidence, that go directly to the question of Mr. El Falesteny's detention. Requiring a factual return from Respondents would cause little or no prejudice. Turning over documents in Respondents' possession should not be difficult: all such documents are, at most, five years old, all should be in electronic form or readily searchable. Counsel for Mr. El Falesteny have security clearances at the appropriate levels. Indeed, much of the information sought is the sort that Respondents have provided to the news media. For example, reporters were allowed to witness CSRT proceedings for many prisoners. *See* Kathleen T. Rhem, *Reporters Offered Look Inside Combatant Status Review Tribunals*, American Forces Information Service, Aug. 29, 2004 (attached as Exhibit 2). For Respondents to now argue that such information should not be provided to counsel is remarkable. This Court should reject Respondents' unsupported contentions and order the production of a factual return for Mr. El Falesteny.

---

[6] *See* Respondents' Factual Return to Petition for Writ of Habeas Corpus by Petitioner Mohammed Al Amin and Notice of Submission of Factual Return Under Seal, *Al Amin v. Bush*, Civ. No. 05-2336 (PLF) (D.D.C. filed Oct. 18, 2006).

## II. CONCLUSION

For the foregoing reasons, and for the reasons set forth in Mr. El Falesteny's opening brief, this Court should grant the Motion for Order Requiring Respondents to Provide Factual Returns.

Respectfully submitted,

_____/s/ Stephen M. Truitt_____

| | |
|---|---|
| Barbara Olshansky (NY #0057<br>CENTER FOR CONSTITUTIONAL<br>RIGHTS<br>666 Broadway, 7th Floor<br>New York, New York 10012<br>Tel: (212) 614-6439<br>Fax: (212) 614-6499<br><br>*Of Counsel for Petitioner Maher El Falesteny* | Stephen M. Truitt (DC # 13235 )<br>600 Fourteenth Street, N.W.<br>Suite 500, Hamilton Square<br>Washington, DC  20005-2004<br>Tel: (202) 220-1452<br>Fax: (202) 220-1665<br><br>Charles H. Carpenter (DC # 432004)<br>PEPPER HAMILTON LLP<br>600 Fourteenth Street, N.W.<br>Suite 500, Hamilton Square<br>Washington, DC  20005-2004<br>Tel: (202) 220-1452<br>Fax: (202) 220-1665<br><br>Christopher J. Huber<br>Benjamin P. Cooper<br>PEPPER HAMILTON LLP<br>3000 Two Logan Square<br>Eighteenth and Arch Streets<br>Philadelphia, PA  19103-2799<br>Tel: (215) 981-4000<br>Fax: (215) 981-4750<br><br>*Counsel for Petitioner Maher El Falesteny* |
| Dated:  November 30, 2006 | |