**Approved for Public Filing by the CSO**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| AMER MOHAMMON, *et al.*, ) <br> ) <br> Petitioners, ) <br> ) <br>  *v.* ) <br> ) <br> GEORGE W. BUSH, *et al.*, ) <br> ) <br> Respondents. ) | No. 05-CV-2386 (RBW) (AK) |

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR THIRTY DAYS'
ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER
SHARAF AL SANANI FROM GUANTANAMO**

Petitioner Sharaf Al Sanini a/k/a Sharaf Ahmad Muhammad Masud (ISN 170) ("Petitioner"), by and through undersigned counsel, respectfully files this reply in support of his simple request for thirty days' advance notice of any removal from Guantánamo.

Since Messrs. Prosper and Waxman prepared their Declarations back in May and June of 2005, much has changed on the detainee-transfer front, and not simply the number of detainees transferred. As of December 17, 2006, more than 380 detainees have been removed from Guantanamo, 114 in 2006 alone. *See* DoD News Release dated December 17, 2006 (copy attached as Exhibit A). On that date, the Government announced that it had transferred seven detainees to Afghanistan, five detainees to Yemen, three detainees to Kazakhstan, one detainee to Libya, and one detainee to Bangladesh. *Id.* Just three days earlier, sixteen detainees were transferred to Saudi Arabia. *See* DoD News Release dated December 14, 2006 (copy attached as Exhibit B). In contrast to the discreet list of transferee countries identified in 2005, detainees have now been transferred to Albania, Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Libya, Maldives, Sudan, Tajikistan, Turkey, Uganda, and Yemen. *Id.*

**Approved for Public Filing by the CSO**

Numerous judges of this Court have granted the modest relief requested here, rejecting Respondents' speculative assertions about the potential impact of such rulings. Indeed, according to a recent analysis of this issue, the decisions granting such relief significantly outnumber the rulings denying it. *See* Robert M. Chesney, *Leaving Guantanamo: The Law of International Detainee Transfers*, 40 U. Rich. L. Rev. 657, 667 & nn.35-38 (2006). Despite all of the rulings granting the requested relief, the "sky has not fallen" on Respondents' diplomatic relations efforts, as confirmed by the continued stream of detainee transfers.

Moreover, notwithstanding Respondents' doubletalk regarding "assurances" received from countries known to violate human rights, a serious risk remains that Respondents will transfer Petitioner from the "frying pan" of illegal detention into the "fire" of a foreign torture den. Against this tangible possibility of the most extreme irreparable injury imaginable (torture and possibly death) is the *de minimus* burden of providing thirty days' advance notice of a transfer – a notice Respondents already provide after-the-fact. *See, e.g.,* Dkt. 39 (notice of transfer of Saleh Mohammed Ali Azoba to Saudi Arabia). Furthermore, as several judges have noted in granting these motions, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Abdah v. Bush*, No. Civ. A. 04-1254, 2005 WL 711814 (D.D.C. Mar. 29, 2005); *Al-Joudi v. Bush*, No. Civ. A. 05-301 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005).

Accordingly, the modest relief requested, as balanced against the serious threat of irreparable harm, requires no careful analysis of the Military Commissions Act of 2006 ("MCA"). Petitioner's motion should be granted, and Respondents should be ordered to provide this Court and counsel with thirty days' advance notice of any intended removal of Petitioner from Guantáanamo Bay.

**Approved for Public Filing by the CSO**

I.     **Factual Developments Since the Government's Outdated Declarations**

     Respondents continue to rely upon Declarations prepared in 2005 by then-Ambassador Pierre-Richard Prosper and then-Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman. *See* Opp., Exhibits 1-2. According to the later of these Declarations (Mr. Waxman's June 2, 2005 Declaration), the vast majority of removals from Guantanamo were for "release," with only sixty-seven detainees "transferred to the control of other governments for further detention, investigation and/or prosecution, as appropriate." Waxman Decl. ¶ 4.

     According to Mr. Waxman's listing of transferee countries, most detainees had been sent to Pakistan or European countries such as the United Kingdom, France, Belgium, and Sweden. *Id.* Only four detainees had been transferred to Saudi Arabia. *Id.* None had been sent to most of the countries now on Respondents' list, such as Albania, Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Maldives, Sudan, Tajikistan, Uganda, and Yemen. *Compare id. with* Exhibit A.

     Beginning in July of 2005, Respondents became increasingly willing to transfer detainees to governments with well-established histories of human rights violations. In that month, detainees were sent to Sudan, Afghanistan, Saudi Arabia, and Jordan. *See* DoD News Release dated July 20, 2005 (Exhibit C). By the end of the year, more detainees had been send to Saudi Arabia, and additional detainees had been transferred to Kuwait and Bahrain. *See* DoD News Releases dated November 3, 2005, and November 5, 2005 (Exhibits D and E). In 2006, Respondents began transferring larger groups of detainees to Saudi Arabia. *See* DoD News Release dated May 18, 2006 (fifteen detainees) (Exhibit F); Exhibit B (sixteen detainees). Respondents continue to transfer to Afghanistan and to countries such as Bahrain, Iran, Libya, and Yemen. *See* Exhibit A; DoD News Releases dated October 12, 2006 and October 16, 2006 (Exhibits G and H).

**Approved for Public Filing by the CSO**

Interestingly, in the most recent News Releases, Respondents have discontinued the practice of disclosing the total number of detainees "transferred" rather than "released," instead euphemistically disclosing only the total number of detainees who "have departed Guantánamo for other countries." *See* Exhibits A-B, G-H.  Respondents have long since abandoned tallying the number of detainees transferred to a particular country, such as Saudi Arabia.  *See id.*

The human rights violations of many of these transferee countries have been well-documented, including by the Department of State.  As a citizen of Yemen, Petitioner most likely would be transferred for continued detention by his own government (although, as Respondents note, a detainee can be transferred to any interested government "willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States or its allies").  Waxman Decl. ¶ 3.  Such a transfer would subject Petitioner to the control of a government with an abominable human-rights record, as recently reported in the Department of State's most recent report on Yemen's Human Rights Practices (available at http://www.state.gov/g/drl/rls/hrrpt/2005/61703.htm).  *See* Prosper Decl. ¶ 6 & n.1 (stating that the Human Rights reports are to be consulted in making transfer decisions).

The report's opening summary identifies extreme fundamental violations such as "acknowledged torture," "poor prison conditions," "prolonged pretrial detention," a "weak judiciary," "government corruption," and "trafficking in persons."  *Id.*  The discussion of "Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment" explains:

> The law prohibits such practices; however, members of the Political
> Security Office (PSO) and Ministry of Interior (MOI) police forces
> tortured and abused persons in detention.  Authorities used force during
> interrogations, especially against those arrested for violent crimes.
> Although penal law permits amputations and physical punishment such as
> flogging for some crimes, which the government maintains is in
> accordance with Shari'a (Islamic law), there were no reports of
> amputations or floggings during the year.

US2000 9648409.3

\*\*\*

> Torture continued to remain a problem in PSO prisons, which were not monitored by other government agencies. There were credible reports pointing to a preferred use of nonphysical abuse, such as sleep deprivation, cold water, and threats of sexual assault, as the primary form of torture in PSO prisons. In October two former PSO prisoners reported being repeatedly tortured and made to sleep without blankets in cold cells while being held without charge. There were reports that the MOI's Criminal Investigative Department (CID) routinely used torture to obtain confessions. On February 4, CID forces investigating a theft case in Dhamar governorate rounded up five suspects who were reportedly beaten during interrogation. One suspect confessed to the crime and was referred to the Attorney General's office for prosecution. The other four were released. Defense attorneys and some human rights NGOs observed that most confessions introduced as evidence against defendants in criminal courts were obtained through torture. Government sources vehemently denied this.

Report § 1.c.

The section of the report discussing the "Prison and Detention Center Conditions" Petitioner would face upon transfer to Yemen is equally bleak:

> Although some observers noted improvements in MOI prison conditions in the past year, local and international observers reported that prison conditions, particularly in rural areas, remained poor and did not meet internationally recognized standards. Although the MHR and a number of NGOs were granted limited access to MOI prisons, the government severely limited access to PSO prisons by independent human rights observers.
>
> During his six-month incarceration in the Sana'a Central Prison, Abdulkarim al-Khaiwani, who was imprisoned on violations of the press law and treason charges (see section 2.a.), was beaten several times by other prisoners.
>
> Many prisons, particularly in rural areas, were still overcrowded with poor sanitary conditions and inadequate food and health care. In some cases prison authorities exacted bribes from prisoners to obtain privileges or refused to release prisoners who completed their sentences until family members paid a bribe.

*Id.*

**Approved for Public Filing by the CSO**

Both Declarations offered by Respondents seek to justify transfer to countries with a risk of torture by noting that "appropriate assurances" will be given by the transferee government. Waxman Decl. ¶ 6; Prosper Decl. ¶¶ 7-9.  Here again, however, Yemen has a well-documented history of violating its own stated laws and policies, not only with respect to torture (*see* Report § 1.c), but also with respect to virtually every other human rights criteria measured in the Report, including "Arbitrary Arrest and Detention" (*id.* § 1.d) "Denial of Fair Public Trial" (*id.* § 1.e), "Arbitrary Interference with Privacy, Family, Home or Correspondence" (*id.* § 1.f), "Freedom of Speech and Press" (*id.* § 2.a), and "Freedom of Peaceful Assembly and Association" (*id.* § 2.b).

Perhaps the most distressing prospect of being turned over to a Yemeni government obliged to continue his incarceration is the likely possibility that Petitioner will be continue to be detained for additional years without being charged with any crime.  Despite constitutional and other legal provisions, "arbitrary arrest and prolonged detention without charge or, if charged, without a public preliminary judicial hearing within a reasonable time remained common practices."  Report § 1.d.  Thus, a "large percentage of the total prison population consisted of pretrial detainees, some of whom have been imprisoned for years without charge."  *Id.*  Even if he is charged, Petitioner could never expect a fair trial.  *See id.* § 1.e.

All of the above findings were made by the U.S. Government itself.  Non-governmental organizations have long reported on torture and abuses in Yemen, which emerged from a civil war only a decade ago.  In a September 2003 report entitled *Yemen: The Rule of Law Sidelined in the Name of Security* (Exhibit I), Amnesty International described how Yemen's enforcement of laws against torture had significantly deteriorated since the September 11, 2001 attacks. Specifically referencing detainees held on suspicions of terrorist activity in connection with the U.S.S. Cole and September 11, 2001 incidents in Yemen, the report noted how "[s]ome detainees

said that they were not tortured ... but others said they were beaten with electric batons, handcuffed and shackled, and subjected to insults and verbal abuse.  Others said they were threatened with the imprisonment of their female relatives if they did not confess."  *Id*. at 8.  This report referenced a statement made by Yemen's Minister of Interior on July 16, 2003, in which he said that 195 people accused of belonging to Al Qaeda remained detained, but "did not refer to any judicial process for these detainees because the rule of law has been sidelined.  They are held totally at the mercy of the government and security forces, far removed from judicial scrutiny."  *Id*. at 1.  In the weeks and months following this statement by the Minister to Yemen's Parliament, "[a]rrests were made without the judicial supervision required by law, and detainees have invariably been subjected to lengthy incommunicado detention, during which some of the detainees alleged that they were tortured or ill-treated."  *Id*.

Yemen authorities do not even claim to comply with international human rights obligations and with their own law, instead arguing they had no choice but to "'fight terrorism' and avert the risks of military action against Yemen by the US in the wake of the 11 September events."  Amnesty International Report, at 3.  *See also id*. at 6 ("After 11 September, the government's message to Amnesty International has been articulated as the 'fight against terrorism' to preserve the security of the country which necessitates action by the arresting authorities beyond the confines of the law and Yemen's international human rights obligations.").  The report concludes by noting how "the Yemeni Government has sidelined the rule of law and its human rights obligations in the name of 'fighting terrorism' and 'national security.'  It has given the green light to the security forces, particularly the Political Security, to act with impunity in total disregard for the law and the role of the judiciary ....  What is more disturbing

US2000 9648409.3

about these human rights violations is that they are being carried out as a deliberate policy by the government." *Id*. at 26.

Reports of abuse and torture of detainees in Yemen are widespread, and the Government is disingenuous in its attempts to suggest otherwise. It is similarly absurd for the Respondents to seek to avoid an injunction by claiming that the Petitioner has not proven that a transfer is "imminent." The Respondents' own affidavits assert that "[t]he United States has no interest in detaining enemy combatants longer than necessary," and Mr. Prosper even complains that judicial review of a decision to transfer the Petitioners may "undermine the United States' ability to reduce the number of individuals under U.S. control." Prosper Decl. ¶¶ 2, 12.

The United States Government has publicly announced its goal of reducing the population of Guantánamo to some 100 "hard-core detainees." *See* Chesney, *supra*, 40 U. Rich. L. Rev. at 665 & n.25 (citing Robin Wright & Josh White, *U.S. Holding Talks on Return of Detainees*, Wash. Post, Aug. 9, 2005, at A13). Earlier news reports similarly confirmed that the Government has a "plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials." *See* Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, N.Y. Times, Mar. 11, 2005.

## II. Decisions of Multiple Judges of this Court Granting the Relief Sought in this Motion

Respondents selectively point to two decisions rejecting detainee requests for advance notice of transfer. *See* Opp., at 3. Even Respondents, however, begrudgingly acknowledge one of the many decisions rejecting their position and providing the modest relief Petitioner seeks. *See id.* at 17 n.7 (citing *Al-Marri v. Bush*, Civ. A. No. 04-2035, 2005 WL 774847 (D.D.C. Apr.

4, 2005)). In fact, the decisions granting detainees their requests for a mere month of advance warning of transfer far outnumber the handful of cases adopting Respondents' position. *See* Chesney, *supra*, 40 U. Rich. L. Rev. at 667 & nn.35-38 (surveying entire Guantánamo docket and finding "twenty-seven pro-detainee decisions imposing the requested notice requirement and six pro-government decisions denying that relief," with one "split decision").

In *Abdah v. Bush*, No. Civ. A. 04-1254, 2005 WL 711814 (D.D.C. Mar. 29, 2005), for example, Judge Kennedy granted a motion for preliminary injunction seeking precisely the relief Petitioner seeks here. Quoting the leading *CityFed* decision cited by Respondents (Opp., at 11), *Abdah* explained that "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." 2005 WL 711814, at *3 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1985)).

The factor forming the "'basis'" of a request for injunctive relief is the risk of irreparable harm. *Id.* Transferred detainees face two such risks: (1) being sent to countries "for torture or indefinite imprisonment without due process of law" and (2) having their habeas claims terminated by executive "fiat." *Id.* at *3-*4. As in *Abdah*, Respondents here embrace the claim that transfer eliminates jurisdiction, confirming the risk of irreparable harm. Opp., at 11-12.

As to the requirement of a likelihood of success on the merits, the *Abdah* court dismissed Respondent's frivolous argument that "advocating for release into freedom" somehow means the same thing as "transfer from ongoing detention in one locale to ongoing detention in another." *Id.* at *4 & n.3. Respondents nevertheless repeat that argument here, again suggesting that transferring a detainee for torture basically provides all the relief sought under his habeas claim. Opp., at 12-13. Rejecting this absurd contention and focusing on the true merits of a transfer challenge, *Abdah* found a strong likelihood of success on a claim by a detainee that a putative

- 9 -

transfer should be blocked as an improper attempt to eliminate an otherwise valid habeas claim. 2005 WL 711814, at *5 (citing, *inter alia*, Fed. R. App. P. 23(a)); *see also Kurnaz v. Bush*, No. Civ. A. 04-1135 (ESH), 2005 WL 839541, at *2 (D.D.C. Apr. 12, 2005) (explaining that Fed. R. App. P. 23(a) protects district court's as well as appellate court's jurisdiction over pending habeas petitions) (citing *Jago v. U.S. District Court*, 570 F.2d 618, 623 (6th Cir. 1978)).

As for Respondents' claimed "parade of horribles" arising from judicial review of a proposed transfer, the *Abdah* court correctly noted that nothing in the narrow relief requested by the detainees would mandate the two purported evils of diplomacy described, *i.e.*, disclosure of governmental communications with the transferee country or internal governmental analyses of the propriety of the transfer. *Id.* at *5. To the contrary, the only burden imposed by the relief was a minimal delay in one aspect of the government's management of the detainees, which was insufficient to outweigh the harm to detainees from potential loss of their entire claim. *Id.* at *6.

As to the public's rights, the *Abdah* court summarily rejected Respondents' self-serving contentions that the "public interest" element automatically was met because Respondents represent the Government. *Id.* To the contrary, "the public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

Two days after *Abdah*, Judge Urbina granted substantially similar relief to other petitioners, explaining that a transfer "would abuse the process now put in place for the purpose of adjudicating matters on their merits." *Al-Oshan v. Bush*, Civ. A. No. 05-0520 (RMU), Order Granting, *inter alia*, 30 Days' Notice of Any Intent to Move Petitioners, at 2 (D.D.C. Mar. 31, 2005) (Exhibit J). Thus, Respondents were precluded from removing the Petitioners in that case

"unless this court and counsel for petitioners receive thirty days' advance notice of such removal." *Id.* at 3. On April 1, Judge Friedman followed *Abdah* and *Al-Oshan* and granted substantially similar injunctive relief against Respondents. *Al-Shiry v. Bush*, Civ. A. No. 05-0490 (PLF), Order (D.D.C. Apr. 1, 2005) (Exhibit K).

On April 4, 2005, Judge Kessler entered two separate orders granting the same relief Petitioner seeks here. *See Al-Joudi v. Bush*, Civ. A. No. 05-301 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005); *Al-Marri v. Bush*, Civ. A. No. 04-2035 (GK), Mem. Order (D.D.C. Apr. 4, 2005) (Exhibit L). Judge Kessler identified two "obvious and substantial threats" faced by detainees such as Petitioner: (1) "transfer to a country where they might be tortured or indefinitely confined," such as Saudi Arabia, Pakistan, or Morocco (citing Department of State Human Rights reports); and (2) the "potential elimination of their habeas claims." 2005 WL 774847, at *4. Both of these threats are "serious" and "imminent." *Id.*

Judge Kessler took a different approach to the requirement of a likelihood of success on the merits. *Id.* at *4-*5. Rather than focusing on the narrow issue of a possible success on a transfer challenge, she considered the merits of the ***entire*** habeas claim that potentially would be eliminated by an executive transfer. *Id.* In this Circuit, the "likelihood of success" prong is met by the presence of questions that "so 'serious, substantial, difficult and doubtful, as to make them a fair ground of litigation.'" *Id.* at *5 (quoting *Washington Metro. Area Transit Comm'n v. Holiday*, 559 F.2d 841, 844 (D.C. Cir. 1977)). As confirmed by the continued disunity of decisions even within this Court and the Supreme Court's repeated rulings on detainee-related issues, the Guantánamo cases manifestly present significant and serious questions. *Id.* at *5.

In an effort to show harm, Respondents again relied upon its assertions that having to defend transfers potentially would impair its negotiations with foreign governments regarding

the transfers. *Id.* As in *Abdah*, the *Al-Joudi* court dismissed such contentions as "speculation" as to future possible efforts to defend a proposed transfer (*id.* at *5 n.12):

> The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioners request only 30 days' notice of transfer – a narrow and discrete request that would impose no burden on the Government. Beyond "vague premonitions" that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority. For example, granting Petitioners' request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice.

*Id.* at *5 (citations omitted). On balance, the "minimal burden" on the Government of filing "a few pieces of paper" did not "outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioners' claims before this Court." *Id.* at *6

On the public interest element, while the Government again endeavored to "conflate[] the public interest with the Government's own position," the public interest "undeniably is served by ensuring that Petitioner's constitutional rights can be adjudicated in an appropriate manner." *Id.*

Judge Huvelle followed all of the above decisions in *Kurnaz v. Bush*, No. Civ. A. 04-1135 (ESH), 2005 WL 839542, at *2 (D.D.C. Apr. 12, 2005), with a small modification: notice was required for any "transfer" but not for a mere "release." Among other things, Judge Huvelle was concerned about transfers to a United States Government custodian in a foreign country; transfers in which the detainee would still be held under the direction and control of the United States (albeit through a foreign agent); and transfers to a country where the detainee could not possibly have had an occasion to violate the law. *See* 2005 WL 839542, at *2.

***

**Approved for Public Filing by the CSO**

Thus, numerous judges of this Court already have granted precisely the type of relief sought by Petitioner. Notwithstanding Respondents' dire warnings as to the implications of providing this limited relief, these rulings have not had any appreciable impact on the Government's transfer process whatsoever. To the contrary, the risks presented to the detainees has increased in the interim, because Respondents are increasingly willing to ship detainees to known human rights violators.

Under Respondents' own argument, moreover, a significant "risk" of transfer – the potential loss of valid *habeas* claims – is enhanced by the recent ruling in *Quassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006). *See* Opp., at 11-12 & n.5. Although Petitioner does not agree that the reasoning of *Quassim* (which held that the **release** of detainees from Guantanamo mooted their habeas claims) applies equally to **transfers** for continued detention, the fact remains that Respondents continue to assert that their unilateral decision to transfer a detainee would terminate that detainee's habeas claim, thereby confirming that there remains a risk of irreparable harm (loss of valid *habeas* claims) from such a transfer.

Nor is there any legitimate fear of "disclosure" of confidential communications between the Government and a foreign government. Respondents' alleged "chilling effect" would come from "public" disclosures. Opp., at 9-10. In this case, however, secure facilities have already been established specifically for the handling, review, and maintenance of classified information. Respondents have failed to identify any manner in which "sensitive" negotiations would be affected if they were "disclosed" only to the Court and counsel in this case.

The Respondents assert that they, and only they, can determine whether or when a Guantanamo detainee should be transferred to a foreign country, and that they will do so unless they, in their alleged sole and unreviewable discretion, find it "more likely than not" that the

transferee "will" be tortured. Waxman Decl. ¶ 6; Prosper Decl. ¶ 4. In other words, Respondents claim that this Court can do nothing to prevent the loss of its jurisdiction or the violation of applicable law, so long as the Secretary of the Navy, apparently, can convince himself that there is only a 50% chance that a detainee "will" (not may) be tortured. Regardless of how satisfied the Executive Branch may feel about its own decisions, when a federal litigant is properly before a Court that has exercised jurisdiction over the underlying claims in a case, that litigant must be provided a meaningful opportunity to contest a transfer seeking to place him outside the Court's jurisdiction or otherwise into the hands of a police state that will torture him.

For this reason, the Respondents' lengthy discussion of extradition proceedings is not relevant. *See* Opp., at 20-22. This is not an "extradition" issue, for the Government in no way claims that these transfers follow the formal process that applies to extradition or that the transfers are otherwise subject to procedural protections. The "rule of non-inquiry" posited by Respondents may or may not limit the inquiries conducted in extradition proceedings, but this is not an extradition case, and the rule cannot in any event prevent federal courts from acting to protect their own jurisdiction over an underlying substantive claim in an already-existing case.

Finally, it is important to note that this motion does not of itself prevent any transfers the Government wishes to effect. All that is sought is thirty days' advance notice of a transfer. If that motion is granted and the Government provides such notice, Petitioner may well decide not to challenge the Government's proposed transfers. Respondents' claims of harm to the diplomatic process are, at best, premature. Given the limited relief sought by Petitioner as compared to the risk of incalculable harm if he was transferred to a country such as Yemen, the injunctive relief factors tilt heavily in Petitioner's favor. Petitioner's motion for thirty-days' advance notice should be granted.

**Approved for Public Filing by the CSO**

**III.    It is Not Necessary to Examine the MCA's Constitutionality to Rule on This Motion**

Respondents open their Opposition with their standard mantra about the impact of the recently-enacted MCA (as well as the DTA) upon the jurisdictional bases for all of these cases. *See* Opp., at 1-4.  Yet they also acknowledge, as they must, that the constitutionality of the MCA was fully briefed in the D.C. Court of Appeals as of November 20, 2006.  *Id*. at 4.  There is no good reason for this Court to undertake a searching constitutional analysis of the MCA when the jurisdictional issues inevitably will undergo a full cycle of appellate review.  This relief sought in this motion would do nothing more than provide a mechanism to preserve the *status quo* while the jurisdictional issues (and any subsequent merits issues) are fully litigated.

To the extent the Court wishes to examine the issues presented by the MCA, Petitioner hereby refers to and incorporates by reference the analysis of the MCA found in pages 2-14 of the "Reply Memorandum Supporting Request for 30-Days' Advance Notice of any Intended Removal of Petitioner from Guantanamo" filed by Petitioner Maher El Falsteny on November 28, 2006 (dkt. no. 219).

**IV.    Conclusion**

Inflicted torture cannot be undone. This Court's ability to enforce its orders, if lost, may be impossible to regain.  Petitioner's requested relief does nothing more than preserve this Court's jurisdiction and ability to enforce its orders.  Respondents are simply wrong in claiming that this Court must stand aside, or even assist, while Respondents transfer illegally-held prisoners into the custody of a torture-practicing foreign state, in violation of the United States' obligations under international and domestic law.

**Approved for Public Filing by the CSO**

    For the foregoing reasons and the reasons stated in the motion, Petitioner respectfully requests that this Court grant the motion.

Dated:  Atlanta, Georgia
         December 18, 2006

                            Respectfully submitted,

                            Counsel for Petitioner:

                            _____/s/ Vinay Jolly_____
                            A. Stephens Clay IV (Pursuant to LCvR 83.2(g))
                            James F. Bogan III (Pursuant to LCvR 83.2(g))
                            C. Allen Garrett Jr. (Pursuant to LCvR 83.2(g))
                            Vinay J. Jolly (Pursuant to LCvR 83.2(g))
                            Leslie J. Abrams (Pursuant to LCvR 83.2(g))
                            Miguel M. Duran (Pursuant to LCvR 83.2(g))
                            KILPATRICK STOCKTON LLP
                            1100 Peachtree Street, Suite 2800
                            Atlanta, Georgia 30309-4530
                            Telephone: (404) 815-6500
                            Facsimile: (404) 815-6555

                            Barbara Olshansky (NY-0057)
                            Gitanjali S. Guiterrez (Pursuant to LCvR 83.2(g))
                            J. Wells Dixon (Pursuant to LCvR 83.2(g))
                            CENTER FOR CONSTITUTIONAL RIGHTS
                            666 Broadway, 7th Floor
                            New York, New York 10012
                            Telephone: (212) 614-6439
                            Facsimile: (212) 614-6499

                            Zachary Katznelson (Pursuant to LCvR 83.2(g))
                            REPRIEVE
                            P.O. Box 52742
                            London EC4P 4WS
                            United Kingdom
                            Telephone: (020) 7353 4640
                            Facsimile: (020) 7353 4641

Approved for Public Filing by the CSO

# CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER SHARAF AL SANANI AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO** by serving electronically all attorneys of record for each party via the Court's Electronic Case Filing system.

Respectfully submitted,

Counsel for Petitioner:

      /s/ Vinay J. Jolly
A. Stephens Clay IV (Pursuant to LCvR 83.2(g))
James F. Bogan III (Pursuant to LCvR 83.2(g))
C. Allen Garrett Jr. (Pursuant to LCvR 83.2(g))
Vinay J. Jolly (Pursuant to LCvR 83.2(g))
Leslie J. Abrams (Pursuant to LCvR 83.2(g))
Miguel M. Duran (Pursuant to LCvR 83.2(g))
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

Barbara Olshansky (NY-0057)
Gitanjali S. Guiterrez (Pursuant to LCvR 83.2(g))
J. Wells Dixon (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Telephone: (212) 614-6439
Facsimile: (212) 614-6499