*EXHIBIT I*

**[EMBARGOED FOR: 24 September 2003]**                                    **Public**

# amnesty international

# Yemen
# The Rule of Law Sidelined in the Name of Security



*Amnesty International September 2003*                    *AI Index: MDE 31/006/2003*

# Yemen
# The Rule of Law Sidelined in the Name of Security

## 1. Introduction

On 16 July 2003 the Minister of Interior of Yemen told Parliament that 95 people accused of belonging to *al-Qa'ida* were released because they "had changed their ideas", and that 195 others remained in detention because they "persist in holding on to the ideas they believe in". He did not refer to any judicial process for these detainees because the rule of law has been sidelined. They are held totally at the mercy of the government and security forces, far removed from judicial scrutiny.

The case of these detainees reflects a significant regression in the government's human rights policy and practice since the 11 September 2001 attacks on the US, which Amnesty International condemned unreservedly. Ten days after these attacks the Yemeni Prime Minister announced "we have decided that investigation[s] must be carried out into anyone who had any connections (with) Afghanistan".[1]

In the weeks and months following this statement, security forces carried out mass arrests targeting Yemeni and foreign nationals, including women, and children as young as 12 years of age. Arrests were made without the judicial supervision required by law, and detainees have invariably been subjected to lengthy incommunicado detention, during which some of the detainees alleged that they were tortured or ill-treated. Most of the Yemenis who were arrested were held for weeks or months before they were released uncharged or tried. Those who remain continue to be held indefinitely outside any recognized legal framework, without charge and without judicial supervision. Most foreign nationals were deported after weeks or months of interrogation in incommunicado detention. They were denied access to asylum procedures and the judiciary to challenge their deportation, and no assessment of the risks of torture or execution in the countries to which they were sent were known to have been carried out.

Government political discourse, coupled with security forces acting beyond judicial control and with total impunity, generated a climate of fear among civil

---

1 See, for example, the Yemeni Arabic weekly al-*Ayyam,* dated 22 September 2001.

society which had been progressively developing into a vibrant agency for positive human rights changes. It initially remained silent in the face of the blatant disregard for the human rights achievements made by Yemen in recent years. This silence facilitated the persistent pattern of harassment against journalists. Reporting events in the wake of the 11 September attacks required extreme caution from journalists in order to avoid warnings, threats or arrest by security forces. However, Amnesty International is encouraged by the re-emerging voice of civil society, including journalists, calling for the restoration of the rule of law and respect for Yemen's international human rights obligations.

During 2002 Amnesty International delegates visited Yemen twice, in February and August, and held talks with government authorities on the deteriorating human rights situation in the country. The authorities, while recognizing that they were in breach of their international human rights obligations and their own laws, argued that this was because they had to "fight terrorism" and avert the risks of military action against Yemen by the US in the wake of the 11 September events. Amnesty International, while understanding the new security and international relations challenges faced by Yemen, believes that the solution to such challenges cannot lie in sacrificing human rights and the rule of law. At times of security crises, such as the one brought about by the 11 September events, human rights need more, not less, protection.

## 2. Background

Yemen has made noticeable institutional legal progress in the field of human rights over the last decade. It has become a state party to most international human rights instruments and its legislation governing arrest and detention is consistent with international human rights standards. This has been accompanied by significant growth in governmental human rights institutions which resulted in the appointment in 2001 of a Minister of State for Human Rights and the upgrading of this position to ministerial level in 2003. There has also been significant development of non-governmental human rights organizations and an emerging civil society concerned with issues of social justice and human rights.

The government has also developed substantive dialogue with international non-governmental human rights organizations, including Amnesty International, and has cooperated with United Nations human rights thematic mechanisms, and the Office of the High Commissioner for Human Rights. Human rights organizations have been granted access to Yemen to carry out investigations into human rights violations, including the detention of prisoners of conscience, torture, extrajudicial

executions, the death penalty, "disappearances", discrimination against women, concerns about juvenile justice, and laws inconsistent with international human rights standards.

Regrettably, this progress is today threatened by the changes in regional and world politics brought about by the 11 September 2001 attacks on the US. The government's security policies adopted in the wake of 11 September events represent a serious setback to its previous progressive undertakings and a further drift away from its obligations under international human rights treaties, including Article 9(1) of the International Covenant on Civil and Political Rights (ICCPR) which states: "Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law."

### 3. Arbitrary arrest and detention

Article 47(b) of the Constitution categorically prohibits arrests made without warrant issued by a judge or prosecutor. This protection from arbitrary arrest is backed up by strict safeguards contained in the Code of Criminal Procedures (CCP). Article 7 of the CCP provides that arrest is not permitted except for acts punishable by law. Under Articles 70 and 72 of the CCP arrests must be carried out with a written and signed order from the competent authority. The order may also be oral, but this is allowed only when the arrest is carried out in the presence of the authority competent to issue the arrest order.[2] In addition, Article 246 of the Penal Code provides for a maximum of five years imprisonment for any official who subjects any person to arbitrary arrest.

In reality, few political detainees have been apprehended in a manner that accords with the law. Instead, arrests have been made without any judicial supervision by members of the Political Security, a security force under the nominal control of the Interior Ministry. In various locations across the country, the common pattern has been for security officers, in uniform or in plain clothes, to remove an individual from his home or work during the mid-afternoon or early evening, without providing any reason or indication of the destination.

In the wake of the 11 September events, those arrested in this manner included many individuals with connections to Afghanistan, but also individuals who had no such connection. They included Ali Mikon, a 17-year-old British national holding a

---

2 For detailed analysis of the legal safeguards against arbitrary arrest in Yemen see Amnesty International's report: "Yemen, Ratification without implementation: The state of human rights in Yemen", AI Index: MDE 31/01/97, March 1997, PP 5-10.

student visa valid from 21 February 2001 to 21 February 2002. He was with three of his friends, also British nationals, one of them aged 15. All four were arrested on 31 December 2001 at 11.00 pm from the Yarmouk Hotel in Sana'a and taken to the Political Security headquarters. They were detained until 30 January 2002, when they were deported to the UK. They were never charged with any criminal offence. During their detention they were held in communal cells with other children and adults, including Ismail Shuhada, a 12-year-old Indonesian national who was arrested with 42 other Indonesians and detained for weeks or even months before they were released. This practice is in violation of the Convention on the Rights of the Child, ratified by Yemen. In 1999 when it examined Yemen's report on implementing this Convention, the UN Committee on the Rights of the Child expressed concerns about the general situation of the administration of juvenile justice in Yemen.[3]

Two academics, Dr Abdelsalam Nur al-Din, British national and Director of the Centre for Red Sea Studies (CRSS) at Exeter University in the United Kingdom, and his colleague, Dr Ahmad Saif, a Yemeni national, were on an official business visit to Yemen to establish joint cooperation projects between the CRSS and Yemen University when they were detained. Prior to their arrest they had meetings with government ministers and other officials, many of whom they knew personally. They were arrested by members of the Political Security force on 26 October 2001, at their hotel in Sana'a, and were detained incommunicado for three days. They were interrogated about their visit to Yemen and about their views of Osama bin Laden. They were released only after Yemeni government officials intervened. They were arrested without a warrant and were never brought before a judge.

In some cases relatives of someone sought by the security forces have been held in an attempt to force the person to hand himself in. Amnesty International considers that anyone held solely because of their relationship to another individual would be a prisoner of conscience and as such should be immediately and unconditionally released. In the evening of 21 September 2001 members of the Political Security in Ibb went to the house of Rashad Muhammad Sa'id Isma'il to arrest him. When they did not find him, they took his father, Muhammad Isma'il, aged 47, and detained him. Two days later they detained Rashad's father-in-law, 'Abd al-Karim Ahmad Naji al-Bu'dani, aged 60. As a result Rashad gave himself up on 27 September and his relatives were released without charge. In a separate case in Hudayda in December 2001, a relative of the detainee[4] told Amnesty International "security men in four vehicles came to the house at about 11.00 am. They broke the

---

3 See Concluding Observations of the Committee on the Rights of the Child: Yemen. 10/05/99. CRC/c/15/Add.102, Para 34.
4 The names have been withheld at their request.

door and took over the house while the mother was washing clothes. They asked her 'where is Sulayman?' She told them he was out. One officer said to her 'you bring him or we will take you and the rest of the family."

The arrests described above were carried out without a judicial warrant and without any judicial supervision. Although arbitrary arrest, particularly by the Political Security, is a long standing pattern of human rights violations in Yemen, it has since 11 September 2001 become further entrenched and is marked by three new developments.

- Prior to 11 September 2001 when arresting authorities acted with impunity they did so without explicit political legitimacy. By contrast, in the wake of 11 September events, such arrests became a deliberate public policy of the government.

- Prior to the 11 September events the practice of arrest by security forces was mainly limited to political opponents and critics of the state, such as members of political parties, journalists and writers. In post 11 September, guided by the vague term of "fighting terrorism", in cooperation with other security forces in the region and beyond, such as the US security forces, the practice of arrest by Yemeni security forces has progressively become borderless. Many relatives of detainees have told Amnesty International that the Political Security frequently threatens handing detainees over to US security forces to take them to Guantánamo Bay.

- There is a noticeable change in the government's message in its dialogue with Amnesty International. Prior to the 11 September events the government maintained that while it was not perfect, any arbitrary arrest taking place in the country was not the result of government policy. After 11 September, the government's message to Amnesty International has been articulated as the "fight against terrorism" to preserve the security of the country which necessitates action by the arresting authorities beyond the confines of the law and Yemen's international human rights obligations.

## 4. Incommunicado detention and allegations of torture and ill-treatment

Khaled Salah 'Abdullah's brother, Muhammad, was a teacher in the small town of Hudayda. In September 2001 he was arrested at home after he accompanied three friends seeking visas for Saudi Arabia. After 20 days, the family learned that they would be able to see Muhammad, but when Khaled and another brother tried to visit

him in the offices of the Political Security, they too were arrested. Khaled and his other brother were held for three months without any notice to their family and without access to a lawyer. During that time they were repeatedly blindfolded and questioned about the whereabouts of their brother's passport.

Individuals held by the Political Security are commonly subjected to a prolonged initial period of detention where communication with the outside world is denied. In many cases, family members may have to wait weeks or months before they learn where their relatives are being held. Several families reported that they were able to visit their relatives only when the Political Security was ready to acknowledge that they were holding them. For those arrested after 11 September 2001, it appears in many cases that it was only through the diligent search by family members and friends that the detainee's location was verified. In one case, that of Salih Mana' al-Najar, his relatives informed Amnesty International that it was by coincidence that they managed to establish his whereabouts. Salih Mana' al-Najar was arrested on 18 October 2001 in Sana'a. His relatives visited different places of detention in Sana'a and sought the help of an officer in the Political Security to establish his whereabouts, but to no avail. Three weeks later, and while the family was still searching for him in Sana'a, they were informed by someone that he had seen Salih handcuffed on the Yamania airline flight from Sana'a to Aden. One relative told Amnesty International, "When we received this information we went directly to the Director of the Political Security in Aden and asked him about Salih…the Director was surprised at how we found out…He told us that Salih's case is in Sana'a". Salih's parents were allowed to visit him approximately one month after his arrest.

Due to the systematic practice of incommunicado detention and the secrecy surrounding the fate of detainees, Amnesty International has not been able to obtain sufficient information to enable it to make an accurate assessment of the scale and frequency of torture and ill-treatment. However, it has received a number of complaints of torture and ill-treatment of some of those detained including, for example, Dr Abdelsalam Nur al-Din and Ali Mikon.

Dr Abdelsalam Nur al-Din was reportedly made to stand blindfolded with his hands pressed against the wall and was beaten with a stick on his back and punched in the chest. He was also said to have been held in solitary confinement in a small cell with very little ventilation, denied regular access to toilets and sometimes drinking water, and threatened with further torture, execution and "disappearance".

Ali Mikon told Amnesty International, "one morning…I had a bad stomach pain and was desperate to use the toilet, but the guard said no because other detainees

were using it. I had to use a bucket with a friend holding a blanket hiding me from other detainees in the cell…when I took the bucket out the guard hit me in the chest…and threatened to make me use the bucket again next time".

A special commission of inquiry set up by the Yemeni Parliament in September 2002 to look into the conditions of detention of detainees held in connection with the attack on the USS Cole on 12 October 2000, and those held in the wake of the 11 September 2001 event observed: "Some detainees said that they were not tortured…but others said they were beaten with electric batons, handcuffed and shackled, and subjected to insults and verbal abuse. Others said they were threatened with the imprisonment of their female relatives if they did not confess".[5]

## 5. Indefinite detention without charge or trial

Yemen's legal system provides significant safeguards against indefinite detention and is in this regard consistent with international human rights standards. Individuals have the right under Article 76 of the CCP and Article 47(c) of the Constitution to see a judge or prosecutor within 24 hours of being detained, and they have the right to challenge the legal basis of their detention. Articles 73 and 77 of the CCP establish a suspect's right to seek prompt legal assistance.

These provisions are rarely honoured when detainees are held by the Political Security, and this pattern of human rights violations has been exacerbated by the government's security policy in the wake of the 11 September events. None of those arrested after 11 September 2001 are known to have been charged with any criminal offence, and they are invariably denied access to lawyers as well as the opportunity to take proceedings before the judiciary to challenge the legality of their detention. Amnesty International raised these issues with the judiciary and the government and found neither authority concerned about the rights of these detainees.

In meetings with the Attorney General and the Minister of Justice in February 2002, the organization sought clarification of the legal process followed in these cases, together with the role of the judiciary in the arrest and detention of the detainees. Both authorities claimed not to have been aware of any arrests or to have had any role in the proceedings.

---

5 See Report of the Parliamentary Special Commission of Inquiry into detainees held in connection with the attack on the USS Cole and 11 September 2001, dated 24 September 2002, P 13.

In a second meeting with the Attorney General in August 2002, Amnesty International again sought clarification of the role of the judiciary with regard to the fate of the detainees. Specifically, Amnesty International delegates asked if any judicial proceedings had been initiated to allow them access to lawyers, or to enable them to challenge the legality of their detention if they were not to be charged with recognizably criminal offences and given prompt and fair trials.   The Attorney General told delegates that the detainees were not held under his jurisdiction but that he understood that the case of 14 people held in connection with the attack on the destroyer USS Cole was about to be transferred to his office to start their trial proceedings. However, even in this case no trial proceedings are known to have been initiated, almost three years after their arrest.

Amnesty International delegates submitted to the Attorney General a copy of a complaint addressed to him by lawyers from the National Organisation for the Defence of Rights and Freedoms, who had been given power of attorney by some 30 relatives of detainees.  The lawyers formulated their complaint under Article 13 (first paragraph) of the CCP, which states that: "Anyone who learns of the arrest of someone without legal reason or his detention in places other than those made for that purpose must inform a member of the public prosecution". They argued that their clients were unlawfully detained, citing Articles 76 and 172 of the CCP.  Article 76 states that: "Anyone detained temporarily on suspicion of having committed a crime must be brought before the judiciary within the maximum period of 24 hours from the time of arrest. The judge or member of the public prosecution must inform him of the reasons of arrest, question him and enable him to present his defence or objections, and must promptly issue an order with justification for his preventive detention or release. In any case, it is prohibited to continue the detention for more than seven days without a judicial order."[6]

Article 172 states that no one should be "...detained except by order of the public prosecution or the court and on a legal basis."

The lawyers urged the Attorney General to assume his responsibility and address the cases of their clients as required by Articles 7(2) and 13 of the CCP. Article 7(2) states that the prosecution should "...promptly release everyone whose freedom is, unlawfully restricted, or put in preventive detention for a longer period than is permitted by law, or decided by a court ruling or an order by the judge." Under Article 13 the prosecution is required to promptly release anyone held unlawfully.

---

6 Amnesty International's translation of Article 76 of the CCP.

Amnesty International delegates asked the Attorney General what steps he would take to address the lawyers' complaint and guarantee them access to their clients in detention. The only undertaking he made in this regard was that he would write a letter to the Director of the Political Security raising the issues. The absence of any commitment to address issues about the legality of detention illustrates the way in which the rule of law is subordinated, and the increasing powers accorded to the security authorities.

With regard to those held in connection with the attack on the Destroyer USS Cole, Yemeni officials indicated to Amnesty International that the government has been planning to bring them to trial but faced strong objections by the US Government. Defendants in this case have been in detention for almost three years and have yet to be formally charged or given access to a lawyer. They include Murad Salih al-Sururi, aged 22.  According to his relatives, he was taken into custody suspected of having acted as a witness in the issuing of false identification papers used by one of the suspects in the attack on the USS Cole. His home was searched soon after he was arrested, and, according to one of his brothers, he has been interviewed by agents of the US Federal Bureau of Investigations. Some relatives of detainees have appointed a lawyer but he has been denied access to them in violation of Principle 1 of the Basic Principles on the Role of Lawyers which states that: "All persons are entitled to call upon the assistance of a lawyer of their choice to protect and establish their rights and to defend them in all stages of criminal proceedings."

With the rule of law sidelined and the door of the judiciary firmly shut in their faces, relatives of the detainees do not know who to turn to in order to seek justice and redress. Many of the families told Amnesty International that they had spent considerable time going from one Political Security detention centre to another looking for their loved ones or to find out why they are being held and what is going to happen to them. In a number of cases, the relatives, with the backing of their community, submitted written appeals to the Political Security. One such appeal was made by the family of the detainee 'Abdullah 'Abdu 'Abdullah al-Khatib, who wrote:

"Dear Director of Hudayada Political Security,

We, the signatories of this letter, testify that 'Abdullah 'Abdu 'Abdullah al-Khatib...had returned from Saudi Arabia in September 2001 in order to complete arrangements for an employment contract in Saudi Arabia.  We were surprised to learn that strangers came and took him from his home in al-Shahariya area (in Hudayda) and we had no idea where or why they took him.  After one month we learned that he was being detained by the Political Security in Hudayda. We, the

residents of al-Shahariya area, testify before God and before you, and we consider this to be the word of justice, for which we will be responsible until the Day of Judgment, that 'Abdullah has always been of good behaviour and has never acted dishonourably towards his family or the security forces. 'Abdullah is the only breadwinner for his family, which consists of his elderly father and eight other persons.

We are sending you this reference with hope and confidence in God and your sense of justice to urge you to look into his case and release him for the sake of justice and compassion for his parents and young brothers. God is witness to our testimony."

In the meantime, family members as well as the detainees must live with the anguish of uncertainty. For many families, the emotional distress is exacerbated by economic hardship, for in several cases the detainee was the sole source of income for a family of limited means. This human cost is brought on by the government's deliberate disregard for the rule of law and international human rights obligations particularly those enshrined in Article 9(3) of the ICCPR which states: "Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release..." Similarly, Article 14(3) of the ICCPR provides the right to prompt and fair trial for anyone suspected of a criminal offence.

## 6. Secret and forcible deportation of foreign nationals

Yemen has for many years provided shelter for thousands of refugees escaping persecution in various countries, particularly those in the Horn of Africa. However, government laws and practice towards those fleeing persecution remains based on political considerations even when these are in flagrant violation of international standards such as the 1951 Convention Relating to the Status of Refugees.

Under Law No. 47 of 1991, foreign nationals resident in the country can be expelled if they are considered a threat to "...the internal or external security and integrity of the state, its national economy and public health or public morals..." The process by which a person may be expelled does not involve the judiciary and contains no safeguards relating to access to asylum procedures and respect for the principle of *non-refoulement* (the prohibition of returning someone to face torture or other grave human rights abuses). The weakness of this legal framework is undermined further by bilateral and multilateral security agreements which are devoid of international safeguards for the protection of people fleeing persecution in their

countries.  Such security agreements include the Arab Convention for the Suppression of Terrorism.[7]

For example, in 1998 Fahd Abdullah Jassim al-Malki, a Qatari national, was forcibly handed over by the Yemen authorities to the Qatari government which sought his extradition in connection with the failed coup attempt of 1996. He was not offered the opportunity to seek asylum. Upon his return to Qatar he was reportedly subjected to torture and has been sentenced to death after an unfair trial.

The weakness of the human rights protection regime for foreign nationals has been exacerbated by the 11 September events. Mass deportations of foreign nationals have taken place in secret since then. Most of them were targeted for arrest because of their nationality and religion, held incommunicado for weeks or months and then expelled after interrogation.  No one is known to have been given the opportunity to challenge the government's decision before the courts or to seek legal assistance during whatever process the government followed in their expulsion.

When Amnesty International sought clarification of the reasons for the expulsions it was simply informed that they were "illegal residents".  However, the organization obtained details of some people who were deported even though their resident permits were valid, and the only reason for their deportation appears to have been connected with the government crackdown on Islamist groups and Islamic religious schools.

Amnesty International requested a list of all those deported together with the country to which they were sent, in order to follow their cases and seek assurances that they would not be subjected to torture and execution in the countries to which they were sent. The government failed to provide this information.  However, the deportees are known to have included nationals from Algeria, Egypt, Libya, Pakistan, Sudan, Saudi Arabia, Indonesia, Somalia, the US, UK and France.

In light of the secrecy surrounding these deportations and the human rights records of many of the countries to which the deportees have been sent, the organization remains concerned about the fate and whereabouts of those deported. In Saudi Arabia, for example, torture[8] and executions are grave concerns. In September

---

7 For analysis of the provisions of the Convention See Amnesty International's report, "The Arab Convention for the Suppression of Terrorism a serious threat to human rights", AI Index: IOR 51/001/2002.

8 For more details see Amnesty International's report "Saudi Arabia Remains a Fertile Ground for Torture with Impunity", AI Index: MDE 23/004/2002, May 2002. See also Amnesty International's report "Saudi Arabia: Defying world trends – Saudi Arabia's extensive use of capital punishment", AI

2002 the Saudi Arabian Minister of Interior announced that a group of Saudi Arabian nationals were handed over to his government by the Yemeni Government and that they were being detained and interrogated. He was quoted as having said that "we will announce the details about them at the appropriate time".[9] No information is known to have been released since then. Such detainees in Saudi Arabia are routinely denied access to lawyers, held without charge or trial, and when they are brought to trial this invariably takes place in secret and without any legal assistance.

Deportations are continuing. Recently, in July 2003, seven Saudi Arabian nationals were said to have been handed over to the Saudi Arabian Government. They were reportedly handed over in exchange for eight Yemeni nationals who had been detained in Saudi Arabia. Neither these seven nor those deported before them are known to have been offered any opportunity to exercise their right to seek asylum or oppose their extradition on the grounds of the risk of torture or execution.

Amnesty International delegates' attempts during their meetings with Yemeni government officials in February and August 2002 to establish the legal framework followed in the deportations shed no light on what processes were being applied nor how the rights of the deportees under international human rights standards were being protected. The Yemeni Government continues to deport foreign nationals with total disregard for its international obligations which include serious assessment of the risks of torture in the country to which a person may be deported. Article 3(2) of the Convention Against Torture requires that in assessing grounds for the risk of torture "…the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the state concerned of a consistent pattern of gross, flagrant or mass violations of human rights."

Following its examination of Yemen's report in July 2002, the UN Human Rights Committee, the expert body monitoring the implementation of the ICCPR, expressed "…concern about cases of expulsion of foreigners suspected of terrorism without an opportunity for them to legally challenge such measures. Such expulsions would, furthermore, be decided without taking into account the risks to the physical integrity and lives of the persons concerned in the country of destination".[10]

### 7. Harassment and detention of journalists

---

Index: MDE 23/015/2001, November 2001.
9 See for example Agence France Presse report of 11/9/2002.
10 See Concluding observations of the Human Rights Committee: Yemen. CCPR/CO/75. (26/07/2002). Para. 18.

Freedom of the press is guaranteed under the Yemeni Constitution.  In reality, however, the margin of freedom of the press is expanded and restricted in accordance with the political circumstances of the day. Seen in this context, freedom of journalists has narrowed in the wake of the 11 September events.

While the Constitution guarantees freedom of expression and thought[11], this is seriously undermined by operational laws, including penal laws, which facilitate the targeting of journalists and critics of state policy. Laws regulating freedom of expression such as Law 25 of 1990 relating to press and publications and the Penal Code, repeatedly qualify such freedom by the vaguely worded phrases of "...within the limits of the law" and for the interests of "national security". In addition to these restrictions which can be made to apply to any situation, freedom of expression is restricted by many other articles which can be equally open to interpretation. For example, Article 103 of Law 25 of 1990, lists 12 restrictions, one of which contains the prohibition of the publication of "...anything that leads to the propagation of ideas against the principles of the Yemeni Revolution or damage to national unity, or distorts the Yemeni heritage of Islamic and Arab civilization". The punishment for acts deemed to be contrary to the terms of this article is a fine of 10.000 Yemeni Riyals (about 40US$) or a maximum imprisonment of one year under Article 104 of the same law. The punishment could be even harsher if the charge is formulated under the Penal Code. For example, if the offence is deemed to amount to apostasy the punishment is death under Article 259 of the code.

The many legal restrictions imposed on freedom of opinion and expression have facilitated a pattern of harassment of journalists and critics of state policy. In September 2001, the Minister of State for Human Rights told the Union of Yemeni Journalists that "press freedom and human rights are two faces of one coin", yet two months later, eight editors of newspapers were summoned to appear before the West Sana'a Court to answer law suits against them. They included a case brought by the Ministry of Information against *al-Shura* newspaper for publishing excerpts from a novel which was deemed by the Ministry to be "inconsistent with the Islamic religion". The consequences suffered by different newspapers include fines, suspension, and continuing threat of imprisonment of editors or proprietors.

Security forces also target individual journalists in the form of warnings, threats, or even arrest and detention if their reporting or criticism is deemed to breach the many restrictions.  The events of 11 September have further narrowed the margin of governmental tolerance for journalists' freedom of expression. The detrimental

---

11 Article 42(3) of the Constitution states that: "Every citizen shall have the right to participate in political, economic, social and cultural life. The state shall guarantee freedom of thought and expression of opinion orally, in writing or in graphic form, within the limits of the law."

effect this has on the role of journalists was clearly visible to an Amnesty International delegation visiting Sana'a in February 2002. Many journalists told the delegation that they had refrained from documenting cases of the mass arrests after 11 September 2001 in Yemen and neighbouring countries for fear of being identified with the views of those arrested, and being subject to arrest themselves. Those who had written about the arrests told the delegation that they had been questioned or received warnings from members of the arresting authorities, particularly the Political Security.

Among those subjected to arrest and detention were Hassan al-Zaidi and Nabil al-Kumaim. Hassan al-Zaidi, a journalist with the weekly newspaper The Yemen Times, was arrested in the wake of the 11 September 2001 events by the Political Security and detained for up to three weeks because of an interview he had conducted with the leader of an Islamist group published in August 2001. He told Amnesty International that publication of his interview only became of interest to the security forces in the wake of 11 September 2001 and that this was the main reason for his arrest and detention. Nabil al-Kumaim, a Sana'a based Yemeni correspondent of the Qatari newspaper *al-Rayah*, was arrested on 29 April 2002 and detained for hours, at night, during which he was interrogated about his knowledge of *al-Qa'ida* organization in Yemen. His interrogation followed a news item in which he referred to a report by another newspaper claiming that members of *al-Qa'ida* were operative in the government security forces. Article 19 (2) of the ICCPR states that "Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice."

In July 2002, the UN Human Rights Committee expressed concern about legal restrictions on freedom of the press in Yemen and "about the difficulties encountered by journalists in the exercise of their profession particularly when criticisms of the authorities are expressed". The Committee called on the government to "ensure respect for the provisions of Article 19 of the Covenant".[12]

## 8. Civil society emerging from a climate of fear

One of the setbacks brought on by the events of 11 September and the subsequent sidelining of the rule of law was the negative impact on civil society and its role as

---

12 See Concluding observations of the Human Rights Committee: Yemen. CCPR/CO/75. (26/07/2002). Para. 21.

human rights protector. Mass arrests, detention and deportations, backed up by political discourse from the highest authorities of the government portraying those targeted by security forces as "terrorists", generated a climate of fear. This was heightened by a further fear felt widely in society, namely that of a possible US military attack or economic sanctions against the country. Faced with these fears, members of civil society felt that they had no option but to remain silent in the face of the onslaught on human rights by security forces.

This impact was felt by Amnesty International delegates who visited the country in February 2002. During their stay in Sana'a, delegates found that while people were being arrested, detained or deported by the hundreds, no one was coming forward to provide information, not even the relatives of those directly affected. This was a situation never previously encountered by Amnesty International in Yemen, not even during the civil war of 1994. Members of civil society had always been an asset for penetrating the walls of secrecy, which can create a fertile environment for human rights violations.

However, after months of silence, civil society began to regain its ground. Taking the lead in this regard has been the National Organization for the Defence of Rights and Freedoms, led by Yemeni lawyer and member of Parliament Mohammed Nagi Allow. It has provided a focal point for relatives of detainees, and has received much attention from the Yemeni press.

In solidarity with civil society, Amnesty International organized, in August 2002 in Sana'a, a public debate, entitled "Human Rights for All". Participants included human rights organizations, including women's rights groups, NGOs, journalists, writers and lawyers. The debate began with a panel discussion of the universality of human rights, and was attended by more than 130 people. Following presentations by panellists, participants raised questions about the detainees being held by the Yemeni authorities. Under what circumstances were individuals being held, had any charges been filed, when would detainees be charged, tried, or released? They raised the same questions about the status of Yemeni detainees held by the United States in Camp X-Ray, Guantánamo Bay, Cuba, and asserted that there should be no double standards. The debate was given extensive media coverage in Yemen and other Gulf countries.

This re-emergence of civil society began to generate pressure for the restoration of the rule of law. In September 2002, parliament set up a commission to look into the situation of the detainees. It has been the first and only civil authority to be given access to the detainees with the aim of investigating breaches of their rights.

The message of this re-emerging civil society is clearly that security cannot be purchased at the price of human rights.

## 9. Government justification and the role of the US

### 9.1. The Yemeni Government response

The Government of Yemen informed Amnesty International that it had "no option" but to continue the practice of detention without charge or trial of those held and to offer them no opportunity of access to lawyers or the judiciary to challenge the legality of their detention. The authorities argued that the primary reason for the arrests and detentions was the priority of security, not justice. They explained that the security risks which the detainees present for the government lies in their "extremist views" of Islam. Specifically, the government told Amnesty International that its plans were to change the "extremist views" of the detainees rather than to prosecute them and that it had already started a program of re-education. The government had formed a committee of Muslim scholars to engage them in discussion in order to change their views on issues such as *al-Jihad* (holy war) and people of other faiths. The authorities added that having them in detention made the government task easy to accomplish. In particular, the government elaborated its rationale and strategy as follows:

9.1.1    The war in Afghanistan presented Yemen with at least two real dangers for its security and stability. One was the fear that some elements from Islamist movements in Yemen might resort to violent actions, particularly against people from Western countries, in support of the Taliban. The other was the fear of US military action against Yemen because of the involvement of Yemeni nationals in the 11 September attacks on New York and Washington as well as media reports about the presence of suspected members of *al-Qa'ida* in Yemen. Confronted with these threats the Yemeni Government said it had to act to reassure the US Government with full cooperation against "terrorism", in order to avert US military action against Yemen.

9.1.2    After the 11 September events the international community called on its member nations to stand firm against "terrorism". The government said Yemen could not shirk its responsibility towards the international community. Yemen is not alone in adopting the measures it had taken. Countries in Europe and North America, have taken similar measures. Yemeni nationals living in

those countries had been subjected to arbitrary arrest and detention for no reason other than their nationality. Yemeni nationals studying in the US who have returned to Yemen during their vacation to visit their families have been denied visas to return to their studies.

While Amnesty International is well aware of the changes in the international political climate and the pressures brought on Yemen, particularly from the United States, it does not believe that this can be used by the government to justify human rights violations. On the contrary, Amnesty International believes that it is at times of harsh political realities that human rights need more, not less, protection. In the name of "security" children have been detained, peaceful dissent silenced, persons deported to countries where they would face torture or execution, and suspects subjected to indefinite detention without charge or trial and without access to lawyers and the judiciary.

The Yemeni Government was reminded of this danger by the UN Human Rights Committee upon examination of its report on compliance with the ICCPR: "While it understands the security requirements connected with the events of 11 September 2001, the Committee expresses its concern about the effects of this campaign on the human rights situation in Yemen, in relation to both nationals and foreigners. It is concerned, in this regard, at the attitude of the security forces, including the Political Security, proceeding to arrest and detain anyone suspected of links with terrorism, in violation of the guarantees set out in the Covenant (Article 9). The Committee also expresses its concern about cases of expulsion of foreigners suspected of terrorism without an opportunity for them to legally challenge such measures. Such expulsions would, furthermore, be decided without taking into account the risks to the physical integrity and lives of the persons concerned in the country of destination (Articles 6 and 7)".

The Committee went on to urge the government to "... ensure that the measures taken in the name of the campaign against terrorism are within the limits of Security Council resolution 1373 and are fully consistent with the provisions of the Covenant". It further requested the government to "ensure that the fear of terrorism does not become a source of abuse".[13] The UN Commission on Human Rights has affirmed that "States must ensure that any measure taken to combat terrorism complies with their obligations under international law, in particular international human rights, refugee and humanitarian law".[14]

13. See Concluding Observations of the Human Rights Committee: Yemen. CCPR/CO/75. (26/07/2002). Para. 18.
14 See Commission on Human Rights resolution 2003/68 adopted on 25 April 2003, Para. 3.

## 9.2. The role of the US

Yemen-US relations bear direct relevance to the deterioration of the human rights situation in Yemen since the 11 September 2001 events. In the wake of these events the two countries forged a special military and security cooperation. The impact of such cooperation on human rights is manifested in the practice of detention, training of Yemen security forces, and the possible extra-judicial killing of six men in November 2002 (see below).

The US government is holding scores of Yemeni nationals in Guantánamo Bay under conditions which are contrary to international human rights and humanitarian laws.[15]   Relatives of these detainees met by Amnesty International in Sana'a informed the organization that they had not received any clarification from the US Government or the Yemeni Government on the legal status or fate of the detainees. Amnesty International raised their cases with Yemeni officials, but they did not provide precise clarification on the legal process followed in these cases, nor on

---

15 Amnesty International's concerns on all the detainees held in Guantánamo Bay are that the US government has:

- transferred and held people in conditions that may amount to cruel, inhuman or degrading treatment, and that violate other minimum detention standards;
- refused to grant people in its custody access to legal counsel, including during questioning by US and other authorities;
- refused to grant people in its custody access to the courts to challenge the lawfulness of their detention;
- undermined the presumption of innocence through a pattern of public commentary on the presumed guilt of the people in its custody in Guantánamo Bay;
- failed to facilitate promptly  communications with or grant access to family members;
- undermined due process and extradition protections in cases of people taken into custody outside Afghanistan and transferred to Guantánamo Bay;
- threatened to conduct trials before military commissions – executive bodies lacking clear independence  from the executive and with the power to hand down death sentences, and without the right of appeal to an independent and impartial court;
- raised the prospect of indefinite detention without charge or trial, or continued detention after acquittal, or repatriation that may threaten the principle of *non-refoulement;*

For more detailed accounts of these concerns see Amnesty International's report, "United States of America: Memorandum to the US Government on the rights of people in US custody in Afghanistan and Guantánamo Bay", AI Index: AMR 51/053/2002, 15 April 2002 and "United States of America: The threat of a bad example: Undermining international standards as "war on terror" detentions continue", AI Index: AMR 51/114/2003, 19 August 2003.

family access and receipt of information about the fate of the detainees. These conditions of detention have been challenged by the Court of Appeal in the UK in a case involving Feroz Abbasi, UK national, held in Guantánamo Bay. In November 2002, the Court of Appeal, the second highest court in England and Wales, referred to Feroz Abbasi's detention in Guantánamo Bay as "in apparent contravention of fundamental principles recognized by both jurisdictions [US and UK] and by international law".[16]

As mentioned before, US security forces have been directly involved in the questioning of at least those held in connection with the USS Cole case. In addition, the Yemeni authorities have told Amnesty International that their plans to bring these detainees to trial were obstructed by the US authorities. The consequences for the detainees, most of whom have been held for almost three years, are that their right to legal assistance and access to the judiciary to challenge the legality of their detention have been and continue to be denied.

The training of Yemeni security forces by US security forces, has been acknowledged by the two governments. US Defense Secretary Donald H. Rumsfield told news reporters "we have some folks in that country that have been working with the government and helping them think through ways of doing things. It's been a good cooperation...".[17] Similarly, the Foreign Minister of Yemen is reported to have said that "...there is no security agreement with the US...but there is security cooperation in training and exchange of information ... and there are US trainers for the Special Forces and security forces (as well as) exchange of names, particularly these days."[18]

---

16 The Court of Appeal ruling came as a result of a judicial review, initiated by the mother of Feroz Abbasi, of a March 2002 decision of the High Court that had stated that UK courts had no jurisdiction to rule on her claim that the UK authorities had not been doing enough to ensure respect for the rights of UK nationals detained at Guantánamo Bay. In its November 2002 ruling the Court of Appeal dismissed his mother's claim for relief. Feroz Abbasi from Croydon is one of nine confirmed UK nationals, including Moazzam Begg from Birmingham, England, Asif Iqbal and Shafiq Rasul from Tipton, England, who remained in US military custody at Guantánamo Bay without charge or trial or access to the courts, lawyers or relatives. For more details on this ruling see Amnesty International Press Release, News Flash, "UK: Government must take action to protect UK nationals held in US custody at Guantánamo Bay", AI Index: EUR 45/023/2002, News Service No: 200, 6 November 2002 and Amnesty International's Media Briefing, "UK: Government must act now on behalf of Guantánamo detainees", AI Index: EUR 45/019/2003, News Service No 167, 11 July 2003.
17 Quoted in Associated Press report "U.S. Strike Six in Al Qaeda Missile Fired by Predator Drone; Key Figure in Yemen Among Dead", dated 5 November 2002.
18 See Parliamentary Special Commission of inquiry into the detainees held in connection with the attack on the USS Cole and 11 September 2001, dated 24 September 2002, P 11.

Concerned that transfers of military or police expertise or training must not contribute to human rights violations, Amnesty International sought clarification of this from the US authorities in a letter, dated 6 June 2003, addressed to the Secretary of State, Colin Powell (see section 10 below). Specifically, Amnesty International asked the following questions: Which Yemeni security forces are receiving such training and do they include the Political Security? Have individuals receiving training from the United States authorities been screened for previous involvement in human rights violations in accordance with Section 556 of US Public Law 107 – 105? What human rights provisions are included in the training programs?

In a letter addressed to Amnesty International, dated 11 July 2003, the US State Department acknowledged that "the U.S. has provided military training to Yemen's counter terrorism forces as part of our cooperative efforts in the global war on terrorism". It added that "no...funding or training is provided to any Yemeni security units for which there is credible evidence that they have committed gross violations of human rights". However, the letter did not give any details as to the security branches which received funding or training assistance and whether these included or excluded the Political Security. This branch of the arresting authorities remains the main perpetrator of human rights violations with impunity.

Perhaps the most visible indication for the disregard for human rights in the US-Yemen security cooperation is the killing of six men in the Governorate of Ma'rab on 3 November 2002. The six were driving in a car when they were blown up reportedly by a missile launched by a CIA-controlled Predator drone aircraft. The group were alleged to be suspected members of *al-Qa'ida* and included Ali Qa'id Sinan al-Harithi, a Yemeni national, allegedly a leading member in the organization.

Fearing that the six may have been victims of extrajudicial killing, Amnesty International sought urgent clarification of the circumstances surrounding the killing from the US and Yemeni governments. Amnesty International wrote to both governments, asking if the killings were carried out as a result of cooperation between the two governments or with the agreement or knowledge of the Yemeni government; whether any attempts were made to arrest the six; and what threat, if any, the suspects posed to security forces or others at the time of their killing. Amnesty International stated that if the attack was a deliberate killing, in lieu of arrest, in circumstances in which the men did not pose an immediate threat, the killings would amount to extrajudicial executions in violation of international human rights law.[19] Amnesty

---

19 See Amnesty International, Yemen/USA: government must not sanction extra-judicial executions, 8 November 2002 (AI Index: AMR 51/168/2002).

International called for an investigation of the killings and for anyone found responsible for any extrajudicial execution to be brought to justice.

Amnesty International has received no direct response from either government. However, the Yemeni government has since declared publicly that it had cooperated with the US Government. The Minister of Interior was reported on 19 November 2002 to have said that the "hunt for the group which ended in their deaths…took place in the context of security cooperation and coordination between Yemen and the United States to fight terrorism".[20] More recently the Yemeni President reiterated his government's role in the operation during an interview with *al-Jazeera* television. In reply to a question on how the US attacked the six he replied "in coordination with us…in coordination with us…" Concerning those killed he said "These are a harmful minority…They are corrupt on earth, they are playing with the national economy and seek to make the country a terrorist country…Let them go (die), three, four, or twenty five for the sake of the country…any traitor…anyone who puts the security of the country at risk let them go".[21] He made no reference to any attempt by the Yemeni or US governments to observe international human rights standards in carrying out this operation.

The US Government has disputed that the killings were extrajudicial executions. In response to the UN Special Rapporteur on extrajudicial, summary and arbitrary executions, the US Government disagreed that "military operations against enemy combatants could be regarded as extrajudicial executions", adding that the "conduct of a government in legitimate military operations, whether against *al-Qa'ida* operatives or any other legitimate military target, would be governed by the international law of armed conflict." It concluded that "enemy combatants may be attacked unless they have surrendered or are otherwise rendered hors de combat", and that any "*al-Qa'ida* terrorists who continue to plot attacks against the United States may be lawful subjects of armed attacks in appropriate circumstances". It stated that the mandate of the Special Rapporteur does not extend to "allegations stemming from any military operations conducted during the course of an armed conflict with *al-Qa'ida*", and that both the Special Rapporteur and the UN Commission on Human Rights lacked competence "to address issues of this nature arising under the law of armed conflict"[22].

---

20 Agence France Presse report dated 19 November 2002.

21 See *al-Jazeera* program "Without frontiers" (Bila Hudud), broadcast on 16 July 2003.

22 Letter dated 14 April 2003 from the Chief of Section, Political and Specialized Agencies, of the Permanent Mission of the United States of America to the United Nations Office at Geneva addressed to the Secretariat of the Commission on Human Rights. E/CN.4/2003/G/80, 22 April 2003.

In Amnesty International's view, it is not at all clear why the laws of war would apply to this situation. Under existing international humanitarian law, it is not possible to have an international armed conflict between a state on the one hand and a non-state actor on the other, should the armed group not form part of the armed forces of a Party to the Geneva Conventions. The Geneva Conventions apply to situations of "armed conflict which may arise between two or more of the High Contracting Parties".[23] There is no armed conflict between the US and Yemen, and the Yemeni Government clearly cooperated in the air strike. In addition, there is no internal armed conflict between the government of Yemen (with the support of US forces) and *al-Qa'ida*. Accordingly, the proper standards applicable to this situation were law enforcement standards according to which the US and Yemen should have cooperated to try to arrest these suspects rather than kill them.

The applicable law enforcement standards include the UN Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the UN Code of Conduct for Law Enforcement Officials. These set out clearly the limitations that apply to the use of force in situations of law enforcement, most specifically that firearms should only be used if lives are in danger and if no other means are available. Basic Principle 9 states "In any event, intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life." Principle 8 states "exceptional circumstances such as internal political instability or any other public emergency may not be invoked to justify any departure from these basic principles." Further, Principle 1 of the UN Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions states "Governments shall prohibit by law all extra-legal, arbitrary and summary executions and shall ensure that any such executions are recognized as offences under their criminal laws, and are punishable by appropriate penalties which take into account the seriousness of such offences. Exceptional circumstances including a state of war or threat of war, internal political instability or any other public emergency may not be invoked as a justification of such executions."

## 10. Amnesty International's approaches to the two governments

In its investigation of human rights violations in Yemen, Amnesty International approached both the Yemeni authorities and the US authorities for information and policy clarification with regard to the concerns detailed in this report. With regard to the Yemeni authorities the organization raised the following issues:

---

23 The exception is the case of armed groups fighting against colonial domination, which is not relevant to what the USA deems to be its "war on terror".

- Amnesty International asked the authorities for their reaction to the widespread claim that the Political Security was working very closely with the FBI in the mass arrests it had carried out and that this cooperation included the FBI involvement in the interrogation of detainees. The authorities, while stating that they were fully cooperating with the US in the fight against "terrorism", categorically denied the claim of the FBI being directly involved in the interrogation of detainees. However, the Parliamentary Special Commission of inquiry, the only civilian authority to have been granted access to the detainees so far, has claimed that it was told by those held in connection with the attack on the USS Cole that they were questioned by the FBI by questions put to them through Yemeni interrogators.[24] According to the Commission findings the US interrogators had warned the detainees of their right not to be questioned except in the presence of a lawyer and apparently offered to provide them with lawyers free of charge. The detainees were apparently forced by Yemeni interrogators to refuse the offer and were questioned by the US interrogators through their Yemeni interrogators, without legal assistance.

- Amnesty International sought access to the detainees, but this was not granted. In addition Amnesty International asked for the lists of detainees, together with details of the reasons for their arrest and the authority which ordered the arrest. Amnesty International was told that this was not possible because the list was constantly changing.

- Amnesty International communicated its concerns about the violations of the rights of those held by the US in Guantánamo Bay and sought clarification of any measures taken by the Yemeni Government to ensure that international human rights and humanitarian law are applied to its nationals detained there. The organization raised this issue in meetings with government officials on two occasions. The first occasion was in February 2002 when a government delegation was preparing to travel to Guantánamo Bay. Amnesty International asked if the terms of reference of the visit included looking into the rights of the detainees, and if so, whether the delegation would include lawyers and doctors. The organisation was told that the delegation was facing difficulties in obtaining permission from the US government and to add lawyers and doctors would complicate the matter even further. The second occasion was at the end of August 2002 after the visit by the Yemeni Government's delegation to

---

24 See Report of the Parliamentary Special Commission of Inquiry into detainees held in connection with the attack on the USS Cole and 11 September 2001, P13.

Guantánamo Bay. Amnesty International asked if the delegation had raised the issue of the detainees' rights, and requested a meeting with members of the delegation in Sana'a. Amnesty International received no clarification except that the delegation had taken medicines for the detainees, and no meeting was arranged.

Similarly, Amnesty International approached the US authorities through the US Embassy in Sana'a and its letter, dated 6 June 2003, addressed to the Secretary of State, Colin Powell, seeking clarification, in addition to the training program of Yemen security forces referred to above, of the following issues:

- In the period following 11 September 2001, many governments, including the United States Government, were concerned that the Yemen Political Security did not notify them of the arrest and detention of their nationals who were subsequently deported. The reasons behind the arrests were, according to various embassies in Sana'a, explained by the Political Security as having to do with their "being Muslims" or students of particular Islamic schools. In light of this fate befalling Yemeni citizens, what is the United States position on the Yemenis currently detained by the Political Security under circumstances that breach the rule of law and Yemen's international human rights obligations?

- Credible sources have informed Amnesty International that the widespread arrests and detention without charge or trial conducted by the Political Security in the wake of 11 September 2001 were prompted by United States pressure and that any inquiries as to the reason of such arrests should be directed to the United States Government. What has been the role of the United States Government in these arrests and the current detention of scores of people particularly in Sana'a, and what efforts have been made by the United States Government to ensure that officials in Yemen respect domestic and international human rights norms with regard to due process? What is the United States reaction to the public perception implicating it in the deterioration of the human rights situation in Yemen since 11 September 2001?

In its 11 July 2003 letter of reply to Amnesty International the US State Department stated that "In concert with partners in the war on terrorism, the Government of Yemen detained suspects accused of links to terrorism after the October 2000 attack on the USS Cole and after the September 11, 2001 attacks. Many detainees were subsequently released following investigation and some cases have begun moving towards trial". No further details about such trials were provided. The arrests referred to here are those detailed in the previous sections of this report which

were carried out without judicial supervision and the detainees were invariably subjected to lengthy incommunicado detention. Those who continue to be held are denied access to lawyers and the judiciary to challenge the legality of their detention. As mentioned before, the letter did not specify whether the Political Security has received training and funding assistance from the US. However, the letter added that "The 2002 Country Report on Human Rights Practices for Yemen notes U.S. concern regarding arbitrary arrests, prolonged detention without charges and pre-trial detainees, among other important issues. ...In order to address the remaining shortcomings addressed in the...Report, the U.S. will continue to provide direct assistance to bolster Yemeni judicial reform efforts, democratic development and human rights awareness by security forces". Amnesty International would welcome any initiatives to end the sidelining of the rule of law by restoring to the judiciary its rightful duty of upholding the rule of law.

## 11. Conclusion

Amnesty international is concerned that the Yemeni Government has sidelined the rule of law and its human rights obligations in the name of "fighting terrorism" and "national security". It has given the green light to the security forces, particularly the Political Security, to act with impunity in total disregard for the law and the role of the judiciary. Mass arbitrary arrest, detention, and deportations have taken place and continue to take place. More than 200 people, many of them arrested nearly two years ago, continue to be detained without charge or trial and denied access to lawyers or the courts to seek justice.

What is more disturbing about these human rights violations is that they are being carried out as a deliberate policy by the government. The rationale for this situation presented to Amnesty International by the authorities in Yemen was that the government had no option but to break its own laws and its international human rights obligations in order to "fight terrorism" and contain the risks of a US military attack against Yemen. Amnesty International believes that sacrificing human rights can never be the solution.

The government of Yemen cannot be exonerated for the human rights violations which have occurred and continue to occur in the country since 11 September 2001. However, Amnesty International believes that the US Government's security policy towards Yemen has also played a significant role in the deterioration of the human rights situation in the country. It has carried out apparent extrajudicial killings in Yemen. It has close security cooperation with Yemen security forces with no apparent consideration for the upholding of universal human rights. It is detaining scores of Yemeni nationals in Guantánamo Bay with total disregard of their

fundamental human rights, and has turned a blind eye to the similar practices carried out by the Yemeni authorities in their own country, as elsewhere.

Amnesty International recognises the duty of any state to bring to justice anyone suspected of recognizable criminal offences, but this should always be in line with international human rights standards. Amnesty International opposes unconditionally arbitrary arrest, indefinite detention without charge or trial or the imprisonment of people because of their political or religious views, their colour, ethnic origin, language or sex or other identity. The organization equally opposes torture, extra-judicial execution, the death penalty, and the forcible expulsion of anyone to any country where they would face serious human rights abuses including torture or execution. In this regard, Amnesty International calls on the Yemeni and US Governments to ensure that their security cooperation is not purchased at the expense of human rights and urge them to take immediate steps to restore the rule of law and the human rights of the detainees held both in Yemen and in Guantánamo Bay. Amnesty International urges the international community to bring pressure on the Governments of Yemen and the US to address the human rights violations documented in this report.

## 12.0. Recommendations

### 12.1 To the Government of Yemen

Amnesty International calls on the Yemeni authorities to:

12.1.1 Release immediately anyone held solely for the non-violent expression of their conscientiously held beliefs, as such detention is contrary to Article 9(1) of the ICCPR;

12.1.2 Ensure that all detainees held by the Political Security on criminal charges are given prompt access to judges in accordance with Article 9(3) of the ICCPR;

12.1.3 Ensure that all detainees are given prompt access to lawyers and to the judiciary to challenge the legality of their detention as recognised by Article 9(4) of the ICCPR;

12.1.4 Take immediate steps to ensure that arrest and detention are always carried under independent and impartial judicial supervision in order to protect suspects from being arrested and detained solely on the basis of their political, religious or other beliefs, ethnic origin, or other discriminatory basis such as the targeting of journalists for their criticism of the state;

12.1.5 Investigate allegations of torture and bring to justice anyone found responsible in accordance with Articles 12 and 13 of the Convention Against Torture.

Such investigations should be carried out by an independent and impartial body;

12.1.6 Halt the expulsion of foreign nationals to countries where they would face serious human rights violations such as torture or execution, and ensure that the rights of refugees and asylum seekers in accordance with, *inter alia*, Yemen's obligations under the 1951 Refugee Convention;

12.1.7 Implement recommendations by UN thematic mechanisms, and the Human Rights Committee.

## 12.2 To the Government of the US

Amnesty International calls on the US Government to:

12.2.1 Investigate the apparent extrajudicial killing on 3 November 2002 of six alleged suspected members of *al-Qa'ida*, and bring to justice anyone suspected of having been responsible for these killings;

12.2.2 Ensure that human rights standards are strictly adhered to in the cooperation between its security forces and those of Yemen, particularly in the arrest and questioning of detainees, and that such standards are also observed in their training programs for Yemeni forces;

12.2.3 Take immediate steps to restore the rights of Yemeni and other nationals held in Guantánamo Bay and urge the Yemeni Government to do likewise for those held under similar circumstances in Yemen.

## 12.3  To the international community

Amnesty International calls on the international community to:

12.3.1 Urge the Governments of Yemen and the US to implement the above recommendations.