APPROVED FOR PUBLIC FILING BY
THE CSO ON 1/16/07

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMER MOHAMMON, et al.** | ) |
| | ) |
| *Petitioners/Plaintiffs,* | ) |
| | ) |
| | ) |
| **v.** | ) **Civil Action No. 05-2386 (RBW)** |
| | ) |
| | ) |
| **GEORGE W. BUSH, et al.** | ) |
| | ) |
| *Respondents/Defendants.* | ) |

**REPLY MEMORANDUM IN SUPPORT OF PETITIONER'S
CONSOLIDATED MOTION FOR ORDER REQUIRING RESPONDENTS TO
PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 30 DAYS'
ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM
GUANTANAMO AND FOR FACTUAL RETURNS**

Since his arrest in February of 2002, Peitioner, Sharkawi Abda Ali Al-Haag, has been

imprisoned and tortured in Pakistan, Jordan, and Afghanistan. Mr. Al-Haag was transferred to

Guantanamo Bay, Cuba in August 2004 and has remained there since. Given his prior

experience, Mr. Al-Haag has reason to fear that he will be transferred into the custody of yet

another government for further illegal detention and torture without due process of law. He

therefore seeks 30-Day's advance notice of any removal from Guantanamo Bay so that he may

consult with counsel regarding his options prior to any transfer.

In addition, Mr. Al-Haag seeks the factual returns upon which Respondents have based

his detention. To date, Mr. Al-Haag's counsel have not been provided with any information

related to any Combatant Status Review Tribunal ("CSRT") or Administrative Review Board

("ARB") convened to consider Petitioner's status. Mr. Al-Haag's counsel must know the

circumstances surrounding his detention in order to represent him adequately and effectively.

Respondents' Opposition Briefs (dkt. nos. 261 ("Notice Opp.") and 262 ("Factual Return Opp.")) fail to provide any basis for this Court to deny the requested relief.[1]

## I.    ARGUMENT

### A.    The Military Commission Act Does Not Strip This Court of Jurisdiction.[2]

Respondents' arguments against both Mr. Al-Haag's motion for 30-days' advance notice and motion for factual returns focus on their contention that this Court has no jurisdiction to hear these motions as a result of the recent enactment of the Military Commissions Act of 2006 ("MCA").[3]  According to Respondents, what has been substituted for this Court's jurisdiction under 28 U.S.C. § 2241 is a new remedy in the United States Circuit Court said to be "exclusive" under the combined effect of the Detainee Treatment Act of 2005 ("DTA")[4] and the MCA. Respondents argue that Section 7 of the MCA strips this Court's jurisdiction.  Respondents cannot succeed in this argument because the new remedy is not the equivalent of the *habeas* remedy eliminated, and the attempted "jurisdiction strip" is void.  *See INS v. St. Cyr*, 533 U.S. 289, 305 (2001) (holding that statutory withdrawal of judicial authority to issue a *habeas* writ without an "adequate substitute" for such authority raises a "serious Suspension Clause" issue).

---

[1] Respondents filed two separate oppositions to Mr. Al-Haag's consolidated motion for 30-days' notice of transfer and for factual returns (dkt. Nos. 261 and 262). Mr. Al-Haag consolidates his reply to these oppositions here.

[2] This section of Petitioner's argument is based on "Reply Memorandum Supporting Request for 30-Days' Advance Notice of any Intended Removal of Petitioner from Guantanamo" filed by Petitioner Maher El Falsteny on November 28, 2006 (dkt. no. 219).

[3] This is said to follow from either the Detainee Treatment Act of 2005, Pub.L.No. 109-148, 119 Stat. 2680, 2739-44 ("DTA") or the MCA itself. *See* MCA, Pub. L. No. 109-366, 120 Stat. 2600. As both acts, according to Respondents, purport to remove this Court's jurisdiction and substitute a very limited review of the Combatant Status Review Tribunal ("CSRT") determinations in the Circuit on the "record" compiled at Guantanamo. Mr. Al-Haag treats those acts' effect as the same insofar as this Court's jurisdiction is concerned.

[4] The statutory provision cited here as the Detainee Treatment Act of 2005 was enacted as title X of the Department of Defense Appropriations Act of 2006, an Act the President signed into law on December 30, 2005. *See* Pub. L. 109-148, §§ 1001-1006, 119 Stat. 2739-44 (2005). Six days later, Congress passed and the President signed into law the National Defense Authorization Act For Fiscal Year 2006, title XIV of which contains a nearly identical version of the Detainee Treatment Act. *See* Pub. L. 109-163, §§ 1401-1406, 119 Stat 3163, 3474-80. References made herein to the Detainee Treatment Act are intended as references to title X of Public Law 109-148.

The Suspension Clause, U.S. Const. art. I, § 9, cl. 2, guarantees that, unless Congress *validly* acts to suspend the writ, which would issue to test the legality of Executive detention, the writ must remain available. Since neither of the preconditions of a valid suspension—domestic rebellion or invasion—are present here, there can be no valid suspension and Section 2241 remains intact, because the *in lieu* Circuit remedy is not the equivalent of the *habeas* remedy eliminated. Moreover, the jurisdiction strip does not apply to pending cases as an initial matter, and thus even if the jurisdiction strip were valid, it would not apply to Mr. Al-Haag's case.

### 1. The Jurisdiction Stripping Provisions of the MCA Do Not Apply to This *Habeas* Petition.

Under familiar canons of statutory construction, this Court should avoid a construction of the MCA that presents troubling constitutional questions. In *Hamdan v. Rumsfeld*, the Supreme Court faced a similar question regarding the application of the DTA to pending cases. *See* 126 S. Ct. 2749 (2006). Applying "[o]rdinary principles of statutory construction," the Court concluded that the DTA did not divest the federal courts of jurisdiction over Hamdan's *habeas* challenge. *Id.* at 2764, 2765-69. Because the jurisdictional provision of the MCA's Section 7 follows the same pattern seen in the DTA, those principles of statutory construction lead to the same result when applied to the MCA.

Section 7(a) of the MCA adds a new subsection (e) to 28 U.S.C. § 2241, the relevant federal habeas statute:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents <u>relating to any aspect of the detention, transfer, treatment, trial,</u>

> or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

MCA § 7(a) (emphasis added); 28 U.S.C. § 2241(e). Subpart (1) divests courts of jurisdiction over *habeas* applications filed by aliens determined to be enemy combatants, or waiting such determination. Subpart (2) divests courts of jurisdiction, except as preserved in the DTA, over any other actions "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien" determined to be an enemy combatant, or awaiting such determination.

Section 7(b) of the MCA provides:

> (b) EFFECTIVE DATE—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

MCA § 7(b) (emphasis added). Thus, Section 7(a) takes effect on the date of enactment (which was October 17, 2006) and applies to "all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien detained by the United States since September 11, 2001." *Id.*

Significantly, however, Section 7(b) does not expressly refer to *habeas* cases pending on the state of enactment. Instead, the language of Section 7(b) tracks, virtually word for word, the language used in Section 2241(e)(2) to refer to "other actions" relating to "detention, transfer, treatment, trial, or conditions of confinement"—specifically actions other than *habeas* actions, which are addressed in Section 2241(e)(1). In determining that similar jurisdictional provisions of the DTA did not apply to the case before it because the case was pending on the DTA's

enactment date, the Supreme Court relied on a "negative inference [that] may be drawn from the exclusion of language from one statutory provision [when that language] is included in other provisions of the same statute." *Hamdan*, 126 S. Ct. at 2765 (citations omitted). Here, the same negative inference may be drawn from the absence of any express reference to a pending *habeas* application in Section 7(b), in contrast to Section 7(b)'s use of exactly the same terms as Section 2241(e)(2) to identify the cases to which it applies. This demonstrates that the pending cases to which the new statute is intended to apply are precisely those described in Section 2241(e)(2), and therefore it is not intended to apply to *habeas* actions like the present one brought by Mr. Al-Haag.

Section 7(b) could apply to pending *habeas* cases only if *habeas* actions are included within the category of cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention." But if *habeas* cases are included in that language of Section 7(b), there would have been no reason for Congress to add a new subsection (e)(1) to Section 2241 dealing separately with *habeas* cases—they would have been covered by the language of subsection (e)(2). Thus, construing Section 7(b) to include *habeas* cases renders subsection (e)(1) superfluous, violating the principle that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted). Subsection (e)(1) is necessary and has independent meaning only if Section 7(b) does not refer to *habeas* cases. But if Section 7(b) does not refer to *habeas* cases, then the jurisdiction stripping provision in (e)(1) does not apply to pending *habeas* cases such as this one. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994) (statutes "will not be construed to have retroactive effect unless their language requires this result") (internal quotes and citations omitted).

The Supreme Court's "longstanding rule requiring a clear statement of congressional intent to repeal *habeas*," *St. Cyr*, 533 U.S. at 298, also militates strongly against an interpretation of the MCA that strips the Court of jurisdiction over this case. Moreover, as in *St. Cyr*, this clear statement requirement is reinforced by an additional canon of construction, namely, the principle that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [the court is] obligated to construe the statute to avoid such problems." 533 U.S. at 299-300 (internal quotes and citation omitted). Here, Respondents' contention that the MCA strips the Court of *habeas* jurisdiction raises serious constitutional problems, which can easily be avoided by the same rules of statutory construction the Supreme Court employed in *Hamdan*, 126 S. Ct. at 2765-69.

It follows that the MCA does not, as a textual matter, apply to deprive this Court of *habeas* jurisdiction as urged by Respondents.

**2.      The MCA Is Unconstitutional If It Eliminates Mr. Al-Haag's Ability to Seek *Habeas*.**

Even if the language of the MCA was effective to strip this Court of jurisdiction over Mr. Al-Haag's *habeas* claim, the MCA is unconstitutional and thus cannot form the basis for this Court to deny Mr. Al-Haag's motion.

**a.      The *Habeas Corpus* Remedy as of the Adoption of the Constitution**

The Founders ensured that the availability of the writ was not dependent upon executive or legislative grace. *See St. Cyr*, 533 U.S. at 304 n.24 (the Suspension Clause "was intended to preclude any possibility that the privilege itself would be lost by either the inaction or the action of Congress") (internal quotes omitted). Thus, the constitutional right to *habeas* relief exists even in the absence of statutory authorization, and may be suspended only by explicit

congressional action under strictly limited conditions. *See Johnson v. Eisentrager*, 339 U.S. 763,

767-68 (1950) (assuming that, in absence of a statutory right of *habeas*, petitioners could seek

the writ directly under the Constitution to the extent their claims fell within the scope of *habeas*

protected by the Suspension Clause).

*Habeas corpus* has long provided a vehicle for a searching factual and legal inquiry into

the basis for a prisoner's detention.[5] This basic purpose of the writ crystallized in the response to

*Darnel's Case*, 3 How. St. Tr. 1 (K.B. 1627). There, the king had indefinitely detained suspected

enemies of state based solely upon his "special command," *id.* at 37, and sought to block any

inquiry into the factual and legal basis for their confinement. When the court upheld the Crown,

it sparked a constitutional crisis that firmly established *habeas* as the pre-eminent safeguard of

common law process and personal liberty with the enactment of the Petition of Right, 3 Car. 1,

c.1 (1628); the Habeas Corpus Act of 1641, 16 Car. 1, c.10 (1641); and the Habeas Corpus Act

of 1679, 31 Car.2, c.2 (1679). By the late 1600s, *habeas corpus* had become, and would remain,

"the great and efficacious writ, in all manners of illegal confinement," 3 William Blackstone,

Commentaries *131, and the most "effective remedy for executive detention," Dallin H. Oaks,

*Legal History in the High Court—Habeas Corpus*, 64 Mich. L. Rev. 451, 460 (1966).

At common law, *habeas* courts did not simply accept the government's return to a

prisoner's petition; rather, they often probed the return and examined additional evidence

submitted by both sides to ensure the factual and legal sufficiency of the commitment. *See, e.g.*,

*Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778) (judges temporarily discharge impressed

sailor, refusing to "shut their eyes" to facts in petitioner's affidavits showing he was legally

exempt from impressments); *R. v. Delaval*, 97 Eng. Rep. 913, 915 (K.B. 1763) (scrutinizing

---

[5] Mr. Al-Haag lays out the history of the writ as it existed in 1789 and was known to the framers of the Constitution.

affidavits and concluding that a girl had been fraudulently indentured as an apprentice and was being misused as a prostitute); *R. v. Turlington*, 97 Eng. Rep. 741, 741 (K.B. 1761) (discharging a woman from "mad-house" after ordering medical inspection, reviewing a doctor's affidavit, and inspecting women who "appeared to be absolutely free from the least appearance of insanity"); *Eleanor Archer's Case* 1701, Lincoln's Inn, MS Misc. 713, p.164 (K.B. 1701) (Holt C.J.) ("court upon oath examined [woman]" to assess claim of mistreatment by her father); *Barney's Case*, 87 Eng. Rep.683 (K.B. 1701) (allowing bail after affidavits proved malicious prosecution); *R. v. Lee*, 83 Eng. Rep. 482, 482 (K.B. 1676) (reviewing affidavits to adjudicate a wife's assertion of "ill usage, imprisonment and danger of her life" by her husband); *see also Goldswain's Case*, 96 Eng. Rep. at 712 (Gould, J.) ("I do not conceive, that either the Court or the party are concluded by the return of a *habeas corpus*, but may plead to it any special matter necessary to regain his liberty"); *Bushell's Case*, 124 Eng. Rep. 1006, 1010 (C.P. 1670) (Vaughan, C.J.) (deeming a return insufficient because it lacked "full and manifest" evidence necessary to sustain commitment); *see generally, e.g.*, R.J. Sharp, *The Law of Habeas Corpus* 66-68 (1989) (citing *habeas* cases involving factual inquiries); *Oaks, supra*, at 454 n.20 (observing that the instances where *habeas* courts conducted fact-finding in non-criminal cases are "sufficiently comprehensive to include most . . . cases").

Indeed, before the Constitution was adopted it was well established that alleged enemy aliens could use the writ to challenge the factual basis of their commitment to ensure that the commitment was within the bounds prescribed by law. *Three Spanish Sailors' Case*, 96 Eng. Rep 775 (C.P. 1779) (examining affidavit detailing facts supporting petitioners' release, but concluding that, "upon their own showing," they are alien enemies); *accord R. v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759).

Further, *habeas* courts exercised broad equitable powers to fashion remedies as the circumstances required. *See, e.g., Earl of Aylesbury's Case*, Harv. L. Sch. MS 1071, fol. 52 (K.B. 1696) (bailing prisoner suspected of treason because it was "just and reasonable" to do so, and "within [the court's] power by the common law").[6]

The very essence of *habeas*—its substance—was, and remains, a searching inquiry by neutral judges into the factual and legal validity of the jailer's proffered justification for the detention. And, to the extent that the lawfulness of the detention turned upon disputed issues of fact, the courts conducted adversary hearings in which the parties presented evidence for courtroom examination. It was these broad equitable features, not the technicalities of pleading, that made the Great Writ of Liberty so fundamental.

### b.    The Writ as Developed In the United States

The Supreme Court has described *habeas corpus* as "a writ antecedent to statute, . . . throwing its roots deep into the genius of our common law." *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (internal quotation marks omitted; alterations in original). "It was brought to America by the colonists, and claimed as among the immemorial rights descended to them from their

---

[6] The occasional general statement that at common law the petitioner could not controvert the truth of a return to a *habeas* petition must be read in the specific context in which it was made: criminal cases. Rollin C. Hurd, *A Treatise on the Right of Personal Liberty, and on the Writ of Habeas Corpus* 270-71 (2d ed. 1876) (hereinafter "Hurd"). The reason is simple: in criminal cases, the prisoner either had already been convicted at a trial that provided full common law process, including the opportunity to confront and cross-examine any witnesses against him, *Crawford v. Washington*, 541 U.S. 36, 49 (2004), or was confined pending such trial, in which case *habeas* guaranteed that he would receive that process without delay. *Habeas Corpus* Act of 1679, 31 Car. 2, c.2, § 7 (1679) (securing right to speedy trial); *see also Hurd* at 266 ("It was the hateful oppressiveness of long and close confinement, and not the dread of a trial by his peers, which made the suffering prisoner of state exclaim: 'The writ of *habeas corpus* is the water of life to revive from the death of imprisonment'") (emphasis omitted). By contrast, in non-criminal cases, including and especially cases of executive detention without trial, the *habeas* court itself supplied common law process by undertaking a factual inquiry into the basis of detention in the first instance.

ancestors . . . this great writ found prominent sanction in the Constitution." *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 95 (1868).

The negative phraseology of the Suspension Clause itself reflects the Framers' understanding that the privilege of the writ of *habeas corpus* is not something for Congress to give. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl.2. The limits on this authority to suspend the Great Writ is justly hailed as the "highest safeguard of liberty," *Smith v. Bennett*, 365 U.S. 708, 712 (1961), and is a momentous step. The Supreme Court has reiterated its hesitation to conclude that Congress has exercised its authority to suspend the Great Writ. *See St. Cyr*, 533 U.S. at 305 ("[A] serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise."); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 101 (1807) ("[u]ntil the legislative will [to suspend the writ] be expressed, this court can only see its duty" to issue the writ). Congress, too, has historically been extremely sparing in its exercise of the suspension power, acting to suspend the writ on only four prior occasions, when the country was facing actual or imminent hostilities on its territory. *See* Thomas C. O'Bryant, *The Great Unobtainable Writ: Indigent Pro Se Litigation After the Antiterrorism and Effective Death Penalty Act of 1996*, 41 Harv. C.R.-C.L. L. Rev. 299, 302 n.18 (Summer 2006); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 562-63 (2004).

If Respondents are correct about Congress' intent to eliminate the writ for prisoners at Guantanamo, the Court must address the validity of the suspension. In determining the validity of an attempt to suspend the writ, the Court must examine if the alternative provided by

Congress *in lieu* of *habeas* is the equivalent of *habeas*. Although today the writ is most frequently employed as a post-conviction collateral remedy for an unlawful criminal conviction, its "historical core" served "as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Rasul*, 542 U.S. at 474 (quoting *St. Cyr*, 533 U.S. at 301); *Swain v Pressley*, 430 U.S. 372, 386 (1977) (Burger, C.J., concurring) ("[T]he traditional Great Writ was largely a remedy against executive detention"). From its earliest *habeas corpus* cases, the Supreme Court has made clear that the writ should issue for the benefit of a petitioner who challenges the Executive's authority to bring him to trial, even before a final conviction at such a trial. Thus, in *Bollman* and *Ex parte Burford*, 7 U.S. (3 Cranch) 448 (1806), the Court issued the writ for the benefit of prisoners who contended that the government had an inadequate basis to detain them for criminal proceedings. *See also United States v. Hamilton*, 3 U.S. (3 Dall.) 17 (1795)). Here, the importance of the writ to the Petitioner is even more clear because the government has given no indication that it intends to bring him, or the vast majority of the men imprisoned at Guantanamo, to trial. Similarly, in *United States v. Villato*, 2 U.S. (2 Dall.) 370 (C.C.D. Pa. 1797), the defendant, committed by the district judge on charge of high treason, persuaded the court that he had never been validly naturalized and therefore could not be prosecuted for treason for acts committed abroad.

These decisions were reaffirmed after the Civil War. In *Ex parte Yerger*, the Supreme Court held that it had jurisdiction to issue the writ to determine whether Yerger's impending trial by a military commission was lawful. *See Ex Parte Yerger*, 75 U.S. (8 Wall.) 85, 106 (1868); *see also id*. at 101-02 (noting that the writ extends to cases in which a petitioner was awaiting trial before a court of the United States). The Court expressed no doubt that, if Yerger had (as he claimed) a right not to be tried by the military commission, he was entitled to release from the

custody of the commission.  The petitioner in *Ex parte McCardle*, 74 U.S. (7 Wall.) 506 (1868), was in the same position; he brought a pre-conviction *habeas* petition challenging the constitutionality of his military detention.  Although the Court ultimately ruled in *McCardle* that it lacked jurisdiction over the petitioner's appeal from the circuit court's decision to remand him to military custody, the Court expressed no doubt that the circuit court could have issued a writ to prevent the petitioner's trial by a military commission, had the petitioner established a right not to be so tried. *See id.* at 515.

These decisions also establish that, when a *habeas* petitioner challenges the authority or jurisdiction of the body that lays claim to try or detain him, the petitioner is entitled to be heard on the merits of that challenge even before any contemplated trial is completed.  Here, Mr. Al-Haag contends, in essence, that he has a right not to be classified by the Combatant Status Review Tribunal ("CSRT") process, which he challenges as violating due process, that the military authorities, acting under the direction of the President, have convened.  In addition, he seeks a hearing on whether his detention is lawful.  If the writ were completely unavailable to challenge this procedure, the right not to be classified by an entity with no authority over the petitioner would become a nullity.

In assessing the suspension question, the Court may wish to consider the view of Kenneth Starr, former Solicitor General, Circuit Court judge, and Independent Counsel.  In the debates on the MCA, Mr. Starr wrote a one page letter to Senator Specter succinctly establishing the invalidity of the jurisdiction-stripping provision that Respondents rely on here.  Letter from Kenneth Star to Sen. Arlen Specter, Chairman, Senate Judiciary Committee (Sept. 24, 2006) (attached as Exhibit A).  Mr. Starr concluded with respect to Guantanamo prisoners, citing Article I, Section 9, Clause 2, that "[t]he United States is neither in a state of rebellion nor

invasion. Consequently, it would [be] problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events." *Id.*

The opposing view seems to have been based on the idea that prisoners at Guantanamo have no constitutional rights so that their *habeas* rights cannot be suspended, as they have none. Mr. Starr addressed this point in observing that as to Guantanamo, *Rasul*, not *Eisentrager*, was good law. *Id.* There are, Mr. Al- Haag submits, five Supreme Court votes for the proposition that Guantanamo is within the jurisdiction of the United States for constitutional purposes, not just statutory analysis. It follows that Mr. Al-Haag has constitutional rights and the suspension question cannot be brushed aside as Respondents urge.

c.    The *In Lieu* Remedy Is Not the Equivalent of the Writ

Under the DTA and MCA, a prisoner's entitlement to judicial review of the legality of his detention is entirely predicated on the government's decision to institute proceedings against him, either in the form of a CSRT or military commission. See DTA § 1005(e)(2); MCA § 7(a). If the government simply does nothing, the detainee has no means of challenging the legality of his detention. Naturally, this provides an incentive for the government to delay, or not institute proceedings at all, which would effectively deprive detainees of any judicial forum. This is simple despotism.

Further, as Judge Green has already found, the CSRT procedures are deficient in at least three respects. *In Re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). First, Judge Green noted the general defect in all CSRT proceedings, namely the failure to provide detainees access to material evidence on which their "enemy combatant" status was affirmed and the failure to permit assistance of counsel. *Id.* at 468-72. Next, she identified reliance on statements obtained by torture or other coercive measures as a grotesque shortcoming of the

CSRT procedures. *Id*. at 472-74. Finally, she observed the overly broad definition of "enemy combatant" was problematic. *Id*. at 474-77. Each of these defects in the CSRT proceedings affect Mr. Al-Haag here, and Judge Green found each to be of constitutional significance. *See id*. at 468-78. We do not repeat her findings in detail but suffice it to say those findings indicate the CSRT proceedings deviated markedly from a fair fact-finding procedure such as the one *habeas* entails, and the review provided by the DTA in the Circuit would not allow challenges to the composition and function of the CSRTs themselves.

None of the infirmities inherent in the CSRT process that Judge Green identified can be pressed before the Court of Appeals. Rather, that review is limited to:

> (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence) . . . .

DTA § 1005(e)(2)(C)(i).

This amounts to saying that review is limited to determining if the CSRT has followed its own deeply flawed rules. Even if the government promptly conducts a CSRT to make a status determination, the DTA does not permit the Circuit Court to engage in the sort of factual inquiry that has long been available via *habeas*. Section 1005(e)(2) does not allow petitioners to engage in discovery (including discovery into whether evidence against them was obtained by coercion), "traverse" the return, or obtain a hearing, as provided by 28 U.S.C. §§ 2243-2248.

Thus in no sense is the Circuit remedy provided *in lieu of habeas* the equivalent of *habeas*. This Court should find that it has jurisdiction over Mr. Al-Haag's *habeas* claim, jurisdiction to require Respondents' production of a factual return, and jurisdiction to require

Respondents to provide Mr. Al-Haag's counsel and this Court with 30-Days' advance notice of any intended removal of Mr. Al-Haag from Guantanamo.

### B.    Ordering a Factual Return Would Be Appropriate[7]

Aside from the jurisdictional challenge just addressed, Respondents argue Mr. Al-Haag's motion for production of his factual return should be denied (1) as precluded by the stay in this action, and (2) as overly burdensome. These latter two challenges fair no better than the first.

### 1.    The Stay Does Not Preclude Court from Requiring Production of Factual Return

Respondents incorrectly attempt to categorize Mr. Al-Haag's request for factual returns as attempting to proceed on the merits of this case. *See* Factual Return Opp. at pp. 1, 5. In fact, Mr. Al-Haag's request was made to ensure that timely and meaningful communication between Petitioner and counsel can occur. In *Al-Anazi v. Bush*, 05-CV-0345, Judge Bates stated that "the factual returns appear necessary for petitioners' counsel effectively to represent petitioners. Indeed, even initial conversations by counsel with their clients may be very difficult without access to that basic factual information." 370 F.Supp 2d 188, 200 (D.D.C. 2005). Such communication has already been made extraordinarily difficult given the logistical challenges and limitations placed upon Petitioner by Respondents in meeting and corresponding with counsel—the absence of this basic factual information needlessly imposes yet another hurdle to Mr. Al-Haag's representation. Just because a stay is in place does not mean that all activity, especially attorney-client communication and investigative measures, should cease. Mr. Al-Haag's Consolidated Motion cites to numerous other decisions by Judges of this Court ordering

---

[7] Parts of this section track language from "Reply Memorandum In Support of Petitioner's Motion for Order Requiring Respondents to Provide Factual Returns" filed by Petitioner Maher El Falsteny on November 30, 2006 (dkt. No. 223).

the production of factual returns despite the stay.  *See* Consolidated Motion at pp. 9-10 (D.D.C. Dec. 14, 2006) (Notice of Filing dkt. No. 241).[8]

Moreover, Respondents claim that the stay in this action was entered "pending the jurisdictional ruling" of the District of Columbia Circuit in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) and *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005).[9] *See* Respondents Factual Return Opposition at p. 5.  These cases, however, deal with the issue of the District Court's power to frame relief in *habeas* actions as to prisoners held at Guantanamo. The Supreme Court in *Hamdan* settled that question.  *Hamdan* framed its relief in the *habeas* context.  The pendency of these appeals, then, no longer affords the slightest justification for continuing the stay.  Because *Hamdan* resolved the critical issues in those cases and because the *habeas* statute contemplates a prompt hearing, *see* 28 U.S.C. § 2243, the justification for the stay is no longer present and it should not be a barrier to ordering factual returns.

### 2.    Burden On Respondents Would be Trivial

Respondents also argue this Court should deny Mr. Al-Haag's motion due to the "logistical burdens" associated with the production of factual returns.  *See* Respondents Factual Return Opp. at p. 6.  Respondents provide little factual support for this contention—no affidavit, no documentary evidence, no testimony—and the court should reject it out of hand.  There are numerous examples of the short time frames in which Respondents have produced factual returns.  For example, in *Said v. Bush*, Respondents produced four separate factual returns within ten days of an order.  *See Said*, No. 05-2384 (D.D.C. May 23, 2006) (dkt. no. 24).  In *Abdullah v. Bush*, Respondents produced factual returns within a seven-day time frame.  *See Abdullah*, No

---

[8] Weeks after it was filed, and long after Respondents' Opposition was publicly filed, Mr. Al-Haag's Consolidated Motion has not yet been approved by the Court Security Officer for public filing.

[9] On appeal these cases are titled *Al Odah v. United States*, No. 05-5064, and *Boumediene v. Bush*, No. 05-5062.

05-023 (D.D.C. Apr. 8, 2005) (dkt. no. 24).  As discussed below, just over a month ago

Respondents produced factual returns within twenty days of Judge Roberts' Order.  *See* Order,

*Feghoul v. Bush*, No. 06-0618 (D.D.C. Oct. 31, 2006) (Roberts, J.).  Respondents' argument is

merely an explanation of the process by which factual returns are produced, with unsupported

claims that the process is time consuming and burdensome.  Additionally, the burdens

Respondents recite in their opposition are the same burdens that this Court has already rejected.[10]

*See id.*

Respondents undoubtedly possess documents, and have other evidence, that go directly to

the question of Petitioner's detention.  Turning over documents in Respondents' possession

should not be difficult:  all such documents are, at most, five years old, all should be in electronic

form or readily searchable.  Counsel for Mr. Al-Haag have security clearances at the appropriate

levels.  Indeed, much of the information sought is the sort that Respondents have provided to the

news media.  For example, reporters were allowed to witness CSRT proceedings for many

prisoners.  *See* Kathleen T. Rhem, *Reporters Offered Look Inside Combatant Status Review*

*Tribunals, American Forces Information Service*, American Forces Information Service, Aug.

29, 2004 (attached as Exhibit B).  For Respondents to now argue that such information should

not be provided to counsel is remarkable.

Other judges have ordered the production of factual returns even after the DTA and the

MCA.  Indeed, on October 31, 2006, just two weeks after the passage of the MCA, this Court

ordered Respondents to produce factual returns.  *See Feghoul* Order.  This order demonstrates

---

[10] With respect to this issue, Respondent's opposition in *Feghoul* is virtually identical to the opposition submitted in
this case.

that issues concerning the MCA pending before the Court of Appeals have no bearing on an order to produce factual returns.

In its order, the Court noted that the Respondents did not dispute petitioner's basic right "to notice of the factual basis for his detention," but instead disputed the court's jurisdiction, just as Respondents do here. *Id.* Furthermore, the Court stated that it was "hardly sensible to withhold or frustrate something that no one doubts is petitioner's right—meaningful communication with counsel regarding the factual basis of petitioner's detention." *Id.* Petitioner here requests the same relief on the same grounds. This Court should reject Respondents unsupported contentions and order the production of a factual return.

### C. An Order Requiring 30-Days' Advance Notice of Intended Removal is Appropriate.[11]

Petitioners array three central challenges to Mr. Al Haag's motion seeking 30 days' advance notice of removal from Guantanamo: (1) The MCA and DTA deprive this Court of jurisdiction to hear Mr. Al-Haag's motion; (2) Mr. Al-Haag cannot show irreparable harm; and (3) the doctrine of separation of powers and/or judicial non-inquiry prevents the Court from granting relief. The jurisdictional challenge was exposed as baseless above. We now turn to address Petitioner's equally baseless irreparable harm and separation of powers challenges.

#### 1.    Irreparable Injury

There is ample evidence both that Mr. Al-Haag is (1) subject to a very real risk of being rendered into the custody of a foreign government for further, indefinite detention without

---

[11] Parts of this section are based on "Reply Memorandum Supporting Request for 30-Days' Advance Notice of any Intended Removal of Petitioner from Guantanamo" filed by Petitioner Maher El Falsteny on November 28, 2006 (dkt. no. 219), as well as from "Reply Memorandum in Support of Motion for Thirty Days' Advance Notice of Any Intended Removal of Petitioner Sharaf Al Sanani from Guantanamo" filed by Petitioner Sharaf Al Sanini on December 20, 2006 (dkt. no. 250).

charges, and (2) that he may be removed to a country that is recognized by the U.S. Department of State as routinely engaging in torture.

Respondents argue that Mr. Al-Haag's claim that he stands to suffer irreparable harm if his motion for advance notice is denied is based on "speculation and incredible accusations" that are "contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials." Notice Opp. At 13. In making this claim, Respondents ignore the facts laid out in Mr. Al-Haag's motion detailing the torture he has *already* endured in Pakistan, Jordan, and Afghanistan since his arrest in 2002. Moreover, Respondents continue to rely upon out-dated declarations prepared in 2005 by then-Ambassador Pierre-Richard Prosper and then-Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman. *See* Notice Opp. Exhibits 1-2. The data offered in these declarations regarding the number of detainees removed or transferred from Guantanamo--and their destinations--is no longer reliable. As of December 17, 2006, more than 380 detainees have been removed from Guantanamo, 114 in 2006 alone. *See* DoD News Release dated December 17, 2006 (copy attached as Exhibit C). On that date, the Government announced that it had transferred seven detainees to Afghanistan, five detainees to Yemen, three detainees to Kazakhstan, one detainee to Libya, and one detainee to Bangladesh. *Id.* In contrast to the discrete list of transferee countries identified in the 2005 declarations, detainees have now been transferred to Albania, Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Libya, Maldives, Sudan, Tajikistan, Turkey, Uganda, and Yemen. *Id.* The Department of States most recent report on Human Rights Practices (available at http://www.state.gov/g/drl/rls/hrrpt/2005/index.htm) identifies the majority of these countries as engaging in torture.

As a citizen of Yemen, Mr. Al-Haag wishes to be released to his home country. However, Mr. Al-Haag seeks advance notice of *any* removal from Guantanamo so that he can benefit from advice of counsel with respect to the circumstances or conditions of the removal and the options available to him.

It is the height of formalism to argue that a transfer is a release from custody and therefore cannot be a form of irreparable injury. If the Respondents procure the incarceration of Mr. Al-Haag as a term of their "release," or "release" him to a country the U.S. Department of State reports to openly practice torture, it is difficult to follow Respondents argument that such "release" would "give petitioner all the relief he can seek through *habeas*." It is precisely such terms which must remain subject to judicial scrutiny.

Giving Mr. Al-Haag notice of any intended transfer will allow him to consult with counsel regarding his rights and options relating to any eminent investigation, detention, or prosecution in the state to which he is to be removed. Such notice will also provide Mr. Al-Haag an opportunity to consult with counsel and evaluate and address, if necessary, torture concerns at any specified location where he might be removed.

### 2.    No Harm to Respondents

By contrast, Respondents fail to demonstrate that the requested notice would cause them any cognizable harm. This Court may lift or modify an injunction if the Respondents can demonstrate a justification for doing so, and the only effect that an injunction would have in this case would be to permit Mr. Al-Haag to challenge a transfer, and prevent the possible loss of this Court's jurisdiction, before that transfer takes place. Many counsel have been advised of an

impending transfer and, at the direction of the client, have interposed no objection. This has posed absolutely no burden on Respondents whatever. And they do not aver that it has.

Nor is there any legitimate fear of "disclosure" of confidential communications with a foreign government. Respondents' alleged "chilling effect" would come from "public" disclosures (Resp. Notice Opp. at 10), but there can be no dispute that, in this case, secure facilities have already been established, specifically for the handling, review and maintenance of sensitive classified information, and that counsel for Guantanamo detainees have access to extensive information that will not be shared either with the public or with their clients. Respondents have failed to identify any manner in which "sensitive" negotiations would be affected if they were "disclosed" only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established.

### 3.    Separation of Powers

Respondents' invocations of the foreign relations power, war power, and rule of non-inquiry are inapposite. It is not necessary to address these matters in granting the relief sought here. The possibility of the courts running the war or the State Department cannot arise on the present limited motion. Respondents seek to frighten the Court into inaction, a tactic they unsuccessfully employed before the Supreme Court in *Rasul*, as they struggled to defeat *habeas* jurisdiction:

> The intelligence-gathering operations at Guantanamo are an integral component of the military's efforts to "repel and defeat the enemy" in the ongoing military campaign being waged not only in Afghanistan but around the globe. Any judicial review of the military's operations at Guantanamo would directly intrude on those important intelligence gathering operations. Moreover, *any judicial demand that the Guantanamo detainees be granted access to counsel to maintain a habeas action would in all likelihood put an end to those operations—a result that not only would be very damaging to the military's ability to win the war, but*

no doubt be "highly comforting to the enemies of the United States." *Eisentrager*,
339 U.S. at 779.

Resp. Brief in Opposition at 43 (emphasis added; citations omitted).

This is the view that the Court rejected when it allowed *Rasul* to proceed, holding that
"What is presently at stake is only whether the federal courts have jurisdiction to determine the
legality of the Executive's potentially indefinite detention of individuals who claim to be wholly
innocent of wrongdoing. Answering that question in the affirmative, we reverse . . . and remand
. . . for the District Court to consider in the first instance the merits of petitioners' claims."
*Rasul*, 542 U.S. at 485. The Supreme Court properly rejected that judicial review invaded the
sacred domain of the executive. So too here.

Likewise the rule of "non-inquiry," which is inextricably tied to the existence and terms
of an extradition treaty, is not involved here, and in any event cannot affect *habeas* jurisdiction.
*Glucksman v. Henkel*, 221 U.S. 508, 512 (1911), (Holmes, J.) ("We are bound by the *existence of
an extradition treaty* to assume that the trial will be fair.") (emphasis added); see also *Factor v.
Laubenheimer*, 290 U.S. 276, 287 (1933).

### 4.    Decisions of Multiple Judges Have Granted 30-Day's Notice of Intended Removal

Even Respondents begrudgingly acknowledge one of the many decisions rejecting their
position and providing the modest relief Petitioner seeks. *See* Resp. Notice Opp. at 17 n.7 (citing
*Al-Marri v. Bush*, Civ. A. No. 04-2035, 2005 WL 774847 (D.D.C. Apr. 4, 2005). Indeed, the
decisions granting detainees their requests for a mere month of advance warning of transfer far
outnumber the handful of cases adopting Respondents' position. *See* Robert M. Chesney,
*Leaving Guantanamo: The Law of International Detainee Transfers*, 40 U. Rich. L. Rev. 657,
667 & nn. 35-38 (surveying entire Guantanamo docket and finding "twenty-seven pro-detainee

decisions imposing the requested notice requirement and six pro-government decisions denying

that relief," with one "split decision").

For example, in *Abdah v. Bush*, No. 04-1254, 2005 WL 711814 (D.D.C. Mar. 29, 2005),

Judge Kennedy granted a motion for preliminary injunction seeking precisely the relief Petitioner

seeks here. Quoting the leading *CityFed* decision cited by Respondents (Resp. Notice Opp. at

11), *Abdah* explained that "[i]f the arguments for one factor are particularly strong, an injunction

may issue even if the arguments in other areas are rather weak." 2005 WL 711814, at *3

(quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

The factor forming the "basis" of a request for injunctive relief is the risk of irreparable

harm. *Id.* Transferred detainees face two risks: (1) being sent to countries "for torture or

indefinite imprisonment without due process of law" and (2) having their *habeas* claims

terminated by executive "fiat." *Id.* at *3-*4. As in *Abdah*, Respondents here embrace the claim

that transfer eliminates jurisdiction, confirming the risk of irreparable harm. Resp. Notice Opp.

at 10-11.

Moreover, as to the requirement of a likelihood of success on the merits, the *Abdah* court

dismissed Respondents' argument that "advocating for release into freedom" somehow means

the same thing as "transfer from ongoing detention in one locale to ongoing detention in

another." 2005 WL 711814, *4 & n. 3. Respondents nevertheless repeat that argument here,

again suggesting that transferring a detainee for torture basically provides all the relief sought

under his *habeas* claim. Resp. Notice Opp. at 12-13. Rejecting this absurd contention and

focusing on the true merits of a transfer challenge, *Abdah* found a strong likelihood of success on

a claim by a detainee that a putative transfer should be blocked as an improper attempt to

eliminate an otherwise valid *habeas* claim. *See* 2005 WL 711814, at *5 (citing, inter alia, Fed R.

App. P. 23(a)); *see also Kurnaz v. Bush*, No. Civ. A. 04-1135 (ESH), 2005 WL 839542, at *2

(D.D.C. Apr. 12, 2005) (explaining that Fed. R. App. P. 23(a) protects district court's as well as

appellate court's jurisdiction over pending habeas petitions) (citing *Jago v. U.S. District Court*,

570 F.2d 618, 623 (6th Cir. 1978)).

As for Respondents' claimed parade of horribles arising from judicial review of a

proposed transfer, the *Abdah* court correctly noted that nothing in the narrow relief requested by

the detainees would mandate the two purported evils of diplomacy described, i.e., disclosure of

governmental communications with the transferee country or internal governmental analysis of

the propriety of the transfer. *See* 2005 WL 711814, *5. To the contrary, the only burden

imposed by the relief was a minimal delay in one aspect of the government's management of the

detainees, which was insufficient to outweigh the harm to the detainees from potential loss of

their entire claim. *See id.* at *6.

As to the public's rights, the *Abdah* court summarily rejected Respondents' self-serving

contentions that the "public interest" element automatically was met because Respondents

represent the Government. *See id.* To the contrary, "the public has a strong interest in ensuring

that its laws do not subject individuals to indefinite detention without due process; 'it is always

in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (quoting *G

& V Lounge, Inc. v. Mich. Liqour Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

Given the very limited relief sought by Mr. Al-Haag here, and the severe harm Mr. Al-

Haag would suffer if he lost meaningful access to this Court and were removed to another state

to face torture or indefinite detainment, the balance of factors to be considered by this Court

weighs heavily in Mr. Al Haag's favor, and Petitioner's Motion for 30-Days' Advance Notice of

Intended Removal should be granted.

WO 681091.5

24

Moreover, because communication with counsel regarding the factual basis of Petitioner's detention is his right and the production of factual returns would not pose an undue burden on the government, his Motion for Factual Returns should also be granted.

Dated:  January 12, 2007

Respectfully submitted,

Counsel for Petitioners:

/s/ Richard G. Murphy, Jr.
Richard G. Murphy, Jr. (D.C. Bar No. 472769)
John P. Anderson (Pursuant to LCvR 83.2(g))
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2415
Telephone: (202) 383-0454
Facsimile:  (202) 637-3593

John A. Chandler (Pursuant to LCvR 83.2(g))*
Elizabeth V. Tanis (Pursuant to LCvR 83.2(g))
Kristin B. Wilhelm (Pursuant to LCvR 83.2(g))
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, N.E.
Atlanta, Georgia  30309-3996
Telephone: (404) 853-8000
Facsimile:  (404) 853-8806

* - Lead Counsel

## CERTIFICATE OF SERVICE

I, Richard G. Murphy, Jr., certify that I today caused a true and accurate copy of the foregoing to be served via the Court Security Officer upon the following persons:

The Honorable Alberto Gonzales
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

The Honorable Kenneth L. Wainstein
United States Attorney for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

Terry Henry, Esq., Senior Trial Attorney
Andrew I. Warden, Esq., Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7144
Washington, DC 20530

This 12th day of January, 2007.

_/s/ Richard G. Murphy, Jr._
Richard G. Murphy, Jr.