# EXHIBIT A

UNCLASSIFIED//FOUO

**Summarized Detainee Statement**

Tribunal President: Okay. Kari, you may now present any evidence you have to the Tribunal and you have the assistance of your Personal Representative in doing so. Do you want to present information to this Tribunal and do want to do it under a Muslim oath?

Detainee: Yes.

Tribunal President: Recorder, please administer the Muslim oath.

**The Detainee was sworn using the Muslim oath.**

Tribunal President: Let me verify the correct name.

Detainee: Maasoum.

Tribunal President: Is that the first name or the last name?

Detainee: My name is Maasoum. My father's name is Abdah.

Tribunal President: So we will use Maasoum Abdah?

Detainee: Yes.

Detainee: I don't I have a problem being called Bilal.

Tribunal President: Okay. Thank you. Maasoum, you may begin your statement or you can answer or respond to any of the allegations on the Unclassified Summary.

Personal Representative: Madam President, the detainee asked me to read his response to the allegations.

Tribunal President: Okay.

Personal Representative: And I have for the Tribunal a copy of what I will be reading for the record. It's marked Exhibit D-b.

Tribunal President: Fine.

**In the following section of the summarized transcript, the Personal Representative reads to the Tribunal the detainee's responses to the allegations found on the Unclassified Summary of Evidence. Any comments made by the detainee or others are summarized, as well. To put the responses and comments into context, the allegations are set forth in italics before the associated response.**

UNCLASSIFIED//FOUO

001494

**UNCLASSIFIED//FOUO**

*3.a. The detainee was a member of the Taliban.*

Personal Representative: The statement is untrue. My being involved with the Taliban is impossible. I don't even speak a word of Pashtu, and I don't know anyone from the Taliban, and I was never associated with anyone from the Taliban.

*3.a.1. The detainee is a Syrian who traveled to Afghanistan in 2000.*

Personal Representative: I wanted to go to Afghanistan to find a wife and get married and stay there. I wanted to live there because it is cheaper to get married and to live there. I intended to stay for a while, but not a long time.

*3.a.2. The detainee stayed for more than 12 months at the Wazir Akbar Khan Street safe house, located in Kabul, Afghanistan.*

Personal Representative: I stayed for nine to ten months. Abu Mouad rented a house and a few of us stayed with him. It was a normal home, a place to eat, drink and sleep.

*3.a.3. The detainee operated a safe house where 5-20 personnel armed with AK-47 rifles could be found at any given time.*

Personal Representative: It is not true that I operated this house. There were no AK-47s at this house.

Detainee: I don't understand.

Personal Representative: It is not true that I operated this house.

Detainee: Do you mean operated like "military" operated?

Personal Representative: Like ran. The allegation is that he operated the safe house.

Detainee: I did not understand the 3rd one. How did I operate this house?

Tribunal President: Use the word "manage."

Detainee: It was a regular house. Just like any other person's house.

Tribunal President: Were you in charge of running the house? Making sure the costumers were comfortable. Did you receive the money for the house?

Detainee: I didn't.

**UNCLASSIFIED//FOUO**

UNCLASSIFIED//FOUO

**The Personal Representative continued to read the detainee's response to the allegations.**

Personal Representative: There were no AK-47s at this house. Normally, there were only seven of us staying in the house. Not five to twenty.

*3.a.4. The detainee's name was found on a list of Mujahideen trainees for a sniper course.*

Personal Representative: This statement is not true at all.

*3.a.5. The detainee confirmed that one of his aliases was on the list for the sniper course.*

Personal Representative: This is likely a mix up in names. If you find a Bilal on this list, I ask, am I the only Bilal in the world? I told the interrogators that I am a Kurdish Bilal, and that there are a lot of Syrian Bilals.

Personal Representative: That is the end of the statement.

Tribunal President: Maasoum, would like to add anything else to your statement, or does that end your statement?

Detainee: Maasoum.

Tribunal President: Maasoum?

Detainee: Bilal is easier, if you would like.

Tribunal President: Fine. Bilal, would you like to add anything else to your statement, or does that end your statement?

Detainee: I don't have anything else.

Tribunal President: Personal Representative, do you have any questions for the detainee?

Personal Representative: Just one. Since Abu Mouad rented the house, would he be the person who managed the house?

Detainee: It is true that he rented that house, but we all worked together. We all bought food and we all ate there. So we were all in that house. He was not managing us. Basically, everyone was working. Getting our own food, we ate together, but he was not supervising us, or anything like that.

Personal Representative: That's all I have.

**UNCLASSIFIED//FOUO**

Tribunal President: Recorder, do you have any questions for the detainee?

Recorder: No, ma'am.

Tribunal President: Do any Tribunal members have any questions for the detainee?

Member: About when did you go to Afghanistan?

Detainee: The year 2000, the sixth month.

Member: Okay. How did you get there?

Detainee: From Syria to Turkey to Iran to Afghanistan. On land.

Member: On land. Okay.

Member: Before you left Syria, did you have to get an Afghanistan visa?

Detainee: No.

Member: You said in your statement before that your Personal Representative read, that you were not part of the Taliban because you don't speak Pashtu?

Detainee: Yes.

Member: But you did go to Afghanistan to find a wife?

Detainee: Yes.

Member: Wasn't there still going to be a language problem?

Detainee: I'm sorry?

Member: Your wife would speak Pashtu also.

Detainee: I asked some Persian women who spoke Farsi. Because I am Kurdish, the Kurdish language is very close to Farsi. I can understand Farsi. Even if I got married to a Pashtu woman, over time I would learn how to speak Pashtu.

Member: Okay. And she would learn your language?

Detainee: Possibly.

Member: Okay. When you stayed at the house, what did you do for money? Did you work?

ISN #330
Enclosure (3)
Page 4 of 10

**UNCLASSIFIED//FOUO**

001497

UNCLASSIFIED//FOUO

Detainee: I did not work in Afghanistan, but when I was in Iran, I worked and I had money.

Member: Okay. Have you had any military training in Syria or Afghanistan or anywhere else?

Detainee: No. Never. Only when I was in the Syrian police, they trained us. But in two years, I only shot – in a year in a half, I only shot seven bullets.

Member: That's all I have.

Member: Maasoum, how were you arrested?

Detainee: When we were leaving Afghanistan to Pakistan on the border line, we were arrested at the border line.

Member: How did you leave Afghanistan?

Detainee: I went to Jalalabad. I stayed there for a day or two days. After a day and a half, we went somewhere where it was safe and no one would bother us. About a month a half. After that we left for Pakistan.

Member: Was this route through the mountains to Pakistan?

Detainee: It was a regular road. There were some mountains and some other things.

Member: When you were arrested by the Pakistanis, did you have a passport with you?

Detainee: No.

Member: Where was your passport?

Detainee: In the house that I stayed in Kabul.

Member: Why was it still in the house? Why wouldn't you take it with you if you knew you were leaving the country?

Detainee: I did not know I was leaving the country. If I had known I was leaving the country, I would have taken it. In the beginning, I didn't know.

Member: Can you tell me when you were arrested by the Pakistanis?

Detainee: In the beginning of the year. I am not sure exactly if it was 2000 or 2003. I have forgotten. Possibly 2002.

ISN #330
Enclosure (3)
Page 5 of 10

UNCLASSIFIED//FOUO

001498

**UNCLASSIFIED//FOUO**

Member: Was it the year after the--

Detainee: I do not know.

Member: Do you recall when the planes flew in the World Trade Center in New York?

Detainee: I saw a movie here.

Member: Was it the first of the year, right after that event took place?

Detainee: When I left?

Member: When you were arrested by the Pakistanis.

Detainee: It was after.

Member: After. When you left Kabul, was that after the bombing started?

Detainee: Honestly, I don't remember.

Member: So did you see any bombing or fighting at all in Kabul or on your way out of the country?

Detainee: I don't remember, but I heard that there would be attacks.

Member: Was the route that you took out into Pakistan from Jalalabad, was it through the Tora Bora mountains?

Detainee: I do not know what the mountain was. That was my first time going through that route.

Member: You said that there were about seven people in your house. Were any of those people associated with the Taliban?

Detainee: No, never.

Member: Were any of them fighters or associated with Al Qaida?

Detainee: Never.

Member: Just want to make sure I understand the timing. So you where in Kabul and then you heard that you might be attacked, so that's when you started to leave to go to Pakistan?

ISN #330
Enclosure (3)
Page 6 of 10

**UNCLASSIFIED//FOUO**

001499

**UNCLASSIFIED//FOUO**

Detainee: Could you repeat please?

Member: Yes. You were living in Kabul and you heard that Kabul could be attacked. So is that when you left and started to go to Pakistan?

Detainee: When the people took me, I did not even know where I was going. They just took me and they took me out of Jalalabad.

Member: Who were the people who took you?

Detainee: Amed Sala and Amed Shariff are the ones who took me.

Member: They just came and took you and said "we're leaving"?

Detainee: Yes.

Member: And you did not ask why and where we're going?

Detainee: Abu Mouad was with them. But the people that took me from Jalalabad were Amed Sala and Amed Shariff. The most important thing for me was to go somewhere safe. I didn't know where.

Member: But if you didn't know why they were taking you, why did you have to go to someplace safe?

Detainee: For sure they would have taken me somewhere safe.

Member: So I take it, then, that you did know that Kabul was going to be attacked?

Translator: I'm sorry?

Member: You did know that Kabul was going to be attacked?

Detainee: There were going to be problems.

Member: Okay. I have no further questions.

Tribunal President: Why did you leave Syria to find a wife? Why not find a wife in Syria?

Detainee: It is very expensive to find a wife. The price is at least $3000. I might work for years and still not be able to collect that much money. In Afghanistan, it is very cheap. The most is $300.

Tribunal President: Had you planned on living in Afghanistan?

**UNCLASSIFIED//FOUO**

**UNCLASSIFIED//FOUO**

Detainee: I was planning to stay for a short period of time. Get married, maybe a couple of years. A short period of time.

Tribunal President: And then return to Syria?

Detainee: No.

Tribunal President: What was your plan after you found a wife and stayed in Afghanistan for two years? What did you plan to do then?

Detainee: I didn't have a practical plan. I was not thinking practical. But possibly I would be going to Jordan. Jordan is close to Syria. And you have some freedoms in Jordan.

Tribunal President: You said Abu Mouad rented the house. Who owned the house?

Detainee: I do not know.

Tribunal President: How did you know to go to that house?

Detainee: I asked. I went to the mosque where people prayed. I prayed there and I asked the people there, "Is there a Syrian person that I can go to?" If that was not possible, then I would have spent the whole time in a hotel.

Tribunal President: Did anyone at the mosque encourage you to go to Afghanistan to find a wife and to stay at that house?

Detainee: The mosque that I was in?

Tribunal President: Yes.

Detainee: Please repeat the question.

Tribunal President: The question is, was there someone at the mosque, one person that encouraged you to go to Afghanistan to find a wife and stay at that house?

Detainee: No, only the house. They showed me the house.

Tribunal President: Okay. So you did not feel that you were being recruited by anyone to fight in Afghanistan?

Detainee: No. Never.

Tribunal President: How did you pay for your trip to Afghanistan?

ISN #330
Enclosure (3)
Page 8 of 10

**UNCLASSIFIED//FOUO**

001501

**UNCLASSIFIED//FOUO**

Detainee: In Afghanistan?

Tribunal President: Yes. How did you pay for your trip to travel from Syria to Afghanistan?

Detainee: I worked in Syria.

Tribunal President: One time you said you had been a policeman. Were you still a policeman prior to going to Afghanistan?

Detainee: For two and a half years I was a police officer, but later I sold fruits and vegetables.

Tribunal President: Did you use that money to pay for your trip to Afghanistan?

Detainee: Yes.

Tribunal President: How did you support yourself while you were in Afghanistan for nine to ten months?

Detainee: I wasn't the only one that was paying. We all paid. Once my friend, once me, once someone else. We all paid.

Tribunal President: Did you work, other than in the house? Did you work at another job in Afghanistan?

Detainee: No, I did not work.

Tribunal President: Did you handle any weapons while you were in Afghanistan?

Detainee: Never.

Tribunal President: Help me to understand who you were with when you were arrested. You mentioned one name, but who were the other people you were arrested with?

Detainee: Myself, Ali, and Abu Roba and Abdul Hadi.

Tribunal President: So that's four of you?

Detainee: Yes.

Tribunal President: Were you walking or were you in a vehicle?

Detainee: Walking.

UNCLASSIFIED//FOUO

Tribunal President: Did any of the four of you have a weapon when you were arrested?

Detainee: Never.

Tribunal President: That's all I have. Any Tribunal members have any questions?

Members: No ma'am.

Tribunal President: Bilal, do you have any other evidence you would like to present to the Tribunal?

Detainee: That's what I have.

Tribunal President: Personal Representative, do you have any other evidence, or does the detainee have any previously approved witnesses to present?

Personal Representative: Madam President, I have no further evidence and there are no witnesses.

Tribunal President: All unclassified evidence having been provided to the Tribunal, this concludes this Tribunal session.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, U.S. Army
Tribunal President

001503

# EXHIBIT B

UNCLASSIFIED/FOUO

## SUMMARIZED DETAINEE STATEMENT

PRES: You may examine documents or statements offered into evidence other then classified evidence; however, some documents may be partially masked for security reasons.

DET: I have no unclassified information or nothing to hide.

PRES: Do you understand this process?

DET: Yes.

PRES: Do you have any questions concerning the tribunal process at this time?

DET: No.

PRES: For the record, the summary of unclassified information identifies Assem Matruq Mohammad Al Aasmi as the detainee, but we understand through the Personal Representative that the detainee prefers to use one of his aliases as Walid Ibrahim Mustafa Abu Hijazi.

DET: No, that is my name. Aasmi is the alias name. Since I came to Cuba they call me by this alias name

PRES: Which name would you prefer to be referred to?

DET: Both of them.

PRES: And that is?

DET: Walid Ibrahim Mustafa Abu Hijazi.

PRES: The detainee has elected not to call any witnesses.

DET: There are no witnesses.

PRES: Do you have any evidence to present to this tribunal?

DET: Yes, what kind of evidence do you want?

PRES: You can present a statement or witnesses; you indicated that there are no witnesses, if you have a statement that you wish to make. I believe you have indicated you would like to make an oral statement to the tribunal.

DET: Is it about Afghanistan and all that happened?

UNCLASSIFIED

ISN #049
Enclosure (3)
Page 1 of 8

002647

UNCLASSIFIED/FOUO

PRES: Yes.

DET: The Personal Representative will go through all we talked about in detail. I told him when we sit in the tribunal he will do the talking for me.

PRES: Walid Ibrahim Mustafa Abu Hijazi, you do not desire to make a statement?

DET: I made my statement with all honesty. He will be representing me as far as talking. You can stop him at anytime if you have any questions.

PRES: You indicated that you did not need to take an oath?

DET: I will swear, I am ready to swear. I am truthful in each word I am going say. There is no need for me not to swear; I will swear and I will be truthful.

PRES: Very well, you may begin with the assistance of your Personal Representative.

DET: I want you to start saying everything I told you all together. Starting with the purpose of going to Afghanistan from Saudi Arabia. I wanted to show with all honesty.

**Personal Representative states what was relayed to him by the detainee during the two interviews that took place.**

DET: I told the interrogators and Personal Representatives that I was not an Enemy Combatant to Americans. I did go to Afghanistan three or four weeks before the events. If I wanted to be an Enemy Combatant to Americans I would have done that in my hometown. We have about thirty thousand Americans visiting every year; they go about having fun. None of the people in my country have any animosity towards them.

I never went from Pakistan to Saudi Arabia and to Afghanistan for Jihad; my intention was not for fighting. If my intentions were for fighting for Jihad then what is more appropriate and more obligated from my side towards my faith to Jihad. My faith does not allow me to go all the way Afghanistan to do Jihad before doing my duty in my home country.

In my hometown I worked in restaurants and other places. I went to Saudi Arabia to find work; it was my only chance. If it were a criminal act for me to go to the camp, I would not have talked in interrogation and admitted that I went to the camp, because I did not know what kind of camp that was. I would not have talked and said that I trained and I was there for two weeks. I trained on this weapon because I know that this kind of weapon was nothing, if I wanted to train on weapons which exist in my hometown that are very much stronger and harder then what I have experienced in Al-Farouq.

UNCLASSIFIED

ISN #049
Enclosure (3)
Page 2 of 8

002648

**UNCLASSIFIED/FOUO**

When you catch an accused, you just capture them and put them in prison, and you tell them they are killers. You take this person and you interrogate them for the negative things. What are the reasons behind it? Maybe the killer had no intention of killing that person.

I did not go to the camp to get trained, I was there for a short time and I left it.

I have nothing more, I am telling you the truth. I don't want to fight Americans; I don't want to be an Enemy Combatant. I want to be in my home country.

It is very hard to find work and get income and provide for yourself, this was my chance to go and find some work.

PRES: You may continue or does this conclude your statement?

DET: I have a lot to say, but I will give the Personal Representative the chance to speak.

PRES: Does this conclude your statement; would you like to pass any more evidence that might be presented through your Personal Representative?

DET: I will give him a chance to say what I told him about the story that you was saying that I went all the way to Afghanistan just to be a Enemy Combatant against the Americans. If you want to make me an Enemy Combatant then I would understand, but outside of Cuba I was not an enemy for you. And I never thought of hurting any individual American. How can you classify me as an Enemy Combatant? If you conscious allow you to judge me as an Enemy Combatant I have no problem. I have nothing more.

Had I worked where I could make a living and a future, where I could spend on myself and get my expenses covered then the thought of going to Afghanistan would not have come to my mind. If it were not for the work conditions in my country I would have worked for myself. I love carpentry and I was very successful but I had no means to open my own shop. I had no chance, no money or job or anything.

This is the truth. Keep it in your mind that I am not an Enemy Combatant and I will never be an Enemy Combatant. You cannot be permitted to judge anyone just because they went to Afghanistan or attended the camp in Al Farouq. Again I am telling you that Americans come to my homeland and they do their religious obligations. No one from my hometown kills or kidnaps Americans or harms them; they walk around with no problem at all. If I wanted to be an Enemy Combatant I would have been one in my home country. I know surely it is not a crime to be in Afghanistan.

(To the Recorder after the Recorder declined to ask him any questions): This could be my last proceeding; if you have anything, ask me now. After this is over I might not be

**UNCLASSIFIED**

ISN #049
Enclosure (3)
Page 3 of 8

002649

UNCLASSIFIED/FOUO

talking to any interrogators. Whether I am classified as an Enemy Combatant or not, I will not be talking to anyone.

## QUESTIONS BY THE TRIBUNAL MEMBERS

Q. Walid, you mentioned that you traveled from Saudi Arabia to Afghanistan to help your Muslim brothers, how were you going to help them?

A. I did not say to help my Muslim brothers, this is when the guy I worked for in Saudi Arabia told me to go and make preparations. I would be proud, but the issue was not to help them.

I had Kalashnikovs in my homeland; all of my cousins have such things.

Q. Why did you go to Afghanistan?

A. It was my only chance to find income and a find a job. Allah watches everything that I am saying.

If I had witnesses I would have brought them. [This is like when] A house is being burned and there was a person sitting in front of the house and someone came and burned the house down and left. Then the American authorities come and take the person that was sitting in front of the house away.

Q. The man that you worked for, what did he want you to do when you went to Afghanistan?

A. In his mind it was for preparation purposes.

Q. Preparation for what?

A. If anything came up, you would be aware of how to use weapons. From my homeland I had some kind of preparation.

Q. So you went specifically to Afghanistan to receive military training on weaponry, is that correct?

A. No, that is not true. My intention was not to get trained.

Q. Why did you go?

A. I was forced to go to Afghanistan so this man could give me a job.

Q. When you arrived to Afghanistan, where did you go?

UNCLASSIFIED

**UNCLASSIFIED/FOUO**

A. I stayed in a guesthouse.

Q. Who ran the guesthouse? Was it an organization?

A. It was run by regular people. When they took us to the camp, I did not know what was going on.

Q. How long were you at the camp?

A. Almost two weeks; after two weeks that is when the events happened.

Q. When you left the camp, where did you go?

A. As to going from the camp there was not a plan, every one was in a group and went in different directions. I had no passport and no money and I did not know about anything because I was new to the camp.

Q. How many people were in your group?

A. We were mixed with people from the camp and people that were not from the camp. Some joined us.

Q. Was everyone in the group armed with Kalashnikovs?

A. Some did, some did not.

Q. What weapons did you have?

A. Kalashnikov.

Q. Did you also have grenades?

A. No, I was not trained on grenades.

Q. Why did you have a Kalashnikov?

A. They gave it to us in the camp. In Afghanistan you have to take care of yourself, there are some hypocrites that work for Massoud.

Q. When you left the camp, you traveled to Khost, is that correct?

A. Yes.

Q. How long were you in Khost before you were injured?

**UNCLASSIFIED**

992651

**UNCLASSIFIED/FOUO**

A. No more than three months.

Q. During the three months that you were in Khost, what did you do?

A. We had breakfast and prayers together, but most of the time we were doing nothing.

Q. First, thank you for the statement that you gave to us earlier, but I would like to clarify some things to make sure that we understand.

A. It is very essential for me that you understand everything.

Q. Can you tell us the circumstances surrounding when you were injured?

A. Do you mean after the injury?

Q. First tell us: how did it happen?

A. We were in some houses built like a hiding place. I went on my way for worship and prayers, and I heard a commotion inside the house. One individual had a grenade that blew up, so my leg got hurt. After an hour they were wrapping my leg then they took me to a hospital about four hours later. At the hospital at Khost, I stayed a day and a half until they put a cast on my leg. They told me my condition was difficult and someone had to take me to Afghanistan. In Afghanistan they gave me first aid, I felt faint most of that time. They took me to a military hospital and they treated me well there and then they took me to civilian hospital and they took care of me there. I came over here and they did three to four operations for me.

Q. Earlier in your statement you made comments about hypocrites who worked for Massoud?

A. No, I said that because that is what they called them. I don't know what that they mean by hypocrites. Should I tell you what I think honestly? I know nothing about Massoud and the Taliban until I came here.

Q. We understand from your answer that you had a negative opinion of Massoud and the people that were with him, is that correct?

A. I don't understand the truth. Everyone wanted to have control over this land and everyone fights so that they can have control.

Q. Did the people that you were with fight against Massoud and his people?

A. After being kept for three months and sitting, there was no fighting at that time.

**UNCLASSIFIED**

ISN #049
Enclosure (3)
Page 6 of 8

002652

**UNCLASSIFIED/FOUO**

Q. You never heard of any fighting, either with the Taliban people or the Arabs to come and help them fight against Massoud?

A. Yes, I did hear about it, but I did not know the intention behind it.

Q. You also said that you were familiar with more powerful weapons then Kalashnikov and grenades, those to you was relatively minor weapons?

A. I know how to use the Kalashnikov and the grenades from back home.

Q. We understand that you were familiar with more powerful weapons from your time in your homeland?

A. Do you mean that after I went to Afghanistan I made more powerful, are you saying power?

Q. In your statement that you gave to us earlier, I understood you to say that the Kalashnikov and the grenades and those other weapons were relatively minor to you?

A. I never took training and if I had I would have told you. I trained on the weaponry I told you I was trained on.

Q. Since you mentioned it in your statement, we were interested to know what other weapons you were familiar with from your time in Palestine.

A. I used to know about the Kalashnikov, because it used to be with other useful guns that I was familiar with. What weapons do you think we would have other then Kalashnikov and the American weapon?

Q. We don't know; that's why we were asking you the question.

A. F-16 and Kalashnikov.

Q. Did you mean M-16?

A. I don't know the American word.

Q. It is a rifle, correct?

A. Yes.

Q. Walid, I have an additional question. Where were you on September 11th?

**UNCLASSIFIED**

ISN #049
Enclosure (3)
Page 7 of 8

002653

UNCLASSIFIED/FOUO

A.  I was in the camp.

Q.  In Al Farouq?

A.  Yes.

Q.  Following that, you traveled to Khost and you were there for three months?

A.  Yes.

Q.  Walid, do you have any more information to present to this tribunal?

A.  I said what I have.

Q.  We understand, just in case you thought of anything else that you might like to present to the tribunal?

A.  If I had anything else I would say.  You want to rule that I am an Enemy Combatant when I am not.


## AUTHENTICATION

**I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.**

**Colonel, U.S. Marine Corps**
**Tribunal President**


UNCLASSIFIED

# EXHIBIT C

UNCLASSIFIED//FOUO

**Summarized Administrative Review Board Detainee Statement**

*The Presiding Officer read the Hearing Instructions to the Detainee and confirmed that he understood and had no questions.*

*The Assisting Military Officer presented Exhibit EC-A, the Enemy Combatant Notification Form to the Administrative Review Board.*

*The AMO presented Exhibit EC-B, the Enemy Combatant Election Form to the Administrative Review Board.*

*The Designated Military Officer presented Exhibit DMO-1, the Unclassified Summary of Information to the Administrative Review Board.*

*The Designated Military Officer gave a brief description of the contents of Exhibit DMO-1, the Unclassified Summary of Information to the Administrative Review Board.*

*The Designated Military Officer confirmed that he had no additional unclassified information to present and requested a closed session to present classified information relevant to the disposition of the Detainee.*

*The Presiding Officer opened the Administrative Review Board to the Detainee to present information with the assistance of the Assisting Military Officer.*

Presiding Officer: The Detainee may now present information to the Administrative Review Board. Assisting Military Officer, does the Detainee want to present any information to this Administrative Review Board including written statements, oral statements, or witness statements prepared on his behalf?

Assisting Military Officer: Yes, sir. During the initial interview with the Detainee I took notes regarding the information contained on the unclassified summary and I would like to present those notes to the hearing now. Also, upon the conclusion of my briefing I believe the Detainee desires to speak with the board as well. Sir, the Detainee made the following comments in response to evidence in the unclassified summary; first he stated that all allegations against him being an enemy combatant are false. He stated that the United States knows that they are false but they are going to go through it anyway. In response to Paragraph 3.A.1, the "Detainee admitted he traveled from Palestine to Afghanistan in the summer of 2001;" he replied he went from Pakistan to Saudi Arabia not Afghanistan in 2001. In response to Paragraph 3.A.2, "the purpose of the Detainee's travel to Afghanistan was to participate in Jihad," he stated he did not travel to Afghanistan to participate in Jihad and that he already has told this information to previous interrogators and investigators. He stated also that he never went to fight Americans, does not dislike Americans and that Americans live amongst Palestinians in Palestine and everyone gets along. He also stated that if he wanted to fight Americans he could have done so in his

UNCLASSIFIED//FOUO

home country and would not have to travel to Afghanistan to do so. In response to Paragraph 3.A.3 "the Detainee admitted that he was convinced to go to Afghanistan by an individual who might be a recruiter for Al Qaida," he stated he did not think the person who convinced him to go to Afghanistan was a member of Al Qaida. In response to Paragraph 3.B.1 and 3.B.2, "when the Detainee traveled to Afghanistan he attended the Al Faruq training camp and received training on Kalashnikov rifle, RPG and another type of rifle," he admits he spent two weeks at the Al Faruq training camp, received weapons training on the Kalashnikov and RPG but he did not receive any training on the rifle and handguns.

In response to Paragraph 3.C.1, "the Detainee admits that he supports the actions of Usama Bin Laden and others who commit acts of terrorism," he states the entire sentence is untrue. In response to Paragraph 3.C.2, "the Detainee admits that he moderately supports the beliefs and actions of the Taliban," the Detainee states that this entire sentence is untrue. In response to Paragraph 3.C.3, "the Detainee admitted that he has lied on previous interviews with interrogators," the Detainee agreed he lied but only about his citizenship because he was worried he would be surrendered to the Israelis. In response to Paragraph 4, under primary factors favoring his release or transfer, the Detainee stated during the CSRT that he was not an Enemy Combatant to Americans and that he never went from Pakistan to Saudi Arabia to Afghanistan for Jihad. His intentions were not for fighting. He went on to say that his faith does not allow me to go all the way to Afghanistan to do Jihad before doing my in duty in my home country. The Detainee stated that he agreed with the entire paragraph. Sir, that concludes my briefing regarding the interview notes.

**Presiding Officer:** Thank you Assisting Military Officer.

**Detainee:** I want to thank the Assisting Military Officer very much for addressing these issues.

**Assisting Military Officer:** You are welcome.

**Presiding Officer:** Al Aasmi, do you want to make your statement under oath? An oath is a promise to tell the truth. We have prepared a Muslim oath if you wish to use it. We do not require an oath.

**Detainee:** Whether I go under oath or I don't it is the same thing to me because I am sincere with my statements. Frankly, I could lie to you even if I went under oath but my religion does not allow me to so it doesn't matter to whether I am under oath or not under oath, but I will tell you that even without the oath I am sincere but if you want me to be under oath I will do so but the oath is not going to force me to be sincere or not sincere, to tell the truth or not.

**Presiding Officer:** The oath is entirely voluntary. If you choose not to do it you may begin with discussing any information you wish to present to this court.

**Detainee:** It is up to you sir, if you want me to be under oath or not. To me it does not matter either way.

ISN 049
Enclosure (5)
Page 2 of 6

000405

UNCLASSIFIED//FOUO

**Assisting Military Officer:** Sir, may I interject something, please? *(The AMO speaks to the Translator and says the following statement)* Tell him (the Detainee) that it is not up to the President of the ARB whether he takes an oath or not but that his AMO suggests that he does so. I recommend that he does.

**Detainee:** I will take the oath.

As the oath is being read to him the Detainee states that his name is not really Al Aasmi but Wa-llid Bra-him Mus-ta-fa Abud-Jasi (ph). The Presiding Officer states that for the purpose of the ARB, the name Al Aasmi will be used.

*The Detainee repeats the Muslim oath.*

**Presiding Officer:** OK, Al Aasmi, you may begin.

**Detainee:** I did not go to a training center in Afghanistan and I proved that to the interrogators. And if my intentions were to get trained to fight the Americans, I would have one so in my own country which was much more stronger and powerful than the training center in Afghanistan. The training that I received in Al Faruq is much-much less powerful than the one we have in our own country. I didn't choose training in my own country so I can go from Palestine to Saudi Arabia to Afghanistan so I can get training. I didn't get training in my own country so I could go from one country to another to receive another training and lose time or waste time. If my intentions were to fight the Americans I would have done so in my own country and you know very well how many Americans are living right now in my own country. I could've fought with them there. That is all I could tell you really. That is all I could tell you. I am not an enemy combatant to the Americans. I have no intentions to fight the Americans and if you have any questions for me I am ready to answer you.

**Presiding Officer:** Thank you. Al Aasmi, does that conclude your statement?

**Detainee:** As far as I am concerned, I am not an enemy combatant. I never had any intentions to fight the Americans and if you have any questions of me, I am willing to answer.

**Presiding:** Did the statements made by your Assisting Military Officer provide the information you wanted us to hear during his presentation?

**Detainee:** Yes, he did.

**Presiding Officer:** Assigned Military Officer, do you have any questions for the Detainee?

**Assigned Military Officer:** No, sir.

UNCLASSIFIED//FOUO

**Presiding Officer:** Designated Military Officer, do you have any questions for the Detainee?

**Designated Military Officer:** No sir.

*Presiding Officer begins with the Questions for the Detainee.*

**Presiding Officer:** What type of training did you receive in your home country?

**Detainee:** I did not receive any training in my own town. I said that if I was to get training in Al Faruq to fight the Americans, I would've done so in my own country with the military in my own country. I did not receive any training in my own country.

**Presiding Officer:** And your country is Palestine?

**Detainee:** Yes, Sir.

**Presiding Officer:** Do any Administrative Review Board members have any questions for the Detainee?

**Board Members:** Yes, sir.

**Board Member:** In the unclassified summary you said you did not go to Al Faruq but you went to Saudi Arabia in the summer of 2001.

**Detainee:** I went from Palestine to Saudi Arabia.

**Board Member:** When the information was presented you did not dispute being at Al Faruq. When were you at Al Faruq?

**Detainee:** At the beginning of the investigation I did say so.

**Board Member:** Were you or were you not at Al Faruq?

**Detainee:** Yes, I did go to Faruq.

**Board Member:** In you testimony you said that you proved to your interrogators that you did not go to train at Al Faruq, how did you prove that to the interrogators?

**Detainee:** What I meant by that was that I was the one that told the investigators that I was at Al Faruq camp. I am the one that informed the investigators of all the trips I took from one town to another until I was captured by the Pakistani. Ever since I left the Saudis group and I was scared that the Americans would surrender me to the Israelis that is why I lied about my immigrant status. I met someone named Raed, he came to me in Kandahar and he warned me. He said that if you are scared of the Americans I will be the coordinator between you and the Americans so I admitted that I was from Palestine and I

ISN 049
Enclosure (5)
Page 4 of 6

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

explained everything. I told them or I explained everything, that my only fear was that the Americans would surrender me to the Israelis. If my intentions were to lie, I would have lied from the beginning. I told the investigators everything. All the Red Cross people know my story from the beginning. If my intentions were to lie, I would not have told the investigators what I wanted to say before they started the investigation.

Presiding Officer: So, you were at Al Faruq?

Detainee: Yes, but I didn't know it was Al Faruq training.

Presiding Officer: What did you do there?

Detainee: My intentions weren't really to train for Jihad. It wasn't on top of my list or my head totally.

Presiding Officer: Can you describe to me what you did at Al Faruq?

Detainee: Program or what? Did I have a program or what?

Presiding Officer: What were your daily tasks?

Detainee: I had breakfast in the morning then I got some training. Then I got a little training on the Kalashnikov which that I chose. I told the investigators that I got that type of training for a little while and my intentions were to leave but I didn't have money to leave. I left Palestine, my own country, seeking a job because we have no jobs in Palestine. That is the reason I left Palestine to Saudi Arabia to seek work. I am ready to answer any further questions you have of me.

Presiding Officer: Right now we have no further questions.

*The Designated Military Officer and the Assigned Military Officer have no other information to present to this Administrative Review Board.*

*The Presiding Officer reads the post-Administrative Board instructions to the Detainee. The Detainee interrupts stating the following:*

Detainee: Is this the last session that I will be entitled to? Is this the session that is going to decide whether I am an enemy combatant or not?

Presiding Officer: No, this board is to decide whether you should be further retained or released. Allow me to continue and hopefully as I read I will answer some of your questions.

Detainee: And now what are you going to decide?

Presiding Officer: Please allow me to continue reading.

ISN 049
Enclosure (5)
Page 5 of 6

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

*The Presiding Officer continues reading the post-Administrative Board instructions to the Detainee.*

Detainee: But this session that is convened right now is to decide whether I am an enemy combatant or not?

Presiding Officer: No, this session is here to decide of you shall be released or retained here. You have already been determined to be an enemy combatant and were notified so by the Assisting Military Officer.

Assisting Military Officer: Sir, if I may interject one thing? I believe there is some confusion on his part on the reason of this hearing. This hearing is to determine whether he remains a threat to the United States and its allies.

Presiding Officer: If we determine you to be a threat, you will be detained if not you will be released or transferred. That is why it was important for you to present what you wanted to present to us. We will consider it.

Detainee: All right.

*The Presiding Officer adjourns the open session of the Board.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Captain, USN
Administrative Review Board Presiding Officer

# EXHIBIT D

UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at US Naval Base Guantanamo Bay, Cuba**

From:      Presiding Officer

To:        AL AASMI, ASSEM MATRUQ // MOHAMMAD

Via:       Assisting Military Officer

SUBJECT:   UNCLASSIFIED SUMMARY OF EVIDENCE FOR ADMINISTRATIVE
           REVIEW BOARD IN THE CASE OF AL AASMI, ASSEM MATRUQ //
           MOHAMMAD

1 An Administrative Review Board will be convened to review your case to determine if
your continued detention is necessary.

2. The Administrative Review Board will conduct a comprehensive review of all reasonably
available and relevant information regarding your case. At the conclusion of this review the
Board will make a recommendation to: (1) release you to your home state or to a third state;
(2) transfer you to your home state, or a third state, with conditions agreed upon by the
United States and your home state, or the third state; or (3) continue your detention under
United States control.

3. The following primary factors favor continued detention:

a. Commitment

   1. The detainee admitted he traveled from Palestine to Afghanistan (AF) in the
summer of 2001.

   2. The purpose of the detainee's travel to AF was to participate in the Jihad.

   3. The detainee admitted that he was convinced to go to Afghanistan by an
individual who might be a recruiter for al Qaida.

b. Training

   1. When the detainee arrived in AF, he attended the al Farouq training camp.

UNCLASSIFIED

001036

EXHIBIT DMO-1

UNCLASSIFIED

2. At the al Farouq training camp, the detainee learned how to use the Kalishnikov rifle, a rocket propelled grenade (RPG), a handgun and a "Biki" rifle.

c. Intent

1. The detainee admits that he supports the actions of Usama Bin Ladin and others who commit acts of terrorism.

2. The detainee stated that he moderately supports the beliefs and actions of the Taliban.

3. The detainee admitted that he has lied on previous interviews with interrogators.

4. The following primary factors favor release or transfer:

Detainee stated during his CSRT that he "was not an Enemy Combatant to Americans." He alleges that he never went from Pakistan to Saudi Arabia and to Afghanistan for Jihad; his intention was not for fighting. He went on to say that "My faith does not allow me to go all the way to Afghanistan to do Jihad before doing my duty in my home country".

5. You will be afforded a meaningful opportunity to be heard and to present information to the Board; this includes an opportunity to be physically present at the proceeding. The Assisting Military Officer (AMO) will assist you in reviewing all relevant and reasonably available unclassified information regarding your case. The AMO is not an advocate for or against continued detention, nor may the AMO form a confidential relationship with you or represent you in any other matter.

UNCLASSIFIED

001037

# EXHIBIT E

## O'Hara, Matthew J.

| | |
|---|---|
| **From:** | Cooper, David N LtCol OARDEC, CYTW [david.n.cooper@navy.mil] |
| **Sent:** | Friday, December 22, 2006 9:11 AM |
| **To:** | atryszman@cmht.com; Alan_Pfeuffer@fd.org; sussman@bard.edu; amy_baggio@id.org; Anant.Raut@weil.com; andrea_george@fd.org; Angela_Campbell@fd.org; anna@johnhorlandlaw.com; anatali@mccarter.com; azmybahe@shu.edu; bjo@ccr-ny.org; bjacewicz@orrick.com; egilson@snet.net; bjacob@schiffhardin.com; billy_nolas@dmhosting.g.ysm.yahoo.com; mickumshoestring@msn.com; bridgetm@umich.edu; ColangelaBryan.Joshua@dorsey.com; Bryan_Lessley@fd.org; hcgorman@igc.org; carl_lietz@fd.org; cebruce@venable.com; carolyn.welshhans@dechert.com; judgetravis@sbcglobal.net; Chester_Keller@fd.org; cdysard@rsko.com; cmoore@cgsh.com; Chris_Schatz@fd.org; Christine_Dahl@fd.org; chodgson@stradley.com; clivess@mac.com; cposa@manatt.com; danderson@schiffhardin.com; gunnd@dicksteinshapiro.com; david.hickerson@weil.com; dremes@cov.com; linda@sleighandwilliams.com; dmccallum@lavin-law.com; doug@kmhlaw.com; Eburke@brnbe-law.com; emcmshaw@aol.com; egreenberg@gsblaw.com; meazell@bmelaw.com; chemerinsky@law.duke.edu; gisaac@mayerbrownrowe.com; georgem.clarke@bakernet.com; gdalyl@bellsouth.net; ggutierrez@ccr-ny.org; gwoodward@schnader.com; Greg.Smith@sablaw.com; gthunt@mdo.net; harvey@theemploymentlawyers.com; heather_rogers@dmhosting.g.ysm.yahoo.com; HJManchel@aol.com; iwallach@nyc.rr.com; jalsup@oriordan-law.com; James_Wade@fd.org; Jkitchel@SCHWABE.com; barrett@blankrome.com; jgoldstein@lawrwu.edu; jcolman@jenner.com; jeffdavis@mvalaw.com; jeff_ertel@fd.org; jilang@debevoise.com; jcargabr@debevoise.com; Jhirsh@mccarter.com; jcohen@pscboston.com; jmarguli@uchicago.edu; jchmbrl5@aol.com; John.Chandler@sablaw.com; joonnolly@murphyshaffer.com; jlundquist@fredlaw.com; jminock@ic.net; jonathan.hafetz@nyu.edu; jeo@lavin-law.com; jdenbeaux@denbeauxlaw.com; jchonsky@igc.org; julia.symon@clitfordchance.com; jmason@paulweiss.com; Kabravanel@stblaw.com; kboris@rhwlafirm.com; kit.pierson@hellerehrman.com; pommevert@aol.com; lmarjon@aol.com; mdf; mgoldrnan@jenner.com; marjoriesmith@verizon.net; mdenbeaux@yahoo.com; mrayner@law.fordham.edu; Martin_Bahl@fd.org; mary_petras@fd.org; Matthew_Dodge@fd.org; michaelmone@ebelaw.com; mrapkin@rgblawyers.com; michael.smith@dechert.com; mahmad@wcl.american.edu; mfolger@mcdadefogler.com; nh@fbdlaw.com; katyaln@lawgeorgetown.edu; neil.koslowe@shearman.com; pbronte@jenner.com; pcurnin@stbtaw.com; pleder@rsko.com; Paul_Rashkind@id.org; preichler@foleyhoag.com; pschoeman@kramerlevin.com; peter.ryan@dechert.com; rclingman@fulbright.com; rcoyne@ou.edu; Rebecca.Dick@dechert.com; mcknightr@dicksteinshapiro.com; richard_coughlin@fd.org; rickcys@dwt.com; dicky@grigg-law.com; dick@srkllp.com; Rick.Murphy@sablaw.com; Rob.Kirsch@wilmerhale.com; bob@bgba.com; rrachlin@drm.com; reddleman@slarpower.net; Ruben_Iniguez@fd.org; rut; sabin.willett@bingham.com; skautfman@gsblaw.com; sarah.havens@newyork.allenovery.com; sbarker@hollandhart.com; soconnell@nixonpeabody.com; Scoff_tilsen@dmhosting.g.ysm.yahoo.com; sergio_rodriguez@fd.org; shereen_charlick@dmhosting.g.ysm.yahoo.com; stephen_demik@fd.org; stephmac@earthlink.net; steve_wax@fd.org; buz.e@verizon.net; hans@sullcrom.com; susan.manning@bingham.com; sylvia_royce@hotmail.com; Thornas_Belsky@fd.org; ttoster@ccr-ny.org; TRJohnson@perkinscoie.corn; tsullivan@jenner.com; tmackintosh@hollandhart.com; sclay@kilpatrickstockton.com; alison.sclater@gmail.com; agarbow@reedsmith.com; bcasey@reedsmith.com; brent.rushtorth@hellerehrman.com; bneff@schiffhardin.com; attorneybullock@sbcglobal.net; cbm@prblaw.com; carpentc@pepperlaw.com; cdbrown@shb.com; huberc@pepperlaw.com; dvoorhees@hollandhart.com; dlaverne@kramerlevin.com; ddebruin@jenner.com; drutowski@orrick.com; dabbott@hollandhart.com; dsongeroth@jenner.com; elubell@tllawgroup.com; ellisjohnston@fd.org; beane.law@verizon.net; jbogan@kilpatrickstockton.com; jrcowan@debevoise.com; Jtaylor@kramerlevin.com; jratliff@moment.net; john.anderson@sablaw.com; Jmissing@debevoise.com; |

jhollandl@mac.com; snodgrassj@dicksteinshapiro.com; jonzulauf@zulaufandchambliss.com;
jblackman@cgsh.com; jon.tee@alston.com; wdixon@ccr-ny.org; Jdixon@kramerlevin.com;
jberman@bermandowell.com; llustberg@gibbonslaw.com; labrams@kilpatrickstockton.com;
Sachnoff, Lowell E.; medevine@jenner.com; mhandley@cmht.com; O'Hara, Matthew J.;
mnath@jenner.com; mmonejr@ebelaw.com; msternhell@kramerlevin.com; pleder@rkollp.com;
rstarr@hangley.com; rweiner@mwe.com; soconnell@nixonpeabody.com;
ssaifee@kramerlevin.com; terry.walsh@alston.com; wal@lesnevichlaw.com;
wpowell@hunton.com; wbrennan@btbblaw.com; bgoodman@ccr-ny.org; wth@hangley.com;
wmurphy@murphyshaffer.com; wert@tir.com; Ysouras@orrick.com; zachary@reprieve.org.uk

**Cc:**        Cooper, David N LtCol OARDEC, CYTW

**Subject:**   COUNSEL SUBMISSION FOR ARB 3

**Importance:** High

Ladies and Gentlemen,

The Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) informs you at this time of your opportunity to provide input regarding your client for review and consideration by the 2007 Administrative Review Boards (ARBs).

If you submitted matters to the ARB process last year on behalf of your client, those matters are already part of your client's records and will be considered by the 2007 ARB.  There is no need for you to resubmit the same or similar documents.

If you have new information that will aid the ARBs in assessing the threat your client may continue to pose to the United States or its allies, you can submit that information through the process described in the attached fact sheet.·

Please note, The Privilege Review Team must receive your submission no later than **Friday, February 23, 2007.** OARDEC cannot guarantee that materials received after that date will be included in the ARB hearings.

Please note also that the OARDEC Legal Advisor will acknowledge receipt of your submission, but will not be able to answer any substantive or procedural questions about your client's ARB of prior years or this year.

Sincerely,

DAVID N. COOPER, Lt Col, USAFR
Staff Judge Advocate
Legal Advisor
DoD, HQ OARDEC
Washington, DC

<<ARB3factsheet.doc>>

1/31/2007

# EXHIBIT F

**Fact Sheet for Habeas Counsel Regarding Administrative Review Boards (ARBs)**

## THE ADMINISTRATIVE REVIEW BOARD PROCESS

The ARBs are an administrative review process to annually assess whether there is reason to believe that an enemy combatant might pose a continuing threat to the United States or its allies in the ongoing conflict against al Qaeda and its affiliates and supporters, and whether there are other factors warranting the enemy combatant's continued detention. The ARBs began in December 2004. Information on the ARB procedures can be obtained through the Department of Defense website at:

http://www.defenselink.mil/releases/2004/nr20040915-1253.html.

## TIMING OF ARBS

The Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) schedules and conducts all annual ARB hearings. OARDEC will not be providing information to counsel on the scheduling or outcomes of the ARBs.

## COUNSEL INVOLVEMENT

Counsel are not permitted to represent the detainee in the ARB hearing. However, as discussed below, counsel are provided the opportunity to submit information to the ARBs if counsel believes that information is relevant to the assessment that his/her client is no longer a threat to the United States or its allies.

## TIMING FOR SUBMISSION OF COUNSEL MATERIALS

- **Friday, February 23, 2007**, is the deadline for counsel submissions for the 2007 ARB hearings. All submissions received by the Privilege Review Team by that deadline will be provided to the ARBs. Submissions received after that deadline will be provided to the ARB if it has not occurred prior to receipt. If your client's ARB occurs before the Privilege Review Team receives your submission, the information will be retained for consideration at your client's next annual review if he remains in detention.

- Any materials submitted last year will be provided to the 2007 ARBs so there is no need for you to resubmit the same or similar documents.

## CLASSIFICATION REVIEW AND MARKING

In order for OARDEC to conduct a proper classification review of your submissions, information submitted by counsel for consideration in an ARB hearing must clearly annotate the sources for any portions that include references to classified, protected, or "For Official Use Only" (FOUO) information. Without the source information, we cannot properly label the documents with the appropriate classification markings; without proper markings, the documents will not be used in the ARB process.

Therefore, you should annotate your submission by indicating what information is derived from classified, protected, or FOUO sources, and indicate what document(s) that information came from (e.g., "classified exhibit R-17 to the CSRT"). This will enable us to go to the source document and then determine the proper classification level of that portion of your submission.

It is the responsibility of counsel to follow all applicable information security regulations with respect to the handling of classified, protected, or FOUO information. Counsel should work closely with the designated Court Security Officers to ensure compliance with security regulations.

## HOW TO SUBMIT INFORMATION FOR ARB CONSIDERATION

It you have information to submit that does not refer to classified or protected information, you must mail it to the Privilege Review Team. The Team will ensure that your submission is delivered to the OARDEC Legal Advisor. If your submission includes references to classified or protected information, you must provide that document to the Privilege Review Team at the secure facility. A member of the Team will ensure it is properly marked and transmit it to the OARDEC Legal Advisor. The Legal Advisor will contact you to confirm receipt of your classified and unclassified submissions but will not provide any further details regarding the processing of your submission.

Unclassified material should be mailed to:

**Privilege Review Team - REF - ARB Submissions**
**U.S. Department of Justice**
**Litigation Security Section**
**20 Massachusetts Avenue, NW**
**Suite 5300**
**Washington, DC 20530**

This information is provided to you solely to identify points of contact to facilitate the transmission of your submissions to the ARB. Neither the Privilege Review Team nor the OARDEC Legal Advisor is permitted to discuss other matters with you regarding your client's ARB.