IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAIF ULLAH *also know as* SAYF BIN ABDALLAH<br>Petitioner,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br>   Respondents. | Civil Action No. 05-cv-02386 (RBW) |

**MOTION FOR ORDER MODIFYING STAY AND REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO**

Pursuant to the All Writs Act, 28 U.S.C. § 1651, Petitioner respectfully moves for an order requiring Respondents to provide counsel for Petitioners and the Court with thirty (30) days advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba.[1] On information and belief, Respondents have contemplated or are contemplating removal of Petitioner from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law. Petitioner is requesting the advance notice to enable his counsel to contest any such removal from Guantánamo and preserve the jurisdiction of the Court in this matter.

---

[1] To the extent necessary, Petitioner also requests that the Court lift the stay for the limited purpose of this motion.

**STATEMENT OF FACTS**

Petitioner, ISN 46, is a citizen of Tunisia who is being detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba. As detailed in the habeas petition he has filed, he denies being an "enemy combatant" and contends he is being detained in violation of the Constitution, treaties and laws of the United States.

In the instant case Petitioner has reason to fear he will be transferred to a country where he will be tortured and/or detained indefinitely without due process of law. Upon information and belief, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture.

According to reports by American and foreign news organizations, including the *Washington Post*, the *Los Angeles Times* and the British Broadcasting Corporation, the United States Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques. According to an article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, at http://www.newyorker.com/fact/content/?050214fa_fact6, ¶ 7. According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries . . . whose intelli-

- 2 -

gence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, [2002], at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* Wash. Post, Dec. 26, 2002, at A1. The countries to which detainees may be brought are known to practice torture. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.").

According to recent news accounts, Guantánamo detainee Mamdouh Habib was rendered to Egypt by the United States *before* being moved to Cuba. During his six months in Egyptian custody, Mr. Habib was allegedly tortured without mercy:

> He said that he was beaten frequently with blunt instruments, including an object that he likened to an electric "cattle prod." And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs. . . . Habib said that he was shackled and forced to stand in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles, and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture* at [¶ 54.] The credibility of Mr. Habib's account is bolstered by the State Department, which has consistently identified the Egyptian government as a practitioner of torture. In a report released on February 28, 2005, for example, the State Department found that

- 3 -

"there were numerous, credible reports that security forces tortured and mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent." Dep't of State, *Country Reports On Human Rights Practices, Egypt 2004*, at http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, § 1(c).

Nor would transfer to Petitioner's home country of Tunisia allay human rights concerns. According to the United States Department of State's own reports, the government's human rights record remained poor, and the government persisted in committing serious abuses. (See Exhibit "A" attached hereto). The State Department reported the following human rights problems: torture and abuse of prisoners and detainees; arbitrary arrest and detention; lengthy pretrial and incommunicado detention and infringement of citizens' privacy rights. (Exhibit "A"). The State Department reported on several instances of torture and the death of at least one prisoner from torture. Prisons are spartan, poor and noncompliant with international standards. (Id). The State Department also reported on numerous political prisoners. (Id. at p.5). Human Rights Watch reports that the Tunisian government has held prisoners in "brutal solitary confinement." (See Exhibit "B"). In 2005, Tunisia had approximately 500 political prisoners. (Id). All political prisoners are Islamasts. (Id).

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Petitioner stands to suffer immeasurable and irreparable harm – from to torture to possible death – at the hands of a foreign government. Transfer to another country, even if "only" for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality of their detention in this Court. By contrast, Respondents, who have already held Petitioner for several years, are asked only to provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo. Respondents can suffer no conceivable harm from complying with such a request.

Petitioner is likely to succeed on the merits of his claims. Petitioner has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). Judge Green has already ruled that detainees in similar circumstances as Petitioner, Saif Ullah a/k/a Sayf Bin Abdallah, have stated actionable claims under the Due Process Clause and the Geneva Conventions. For the United States Government to remove Petitioner to a country that would afford no such protections would be to flout Judge Green's ruling and defeat the Court's jurisdiction. Such a transfer would also violate basic international legal norms embodied not only in the Geneva Con-

ventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant – properly before the Court and represented by counsel – be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

For the reasons discussed above, the motion should be granted.

Dated: February 15, 2007

> Respectfully Submitted,
> Counsel for Petitioner
>
> _____/s/ Joseph S. Berman_____
> Joseph S. Berman, BBO NO. 566006
> BERMAN & DOWELL
> 210 Commercial Street
> Boston, MA 02109
> Tel: (617)-723-9911
> Fax: (617)-723-6688
>
> *Of Counsel*
> J. Wells Dixon  (NY_____)
> (Pursuant to LCvR 83.2(g))
> CENTER FOR CONSTITUTIONAL RIGHTS
> 666 Broadway, 7th Floor
> New York, New York 10012
> Tel: (212) 614-6439
> Fax: (212) 614-6433

## CERTIFICATE OF SERVICE

I, Joseph S. Berman, hereby certify that I today caused a true and accurate copy of the foregoing to be served electronically via the Court's Electronic Case Filing system.

/s/ Joseph S. Berman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAIF ULLAH<br>*also know as* SAYF BIN ABDALLAH<br>Petitioner,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br>Respondents. | Civil Action No. 05-cv-02386 (RBW) |

## ORDER

The court having considered the motion and memoranda and the record of the entire case, now therefore it is

ORDERED that with respect to Petitioner Saif Ullah a/k/a Sayf Bin Abdallah, Respondents, their agents, servants, employees, confederates, and any persons acting in their concert or participation with them, or having actual implicit knowledge of this Order by personal service or otherwise, may not transfer or remove the detained Petitioner from United States custody at Guantanamo Bay unless this court and counsel for Petitioner receive thirty days' advance notice of such transfer or removal.

BY THE COURT

_____
Reggie B. Walton
United States District Judge