# EXHIBIT A



# Tunisia

Country Reports on Human Rights Practices - 2005
Released by the Bureau of Democracy, Human Rights, and Labor
March 8, 2006

Tunisia is a constitutional republic with a population of approximately 10 million, dominated by a single political party, the Democratic Constitutional Rally (RCD). Zine El-Abidine Ben Ali has been the president since 1987. In the October 2004 presidential and legislative elections, President Ben Ali ran against three opposition candidates and won approximately 94 percent of the popular vote, with official turnout quoted as higher than 90 percent of registered voters, although there were indications that voter turnout figures were artificially inflated. A second legislative body, the Chamber of Advisors, was created in a 2002 referendum amending the constitution. Elections for the Chamber of Advisors were held in July; members were either appointed by the president or elected by parliamentary deputies and other government officials. The civilian authorities generally maintained effective control of the security forces.

The government's human rights record remained poor, and the government persisted in committing serious abuses. However, the government continued to demonstrate respect for the religious freedom of minorities, as well as the human rights of women and children. The following human rights problems were reported:

- torture and abuse of prisoners and detainees
- arbitrary arrest and detention
- police impunity
- lengthy pretrial and incommunicado detention
- infringement of citizens' privacy rights
- restrictions on freedom of speech and press
- restrictions of freedom of assembly and association

The government signed an agreement to allow the International Committee of the Red Cross (ICRC) to visit all prison and detention facilities in the country. In addition, the government eliminated longterm solitary confinement. In a significant development, the government declared an end to "*depot legal*", or prior review, for newspapers, although other press restrictions continued, including prior review on books.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings; however, on June 17, Moncef Ben Ahmed Ouahichi, a Jendouba resident, died of a cerebral hemorrhage at La Rabta Hospital in Tunis. This followed his arrest June 10 and his release the next day, at which time he was unconscious and bearing bruises, according to the Jendouba regional chapter of the Tunisian Human Rights League (LTDH). Following his death, Ouahichi's defense lawyer filed a case before the public prosecutor calling for an investigation into Ouahichi's death and indicated that authorities prevented him from visiting his client when he was initially in the Jendouba Hospital. The Association for the Struggle Against Torture in Tunisia (ALTT) stated that security agents in Jendouba claimed that Ouahichi, a commercial driver, had "transported terrorists" and that the security agents told Ouahichi's brother not to hospitalize him nor speak publicly of the incident.

In 2004 the LTDH reported that Badreddine Rekeii died in police custody in 2003. Police reportedly told Rekeii's family that he committed suicide, although Reheii's family did not believe the police report because the body showed signs of abuse. According to Amnesty International (AI), the family called for a further investigation, as the original investigation failed to establish the cause of extensive bruising on his body and a deep wound on his back. There was no further information on whether an investigation was carried out.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices; however, security forces reportedly tortured detainees to elicit confessions and discourage resistance. The forms of torture and other abuse included: electric shock; submersion of the head in water; beatings with hands, sticks, and police batons; suspension, sometimes manacled, from cell doors and rods resulting in loss of consciousness; and cigarette burns. According to AI, police and prison officials used sexual assault and threats of sexual assault against the wives of Islamist prisoners to extract information, to intimidate, and to punish.

Charges of torture in specific cases were difficult to prove because authorities often denied the victims of torture access to medical care until evidence of abuse disappeared. The government maintained that it investigated all complaints of torture and mistreatment filed with the prosecutor's office, and noted that alleged victims sometimes accused police of torture without filing a complaint, which is a prerequisite for an investigation.

According to defense attorneys, local human rights groups, and AI, police routinely refused to register complaints of torture. In addition, judges dismissed complaints without investigation and accepted as evidence confessions extracted through torture. The government may open an administrative investigation of allegations of torture or mistreatment of prisoners without a formal complaint; however, it was unlikely in those cases to make the results public or available to the lawyers of affected prisoners.

Consistent with an effort to extract information or coerce confessions, more reports of torture came from pretrial detention centers than prisons. Human rights activists, citing prisoner accounts, identified facilities at the Ministry of Interior as the most common location for torture. Political prisoners and Islamists allegedly received harsher treatment than criminals.

Several domestic nongovernmental organizations (NGOs), including the National Council for Freedoms in Tunisia (CNLT) and the Association for the Fight Against Torture in Tunisia (ALTT), reported on multiple torture cases throughout the year. For example, on June 25, according to CNLT, 25-year-old Zied Ghodhbane appeared in court in a state of physical and psychological distress, bearing marks of abuse on his body. He reportedly testified that officials at the Ministry of Interior tortured him by beatings, electrocution, and holding his head under water in detention facilities at the interior ministry after his extradition from Algeria to the country. Defense lawyers for the accused requested that the judge recommend a medical examination, but the judge reportedly ruled that such a request should come from the general prosecutor.

In April authorities sentenced the "Bizerte Group," 11 defendants arrested in 2004 and charged with various terrorism-related crimes, to prison terms ranging from 10 to 30 years. On July 2, the court acquitted five of the defendants, while the remaining six received sentence reductions. The Committee of the Defense of Victims of the Law on Terrorism released multiple communiqués charging that authorities gathered confessions from the group using torture (see section 1.e.).

There were no further developments on reports that three individuals, alleged members of the security forces, assaulted journalist Sihem Ben Sedrine in January 2004 (see section 2.a.), or on reports in October 2004 of an assault on former political prisoner Hamma Hammami, whose political party urged the boycott of the October 2004 presidential elections.

In June 2004, according to the International Association for the Support of Political Prisoners (AISPP), the senior official of Borj Erroumi Prison beat and placed in solitary confinement Nabil El Ouaer, whom a military tribunal had sentenced to 15 years of prison in 1992. While in solitary confinement, four other prisoners allegedly raped him. Based on its timing and location, human rights activists believed prison officials sanctioned the incident. El Ouaer conducted a hunger strike and filed a complaint through a lawyer, despite reported pressure from prison officials to withdraw the complaint. When the case received international attention, President Ben Ali ordered the Higher Commission on Human Rights and Basic Freedoms (a state-appointed body) to conduct an inquiry into the case, but the authorities did not publicize the results. According to AI, authorities transferred El Ouaer to three different prisons, admitted him to Rabta Hospital in Tunis, and subsequently released him conditionally in November 2004. El Ouaer reportedly suffered psychological distress as a result of the assault. Despite several requests by his lawyer for an independent criminal inquiry into the assault, no investigation was carried out.

Authorities did not charge any police or security force official with abuse during the year.

Prison and Detention Center Conditions

Prison conditions ranged from spartan to poor, and generally did not meet international standards. Foreign diplomatic

observers who visited prisons described the conditions as "horrible." Overcrowding and limited medical care posed a significant threat to prisoners' health. Sources reported that 40 to 50 prisoners were typically confined to a single 194 square foot cell, and up to 140 prisoners shared a 323 square foot cell. Current and former prisoners reported that inmates were forced to share a single water and toilet facility with more than 100 cellmates, creating serious sanitation problems.

In March AI reported that most prisoners shared beds or slept on the floor. Contagious diseases, particularly scabies, were widespread, and prisoners did not have access to adequate medical care. Additional discriminatory and arbitrary measures worsened the conditions of detention, particularly when prisoners sought redress for grievances about treatment and conditions.

In 2004 the LTDH released a 63-page report on the country's prisons entitled "The Walls of Silence," which stated that there were approximately 26 thousand prisoners in 29 prisons and 7 juvenile detention centers. The report described a number of abuses, alleging that torture and humiliating treatment of prisoners were widespread.

On April 20, Human Rights Watch (HRW) held a press conference in Tunis to release a report describing the government practice of holding political prisoners in prolonged solitary confinement. During the conference, HRW announced that the government promised not to place prisoners in solitary confinement for more than 10 days, the maximum time allowed for punishment according to the law. Shortly thereafter, the government confirmed that it had eliminated longterm solitary confinement. However, HRW reported that the government continued to keep some political prisoners, most of whom were An-Nahdha leaders, in small-group isolation.

Prison conditions for women were generally better than those for men. Conditions for detainees and convicts were the same.

International and local NGOs reported that political prisoners regularly were moved among jails throughout the country, thereby making it more difficult for their families to deliver food to them and to discourage their supporters or the press from inquiring about them (see section 1.b.). The National Council for Liberties in Tunisia (CNLT) reported that other inmates were instructed to stay away from political prisoners and were punished severely for making contact with them.

In April the government reportedly approved access for HRW to make prison visits. Following this verbal agreement, however, HRW submitted a formal request for prison access, but by year's end had received no response. In June the ICRC began conducting prison and detention center visits, following more than a year of negotiations with the government. In December the ICRC reported that prison authorities had respected their mission and had allowed them to conduct visits without obstacle. The government did not permit media to inspect or monitor prison conditions.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but, in practice, arbitrary arrest and detention occurred.

Role of the Police and Security Apparatus

The Interior Ministry controls several law enforcement organizations including: the police, who have primary responsibility within the major cities; the National Guard, which has responsibility in smaller cities and the countryside; and state security forces, which monitor groups and individuals the government considers to be a dangerous threat, such as opposition parties and leaders, the media, Islamists, and human rights activists.

In general, law enforcement groups were disciplined, organized, and effective; however, there were episodes involving petty corruption and police brutality. Law enforcement organizations operated with impunity, and the police committed attacks, sanctioned by high officials, on dissidents and oppositionists.

In March 2004 the Minister of Interior announced the creation of the Higher Institute of Internal Security Forces and Customs, a new oversight body for law enforcement officers in the ministries of interior and customs. The organization's stated mission was to reinforce human rights and improve law enforcement; however, no information was available about its subsequent operations, and no information was available about punishment of police and prison guards for committing infringements against detainees since 2002.

Arrest and Detention

The law provides that the police must have a warrant to arrest a suspect, unless the crime committed is a felony or is in progress; however, arbitrary arrests and detentions occurred. The penal code permits the detention of suspects for up to

six days prior to arraignment, during which time the government may hold suspects incommunicado. Arresting officers are required to inform detainees of their rights, immediately inform detainees' families of the arrest, and make a complete record of the times and dates of such notifications, but those rules were sometimes ignored. Detainees were allowed access to family members when they were not being held incommunicado, although the government did not always facilitate the efforts of family members to identify the whereabouts of their detained relatives.

Detainees have the right to know the grounds of their arrest before questioning, and may request a medical examination. They do not have a right to legal representation during the pre-arraignment detention. Attorneys, human rights monitors, and former detainees maintained that the authorities illegally extended detainment by falsifying arrest dates. Police reportedly extorted money from families of innocent detainees in exchange for dropping charges against them.

The law permits the release of accused persons on bail, and detainees have the right to be represented by counsel during arraignment. The government provides legal representation for indigents. At arraignment, the examining magistrate may decide to release the accused or remand him to pretrial detention.

The government denied detaining anyone for political crimes. The lack of public information on prisoners and detainees made it impossible to estimate the number of political detainees. However, it was likely that the number of those held without charge was low because criminal convictions of dissidents and Islamists were easy to secure under laws prohibiting membership in outlawed organizations and "spreading false information aimed at disturbing of the public order."

In cases involving crimes for which the sentence may exceed five years or that involve national security, pretrial detention may last an initial period of six months and may be extended by court order for two additional four-month periods. For crimes in which the sentence may not exceed five years, the court may extend the initial six-month pretrial detention by an additional three months only. During this pretrial stage, the court conducts an investigation, hears arguments, and accepts evidence and motions from both parties. Complaints of prolonged pretrial detention were common.

Amnesty

Judges and the government exercised their authority to release prisoners or suspend their sentences, often on conditional parole (see section 1.e.). On March 20, President Ben Ali pardoned an unannounced number of prisoners in commemoration of Independence Day. On March 23, the unregistered Tunisian Islamist An-Nahdha party announced that six of the movement's "former" members were among those released. According to the An-Nahdha statement, all were arrested in the southern town of Gabes in early 1992 and were sentenced to 16 years imprisonment. On July 24, on the occasion of Republic Day, the government again granted amnesty to an unannounced number of prisoners, who were not identified.

On November 4, President Ben Ali pardoned an unknown number of unidentified prisoners. The website of An-Nahdha later claimed that 40 political prisoners were among those released. AISPP listed many of those, convicted in the 1990s for ties to An-Nahdha, as political prisoners, a number of whom had nearly completed 15-year sentences.

e. Denial of Fair Public Trial

The law provides for an independent judiciary; however, the executive branch and the president strongly influenced judicial procedures, particularly in political cases. The executive branch exercised an indirect authority over the judiciary through the appointment, assignment, tenure, and transfer of judges, rendering the system susceptible to pressure. In addition, the president was head of the Supreme Council of Judges, composed primarily of presidential appointees.

The law provides citizens legal recourse to an administrative tribunal to address grievances against government ministries, although government officials rarely respected the tribunal's nonbinding decisions. Throughout the year the government permitted observers from diplomatic missions, members of the European Parliament, and foreign journalists to monitor trials. The government did not permit observers to attend sessions of military tribunals.

In June, as it had in the previous year, the Association of Tunisian Judges (AMT), a 1,700-member professional organization, released a communiqué calling for reform of the recruitment, transfer, and promotion system for judges and proposing more elections of judges to the Supreme Council of Judges, the governing body for the judiciary (see section 2.b.). The government did not officially respond to the association's communiqué, but human rights organizations stated that the government tried to remove AMT leadership due to its demonstrated independence.

The civil court system is a four-tiered hierarchy. At the first level, there are 51 district courts, in which a single judge hears each case. At the second level are 24 courts of first instance, which serve as the appellate courts for the district courts, but they also have original jurisdiction for more serious cases. There is a three-judge court of first instance in each region,

empowered to consider all commercial and civil cases. At the third level are three appeals courts. The Court of Cassation or Supreme Court serves as the final court of appeals. The Supreme Court only considers arguments pertaining to points of law. The organization of the criminal court system is similar to that of the civil court system. In most cases, the presiding judge or panel of judges dominates a trial, and attorneys have little opportunity to participate substantively.

Military courts fall under the ministry of defense and an administrative tribunal.

Trial Procedures

Trials in the regular courts of first instance and in the courts of appeal are open to the public. By law the accused has the right to be present at trial, to be represented by counsel, and to question witnesses; however, judges do not always observe these rights in practice. The law permits the trial in absentia of fugitives from the law. Both the accused and the prosecutor may appeal decisions of the lower courts.

The law provides that defendants are presumed innocent until proven guilty "following a procedure offering essential defense guarantees." However, that presumption was sometimes ignored in practice, especially in politically sensitive cases. Defendants may request a different judge if they believe the assigned one is not impartial; however, judges are not required to recuse themselves. There were no reports that judges offered the alternative of community service in political cases.

Although family and inheritance law is codified, civil law judges were known to apply Shari'a (Islamic law) in family cases if the two systems conflicted. For example, codified laws provided women with the legal right to custody over minor children; however, judges sometimes refused to grant women permission to leave the country with them, holding that Shari'a appoints the father as the head of the family and the one who must grant children permission to travel. Some families avoided the application of Shari'a inheritance rules by executing sales contracts between parents and children to ensure that daughters received shares of property equal to that of sons.

Lengthy trial delays remained a problem (see section 1.d.). Defendants do not have the right to a speedy trial, nor is there any limit to how much time a case can take. Defense lawyers claimed that judges sometimes refused to let them call witnesses on their clients' behalf or to question key government witnesses. Defense lawyers contended that the courts often failed to grant them adequate notice of trial dates, or to allow them time to prepare their cases. Some reported that judges restricted access to evidence and court records, and in some cases, required all the lawyers working on a case to examine documents together on a single date in judges' chambers, without allowing them to copy relevant documents.

Lawyers and human rights organizations reported that courts routinely failed to investigate allegations of torture and mistreatment and accepted as evidence confessions extracted through torture (see section 1.c.). They noted that the summary nature of court sessions sometimes prevented reasoned deliberation. They also stated that erratic court schedules and procedures were designed to deter observers of political trials.

Military tribunals have the authority to try cases involving military personnel and civilians accused of national security crimes. A military tribunal consists of a civilian judge and four military deputy judges. Defendants may appeal the military tribunal's verdict to the civilian Supreme Court, which considers arguments on points of law as opposed to the facts of a case.

Political Prisoners

The government denied that it held any political prisoners, and there was no definitive information regarding the number, if any, of such prisoners. Nevertheless, in 2004 the AISPP published a list of 542 names of individuals whom it considered political prisoners. The AISPP stated that impediments to gathering information about prisoners made it very likely that the total number of political prisoners was higher. Nearly all of these prisoners were Islamists, but very few were convicted for acts of violence. Most of those who were identified by international human rights groups as political prisoners or prisoners of conscience were arrested for violating laws that prohibit membership in illegal organizations and spreading false information aimed at undermining public order. Many were arrested for disseminating information produced by organizations such as An-Nahdha. Former political prisoners said their identity papers were marked in a way that resulted in their receiving harsher treatment.

On June 15, the government released Lotfi Amoudi, who the AISPP stated was a political prisoner. He had served 14 years in prison and was released in poor health after having undergone a 26-day hunger strike.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions "except in exceptional cases defined by law"; however, the government generally did not respect these prohibitions in practice. Police sometimes ignored the requirement to have a warrant before conducting searches if authorities considered state security to be involved. On March 20, unknown persons broke into AISPP President Mohamed Nouri's car and searched his papers. Nouri charged that the thieves stole his car stereo to disguise the search as a theft.

Authorities may invoke state security to justify telephone surveillance. There were numerous reports by NGOs, the news media, and diplomatic representatives that the government intercepted faxes and emails. The law does not explicitly authorize these activities, but the government stated that the code of criminal procedure implicitly gives investigating magistrates such authority. Many political activists experienced frequent and sometimes extended interruptions of service to home and business telephones, faxes, and the Internet. Human rights activists accused the government of using the postal code, with its broad but undefined prohibition against mail that threatens the public order, to interfere with their correspondence and interrupt the delivery of foreign publications. Security forces routinely monitored the activities, telephone, and Internet exchanges of opposition, Islamist, and human rights activists, as well as journalists, and also placed some under surveillance (see section 2.a.).

Human rights activists claimed that the government used charges of "association with criminal elements" to punish family members of Islamist activists for crimes allegedly committed by the activists. Family members reportedly were denied jobs, business licenses, and the right to travel due to their relatives' activism. They also alleged that relatives of Islamist activists, in jail or living abroad, were subjected to police surveillance and mandatory visits to police stations for questioning about their activist relatives. The government maintained that the relatives were themselves members or associates of the An-Nahdha movement, and therefore were subject to laws prohibiting membership in or association with that organization.

Human rights activists reported that upon release from prison, detainees suspected of An-Nahdha membership received identity cards marked to restrict their employment, unlike past reports that the identity cards were confiscated. Even if they had not been jailed, the authorities confiscated the identity cards of some activists and Islamists. For example, AISPP member Lasaad Johri has been deprived of an identity card since 1999.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press "exercised within the conditions defined by the law"; however, the government generally did not respect these rights in practice. It limited press freedom and intimidated journalists, editors, and publishers into practicing self-censorship. Security forces closely monitored press activity.

The law prohibits citizens from discussing national politics on foreign radio or television channels during the two weeks prior to national elections; however, there were no cases in which the law was invoked during the year.

Security forces often questioned citizens seen talking with foreign visitors or residents, particularly visiting international human rights monitors and journalists. The government attempted to influence public meetings by surrounding meeting places with scores of plainclothes policemen (see section 2.b.), as happened at the May 6 meeting on World Press Freedom Day, when plainclothes policemen lined the street leading up to the office of the Tunisian League of Human Rights.

The government stated that there were 950 foreign publications and newspapers distributed in the country and that 90 percent of the newspapers were "privately owned and editorially independent." However, of the eight mainstream dailies, two were government owned, two were owned by the ruling party, and two, though nominally private, took editorial direction from senior government officials. All media were subject to significant governmental pressure over subject matter.

There were three opposition party newspapers with small circulations and editorial independence from the government. Nevertheless, two of them, *Ettariq El Jadid* and *Al-Wahda*, received government subsidies under a law that provides government financing to papers representing opposition parties with seats in parliament. The third, *Al-Mawqif*, did not receive the subsidy since its party was not represented in parliament.

While the government permitted public criticism in opposition newspapers, the government impeded similar criticism in the mainstream press. Individuals and certain groups faced reprisal for statements critical of the government. For example, on April 28, a court found Mohamed Abbou, a lawyer, guilty of publishing statements "likely to disturb the public order" in which he compared the fate of Iraqi prisoners in Abu Ghraib to that of citizen prisoners. He was arrested following the online publication of another article in which he unfavorably compared the country's president to Israeli Prime Minister Ariel

Sharon.

During the year there were no reports of journalists being arrested. Abdullah Zouari, a journalist who once worked for *Al-Fajr*, the weekly newspaper of the An-Nahdha party, remained under administrative control and in internal exile. Zouari undertook a number of hunger strikes during the year to bring attention to his situation. Hamadi Jebali, a former editor of *Al-Fajr*, remained in prison serving his six-year sentence for insurrection and "membership in an illegal organization." In April, Jebali undertook a hunger strike to end his solitary confinement in prison. According to Reporters Without Borders (RWB), Jebali's conditions of imprisonment improved, and he ended his strike in late April. However, Jebali undertook two other hunger strikes later in the year to protest his continued imprisonment.

In the days before and during the UN World Summit on the Information Society, held in Tunis from November 16-18, the government harassed journalists and restricted press freedom.

On the night of November 11, four men attacked Christophe Boltanski, a journalist for the French newspaper *Liberation*, beating and slashing him with a knife and stealing his mobile telephone and documents. Boltanski had been reporting on demonstrations in support of the Movement of 18 October hunger strikers (see section 2.b.). Following the attack, international and local civil society organizations accused the security forces of organizing the assault. The government claimed it had arrested two suspects in the attack.

On November 14, according to international media and NGO reports, plainclothes policemen pulled Jean Jacques Mathy of the Belgian TV station RBF from his car and seized his video camera and cassette. The camera was subsequently returned without the cassette. Mathy was accompanying reporter Marianne Klaric and local human rights activist Rahdia Nasraoui to a meeting of NGOs at the foreign government-sponsored Goethe Institute (see section 2.b.).

During the year the government moved to abolish "*depot legal*," which had been a requirement that the government approve all printed material prior to publication or distribution. The action followed the president's announcement May 27 that "*depot legal*" would be abolished and the subsequent lifting of restrictions on printed media. Other press restrictions continued, including prior review of books.

Article 25 of the Press Code stipulates that the publication, introduction, and circulation of foreign works may be restricted. Authorities restricted the timely purchase of foreign publications that included articles deemed critical of the country. For example, authorities held the distribution of the May 22 edition of *Jeune Afrique L'Intelligent* due to its article on the reaction of local lawyers to the Abbou case.

The law authorizes sentences of up to three years in prison for defamation of constituted bodies, the administration, government members or deputies, and up to five years in prison for offensive statements against the president. Charges for defamation were brought against the editor of *Al Mawqif* for a 2004 article calling for an investigation into the railroad system. The case remained pending at year's end.

Directors and owners of existing private media, as well as journalists at the government and ruling party-owned press, practiced a high degree of self-censorship. Journalists in the mainstream press regularly refrained from investigative reporting on national issues. Only the small opposition press reported regularly on controversial national issues.

On May 3, three independent members of the Board of the Tunisian Journalists Association published a report in the name of the association that reported the "rampant violations undergone by journalists under the form of censorship, harassment and various other sorts of oppression." On May 27, one of the members, Neji Bghouri, was held in police headquarters, but no formal charges were brought against him.

Government regulations required foreign correspondents to obtain written approval before videotaping in any public area. The government also controlled the satellite transmissions of local correspondents reporting for foreign television stations by refusing to license correspondents and insisting that all correspondents use government-owned facilities for satellite uplinks.

Newspapers were often pressured to carry the government wire service's version of an event, even when their own journalists were present. Following a press conference held by the Tunisian Lawyer's Association on the Mohamed Abbou case, government representatives told journalists present not to write about the event.

The government maintained tight control of the broadcast media. Although the private broadcast media made some inroads in social and sports commentary, both private and government-owned radio stations confined broadcast news to international and uncontroversial national issues.

The negotiations over the licensing of the Hannibal private television station included a stipulation that it would not broadcast news. The granting of the licenses for the three existing private broadcast media was not transparent, and several requests for licenses, some dating back for years, remained in limbo. However, the government did not restrict the widespread possession of satellite dishes.

The government pressured journalists and the media in a variety of ways, including control over licensing, journalist accreditation, and directing the placement of government advertising. The government continued to exercise tight control over the licensing of new newspapers. Although there were at least 11 existing applications, the government did not allow the creation of any new newspaper. The government withheld press credentials from, and delayed granting passports to, journalists with whom it was displeased, including Slim Boukhdir, who in 2004 posed a question in a press conference implying that relatives of the president had pressured the judiciary to influence a legal case. The government did not grant government press cards to other experienced journalists, including Lotfi Hajji, Abdelatif Fourati, Slaheddine Jourchi, and Mohamed Fourati. Such press cards were needed for official accreditation as a journalist and were reviewed on an annual basis.

On September 10, officials at the Ministry of Interior prevented Sihem Ben Sedrine, a journalist, publisher, and one of the founders of the CNLT, from registering her newspaper *Kalima*, whose website remained blocked within the country (see section 2.b.) It was Ben Sedrine's fourth attempt to register the publication. Ben Sedrine and international human rights NGOs alleged that the government refused registration of *Kalima* due to its commentary critical of the government.

According to media editors, senior government officials routinely called news directors and editors to inform them which issues they were forbidden to print and to direct editorial content and news coverage. The Tunisian Agency for External Communications enforced this policy and other informal censorship mechanisms by selective placement of government advertising. In addition, private companies were consistently unwilling to advertise in newspapers no longer receiving government advertisements to avoid the appearance of siding with the media organization being punished.

Book publishing continued to be subject to "*depot legal*" as set out in Article 8 of the press code. In its February report, the Tunisia Monitoring Group of the International Exchange on Freedom of Expression provided a list of 21 books or academic works by local authors who were censored in the country.

The government blocked access to a number of Internet websites, including nearly all sites belonging to domestic human rights, opposition, and Islamist groups. In April 2004 the government allowed access to several foreign websites that previously had been blocked, including Hotmail, Al Jazeera, AI, and the French daily *Liberation*. Some foreign human rights websites remained blocked, including that of RWB. In November the OpenNet Initiative, a collaboration of universities in several nations studying government attempts to control Internet information, reported that the government had blocked 10 percent of the 2 thousand websites it tested. AISPP reported that potentially hundreds of persons had been arrested for visiting suspicious terrorism-related websites and were detained without proper legal procedures or sufficient evidence of having committed a crime. A July report on "cyber freedom," published by the Arab Information Network on Human Rights, ranked the country last among 11 Arab countries.

The government limited academic freedom and sought to foster a culture of self-censorship in universities. The government closely monitored administrators, teachers, and students to identify any political activity. Police on university campuses, both in uniform and in plainclothes, discouraged students from openly expressing dissent. In March police assaulted students during campus demonstrations against the government's invitation to Israeli Prime Minister Ariel Sharon to attend a UN summit. Police arrested one faculty member and several students (see section 2.b.).

Authorities subjected academic publications to the pro forma process of submission to the government before publication, and university libraries did not purchase foreign books or subscribe to foreign magazines deemed critical of the government. Tight government control over academic research funds prevented university administrators from applying for grants on research topics that they believed the government would find objectionable. Professors avoided teaching classes on subjects considered sensitive, such as legal courses on political systems or classes on civil liberties. University professors often avoided discussion of any subject deemed sensitive enough to interest the government, and faculty members reported that they were hesitant to gather in groups outside the classroom.

b. Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, but the government restricted this right in practice.

Freedom of Assembly

The law requires groups wishing to hold a public meeting, rally, or march to obtain a permit from the Ministry of Interior no

later than three days before the proposed event and to submit a list of participants; the authorities routinely approved such permits for groups that supported government positions and generally refused permission for groups that expressed dissenting views. As in previous years, NGO leaders reported difficulty in renting space to hold large meetings. They maintained that police pressured hotel and hall managers to prevent them from renting meeting space. Hotel managers and businessmen denied that there was a specific ban on renting space to opposition groups; however, they said they cooperated with the Ministry of Interior and accommodated its requests when possible.

In September a local hotel withdrew the reservation of the Tunisian Journalist's Syndicate (SJT), which had planned to hold a congress at the hotel. On August 24, police told SJT leader Lotfi Hajji that the government did not recognize the SJT and that the organization would not be permitted to hold a congress.

On November 10, organizers of the "Citizen's Summit on the Information Society," an unofficial parallel summit to the UN World Summit on the Information Society and sponsored by a group of international and national civil society organizations, reported that after reserving a venue for the conference at a hotel in Tunis, the hotel notified them that the hall was no longer available, citing the sudden need for repair work. On November 14, representatives of the organizations planning the citizen's summit tried to meet at the Goethe Institute, but they were prevented from entering by several dozen plainclothes police. According to HRW representatives, the police, who did not identify themselves, "manhandled local and foreign activists, knocking down several individuals as they pushed them along the streets."

The government used police and other state security forces to monitor, control, and sometimes disrupt demonstrations. The government broke up several unsanctioned demonstrations during the year. In general demonstrators and security forces did not resort to violence; however, there were some exceptions, such as scuffles ensuing from demonstrators' attempts to cross police lines or demonstrators not dispersing when ordered by police.

In March the government refused to allow several demonstrations to take place. Opposition groups, human rights NGOs, and students had petitioned to demonstrate in protest of the government's invitation to Israeli Prime Minister Ariel Sharon to attend the World Summit on the Information Society. Despite the ban, several protests took place. There were multiple reports that police assaulted several opposition leaders, human rights activists, and students during one demonstration.

Freedom of Association

The law provides for freedom of association; however, the government generally did not respect this right in practice. The law requires that new NGOs submit an application to the government to gain recognition and to operate legally. According to the law, an NGO that has filed an application to register may operate freely while the government processes its application. If the government does not reject the application within 90 days, the NGO is automatically registered.

The government routinely blocked the registration of new independent NGOs by refusing to provide receipts for their registration applications. Without such a receipt, NGOs were unable to counter the government's assertions that they had not applied to register and therefore were not allowed to operate. In such cases, NGOs could be shut down, their property seized, and their members prosecuted for "membership in an illegal organization."

During the year significant numbers of RCD members attempted to join independent NGOs, such as the LTDH and other civil society groups, with the apparent intent of eventually gaining control of the NGOs through elections or disrupting their operations. For example, in September a court ruled that the LTDH could not hold its national congress because of a suit filed by seven members of the LTDH allegedly loyal to the RCD. In some cases RCD members used the NGOs' own bylaws, while in other cases they exploited a provision of the law on associations that requires "organizations of a general character" to grant membership to all who apply.

Leaders of the AMT also alleged that the government used members loyal to the RCD to disrupt its meetings and operations. AMT members under government and RCD control held new elections for AMT leadership after the current president proposed new judicial reform initiatives and supported a group of lawyers that alleged improprieties in the trial of Mohamed Abbou (see section 1.c.). These RCD-loyal AMT members claimed that the president's communiqué was not representative of all AMT members. In August the government evicted AMT leadership from the association's headquarters in Tunis. Human rights organizations stated that the government removed the current AMT leadership due to its demonstrated independence.

c. Freedom of Religion

The law provides for freedom of religion that does not disturb public order, and the government generally respected this right in practice, although there were some restrictions and abuses. Islam is the state religion, and the law stipulates that the president must be a Muslim.

The government recognizes all Christian and Jewish religious organizations that were established before independence in 1956. Although it permitted other Christian denominations to operate, the government formally recognized only the Catholic church.

The government allowed the re-opening of a Catholic church in Djerba, but did not permit Christian groups to establish new churches.

While it is not illegal to change religions, Muslims who convert to another religion face social ostracism. The government requires non-Muslim men to convert to Islam before marrying a Muslim woman. The government did not allow married couples to register their children with non-Muslim names.

While authorities did not deport foreigners suspected of proselytizing, the government did not renew the visas of suspected missionaries. During the year there were no reported cases of official action against persons suspected of proselytizing.

The government required Islamic religious education in public schools, and the religious curriculum for secondary school students also included histories of Judaism and Christianity.

The government did not permit the establishment of political parties based on religion, and it used this prohibition to continue to outlaw the Islamist party An-Nahdha and to prosecute suspected An-Nahdha members for "membership in an illegal organization" (see section 1.e.). The government continued to maintain tight surveillance over Islamists and monitored activity in mosques.

The law provides that only persons appointed by the government may lead activities in mosques. The government required that mosques remain closed except during prayer times and other authorized religious ceremonies, such as marriages or funerals. According to human rights lawyers, the government regularly questioned individuals observed praying frequently in mosques. Authorities instructed imams to espouse governmental social and economic programs during prayer times in mosques. The government paid the salaries of imams.

The government sought to suppress certain outward signs of citizens' religious practice. For example, authorities characterized the hijab as a "garment of foreign origin having a partisan connotation" and officially prohibited its use in public institutions in order to "observe impartiality required of officials in their professional relations with others." However, in practice, wearing of the hijab in public places was sometimes permitted. In several cases, school officials took disciplinary action to punish and deter hijab use by attempting to have women sign written oaths renouncing its use. There were reports that police sometimes detained men with what were termed "Islamic" beards, compelling them to shave.

Religious publications were subject to the same restrictions on freedom of speech and the press as secular publications. Christian groups were generally allowed to distribute religious documents in English but not in Arabic. Only sanctioned religious groups were allowed to distribute religious documents. In the government's view, distribution by other groups constituted an illegal "threat to public order" (see section 2.a.). The government held a lottery to determine which citizens could make the hajj due to country quotas from the Saudi Arabian government on how many nationals from each country could participate in the Hajj.

Societal Abuses and Discrimination

Privately owned newspapers on occasion published cartoons and articles critical of Israel. Some cartoons used derogatory images of orthodox Jews to portray the state of Israel and Israeli interests. These cartoons were drawn by cartoonists outside of the country and reprinted locally.

Christians and Jews living in the country, including foreigners, constituted less than 1 percent of the population. The government permitted Christians and Jews who did not proselytize to worship as they wished, and it allowed Jewish communities to operate private religious schools. Jewish children on the island of Djerba were permitted to divide their academic day between public secular schools and private religious schools. The government also encouraged Jewish foreigners to return for the annual pilgrimage to the historic El-Ghriba Synagogue on Djerba.

Jewish community leaders reported that the government increased its traditionally active role in protecting synagogues, particularly during Jewish holidays. The government allowed the Jewish community freedom of worship and paid the salary of the grand rabbi. The government partially subsidized restoration and maintenance costs for some synagogues. While the government during the year did not act on a 1999 application to grant permanent registration to the Provisional Committee of the Jewish community to function as a sanctioned association, the leadership of the committee met weekly and performed religious activities and charity work.

In December 2004 the government announced that it would no longer require Israeli citizens to deposit their passports at the border for the duration of their visit to the country. The government also announced that a former Hebrew school would be restored and made into a training center of the arts for persons with disabilities, and indicated that the Jewish cemetery of Tunis would be restored. The number of Jewish pilgrims to El-Ghriba in May increased dramatically from previous years. According to Jewish leaders, approximately one thousand pilgrims were Israeli citizens.

During the year authorities did not report any anti-Semitic activities.

While Baha'is do not consider themselves Muslims, the government regarded the Baha'i faith as a heretical sect of Islam and permitted its adherents to practice their faith only in private. Interior ministry officials periodically met with prominent Baha'i leaders to discuss their community's activities, leading to an improved relationship between their community and the government.

For a more detailed discussion, see the *2005 International Religious Freedom Report*.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, Repatriation, and Exile

The law provides for these rights, and the government generally respected them in practice; however, the government refused to issue, renew, amend, or accept passports of some dissidents, Islamists, and their relatives. The government also may impose a five-year period of "administrative controls" at sentencing on certain former prisoners that constituted a type of internal exile.

The law authorizes the courts to cancel passports and contains broad provisions that both permit passport seizure on national security grounds and deny citizens the right either to present their case against seizure or to appeal the judges' decision. The Ministry of Interior is required to submit requests to seize or withhold a citizen's passport through the public prosecutor to the courts; however, the ministry routinely bypassed the public prosecutor with impunity.

Many citizens reported difficulty applying for or renewing their passports and accused the government of blocking their applications solely on the basis of political opposition.

Former Islamist leader Dr. Mohamed Sedki Labidi has been deprived of his passport for the last decade without a court decision. During the year the government issued a passport to Mokhtar Boubaker, a labor leader and former chief editor of the General Union of Tunisian Workers (UGTT) weekly, *Esch-Chaab*, after refusing to issue one since 2001. No reason was given by the Ministry of Interior, either for the original denial or the current issuance.

The law prohibits forced exile; however, the penal code provides for the imposition of a form of internal exile (which the government calls "administrative control") on convicts for up to five years. Administrative control measures, which take effect upon a convict's release from prison, are similar to parole restrictions, except that they may be applied to prisoners even after they have completed their sentences. The government requires those individuals to reside in an indicated place, chosen by the government, which may be anywhere in the country, and they are required to stay "in the area of their residence." They also may be required to report to a police station frequently each day, at times determined only the previous evening. At the police station, they may be forced to wait hours before they are allowed to sign in, making employment impossible. Numerous Islamists released from prison in recent years have been subjected to such continuing punishment.

By law, administrative control measures may only be imposed at sentencing; however, a former high school teacher, Nouri Chniti, claimed that, although his sentence did not include administrative control, he has been subject to extrajudicial administrative control measures since 1991 when he received a suspended sentence for membership in An-Nadha.

Some political opponents in self-imposed exile abroad were prevented from obtaining or renewing their passports to return to the country. During the year a group of citizens abroad who had been refused passports formed an organization called "Tunisians Without Passports" and released communiqués calling on the government to allow all citizens to receive passports.

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol. The government cooperated to a certain degree with the office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees and asylum seekers, but the government has not established a system for providing protection to refugees or foreign nationals who may not qualify as refugees under the 1951 Convention and 1967 protocol, but who still need some form of international protection. In

practice, the government did not provide protection against *refoulement*, the return of persons to a country where they feared persecution

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides that citizens shall directly elect the president and members of the chamber of deputies for five-year terms; however, there were significant limitations on citizens' right to change their government. Moreover, there were irregularities that routinely called into question the legitimacy of elections.

Elections and Political Participation

In the October 2004 national elections, President Ben Ali faced three candidates and received approximately 94 percent of the popular vote to secure a fourth term. The third opposition candidate, Mohamed Halouani of the Et Tajdid party, cited government restrictions and other irregularities to explain why he received less that 1 percent of the official vote count. According to official election returns, more than 90 percent of registered voters went to the polls; however, independent NGOs estimated that the actual turnout was closer to 30 percent, casting serious doubt on the election.

Irregularities such as voter intimidation also characterized the polling. A coalition of three local independent NGOs (LTDH, CNLT, and the Tunisian Association of Democratic Women) cited as serious problems the opposition's lack of media access during the campaign and media bias in favor of the ruling party. Opposition candidates and other observers also cited restrictions on disseminating campaign materials and organizing campaign events.

The Electoral Code significantly limits the number of individuals eligible to run for president. A candidate must be Muslim and must receive the endorsement of 30 sitting deputies or municipal council presidents to be eligible to run. By law, 20 percent of the seats in one house of the legislature (Chamber of Deputies) are reserved for opposition party candidates. The ruling party's domination of state institutions and political activity precluded any credible and competitive electoral challenges.

On March 15, the National Election Observatory, formed by the government in 2004 to monitor all stages of the 2004 elections, issued its report, concluding that the electoral process in general proceeded fairly and according to law. The report contained references to opposition and NGO criticism of the election, including the non-distribution of voting cards to opposition party members, the ruling party's media advantage, the lack of transparency of the actual balloting, and secret ballot counts. While the report refuted the claims, it also listed 12 specific recommendations to address problems. Independent human rights activists complained that the real purpose of the observatory was to deflect criticism over the lack of independent or international observers.

The ruling party has maintained power continuously since the country's independence in 1956. It dominates the cabinet, the chamber of deputies, and regional and local governments.

On July 3, the government conducted elections for the Chamber of Advisors, a second parliamentary chamber created by a 2002 constitutional amendment. The voters consisted of 4,555 officials, including municipal counselors, deputies, and mayors, plus the 189 members of the Chamber of Deputies. Of the 4,555 voters, only 305 belonged to opposition parties. The constitutional amendment creating the chamber specified that its 126 seats must be allocated among various regional and professional organizations, including 14 seats for the UGTT, which refused to name candidates, citing a lack of independence and democracy in the candidate selection process. The president appointed directly 41 candidates. The elected members of the new chamber were overwhelmingly members or supporters of the ruling RCD party.

The president appoints the prime minister, the cabinet, and the 24 governors. The government and the party are closely integrated; current and former senior government officials constitute the top ranks of the RCD. The president of the country is also the president of the party, and the party's vice president and secretary general each hold the rank of minister. All the members of the RCD politburo hold ministerial rank based on their current or former government service.

RCD membership conferred tangible advantages. For example, there were widespread reports that RCD members and their families were much more likely to receive educational housing benefits, small business permits, and waivers on zoning restrictions.

To mitigate the advantages wielded by the ruling party, the Electoral Code reserves 20 percent of seats in the Chamber of Deputies (37 of 189) for the seven officially recognized opposition parties, and distributes them on a proportional basis to those parties that won at least a single directly elected district seat. In the October 2004 elections, five of the opposition parties gained seats under that provision. The RCD continued to hold the remaining 152 seats.

The government partially funded opposition parties. Each party represented in the chamber of deputies received a public subsidy of approximately $42,000 (60,000 dinars), plus an additional payment of $3,500 (5,000 dinars) per deputy. The government also provided $105,000 (120,000 dinars) to each newspaper of an opposition party represented in the legislature. On November 30, the president announced an increase in the level of support for opposition parties represented in the chamber. The government raised the public subsidy for operational costs of opposition parties $56,300 (75,000 dinars) per year, raised the additional payment per deputy to $5,300 (7,500 dinars), and increased the level of government funding for opposition newspapers to $112,500 (150,000 dinars).

By law, the government does not permit the establishment of political parties on the basis of religion, language, race, or gender. The government used the prohibition to continue to outlaw the Islamist An-Nahdha party and to prosecute suspected members for "membership in an illegal organization" (see sections 2.b. and 2.c.). The government refused to recognize the creation of the Tunisian Green Party.

On a number of occasions, the president expressed the desire to increase the level of representation of women in the government to 25 percent. In April 2004 he appointed the country's first female governor. There were 50 women in the 301-seat legislature, 2 women in the 25-seat cabinet, and 5 women among the 18 secretaries of state. Following municipal elections in May, more than one-fourth of municipal council members elected were women. Three women served as presidents of chambers on the Supreme Court, and two women served on the 15-member Higher Council of the Magistracy. The government conducted the first elections without gender segregation during a September 2004 by-election in a governorate on the outskirts of Tunis.

Government Corruption and Transparency

There are 13 articles of the penal code concerning penalties for corruption, and there were a small number of corruption cases prosecuted throughout the year. In March 2004 the Minister of Interior announced the creation of the "Higher Institute of Security Forces and Customs," tasked not only with "reinforcing human rights and improving law enforcement," but also reducing corruption. There were no public reports of the organization's subsequent activities. There are no laws to provide government documents to citizens.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A variety of domestic and international groups generally were able to investigate and publish their findings, although with some difficulty, but the government actively discouraged investigations of human rights abuses. According to the government, there were more than eight thousand NGOs in the country devoted exclusively to social and economic development issues. The government sought to monitor and control the activities of some foreign NGOs within the country. There were approximately one dozen domestic human rights NGOs, although only half were authorized. The government met with registered domestic human rights NGOs and responded to their inquiries; however, it also harassed, targeted, and prosecuted some of them.

The LTDH was one of the most active independent advocacy organizations, with 41 branches throughout the country. The organization received and investigated complaints and protested abuses, although the government rarely responded to LTDH communiqués. The government continued to block a European Union grant to the LTDH, citing a law on NGO financing that includes broad prohibitions on funding of NGOs without government approval.

Other independent human rights NGOs included: the legally registered Arab Human Rights Institute; the Tunisian Association of Democratic Women (ATFD); the unregistered AISPP; and the ALTT.

Since 1998 the government has refused to authorize the CNLT's registration as an NGO. The CNLT issued statements sharply criticizing the government's human rights practices. Government officials have accused CNLT members of violating the pro forma submission requirements by publishing communiqués without prior government approval (see section 2.a.).

During the year significant numbers of ruling party RCD members continued attempts to join independent NGOs, such as the LTDH and other civil society groups, with the apparent intent of eventually gaining control of the NGOs through elections (see section 2.b).

In May the government refused to issue a visa to a member of AI's regional office in Beirut. According to local news sources, the AI member was attempting to participate in a human rights training session. On November 17, Robert Menard, Secretary General of RWB, attempted to enter the country to attend the UN World Summit on the Information Society. According to Menard, security agents boarded his plane upon landing and informed him that he was not allowed

to enter the country. A government spokesman later said Menard could not enter because of ongoing legal proceedings in the country relating to a 2002 protest of the country's tourist office in Paris. The government blocked RWB's website, which contained critical material on the country's human rights record.

In April HRW held a press conference in Tunis to announce a report on solitary confinement (see section 1.c.).

The International Freedom of Expression Exchange – Tunisia Monitoring Group (IFEX-TMG), a coalition of international human rights and freedom of expression NGOs, conducted fact-finding missions during the year. The IFEX-TMG reported heavy police surveillance of their activities and government interference with their mission. Police prevented translators and private citizens traveling with the group from attending some meetings.

In April the ICRC signed an agreement with the government that the local office could conduct visits to all prisons and detention centers in the country. The agreement followed more than a year of negotiations. The ICRC conducted visits starting in June and reported that access and cooperation with the government were good (see section 1.c). There were credible reports that police prevented some family members of prisoners from visiting ICRC offices. In September police allegedly assaulted the wife of an Islamist prisoner when she left AISPP offices, and they also prevented her from entering ICRC offices, reportedly telling her that she would be "put in prison with (her) husband" if she tried to enter the ICRC office.

The Ministry of Justice and Human Rights has the lead on government policy on human rights issues in the country, although other ministries also had human rights offices. The ministry did not release any public reports of cases or investigations. A government-appointed and funded body, the Higher Commission on Human Rights and Basic Freedoms, addressed, and occasionally resolved human rights complaints. The commission submitted confidential reports directly to the president. The government maintained several government-run news sites that include sections on human rights, but the sites are not specifically identified as government sponsored. However, the government continued to block access to the sites of domestic human rights organizations (see section 2.a.).

Section 5 Discrimination, Societal Abuse, and Trafficking in Persons

The law provides that all citizens are equal before the law, and the government generally respected this right, although in inheritance and family law, biased-based provisions in the civil code adversely affected women.

Women

Laws against domestic violence provide for fines and imprisonment for assaults committed by a spouse or family member that are double those for the same crimes committed by an unrelated individual, but enforcement was lax, as police and the courts generally regarded domestic violence as an internal family problem. Violence against women and spousal abuse occurred, but there were no statistics to measure its extent. The National Union of Tunisian Women (UNFT), a government-sponsored organization that ran a center to assist women and children in difficulty, sponsored national educational campaigns for women. The UNFT reported that its shelter handled one thousand cases during the year. The ATFD, active in debating and publicizing women's issues, operated a counseling center for female victims and reported that its shelter assisted approximately 100 women using the shelter for the first time during the year, in addition to a continuing caseload from previous years.

The penal code specifically prohibits rape, including spousal rape, and the government enforced the laws vigorously, giving significant press coverage to rape cases. Perhaps due to social stigma, there were no reports of prosecution for spousal rape. The death sentence is the penalty for rape with the use of violence or threat with a weapon. For all other rape cases, the penalty is life imprisonment.

The penal code prohibits prostitution, although individuals were rarely charged. The penalty for prostitution is up to two years in prison. The law applies to both women and men and their accomplices. There were no reported cases of trafficking or forced prostitution involving women.

In August 2004 the chamber of deputies passed the country's first law making sexual harassment a criminal offense, but the government subsequently suspended the law after civil society groups vociferously criticized it. Nevertheless, sexual harassment was a problem, although there were no comprehensive data to measure its extent.

Women enjoyed substantial rights, and the government advanced those rights in the areas of divorce and property ownership. Women enjoy the same legal status as men. The law explicitly requires equal pay for equal work, and although there were no statistics comparing the average earnings of men and women, anecdotal evidence indicated that women and men performing the same work received the same wages. A slight majority of university students were women.

Women served in high levels of the government as cabinet ministers and secretaries of state, comprising more than 13 percent of the total, and President Ben Ali appointed the country's first female governor in April 2004 (see section 3). Women constituted approximately 37 percent of the civil service and 24 percent of the nation's jurists. However, women still faced societal and economic discrimination.

Codified civil law is based on the Napoleonic code, although judges often used Shari'a as a basis for customary law in family and inheritance. Most property acquired during marriage, including property acquired solely by the wife, is held in the name of the husband. Muslim women are not permitted to marry outside their religion. Marriages of Muslim women to non-Muslim men abroad are considered common-law and are voided when the couple returns to the country. Application of inheritance law continued to discriminate against women, and there was a double standard based on gender and religion: non-Muslim women and Muslim men who are married may not inherit from each other. The government considers all children from those marriages to be Muslim, and forbids those children from inheriting anything from their mothers. Female citizens can convey citizenship rights to their children whether the father is a citizen or not.

In February 2004 the government launched a morality campaign invoking a 1940 law penalizing "immoral behavior" that observers said primarily affected women. For example, women were detained for wearing jeans that police judged too tight, for holding hands with men in public, and for driving with young men "without authorization." However, this campaign was discontinued later in 2004, and there was no enforcement of these penalties during the year.

The Ministry for Women's Affairs, Family, Children and Senior Citizens sponsored several national media campaigns to promote awareness of women's rights. Nearly two-thirds of its budget was devoted to ensuring the legal rights of women, while simultaneously improving their socioeconomic status. The government supported and funded the UNFT, the Center for Research, Documentation, and Information on Women (CREDIF), and women's professional associations. Several NGOs focused on women's advocacy and research in women's issues, and a number of attorneys represented women in domestic cases.

Children

The government demonstrated a strong commitment to free and universal public education, which is compulsory from age 6 to 16 years. According to the UN Children's Fund (UNICEF), 95 percent of boys and 93 percent of girls were in primary school, and approximately 73 percent of boys and 76 percent of girls were in secondary school. During the year, female students graduated from secondary school at a higher rate than their male counterparts. There were schools for religious groups (see section 2.c.). The government sponsored an immunization program targeting preschool-age children and reported vaccinating more than 95 percent of children. Male and female students received equal access to medical care.

Convictions for abandonment and assault on minors carried severe penalties. There was no societal pattern of child abuse.

Child labor and child prostitution were not significant problems. There were two ministries responsible for rights of children: the Ministry of Women's Affairs, Family, and Childhood, and the Ministry of Youth, Sports, and Physical Training. Each had secretaries of state responsible for safeguarding the rights of children.

Trafficking in Persons

The law prohibits trafficking in persons, and there were no reports that persons were trafficked to, from, or within the country.

In January 2004 the legislature approved amendments to the 1975 law on passports and travel documents. The law includes provisions for sentencing convicted traffickers to prison terms of 3 to 20 years, and fines of $67 thousand to $83 thousand (80 thousand to 100 thousand dinars). The amendments brought national law into conformance with the international protocol agreement on trafficking of persons. The government prepared to use provisions of the penal code to combat trafficking should the need arise. For example, traffickers could be prosecuted under laws prohibiting forced displacement of persons.

The Ministry of Interior and Local Development and the Ministry of Social Affairs, Solidarity and Tunisians Abroad were the agencies responsible for antitrafficking efforts. Since trafficking was not deemed a problem, there were no specific government campaigns to prevent trafficking.

Persons with Disabilities

The law prohibits discrimination against those with physical or mental disabilities and mandates at least 1 percent of public

and private sector jobs be reserved for persons with disabilities, and the government generally enforced these provisions. There was little discrimination against persons with disabilities in employment, education, access to health care, or in the provision of other state services. All public buildings constructed since 1991 must be accessible to persons with physical disabilities, and this was enforced. The government issued special cards to persons with disabilities for benefits such as unrestricted parking, priority medical services, preferential seating on public transportation, and consumer discounts. The government provided tax incentives to companies to encourage the hiring of persons with physical disabilities, and the government strongly supported NGOs working to help persons with disabilities.

Several active NGOs provided educational, vocational, and recreational assistance to children and young adults with mental disabilities. The government and international organizations funded several programs. The Ministry of Social Affairs and Solidarity and Tunisians Abroad was responsible for protecting the rights of persons with disabilities.

Section 6 Worker Rights

a. The Right of Association

The law provides workers the right to organize and form unions, and the government generally respected this right in practice. The UGTT was the country's only labor federation. There were some unauthorized, independent trade unions: the Democratic Confederation for Labor and the Tunisian Journalists Syndicate. Approximately 30 percent of the work force belonged to the UGTT, including civil servants and employees of state-owned enterprises, and a considerably larger proportion of the work force was covered by union contracts. A union may be dissolved only by court order. Approximately 27 percent of the total workforce was unionized.

The UGTT and its member unions were legally independent of the government and the ruling party; however, they operated under regulations that restricted their freedom of action. The UGTT membership included persons associated with all political tendencies. There were credible reports that the UGTT received substantial government subsidies to supplement union dues; however, UGTT leaders stated that their only funding came from modest union dues and revenue from an insurance company and hotel owned by the union. Union members and their families received additional support from the National Social Security Account (CNSS). The government provided the UGTT with land for its new headquarters and support for its construction. The central UGTT leadership generally cooperated with the government regarding its economic reform program. Throughout the year, the UGTT board showed some independence regarding economic and social issues, and in support of greater democracy. At mid-year, the UGTT refused to submit a list of candidates for 14 UGTT-designated seats in the newly created Chamber of Advisors, citing a lack of independence and democracy in the selection process and an unfair distribution of seats (see section 3). The UGTT supported the LTDH and allowed LTDH regional chapters to use UGTT facilities for conferences and meetings.

The law prohibits antiunion discrimination by employers, although the UGTT claimed that there was antiunion activity among private sector employers, such as the firing of union activists and using temporary workers to avoid unionization. In certain industries, such as textiles, hotels, and construction, temporary workers accounted for a large majority of the work force. The labor code protects temporary workers, but enforcement was more difficult than in the case of permanent workers. A committee chaired by an officer from the Labor Inspectorate of the Office of the Inspector General approved all worker dismissals. The committee is composed of representatives from the Ministry of Social Affairs, Solidarity and Tunisians Abroad, the UGTT, and the company dismissing the worker.

b. The Right to Organize and Bargain Collectively

The law protects the right to organize and bargain collectively, and the government protected this right in practice. Wages and working conditions are set in triennial negotiations between the UGTT member unions and employers. Numerous collective bargaining agreements set standards for industries in the private sector and covered 80 percent of the total private sector workforce. The government's role in private sector negotiations was minimal, consisting mainly of lending its good offices as a mediator if talks stalled. The government must approve, but may not modify, all agreements; once approved, the agreements are binding on both union and nonunion workers in the line of work that they cover. The UGTT also negotiated wages and work conditions of civil servants and employees of state-owned enterprises. The government was the partner in such negotiations. During the year the triennial labor negotiations with the UGTT, the Union of Tunisian Employers (the private sector employer's association) and the government continued as the UGTT sought more favorable wage increases for employees.

Unions, including those representing civil servants, have the right to strike, provided that they give 10 days advance notice to the UGTT, and it grants approval. The ICFTU has characterized the requirement for prior UGTT approval of strikes as a violation of worker rights, but such advance approval rarely was sought in practice. There were numerous short-lived strikes over failure by employers to fulfill contract provisions regarding pay and conditions and over efforts by employers to impede union activities. While the majority of the strikes technically were illegal, the government did not prosecute workers

for illegal strike activity. The law prohibited retribution against strikers. Labor disputes were settled through conciliation panels in which labor and management were represented equally. Tripartite regional arbitration commissions settle industrial disputes when conciliation fails.

There are export-processing zones (EPZs) subject to regular labor laws.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced and compulsory labor, including by children, and there were no reports that such practices occurred. However, some parents of teenage girls placed their daughters as domestic servants and collected their wages (see section 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children under 18 in jobs whose nature and environment present a serious threat to their health, security and morality, and the UGTT and CNSS conducted inspection tours of factories and industrial sites to ensure compliance with the law.

In April the government amended the Household Workers Law to prohibit the employment of children under the age of 16 years, which is consistent with the age for completing educational requirements, and inspectors of the Ministry of Social Affairs and Solidarity examined the records of employees to verify that employers complied with the minimum age law. However, there were no reports of sanctions against employers. Child labor also existed in the informal sector disguised as apprenticeship, particularly in the handicraft industry.

The minimum age for light work in the nonindustrial and agricultural sectors during nonschool hours was 13 years. Workers between the ages of 14 and 18 must have 12 hours of rest per day, which must include the hours between 10 p.m. and 6 a.m. In nonagricultural sectors, children between the ages of 14 and 16 years may work no more than 2 hours per day. The total time that children spend in school and work may not exceed seven hours per day. Nonetheless, young children sometimes performed agricultural work in rural areas, and worked as vendors in towns, primarily during their summer vacation from school.

e. Acceptable Conditions of Work

The labor code provides for a range of administratively determined minimum wages. In August the industrial minimum wage was raised to $179 (224 dinars) per month for a 48-hour workweek and to $155 (194 dinars) per month for a 40-hour workweek. The agricultural daily minimum wage was $5.87 (7.33 dinars) per day for "specialized" agricultural workers and $6.17 (7.71 dinars) per day for "qualified" agricultural workers. With the addition of transportation and family allowances, the minimum wage provided a decent standard of living for a worker and family, although that income was only enough to cover essential costs. More than 500 thousand workers were employed in the informal sector, which was not covered by labor laws.

Regional labor inspectors were responsible for enforcing standards related to hourly wage regulations. They inspected most firms approximately once every two years. The government often had difficulty enforcing the minimum wage law, particularly in nonunionized sectors of the economy. The labor code sets a standard 48-hour workweek for most sectors and requires one 24-hour rest period per week.

Special government regulations governed employment in hazardous occupations like mining, petroleum engineering, and construction, and the Ministry of Social Affairs and Solidarity and Tunisians Abroad had responsibility for enforcing health and safety standards in the workplace. Working conditions and standards generally were better in export-oriented firms than in those firms producing exclusively for the domestic market. Workers were free to remove themselves from dangerous situations without jeopardizing their employment, and they could take legal action against employers who retaliated against them for exercising this right.

The few foreign workers in the country had the same protections as citizen workers.