**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANAD ALI YISLAM AL-KAZIMI<br>    Detainee,<br>    Guantánamo Bay Naval Station,<br>    Guantánamo Bay, Cuba.<br>                           Petitioner,<br><br>v.<br><br>GEORGE WALKER BUSH, *et al.*,<br>                           Respondents. | Civil Action No: 05-2386(RBW)(AK) |

## MARCH 9, 2007 DECLARATION OF RAMZI KASSEM

Pursuant to 28 U.S.C. §1746, I declare that the following is true and correct:

1. My name is Ramzi Kassem.

2. I am an Adjunct Professor of Law at Fordham University School of Law in New York, NY, and am counsel to the Petitioner in the above captioned case.

3. On January 15, 2007, I met with my client at the Guantánamo Bay Naval Station, Guantánamo, Cuba.

4. During that meeting, I learned from my client the alarming facts listed below. In light of the restrictive base rules relative to attorney meetings and the virtual impossibility and extreme delays inherent in mail communications, it was impracticable to draw up a declaration for my client to execute. Accordingly, I make this declaration on the basis of my observations and my client's statements to me during our meeting.

5. On January 14, 2007, I traveled to Guantánamo Bay Naval Station, Cuba, and, on the following day, January 15, 2007, I met with my client, Petitioner Sanad Al-Kazimi (ISN 1453), a Yemeni national imprisoned at Guantánamo without charge or recognized legal status for over two years. The meeting took place in a shack at the Camp Iguana section of the detention facilities on the base.

6. Upon entering the shack, I was immediately able to observe multiple bruises and severe swelling all over Sanad's face and neck.

7. After a more thorough examination, I noted additional bruises and marks on my client's arms and on his back.

8. It was apparent to me that these injuries were the result of deliberate and sustained beatings.

9. My client complained of soreness in his jaw and back as well as an excruciating headache.

10. Sanad told me that his injuries were the result of a beating he received at the hands of an Immediate Reaction Force ("IRF") team that burst into his cell in Camp 6, around 7PM on January 14, 2007, the day before our meeting.

11. I know from Sanad and other clients held at Guantánamo that IRF teams are generally deployed to intimidate, punish and force compliance from prisoners at Guantánamo. Those teams are also sometimes used during interrogations to brutalize prisoners into cooperating with interrogators.

12. On January 14, 2007, Sanad was using the toilet in his cell.

13. My client's religious beliefs dictate modesty at all times, especially with respect to unrelated members of the opposite sex.

14. As is the common and accepted practice among the prisoners at Guantánamo, Sanad used his blanket to cover the lower half of his body while he was seated on the toilet. While using the toilet, Sanad made sure to keep the upper part of his body and his head visible at all times to the guards patrolling outside his cell.

15. However, two military guards, one female and one male, ordered him to remove his blanket and uncover his private areas.

16. Because his religious convictions and sense of privacy precluded exposing himself in the nude, especially in the presence of a female, my client refused to remove his blanket.

17. At that point, the guards summoned the IRF team.

18. Sanad heard the IRF team approaching his cell, marching in formation, stomping and chanting loudly.

19. The IRF team members marched into his cell, in full riot gear and bunched together behind a large plastic or Plexiglas shield.

20. They all piled on top of Sanad, pinning him to the ground, with IRF soldiers securing each of his arms and legs and another grabbing hold of his head.

21. My client did not put up any resistance, yet he was still punched, kicked and otherwise beaten mercilessly by the IRF team members who used their shield, fists, elbows, knees and boots on his face, neck, arms, torso and back.

22. Sanad noted that all IRF interventions are videotaped by the authorities at Guantánamo and that this particular intervention targeting him had been videotaped as well.

23. The following morning, prior to my meeting with Sanad, a prisoner in a cell next to his, who had heard the commotion the night before and knew that Sanad had been beaten, clamored for medical aid to be brought to Sanad. The prisoner speaks fluent English, whereas my client does not.

24. Some time later, two military officers visited Sanad in his cell.

25. They were not accompanied by an interpreter and neither of them demonstrated any knowledge of Arabic, my client's language.

26. They were not doctors yet proceeded to gauge Sanad's blood pressure.

27. While the officers were in my client's cell, his neighbor shouted out instructions to them in English, telling them to medically treat Sanad properly and to give him a Motrin.

28. The officers conducted no further medical examination, nor did they even give my client medication to soothe his obvious pain or quell the inflammation ahead of our meeting later that morning.

29. I know from another client held at Guantánamo that withholding minimally adequate medical treatment and painkillers is a form of punishment and discipline meted out by the authorities at Guantánamo to prisoners deemed uncooperative.

30. It is my belief that in the wake of his abuse at the hands of the IRF team, my client Sanad was denied access to proper medical care in direct application of this policy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of March, 2007.

RAMZI KASSEM
*Counsel for Petitioner*