UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANAD ALI YISLAM AL-KAZIMI<br>    Detainee,<br>    Guantánamo Bay Naval Station,<br>    Guantánamo Bay, Cuba.<br><br>                        Petitioner,<br><br>        v.<br><br>GEORGE WALKER BUSH, *et al.*,<br><br>                        Respondents. | Civil Action No: 05- 2386(RBW)(AK) |

**PETITIONER'S REPLY MEMORANDUM IN SUPPORT OF EMERGENCY MOTION**

Petitioner respectfully submits this reply memorandum in further support of his Emergency Motion to Compel disclosure of certain records. In its response, the Government has gone to great lengths to oppose Petitioner's motion to preserve access to counsel and disclose information related to the recurring IRF interventions. Respondents set forth, for example, that counsel for Petitioner is impermissibly requesting discovery and that Petitioner has "concocted" his account. Such arguments, however, should prove unavailing in light of the exigent circumstances presented by Petitioner and the narrowly-tailored, limited remedies he seeks, all of which are easily manageable by the Government, well within the boundaries of the Protective Order governing this case, and fundamental to the principle of ensuring timely and adequate access to counsel.

Petitioner does not seek back-end discovery to challenge his indefinite detention. Counsel simply seeks to prevent the injury or death of their client who has, understandably,

1

lost hope after over two years of isolated detention, without charge, at Guantánamo. Respondents' refusal to provide counsel for Petitioner or the Court any of the requested information initially requested, even refusing to acknowledge the serious bruising all over Petitioner's body, alone warrants intervention to ensure that Petitioner's access to counsel is not reduced to a meaningless exercise.

Furthermore, Respondents urge the Court to simply accept their conclusory claims without scrutiny. Petitioner respectfully reminds the Court that the representations made by the Government with respect to its IRFing policy at Guantánamo have proven incorrect -- with devastating consequences -- on numerous occasions. For example, Sean Baker, a United States soldier, playing the role of an uncooperative detainee during an IRF training drill now suffers from traumatic brain injury as a result. At first, the Government said that Baker's hospitalization after the training incident was not related to the beating. Later, officials conceded that he had been treated for injuries suffered when a five-person IRF team choked him, slammed his head several times against a concrete floor and sprayed him with pepper gas. Moreover, the numerous former and current detainees incarcerated at Guantánamo have described the IRF team as a disciplinary squad that responds with excessive physical punishment to often minor detainee infractions or none at all.

That Respondents persist in asking the Court to rely on their word that Petitioner's well-being and counsel access are adequately protected when events of recent years have clearly demonstrated otherwise only buttresses the need for this Court to ensure that meaningful counsel access is preserved. For these reasons, and those set forth in greater detail below, Petitioner's motion should be granted.

**ARGUMENT**

I.  **Review of the Evidence Would Enable this Court to Decide which Account to Credit and the Form of Relief Necessary to Preserve Access**

As Respondents admit, there are factual discrepancies between Petitioner's and Respondents' recounting of the IRFing incident that occurred on January 14, 2007.[1] Respondents attempt to undermine Petitioner's account of the events in several ways that the Court should find unavailing. First, Respondents' declarations do not of themselves and simply by virtue of their difference from Petitioner's story establish that Petitioner "concocted" his account, as they claim. See Respondents Opposition, at 6 (hereinafter, "Opp."). If that were true, then it would be equally true that Mr. Al-Kazimi's account gives Respondents' declarants the lie. Rather, together with Petitioner's account, all these declarations show is a dispute of fact, one that only this Court can examine and resolve as part of its role in enforcing the guarantees delineated in the Protective Order for effective counsel access.

In their opposition, Respondents offer a radically different and implausible account of the IRF intervention targeting Petitioner on January 14, 2007. Conceding that Mr. Al-Kazimi offered no resistance to the IRF Team, Respondents state that the team did not subject him to any "rough treatment." See Declaration of Colonel Wade F. Dennis ¶ 5 (hereinafter, "Dennis Decl."). Yet, they also admit to his complaining of "cuts," id. ¶ 6, sustained during the

---

[1] Counsel for Petitioner thank Respondents' counsel for indicating that IRF teams should be correctly referred to as "Initial Response Force" teams rather than "Immediate Reaction Force" teams (see Respondents' Opposition, at 7), and suggest that they also alert Respondents as to the correct term to be used. See, e.g., http://www.dod.mil/pubs/foi/detainees/IRF_Guantanamo.html (Department of Defense website referring to IRF incident reports as "Documents concerning Immediate Reaction Force (IRF), Guantánamo Bay") (emphasis added) (last visited on Apr. 2, 2007; on file with Petitioner's counsel); see also http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=3002 (Vice Admiral Albert T. Church, III, Naval Inspector General, referring to IRF teams as "Immediate Response Force" teams) (last visited on Apr. 2, 2007; on file with Petitioner's counsel).

extraction, the origins of which are left unclear and without any explanation in their version of events. The existence of cuts, bruises, redness and swelling all over Petitioner's body refutes the assertion by Respondents and their declarants that Petitioner was not subjected to rough and aggressive treatment on January 14, 2007. [2]

Counsel Ramzi Kassem, as an Officer of the Court, provided a declaration attached as Exhibit A to Petitioner's Emergency Motion, describing the bruises observed on his client's face, neck, back, and arms during his January 2007 visit to Guantánamo. Since Respondents appear to consider these observations insufficient or unbelievable, and the reality and gravity of Petitioner's injuries remain at issue, attached to this Reply is an additional declaration by co-counsel for Petitioner, James A. Cohen. See Declaration of James A. Cohen, dated March 30, 2007, attached hereto as Exhibit A. Cohen also attended the January 15, 2007, meeting with Petitioner. Id. ¶ 3. Consistent with Ramzi Kassem's Declaration, dated March 9, 2007, Cohen also observed bruises, redness, and swelling that appeared to be results of deliberate and sustained physical contact as such as would be caused by a beating. Id. ¶¶ 4-6. Cohen also noted that the injuries were not defensive in nature. Id. ¶ 6. While Colonel Dennis' declaration makes clear that under JTF-GTMO policy, the IRF team will use only a proportionate level of force in response to the level of resistance by a detainee, see Dennis Decl. ¶ 4, it is unclear how Petitioner, who all parties agree provided no resistance to the FCE on January 14, 2007, sustained such seriously disproportionate injuries as a result of the event as described by Respondents.

---

[2] Notably, there is no declaration or affidavit provided by the medical corpsman who supposedly attended to Mr. Al-Kazimi after the incident occurred. See, e.g, Al-Joudi v. Bush, 406 F. Supp. 2d 13, 18 (D.D.C. 2005), where the government filed the declaration of Dr. John S. Edmondson to articulate medical procedures in place at Guantánamo relating to hunger-striking.

4

More generally, Respondents contend that the IRF teams are trained to conduct extractions and secure detainees "in a safe manner." See Dennis Decl. ¶ 3. Respondents conveniently ignore the departures from training vividly illustrated in Baker v. United States, 2006 WL 1635634 (E.D. Ky. 2006). The Baker case offers the only public illustration other than detainee accounts of the IRF's so called "safe practices." As recounted in the factual background by Judge Hood, the IRF team physically restrained Baker and repeatedly slammed his head onto the cell's steel floor. Id. at *1. It was not until the unit realized that their victim was a U.S. solider involved in a training exercise and not a real detainee as they had believed, that they halted the abuse.[3] Id. Even stopping short the exercise, Baker suffered permanent brain damage and received 100% disability income due to "the severity of the injuries." Id.[4] Colonel Dennis' declaration states that "[t]he use of the IRF Team, when appropriate, is a proportionate level of force used in response to the level of resistance by a detainee or in response to an emergency. Use of the IRF Team is not used (sic) as a method of punishment or as an interrogation tool." See Dennis Decl. ¶ 4. While counsel will not dispute that this may be the intended usage of the IRF Team, accounts from former detainees at Guantánamo taken together with Baker's abovementioned experience, suggest that the actual usage of the squad often strays far from that intent. Indeed, former detainees have given accounts of mistreatment at the hands of the IRF squad that are consistent with Baker's and with Petitioner Al-Kazimi's experience on January 14, 2007.[5] Therefore, Petitioner's

---

[3] The inference, of course, is that had the subject been an actual detainee, the abuse might have continued with graver consequences than the permanent brain damage sustained by Baker.

[4] See also, David Zucchino, Pummeled MP sues Pentagon Soldier was impersonating unruly Guantánamo detainee in training, Los Angeles Times Saturday, June 18, 2005, at A14 (conceding, after their initial denial, the injuries suffered by Baker were a result of the IRF intervention training).

[5] See CENTER FOR CONSTITUTIONAL RIGHTS, REPORT ON TORTURE AND CRUEL, INHUMAN AND DEGRADING TREATMENT OF PRISONERS AT GUANTÁNAMO BAY, CUBA (July 2006) [hereinafter CCR REPORT] (cited in

safety, far from being assured, is in fact in constant jeopardy during his detention at Guantanamo, as numerous interactions with the IRF team establish.

Respondents highlight the fact that counsel did not raise the issue of Mr. Al-Kazimi's wellbeing with the Staff Judge Advocate's ("SJA") Office while present at Guantánamo in January 2007. See Opp., at 8. Not only do Respondents improperly insinuate that Petitioner's counsel lied in his declaration as to the signs of abuse, Respondents also seem to suggest that raising concerns with the SJA's Office is somehow obligatory. However, submitting requests through the SJA's office is not a mandatory procedure, and Respondents cite no authority in support of their proposition for the simple reason that there is no such authority.

Counsel's decision to not relay his observations and concerns through the SJA Office was not the product of omission, oversight, or deceit on counsel's part, nor a sign of indifference to Mr. Al-Kazimi's condition, but rather a conscious choice to respect Petitioner's wish to not report an instance of abuse to the very authorities responsible for that abuse. Petitioner instead requested that counsel bring the matter to the attention of an impartial arbiter, and counsel obliged by bringing this motion in front of the Court. Furthermore, there have been instances where counsel's clients, including Petitioner, have not specifically requested or indicated that a matter should be brought before a judge. For these matters, and when counsel determines that it is in the client's interest to place a request with the SJA's Office, counsel has indeed done so. Such discretion is the prerogative of counsel as

---

Petitioner's Motion, at 7). Additionally, in a UN report, (which, unfortunately, employs yet another variation on what the acronym IRF stands for), the Commission on Human Rights examines the situation of detainees at Guantánamo Bay. Within the report, three areas are identified as contexts where "excessive force" is routinely used: "during transportation [of detainees], with regard to operations by the "Initial Reaction Forces" (IRF), and by force-feeding during hunger strikes." See UN, Commission on Human Rights, Economic, Social and Cultural Rights, Civil and Political Rights ¶ 54 (Feb. 2006). The CCR Report also refers to a U.S. Southern Command report which called the use of all-female IRF teams "inexplicable." The CCR Report comments on this statement by explaining that Muslim men are forbidden to be touched by any women who are not relatives. See CCR REPORT, at 28. The suggestion, not directly stated, is that females are deliberately used as a means of offending the religious beliefs of Muslim men. Id.

6

we determine how best to serve and represent our clients, and there is nothing that binds counsel to reporting all incidents or concerns to the SJA's Office as a matter of first recourse. The mere fact that counsel opted for one course of action over another can in no way be taken to undermine the veracity or gravity of our client's account of events, nor does it add any credence to the improper insinuation by Respondents that an Officer of the Court has proffered a false declaration.

What the two declarations provided as exhibits to Respondents' Opposition make clear, however, is that records of the incident that occurred on January 14, 2007, do exist. It should be noted that Respondents make no mention of the videotapes that Petitioner has requested, though it is well-documented that IRF incidents are taped, and Petitioner stated to counsel that he saw a camera trained on him during the incident that occurred on January 14, 2007. [6] See Ramzi Kassem Declaration ¶ 22 (hereinafter, "Kassem Decl."). In light of these facts, it is fair to assume that a videotape of the incident in question is among the records in Respondents' exclusive custody and control and was part of the "information" reviewed and referred to by Respondents' declarants. See Dennis Decl. ¶ 2; McCarthy Decl. ¶ 2. There can be no reason why this Court should be precluded from reviewing these records. Because this is not a discovery request and Petitioner's counsel are only concerned with preserving access under the Protective Order, we do not need to obtain the records and again invite the Court to conduct an in camera review of the records requested. See Mot. at 4-5. Such relief will enable the Court to determine whether Respondents' actions are subverting the very purpose

---

[6] See, e.g., Paisley Dodds, Tapes Show Guantánamo Squads' Tactics, ASSOC. PRESS, Feb. 1, 2005; CCR REPORT, supra note 5, at 21. Additionally, that Sean Baker sought production of the videotape of his attack is further proof of the existence of such videos. In response to his request, Baker's squad leader told him that there was no tape, and Platoon Sergeant Riley said, "[t]hat was the only time that I heard that a tape had gone missing." See CBS News, G.I. Attacked During Training,
http://www.cbsnews.com/stories/2004/11/02/60II/main652953.shtml (last visited Mar. 31, 2007) (on file with Petitioner's counsel).

of the Amended Protective Order by placing Petitioner's health and well being in imminent danger, thereby jeopardizing his right to meaningful counsel access. When the records are reviewed, this Court can decide which account of the incident to credit, and what further relief to grant, if it deems any appropriate.

**II.     Respondents Improperly Read into the Protective Order Non-Existent Requirements and Limitations**

Respondents attempt to characterize the Protective Order as doing nothing more than establishing "a regime for the protection, handling of classified and otherwise protected information in light of the unique circumstances of these Guantánamo habeas cases." See Opp., at 9 n. 5. As justification for this premise, Respondents maintain that "Petitioner's motion does not cite to any provision of the Protective Order that would entitle him to the discovery he seeks." Id., at 9. This is a most puzzling assertion. To the extent that the Protective Order delineates procedures for counsel's access to their clients, it is somewhat incongruous to require that the Protective Order contain specific language indicating that Respondents are forbidden from taking affirmative measures to undermine such access. Certainly, the Protective Order clearly indicates that the procedures delineated therein "shall govern counsel access to all detainees in the control of the Department of Defense at the U.S. Naval Base at Guantánamo Bay, Cuba." In re Guantánamo Detainee Cases, 344 F. Supp. 2d 174, 183 (D.D.C. 2004) (emphasis added). It further requires counsel to provide verification of representation, sets forth procedures for correspondence between counsel and their respective clients, and more importantly, provides for counsel visits to meet with their clients

in person at Guantánamo. Id., 187-189. Consequently, counsel access is an integral part of the Amended Protective Order.[7]

Not only does Respondents' understanding of the Protective Order clash with its terms and plain meaning, it is also inconsistent with this Court's broader understanding thereof as evidenced by the decision in Al-Joudi v. Bush, 406 F. Supp. 2d 13 (D.D.C. 2005). In Al-Joudi, this Court reasoned "that in order to properly represent Petitioners, their counsel must have access to them, must be able to communicate with them, and must be made aware if their clients are in such fragile physical condition that their future ability to communicate is in imminent danger." [8] Id. at 21-22; see also Mot. at 9. Clearly then, "counsel access" means more under the Protective Order than mere information-handling procedures.

Respondents also contend that Petitioner must establish a Protective Order violation, which hypothetical condition is not satisfied where "respondents have not denied petitioner access to his counsel" and where there is no "evidence to suggest his communication with petitioner has been impaired because of the alleged IRF incident." See Opp. at 10, 11. Respondents' improbable argument here is that egregious abuse by the IRF, though capable of repetition, does not amount to an access issue under the Protective Order and evades review until it is effectively too late for Petitioner. By Respondents' logic, only when permanent and

---

[7] This Court has already rejected Respondent's claims that the Protective Order does not guarantee Petitioner effective access to counsel. See Mohammon, 05-2386 (RBW) (Order, at 2) (June 26, 2006) (dkt. no. 66) (Judge Walton maintaining "[b]eyond these arguments, the respondents have offered no further support for their position that the Court lacks authority to enter protective orders affording the petitioner access to counsel .") Thus, where a protective order governing a client's access to counsel remains in effect, as is the case here, the Court, outside of the main controversy, has exclusive authority to ensure that the terms of that Protective Order are respected by all parties.

[8] Respondents rely on L.A. v. Lyons, 461 U.S. 95 (1983), to argue that counsel merely speculates as to the possibility of future IRFings (or future physical abuse) and therefore relief should not be granted on that basis. In Lyons, a police officer placed the plaintiff in a chokehold during a routine traffic stop. The Court refused to grant relief because it was unlikely that the same situation would recur given that the police officer was acting in violation of policy. This is easily distinguished from the facts in Petitioner's case, where IRFing is an institutionalized part of Guantánamo's detention policies.

9

irreversible damage to Petitioner's health is shown can counsel claim that access had been impaired and petition for whatever relief remains available at that point, which would likely be meaningless. Fortunately, this Court laid that argument to rest in Al-Joudi when it granted relief similar to that sought here well before it was too late and in order to forestall future deterioration in the petitioners' physical and mental states.[9] Consequently, the issues raised by Petitioner are properly justifiable under the Protective Order.

### III. Petitioner is not Engaging in Conditions of Confinement Litigation

Petitioner does not seek to challenge or second-guess the conditions of his confinement, as Respondents suggest.[10] Nevertheless, Counsel for Petitioner need only repeat this Court's characterization of the relief requested in Al-Joudi as categorical proof that Petitioner's request is in fact inherently linked to and inseparable from the question of effective counsel access. There is no suggestion in Al-Joudi, that disclosure of records relating

---

[9] Respondents appear to minimize the critical situation in which Petitioner finds himself by characterizing it as a single incident of abuse arguing that before relief can be contemplated by this Court, something worse must occur. In Al- Joudi v. Bush, however, this court rejected the Government's argument that "no one has died," refusing to wait for that event. 406 F. Supp. 2d 13, 20 (D.D.C. 2005). Instead, the Court required the Government to provide petitioners' counsel "a. medical records spanning the period beginning one week prior to the date forced feeding commenced; and b. provision of medical records shall continue, at a minimum, on a weekly basis until forced feeding concludes." 406 F. Supp. 2d 13, 23 (D.D.C. 2005). Petitioner has in fact been subjected to numerous incidents of abuse at the hands of IRF teams and thus it is not an isolated event, but in fact recurring abuse for Mr. Al-Kazimi and others. See Mot., at 7. The January 14, 2007, incident was discussed in detail, and was the motivating incident behind the Emergency Motion, because of the fact that this was the first time that counsel was able to observe to the immediate aftermath of such a grave incident.

[10] However, it should be noted that Respondents' proposition that confinement conditions litigation in the habeas context is impermissible is far from well-established. Even assuming that Petitioner were seeking to litigate the conditions of his confinement, Petitioner would not necessarily be foreclosed from seeking such relief within the context of a habeas petition. Respondents themselves concede that neither the Supreme Court nor the D.C. Circuit have definitively addressed the extent to which prisoners may use habeas to challenge their conditions of confinement. See Opp. n. 4, at 6. Both the Supreme Court and the D.C. Circuit have commented on the issue with some detail, however. See Preiser v. Rodriquez, 411 U.S. 475, 499 (1973) ("This is not to say that habeas corpus may not also be available to challenge such prison conditions . . . . When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal."); Blair-Bey v. Quick, 151 F.3d 1036, 1042 (D.C. Cir. 1998) ("It is possible that habeas corpus might be available to challenge prison conditions in at least some situations. The Court expressly left this possibility open in Preiser v. Rodriquez."); Brown v. Plaut, 131 F.3d 163, 168 (D.C. Cir. 1997) ("Habeas corpus might conceivably be available to challenge . . . prison conditions, [such as] mail, shower or library privileges.").

to treatment constituted an attempt to litigate conditions of confinement. Similarly, there can be no suggestion here that Petitioner's requested relief, that is to say medical records, as well as written and videotaped records of IRF interventions, is anything other than a matter falling under the rubric of counsel or client access. There, as here, the Court or counsel must be made aware if Petitioner is so imperiled that his future ability to communicate with counsel is at risk. Release of the requested records, whether to counsel for Petitioner, or to this Court, is the only available means for such a determination to be made.

**IV.    Petitioner Does Not Seek Discovery as Respondents Contend**

Respondents misconstrue Petitioner's request for relief as a discovery request relating to conditions of confinement, maintaining that such relief falls outside the ambit of the Amendment Protective and Procedures for Counsel Access (hereinafter "Amended Protective Order" or "Protective Order"). See Opp. 1. This is a plainly erroneous categorization for Petitioner does not seek to obtain factual returns or otherwise "discover" evidence through this motion in order to challenge the legality of his detention, but rather to ensure compliance by Respondents with a valid and effective protective order that governs and guarantees effective counsel access. In this regard, Respondent's reliance on Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999), for the proposition that "[a] habeas petitioner does not enjoy the presumptive entitlement of discovery of a traditional civil litigant," and that "discovery is available in the discretion of the court and for good cause shown," is wholly irrelevant. See Opp., at 9-10. Here, Petitioner is not seeking discovery and therefore the remedy sought is not limited by these restrictions.

Indeed, counsel for Petitioner need not delve into abstract argumentation for the simple and well-accepted proposition that discovery, by definition, relates to the substantive

issues at the heart of a complaint or petition, issues wholly unrelated to the relief sought here. See, e.g., Primos Inc. v. Hunter's Specialties, 451 F.3d 841, 851 (Fed. Cir. 2006) (stating that "the purpose of discovery is to enable parties to obtain the factual information needed to prepare their cases for trial.")[11]  It is difficult to imagine, in this context, how a request for medical records, written records detailing IRF interventions, as well as videotape recordings of such interventions, could possibly be construed as a discovery request addressing the illegality of Petitioner's continued detention without charge on its merits.

### V.    The Relief Sought by Petitioner Does Not Place "Entirely New" Obligations upon Respondents

Respondents also argue that the relief sought by Petitioner places "new . . . obligations on respondents that are not contemplated by the Protective Order." See Opp., at 12.  More specifically, Respondents maintain that "once jurisdiction ceases to exist, 'the court lacks the power to impose any new, affirmative requirements on the parties.'"  Opp., at 12 (citing United Nuclear Corp. v. Cransford Ins. Co., 905 F.2d 1424, 1428 (10th Cir. 1990)). Unfortunately, however, Respondents' reliance on United Nuclear Corp. is misplaced.  That case, concerned the modification of a protective order, four years after the dismissal of an underlying suit, whereby collateral litigants were seeking access to records place under seal by that order.  Id.  There, the Court of Appeals for the Tenth Circuit acknowledged that it lacked the power to impose new requirements on the parties, yet affirmed the District Court's

---

[11] See also, US v. Proctor & Gamble Co., 356 U.S. 677, 682 (1958) ("[Discovery] procedures make trial less a game of blind man's bluff and more a fair contest . . ." (emphasis added)); Chiasson v. Zapata Gulf Marine Corp., 988 F.2d 513, 517 (5th Cir. 1993) (same); U.S. ex rel. Schwartz v. TRW Inc., 211, F.R.D. 388, 392 (D.C. Cal. 2002) ("[T]he purpose of discovery in civil actions is to remove surprise from trial preparation so the parties can obtain evidence necessary to evaluate and resolve their dispute."). The preceding list of cases can be supplemented ad nauseum, but in the interest of brevity, they are sufficient to demonstrate that discovery is a mechanism by which parties uncover evidence pertaining to the merits of litigation and not to corollary administrative matters such as client access.

modification of the protective order to allow collateral litigants access to those records. Id., at 1429.  Since such a modification was not deemed to be a new and affirmative obligation upon the parties in that case, it is difficult to see how a contrary conclusion could be contemplated in this case, given that Petitioner is not even seeking modification, but rather compliance with the existing terms of the Protective Order.  To the extent that the Amended Protective Order continues to control the handling of classified materials as well as counsel access to their clients, this Court retains the power to ensure that such access is not affirmatively subverted by Respondents.

In fact, the language cited by Respondents does not originate from that case at all, but from Public Citizen v. Liggett Corp, Inc., 858 F.2d 775, 781 (1st Cir. 1988).  That particular case concerned two distinct issues. First, an order requiring the parties to file previously sealed discovery materials in court, entered after a final adjudication on the merits, and second, the post-judgment modification of a protective order entered approximately three years before final adjudication.  Id., at 780.  These two distinct orders were deemed by the Court to "raise separate legal issues and concerns," and as such were considered independently.  Id., at 781.  Significantly, it was in connection with the filing order rather than the protective order that the Court of Appeals for the First Circuit maintained that following a final adjudication on the merits "the court simply lacked the power to impose any new, affirmative requirements on the parties."  Id. This determination, however, did not seek to address the authority of a District Court to modify a protective order after a final adjudication on the merits.  Turning to that very question, the Court of Appeals affirmed the post-adjudication modification of the protective order. Id., at 792.  In particular, the Court of Appeals found that "the district court had the inherent power to modify its February 25, 1985

13

protective order for so long as the order was in effect," even where jurisdiction over the substantive issue had been lost through final judgment. Id., at 782. Respondents' inadvertent reliance upon Public Citizen v. Ligget Corp, Inc., therefore, serves only to bolster Petitioner's position that the Court retains authority over its own protective orders that remain in effect, irrespective of whether or not it retains jurisdiction over the underlying substantive issues. See Mot., at 12.

Thus, the relief requested by Petitioner in his Emergency Motion does not implicate the jurisdictional dispute. While the habeas petitions remain pending, awaiting final resolution of the jurisdictional issues, through possible rehearing in the D.C. Circuit or otherwise, the Protective Order remains in effect and it remains within this Court's authority to police and enforce it. [12]

---

[12] Respondents incorrectly state that the DTA "deprives the district court of jurisdiction in cases where, as here, the petitioner challenges his detention as an enemy combatant." See Opp., at 5. The Supreme Court has already rejected this argument in Hamdan v.Rumsfeld, denying the Government's motion to dismiss based on the DTA's effect on jurisdiction. 126 S. Ct. 2749 (2006). The Court stated that the DTA was silent about whether § 1005(e)(1) applied to claims pending on the date of enactment. Additionally, the Supreme Court held that "[o]rdinary principles of statutory construction suffice to rebut the Government's theory—at least insofar as this case, which was pending at the time the DTA was enacted, is concerned." Id., at 2764.

14

## **CONCLUSION**

For the reasons stated in the emergency motion and for the foregoing reasons, Petitioner respectfully requests that the Court grant the relief sought.

Dated: New York, New York
      April 2, 2007

                              Respectfully submitted,

                              Counsel for Petitioner:

                              /s/
                              Ramzi Kassem (Pursuant to LCvR 83.2(g)
                              (NY-RK-3567))

                              Martha Rayner (NY-MR-1423)
                              James A. Cohen (NY-JC-3836)
                              Lincoln Square Legal Services
                              Fordham University School of Law
                              33 West 60th Street, 3d Floor
                              New York, NY 10023
                              Telephone: (212)-636-6934
                              Fax: (212)-636-6923