IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMER MOHAMMON, et al., ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-2386 (RBW) |
| ) | |
| GEORGE W. BUSH, et al., ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR ORDER
REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE
COURT WITH 60 DAYS' ADVANCE NOTICE BEFORE ANY INTENDED TRANSFER
OF PETITIONER FROM GUANTANAMO, AND NOTICE REGARDING DECISION
NOT TO FILE DTA PETITION**

Petitioner Abdul Aziz Naji seeks an order compelling respondents to provide sixty days' notice to the Court and to petitioner's counsel before transporting or removing the petitioner from Guantanamo Bay, Cuba, for the purpose of repatriating him to Algeria or transferring him to a third country. Mot. for Order Requiring Resp'ts to Provide Counsel for Pet'r and the Court with 60 Days' Advance Notice Before Any Intended Transfer of Pet'r from Guantanamo, and Notice Regarding Decision Not to File DTA Pet. (dkt no. 383). The petitioner's motion should be denied because the Court of Appeals for this Circuit has held that this Court lacks jurisdiction to grant such relief. Specifically, the Court of Appeals on February 20, 2007, held in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted*, 127 S. Ct. 3078 (U.S. June 29, 2007) (No. 06-1195), that the Military Commissions Act of 2006 ("MCA") has deprived this Court of jurisdiction over cases such as petitioner's. Therefore, and for the additional reasons explained below, respondents hereby oppose petitioner's motions for an order requiring respondents to provide 60 days' notice of petitioner's transfer or removal from Guantanamo Bay.

The United States has compelling interests in not serving indefinitely as the world's jailer in circumstances where other countries are ready and willing to take responsibility for transferees in accordance with their own laws, and in being able to repatriate or transfer detainees when continued detention by the United States is no longer a military necessity or appropriate. Further, the United States has adopted policies and procedures to guard against the transfer of Guantanamo detainees where transfer would raise unacceptable concerns regarding a detainee's treatment by the receiving country. Petitioner's supposition that he may be mistreated if he is transferred is speculative, and cannot form the basis for injunctive relief. Notwithstanding the Supreme Court's decision to review *Boumediene* (the outcome of which review is obviously unknown at this time), that decision constitutes binding law in this Circuit. Petitioner's request for an injunction ignores, and asks the Court to disregard, the law of the Circuit reflected in *Boumediene* that the Court lacks jurisdiction over cases such as petitioner's. Even beyond this jurisdictional bar, petitioner otherwise fails to make the showing required to justify the grant of the extraordinary injunctive relief he seeks, controlling the timing of the repatriation or transfer of an alien enemy combatant during an ongoing, global armed conflict where such an injunction would interfere with the Executive's conduct of war-making and foreign policy. Accordingly, petitioner's motion should be denied. Rather, in keeping with the *Boumediene* decision, respondents' motion to dismiss should be granted.

## BACKGROUND

The petition in this case was filed on December 21, 2005, on behalf of a number of petitioners detained by the Department of Defense ("DoD") at the Guantanamo Bay Naval Base in Cuba ("Guantanamo"), including Naji. *See* dkt. no. 1. Petitioner was previously determined

by a Combatant Status Review Tribunal ("CSRT") to be an enemy combatant. *See* Second Decl. of Karen L. Hecker ¶¶ 2–3 (attached as Exhibit 1). Petitioner supposes that, at some point in the future, respondents might decide to transfer him to another country, one in which he might be mistreated. Thus, although the very purpose of this proceeding is presumably to achieve his release from detention at Guantanamo Bay, petitioner has moved for an order requiring that he be given advance notice of any transfer.

Aside from the speculative nature of petitioner's belief as to what might happen to him in connection with a transfer, the factual premises of his motion are incorrect. As described in the declarations attached hereto, attested to by Clint Williamson and Joseph Benkert, for any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Williamson Decl. ¶ 4; Benkert Decl. ¶¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. *Id.* If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Benkert Decl. ¶ 6; Williamson Decl. ¶ 5-6. Once DoD initially approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned. *Id.* Such discussions include an effort to seek assurances (in every transfer case in which continued detention by the government concerned is foreseen) that the United States Government considers necessary and appropriate with regard to the country in question. These include assurances of humane treatment and treatment in accordance with the international

obligations of the foreign government accepting transfer. *Id.* Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and ensures that assurances are tailored accordingly if the nation concerned is not a party or other circumstances warrant.[1] *Id.*

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Williamson Decl. ¶¶ 6-8; Benkert Decl. ¶¶ 6-7. Recommendations by the Department of State are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the Department of State's annual Country Reports on Human Rights Practices) and the relevant Department of State regional bureau, country desk, or U.S. Embassy. Williamson Decl. ¶ 7. When evaluating the adequacy of assurances, Department of State

---

[1] The particulars of whatever discussions there might be between the Executive Branch and foreign countries in any specific case – including this one – are closely held within appropriate Executive Branch channels. The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Williamson Decl. ¶ 9; Benkert Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Williamson Decl. ¶ 9; Benkert Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to this country's ability to conduct foreign relations. Williamson Decl. ¶ 9.

officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Williamson Decl. ¶ 8. In an appropriate case, the Department of State may consider various monitoring mechanisms for verifying that assurances are being honored. Id. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Benkert Decl. ¶ 7; Williamson Decl. ¶ 8. Indeed, circumstances have arisen in the past where DoD decided not to transfer detainees to their country of origin because of mistreatment concerns. *Id.*

In sum, the Executive Branch employs an elaborate inter-agency process for evaluating the propriety of transfers of Guantanamo detainees and implementing the United States' policy not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. That process involves senior level officials and includes consideration of the detainee's particular circumstances, an informed and well-rounded analysis of the current situation on the ground in the prospective transferee country, the input of various Department of State offices with relevant knowledge, personal interactions and negotiations with senior officials of the prospective transferee government, and consideration of assurances provided by the prospective transferee country, as well as their sufficiency and any mechanisms for verifying them. *See* Williamson Decl. ¶ 7 & *passim*.

## ARGUMENT

I.  **PETITIONER'S MOTION SHOULD BE DENIED BECAUSE THE COURT LACKS JURISDICTION TO GRANT THE MOTION.**

Petitioner's motion for an injunction conditioning his repatriation or transfer on prior notice should be denied because this Court lacks jurisdiction to grant the requested relief. On October 17, 2006, the MCA was enacted. The MCA amended the habeas statute, 28 U.S.C. § 2241, adding a subsection (e) to provide that "[n]o court, justice, or judge shall have jurisdiction" to consider either (1) habeas petitions filed by aliens detained by the United States determined to be enemy combatants or awaiting such a status determination, or (2) any other action "relating to any aspect of the detention, *transfer*, treatment, trial, or conditions of confinement" of an alien who is or was so detained, except for the exclusive review mechanism in the Court of Appeals created under the DTA for addressing the validity of the detention of such an alien.[2] *See* MCA § 7(a) (emphasis added). This new amendment to § 2241 took effect on the date of enactment and applies specifically "to all cases, without exception, pending on or after the date of the enactment of this Act which relates to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." *Id.* § 7(b).

On February 20, 2007, the Court of Appeals held in *Boumediene* that the MCA plainly applies to all cases filed by aliens detained as enemy combatants, including pending habeas

---

[2] *See* DTA § 1005(e)(2)-(3) (as amended by MCA §§ 9-10). Section 1005(e)(2) of the DTA, as amended, states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.

petitions such as this one, and withdraws all District Court jurisdiction over such cases, including both habeas and non-habeas claims. *See* 476 F.3d 981, 986-88 & n.1; *id.* at 994 ("Federal courts have no jurisdiction in these cases."). The Court of Appeals also held that the withdrawal of habeas jurisdiction over pending cases did not violate the Suspension Clause because the alien detainees held at Guantanamo have no constitutional rights and because the constitutional right to seek habeas review does not extend to aliens held at Guantanamo. *Id.* at 988-94. Consequently, the Court of Appeals (1) ordered that the district courts' decisions on appeal be vacated and (2) dismissed the cases on appeal for lack of jurisdiction. *Id.* at 994.

The Supreme Court granted *certiorari* in *Boumediene* on June 29, 2007. *See Boumediene v. Bush*, 127 S. Ct. 3078 (June 29, 2007).[3] However, at least while *Boumediene* remains pending before the Supreme Court, the law of this Circuit[4] remains settled: under the MCA, federal

---

[3] Petitioner incorrectly suggests that in its earlier denial of certiorari, the Supreme Court intimated that he had to exhaust DTA remedies before his habeas claims could be addressed. *See* Pet'r's Mot. at 2. The Court made no such statement. Two Justices commented that principles of exhaustion favored denial of certiorari, but even these two Justices did not state any conclusion that the petitioners in the *Boumediene* and *Al-Odah* cases—let alone petitioners in other Guantanamo detainee cases—could seek habeas relief in district court once they had pursued DTA remedies. Indeed, the Justices emphasized that neither they nor the Court were expressing any opinion on the merits. *See Boumediene v. Bush*, 127 S. Ct. 1478, 1478 (2007) (statement of Stevens, J. and Kennedy, J. respecting denial of certiorari).

[4] *See Ayuda, Inc. v. Thornburgh*, 919 F.2d 153, 154 (D.C. Cir. 1990) (Henderson, J., concurring) ("Once [an] opinion [is] released it [becomes] the law of this circuit."); *Vo Van Chau v. U.S. Dep't of State*, 891 F. Supp. 650, 654 (D.D.C. 1995) (holding that the district court was bound by the principle of *stare decisis* to abide by a Court of Appeals decision even though the Court of Appeals had not yet issued its mandate and even though the mandate was stayed during the pendency of a petition for rehearing). The fact that this Court must follow the law of the Circuit and dismiss this case is discussed in greater detail in respondents' Motion to Dismiss filed on April 19, 2007. The law of the circuit doctrine renders the decision of a panel of circuit judges binding on all other panels within that circuit, *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*), and also on district courts within that circuit. And, "[t]he requirement that jurisdiction be established as a threshold matter ... is 'inflexible and without

district courts do not have jurisdiction over cases brought by aliens at Guantanamo Bay detained as enemy combatants, and such aliens do not have constitutional rights.[5] Accordingly, the Court lacks jurisdiction over petitioner's case. This Court is not free to ignore the binding precedent in *Boumediene* merely because the Supreme Court has granted review. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Without jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).[6] Consequently, this Court has no choice but

---

exception." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) (internal quotation marks and citations omitted). Respondents' motion to dismiss has been granted in several cases based on the law of the circuit as established in *Boumediene*. *See, e.g., Sadkhan v. Bush*, 05-CV-1487 (RMC) (dkt. no. 51; May 9, 2007); *Al-Qahtani v. Bush*, 05-CV-1971 (RMC) (dkt. no. 39; May 9, 2007). Indeed, Judge Robertson dismissed the Guantanamo cases on his docket *sua sponte*. *See, e.g., Khan v. Bush*, 05-CV-1491 (JR) (dkt. no. 26; April 5, 2007); *Zuhoor v. Bush*, 05-CV-1011 (JR); (dkt. no. 19; April 5, 2007).

[5] Even prior to enactment of the MCA, the DTA invested the Court of Appeals with the same "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." *See* DTA § 1005(e)(2)-(3). This investment of exclusive jurisdiction in the Court of Appeals, independent of the MCA, deprived the district court of jurisdiction in cases challenging the detention of enemy combatants. *See, e.g., Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); *Laing v. Ashcroft*, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75, 78-79 (D.C. Cir. 1984) (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals); *cf. id.* at 77 ("By lodging review of agency action in the Court of Appeals, Congress manifested an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power."). In any event, with the enactment of the MCA, as the D.C. Circuit made clear in *Boumediene*, district court jurisdiction has been unambiguously withdrawn.

[6] The D.C. Circuit's June 7, 2007, order in *Al Ginco v. Bush*, No. 06-5191, also did not change the law of the Circuit. The *Al Ginco* order merely noted that the district court "may consider in the first instance respondents' motion to dismiss and petitioners' motions to stay and

to deny petitioner's motions for injunctive relief relating to a transfer and his motion to enter a stay-and-abeyance order, and to grant respondents' motion to dismiss.

Indeed, on the strength of the MCA and the *Boumediene* decision, the D.C. Circuit refused to interfere with a transfer of a Guantanamo detainee in the context of an appeal from Judge Urbina's denial of a motion seeking to enjoin the transfer, explicitly noting that dismissal was required "for lack of subject matter jurisdiction." *Zalita v. Bush*, No. 07-5129 (Apr. 25, 2007) (copy attached as Exhibit 2).[7] In another case, this one decided after the Supreme Court's grant of *certiorari* in *Boumediene*, the D.C. Circuit denied an emergency motion for an order seeking 30 days' advance notice of any intended removal of a Detainee Treatment Act (DTA) petitioner detained at Guantanamo, concluding that under the MCA, the Court of Appeals lacked jurisdiction to grant the requested relief. *Hamlily v. Gates*, No. 07-1127 (D.C. Cir. July 16, 2007) (copy attached as Exhibit 5) (petition for rehearing pending). Even more recently, in *Belbacha v. Bush*, No. 07-5258 (D.C. Cir. Aug. 2, 2007) the Court of Appeals denied an emergency motion to stay any transfer of the petitioner to Algeria; the court's order cited *Boumediene* as well as the court's statement in *Maxwell v. Snow*, 409 F.3d 354 (D.C. Cir. 2005), that it "is bound to follow circuit precedent until it is overruled by an en banc court or the

---

hold in abeyance," without saying what result the district court should reach with respect to either of the motions. The D.C. Circuit in *Al Ginco* presumably expected the district court to resolve the motions in a manner consistent with the law of the Circuit as established in *Boumediene*, which held that district courts lack jurisdiction over actions challenging the detention of aliens held as enemy combatants.

[7] A copy of Judge Urbina's order denying an injunction in *Zalita* is attached hereto as Exhibit 3. A motion seeking the same relief was subsequently denied by the Supreme Court in the *Zalita* case, *Zalita v. Bush*, 06A1005 (Sup.Ct. May 1, 2007) (copy attached as Exhibit 4), although with no discussion of the basis for the denial.

Supreme Court." (copy attached as Exhibit 6). On August 10, 2007, the Supreme Court denied a motion for an emergency stay in that case. *Belbacha v. Bush*, No. 07A98 (U.S. Aug. 10, 2007) (attached as Exhibit 7).

The All Writs Act, 28 U.S.C. § 1651, does not provide a basis for this Court to issue interlocutory relief in a case where the Court lacks jurisdiction. The Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but the Act "confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction" and "does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999); *see also In re Tennant*, 359 F.3d 523, 527 (D.C. Cir. 2004) (quoting *id.*). Thus, because the MCA deprives the Court of jurisdiction as explained in *Boumediene*, the All Writs Act provides no basis for issuing writs in aid of any exercise of jurisdiction by the District Court.

That the Court lacks jurisdiction to grant even interlocutory injunctive relief was recently confirmed by Judge Kollar-Kotelly of this Court in another Guantanamo detainee habeas case. In *Hicks v. Bush*, No. 02-CV-0299 (CKK), petitioner asked the Court to preliminarily enjoin petitioner's trial by military commission, claiming irreparable harm if tried by a commission that, petitioner argued, had no legitimate jurisdiction over him. In denying the motion for preliminary injunction, Judge Kollar-Kotelly explained,

> In *Boumediene*, the D.C. Circuit clearly held that Congress intended to deprive the federal district courts of jurisdiction over 'all cases, without exception, pending on or after the date of the enactment of [the MCA] which relate to any aspect of the detention, transfer, treatment, trial or conditions of detention of an alien detained by the United States since September 11, 2001,' and that Congress did so constitutionally . . . . As such, this Court lacks jurisdiction to review Petitioner's habeas petition.

*Hicks v. Bush*, No. 02-CV-0299 (CKK), 2007 WL 902303 at *5 (D.D.C. Mar. 23, 2007).

Importantly, Judge Kollar-Kotelly denied the motion without engaging in the traditional, four-part test used to determine the propriety of such relief because "*Boumediene* holds that this Court lacks jurisdiction to even consider Petitioner's claims, such that this Court is precluded from even engaging in a balancing of the factors that would be considered on a motion for a preliminary injunction." 2007 WL 902303 at *6.

Likewise here, the Court has no authority to grant petitioner's motion, and it should be denied on jurisdictional grounds alone.[8]

## II. PETITIONER'S MOTION FOR AN ORDER REQUIRING ADVANCE NOTICE OF TRANSFER WOULD HAVE TO BE DENIED IN ANY EVENT BECAUSE PETITIONER FAILS TO SATISFY THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

Even if the Court were to move beyond the jurisdictional bar to consider further petitioner's motion for an order requiring advance notice of transfer, petitioner's motion should be denied. It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an

---

[8] A petitioner's request for an order requiring notice of transfer or return has been denied even after the grant of *certiorari* in *Boumediene*. *See Al Darby v. Bush*, 05-cv-2371 (D.D.C. Aug. 8, 2007) (dkt. no. 49). To be sure, other judges of this Court, including Judge Kollar-Kotelly, have recently granted relief along the lines of what petitioner here requests, *see, e.g., Ghanem v. Bush*, 05-cv-1638 (D.D.C. July 10, 2007) (dkt. no. 53), but respondents maintain that orders granting such relief are inconsistent with *Boumediene*.

injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). The irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Petitioner's motion fails to make the showing required to justify the grant of injunctive relief.

***Petitioner Has No Likelihood of Success On the Merits.*** Petitioner has no likelihood of success on the merits because, as discussed above, the law of the Circuit is that § 7 of the MCA clearly deprives this Court of jurisdiction. *See supra* I. Even beyond that dispositive holding, however, petitioner cannot otherwise demonstrate a likelihood of success on the merits. The petitioner maintains that *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), established that detainees may assert claims under the Due Process Clause and the Geneva Conventions. However, *Hamdan* did not establish any such principle. *Hamdan* dealt with the validity of the system in place at the time for trial of enemy combatants by military commissions. The Supreme Court explicitly noted that it was not addressing any issues relating to the legality of the detention of enemy combatants. *Id.* at 2798. Furthermore, the Court of Appeals in *Boumediene* has since held that aliens detained at Guantanamo do not have constitutional rights. *See* 476 F.3d at 988-94. To the extent petitioner might want to base his request for relief on the Geneva Conventions, the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT"), or the United Nations Convention Relating to the Status of Refugees ("Refugee Convention"), he could not do so. Neither the CAT nor the Refugee Convention gives rise to

judicially enforceable rights. *See, e.g., Castellano-Chacon v. INS*, 341 F.3d 533, 544 (6th Cir. 2003) (Refugee Convention); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition); *see also Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 194 (D.D.C. 2005) (Bates, J.) (rejecting petitioner's argument that the Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as a legal basis for prohibiting or limiting transfer of wartime detainees to other countries). And section 5(a) of the MCA, which provides that "no person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer . . . is a party as a source of rights" in any civil court proceeding, precludes petitioner's reliance on those Conventions as providing a basis for court relief in this matter. *See Boumediene*, 476 F.3d at 988 n.5 (sections 5(a) and 7 of the MCA preclude habeas jurisdiction over Geneva Conventions claims).

Further, even if some valid legal basis existed for petitioner's request for an injunction, the separation of powers would bar such relief. "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch." *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)); *see also Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal*

*Operating Co.*, 358 U.S. 354, 383 (1959)).[9] If the Court were to entertain petitioner's claim to a right to have conditions placed on repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters. Judicial review of a transfer or repatriation decision would involve scrutiny or second-guessing of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments regarding the state of diplomatic relations with a foreign government, the reliability of information concerning and representations from a foreign government, the adequacy of assurances provided and a foreign government's capability to fulfill them. Williamson Decl. ¶¶ 8-12. Second-guessing in such matters by the courts or others could chill important sources of information and interfere with or undermine our ability to interact effectively with foreign governments, including our ability to obtain the cooperation of other nations in the war on terrorism. *See* Williamson Decl. ¶¶ 8-12; Benkert Decl. ¶ 8.[10]

---

[9] In *Holmes,* U.S. citizen-servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. *citizens*, the district court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

[10] It is certainly beyond argument that the courts of the United States would have no authority to interfere with any decision of a foreign sovereign nation regarding detention or prosecution of its own national being returned to it pursuant to its own laws. *See Worldwide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-65 (D.C. Cir. 2002) ("The act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory.") (internal quotation marks and citation omitted). *Cf., e.g., United States v. Kin-Hong*, 110 F.3d 103, 110–11 (1st Cir. 1997) (expressing concern about inquiring into fairness of foreign nation's judicial system under "rule of non-inquiry").

Accordingly, there is no basis in law for an injunction barring the repatriation or transfer of an alien enemy combatant, such as petitioner, during wartime. Thus, petitioner has no likelihood of success to support his request for an injunction imposing a condition on transfer, and his motion must be denied.

***Petitioner has not Demonstrated Irreparable Injury.*** Petitioner also has not carried his burden to show irreparable injury that is "certain and great . . . actual and not theoretical," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), by merely speculating that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States may repatriate or transfer petitioner under circumstances where he might be tortured. Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there. Williamson and Benkert Decls., *passim*. To implement this policy, the Executive Branch employs an elaborate inter-agency process for evaluating the propriety of transfers of Guantanamo detainees that involves senior level officials and includes consideration of the detainee's particular circumstances, an informed and well-rounded analysis of the current situation on the ground in the prospective transferee country, the input of various Department of State offices with relevant knowledge, personal interactions and negotiations with senior officials of the prospective transferee government, and consideration of assurances provided by the prospective transferee country, as well as their sufficiency and any mechanisms for verifying them. *Id.* Further, a transfer will not take place where concerns about the treatment of a detainee after transfer cannot be satisfactorily resolved. *Id.* To conclude that an injunction

placing conditions on an intended transfer of petitioner is nevertheless necessary would require the Court to conclude that the United States' policies and practices are somehow a sham or pretext. There is no valid basis for such an assumption. *Cf. Almurbati v. Bush*, 366 F. Supp. 2d 72, 78 (D.D.C. 2005) (Walton, J.) (holding that respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit").

Accordingly, petitioner has failed to demonstrate irreparable harm justifying an injunction conditioning a repatriation or transfer of the petitioner on prior notice.[11]

***The Balance of Harms Warrants Denial of the Injunction.*** While petitioner argues that Respondents would not be harmed by an injunction restricting repatriation or transfer of the petitioner, *see* Pet'r's Mot. at 9, in fact consideration of the equities and the harm that would flow from such an injunction warrant that petitioner's motion be denied.

Petitioner's requested injunction entails serious and unprecedented harms that compel that it be denied. As explained *supra*, allowing for the second-guessing of a determination to repatriate or transfer petitioner would involve Court intervention into sensitive diplomatic matters and would interfere with or undermine the government's ability to conduct foreign affairs, interact effectively with foreign governments, and obtain the cooperation of other nations

---

[11] Petitioner asserts that if he is returned to Algeria, he could be threatened with harm not only by the government of Algeria but also by armed militant groups operating in Algeria. *See* Pet'r's Mot. at 4, 5. Nothing in the Government's declarations states that the Government considers only the likelihood of torture or mistreatment imposed by the receiving government. As the Williamson declaration stated, "Decisions with respect to Guantanamo detainees are made on a case-by-case basis, taking into account the particular circumstances of the transfer, the country, the individual concerned, and any concerns regarding torture or persecution that may arise." Williamson Decl. ¶ 7.

in the war on terrorism. *See* Williamson Decl. ¶¶ 8-10, 12; Benkert Decl. ¶ 8. *See also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). Constitutional and public interests favor allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions such as detention of enemy combatants for the duration of hostilities[12] and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility. As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. *See People's Mojahedin Org.*, 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

*Al-Anazi*, 370 F. Supp. 2d at 199.

Here, petitioner asks this Court to impose a condition on the repatriation or transfer of an alien enemy combatant held outside the United States during wartime. Separation of powers and other public interests warrant the rejection of petitioner's request. *See Hamdi*, 542 U.S. at 531 ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them.").

* * *

Accordingly, the Court lacks jurisdiction to consider petitioner's motion for an order

---

[12] *See Hamdi*, 542 U.S. at 518-19.

requiring advance notice of a transfer of the petitioner, and, in any event, petitioner has not satisfied the requirements for such relief.[13]

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motion for an order requiring advance notice of a transfer of the petitioner be denied.

Dated: August 17, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

 /s/ JAMES C. LUH
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar 347518)
TERRY M. HENRY
JAMES J. SCHWARTZ
JEAN LIN
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS A. OLDHAM
JAMES C. LUH
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4938
Fax:  (202) 616-8470

Attorneys for Respondents

---

[13] Even if this Court were to require pretransfer notice, the relief that petitioner seeks in the present motion should not be granted in its entirety. Petitioner asks for sixty days advance notice before a transfer, without offering any justification for such a lengthy notice period.