IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MABROUK, ADIL BIN**<br>    Petitioner,<br><br>*v.*<br><br>**GATES, ROBERT M.,** *et al.,*<br>    Respondents. | )<br>)<br>)<br>)<br>)  Civil Action No.:  05-cv-2386 (RBW)<br>)<br>)<br>)<br>)<br>) |

**EMERGENCY MOTION
FOR ORDER REQUIRING RESPONDENTS TO PROVIDE
COUNSEL FOR PETITIONER AND THE COURT
WITH THIRTY-DAYS ADVANCE NOTICE
<u>OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO</u>**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner respectfully moves for an emergency order requiring Respondents to provide counsel for Petitioner and the Court with advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba.  Petitioner has just received notice that he has been cleared for possibly imminent removal from Guantánamo, and there is substantial evidence that he will be forcibly sent to foreign territories for torture or indefinite imprisonment without due process of law.  Petitioner is requesting advance notice to enable his counsel to contest any such transfer into equally unlawful detention at the hands of another, and to preserve the jurisdiction of the Court in this matter.

**STATEMENT OF FACTS**

Petitioner Adil Bin Mabrouk ("Mabrouk") is a Tunisian national who is being detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba. As indicated in Mabrouk's "Statement of Issues to Be Raised" in his pending DTA petition, Mabrouk denies being an "enemy combatant" and contends that he is being detained in violation of the laws and Constitution of the United States and international law.

**I.    Notice of Authorization for Transfer from Guantanamo**

On or around November 13, 2007, Mabrouk received from the Government a notice dated November 1, 2007 – two weeks earlier – stating that he has been "authorized for transfer from Guantanamo Bay." A true and correct copy of this unclassified notice is attached hereto as Exhibit A. The Government has never provided a copy of this notice to counsel. Rather, it was provided to counsel by Mabrouk himself during counsel's visit to Guantanamo on November 21.

Although the notice states that Mabrouk's transfer may take "considerable time," the Government also states its intention to conduct the transfer "as soon as possible." (*See* Exh. A hereto.) Mabrouk thus fears that he could transferred from Guantanamo at any time, and likely to his native Tunisia, where, on information and belief, he has been convicted in absentia to 20 years in prison for terrorism-related charges (a true and correct copy of available pages of this conviction, in Arabic, and an English translation, are attached hereto as Exhibit B), and where he will likely face torture and conditions of confinement abhorrent to international norms. The United States State Department has well documented Tunisia's human rights abuses (a true and correct copy of a State Department report on Tunisia is attached hereto as Exhibit C), and other Guantanamo detainees sent there have reported being tortured at the hands of Tunisian authorities (a true and correct copy of a Human Rights Watch report on this subject is attached

- 3 -

hereto as Exhibit D).

**II.     Release and Transfer to Tunisia**

As of this past summer, of the about 375 detainees held at Guantánamo, an estimated 150 were considered no longer a threat or eligible for release. Richard Willing, *Lawmakers to Work on Closing Gitmo,* USA TODAY, July 8, 2007, at http://www.usatoday.com/news/washington/2007-07-08-lawmakers-gitmo_N.htm (citing J. Alan Liotta, Director for the Office of Detainee Affairs, Defense Department). Although for many detainees these developments are welcome news, those who come from countries with poor human rights records, such as Tunisia, fear indefinite imprisonment without due process of law, torture and death upon their release and return to their home country and would rather remain in Guantánamo. Human Rights Watch, *Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations*, vol. 19, no. 4(E), September 2007, http://hrw.org/reports/2007/tunisia0907/, at 1 (attached as Exh. D hereto).

The torture practices Tunisian security forces are suspected to engage in are well-documented in the U.S. State Department's report on Tunisian human rights practices. (*See* Exh. C hereto.) These practices include "sleep deprivation; electric shock; submersion of the head in water; beatings with hands, sticks, and police batons, suspensions, sometimes manacled, from cell doors and rods resulting in loss of consciousness, and cigarette burns." U.S. State Department Bureau of Democracy, Human Rights, and Labor, *Country Reports on Human Rights Practices— 2006: Tunisia*, March 6, 2007, at http://www.state.gov/g/drl/rls/hrrpt/2006/78864.htm, at 1 (attached as Exh. C hereto).

Furthermore, the experiences of Abdullah al-Hajji Ben Amor and Lotfi Lagha—two Tunisian Guantánamo detainees who were returned to their home country on June 17, 2007—

confirm the State Department's findings.  Their experience raises grave concerns as to the kinds of torture and abuse Mabrouk would expect were he to be forcibly returned to Tunisia:

> Despite the assurance of humane treatment, al-Hajji reports being immediately taken to an interrogation center, where he says he was prohibited from sleeping, slapped, threatened with the rape of his wife and daughters, and coerced into signing something he could not read.  He says that he was held for six weeks in solitary confinement, even though the Tunisian government had explicitly pledged to Human Rights Watch to end the use of prolonged solitary confinement in prisons.
>
> Similar concerns exist regarding the treatment of Lagha, whom Tunisian authorities also detained in solitary confinement.  He was held for six weeks in pretrial detention without access to an attorney or any other outside monitor who could publicly report on his treatment or condition.

Human Rights Watch, *Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations*, vol. 19, no. 4(E), September 2007, http://hrw.org/reports/2007/tunisia0907/, at 23 (attached as Exh. D hereto).

Indeed, it was credible allegations of "inhuman living conditions" in Tunisian prisons and of "torture and police brutality" that prompted serious concerns about the detainee's health and safety upon transfer back to Tunisia and contributed to D.C. District Court Judge Kessler's decision to stay the transfer of Petitioner Rahman back to Tunisia.  *Rafiq Bin Bashir Bin Jallul Alhami v. George Bush*, No. 05-359 (D.D.C. Oct. 2, 2007), available at http://jurist.law.pitt.edu/pdf/alhami.pdf, at 5.

Considering Tunisia's extremely poor human rights record and the inhumane treatment experienced by al-Hajji and Lagha upon their return, Mabrouk has nothing but the worst to fear should he be sent there as well.  This holds particularly true given that the Tunis Military Court has already sentenced Mabrouk *in absentia* to 20 years in prison and five years of post-sentence administrative controls for "serving in, and inciting others to join" an alleged terrorist organization.  Human Rights Watch, *Ill-Fated Homecomings: A Tunisian Case Study of*

*Guantánamo Repatriations*, vol. 19, no. 4(E), September 2007, http://hrw.org/reports/2007/tunisia0907/, at 12 (attached as Exh. D hereto); *See* Exh. B hereto. At a minimum, Mabrouk should be given an opportunity to prepare for the abuse that is almost certain to come upon his release by informing his family of his return and providing for legal representation in his home country.

### III.     Practice known as "Rendition," "Irregular Rendition," or "Extradition Rendition"

Upon information and belief, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal processes.  This practice, known as "rendition," "irregular rendition," or "extradition rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture.

According to reports by American and foreign news organizations, including the *Washington Post*, the *Los Angeles Times* and the *British Broadcasting Corporation*, the United States Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques.  According to the *New Yorker*, the rendition process was originally "a program aimed at a small, discrete set of suspects—people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, NEW YORKER, Feb. 14, 2005, at http://www.newyorker.com/fact/content/_?050214fa_fact6, ¶ 7.  According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources.  The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to

> interrogation tactics—including torture and threats to families—that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chandrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002, at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* WASH. POST, Dec. 26, 2002, at A1. The countries to which detainees may be brought are known to practice torture. *See*, *e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. TIMES, Jan. 13, 2005, at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan, and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.").

On information and belief, other detainees have been removed to countries where they have been imprisoned and denied access to the courts. According to a report by six leading human rights organizations, 39 persons believed held in U.S. custody are presently unaccounted for. Amnesty Int'l, Cageprisoners, the Ctr. for Constitutional Rights, the Ctr. for Human Rights and Global Justice at New York Univ. Sch. of Law, Human Rights Watch, and Reprieve, *Off the Record: U.S. Responsibility for Enforced Disappearances in the War on Terror*, June 7, 2007, http://hrw.org/backgrounder/ usa/ct0607/, at 6. News reports indicate that the United States government contemplated transferring "large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantánamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries." Dana Priest, *Long-Term Plan Sought For Terror Suspects*, WASH. POST, Jan. 2, 2005, at A1. As of May 2007, the U.S. government was holding approximately 650 detainees at the Bagram Theater Interment Facility in Afghanistan. They were held without access to

lawyers and without even the due process provided by the government through the Combatant Status Review Tribunal process for detainees in Guantánamo. Eliza Griswold, *The Other Guantánamo Black Hole*, THE NEW REPUBLIC, May 2, 2007, ¶¶ 2, 13. According to Human Rights Watch, eight detainees at Guantánamo provided consistent accounts revealing that the United States, as recently as 2004, operated a secret prison in Afghanistan where detainees were subjected to torture and other mistreatment. Human Rights Watch, *U.S. Operated Secret 'Dark Prison' in Kabul*, Dec. 19, 2005, http://hrw.org/english/docs/2005/12/19/afghan12319.htm.

## ARGUMENT

### I.  Preservation of Jurisdiction

This court has jurisdiction to determine its own habeas jurisdiction. *See Hamdan v. Rumsfeld,* 126 S. Ct. 2749 (2006); *Rasul v. Bush,* 542 U.S. 466 (2004); *U.S. v. Ruiz*, 536 U.S. 622, 627 (2002) ("[A] federal court always has jurisdiction to determine its own jurisdiction."). Furthermore, the All Writs Act, 28 U.S.C. § 1651, authorizes this court to "issue all writs necessary or appropriate in aid of [its] jurisdiction."

Petitioner has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004); *Bismullah v. Gates*, Nos. 06-1197, 06-1397, 2007 WL 2067938 (D.C. Cir. July 20, 2007). Transfer outside this Court's jurisdiction could "eliminate any opportunity for [Petitioner] to ever obtain a fair adjudication of [his] 'fundamental right to test the legitimacy of [his] detention.'" *Abdah v. Bush*, No. Civ. A. 04-1254 (HHK) 2005 WL 711814, at *4 (D.D.C. Mar. 29, 2005). Indeed, the "federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal Courts for the protection of the rights in those tribunals." *Id*. (quoting *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004)). Further, transfer of Petitioner to the custody of a country where there is a likelihood of

torture constitutes a direct violation of his rights and the United States' obligations under the basic international legal norms embodied not only in the Geneva Conventions, but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. *Geneva Convention Relative to the Treatment of Prisoners of War*, opened for signature 12 August 1949, 75 UNTS 135; *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, opened for signature 12 August 1949, 75 UNTS 287 (all of these conventions entered into force on 21 October 1950); *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, entered into force 10 Dec. 1984, 1465 U.N.T.S. 85. Advance notice to the Court of any intended involuntary removal of Petitioner as well as his proposed destination is necessary to provide the Court with the opportunity of determining whether such a transfer would violate the law, before the Court's jurisdiction is stripped and its ruling rendered meaningless.

Petitioner's request is not overly burdensome. Respondents, who have already held Mabrouk for several years, are asked only to provide Counsel and the Court with adequate notice of any intended removal of Mabrouk from Guantánamo. Respondents will suffer no harm from complying with such a request. As Judge Kennedy held in response to a similar request: **"Beyond [the government's] vague premonitions . . . the court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their clients will intrude upon executive authority."** *Abdah v. Bush*, No. Civ.A. 04-1254 (HHK), 2005 WL 711814, at *5 (D.D.C. March 29, 2005) (emphasis added).

In addition, on June 29, 2007 the Supreme Court granted certiorari in *Boumediene v. Bush*, 127 S. Ct. 3078 (2007) and *Al Odah v. United States*, 127 S. Ct. 3067 (2007). These two cases were subsequently consolidated. The issues before the Court—whether the Military

Commissions Act of 2006, Pub L. No. 109-366, 120 Stat. 2600, validly stripped federal court jurisdiction over habeas petitions filed by alien detainees at Guantánamo and whether their prolonged confinement warrants habeas relief—bear directly on Petitioner's case. Like the petitioners in *Boumediene* and *Al Odah*, Mabrouk has been subjected to extended confinement without due process of law and has petitioned this court for habeas corpus and all incidental relief.

Until the jurisdictional issues are finally resolved, this Court retains the power "to make orders to preserve the existing conditions and the subject of the petition." *See United States v. United Mine Workers of Am.*, 67 S.Ct. 677, 695 (1947) (quoting *United States v. Shipp*, 27 S.Ct. 165, 166 (1906) (internal quotation marks omitted)). Any transfer of Petitioner would destroy "the existing conditions" by mooting his DTA petition and habeas claim. As such, this Court has jurisdiction to preserve the status quo pending resolution of questions before the Supreme Court in *Boumediene* and *Al Odah*. *See Al Oshan v. Bush,* No. 05-0520, available at http://www.scotusblog.com/wp/wp-content/uploads/2007/10/urbina-order-10-05-07.pdf (D.D.C. Oct. 5, 2007) (vacating order to dismiss petitioners habeas cases pending a decision in *Boumediene v. Bush*, 127 S. Ct. 3078 (U.S. June 29, 2007) (No. 06-1195); *see also Rafiq Bin Bashir Bin Jallul Alhami v. George Bush*, No. 05-359 (D.D.C. Oct. 2, 2007), available at http://jurist.law.pitt.edu/pdf/alhami.pdf (holding that "it is imperative that the Court protect its jurisdiction until the Supreme Court issues a definitive ruling in *Boumediene*" and granting petitioner's motion to stay transfer back to Tunisia).

No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant—properly before the Court and represented by counsel—be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely. The Framers of the Constitution

recognized the danger of consolidating power in a single branch of government. In response, they created the judiciary to ensure that civil and human rights were not abused by improper exercises of power. "Were [judicial power] joined to the executive power, the judge might behave with all of the violence of an oppressor." The Federalist No. 47, at 303 (James Madison) (C. Rossiter ed. 1961).

Mabrouk filed a petition for writ of habeas corpus, and is also seeking relief under DTA. The Court's power to protect him from wrongful detention would be illusory if the Administration can simply transfer him secretly to another country for the purpose of evading judicial review.

## II. Opportunity to Challenge Transfer and Notify Family

Under the All-Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions." *SEC v. Vision Comm., Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA,* 485 F. 2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d. § 65.20 (2004)**.**

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioners are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *see also*

*Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Petitioner stands to suffer immeasurable and irreparable harm if transferred. Mabrouk's transfer to a country that practices torture, including possible transfer to Tunisia, is tantamount to, at best, a life sentence. Even if torture victims are released from confinement, the physical agony they faced at the hands of their tormentors gives way to severe psychological torment. *See* Centre for the Survivors of Torture, http://www.ccst.ie/about.html (last visited Nov. 26, 2007) ("[V]ictims of torture can suffer from flashbacks (or intrusive thoughts), severe anxiety, insomnia, nightmares, depression, memory lapses, sexual dysfunction, and a breakdown in social relations. They often feel guilt and shame, triggered by the humiliation they have endured or by a sense that they have betrayed themselves or their friends and family."). By contrast, Respondents are asked merely to provide counsel and the Court with adequate notice of any intended removal of Mr. Mabrouk from Guantánamo. Respondents can suffer no conceivable harm from complying with such a request.

Petitioner is likely to succeed on the merits of his claim. He has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). For the United States Government to remove Mabrouk to any country that would afford no due process of law would deprive him of all Due Process protections and defeat the Court's jurisdiction. Such a transfer would also violate basic legal norms embodied not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention against Torture and other Cruel and Degrading Treatment and Punishment. Moreover, Judge Kessler's grant of petitioner Rahman's motion to stay his transfer back to Tunisia provides a strong precedent for the

likelihood of success of Petitioner's claim.  *Rafiq Bin Bashir Bin Jallul Alhami v. George Bush*, No. 05-359 (D.D.C. Oct. 2, 2007), available at http://jurist.law.pitt.edu/pdf/alhami.pdf.

A thirty-day notice of the government's intention to transfer Petitioner would provide counsel an opportunity to contest or at least prepare for the transfer.  Regardless of Mabrouk's eventual success challenging such a transfer, notice would provide his family with knowledge of his whereabouts so that they can continue their efforts to secure his release and safety.

Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioners from the Court's jurisdiction.  As noted above, no matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant—properly before the Court and represented by counsel—be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

For the reasons stated, petitioner respectfully requests that his motion be granted.

Respectfully submitted,

    /s/ Jonathan M. Fee
Jonathan M. Fee
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
jon.fee@alston.com
DC Bar No. 479579

Michael E. Ward
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
michael.ward@alston.com
DC Bar No. 434624

- 13 -

*Attorneys for Petitioner*

ADMIN/20166156v1

- 14 -

## **CERTIFICATE OF SERVICE**

    I, Jonathan M. Fee, hereby certify that I today caused a true and accurate copy of the foregoing to be served electronically via the Court's Electronic Case Filing system.

                                                            /s/ Jonathan M. Fee

ADMIN/20166156v1

- 15 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MABROUK, ADIL BIN**<br>    Petitioner,<br><br>*v.*<br><br>**GATES, ROBERT M.,** *et al.,*<br>    Respondents. | )<br>)<br>)<br>)<br>)  Civil Action No.:  05-cv-2386 (RBW)<br>)<br>)<br>)<br>)<br>) |

## **ORDER**

The court having considered the motion and the recored of the entire case, now therefore it is

ORDERED that with respect to Petitioner Adil Bin Mabrouk, Respondents, their agents, servants, employees, and any persons acting in concert or participation with them, or having actual knowledge of this Order by personal service or otherwise, may not transfer or remove the detained Petitioner Adil Bin Mabrouk from the United States' custody at Guantanamo unless this court and counsel for Petitioner receive thirty days' advance notice of such transfer or removal.

BY THE COURT

_____
Reggie B. Walton
United States District Judge