

SEPTEMBER 2007

VOLUME 19, NO. 4(E)

# Ill-Fated Homecomings

## A Tunisian Case Study of Guantanamo Repatriations

I. Summary ................................................................................................. 1

II. Returns to Tunisia ................................................................................ 3
   Abdullah al-Hajji Ben Amor ................................................................... 3
   Lotfi Lagha .......................................................................................... 7

III. Other Tunisians in Guantanamo ..................................................... 10

IV. Tunisia—Country of Concern ........................................................... 14
   The Practice of Torture in Tunisia ....................................................... 16
      Right of Access to a Doctor ............................................................. 17
   Violations of the Right to a Fair Trial in Tunisia .................................. 18
      Right to a Lawyer ............................................................................ 18
      Right to Confront Witnesses at Trial ............................................... 19
      Efforts to Challenge Coerced Statements ...................................... 20
      Civilians Tried before Military Courts ............................................. 20

V. Other Guantanamo Detainees at Risk ............................................. 21

VI. Legal Obligations ............................................................................. 24

VII. Conclusions .................................................................................... 27

VIII. Recommendations ......................................................................... 29
   To the United States executive branch ................................................ 29
   To the United States Congress ............................................................. 29
   To the Tunisian Government ................................................................ 30
   To Other Governments ........................................................................ 30

IX. Acknowledgements ........................................................................... 31

**Appendix A. Sworn Statement of Samir Ben Amor, Attorney** ...................................32

**Appendix B. Letter to Béchir Tekkari, Tunisian minister of justice** ......................... 36

**Appendix C. Statement by Official of the Tunisian Ministry of Justice and Human Rights** ...............................................................................................................40

# I. Summary

On June 17, 2007, the United States government took two of the 355 detainees currently incarcerated at Guantanamo Bay out of their cells, loaded them onto a plane, and returned them to their home country, Tunisia.

Ten weeks later, as this report went to press, the two men—Abdullah al-Hajji Ben Amor and Lotfi Lagha—are still being held in a Tunisian prison.[1] They have told those who visit them that things are so bad they would rather be in Guantanamo than where they are now.

With the push to close Guantanamo heating up—even the US Secretary of Defense has said that he would like to see Guantanamo closed—the effort to move out many of the men is in high gear. As of June 2007 the United States said that it had slated 80 detainees for release or transfer. Now the US Department of Defense is saying that 150 are eligible for release or transfer.[2]

For the majority of detainees, many of whom have now spent more than five years in Guantanamo without charge, this is welcome news. But for some who come from countries like Algeria, China, Libya, Tunisia, and Uzbekistan—all countries with known records of torture—home is a place that the detainees so fear that they would rather remain in Guantanamo than be returned there.[3]

In some cases, the US administration has found these concerns legitimate and decided not to send the detainees home. It has sent eight detainees—five Chinese Uighurs, an Algerian, an Egyptian, and a Russian—to Albania rather than return them to their home countries. And it is reportedly still trying to find a country that will

---

1 A note on the spelling of Tunisian names: please excuse inconsistencies in the rendering in Latin characters of Tunisian Arabic names. These are due to variations between the French-influenced renderings of Arabic names preferred in Tunisia and the standard English transliteration systems for rendering Arabic.

2 Richard Willing, "Lawmakers to Work on Closing Gitmo," *USA Today*, July 8, 2007, http://www.usatoday.com/news/washington/2007-07-08-lawmakers-gitmo_N.htm (accessed August 13, 2007).

3 Human Rights Watch communications with attorneys representing Guantanamo detainees (names withheld), June-August 2007.

accept the remaining 17 Uighurs in Guantanamo, all of whom it has concluded it cannot return to China.

But in other cases, the administration claims that it can protect against abuse and mistreatment by getting what are known as "diplomatic assurances"—promises of humane treatment—from the receiving country.[4] But what protection does an unenforceable promise from a country that regularly engages in torture really provide? Human Rights Watch documented the torture and other abuse faced by seven Guantanamo detainees returned to Russia on the basis of diplomatic assurances in 2004.[5] The experience of al-Hajji and Lagha in the weeks since their arrival in Tunisia provides additional cause for concern.

Human Rights Watch has long called on the US government to close the detention facilities at Guantanamo Bay, and we continue to do so. But the haphazard shipping of detainees like al-Hajji and Lagha to countries with known records of torture and abuse is not the way to go about that closure. The Bush administration could shut down the prison camp responsibly by providing notice of impending return to the detainees and their lawyers and an opportunity to challenge the transfer, including the nature of any assurances made by the receiving country. It is true that detainees who challenge their transfer will be extending their continued detention at Guantanamo. But they should be allowed to make that choice. Otherwise, the process of closing Guantanamo could end up condemning the detainees to a fate even worse than Guantanamo, and the US to renewed criticism and ill-will.

---

4 See Human Rights Watch, *Still at Risk: Diplomatic Assurances No Safeguard Against Torture*, vol. 17, no. 3(D), April 2005, http://hrw.org/reports/2005/eca0405/, pp. 30-33, 38-41; and see also Human Rights Watch, *Questions and Answers: 'Diplomatic Assurances' against Torture*, November 2006, http://www.hrw.org/backgrounder/eca/ecaqna1106/.

5 Human Rights Watch, *The Stamp of Guantanamo: The Story of Seven Men Betrayed by Russia's Diplomatic Assurances to the United States*, vol. 19, no. 2(D), March 2007, http://www.hrw.org/reports/2007/russia0307/.

## II. Returns to Tunisia

The United States has brought a total of 12 Tunisians to Guantanamo, most of them in 2002. The US has not brought charges against any of these men.

On June 17, 2007, the United States sent home two of the 12, relying in part on promises of humane treatment from the Tunisian government.[6] During the last week of July two Human Rights Watch researchers traveled to Tunisia to track the fate of these two men. While the government declined a request by Human Rights Watch to speak with the detainees, we talked to their lawyer and family members who had been in contact with them, and found that the men's situation is bleak.[7]

### Abdullah al-Hajji Ben Amor

Abdullah al-Hajji, a 51-year-old father of eight, left Tunisia with his family in 1990.

In 1995 a Tunisian military court convicted him in absentia for participating in a terrorist organization operating abroad. Tunisia's Military Penal and Procedural Code (*majalla al-murafa`at wa'l-`uqubat*, hereinafter the Code of Military Justice) gives military courts jurisdiction over civilians charged with serving a terrorist organization operating abroad.

The primary evidence against al-Hajji appears to have been the statement that one of his 19 codefendants made to the police in 1993, in which he claimed that al-Hajji had taken a leadership position in an organization known as the Tunisian Islamist Front while in Pakistan. Al-Hajji's lawyer, Samir Ben Amor, based on his experience from similar cases, considers it likely that this incriminating statement was the product of torture and abuse.[8]

---

6 Communications from US administration officials to Human Rights Watch, June-July 2007. Despite repeated requests, the US has refused to provide any details about the nature of these assurances.

7 Letter from Human Rights Watch to Béchir Tekkari, Tunisian minister of justice, July 27, 2007, in which Human Rights Watch requested permission to visit Hajji and Lagha in prison. An official of the Ministry of Justice responded that the detainees "can be visited" by their families, lawyers, and the International Committee of the Red Cross (ICRC) (see Appendix C).

8 Human Rights Watch interview with Samir Ben Amor, Tunis, July 25, 2007. Abdullah Hajji Ben Amor and Samir Ben Amor are not related.

At the time of al-Hajji's transfer, his lawyer in the US, Clive Stafford Smith, who had learned of the conviction only a short time before, was in Guantanamo trying to meet his client to inform him of it. But al-Hajji, who had spent five years in Guantanamo,[9] was put on a plane and sent to Tunisia before his lawyer could contact him.

Al-Hajji has since told his Tunisian lawyer, Ben Amor, that neither the Tunisians nor Americans ever informed him of the 1995 conviction before sending him home.[10]

On June 18 al-Hajji landed in Tunisia after a long military flight during which US officials reportedly kept him blindfolded, hand- and feet-cuffed, and strapped to his seat. He says that the Tunisians replaced his blindfold with a hood when the plane landed on Tunisian soil.[11]

Al-Hajji reported that Tunisian authorities subjected him to a brief period of questioning, apparently at the airport, followed by two days of interrogation at the Ministry of Interior in Tunis. Al-Hajji told his lawyer that ministry officials slapped him, threatened him with the rape of his wife and daughters, and shook him awake every time he started to sleep. In the end, said al-Hajji, he signed the paper officials presented to him even though his glasses were so out of date and his eyesight so bad he could not read it and had no idea what it said.[12]

On June 20, two days after his return home, al-Hajji appeared before the military court that had convicted him in absentia, and contested this prior conviction. The court scheduled a retrial for September 26, 2007, and ordered that police hold him in pretrial detention.[13] Authorities placed al-Hajji at Mornaguia prison, a large, new facility about 30 minutes' drive outside Tunis.

---

9 Hajji was reportedly arrested by the Pakistanis in 2002, handed over to the United States, and sent to the Guantanamo prison camp.

10 Human Rights Watch interviews with Samir Ben Amor, Tunis, July 25 and July 27, 2007 (see Appendix A for Samir Ben Amor's sworn statement regarding his communications with Hajji).

11 Ibid.

12 Ibid.

13 Under article 180 of the *Code de Procédure Pénale* (CPP) (Tunisian Penal Procedure Code), persons convicted in absentia are usually entitled to a new trial when they appear before judicial authorities and contest their conviction.

In a letter to the *Washington Post*, dated July 17, a Tunisian official denied the allegations regarding al-Hajji's treatment during the first two days after his return to Tunisia, saying al-Hajji "was not mistreated in Tunisia after his release on June 18 from the US detention facility at Guantanamo Bay, contrary to the baseless allegations attributed to his lawyer. No threat was ever made against him or his family." The official also asserted that al-Hajji "has not been questioned yet by judicial police or by the appointed judge." Rather, the police who had custody of him merely "established an arrest report" before presenting him to court to answer to his in absentia conviction.[14]

On July 31 Human Rights Watch submitted a letter to the Tunisian Ministry of Justice asking for further clarification about al-Hajji's treatment since return, including information on the following: where they had held al-Hajji between his arrival in Tunis on June 18 and June 20; whether any police agency other than the judicial police questioned al-Hajji; and whether al-Hajji signed a statement while in police custody, and if so, the nature of that statement.[15]

An official from the ministry responded on August 10 with the same general denial provided to the *Washington Post*, stating: "[Al-Hajji] was not subjected to any mistreatment. The judicial police took custody of [him] and referred [him] directly to the proper judicial authorities." The official did not answer any of the specific questions about al-Hajji's treatment in the two days after he arrived in Tunis.[16]

Al-Hajji told his lawyer that upon arrival at the prison, he was placed in solitary confinement in a poorly ventilated room he called his "tomb." The authorities allowed him out for only 15 minutes a day in an enclosed exercise space without any natural light. He told his lawyer that he had no idea what time it was, and therefore could not properly time his daily prayers according to Islamic ritual. He said that whenever the guards took him out of his cell, they cleared the common spaces of all other prisoners so that he would have absolutely no contact with other inmates. And while al-Hajji has seen a general physician since arriving at Mornaguia, he had not,

---

14 Taoufik Chebbi, press counselor, Embassy of Tunisia to the United States, letter to the editor, *Washington Post*, July 18, 2007.

15 Letter from Human Rights Watch to Béchir Tekkari, Tunisian minister of justice, July 31, 2007 (see Appendix B).

16 Statement by official of the Tunisian Ministry of Justice and Human Rights, August 10, 2007 (see Appendix C).

as of August 15, obtained glasses appropriate for his vision, and therefore could not even pass the days by reading.[17]

Al-Hajji's confinement in a solitary cell lasted for over five weeks. In April 2005 the Tunisian government had made a commitment to Human Rights Watch to end the use of prolonged solitary confinement of prisoners.[18]

Al-Hajji told his lawyer that he was finally moved out of solitary and into a cell with common-law prisoners during the first week of August.[19] The August 10 communication from the Tunisian Ministry of Justice to Human Rights Watch confirmed that "both [al-Hajji and Lagha, the other detainee returned from Guantanamo] are detained in the company of three o[r] four other inmates."[20] But the communication did not deny al-Hajji's claim that they had previously held him in solitary confinement.

On July 27, 2007, Human Rights Watch researchers met with Robert F. Godec, the US ambassador to Tunisia, to discuss the treatment of al-Hajji and Lagha. Ambassador Godec opened his remarks by saying, "I personally, and the US government, are committed to human rights, including in the case of the Guantanamo detainees. We would not transfer individuals where it is more likely than not they would be tortured or mistreated." Ambassador Godec emphasized, "We get assurances [from the Tunisian government] that are specific and credible, and we follow up on those assurances. We have to be confident that these people will be treated humanely when they are returned."

However, Ambassador Godec declined to answer any questions about the nature of the assurances provided by the Tunisians; whether al-Hajji's treatment since return had been consistent with these assurances; what, if anything, the US was doing to follow up on these assurances; and what, if anything, they were doing to help ensure

---

17 Human Rights Watch telephone interview with Samir Ben Amor, August 18, 2007. Ben Amor visited Hajji in prison on August 15.

18 "Tunisia Pledges to End Long Solitary Confinement," Human Rights Watch news release, April 20, 2005, http://hrw.org/english/docs/2005/04/20/tunisi10523.htm.

19 Email communication from Samir Ben Amor to Human Rights Watch, August 4, 2007.

20 Statement by official of the Tunisian Ministry of Justice and Human Rights, August 10, 2007 (see Appendix C).

that al-Hajji receive a fair retrial. Ambassador Godec would not even say whether any representative from the US government had yet met with al-Hajji to assess and monitor compliance with the assurances.[21]

Tunisian authorities have granted both al-Hajji's lawyer, Samir Ben Amor, and the International Committee of the Red Cross (ICRC) access to him. The ICRC maintains strict confidentiality in its prison visits and shares its findings only with the Tunisian authorities; its visits do not result in public information on detainee treatment.

The authorities have also allowed al-Hajji's family members weekly visits of 15 minutes each, with the visits monitored by prison guards. Al-Hajji's family told his lawyer, Ben Amor, that the local police have ordered them to report on the content of their conversations.

## Lotfi Lagha

Less is known about the plight of Lotfi Lagha, a 38-year-old from a remote village in southern Tunisia, who never had a lawyer during his five years at Guantanamo and was not granted access to an attorney in Tunisia until August 9, 2007, more than seven weeks after being returned there.

Lagha is now represented by Samir Ben Amor, the same lawyer who represents al-Hajji.[22] Lagha has told Ben Amor that he left Tunisia in 1998, traveled to Italy, and eventually ended up in Pakistan, where he was arrested in 2002. Lagha reports that he was initially held at the Bagram Air Force Base in Afghanistan, where he says several frostbitten fingers were amputated without his consent.[23] A relative who visited Lagha confirmed that he is missing several fingers on both hands.[24]

---

21 Human Rights Watch interview with Robert F. Godec, United States ambassador to Tunisia, Tunis, July 27, 2006.

22 When Ben Amor had tried to see Lagha previously, in late July, he was turned away. And while the Tunisian authorities stated that, as of August 10, Lagha "enjoys legal counsel and is represented by an attorney," (see Appendix C for the statement by an official of the Tunisian Ministry of Justice and Human Rights, August 10, 2007) they did not specify when the lawyer was first granted access, or whether Lagha was offered any legal representation, as is required under Tunisian law, when he was brought before the investigating judge on June 21.

23 Email communication from Samir Ben Amor to Human Rights Watch, August 11, 2007. Information based on what Lagha told Ben Amor in a meeting on August 9, 2007. See also Bouazza Ben Bouazza, "Tunisian Sent Home from Guantanamo Says He Was Beaten by US Soldiers," Associated Press, August 12, 2007.

24 Human Rights Watch interview with relatives of Lotfi Lagha, Tunis, July 2007 (names and dates withheld). On July 27 Lagha received his third family visit since his arrival in Tunisia.

Although Lagha had no outstanding charges or unserved sentences pending when he returned to Tunisia, an investigating judge[25] has, since his return, reportedly recommended he be charged with participating in a terrorist organization operating abroad.[26] A trial is now reportedly scheduled for November 2007.[27]

Lagha told Samir Ben Amor that upon his arrival in Tunisia, authorities immediately hooded him and took him to the Ministry of Interior building. There, after photographing him and conducting a medical examination, authorities interrogated him until 11 p.m. They questioned him intermittently during the next three days, and threatened him with torture but never actually beat him. Lagha said that on June 21 the police brought him before a civil court investigating judge. He was not told of his right not to answer questions without his lawyer present; rather, he was told that he could appoint a lawyer at the end of this questioning.[28] The judge recommended charging Lagha with involvement in a terrorist organization and ordered his detention pending the ongoing investigation.[29]

Lagha told Ben Amor that he was held in solitary confinement in Mornaguia prison until August 7, when he was transferred to a cell with common-law prisoners. He told Ben Amor, "I would rather return to Guantanamo than remain in these conditions."[30] Lagha also told a relative who visited him that he had been placed in solitary confinement upon his arrival at Mornaguia, and that under the circumstances he would have preferred to remain in Guantanamo.[31]

---

25 A *juge d'instruction* (investigating judge) is the magistrate who assesses the evidence and recommends whether to pursue charges.

26 Human Rights Watch interview with Samir Ben Amor, Tunis, July 27, 2007; and email communication from Samir Ben Amor to Human Rights Watch, August 11, 2007.

27 Ben Bouazza, "Tunisian Sent Home from Guantanamo Says He Was Beaten by US Soldiers in Afghanistan," Associated Press.

28 Email communication from Samir Ben Amor to Human Rights Watch, August 16, 2007. Information based on a meeting between Ben Amor and Lotfi Lagha on August 15, 2007.

29 Email communication from Samir Ben Amor to Human Rights Watch, August 11, 2007. Ben Amor said that based on his review of Lagha's case files, the judge had recommended charging Lagha with articles 52bis, 131, and 132 of the Penal Code. These articles, taken together, refer to participation in a criminal enterprise for the purpose of carrying out terrorism as Tunisian law defines it.

30 Email communication from Samir Ben Amor, August 11, 2007. Information based on a meeting between Samir Ben Amor and Lotfi Lagha on August 9, 2007.

31 Human Rights Watch interview with a relative of Lotfi Lagha, Tunis, July 2007 (name and date withheld).

Lagha told Ben Amor that while he was in Guantanamo, he had informed ICRC representatives that he did not want to return to Tunisia.

During the last week of July, some of Lagha's relatives made the 500-kilometer trip to Tunis from their family home in Medenine governorate in southern Tunisia to see him for the first time. They said the family had lost touch with him around 2000 and did not even know he had been in Guantanamo; their parents thought he was dead, according to one of the relatives. The family said they first learned of his whereabouts when the pan-Arab al-Arabiya television channel reported that Lagha was on his way home from Guantanamo to Tunisia.[32]

As with al-Hajji, US Ambassador Godec declined to disclose to Human Rights Watch whether, when, and how the US government was monitoring Lagha's treatment, whether it comported with the promises of humane treatment that Tunisia had provided, and if not, what the US was doing to enforce those promises.

Lagha told his lawyer, Samir Ben Amor, on August 15 that no American had yet visited him since his return to Tunisia.[33]

---

32 Ibid.

33 Email communication from Samir Ben Amor, August 16, 2007.

# III. Other Tunisians in Guantanamo

There are 10 other Tunisians still in Guantanamo, at least eight of whom have been convicted in absentia.[34]

Tunisia does not have a centralized, publicly accessible database of criminal records, making it difficult to gather information about prior convictions.[35] We were, however, able to gather case files (some only partial) for several of the Guantanamo detainees from Tunisia:

1. Adel Ben Ahmed Ben Ibrahim Ben Saleh al-Hakimi, born March 27, 1965, in Tunis.
2. Riyadh Ben Mohamed at-Taher Ben al-Akhdhar an-Naceri, born July 7, 1966, in Gafsa.
3. Lotfi Ben Abid Ben Amor Ben Ali, born August 15, 1964, in Tunis.[36]
4. Ridha Ben Saleh Ben Mabrouk al-Yazidi, born January 24, 1965, in Nafidha.

On January 26, 2005, the Tunis Military Court convicted al-Hakimi, an-Naceri, Ben Ali, and al-Yazidi in absentia on charges of serving a terrorist organization operating abroad,[37] and sentenced each to 20 years in prison, and five years of administrative control and deprivation of their civil liberties. There were 35 defendants in the case, only five of whom were in custody at the time. According to the court ruling, the main evidence in support of conviction was the statements made to the police by their

---

34 While there is no absolute prohibition on trials in absentia under international law, trials in absentia compromise the ability of an accused to exercise his or her rights to a fair trial under the International Covenant on Civil and Political Rights (ICCPR), including the rights to adequately prepare a defense, to communicate with counsel of choice, and to examine witnesses. As noted above, Tunisian law grants new trials to persons convicted in absentia who present themselves, or are presented, to judicial authorities. See International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, ratified by Tunisia on March 18, 1969, art. 14.

35 Statement by official of the Tunisian Ministry of Justice and Human Rights, August 10, 2007 (see Appendix C). The ministry stated that Guantanamo detainees can request information about their judicial records in Tunisia from the office of the state prosecutor at the Court of First Instance, or the director of judicial services at the general prosecutor's office. Human Rights Watch does not yet have a basis for evaluating whether the judicial authorities handle such requests in a thorough and timely fashion.

36 Lotfi Ben Abid Ben Amor Ben Ali is the legal name for Mohammad Abdul Rahman, referred to in Appendix B. Rahman is the name the US uses for him in Guantanamo.

37 Tunis Military Court, case no. 16851.

codefendants in custody, to the effect that they had met al-Hakimi, an-Naceri, Ben Ali and al-Yazidi at a military camp in Afghanistan, and that they had undergone military training in preparation for returning to Tunisia to carry out operations there. During the trial those codefendants tried to disavow their statements to the police, but the judge refused this request.

Al-Hakimi, an-Naceri, and Ben Ali were also in absentia codefendants, along with Adel Ouarghi (see below), in another case before the Tunis military court in which they were charged with participating in the establishment in Afghanistan of a new "fundamentalist jihadist" organization.[38] The court, on March 24, 2006, sentenced al-Hakimi, an-Naceri, and Ben Ali to 20 years in prison.[39]

5. Rafiq Ben al-Béchir Ben Haloul al-Hammi, born March 14, 1969, in Tunis.
6. Hichem Ben Ali Ben Amor al-Sliti, born February 11, 1966, in Tunis.

On March 22, 2005, the Tunis Court of First Instance convicted al-Hammi and al-Sliti, plus a third in absentia defendant and Moncef al-Hammami, who was in custody, on five counts under Tunisia's Law in Support of International Efforts to Combat Terrorism and to Fight Money-Laundering (hereinafter the 2003 Anti-Terror Law), sentencing each of the in absentia defendants to 40 years in prison, a fine of 25,000 dinars (about US$20,000), and five years of post-release administrative control.[40]

Both al-Hammi and al-Sliti had already been in Guantanamo for more than a year when the 2003 law upon which they were convicted was passed. Moncef al-Hammami, the only one of the four defendants in custody, appealed the conviction, arguing among other things that he, too, had been in custody since before December 2003 and therefore had been improperly convicted under a law which had only been enacted after the alleged "offense" was committed. Tunis Appeals Court Judge Mohamed at-Taher al-Sliti reduced Hammami's sentence to 10 years but rejected the

---

38 Tunis Military Court, report of the investigating judge, no. 2/3736, September 22, 2004.

39 Tunis Military Court, case no. 28265.

40 Tunis Military Court, case no. 0464/2004. The court sentenced the in absentia defendants to five eight-year sentences, to run consecutively, on charges of membership in a terrorist organization (art. 13.2 of the 2003 Anti-Terror Law), using a *nom de guerre* within a terrorist organization (art. 12), undergoing training with a view toward committing terrorist acts (art. 13), procuring arms (art. 16), and procuring a meeting place for a terrorist organization (art. 18).

argument on retroactive application of the law, explaining that because al-Hammami had not explicitly renounced his membership, he was therefore committing a "continuing offense." International human rights law prohibits retroactive application of criminal laws.[41]

7. Adel Ben Mabrouk Ben Hamida Ben Mabrouk, born September 15, 1970.

On January 30, 2002, the Tunis Military Court sentenced Mabrouk in absentia to 20 years in prison and five years of post-sentence administrative controls for serving in, and inciting others to join, the Adherents of the Islamic Community and the Traditions of the Prophet (*Ahl as Sunna wa Djamaa*), which the government considers an Al Qaida-affiliated terrorist group operating abroad. The court judged 31 of the defendants, including Mabrouk, in absentia. The defense lawyers for the three defendants who were present at the trial stated that the police had held the men in incommunicado detention longer than the six days that the law permits, and then covered this up by falsifying the date of arrest in the register. At least two of them claimed the police had obtained their "confessions" through torture, but the trial judge nevertheless relied almost exclusively on these statements, and sentenced the three defendants present at trial to prison terms of between eight and 10 years, while giving 20-year sentences to the in absentia defendants, including Mabrouk.[42]

8. Adel Ben Mohamed Ben Abbas al-Ouarghi, born July 25, 1965, in Tunis.[43]

The Tunis Military Court sentenced Ouarghi in absentia to 20 years in prison on March 24, 2006. Among the codefendants the court found guilty was Seifallah Ben Hcine, who was also a central figure and codefendant in the above-mentioned case against al-Hakimi, an-Naceri, Ben Ali, and al-Yazidi (al-Hakimi, an-Naceri and Ben Ali were also codefendants in this case against Ouarghi). The court reportedly based the conviction of Ouarghi almost exclusively on a statement made to the police by Ben Hcine, the only one of the 14 defendants in custody. In that statement he named

---

41 ICCPR, art. 15; see also UN Human Rights Committee, *Westerman v. the Netherlands*, Communication no. 682/1996, Doc. CCPR/C/67/D/682/1996 (December 13, 1999).

42 Tunis Military Court, case no. 12101. See reference to this case in Amnesty International, *Tunisia: The Cycle of Injustice*, June 10, 2003, MDE 30/001/2003, http://web.amnesty.org/library/Index/ENGMDE300012003?open&of=ENG-TUN (accessed August 19, 2007).

43 Tunis Military Court, case no. 28265.

Ouarghi and other Tunisians with whom he met in Afghanistan for the purpose of establishing a new "fundamentalist jihadist" organization. Before the investigating judge, Ben Hcine denied the contents of his statement to the police, saying it had been "extracted" from him. But the investigating judge rejected Ben Hcine's effort to exclude his confession from the evidence in the case.[44]

The court gave Ouarghi 10 years on each of two charges: membership in a terrorist organization operating abroad and incitement to belong to such an organization.

9.  Sayf Ben Abdallah, born June 24, 1973.
10. Al-Hedi Ben al-Hedhili Hammami, born March 18, 1969.

No details on either of these two cases are available. Hammami's family said through a lawyer that they are unaware of any charges pending against him.[45]

---

44 Tunis Military Court, report of the investigating judge, no. 2/3736, September 22, 2004, in which the term "extracted" is employed to summarize Ben Hcine's claim.

45 Human Rights Watch interview with Samir Ben Amor, Tunis, July 27, 2007.

# IV. Tunisia—Country of Concern

In Tunisia persons suspected of politically motivated offenses, whether violent or nonviolent, are at risk of torture during police interrogation and have little chance of receiving a fair trial.

Since the early 1990s the government of President Zine el-Abidine Ben Ali has cracked down relentlessly on suspected members of all movements organized around an Islamist political agenda. Tunisian law bans parties based on religion. The government considers the country's most prominent Islamist movement, an-Nahdha, or "Renaissance," to be an extremist movement, even though its leaders regularly denounce violence and the party has not been linked to violent acts for at least 15 years.

President Ben Ali's crackdown on Islamists began in 1990 with mass arrests of an-Nahdha members. In 1992 it put on trial before a military court 279 an-Nahdha leaders and members in connection with an alleged plot to overthrow the government. The courts convicted 265 of the defendants in trials that Human Rights Watch and other human rights organizations criticized as unfair.[46] Dozens of the men convicted in those trials remain in prison today.

Throughout the 1990s authorities continued to prosecute members of an-Nahdha. Courts imprisoned hundreds for such nonviolent offenses found in Tunisian law as membership in, or attending meetings of, or collecting money for, an "unauthorized association."

In 1993 authorities amended the Penal Code to define the crime of terrorism as "any infraction in relation to an individual or a collective enterprise whose purpose is to cause harm to persons or property, by intimidation or terror," as well as "acts of incitement to racial or religious hatred or fanaticism regardless of the means

---

46 See, for example, Middle East Watch (now Human Rights Watch/Middle East and North Africa) and International Human Rights Law Group, *Military Courts that Sentenced Islamist Leaders Violated Basic Fair Trial Norms*, vol. 4, no. 9, October 1992, http://hrw.org/reports/pdfs/t/tunisia/tunisia.920/tunisia920full.pdf.

employed."[47] Treating an-Nahdha as a movement that preached religious fanaticism, authorities brought terrorism charges against members even though the accusations against them included neither preparing nor carrying out acts of violence. By prosecuting them as terrorists, the judiciary could impose harsher penalties than those available for non-terrorism-related crimes.

Since the mid-1990s authorities have also aggressively prosecuted scores of Tunisians who returned home, either voluntarily or by force, on charges of engaging in terrorist activities abroad. They imprisoned dozens under article 123 of the Code of Military Justice, which gives military courts jurisdiction over civilians charged with serving a terrorist organization that operates abroad. Most of those convicted under this provision received prison terms of at least eight years, even though in most cases the courts did not find them guilty of having committed any act of violence.

In contrast to the civilian courts, the military court verdicts are subject to no appeal on the facts. A defendant can refer a military court verdict only to the Court of Cassation, which can annul a verdict only on the grounds of error in procedure or in application of the law.

In 2003 Tunisia adopted a new terrorism law. Its definition of terrorism, like that of the Penal Code, encompasses "acts of incitement to racial or religious hatred or fanaticism regardless of the means employed,"[48] thereby leaving open the possibility of prosecuting as terror crimes political opinion or association.

In recent years authorities have rounded up hundreds of youths who are suspected of harboring jihadist sympathies. The majority of those who were subsequently convicted were never accused of having planned or committed specific acts of violence.[49] According to Tunisian human rights lawyers and organizations, the police have subjected those rounded up in this context to harsher treatment than those

---

47 Penal Code, art. 52bis.

48 2003 Anti-Terror Law, art. 6, which superseded Penal Code, art. 52bis.

49 See *Conseil national pour les libertés en Tunisie* (National Council on Liberties in Tunisia), "*Procès jugés en vertu de la loi antiterroriste en Tunisie: Justice préventive et instrumentalisation politique, Tunis : juin 2005-mars 2007* (Trial under the Tunisian 2003 Anti-Terror Law: Preventive Justice and Political Instrumentalization, Tunis: June 2005-March 2007)," April 2007, http://www.cnltunisie.org/fr/images/Rapport_loi_terrorisme%20avril%202007.pdf (accessed August 19, 2007).

rounded up in the mid-1990s.[50] The authorities have also reportedly routinely abused *garde-à-vue* detention, or pre-arraignment incommunicado police custody, by holding detainees for longer than the legal limit of six days and subjecting them to various forms of torture and other mistreatment. Plainclothes police who do not identify themselves or present warrants carry out the arrests, and efforts by the family to learn the whereabouts of the suspect are fruitless until after the police have finished interrogating him and have transferred him before an investigating judge.[51]

## The Practice of Torture in Tunisia

Tunisia in 1988 ratified without reservation the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention against Torture),[52] and the following year added to its Penal Code a robust definition of torture and penalties of eight years in prison for public servants who torture.[53]

In practice, however, persons arrested on suspicion of involvement in Islamist and other opposition political activities routinely report that the police tortured them during interrogation in order to extract incriminating statements. The Tunisian judiciary is complicit in the practice of torture by ensuring impunity for its practitioners. Tunisian human rights lawyers and organizations report that, with rare exceptions, the courts admit into evidence statements that were coerced, and fail to act on the ample evidence before them that the police tortured detainees and violated many provisions of Tunisian law that are designed to protect the rights of persons in custody.[54]

---

50 Ibid.

51 Ibid.

52 Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention against Torture), adopted December 10, 1984, G.A. Res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987, ratified by Tunisia on September 23, 1988.

53 Law no. 89 of August 2, 1999, added to CPP, art. 101bis, which punishes public servants who torture with eight years in prison and specifies, "Torture means any act that results in causing physical or mental pain or extreme suffering willfully inflicted on the concerned person with the aim of obtaining information or a confession from him or from another; or to punish him for an act he or another committed or are suspected of having committed; or to intimidate him or another; or when the infliction of pain and extreme suffering occurs for any reason related to discrimination of any kind."

54 See National Council on Liberties in Tunisia, "Trial under the Tunisian 2003 Anti-Terror Law, Preventive Justice and Political Instrumentalization." This practice violates the Convention against Torture, art. 15, which states, "Each State Party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made."

We know of no case of a Tunisian state official or agent being held accountable for torturing persons held for politically motivated offenses. According to the US State Department *Country Reports on Human Rights Practices* covering the year 2006, "[Tunisian] authorities did not charge any police or security force official with abuse [of detainees] during the year."[55]

Detainees report a range of methods of physical and mental forms of torture and ill-treatment. Most common, according to human rights lawyers and organizations, are sleep deprivation; threats to rape the detainee or women family members; beatings, especially on the soles of the feet (*falaka*), using fists, kicks, and sometimes clubs or electric cables; and tying and suspending detainees from the ceiling or in the "roast chicken" (*poulet rôti*) position, either while fully or nearly naked, from a rod that is supported by a table at each end.[56]

## Right of Access to a Doctor

The right of access to a doctor whilst in detention is a key safeguard against torture, and also essential to preserving evidence that abuse may have taken place.[57] Although Tunisian law grants a detainee and his relatives the right to request a medical examination during *garde-à-vue* detention,[58] in practice, the police rarely inform detainees of this right. Even when they do, the person in custody is often too afraid to make such a request, fearing an even harsher interrogation in response, human rights lawyers told us.[59]

---

55 US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2006: Tunisia," March 6, 2007, http://www.state.gov/g/drl/rls/hrrpt/2006/78864.htm (accessed August 13, 2007).

56 Ibid., sec. 1.c, which provides a more extensive list of methods: "The forms of torture and other abuse [according to human rights organizations] included: sleep deprivation; electric shock; submersion of the head in water; beatings with hands, sticks, and police batons; suspension, sometimes manacled, from cell doors and rods resulting in loss of consciousness; and cigarette burns. According to Amnesty International (AI), police and prison officials used sexual assault and threats of sexual assault against the wives of Islamist prisoners to extract information, intimidate, and punish." See also National Council on Liberties in Tunisia, "Trial under the Tunisian 2003 Anti-Terror Law: Preventive Justice and Political Instrumentalization;" and *Comité pour le Respect des Libertés et des droits de l'Homme en Tunisie* (Committee for the Respect of Liberties and Human Rights in Tunisia), *La torture en Tunisie 1987-2000 , Plaidoyer pour son abolition et contre l'impunité* (Torture in Tunisia 1987-2000, Advocating for its Abolition and against Impunity), (Paris: Editions les Temps des Cerises, 2000).

57 UN Human Rights Committee, General Comment no. 20, Article 7, Prohibition of torture, or other cruel, inhuman or degrading treatment or punishment, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.7, May 12, 2004, http://www.unhchr.ch/tbs/doc.nsf/0/ca12c3a4ea8d6c53c1256d500056e56f/$FILE/G0441302.pdf (accessed August 24, 2007), para. 11.

58 CPP, art. 13bis.

59 Human Rights Watch interviews with numerous human rights lawyers in Tunisia between 1996 and 2007. The UN Committee against Torture said it was "concerned over the pressure and intimidation used by officials, to prevent the victims

It is slightly more common for detainees to ask for a medical examination from a judge once they have legal representation. But judges rarely grant the request, even if the detainee bears physical evidence of having been abused, according to Tunisian lawyers. The judges rarely explain their decision to refuse the request, or even note in the trial records that the defendant had filed one.[60]

## Violations of the Right to a Fair Trial in Tunisia

The Tunisian judiciary lacks real independence from the executive branch.[61] Whether before a civilian or a military court, defendants in Tunisia face a daunting series of obstacles to obtaining a fair trial, even where the law grants to the defendant strong procedural safeguards.

### Right to a Lawyer

The suspect has no right to see a lawyer or anyone else during the period of *garde-à-vue* police detention, which Tunisian law limits to six days.[62]

When the police transfer the suspect from *garde-à-vue* detention to the investigating judge, the latter is obliged to immediately inform him of his right to an attorney, and a corresponding right to refuse to answer questions without a lawyer present.[63] Unless the defendant explicitly renounces this right, the investigating judge may not, according to the law, question the defendant without his lawyer present.[64] According

---

from lodging complaints," and urged Tunisia "to ensure the right of victims of torture to lodge a complaint without the fear of being subjected to any kind of reprisal, harassment, harsh treatment or persecution, even if the outcome of the investigation into their claims does not prove their allegations, and to seek and obtain redress if these allegations are proven correct." UN Committee against Torture, Summary Record of the 363rd meeting: Tunisia, December 11, 1998, CAT/C/SR.363. See also Human Rights Watch, Amnesty International, and the Observatory for the Protection of Human Rights Defenders, *The Administration of Justice in Tunisia: Torture, Trumped-Up Charges and a Tainted Trial*, March 2000, vol. 12, no. 1(E), http://www.hrw.org/reports/2000/tunisia/.

60 See, for example, the case of Zied Ghodhbane, in National Council on Liberties in Tunisia, "Trial under the Tunisian 2003 Anti-Terror Law: Preventive Justice and Political Instrumentalization."

61 US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2006: Tunisia," sec. 1.e, which states, "The law provides for an independent judiciary; however, the executive branch and the president strongly influenced judicial procedures, particularly in political cases. The executive branch exercised indirect authority over the judiciary through the appointment, assignment, tenure, and transfer of judges, rendering the system susceptible to pressure. In addition, the president was head of the Supreme Council of Judges, composed primarily of presidential appointees."

62 As noted above, the suspect has a right to request a medical examination, but this is rarely granted before the end of *garde-à-vue* detention.

63 CPP, art. 69.

64 Ibid., art. 72.

to human rights lawyers handling terrorism-related cases, however, the investigating judges often question defendants in the absence of their lawyers[65] and without the lawyers being properly notified of the hearing. Defendants also frequently claim that they were not told of their right to a lawyer at this stage of the proceedings.

Although Tunisian law limits *garde-à-vue* detention to six days, many detainees report being held much longer.[66] This illegal prolongation of *garde-à-vue* allows the police more time to interrogate the detainee and also for visible evidence of abuse to fade before his lawyer or the investigating judge sees him.

## Right to Confront Witnesses at Trial

Tunisian courts often use written statements made by third parties before the police or the investigating judge as evidence to convict defendants in cases involving security offenses. Defense lawyers can petition the judge to subpoena the third party for questioning, but the judge is not required to grant the petition. The CPP states in article 59 that the investigating judge "has the right" to hear all persons whose testimony he deems useful. In practice, the judge often declines defense requests to call witnesses and, as a result, convicts a defendant without even providing him basic confrontation rights, Tunisian human rights lawyers told Human Rights Watch.[67]

Persons charged under the 2003 Anti-Terror law (see above) face additional obstacles to mounting a fair defense. The law allows the government to withhold from disclosure the identities of witnesses, even central witnesses. Although the defendant may petition the judge for disclosure, a judge's refusal is not subject to appeal.[68] In addition, persons convicted in absentia under the 2003 law do not

---

65 National Council on Liberties in Tunisia, "Trial under the Tunisian 2003 Anti-Terror Law: Preventive Justice and Political Instrumentalization."

66 CPP, art. 13bis; and US State Department, "Country Report on Human Rights Practices – 2006: Tunisia," sec. 1.d, which states, "Attorneys, human rights monitors, and former detainees maintained that authorities illegally extended detainment by falsifying arrest dates."

67 See ICCPR, art. 14(3)(b) provides that anyone being tried for a criminal offense has the right "[t]o examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him."

68 2003 Anti-Terror Law, art. 52.

benefit from the suspension of their sentences if they appear before judicial authorities and contest their in absentia conviction.[69]

## Efforts to Challenge Coerced Statements

Some defendants during trials seek to describe the abuse they say they endured from interrogators as a way of discrediting signed confessions. In many cases, human rights lawyers say, the judge either cuts off the defendant when he talks about police abuse, or he refuses to instruct the court clerk to enter the defendant's statement into the official record, or instructs the clerk to use euphemisms to summarize the defendant's allegations, referring, for example, to acts of "coercion" rather than of "torture."[70]

## Civilians Tried before Military Courts

Trying civilians before military courts raises numerous fair trial issues under international law. The United Nations (UN) Human Rights Committee—the expert body that interprets and monitors compliance with the International Covenant on Civil and Political Rights (ICCPR)—has stated that the trial of civilians by military courts should be very exceptional and occur only under conditions that genuinely afford full due process.[71]

Military tribunals in Tunisia do not meet international fair trial standards.[72] And unlike those prosecuted by civilian courts in Tunisia, persons convicted by military courts are not entitled to an appeal of the facts. They can only appeal the verdict on the grounds of error in procedure of application of the law.

---

69 Ibid., art. 47.

70 See Convention against Torture, art. 13, which states, "Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities. Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given."

71 UN Human Rights Committee, General Comment no. 13, Article 14, Equality before the courts and the right to a fair and public hearing by an independent court established by law, (Twenty-first session, 1984), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, para. 4.

72 See, for example, Amnesty International, *Tunisia: The Cycle of Injustice*, June 10, 2003.

# V. Other Guantanamo Detainees at Risk

Of the 355 detainees still being held in Guantanamo, approximately four dozen from countries such as Algeria, China, Libya, Tunisia, and Uzbekistan—all countries with known records of torture—have told their attorneys that they are so fearful of torture or other abuse that they do not want to return home. Another nine who are either unrepresented or never met with their lawyer come from such "at-risk" countries and may also have valid repatriation concerns. Detainees from other countries may also be at risk because of the particular circumstances of their case.

Before passage of the Military Commissions Act of 2006, which strips court jurisdiction over detainees' habeas corpus claims and any other suit challenging conditions of confinement, treatment, or transfer,[73] detainees could as part of habeas petitions request from the court what are known as 30-day notices, requiring advance notice to the detainee and his lawyer prior to any transfer abroad. Some detainees who got such notice subsequently asked for a review and stay of the transfer on the basis that there were substantial grounds for believing that they would be in danger of being subjected to torture upon return, pursuant to the Convention against Torture, which the United States ratified in 1994.[74] Since passage of the Military Commissions Act, most courts have now concluded that they do not have jurisdiction to stop a transfer, no matter how likely the risk of abuse upon return.[75]

As a result, the decision whether to transfer is exclusively within the executive branch's discretion, without any independent and transparent review of the decision to transfer. The Bush administration claims to take into account information

---

73 The Military Commissions Act (MCA) of 2006, S. 3930, October 17, 2006, sec. 7: Habeas corpus matters. The constitutionality of these court-stripping provisions is currently being challenged before the Supreme Court in *Boumediene v. Bush*. Briefing on the case is scheduled to be completed by October 9, 2007, and arguments are expected to take place near the end of the year.

74 Convention against Torture, art. 3, which prohibits the transfer of persons to countries where there are substantial grounds for believing that they would be in danger of being subjected to torture upon return.

75 See *Zalita v. Bush*, no. 07-5129 (D.C. Cir. filed Apr. 25, 2007) (per curiam) and no. 06A1005 (127 S. Ct. 2159 (Mem), 167 L.Ed.2d 886, 75 USLW 3607, U.S., May 1, 2007); see also *Belbacha v. Bush*, no. 07-5258 (D.C. Cir. filed Aug. 2, 2007) (per curiam) and no. 07A98 (S. Ct. filed Aug. 10, 2007); and see also *Hamlily v. Gates*, no. 07-1127 (D.C. Cir. filed Jul. 16, 2007) (per curiam).

provided by the International Committee for the Red Cross, which has access to Guantanamo Bay detainees prior to their departure, regarding a detainee's fear of return.[76] But the ICRC's strict confidentiality means there is no way to assess how much weight, if any, the administration gives its recommendations.[77]

In some cases, the administration has found these concerns legitimate and decided not to send the detainees home. It has sent eight detainees—five Chinese Uighurs, an Algerian, an Egyptian, and a Russian—to Albania rather than return them to their home countries. And it is reportedly still trying to find a country that will accept the remaining 17 Uighurs in Guantanamo, all of whom it has concluded it cannot return to China. But the process of finding a third-party country, let alone an appropriate one, is concededly not easy. To date, only Albania has stepped forward, but it has resettled just eight detainees.[78]

As a result, the US government appears to be turning more and more to the use of diplomatic assurances—promises of humane treatment—from the government of the detainee's home country as a means of mitigating the risk of abuse. The Tunisian government reportedly provided such assurances prior to the transfer of al-Hajji and Lagha. And the US is reportedly negotiating such assurances with Algeria, which still has 26 detainees in Guantanamo, and Libya, which has nine. Both are countries with known records of torture.[79]

The effort to mitigate the risk of abuse that detainees face when they voluntarily choose to return home to a country with a poor record on torture is a positive

---

76 Communications from administration officials to Human Rights Watch, May-June 2007.

77 According to legal counsel for detainees, the ICRC does not conduct its "exit interview" with the detainee until days prior to the scheduled transfer, once all of the agreements for transfer have already been worked out and changing course would be difficult.

78 These detainees did not have previous ties to Albania and are now living in a refugee camp outside of Tirana, the capital, where they are having difficulty finding jobs and integrating into the society. See Llazar Semini, "Albania Confirms It Will Shelter 3 Released Guantanamo Detainees," Associated Press, November 18, 2006; see also Tim Golden, "Chinese Leave Guantanamo for Albanian Limbo," *New York Times*, June 10, 2006; and see also Jackie Northam, "Morning Edition: Guantanamo Prisoner Release Becomes Challenging," National Public Radio, August 7, 2007.

79 US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Report on Human Rights Practices – 2006: Algeria", March 6, 2007, http://www.state.gov/g/drl/rls/hrrpt/2006/78849.htm (accessed August 13, 2007), which describes "abuse and torture" as among the "significant human rights problems" in Algeria; and US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Report on Human Rights Practices – 2006: Libya," March 6, 2007, http://www.state.gov/g/drl/rls/hrrpt/2006/78858.htm (accessed August 13, 2007), sec. 1.c., which states, "The law prohibits such practices, but security personnel routinely tortured prisoners during interrogations or as punishment."

development. But assurances cannot—and should not—be relied upon as sufficient protection to override the credible fear of torture and mistreatment of detainees who do not want to return.

The cases of al-Hajji and Lagha support our concerns.

Despite the assurances of humane treatment, al-Hajji reports being immediately taken to an interrogation center, where he says he was prohibited from sleeping, slapped, threatened with the rape of his wife and daughters, and coerced into signing something he could not read. He says that he was held for six weeks in solitary confinement, even though the Tunisian government had explicitly pledged to Human Rights Watch to end the use of prolonged solitary confinement in prisons.

Similar concerns exist regarding the treatment of Lagha, whom Tunisian authorities also detained in solitary confinement. He was held for six weeks in pretrial detention without access to an attorney or any other outside monitor who could publicly report on his treatment and condition. For a detainee in a country like Tunisia, the lack of access to an attorney and the absence of independent, transparent monitoring heightens fears of mistreatment.

# VI. Legal Obligations

International law prohibits the return of people to countries where they are at risk of torture or ill-treatment.

Specifically, the Convention against Torture forbids the transfer ("refoulement") of a person to countries "where there are substantial grounds for believing that he would be in danger of being subjected to torture."[80] The US government incorporated that principle in the Foreign Affairs Reform and Restructuring Act of 1998, which states in section 1242, "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."[81]

Other international treaties to which the United States is party likewise prohibit transfer to risk of mistreatment. The ICCPR, ratified by the United States in 1992, states, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."[82] The UN Human Rights Committee in its general comment on this provision explained that "[s]tates parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."[83] Human Rights Watch believes that returning a person to a place where he or she is likely to be subjected to prolonged arbitrary detention or imprisoned or otherwise punished after an unfair trial may amount to cruel or inhuman treatment.[84]

---

80 Convention against Torture, art. 3.

81 Foreign Affairs Reform and Restructuring Act of 1998, H.R. 1757, January 27, 1998, http://usinfo.state.gov/usa/infousa/laws/majorlaw/hr1757.pdf (accessed August 24, 2007), sec. 1242.

82 ICCPR, art. 7.

83 UN Human Rights Committee, General Comment no. 20, para. 9.

84 See European Court of Human Rights, *Soering v. United Kingdom*, 1/1989/161/217, July 7, 1989, which states, "The Court considers that, like the risk of [deprivation of the right to life and torture and other cruel and inhuman treatment], the risk of a flagrant denial of justice in the country of destination must primarily be assessed by reference to the facts which the Contracting State knew or should have known when it extradited the persons concerned .... [T]he risk of a flagrant denial of justice must also be assessed in the light of the information available to the Court when it considers the case."

The Convention relating to the Status of Refugees and the 1967 Optional Protocol to it, both ratified by the US in 1968, prohibit the transfer of a person to a place where his life or freedom would be threatened on account of his race, religion, nationality, membership in a social group or public opinion, unless he is disqualified from persecution protection on serious criminal- or security-related grounds.[85]

The United States claims that these international treaty obligations do not apply to states on an extraterritorial basis and therefore do not bind the US in its treatment of the detainees at Guantanamo Bay. Human Rights Watch believes that the language and underlying aims of the human rights treaties require their extraterritorial application.[86] The US has nonetheless adopted a policy of abiding by these obligations. In the words of Clint Williamson, ambassador-at-large for war crimes at the Department of State:

> Of particular concern to the Department of State in making recommendations on transfers is the question of whether the foreign government concerned will treat the detainee humanely, in a manner consistent with its international obligations … [It is] the long-standing policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured, or, in appropriate cases, that the person has a well-founded fear of persecution and would not be disqualified from persecution protection on criminal- or security-related grounds. This policy is consistent with the approach taken by the United States in implementing the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment and the Protocol relating to the Status of Refugees."[87]

---

85 Convention relating to the Status of Refugees, 189 U.N.T.S. 150, entered into force April 22, 1954, art. 33; and Protocol relating to the Status of Refugees, 606 U.N.T.S. 267, entered into force October 4, 1967.

86 See Human Rights Watch, "Submission to the Committee against Torture in Response to United States Positions Expressed During the Committee's Consideration of the Second Periodic Report of the United States on May 5 and May 8, 2006," http://hrw.org/us/hrw_response_051706.pdf, pp. 3-4; and see also Human Rights Watch, "Supplemental Submission to the Human Rights Committee During its Consideration of the Second and Third Periodic Reports of the United States," June 2006, http://hrw.org/pub/2006/us063006_iccpr_submission.pdf, pp. 10-11.

87 *Al-Harbi v. Gates*, no. 07-1095 (D.C. Cir., filed June 8, 2007), Attachment A of the Government's Opposition to Petitioners' Motion for Thirty Days' Advance Notice of Transfer, Declaration of Clint Williamson, executed June 8, 2007, para. 4.

The US also claims that this policy goal can be achieved by obtaining diplomatic assurances from the receiving country as a means of protecting against torture, persecution or other abuse. But as the UN Committee against Torture has warned, the US government's use of assurances is cause for concern:

> The Committee is concerned by the State party's use of "diplomatic assurances," or other kinds of guarantees, assuring that a person will not be tortured if expelled, returned, transferred or extradited to another State. The Committee is also concerned by the secrecy of such procedures, including the absence of judicial scrutiny and the lack of monitoring mechanisms put in place to assess if the assurances have been honoured.[88]

The US has failed to take heed of the Committee against Torture's concerns in dealing with the Guantanamo Bay detainees. It relies on diplomatic assurances from countries like Tunisia—a country for which the State Department lists "torture and abuse" as among the "significant human rights problems."[89] Post-return monitors operate in such secrecy that the US will not even say whether any representative of the US government has visited returned detainees. And most importantly, the US has failed to establish any judicial mechanism that can consider the merits of each individual transfer case, including review of any assurances secured from the country of return.

As Human Rights Watch's research demonstrates, US policies and practices have failed to meet the stated goal of humane treatment in accordance with applicable international legal standards. Not only have both al-Hajji and Lagha been subjected to various forms of abuse and mistreatment since their return to Tunisia, they both now face trials in a judicial system that fails to comport with basic fair trial guarantees mandated by international law.

---

88 UN Committee against Torture, "Consideration of Reports Submitted by States Parties under Article 19 of the Convention, Conclusions and Recommendations of the Committee against Torture, United States of America," CAT/C/USA/CO/2, May 18, 2006, http://daccessdds.un.org/doc/UNDOC/GEN/G06/432/25/PDF/G0643225.pdf?OpenElement (accessed August 19, 2007), para. 21.

89 US State Department, Bureau of Democracy, Human Rights, and Labor, "Country Reports on Human Rights Practices – 2006: Tunisia," March 6, 2007.

# VII. Conclusions

Human Rights Watch has long called on the US government to close the detention facilities at Guantanamo Bay, and we continue to do so. The Bush administration could shut them down responsibly by providing notice of impending return to the detainees and their lawyers and an opportunity to challenge the transfer, including the nature of any assurances made by the receiving country, before an independent and impartial adjudicator. Notice should include the relevant information needed to make an informed choice, including any records of prior convictions in absentia.

Congress also has a role to play. It should promptly enact legislation to restore habeas rights for detainees and provide federal court jurisdiction over transfer claims. Legislation pending in both the House and Senate would do just that.[90]

While the majority of Guantanamo detainees will avoid any court process that will slow their return home, court review of the transfer decision will insert an invaluable protection for those who can demonstrate a credible fear of torture or other abuse.

It is also smart policy. The closing of Guantanamo provides the United States an important opportunity to rebuild its moral authority and international good will. It should not squander this opportunity by unilaterally sending detainees back to places with known records of torture and other abuse, without first giving detainees a chance to object to the transfer, and have their claim heard.

The US will ultimately have to resettle individuals who successfully challenge their transfer—an uphill struggle no doubt, but not an impossible one. In early August the United Kingdom government shifted course and agreed to resettle five non-citizens being held in Guantanamo who had previously had legal residency in the UK, most of whom cannot be returned to their country of origin because of fears of torture.[91] The

---

90 See S. 185, introduced by Senator Arlen Specter and Senator Patrick Leahy, January 4, 2007; and see also H.R. 2826, introduced by Rep. Ike Skelton, June 22, 2007, which includes a provision that explicitly ensures detainees can access federal courts to seek injunctive relief against a transfer.

91 "Guantanamo Bay: Former UK Residents," United Kingdom Foreign and Commonwealth Office press release, August 7, 2007,

US, European Union, and other countries now need to work together to find placements for other detainees entitled to release who may not have a claim of legal residency but cannot be returned to their home countries.

The US also needs to provide full access to the United Nations High Commissioner for Refugees to review files and conduct refugee status determinations at Guantanamo so that it will be able to help find placements for those detainees who qualify for refugee status.

It is true that detainees who challenge their transfer will be extending their continued detention at Guantanamo. But they should be allowed to make that choice. Otherwise, the process of closing Guantanamo could end up condemning the detainees to a fate even worse than Guantanamo, and the US to renewed criticism and ill-will.

---

http://www.fco.gov.uk/servlet/Front?pagename=OpenMarket/Xcelerate/ShowPage&c=Page&cid=1007029391638&a=KArticle&aid=1184760001011 (accessed August 13, 2007).

# VIII. Recommendations

## To the United States executive branch

Provide any person subject to transfer from Guantanamo Bay to his home or a third country with at least 30 days' advance notice of the transfer, and an effective opportunity to challenge his transfer and the reliability of any diplomatic assurances before a federal court based on fear of torture, inhumane treatment, or persecution upon return.

In cases where detainees choose to return to their home country, urge the receiving government to allow US officials access to returned detainees should they be detained by the receiving country; visit the detainees; monitor their treatment; and pressure the receiving government to ensure that it treats them humanely and provides them a fair trial.

Do not rely on diplomatic assurances to override a detainee's fear of return when there are substantial grounds for believing that the detainee would be in danger of torture or abuse.

Protest publicly and at the diplomatic level the mistreatment of former Guantanamo Bay detainees upon learning of such abuse.

Disclose any diplomatic assurances the US may have received from Tunisian authorities regarding the treatment of former Guantanamo detainees Abdullah al-Hajji Ben Amor and Lotfi Lagha.

## To the United States Congress

Promptly restore to Guantanamo Bay detainees legal access to federal courts; ensure that detainees are able to seek injunctive relief to protect against a transfer to torture, inhumane treatment, or persecution.

Enact legislation requiring the executive branch to provide at least 30 days' notice to Guantanamo Bay detainees and their lawyers prior to any return, and an opportunity to challenge the transfer, including the reliability of diplomatic assurances before federal courts.

## To the Tunisian Government

Ensure that Abdullah al-Hajji Ben Amor and Lotfi Lagha are either prosecuted for cognizable criminal offenses that do not violate their rights to freedom of association or expression, or are released. Their trials should meet international fair trial standards and be open to observers.

Conduct independent and impartial investigations into al-Hajji's and Lagha's allegations of mistreatment.

End the practice of trials in absentia as compromising the ability of an accused to exercise his or her rights to a fair trial. Until the practice of in absentia trials is ended, records of such convictions, like any convictions, should be made public and readily available to Tunisians, including those held at Guantanamo Bay.

Honor the government's commitment to end the practice of placing detainees in long-term solitary confinement.

## To Other Governments

Work with the United States to help find resettlement options for Guantanamo detainees entitled to release or transfer who cannot be returned to their home countries due to credible fears of torture, inhumane treatment, or persecution.

# IX. Acknowledgements

Jennifer Daskal, senior counterterrorism counsel, and Eric Goldstein, research director for the Middle East and North Africa (MENA) division, researched and wrote this report. It was edited by Sarah Leah Whitson, MENA director; Joanne Mariner, director of the Terrorism/Counterterrorism program; James Ross, Legal and Policy director; Aisling Reidy, senior legal advisor; Ian Gorvin, consultant to the Program Office; and Julia Hall, senior researcher in the Europe and Central Asia division. Stacy Sullivan, US media director, provided helpful comments throughout.

Thomas Gilchrist, associate in the US Program, coordinated report production and provided research and editorial assistance. Andrea Holley, Grace Choi, and Fitzroy Hepkins prepared this report for publication.

Human Rights Watch is grateful to the many persons who assisted us in the research for this report, especially Tunisian lawyer Samir Ben Amor. We also thank those US and Tunisian officials who met with us and responded to our requests for information.

## Appendix A. Sworn Statement of Samir Ben Amor, Attorney

RE:     ABDULLAH AL-HAJJI BEN AMOR

DATE:  JULY 29, 2007

1. My name is Samir ben Amor. I am a lawyer for Abdullah al-Hajji ben Amor. I live and work in Tunisia. My office is at No. 69 Rue el Djazira, Tunis.

2. Al-Hajji is 51 years old. He is married to Khadija Bousaidi with eight children. His wife is 37 years old and lives in Tunis.

3. In 1995, al-Hajji was convicted in absentia in a case with 12 co-defendants for being part of a terrorist organization operating abroad (Article 123 of the Code of Military Justice). Al-Hajji was sentenced to ten years.

4. The main evidence against al-Hajji was a statement from another co-defendant, Hachmi ben Saad.

5. I believe that the statement against al-Hajji may have been extracted with torture. It is common for the Ministry of Interior to torture prisoners in order to get them to sign statements like the one used in al-Hajji's case.

6. Abdullah al-Hajji was returned from Guantanamo to Tunisia on June 18, 2007.

7. I have visited Abdullah al-Hajji ben Amor three times since he has been at Mornaguia prison. I visited him was on June 25, 2007, July 12, 2007, and July 23, 2007.

8. The first time I visited him al-Hajji was very disoriented and confused. The second two visits he was much more coherent.

9. Al-Hajji told me that he did not know he had been convicted in absentia until he returned to Tunisia.

10. Al-Hajji told me that if he had known that he had been convicted in Tunisia, he never would have wanted to return to Tunisia. He told me that he wishes he were still in Guantanamo.

11. Al-Hajji told me that he first learned that he was being transferred back to Tunisia three days before his transfer. He learned of the transfer from an American working in Guantanamo.

12. Al-Hajji said that the Americans did not tell him that he had a pending conviction in Tunisia.

13. Al-Hajji said that he was blindfolded on the flight from Guantanamo to Tunisia. He said his hands and legs were handcuffed and he was strapped around his chest to his seat. Al-Hajji told me the flight was very uncomfortable because of the way he was strapped down. He said that he was too uncomfortable to sleep.

14. Al-Hajji told me that when he arrived in Tunisia, the police put a hood over his head. He said that his handcuffs, which had been in front of his body during the flight, were moved to behind his back.

15. Al-Hajji said that he was taken to a room somewhere in a building next to where the airplane landed and questioned for about an hour and a half. He said that the questions focused on his identity and his family's identity.

16. Al-Hajji told me that after he was interrogated he was taken to the Ministry of Interior. He was transported in a truck with separate blocks for each individual prisoner. He said that it was very uncomfortable and hard to breathe.

17. Al-Hajji said that he was held in the Ministry of Interior for approximately two days and two nights.

18. Al-Hajji told me that he was repeatedly interrogated during those two nights and two days he was held in the Ministry of Interior. He said that if he started to fall asleep, the police in the Ministry of Interior would shake him awake. This is sleep deprivation - a form of torture that is practiced widely in Tunisia.

19. Al-Hajji said that the interrogators slapped him and threatened to rape his wife and daughters.

20. Al-Hajji said that the interrogators gave him a piece of paper to sign. He could not read what the paper said because he has extremely poor eyesight and his glasses were out of date. Al-Hajji said that he signed the statement because the interrogators threatened to rape his wife and daughters if he did not sign the paper.

21. On June 20, Al-Hajji was taken to the Military Court in Tunis. He said that he was allowed to sleep for two hours before being taken to military court. He said that this was the first time that he slept in three days.

22. Al-Hajji challenged his absentia conviction before the Military Court. The Military Court set a retrial date for September 26.

23. Since June 20, al-Hajji has been held in Mornaguia prison, which is about a half hour drive from Tunis.

24. Al-Hajji said that he has been held in solitary confinement since his arrival in Mornaguia prison. He said that his cell is "like a tomb." He said there is a single opening on a ceiling to the view of a roof. Al-Hajji said that there is no ventilation in the cell, and that is very hot. He said that he cannot distinguish between night and day. He cannot pray because he can't tell the difference between night and day.

25. Al-Hajji said that he is only taken out of his cell for approximately ten to fifteen minutes a day for "recreation." But he said the recreation area is small and indoors and does not have any windows or view of the sky.

26. Al-Hajji said that he does not have any contact with any prisoners. When he is taken out of his cell for any reason the prison guards move all the other prisoners elsewhere so that he cannot have any contact with them.

27. It is illegal to put Al-Hajji in long-term solitary confinement. Under the law, prisoners can only be held in solitary confinement for disciplinary matters for a period not to exceed ten days. (Law on Prisons, Article16, 2001).

28. Al-Hajji has very poor eyesight. Although the prison promised to take him to an eye doctor so he could get a prescription for new glasses, he has not yet been taken to see the eye doctor. He has only an old pair of glasses, with a prescription that is out-of-date. He is unable to read with these glasses.

29. Al-Hajji told me that he felt very strange when he first arrived in the Mornaguia prison. He said it felt like he had been drugged.

30. Al-Hajji told me that when his family first came to see him he did recognize his daughter. His family said he behaved as if he had been on drugs.

31. Al-Hajji told me that the International Committee for the Red Cross has come to see him two times since he has been in prison. The first time they visited him, he was meeting with his family and he did not talk to them. On the second visit, al-Hajji talked to the ICRC about how he has been treated since he has been returned to Guantanamo.

32. Al-Hajji's family goes to visit him for 15 minutes every Thursday. They have visited him every Thursday since June 25, 2007.

33. There is a glass separating Al-Hajji from his family members, and they talk by a phone. A guard sits next to Al-Hajji and a guard sits next to the family member.

34. Al-Hajji's wife has been questioned by the police many times since Al-Hajji's return. The local Tunis police require her to report to them after each visit and tell them what she and Al-Hajji discussed. Her home is under constant surveillance by the police.

I hereby swear that the above statement is true and accurate.

Samir ben Amor

Samir ben Amor
_____

Date
_____

## Appendix B. Letter to Béchir Tekkari, Tunisian minister of justice

July 31, 2007

Béchir Tekkari
Minister of Justice
Ministry of Justice
31 Blvd. Bab Benat
1006 Tunis, Tunisia

Via facsimile: +216 71 568 106
            +216 71 561 440

Dear Mr. Minister:

We are writing to request information regarding Abdallah Amor Ali al-Hajji and Lotfi Lagha, the two Tunisian detainees in Guantanamo whom the United States delivered to Tunisia on June 18, 2007. Human Rights Watch is closely monitoring both the situation in Guantanamo and the fate of detainees who are released from there. We have published a report on Russian detainees in Guantanamo who were returned to Russia (online at http://www.hrw.org/reports/2007/russia0307/), and we intend to publish a report in the very near future on the situation of Tunisians who are returned to Tunisia.

Please find below a list of questions we wish to address to your ministry. We will reflect in our report any pertinent information you provide us in response to any of these questions, or in relation to the plight of Guantanamo detainees, by Monday, August 6.

*Discussions with the United States*
   1. Has the US expressed concern to Tunisian authorities about the situation facing al-Hajji and Lagha since their return to Tunisia?

2. Has the US asked to visit al-Hajji or Lagha since their return? If so, has your government allowed a representative from the US to visit al-Hajji and Lagha? How many times has a US representative visited each detainee?

3. Prior to al-Hajji's return from Guantanamo, did any representative of the Tunisian government inform any US official that the military court in Tunis had convicted al-Hajji in absentia in 1995 and sentenced to ten years in prison?

4. Did Tunisian authorities notify in advance the US that they intended to detain al-Hajji and Lagha upon their arrival in Tunisia?

5. What assurances or understandings, if any, did the Tunisian government convey to the US government as to the treatment that would await Lagha and al-Hajji upon their return? Are these in writing? If so, please provide us with copies.

### Situation upon Return to Tunisia

We understand that Tunisian authorities have held both al-Hajji and Lagha in strict, round-the-clock solitary confinement since their arrival in Mornaguia prison. Al-Hajji reportedly arrived in Mornaguia on June 20. We do not know the date that Lagha arrived in Mornaguia prison.

6. Is it true that authorities are holding al-Hajji and Lagha in solitary confinement?

7. If so, why are al-Hajji and Lagha being held in solitary confinement?

8. Can you explain how the long-term detention of these men in solitary confinement conforms to Tunisia's Law on Prisons (2001) and the explicit engagement made by authorities to Human Rights Watch in April 2005 that the government would no longer hold any prisoner in long-term solitary confinement?

Al-Hajji told his lawyer that between his arrival in Tunisia on June 18 and his transfer to Mornaguia prison on June 20, the police detained him and questioned him, prevented him from sleeping, slapped him and threatened him in order to compel him to sign a statement that he was unable to read. In a statement to the press made on July 17, Tunisian authorities denied that al-Hajji had been mistreated and that the judicial police had interrogated him.

9.  Please tell us al-Hajji's whereabouts between the time of his arrival in Tunisia on June 18 and his presentation before the Tunis Military Court investigating judge on June 20.

10. Did a police agency other than the judicial police interrogate al-Hajji? If so, please provide the legal basis for the questioning that took place, and whether the questioning resulted in a document signed by al-Hajji.

11. On what date did authorities bring Lagha before the investigating judge? Was he represented by a lawyer at this hearing?

12. Where did authorities hold Lagha before presenting him before the investigating judge? Since his appearance before the investigating judge has Lagha been at Mornaguia prison continuously? If not, where was he?

13. Please tell us if and when Lagha consulted with a defense lawyer.

14. We understand that the investigating judge has completed the investigation into Lagha and has recommended bringing him to trial on charges of associating in a criminal enterprise for the purpose of committing acts of terrorism. Can you please confirm if he has been charged and if so, the nature of the charges?

15. We understand that the ICRC has visited al-Hajji at least two times. Has the ICRC visited Lagha? If so, how often?

16. Has anyone other than the ICRC, the prisoners' lawyers, and the prisoners' families visited Lagha or al-Hajji? If so, who visited whom and when?

*Prior to Transfer*

17. Did anyone representing the Tunisian government visit al-Hajji when he was in Guantanamo? Did anyone representing the Tunisian government inform al-Hajji while he was still in Guantanamo that he had been convicted in absentia?

18. Did anyone representing the Tunisian government visit Lagha when he was in Guantanamo? Did anyone representing the Tunisian government provide Lagha while he was in Guantanamo information about his judicial status?

*The Ten Remaining Tunisian Detainees in Guantanamo*

As you are aware, the US government is holding ten other Tunisians in Guantanamo:

Hichem bin Ali bin Amor al-Sliti

Adel ben Ahmed ben Ibrahim ben Saleh al-Hakeemy

al-Hedi ben al-Hedili

Rafiq bin al-Béchir bin Haloul al-Hammi

Mohammad Abdul Rahman

Sayf bin Abdallah

Adel ben Mohamed ben Abbas al-Ouarghi

Ridha bin Saleh ben Mabrouk al-Yazidi

Riyadh ben Mohamed at-Taher ben al-Akhdhar an-Naceri

Adel ben Mabrouk ben Hamida ben Mabrouk

19. For each detainee please provide information as to whether a Tunisian court has convicted the detainee in absentia.

20. Please tell us if and how each of these detainees can learn whether a Tunisian court has convicted him in absentia.

Finally, we wish to reiterate our request to visit both Lagha and al-Hajji. I am attaching again our request made on July 27 to visit these men. By allowing Human Rights Watch to meet with Lagha and al-Hajji, Tunisian authorities would be making an important statement about transparency. While we applaud the fact that Tunisia has granted access to the ICRC, the discretion that the ICRC maintains with respect to its visits to detainees means that, in contrast to Human Rights Watch, it does not inform the public what it learns from interviewing the prisoners.

We thank you for your consideration and hope to receive your comments by August 6.

Sincerely yours,

Sarah Leah Whitson
Executive Director, Middle East and North Africa Division

Joanne Mariner
Executive Director, Terrorism and Counter-Terrorism Program

# Appendix C. Statement by Official of the Tunisian Ministry of Justice and Human Rights[92]

10 August 2007

◊  Question: Were the Americans aware of the previous sentence against Mr Hajji?
◊  Answer: Yes they were. They were also aware of the guarantees regarding due process of law.

◊  Question: Are Hajji and Lagha held in solitary confinement?
◊  Answer: Not true. Both are detained in company of three of four other inmates.

◊  Question: Was Hajji mistreated upon arrival in Tunisia?
◊  Answer: Not true. He was not subjected to any mistreatment. The judicial police took custody of both individuals and referred them directly to the proper judicial authorities.

◊  Question: Are Hajji and Lagha represented by lawyers
◊  Answers: Each enjoys legal counsel and is represented by a lawyer.

◊  Question: Is it possible for Lagha to appeal the charges
◊  Answer: Yes. Even before going to trial, he can appeal the charges before *la Chambre de Mise en Accusation* or the Cassation Court.

◊  Question: Were both visited by the ICRC ?
◊  Answer: The ICRC did visit both Mr Hajji and Mr Lagha.

◊  Question: Is is [sic] possible to visit the two detainees?
◊  Answer: The detainees can be visited by their families or lawyers. The ICRC is able to visit detainees since it is signatory to an agreement to this effect with the Government of Tunisia.

---

[92] Email communication (in English) from a Tunisian government official to Human Rights Watch, August 10, 2007, described as "my rendering of your questions," punctuation as per original document.

◊   Question: Is it possible for remaining Tunisian detainees in Guantanamo to know about possible sentences passed in absentia against them by Tunisian courts?

◊   Answer: They can write to this effect to *le Procureur de la République près le tribunal de Première instance* or to *le Procureur Général, Directeur des Services Judiciaires*.