IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMER MOHAMMON, *et al.*<br>  Petitioners,<br><br>*v.*<br><br>GATES, ROBERT M., *et al.*,<br>  Respondents. | Civil Action No.: 05-cv-2386 (RBW) |

**PETITIONER'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER TO PREVENT RESPONDENTS FROM REMOVING PETITIONER FROM GUANTÁNAMO UNTIL PETITIONER'S EMERGENCY MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH THIRTY-DAYS ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO IS DECIDED**

Pursuant to Federal Rules of Civil Procedure 64 and 65, Adil Bin Mabrouk ("Mabrouk") hereby applies for an *ex parte* temporary restraining order prohibiting Respondents from transferring Mabrouk from Guantánamo Bay until the outstanding "Motion for Order Requiring Respondents to Provide Counsel for Petitioner and the Court with Thirty-Days Advance Notice of Any Intended Removal of Petitioner from Guantánamo" (Mabrouk's "30-Day Motion," Doc. 389) is decided.

A temporary restraining order is urgently needed to maintain the *status quo* of the instant litigation. Respondents have stated in writing their intention to transfer Mabrouk, potentially at any moment and without further notice. Indeed, the undersigned did not even receive any formal or direct notice of this impending transfer until 11 weeks after Respondents provided notice to Mabrouk. If they are allowed to transfer him from

Guantanamo, there is a high likelihood that Respondents will attempt to return Mabrouk to his native Tunisia, where he faces a severe and documented risk of torture at the hands of Tunisian authorities.

Without a temporary restraining order, Respondents could transfer Mabrouk from Guantánamo Bay to Tunisia or otherwise without allowing him the opportunity to contest the legality of such a transfer or to prepare for his arrival in the receiving state. Such a transfer would not only subject Mabrouk to the possibility of torture or indefinite detention in the receiving state, but would also strip this Court of its habeas jurisdiction.

Mabrouk is compelled to move for a temporary restraining order after receiving an e-mail from Respondents on February 7, 2008 confirming that Mabrouk "has been approved to leave Guantánamo, subject to the process for making appropriate diplomatic arrangements for his departure." (*See* e-mail from Bree Ermentrout to Jon Fee dated February 7, 2008 ("Bree Ermentrout Email"), attached hereto as Exhibit A.) Respondents' e-mail suggests that arrangements for Mabrouk's removal from Guantánamo Bay are accelerating and possibly complete, and that his departure may only be a matter of days.

Mabrouk files this motion *ex parte* because he is apprehensive that his removal is imminent and that filing according to ordinary procedure would further delay relief and frustrate his efforts to obtain advance notice of his removal. The undersigned counsel's declaration under Fed. R. Civ. P. Rule 65(b)(1) is attached hereto as Exhibit B.

## STATEMENT OF FACTS

The relief Mabrouk seeks in his 30-Day Motion itself is very limited. In that motion, Mabrouk seeks an order requiring respondents to give advance notice to the

Court and counsel before they remove Mabrouk from Guantánamo to Tunisia where, Mabrouk fears, he will be tortured or detained indefinitely without any legal process. In making that motion, Mabrouk asks for nothing more than an opportunity to contest the legality of any transfer before it becomes a *fait accompli* or, alternatively, for the opportunity to prepare for his arrival in Tunisia by obtaining local counsel and informing his family of his return. The instant motion for a temporary restraining order seeks even less: maintenance of the status quo only for the time while Mabrouk's 30-Day Motion is pending.

Mabrouk's concerns about his imminent transfer from Guantánamo to Tunisia are serious and justified. Respondents recently confirmed that Mabrouk has been approved for a transfer subject only to the completion of certain processes and arrangements in preparation for his departure. (*See* Exh. A.) While such notice may be welcome news for some Guantánamo detainees, it is the cause of grave concern for Mabrouk.

Mabrouk fears that he will be tortured or detained indefinitely without any process of law upon his return to Tunisia. These concerns are well founded. A Tunisian Military Court has already sentenced Mabrouk *in absentia* to 10 years in prison and five years of post-sentence administrative controls. (*See* 30-Day Motion, Doc. 389, at Exh. A.) Furthermore, the experiences of Abdullah al-Hajji Ben Amor and Lotfi Lagha, two Tunisian Guantánamo detainees who were returned to their home country on June 17, 2007, immediately taken into custody by Tunisian authorities, and severely mistreated, confirm Mabrouk's concerns as to the treatment he could expect were he forcibly returned to Tunisia. *See* Human Rights Watch, *Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations*, vol. 19, no. 4(E), September 2007,

http://hrw.org/reports/2007/tunisia0907/, at 23. Indeed, this Court has already stayed the transfer of another Tunisian detainee from Guantánamo to Tunisia based in substantial part on credible allegations of "inhumane living conditions" in Tunisian prisons and of "torture and police brutality." *Alhami v. Bush,* No. 05-359 (D.D.C. Oct. 2, 2007).

Respondents' reference to United States policy pronouncements – assuring the public that the United States does not repatriate or transfer detainees to countries when there is reason to believe that it is more likely than not that the individual will be tortured there (*see* Respondent's Opposition to 30-Day Motion, Doc. 399, at 4) – cannot alleviate Mabrouk's concerns. As stated above and in detail in Mabrouk's 30-Day Motion, despite Respondents' acute awareness of Tunisia's extremely poor human rights record, other Tunisian detainees have been repatriated to Tunisia and have suffered severe mistreatment at the hands of Tunisian authorities, contrary to the assurances of the Tunisian government. *See* Human Rights Watch*, Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations,* at 23.

Respondents' expressed intention to transfer Mabrouk likewise raises serious questions about the implementation of the U.S. policy concerning the repatriation of detainees in light of serious concerns regarding the detainees' health and safety. A report by the U.S. State Department describes in detail the torture and inhumane treatment employed by Tunisian authorities. *See* U.S. State Department, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices 2006: Tunisia, March 6, 2007, http://www.state.gov/g/drl/rls/hrrpt/2006/78864.htm, at 1. Certainly, Mabrouk's conviction *in absentia* and sentence should suggest to Respondents that Mabrouk's treatment upon his arrival in Tunisia can be expected to be in accordance with

the conditions reported by the State Department.

In sum, Mabrouk's concerns about his transfer from Guantánamo are serious, imminent and concrete. The requested relief is necessary to prevent irreparable harm to Mabrouk and to preserve the jurisdiction of this court, not only with respect to the 30-Day Motion but also with respect to Mabrouk's pending habeas petition.

## ARGUMENT AND CITATION OF AUTHORITIES

### A. This Court has Jurisdiction to Grant the Requested Temporary Restraining Order.

As set forth in more detail in his 30-Day Motion, Mabrouk has properly invoked this Court's jurisdiction. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004); *Bismullah v. Gates*, Nos. 06-1197, 06-1397, 2007 WL 2067938 (D.C. Cir. July 20, 2007). Transfer outside this Court's jurisdiction would "eliminate any opportunity for [Petitioner] to ever obtain a fair adjudication of [his] 'fundamental right to test the legitimacy of [his] detention.'" *Abdah v. Bush*, No. 04-1254 (HHK), 2005 WL 711814, at *4 (D.D.C. Mar. 29, 2005). Indeed, the "federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal Courts for the protection of the rights in those tribunals." *Id*. (quoting *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004)).

Recent developments in *Boumediene*, the leading case on the issue of federal courts' jurisdiction over Guantánamo detainee cases, support this conclusion. *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted,* 127 S. Ct. 3078 (June 29, 2007) (No. 06-1195). Following the Supreme Court's grant of *certiorari* in *Boumediene*, the D.C. Circuit recalled its mandate ordering the dismissal of Guantánamo detainees' habeas petitions and stayed the proceedings pending the outcome of the

Supreme Court's review of the jurisdiction-stripping provisions of the MCA.[1]  The effect of recalling the mandate was to divest this Court of the authority to dismiss those cases, and to preserve in those cases the relevant protective order and counsel access rules, as well as related orders, such as those requiring the government to provide counsel with advance notice of any intended transfers from Guantánamo.

Both this Court and the D.C. Circuit have already issued orders requiring Respondents to give detainees and their counsel advance notice of any transfer from U.S. custody and staying such transfers in other cases.  For example, in *Abdah v. Bush*, this Court granted the motion of Yemeni petitioners for 30 days' notice of an intended transfer of petitioners from Guantánamo.  No. 04-1254, 2005 U.S. Dist. LEXIS 4942 (D.D.C. Mar. 29, 2005).  Similarly, in *Rohullah v. Gates*, this Court ordered the government to give Rohullah's counsel 30 days' notice before they transfer him from Bagram Air Force Base to Afghan custody. No. 06-1707 (D.D.C. Nov. 3, 2007).  In *Alhami v. Bush*, 05-359 (GK) (D.D.C. Oct. 2, 2007), this Court stayed the transfer of another Tunisian detainee back to his home country.  Finally and most recently, the D.C. Circuit Court stayed the transfer of Ahmed Belbacha to Algeria in order to preserve its jurisdiction over the case while it considers Belbacha's appeal.  *Belbacha v. Bush*, No. 07-5258 (D.C. Cir. Dec. 31, 2007).

This precedent confirms the jurisdiction of this Court to provide the requested

---

[1] *See also, e.g., Kiyemba v. Bush,* No. 05-5487 et al., 2007 U.S. App. LEXIS 21742 (D.C. Cir. Sept. 7, 2007) (recalling D.C. Circuit's mandate ordering the dismissal of Guantánamo detainees' habeas petitions on jurisdictional grounds); *Paracha v. Bush*, No. 05-5194, consolidated with 05-5333, 2007 U.S. App. LEXIS 21741 (D.C. Cir. Sept. 7, 2007) (staying mandate ordering the dismissal of Guantánamo detainees' habeas petitions on jurisdictional grounds); *Abdah v. Bush,* No. 05-5224 et al., 2007 U.S. App. LEXIS 19078 (D.C. Cir. Aug. 9, 2007) (deferring consideration of government's motion to dismiss Guantánamo detainees' habeas petitions and denying government's motion to

relief and to preserve its jurisdiction over Mabrouk's 30-Day Motion and his habeas corpus petition.

### B. Mabrouk's Petition Satisfies the Requirements Governing Temporary Restraining Orders.

Federal Rule of Civil Procedure 65(b) provides that a temporary restraining order "may be granted without written or oral notice to the adverse party or that party's attorney only if it clearly appears from specific facts shown by the affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing can be held. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).

In considering a request for a preliminary injunction or temporary restraining order, a court must examine whether: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Brotherhood of Teamsters, AFL-CIO*, 166 F.3d, 356, 360 (D.C. Cir. 1999). These factors interrelate on a sliding scale and must be balanced against each other. *Id.* at 361.

Where the balance of hardship tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm'n*

vacate 30-day notice order).

*v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury to the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Washington Metro.,* 559 F.2d at 844.

      **1.**    **Mabrouk Will Suffer Irreparable Injury If He Is Transferred to Tunisia Without Advance Notice.**

As set forth in detail above and in his 30-Day Motion, Mabrouk stands to suffer immeasurable and irreparable harm – from torture to possible death – if he is transferred into the hands of Tunisian authorities. Transfer to Tunisia, even if "only" for continued imprisonment, also circumvents Mabrouk's right to adjudicate the legality of his detention in this Court.

The torture practices that Tunisian security forces engage in are well-documented in the U.S. State Department's report on Tunisian human rights practices. These practices include "sleep deprivation; electric shock; submersion of the head in water; beatings with hands, sticks, and police batons, suspensions, sometimes manacled, from cell doors and rods resulting in loss of consciousness, and cigarette burns." U.S. State Department, Bureau of Democracy, Human Rights, and Labor, *Country Reports on Human Rights Practices 2006: Tunisia*, March 6, 2007, at http://www.state.gov/g/drl/rls/ hrrpt/2006/78864.htm, at 1. The experiences of Abdullah al-Hajji Ben Amor and Lotfi Lagha — two Tunisian Guantánamo detainees who were returned to their home country

on June 17, 2007 — confirm the State Department's findings. Human Rights Watch followed up on the fate of these Tunisian detainees and reported the following:

> Despite the assurance of humane treatment, al-Hajji reports being immediately taken to an interrogation center, where he says he was prohibited from sleeping, slapped, threatened with the rape of his wife and daughters, and coerced into signing something he could not read. He says that he was held for six weeks in solitary confinement, even though the Tunisian government had explicitly pledged to Human Rights Watch to end the use of prolonged solitary confinement in prisons.
>
> Similar concerns exist regarding the treatment of Lagha, whom Tunisian authorities also detained in solitary confinement. He was held for six weeks in pretrial detention without access to an attorney or any other outside monitor who could publicly report on his treatment or condition.

Human Rights Watch, *Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Repatriations*, vol. 19, no. 4(E), September 2007, http://hrw.org/reports/2007/tunisia0907/, at 23. These reports raise grave concerns as to the serious torture and abuse Mabrouk would expect upon his release and return to Tunisia.

Even if it is not certain that Mabrouk would challenge his transfer to Tunisia, irreparable harm is almost certain to result from his inability to prepare for his return to his home country. Without appropriate notice, he will be unable to arrange for representation in Tunisia or to notify his family of his return. He would be left at the mercy of local authorities without any support from his family or local counsel.

   **2.     Mabrouk Has a Substantial Likelihood of Success on the Merits.**

Injunctive relief may be denied for failure to show a likelihood of success on the merits only "if there are no circumstances under which Petitioners could obtain an order preventing a contemplated transfer." *Abdah v. Bush*, No. 04-1254, 2005 U.S. Dist. LEXIS 4942, at *15 (D.D.C. Mar. 29, 2005) (emphasis added). The following

sufficiently demonstrates that this certainly is not the case here.

As stated in more detail above and in his 30-Day Motion, Mabrouk has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). For the United States Government to remove Mabrouk to any country that practices torture would deprive him of his Due Process protections and would rob this Court of its jurisdiction. As stated in more detail above, recent developments in the *Boumedine* case and subsequent orders by this Court affirm this Court's jurisdiction to preserve its jurisdiction over the instant case.

Furthermore, this Court has held that "transfer of Petitioners without notice and leave of court is forbidden by *FED. R. APP. P. 23(a)*, which requires that pending review of a decision in a habeas corpus proceeding . . . the person having custody of the prisoner must not transfer custody to another unless transfer is directed in accordance with this rule." *Abdah v. Bush,* No. 04-1254, 2005 U.S. Dist. LEXIS 4942, at *15-16 (D.D.C. Mar. 29, 2005). The purpose of this rule is to "prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in which a habeas petition is pending." *Id.* at 16.

An order by this Court enjoining the transfer of Mabrouk to Tunisia would not interfere with Executive authority, given that a finding by this Court that such transfer would raise unacceptable concerns about Mabrouk's health and safety would be in keeping with the U.S. State Department's findings concerning Tunisia's poor human rights record, and would also accord with the United States' express policy to refrain from repatriation to countries where a detainee would be at risk of torture.

Furthermore, a stay of Mabrouk's transfer may be required by the United States Constitution. In its recent decision in *Khouzam v. Hogan*, No. 3:CV-07-0992 (M.D. Pa. Jan. 10, 2008), the United States District Court for the Middle District of Pennsylvania held that subjecting even an alien to the risk of torture violated the petitioner's rights under the Fifth Amendment: "Freedom from torture is a 'fundamental right,' surely protected by the Fifth Amendment regardless of a person's immigration status." *Id.* at 38. The Court also held that the government's unilateral reliance on diplomatic assurances, and its attempt to use those assurances as a shield against judicial review, violated the Due Process Clause. *Id.* at 46. This decision bears immediately on the instant case. Only if this Court grants Mabrouk's petition will he be provided with an opportunity to challenge his transfer to Tunisia on the grounds that he will face torture and mistreatment upon his return.

The likelihood of success of Mabrouk's claim on the merits is most clearly evidenced by the grant of such petition in a case involving a Tunisian national. In *Alhami v. Bush,* this Court held that a stay of the intended transfer of the petitioner back to Tunisia was warranted in light of credible allegations of "inhumane living conditions" in Tunisian prisons and of "torture and police brutality." No. 05-359 (D.D.C. Oct. 2, 2007).

### 3. Respondents Will Suffer No Harm If Mabrouk's Motion Is Granted.

In stark contrast to the actual bodily harm and loss of opportunity for legal redress that Mabrouk faces, Respondents can articulate no actual harm that they will suffer by being restrained from transferring Mabrouk out of Guantánamo between now and the disposition of his 30-Day Motion. Granting Mabrouk's request for a stay of transfer until the 30-Day Motion is decided cannot undermine Executive authority in any material way.

### 4. An Injunction Will Further the Public Interest.

Public policy favors requiring Respondents for a short period of time from removing petitioners from Guantánamo — where he has been incarcerated for years — to a country outside of the jurisdiction of this Court. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant, properly before the Court and represented by counsel, be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

### CONCLUSION

For the reasons stated, Petitioner respectfully requests that his motion be granted.

Respectfully submitted,

/s/ Jonathan M. Fee
Jonathan M. Fee
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
(202) 756-3387
jon.fee@alston.com
DC Bar No. 479579

*Attorney for Petitioner*

Dated: February 28, 2007

- 14 -

## CERTIFICATE OF SERVICE

I, Jonathan M. Fee, hereby certify that I today caused a true and accurate copy of the foregoing to be served electronically via the Court's Electronic Case Filing system.

                                                                             /s/ Jonathan M. Fee