# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMEH SAMI S. KHOUZAM,      :
         **Petitioner**      :
     v.            :      **3:CV-07-0992**
                   :      **(JUDGE VANASKIE)**
THOMAS H. HOGAN, ET AL.,     :
       **Respondents**     :

## MEMORANDUM

At the center of this habeas corpus proceeding lies an Egyptian diplomatic assurance that Petitioner Sameh Sami S. Khouzam, an alien presently in custody in a prison in York County, Pennsylvania, will not be tortured if returned to Egypt, where allegedly he has been convicted *in absentia* of murder. Respondents, the legal custodians of Khouzam (sometimes referred to herein as the Government), assert that the diplomatic assurance preempts a prior judicial determination that it is probable that Khouzam will be tortured if removed to Egypt. See Khouzam v. Ashcroft, 361 F.3d 161, 171 (2d Cir. 2004). Khouzam, a Coptic Christian who made a credible showing that he had been the victim of torture at the hands of Egyptian law enforcement officials before fleeing to the United States, essentially presents three challenges to his removal to Egypt: First, he argues that the Government's reliance upon a diplomatic assurance from Egypt violates the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988),* 1465 U.N.T.S. 85 ("CAT"), as implemented in the United States by the Foreign Affairs Reform and Restructuring Act

("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. §1231).  He next contends that, even if there is no categorical prohibition against Egyptian diplomatic assurances, the Government failed to comply with applicable regulations implementing FARRA.  Finally, he asserts that the Government's refusal to allow any review of the diplomatic assurance is contrary to congressional intent expressed in FARRA as well as the Fifth Amendment's Due Process Clause.

Having carefully considered the thoroughly-briefed arguments of the parties, I have concluded that diplomatic assurances from States regarded as routinely engaging in torture, such as Egypt, do not, *per se*, violate CAT or FARRA.  I have also found that there is a substantial question of fact as to whether the Government complied with the regulations concerning deportation on the basis of a diplomatic assurance.  Finally, I have determined that the Government's refusal to expose the Egyptian diplomatic assurance to review by any impartial tribunal is not consonant with congressional intent expressed in FARRA, and that, even if FARRA did not require an opportunity to challenge the Government's reliance upon the diplomatic assurance, Khouzam's right to be free from torture is such that the Due Process Clause mandates a fair process that includes review of the diplomatic assurance by an impartial adjudicator.  In light of the Government's refusal to expose the Egyptian diplomatic assurance to any sort of impartial review, the Government may not proceed with

2

the removal of Khouzam.  Accordingly, his habeas corpus petition will be granted.  Because there is no probability that Khouzam will be removed from the United States in the reasonably foreseeable future, the Government will be ordered to release him subject to appropriate terms and conditions.

## I.  BACKGROUND

Khouzam, a national and citizen of Egypt, sought to enter the United States on February 11, 1998.  Admission was denied because his non-immigrant visa had been canceled after Egyptian authorities notified the United States that Khouzam was suspected of murdering an Egyptian woman.  Khouzam was taken into custody, and removal proceedings were commenced.

On May 4, 1998, an Immigration Judge (IJ), having concluded that there were substantial grounds for believing that Khouzam had committed a serious non-political crime in Egypt, ruled that Khouzam was statutorily ineligible for asylum or withholding of removal under sections 208(b)(2)(A)(iii) and 241(b)(3)(B)(iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii).  (Response to Habeas Corpus Pet., Dkt. Entry 9, at 000874-84.)  On January 4, 1999, the Board of Immigration Appeals (BIA) affirmed the IJ's determination that there were substantial reasons to believe that Khouzam had committed a serious non-political crime outside the United States prior to his arrival in the United States.  (Id. at 000722-24) The BIA also rejected Khouzam's request to

3

remand the matter to the IJ for consideration of additional evidence.  (Id.)

On July 18, 1999, Khouzam moved to re-open the proceedings in order to allow him to apply for relief under Article 3 of CAT.  In a decision dated July 26, 1999, the BIA granted the motion to re-open, explaining that  Khouzam was eligible to seek such relief under recently promulgated rules of the Department of Justice implementing § 2242 of FARRA. (Id. at 000707-08.)  The BIA Order indicated that both Khouzam and the Government could present "additional evidence" on the issue of "Khouzam['s] eligibility for relief from deportation pursuant to [CAT] as set forth in the interim regulations."  (Id. at 000708.)

In a written decision dated January 14, 2000, the IJ summarized the testimony presented by Khouzam and an expert witness called by Khouzam to testify to conditions existing in Egypt at that time.  (Id. at 000489-500.)  As related by the IJ, Khouzam testified to a number of incidents during which he was subjected to cruel and inhumane treatment by Egyptian law enforcement officers.  These incidents included the insertion of rubber hoses up his rectum, being stabbed in the stomach with a screw driver, and physical beatings resulting in injuries that required surgical intervention.  Khouzam attributed these incidents to his adherence to the Coptic Christian religion in the face of demands that he convert to Islam.

According to Khouzam, the efforts to compel his conversion included a false accusation that he had sexually assaulted a co-worker in 1997, resulting in his fleeing Egypt

4

along with his wife to the United States.  Khouzam claimed that he returned to Egypt only

after being informed that his mother had been detained by Egyptian authorities for assisting

him in leaving Egypt.

A final encounter with Egyptian authorities, according to Khouzam, resulted in his

escaping police custody by climbing out of a bathroom window at the hospital where he had

been taken for treatment of an injured hand.  The injury had occurred during a melee when

he was assaulted for refusing to marry the woman that he had been accused of sexually

assaulting.

Although finding Khouzam's testimony less than fully credible, the IJ credited the

expert witness evidence concerning conditions existing in Egypt, especially in relation to

Coptic Christians.  The IJ concluded:

> The court has considered the country conditions in Egypt, including the long
> history of discrimination against Christians in Egypt by the government, the
> continued violence against Christians by Islamic zealots and occasionally by
> the security forces and police, and the often-time abusive conditions of its
> detainees and inmates.  Such evidence exists in the form of documents
> authored by the United States government, and through the testimony of a
> witness acknowledged by [the Government] for his expertise in the area under
> scrutiny by this court.  Taken together, *the evidence is overwhelming* that
> [Khouzam] will more likely than not be subjected to torture by a responsible
> Egyptian government official who will breach his duty and engage in the
> torture of [Khouzam], or at the least, will abdicate such duty by acquiescing in
> such torture. . . .

(Id. at 000499-500; emphasis added.)  In granting deferral of removal, the IJ provided the

following notice to Khouzam:

5

(i) Deferral does not confer any lawful or permanent status in the United
States;

(ii) Deferral will not necessarily result in the alien being released from custody
. . . if the alien is subject to such custody;

(iii) Deferral is effective until terminated;

(iv) Deferral is subject to review and termination if the immigration judge
determines that it is not likely that the alien would be tortured in the country to
which removal has been deferred, or if the alien requests that deferral be
terminated.

(Id. at 500.)  The IJ further wrote that "the Secretary of State may, in her discretion, seek

diplomatic assurances from the Egyptian government that [Khouzam] would not be tortured

if he is returned there, and then, in consultation with the Attorney General, may separately

assess the adequacy of such assurances."  (Id.)   The IJ explained that, in such a case, a

diplomatic assurance "would override this court's Order deferring removal."  (Id.)

In a decision dated July 24, 2000, the BIA affirmed the deferral of removal, stating:

In light of the evidence that the Egyptian authorities routinely torture and
abuse suspected criminals and the medical evidence indicating that
[Khouzam] has scars and injuries which are consistent with past torture, we
agree with the Immigration Judge that the respondent has established that it
is more likely than not that he would be tortured if returned to Egypt.

(Id. at 000452.)  In rejecting the Government's argument that the "high profile" nature of the

criminal case against Khouzam precluded a finding that he likely would be tortured, the BIA

also noted that "the Secretary of State may seek diplomatic assurances from the Egyptian

government that [Khouzam] would not be tortured if he was returned there, and then in

6

consultation with the Attorney General determine whether such assurances are sufficiently reliable to terminate deferral of removal and allow . . . removal consistent with Article 3 of [CAT]." (<u>Id.</u>)

Although receiving relief in the form of a deferral of removal, Khouzam persisted in claiming that he was entitled to asylum or withholding of removal, petitioning the Court of Appeals for the Second Circuit for review of the denial of this more expansive relief. Pursuant to a stipulation entered into between the parties while the matter was pending before the Second Circuit, the case was remanded "to determine, based on any new evidence that may be presented, whether 'there are serious reasons to believe that [Khouzam] committed a serious nonpolitical crime outside the United States.'" (<u>Id.</u> at 000178.)

In an oral decision dated October 26, 2001, the IJ reaffirmed the earlier decision that Khouzam "is not eligible for asylum or withholding of removal as a matter of law . . . ." (<u>Id.</u> at 000199.) In an opinion dated March 7, 2002, the BIA again affirmed the IJ, explaining:

> The [Government] presented properly certified documents from the Egyptian ministry of foreign affairs, obtained by the United States Embassy in Cairo, Egypt, related to a murder allegedly committed by [Khouzam] prior to his departure from Egypt. The documents were originally received as part of a request for [Khouzam's] extradition by the Egyptian government. The documents include police reports and an arrest warrant relating to him. The Immigration Judge correctly concluded that the rebuttal evidence submitted by [Khouzam] in the form of documents and the testimony of two expert witnesses was unconvincing, in that it did not establish that the mistreatment of Coptic Christians in Egypt includes framing them on false charges.

7

> [Khouzam] also failed to establish any egregious procedural irregularity in the creation of the documents that would indicate that the charges against him were falsified.

(Id. at 000125.)

Claiming error in the decision to defer removal, the Government asked the BIA to reconsider that aspect of its earlier decision. In a decision dated May 7, 2002, the BIA granted the Government's motion for reconsideration, concluding that subsequent to its July 24, 2000, decision affirming the grant of deferral of removal, a change in the law had occurred with respect to CAT claims. Specifically, the BIA found that, because Khouzam would be detained pursuant to criminal process, any pain or suffering he may endure incident to a lawful sanction did not merit CAT relief. The BIA wrote:

> In this case, [Khouzam] is essentially fleeing prosecution for a crime that he allegedly committed in Egypt. His detention and any acts perpetrated against him would therefore arise from a lawful sanction and would not have an illicit purpose. . . . In this case, [Khouzam] stands accused of a serious crime and the Egyptian government has an interest in detaining him prior to his trial, to insure that he does not flee the country again prior to that trial. [Khouzam] did not establish that the Egyptian government would detain him for any other proscribed purpose.

(Id. at 000080.)

Khouzam then petitioned the Second Circuit for review of the denial of all relief. Although finding that the evidence was sufficient to support the BIA's determination that there were serious reasons to believe that Khouzam committed murder, thus making Khouzam ineligible for asylum or withholding of removal, the Second Circuit found that the

BIA had erred in vacating its earlier decision that had granted Khouzam deferral of removal.

Khouzam v. Ashcroft, 361 F.3d 161 (2d Cir. 2004).  In explaining this result, Judge

Cardamone, writing for a unanimous panel, stated:

> The fact that Khouzam has been accused of a crime does not in itself render any acts inflicted against him incapable of constituting torture.  Further, the BIA's July 24, 2000 finding that the Egyptian police have routinely tortured, abused, and killed suspected criminals to extract confessions is completely at odds with the BIA's conclusion that the state action requirement has not been met.

> Applying the correct legal standard to the BIA's findings *de novo*, we conclude, as the BIA itself previously did, that Khouzam will more likely than not be tortured if he is deported to Egypt.  To the extent that the Egyptian police are acting in their official capacities – as is strongly suggested by the fact that their goal is to extract confessions – then the acts are carried out 'by . . . a public official . . . acting in an official capacity.'  (CAT Art. 3) To the extent that these police are acting in their purely private capacities, then the 'routine' nature of the torture and its connection to the criminal justice system supply ample evidence that higher-level officials either know of the torture or remain willfully blind to the torture and breach their legal responsibility to prevent it.

Id. at 171.

Accordingly, the court vacated the BIA's May 7, 2002 decision denying relief under

CAT.  On June 23, 2004, the BIA implemented the Second Circuit ruling by granting

Khouzam's request for deferral of removal.

Khouzam continued to be held in custody by the Bureau of Immigration and Customs

Enforcement (BICE) following the Second Circuit ruling.  On February 6, 2006, acting on a

habeas corpus challenge to the validity of Khouzam's continuing detention, the Honorable

9

Dennis M. Cavanaugh of the District of New Jersey, the judicial district where Khouzam was being held, ordered Khouzam's release, finding that there was no significant likelihood of Khouzam's removal in the reasonably foreseeable future. (Exhibit 2 to the Habeas Corpus Petition, Dkt. Entry 1.) Having informed Judge Cavanaugh that, if released, he would live in York, Pennsylvania, Khouzam was directed to report to the BICE facility in that area in accordance with applicable reporting requirements.

On May 29, 2007, while reporting as required at the BICE facility in York, Khouzam was taken into custody and informed that his deferral of removal had been terminated four months earlier based on diplomatic assurances from the Government of Egypt that he would not be tortured. Khouzam was informed that he would be removed to Egypt as early as June 1, 2007.

According to the Declaration of Robert K. Harris, Assistant Legal Adviser for Human Rights and Refugee Law in the Office of the Legal Adviser of the U.S. Department of State, a letter from the Under Secretary of State for Political Affairs was sent to the Deputy Secretary of the Department of Homeland Security on August 7, 2006, asserting that "assurances received from the Government of Egypt regarding the treatment of . . . Khouzam were of sufficient reliability to enable the Secretary of Homeland Security to conclude that if Mr. Khouzam were removed to Egypt with these assurances, it would not be more likely than not that he would be tortured." (Exhibit 1 to the Government's Reply

10

Memorandum, Dkt. Entry 59.)  According to an unauthenticated file memorandum of Julie L.

Myers, Assistant Secretary of the Department of Homeland Security, the Secretary of

Homeland Security elected to credit the diplomatic assurances and terminate the deferral of

removal, effective January 24, 2007.  (Exhibit E to the Response to the Habeas Corpus

Petition, Dkt. Entry 9.)[1]

On May 30, 2007, Khouzam, now incarcerated within this District, filed in this Court

an emergency petition for writ of habeas corpus and a request for stay of removal.[2]  On May

31, 2007, this Court temporarily stayed Khouzam's removal.  (Dkt. Entry 7.) On June 15,

2007, this Court issued a written decision denying the Government's motion to dismiss this

action for lack of subject matter jurisdiction.[3]  The June 15th decision also stayed

Khouzam's removal pending the outcome of this action.

On June 22, 2007, Khouzam, through counsel, moved to compel his release from

confinement.  (Dkt. Entry 31.)  That motion has been fully briefed.  In addition, the parties

filed comprehensive memoranda of law along with various declarations and affidavits

---

[1]Neither the Government of Egypt's written assurance nor any record of the
deliberations as to the reliability of the assurance has been presented in this matter.

[2]The delay between the decision to terminate the deferral of removal (January 24,
2007), and informing Khouzam of this fact (May 29, 2007), has been attributed to the need
to secure travel documents from the Egyptian government.  The Government has asserted
that it did not receive the travel documents from the Egyptian government until May 15,
2007.  (Exhibit "F" to the Response to the Habeas Corpus Petition, Dkt. Entry 9.)

[3]This Court's June 15, 2007 decision is reported at 497 F. Supp. 2d 615.

concerning the substantive merits of Khouzam's claims.  Oral argument was held on August

30, 2007. [4]

## II.  DISCUSSION

### A.  CAT, FARRA and Implementing Regulations

_____"[T]he right to be free from official torture is fundamental and universal, a right

deserving of the highest status under international law, a norm of *jus cogens*."[5] Siderman

de Blake v. Republic of Argentina, 965 F.2d 699, 717 (9th Cir. 1992).  "A state violates

international law if, as a matter of state policy, it practices, encourages, or condones . . .

torture or other cruel, inhuman, or degrading treatment or punishment . . . ." RESTATEMENT

(THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 702 (1987).   As our Court

of Appeals  has observed, "'[i]n light of the universal condemnation of torture in numerous

international agreements, and the renunciation of torture as an instrument of official policy

by virtually all of the nations of the world (in principle if not in practice), . . .  an act of torture

committed by a state official against one held in detention violates established norms of the

---

[4]In light of the importance, complexity and sensitivity of the issues pertaining to the Egyptian diplomatic assurance, the Court deferred consideration of the motion to compel release of Khouzam until resolution of the merits of the controversy.

[5] *Jus Cogens* or a peremptory norm of international law, is 'a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" Jane C. Kim, Note, Nonrefoulement under the Convention Against Torture: How U.S. Allowances for Diplomatic Assurances Contravene Treaty Obligations and Federal Law, 32 BROOK J. INT'L L. 1227, 1234 n.38 (2007).

12

international law of human rights, and hence the law of nations."  Zubeda v. Ashcroft, 333

F.3d 463, 479-80 (3d Cir. 2003), quoting Filartiga v. Pena-Irala, 630 F.2d 876, 880 (2d Cir.

1980).[6]

Article 3 of CAT provides:

1.  No State Party shall expel, return ('refouler") or extradite a person to
another State where there are substantial grounds for believing that he would
be in danger of being subjected to torture.

2.  For the purpose of determining whether there are such grounds, the
competent authorities shall take into account all relevant considerations
including, where applicable, the existence in the State concerned of a
consistent pattern of gross, flagrant or mass violations of human rights.

"No exceptional circumstances whatsoever, whether a state of war or a threat of war,

internal political instability or any other public emergency, may be invoked as a justification

of torture."  CAT, Art 2.

President Reagan signed CAT on behalf of the United States on April 18, 1988.  The

Senate, in October of 1994, gave its advice and consent to the ratification of CAT, subject to

certain reservations, understandings, and declarations.  S. Exec. Rep. No. 101-30 (1990)

(Resolution of Advice and Consent to Ratification).  The declarations relevant here are that

Articles 1 through 16 of CAT are not self-executing, thus requiring implementing domestic

---

[6]President George W. Bush has asserted that "[f]reedom from torture is an
inalienable human right."  President George W. Bush, Statement by the President on United
Nations International Day in Support of Victims of Torture, July 2, 2003,
http://www.whitehouse.gov/news/releases/2003/06/20030626-3.html.

legislation, and that the United States recognizes the competence of the Committee against Torture only with respect to the Committee's receipt and consideration of communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under CAT.[7]  In addition, the Senate ratified CAT with the express understanding that the phrase, "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as set forth in Article 3 of CAT, means "if it is more likely than not that he would be tortured."  Id.

Article 3 of CAT imposes an absolute obligation on a signatory State to not return any individual to a country where there are substantial grounds to believe that the individual would be tortured.  Congress implemented this obligation of non-refoulement through FARRA, which provides that it is "the policy of the United States not to expel, extradite or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  Pub. L. No. 105-277, Div. G. Title XXII, § 2242(a), 112 Stat. 2681, 2681-822 (codified as note to 8 U.S.C. § 1231).  Congress directed "the heads of the appropriate agencies [to] prescribe regulations to implement the obligations of the United States under Article 3 . . ., subject to

---

[7]The Committee against Torture was established by Article 17 of CAT.  It is to receive reports from Party States concerning their compliance with their obligations under CAT, and the Committee may comment on such reports.  Art. 19 of CAT.

any reservations, understandings, declarations, and provisos contained in the United States

resolution of ratification of the Convention." Id. § 2242(b).  FARRA further provided:

> Notwithstanding any other provision of law, and except as provided in the
> regulations described in subsection (b), no court shall have jurisdiction to
> review the regulations adopted to implement this [legislation], and nothing in
> this [legislation] shall be construed as providing any court jurisdiction to
> consider or review claims raised under the Convention or this [legislation], or
> any other determination made with respect to the application of the policy set
> forth in subsection (a), *except as part of the review of a final order of removal*
> *pursuant to section 242 of the Immigration and Nationality Act.*

Id., § 2242(d)(emphasis added).

As Khouzam's case was making its way through the administrative process, the

Department of Justice promulgated regulations implementing FARRA that were "to establish

procedures that ensure that no alien is removed from the United States under

circumstances that would violate Article 3 without unduly disrupting the issuance and

execution of removal orders consistent with Article 3."  Immigration and Naturalization

Service, 64 Fed. Reg. 8478, 8479 (Feb. 19, 1999).  As to aliens who are not entitled to

withholding of removal because they fall within section 241(b)(3)(B) of the INA, but who

nonetheless show a likelihood of torture if removed from the United States, the regulations

provide for relief in the form of deferral of removal.  See 8 C.F.R. § 208.17 (2003).

The regulations underscore the limited relief afforded by deferral of removal in cases

where the alien has been accused of a serious non-political crime committed outside the

United States.  See 8 C.F.R. § 208.17(b) (2003).  Indeed, deferral of removal has been

15

described as "the most precarious and restricted immigration relief under the [INA] . . . ."
Immigration Relief Under the Convention Against Torture For Serious Criminals And Human
Rights Violators: Hearing Before the Subcomm. on Immigration, Border Security, and
Claims of the H. Comm. on the Judiciary, 108th Cong. 24 (2003) (statement of Regina
Germain, Georgetown University Law Center), available at

http://judiciary.house.gov/legacy/88220.pdf.  The regulations specify that deferral of removal
does not confer any lawful or permanent immigration status in the United States, will not
necessarily result in the alien being released from custody, and "[i]s subject to review and
termination if the immigration judge determines that it is not likely that the alien would be
tortured in the country to which removal has been deferred . . . ."  8 C.F.R. § 208.17(b)(4)
(2003).  The regulations specify a process by which the Government may seek termination
of deferral of removal where new evidence is available.  8 C.F.R. § 208.17(d) (2003).[8]  The
process requires notice to the alien, an evidentiary hearing, a *de novo* determination of the
likelihood of torture if the alien is removed, and an appeal to the BIA.  8 C.F.R. §

---

[8]Subpart (1) of § 208.17(d) provides:

At any time while deferral of removal is in effect, the INS District Counsel for
the District with jurisdiction over an alien whose removal has been deferred
. . . may file a motion with the Immigration Court . . . to schedule a hearing to
consider whether deferral of removal should be terminated.  The . . . motion
shall be granted if it is accompanied by evidence that is relevant to the
possibility that the alien would be tortured in the country to which removal has
been deferred and that was not presented at the previous hearing.

208.17(d)(2)-(4) (2003).

The regulations also describe another means of terminating deferral of removal: "At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the Secretary of State pursuant to the procedures in § 208.18(c)." 8 C.F.R. § 208.17(f) (2003).  Section 208.18(c) provides:

> (c) Diplomatic assurances against torture obtained by the Secretary of State.

> (1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

> (2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. The Attorney General's authority under this paragraph may be exercised by the Deputy Attorney General or by the Commissioner, Immigration and Naturalization Service, but may not be further delegated.

> (3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention Against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

It is the Government's reliance upon the interplay between 8 C.F.R. § 208.17(f) and 8 C.F.R. § 208.18(c) that brings this matter before this Court.  The Government argues that

17

the regulations grant it unfettered authority to remove Khouzam on the basis of an

assurance that Khouzam will not be tortured.  Khouzam contends that reliance upon

diplomatic assurances in this instance violates CAT as implemented by FARRA.  He further

contends that, even if the Government may rely upon these assurances and not violate

Article 3 of CAT, the Government failed to comply with the applicable regulations because

(a) the Secretary of State was not personally involved in the decision-making process in this

matter, and (b) the Government has failed to show that there were meaningful consultations

between the Department of State and the Department of Homeland Security.  Finally,

Khouzam argues that termination of deferral of removal without any opportunity to examine

the diplomatic assurance and provide evidence as to its reliability violates FARRA and the

Due Process Clause of the Fifth Amendment.

## B.  CAT, FARRA, and Diplomatic Assurances

Khouzam argues that CAT and FARRA categorically prohibit reliance upon

diplomatic assurances to deport a person to a country that has a consistent record of

engaging in torture, such as Egypt.[9]  In support of this argument, Khouzam points to the

---

[9]According to one commentator:

The State Department's 2001, 2002, 2003 and 2004 human rights reports all
discuss widespread and severe torture in Egyptian prisons.  The 2004 report
cited a study by the Egyptian Organization for Human Rights that:

> documented 41 cases of torture in police stations resulting in

(continued...)

18

admonition of the Committee against Torture that "[w]hen determining the applicability of its

non-refoulement obligations under Article 3 of the Convention, the [United States] should

only rely on 'diplomatic assurances' in regard to states which do not systematically violate

the Convention's provisions."  U.N. Comm. Against Torture, Conclusions and

Recommendations to U.S., ¶ 21, U.N. Doc. CAT/C/USA/Co/2, ¶ 21 (July 25, 2006).

Khouzam also references reports of other international authorities, such as the Special

Rapporteur on Torture, as well as the opinions of experts in this area of international law.

Moreover, he cites opinions of courts of foreign countries that have counseled caution in

"relying on diplomatic assurances from regimes that have a poor record of respecting

human rights."  (Petitioner's Supplemental Brief, Dkt. Entry 53, at 23.)

Although pronouncements of international bodies, such as the Committee against

Torture, may afford significant guidance in interpreting the language of treaties to which the

United States is a party, such pronouncements do not have the force of law nor in any way

---

[9](...continued)

> fifteen deaths in custody from April 2003 to April 2004.  EOHR also asserted that from April 1993 to April 2004, it documented 412 cases of torture in police stations, including 120 cases where detainees died as a direct result of torture.

Katherine R. Hawkins, The Promises of Torturers: Diplomatic Assurances and the Legality of "Rendition," 20 GEO. IMMIGR. L. J. 213, 242 (2006).  The most recent country report on Human Rights Practices for Egypt issued by the U.S. State Department asserts that "torture and abuse of prisoners and detainees by police, security personnel, and prison guards remain[] common and persistent."   U.S. STATE DEP'T, EGYPT: COUNTRY REPORT ON HUMAN RIGHTS PRACTICES 2006, § 1(c), http://www.state.gov/g/drl/rls/hrrpt/2006/78851.htm.

bind the United States.[10]  See I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 427-28 (1999).

Courts, however, may consider as aids to their interpretation of a treaty ratified by the United

States "the negotiating and drafting history (*travaux preparatoires)* and the postratification

understanding of the contracting parties."[11]  Zicherman v. Korean Airlines Co., 516 U.S. 217,

226 (1996).

Both CAT and FARRA are silent on the subject matter of diplomatic assurances in

relation to the likelihood that an alien would be exposed to torture, and the parties have not

directed the Court to any negotiation or drafting history concerning this subject.  Post-

ratification conduct of contracting parties, however, strongly supports the conclusion that, in

appropriate circumstances, diplomatic assurances may be sufficient to enable a State to

---

[10]As noted above, the Senate's advice and consent to CAT was subject to the declaration that the United States recognize the competence of the Committee against Torture only to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under CAT.  S. Exec. Rep. No. 101-30 (1990).

[11]The Government correctly observes that, because CAT is not self-executing, it is FARRA, the implementing legislation, and not CAT, that "is given effect as law in the United States."  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111, comment h (1987).  FARRA, however, contains the same flat prohibition on refoulement that is found in Article 3 of CAT.  Moreover, Congress specified that the terms used in FARRA were to be given the same meaning as those terms in CAT, "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention."  Pub. L. No. 105-277, Div. G, Title XXII, § 2242(f)(2). There is no reservation, understanding, declaration or proviso that concerns diplomatic assurances.  Accordingly, it is appropriate to consider pronouncements of international tribunals and foreign courts, as well as the post-ratification conduct of other signatory States, in assessing the non-refoulement obligation of the United States under FARRA.

return an alien to a country, even though that country has a recent history of human rights abuses. For example, both Canada and the United Kingdom have relied upon diplomatic assurances to seek removal to States that have a past history of torture. E.g., MT, RB and U v. Secretary of State for the Home Department, 2007 EWCA Civ. 808 (July 30, 2007); Mahjoub v. Canada, (Minister of Citizenship and Immigration), 2006 FC 1503 (Dec. 14, 2006). Although the diplomatic assurances in those cases were not regarded as sufficiently reliable to defeat the aliens' showing that torture was likely, neither tribunal purported to hold that diplomatic assurances were categorically barred by Article 3 of CAT. The fact that other States that are parties to CAT pursued diplomatic assurances to effect the return of an alien despite the receiving country's reputed history of torture affords strong support for the conclusion that the United States is not foreclosed from obtaining appropriate diplomatic assurances in particular instances.

Buttressing this conclusion is the deference to be accorded administrative agencies charged with administering the statute under scrutiny. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc, 467 U.S. 837, 842 (1984). Where, as here, a statute is silent with respect to the precise issue before the Court, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843.[12] In light of the fact that the non-refoulement obligation applies only where "there are

---

[12] Chevron deference is, of course, fully applicable in the context of immigration

(continued...)

substantial grounds for believing the person would be in danger of being subjected to torture," FARRA, § 2242(a), it is not unreasonable to utilize appropriate diplomatic assurances to avoid violating FARRA.  That a particular country may have a record of torture does not mean that a diplomatic assurance will never have sufficient indicia of reliability.  Indeed, it is expected that diplomatic assurances will be sought from those States to which return of the alien may otherwise pose a violation of the non-refoulement obligation.  Thus, the Department of Justice regulations that recognize that diplomatic assurances may be effective in allowing for the return of an alien without violating FARRA in particular cases is a reasonable interpretation of FARRA.  Accordingly, Khouzam's facial challenge to the diplomatic assurance obtained in this case must be rejected.

### C. Compliance With the Pertinent Regulations

Khouzam contends that, even if diplomatic assurances do not violate FARRA, the Government may not rely upon the Egyptian diplomatic assurance obtained in his case because the requirements of the applicable regulations were not followed.  Specifically, he argues that the Government violated the regulations because the Secretary of State was not involved personally in obtaining and forwarding the diplomatic assurances to the Department of Homeland Security, and because there is no competent evidence of the

---

[12](...continued)
related decisions. See I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 420 (1999); Kamara v. Attorney General of U.S., 420 F.3d 202, 211 (3d Cir. 2005).

requisite high-level consultation between the Departments of State and Homeland Security concerning the reliability of the assurances.

Pointing out that the regulations are captioned "Diplomatic assurances against torture obtained by the Secretary of State," 8 C.F.R. § 1208.18(c) (2005), and that the regulations refer only to the Secretary of State as the person who is to obtain and forward the diplomatic assurances, see 8 C.F.R. § 1208.18(c)(2) (2005), Khouzam argues that the regulations plainly intended that the Secretary of State herself must be involved in the matter.  He argues that this conclusion is compelled by the fact that the regulations provide for a very limited delegation of authority only by the Attorney General.[13]

The Secretary of State is statutorily empowered to "delegate authority to perform any of the functions of the Secretary or the Department to officers and employees under the direction and supervision of the Secretary." 22 U.S.C. § 2651(a)(4).  The Government has provided evidence that the Secretary of State delegated to the Deputy Secretary of State "all authorities and functions vested in the Secretary of State by any . . . regulation . . .," 66 Fed. Reg. 22065 (May 2, 2001), and, upon the resignation of the Deputy Secretary of State,

---

[13]The regulations stipulate that the Attorney General may delegate his authority pertaining to diplomatic assurances to the Deputy Attorney General or to the Commissioner of the Immigration and Naturalization Service, but not to anyone else.  8 C.F.R. § 208.18(c)(2) (2003).  Khouzam argues that, by negative implication, the Secretary of State's authority may not be delegated at all.  (The regulations were promulgated before the establishment of the Department of Homeland Security.  The delegation of authority is now understood to extend to the Secretary and Deputy Secretary of Homeland Security.)

delegated to the Under Secretary of State for Political Affairs "all authorities and functions . . . that have been or may be delegated or re-delegated to the Deputy Secretary." 71 Fed. Reg. 41306 (July 20, 2006).

Delegation of authority "generally is permitted where it is not inconsistent with the statute." Inland Empire Public Lands Council v. Glickman, 88 F.3d 697, 702 (9th Cir. 1996). Stated otherwise, "[e]xpress statutory authority for delegation is not required . . . ." Loma Linda University v. Schweiker, 705 F.2d 1123, 1128 (9th Cir. 1983). In this case, the limited delegation of authority provided by the Secretary of State does not appear to be inconsistent with the regulations. Moreover, the delegation of authority fell within the statutory provision empowering the Secretary to make appropriate delegations. Thus, the lack of personal involvement of the Secretary of State does not preclude reliance upon the Egyptian diplomatic assurance.

The Government has supplied an unsworn declaration that, on August 7, 2006, the Under Secretary of State for Political Affairs forwarded the Egyptian diplomatic assurance to the Deputy Secretary of Homeland Security and formally conveyed the Department of State's view that the assurances were sufficiently reliable to remove Khouzam to Egypt. (Exhibit 1 to Respondents' Reply Memorandum, Dkt. Entry 59.) It is unclear, however, whether the Undersecretary for Political Affairs was involved in obtaining the diplomatic assurance from Egypt. The declaration of James F. Jeffrey, submitted as Exhibit "H" to the

24

Response to the Habeas Corpus Petition (Dkt. Entry 9), states that "the Department of State

engaged in discussions and other communications with the government of Egypt . . . ."  His

declaration does not identify the persons involved in those discussions.

Furthermore, there is no competent evidence that the appropriate high level official at

the Department of Homeland Security actually engaged in consultations with the appropriate

official at the Department of State concerning the Egyptian assurances.  The

unauthenticated and unsigned "Memorandum to File" of Julie L. Meyers, Assistant Secretary

of Homeland Security, simply states:

> After consulting with the Department of State and taking into account all
> relevant considerations, including human rights practices in Egypt, I
> determined, consistent with the procedures set forth at 8 C.F.R. §§ 1208.18(c)
> and 208.18(c), that the assurances were sufficiently reliable to allow for Mr.
> Khouzam's removal to Egypt . . . .  (Exhibit E to the Response to the Habeas
> Corpus Petition, Dkt. Entry 9.)[14]

The regulations require more than the mere forwarding of diplomatic assurances

obtained by the State Department.  They require *consultation* at the highest levels of the

Departments of State and Homeland Security.  The evidence presented thus far in this

proceeding does not permit a conclusion that such consultations actually occurred.

It must be presumed that the consultation requirement had a serious purpose.  See

Lujan v. Defenders of Wildlife, 504 U.S. 555, 585 (1992) (Stevens, J., concurring) ("If

Congress has required consultation between agencies, we must presume that such

---

[14]  Of course, the "Memorandum to the File" is not competent evidence.

25

consultation will have a serious purpose that is likely to produce tangible results."). Otherwise, the establishment of a consultation requirement would be meaningless.

It may be that the Government can establish that the requisite consultations did occur.[15] There is no reason to request supplementation of the record or to consider the matter at greater length, however, because there is a more fundamental defect in the Government's position that would not be obviated by proof of meaningful consultation.

The Government contends that neither the diplomatic assurance itself, nor the record concerning the diplomatic assurance and the discussions that may have occurred, is to be made available to Khouzam with an opportunity to be heard on the reliability of the assurance. The crux of the government's position is captured by this assertion: "If the Executive Branch deems an assurance reliable – that the country will comply with its sovereign promise to the United States not to torture the person – then the alien can no

---

[15]The Government argues that this Court should not "presume that the officials involved, namely a Department head and the State Department official exercising the authority of the Deputy Secretary of State, did not carefully evaluate the case." (Respondents' Reply Memorandum, Dkt. Entry 59, at 16.)  No such presumption has been made in this case.  It must also be noted, however, that the presumption of regularity attending agency action, see Abdulai v. Ashcroft, 239 F.3d 542, 555 (3d Cir. 2001), does not mean that Khouzam is unable to question whether the requisite agency officials engaged in the necessary consultations.  The presumption of regularity of agency action is rebuttable. Id.  In this case, no competent evidence of the requisite consultation has been presented. Moreover, it is not clear that a presumption of regularity may be applied where the agency action "does not have the transparent features of the ordinary administrative process . . . ." Bismullah v. Gates, 501 F.3d 178, 185-86 (D.C. Cir. 2007).  Accordingly, whether the requisite meaningful consultation occurred in this case remains unresolved.

26

longer prove by a preponderance of the evidence that he more likely than not will be tortured if returned to that country." (Respondents' Reply Memorandum, Dkt. Entry 59, at 39.) It is the validity of this irrebuttable presumption erected by the Government to which attention now is turned.

### D. Unreviewable Diplomatic Assurances Under CAT, FARRA and the Due Process Clause

Khouzam contends that reliance upon diplomatic assurances without making them available to him with an opportunity for assessment by an impartial adjudicator violates CAT, FARRA, and the Due Process Clause of the Fifth Amendment. The Government responds by asserting that FARRA actually forecloses review of diplomatic assurances by an impartial adjudicator, and that 8 C.F.R. § 208.18(c)(3), precluding review of diplomatic assurances by an IJ, the BIA, or any asylum officer, is consistent with FARRA. The Government also argues that Khouzam, as an arriving alien, does not fall within the protection of the Fifth Amendment. Thus, any process provided by legislation or regulation, argues the Government, is all the process to which Khouzam is entitled. The Government also claims that the complete delegation of authority extended to the Executive Branch in FARRA means that the Government can choose to rely upon secret diplomatic assurances, especially given the substantial deference to which it is entitled in matters concerning immigration and foreign affairs. The Government points to the "rule of non-inquiry," applicable in extradition cases, as yet additional support for its position in this matter.

27

### 1.  Impartial review of diplomatic assurances under FARRA

Congress directed "the heads of the appropriate agencies" to prescribe regulations that implement the obligation of the United States under Article 3 of CAT.  FARRA § 2242(b).  The obligation of the United States under Article 3 is to not return any person to a country where it is likely that the person would be tortured.  Id. § 2242(a).  The Department of Justice, through the Immigration and Naturalization Service, promulgated regulations that purported to immunize diplomatic assurances from review by an IJ, the BIA, or a court of law.  While Congress exempted from judicial review the regulations adopted to implement the obligations of the United States under Article 3, it also legislated that an impartial review process would be available with respect to the application of the Article 3 requirement of non-refoulement.  Id. § 2242(d).  Thus, Congress plainly contemplated that there would be a hearing process, culminating with judicial review, in connection with our nation's compliance with the absolute duty of non-refoulement.

Congress provided that judicial review would occur after a final removal order had been entered, i.e., after the administrative process had been completed.  Given congressional concern for delays attending adjudication of CAT claims by way of habeas corpus petitions, it makes sense that Congress would specify that judicial review of any CAT claim would occur only after a final removal order had been entered.  The CAT claim would then be considered along with all other challenges to removal in a single judicial review

process. The adjudication of CAT claims would be facilitated by the development of a

record in proceedings conducted by immigration judges, rather than by the presentation of

evidence in a district court. There is nothing in FARRA, however, that contemplates a

scenario where the Executive Branch would effect the removal of an alien who has shown a

likelihood of torture by relying upon a secret, unreviewable diplomatic assurance. On the

contrary, as pointed out in this Court's June 15, 2007 ruling, Congress had declared its

intention to "give every alien a fair opportunity to obtain judicial review while restoring order

and common sense to the judicial review process." H. R. Rep. No. 109-72, at 174-75 (2005)

(Conf. Rep.).[16]

　　There is nothing in the legislative history of FARRA to suggest that Congress

intended that the Government could evade impartial review of its application of the policy of

---

[16]The quotation in the text is from the Conference Report for the REAL ID Act of
2005, H.R. Rep. No. 109-72, at 4 (2005) (Conf. Rep.), which added the following provision
with regard to CAT claims:

> Notwithstanding any other provision of law (statutory or non-statutory),
> including § 2241of title 28, or any other habeas corpus provision, and sections
> 1361 and 1651 of such title, a petition for review filed with an appropriate
> Court of Appeals in accordance with this section shall be the sole and
> exclusive means for judicial review of any cause or claim under the [CAT].

8 U.S.C. § 1252(a)(4). The legislative history quoted in the text confirms the conclusion that
Congress did not contemplate a scenario where some aliens would not have any
opportunity for any review of their CAT claims. Indeed, the Conference Report states that
"[n]o alien, *not even criminal aliens*, will be deprived of judicial review of such claims." H.R.
Rep. No. 109-13, at 174-75 (2005) (Conf. Rep.) (emphasis added).

29

non-refoulement by resorting to diplomatic assurances.  This Court found habeas jurisdiction

because the Executive Branch had devised a means of evading judicial review by accepting

diplomatic assurances outside the context of the completed removal proceedings.

The Government, of course, is obligated to apply the non-refoulement policy here.

Because Congress contemplated there would be impartial review of the United States's

compliance with the non-refoulement obligation, it necessarily follows that the diplomatic

assurances should be subject to some review process.  Otherwise, the review process that

has been prescribed by regulations as intended by Congress would be a farce.  The

Government could, as it did in this case, dispute the likelihood of torture, have its position

rejected by the impartial adjudicators, and then preempt the impartial ruling by a secret

diplomatic assurance that, by its very nature, has no legal effect or enforcement mechanism.

The Government argues that the Senate's report regarding CAT evidences an

intention to preclude judicial review.  (Respondents' Reply Memorandum, Dkt. Entry 59, at

28-29.)  In making this argument, the government refers, however, not to a legislative

analysis of CAT, but instead to the *Executive's* analysis of the term "competent authorities"

in Article 3 of CAT.  The Executive proposed that the ratification resolution state that "the

United States declares that the phrase 'competent authorities' as used in Article 3 of the

Convention, refers to the Secretary of State in extradition cases and to the Attorney General

in deportation cases."  S. Exec. Rep. No. 101-30, at 17 (1990).  The Executive's analysis

included the assertion that "[b]ecause the Convention is not self-executing, the

determinations of these authorities will not be subject to judicial review in domestic courts."

(Id. at 18.)  Notably, this declaration was not included in the Senate Resolution of Advice

and Consent.  According to the Senate Executive Report, this declaration was omitted

because, although "the competent authorities referred to in Article 3 would be the Secretary

of State in extradition cases and the Attorney General in deportation cases, it is not

necessary to include this declaration in the formal instrument of ratification."  The Senate

Executive Report contained no indication that it was the legislature's intention that the

determination of the Secretary of State and the Attorney General would be exempt from

judicial review.  The reservations, understandings and declarations that are part of the

Senate Resolution of Advice and Consent do not address the question of judicial review.

FARRA, however, which establishes an absolute non-refoulement policy consistent with

Article 3 of CAT, contemplates judicial review based upon the record compiled in obtaining a

final order of removal, at least where, as here, the matter is pursued by way of deportation

as opposed to extradition.[17]  Morever, in declaring that the provisions of Articles I through 16

of CAT are not self-executing, the Senate Executive Report observed that it was "preferable

to leave any further implementation that may be desired to the domestic legislative and

---

[17]The Egyptian government submitted an extradition request to the Department of
State in this matter.  No explanation has been provided as to why the State Department took
no action with respect to the extradition request.

31

judicial process," thus suggesting a review role for the judiciary.

Contrary to the Government's contention, the following statement in the Conference Report on FARRA – "the provision agreed to by the conferrees does not permit for judicial review of the regulations or of *most claims* under the Convention," H. R. Conf. Rep. No. 105-432, 150 (1998) (emphasis added), reprinted at 1998 WL 105466, at *333-34 – does not mean that there would be no judicial review of the termination of a deferral of removal. Indeed, this ambiguous statement clearly contemplates that CAT claims would be subject to judicial review as part of the removal procedures.

The Government persists, however, that the full delegation of authority it received to promulgate implementing regulations means that the Executive Branch could remove some matters from any review. Executive Branch action, however, cannot extend beyond the parameters of the enabling statute. I.N.S. v. Chadha, 462 U.S. 919, 954 (1983). "The courts, when a case or controversy arises, can always 'ascertain whether the will of Congress has been obeyed,' and can enforce adherence to statutory standards." Id. Even in the immigration context, "executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review . . . ." Id.

In this case, Congress contemplated that there would be review of CAT claims adjudicated through the removal proceedings. There is no evidence that Congress believed

32

that the Executive could trump a judicial determination after a final order of removal on the basis of a secret diplomatic assurance.  Nor did Congress indicate that the Executive could circumvent processes intended to assure our nation's compliance with its treaty obligations.

"Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid problems unless such construction is plainly contrary to the intent of Congress."  Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg., 485 U.S. 568, 575 (1988).  This Court has already ruled that the applicable legislation is capable of being interpreted as not precluding habeas review of the decision to terminate Khouzam's deferral of removal.  497 F. Supp. 2d at 623.  In reaching this result, this Court referred to its obligation to construe the applicable legislation to avoid the substantial constitutional concerns posed by an interpretation that forecloses judicial review of termination of deferral of removal based upon secret diplomatic assurances, if an alternative construction is "fairly possible."  I.N.S. v. St. Cyr, 533 U.S. 289, 299-300 (2001). The analysis in this Court's June 15th decision is pertinent here.  FARRA is plainly cable of being interpreted to require impartial review in relation to action implicating the obligation of non-refoulement, such as termination of deferral of removal based upon diplomatic assurances.  The Government's interpretation of FARRA to preclude any impartial review of the sufficiency of Egypt's diplomatic assurance, as embodied in 8 C.F.R. § 208.18(c)(3), cannot stand.

Furthermore, the fact that this matter implicates the foreign affairs of the United

States does not insulate the Executive Branch action from judicial review.  As observed in

Gross v. German Foundation Indus. Initiative, 456 F.3d 363, 377 (3d Cir. 2006):

> [N]ot 'every case or controversy which touches foreign relations lies beyond
> judicial cognizance.' '[U]nder the Constitution, one of the Judiciary's
> characteristic roles is to interpret statutes[, treaties and executive
> agreements],' and 'we cannot shirk this responsibility merely because our
> decision may have significant political overtones.'

Non-refoulement is the law of the United States.  FARRA contemplated a review

process for claims of violation of the non-refoulement obligation, culminating with judicial

review.  The Executive Branch simply cannot evade that process by promulgating a

regulation that says it will preempt all review on the basis of secret diplomatic assurances.[18]

The Government's reliance upon the "rule of non-inquiry" is equally unavailing.[19]

---

[18]The Government's reliance upon Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103 (1948), for the proposition that the judiciary may not intervene where the President is exercising constitutionally-premised authority to conduct foreign relations is misplaced.  That case concerned economic interests, not individual liberties.  Not even the President of the United States has the authority to sacrifice on the alter of foreign relations the right to be free from torture.

[19]    'The rule of non-inquiry' . . . is a judicial doctrine under which
courts of the United States refrain from examining the penal
systems of nations requesting extradition of fugitives when
considering whether to permit extradition.   Rather, such issues
are considered by the Secretary of State in making the final
extradition decision.   The rule of non-inquiry recognizes that,
among the three branches of the U.S. Government, the
Executive branch is best equipped to evaluate and deal with

(continued...)

Significantly, the rule of non-inquiry has been held inapplicable in habeas corpus

proceedings.  See Mironescu v. Costner, 480 F.3d 664, 672-73 (4th Cir. 2007).  Because

the analysis in Mironescu is plainly applicable here, it is restated at length:

> [T]he Government maintains that regardless of the fact that the Secretary's
> extradition of Mironescu would violate federal law if extradition will likely result
> in Mironescu's torture, the rule of non-inquiry should preclude habeas review
> here because courts are ill-equipped to "second-guess[ ] the expert opinion of
> the State Department" regarding whether torture is likely to occur in Romania.
> We do not agree. It is important to emphasize that a habeas court reviewing
> CAT or FARR Act claims would not be called upon to consider whether
> extradition would further our foreign policy interests or, if so, how much to
> weigh those interests. Rather, it would be required to answer only the
> straightforward question of whether a fugitive would likely face torture in the
> requesting country. American courts routinely answer similar questions. . . .
> We see no reason to doubt that district courts could adequately perform this
> function in this context as well.
>
> The Government also maintains that concerns regarding international comity -
> especially the possibility of delays that habeas review could cause - warrant
> application of the rule of non-inquiry. That habeas review may delay
> extradition, or preclude it altogether, cannot negate Mironescu's right to obtain
> habeas relief if he is being detained in violation of federal law. . . . Indeed, . . .
> habeas proceedings regarding claims that extradition would be
> unconstitutional "will often involve delicate questions of international
> diplomacy."  Moreover, one could well argue that the damage done to our

---

[19](...continued)
> such issues.  The Rule of non-inquiry is regularly cited and
> relied upon in U.S. judicial opinions involving extradition.

U.S. STATE DEP'T, UNITED STATES' RESPONSE TO THE QUESTIONS ASKED BY THE COMMITTEE
AGAINST TORTURE (2006), http://www.state.gov/g/drl/rls/68561.htm.  This case, of course,
does not involve extradition, the Department of State having failed to act upon the
Government of Egypt's extradition request.

foreign relations with another country is likely to be less when a court, as
opposed to the Secretary, makes the decision that extradition must be denied.

Finally, the Government suggests that habeas review concerning the
treatment a fugitive would likely receive in the requesting country might
compromise the confidentiality of certain sensitive communications between
the Executive and a foreign government. However, we have no reason to
doubt that district courts can adequately protect the confidentiality of such
communications by considering them in camera, as the district court intends
to do here.

Id. at 672-73.[20]

Indeed, even the case upon which Government relies to advance the "rule of non-

inquiry" recognized that the Rule is not absolute, and that there may be situations where the

prospect of torture is such that judicial review would be warranted.  United States v. Kin-

Hong, 110 F.3d 103, 112 (1st Cir. 1997).  This case, involving a prior judicial determination

of a likelihood of torture, presents just such a scenario.

In summary, a careful reading of FARRA and pertinent legislative pronouncements

compels the conclusion that Congress intended every alien, even criminal aliens, to have an

opportunity for impartial review of his or her CAT claim, culminating with judicial review in a

---

[20]The Court of Appeals in Mironescu ultimately concluded that the district court
lacked jurisdiction to consider the habeas corpus challenge based upon CAT and FARRA in
the context of extradition proceedings, observing that "*[e]xcept in the context of immigration
proceedings*, §2242(d) flatly prohibits courts from 'consider[ing] . . . claims' raised under the
CAT or the FARR Act."  Id. at 676 (emphasis added).   The court observed, however, that
"the fact that Mironescu's claim challenges his extradition rather than his removal is
significant."  Thus, the holding in Mironescu supports rejection of the rule of non-inquiry in
the removal context presented here.

Court of Appeals.  The Departments of State and Homeland Security have no authority to

override that congressional determination.  By invoking 8 C.F.R. § 208.18(c)(3) to do so in

this case, the Government violates FARRA.[21]

## 2.  Diplomatic assurances and the Due Process Clause

Even if Congress had intended to foreclose review of a CAT claim in the context of a

diplomatic assurance, the Due Process Clause of the Fifth Amendment requires some level

of scrutiny of the assurance by an impartial tribunal.  The Fifth Amendment proclaims that

"[n]o person shall be . . . deprived of life, liberty, or property, without due process of law. . . ."

U.S. CONST. amend. V.  "Liberty" within the protection of the Fifth Amendment encompasses

"fundamental rights found to be deeply rooted in our legal tradition. . . ."  Washington v.

Gluckburg, 521 U.S. 702, 722 (1997).

_____

[21]Khouzam's status as an arriving alien has no relevance to the issue of whether
reliance upon a diplomatic assurance without subjecting it to review by an impartial
decisionmaker violates FARRA.  In Clark v. Martinez, 543 U.S. 371 (2005), the Court
recognized that its holding in Zadvydas v. Davis, 533 U.S. 678 (2001), concerning the
interpretation of 8 U.S.C. § 1231(a)(6), applied with equal force to arriving aliens.  The Court
explained that the difference between arriving aliens and other aliens who have gained entry
to the United States "cannot justify giving the same detention provision a different meaning
when [arriving] aliens are involved."  Id. at 380.  Similarly, this Court's interpretation of
FARRA to afford judicial review in the unique circumstances presented here does not
depend upon the status of the alien.  Congress has recognized that an arriving alien such as
Khouzam has a right to seek deferral of removal to guard against torture.  Where the
Government establishes a right to petition for relief on such a fundamental matter, it must
provide a fair process.  See Marincas v. Lewis, 92 F.3d 195, 203-04 (3d Cir. 1996) (aliens
with stowaway status entitled to same asylum procedures deemed necessary for other
aliens).

It cannot be denied that the interest in freedom for torture is such a right. As noted above, the right to be free from torture is *jus cogens*. President Bush has described it as an "inalienable human right."[22] Indeed, "[e]very violation of a person's bodily integrity is an invasion of his or her liberty." Washington v. Harper, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in part, dissenting in part). Freedom from torture falls squarely within the concept of "liberty" protected by the Fifth Amendment.

A human being does not forfeit the right to be free from torture because he is ineligible for admission into this country. The right is not lost because of a conviction *in absentia*.[23] Freedom from torture cannot be abridged even where the person flees a valid prosecution. Freedom from torture is a "fundamental right," Filartiga v. Pena-Irala, 630 F.2d 876, 885 (2d Cir. 1980), surely protected by the Fifth Amendment regardless of a person's immigration status.

The issue in this case does not concern any right of Khouzam to remain in the United States. The right at stake here is to be free from torture. Thus, the holding in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953), – that "'whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned'" – has no application here. The Government could not justify torture of an arriving alien on the

---

[22]See *supra* note 6.

[23]It should be noted that no competent evidence of Khouzam's conviction *in absentia* has been presented in this proceeding.

38

ground that his interest in life and liberty is not protected by the Fifth Amendment.  So, too,

the Government cannot return an alien to a country where there is a likelihood he will be

tortured without affording the alien an opportunity to be heard.

Khouzam has submitted uncontradicted evidence that "the United States is the only

government that purports to deny a person subject to transfer the right to challenge the

reliability and sufficiency of diplomatic assurances against torture before an independent,

impartial body."  (Declaration of Julia Hall, Exhibit 6 to the Petitioner's Supplemental Brief,

Dkt. Entry 53, at ¶6.)  According to Hall, Austria, Canada, Germany, Netherlands, Russia,

Sweden, Switzerland, Turkey and the United Kingdom, all parties to CAT, provide for judicial

review of the reliability and sufficiency of diplomatic assurances.  Id.  For example, in Suresh

v. Canada, (Minister of Citizenship & Immigration), [2002] 1 S.C.R. 3, the Supreme Court of

Canada held that "[w]here the Minister is relying on written assurances from a foreign

government that a person would not be tortured, the refugee must be given an opportunity

to present evidence and make submissions as to the value of such assurances."  Id. ¶ 123.

The requirement of notice, receipt of the diplomatic assurance upon which the government

is relying, and an opportunity to be heard were reiterated in Mahjoub v. Canada, (Minister of

Citizenship & Immigration), 2006 FC 1503 (December 14, 2006), which involved a

diplomatic assurance from Egypt.  The United Kingdom similarly requires that "[w]here the

state relies on diplomatic assurances or other similar material received from the state of

return, it must produce the material it relies on and the court can review it." (Declaration of Nicholas John Blake, Exhibit 1 to the Petitioner's Supplemental Brief, Dkt. Entry 53, at ¶ 3.) Thus, for example, in <u>MT, RB, and U v. Secretary of State for the Home Department</u>, the U.K. court observed that "[t]he state's obligation is not only not to deport persons to a state where they face a real risk of torture, but also to ensure that the proceedings in which that issue was considered were fair.  Proceedings are not fair if evidence is used that is not seen by the [claimant] and his . . . advocates." [2007] EWCA Civ. 808 ¶ 10.  The Declaration of Victor Lodewijk Koppe attests, without contradiction, that under the law of Netherlands a person facing deportation on the strength of a diplomatic assurance against torture must be given an opportunity to challenge that assurance in court.  (Exhibit 2 to the Petitioner's Supplemental Brief, Dkt. Entry 53, at ¶ 13.)  The Committee against Torture ruled in the matter of <u>Agiza v. Sweden</u>, Communication No. 233/2003, U.N. Doc. CAT/C/34/D/233/203 (May 24, 2005), involving the expulsion of a suspected terrorist from Sweden to Egypt on the basis of diplomatic assurances, that Article 3 of CAT requires, in the context of diplomatic assurances, "an opportunity to effective, independent and impartial review of the decision to expel or remove . . . when there is a plausible allegation that Article 3 issues arise."  (<u>Id.</u> at ¶ 13.7.)  See also <u>Pelit v. Azerbaijan</u>, Communication No. 281, 2005, U.N. Doc. CAT/C/38/D/281, 2005, ¶ 11 (May 30, 2007).

     Although the opinions of international tribunals and courts of other countries have no

40

binding effect in the United States, they are nonetheless often viewed as relevant in determining whether certain action in the United States violates fundamental interests.  For example, in Lawrence v. Texas, 539 U.S. 558, 576-77 (2003), the Court observed that "[t]here has been no showing that in this country the governmental interest in circumscribing personal choice is somehow more legitimate or urgent" than the interests of governments throughout the world that accepted a right of homosexual adults to engage in intimate, consensual conduct.  In Roper v. Simmons, 543 U.S. 551, 575 (2005), the Court reiterated its practice of referring "to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'" The Court further observed that it was proper that it "acknowledge the overwhelming weight of international opinion against the juvenile death penalty . . .," as "[t]he opinion of the world community, while not controlling . . ., does provide respected and significant confirmation for [the Court's] own conclusions."  Id. at 578.  See also Thompson v. Oklahoma, 487 U.S. 815, 830-31 (1988) ("the conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense . . . is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European Community").

Although Congress may have "'plenary power' to create immigration law, and . . . the

41

Judicial Branch must defer to Executive and Legislative Branch decision making in that area, . . . that power is subject to important constitutional limitations." Zadvydas v. Davis, 533 U.S. 678, 695 (2001). Even in times of war, "[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations . . ., it most assuredly envisions a role for all three branches when individual liberties are at stake." Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004). "The Court's repeated statements that decisions by the political branches in the immigration area are *largely* immune from judicial control,' or are 'subject only to *narrow* judicial review,' clearly do not altogether preclude judicial scrutiny, and this principle applies to executive as well as Congressional action." Jean v. Nelson, 727 F.2d 957, 967 n.11 (11th Cir. 1984). What was said by our High Court more than 150 years ago in affirming the availability of habeas corpus review in the extradition context resonates still today:

> Public opinion ha[s] settled down to a firm resolve . . . that so dangerous an engine of oppression as secret proceedings before the executive, and the issuing of secret warrants of arrest founded on them, . . . and then, an extradition without an unbiased hearing before an independent judiciary, were highly dangerous to liberty and ought never to be allowed in this country.

In re: Kaine, 55 U.S. 103, 113 (1852).

Khouzam's "inalienable human right" to be free from torture is worthy of protection under the Due Process Clause. Ascertaining what process is required involves an assessment of the interests at stake, the risk of an erroneous determination resulting from

42

the process employed, and the burden imposed on the Government by additional procedural safeguards.  See Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

### 3.  Due Process and the "Process" Accorded Khouzam

The Government asserts that the fact that the Egyptian diplomatic assurance was evaluated at the highest level of our Executive Branch accorded Khouzam more than adequate process.  But consultation among members of the Executive Branch, even assuming it occurred, does not satisfy the constraint of the Fifth Amendment that no person's life or liberty be deprived without due process of law.  "The involvement of more than one of the servants of [the] unitary executive in commencing a deprivation does not create an apparent substitute for the notice requirement inherent in the constitutional norm." National Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 207 (D.C. Cir. 2001). As Khouzam declares, "[i]t would stand due process on its head to allow the very same agency that lost in the courts to have the final word on whether circumstances are now sufficiently different to overturn the court's determination."  (Petitioner's Supp. Brief, Dkt. Entry 53, at 70.)

"At the core of due process are the requirements of notice and a meaningful opportunity to be heard."  Jarbough v. Attorney General of U.S., 483 F.3d 184, 190 (3d Cir. 2007).  The Government argues that Khouzam was given "notice" by being told that the deferral of removal had been terminated on the basis of a diplomatic assurance.  The

43

Government further argues that the requisite meaningful opportunity to be heard is provided by this habeas corpus proceeding.  The Government concludes by asserting that the termination of deferral of removal must be upheld because its reliance upon an undisclosed diplomatic assurance provides a "facially legitimate and bona fide" rationale for its conclusion that Khouzam is unable to show that it is more likely than not that he will be tortured.

The cases upon which the Government relies in arguing that review must be limited to determining whether its rationale for terminating deferral of removal is "facially legitimate and bona fide" are distinguishable.  For example, Kleindienst v. Mandel, 408 U.S. 753 (1972), involved the Attorney General's denial of a waiver of the statutory exclusion of an alien advocating world communism because that alien had engaged in such activities on a prior entry into the United States.  The Court ruled that "when the Executive exercises . . . power [to make rules for exclusion of aliens] negatively on the basis of a facially legitimate and bona fide reason, the Courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant."  Id. at 770.   Here, by way of contrast, the Executive is not seeking to exercise some power negatively by excluding an alien.  Instead, it is seeking to exercise an authority to return an alien where there is a substantial claim that the removal would subject the alien to torture.

44

In Fiallo v. Bell, 430 U.S. 787 (1977), also applying the "facially legitimate and bona fide" standard, the Court was concerned with sections of the INA that had the effect of excluding the relationship between an illegitimate child and his natural father for special preference immigration status. The Court ruled that it was inappropriate for a court to inquire as to the justifications for the legislative decision. Fiallo did not concern executive action based upon secret documents.

In Nadarajah v. Gonzales, 443 F.3d 1069, 1082-83 (9th Cir. 2006), the court indicated that the "facially legitimate and bona fide" standard is generally applicable where the factual basis for the reason offered by the Attorney General is undisputed. In Nadarajah, both the IJ and the BIA had found that the alien was entitled to be paroled into the United States. The Government nonetheless denied the request for parole, asserting simply that he no longer satisfied the applicable criteria. The Government argued that the denial of parole should be upheld because its reasons were "facially legitimate and bona fide." The Ninth Circuit disagreed, finding that, because the government had "received a full hearing on its contention that Nadarajah was a security risk, and its evidence has been rejected," id. at 1083, the denial of parole would be set aside.

In this case, the Government has elected not to reveal the factual basis for its conclusion that the diplomatic assurance from Egypt is sufficiently reliable to offset the prior judicial determination that Khouzam is likely to be tortured. "[T]he availability of judicial

review . . . necessarily contemplates something . . . to review." Abdulai v. Ashcroft, 239 F.3d 542, 555 (3d Cir. 2001). Unsworn declarations that a written diplomatic assurance has been received leave nothing to review. As in Nadarajah, the Government has not provided an adequate factual record on which to premise a determination that it decision should be sustained, even under the narrow "facially legitimate and bona fide" standard of review.

The Government's position is that its finding that the diplomatic assurance is reliable is irrebuttable. Absent some empirical or logical basis for this presumption, however, it cannot be upheld. See e.g., Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 90 (2002). A decision on such an important matter as the likelihood of torture "cannot be sustained simply by invoking the State Department's authority." Ezagwuna v. Ashcroft, 325 F.3d 396-407 (3d Cir. 2003). Moreover, in assessing an irrebuttable presumption, the availability of less drastic means of achieving the objective is a pertinent consideration. See Aptheker v. Secretary of State, 378 U.S. 500, 514 (1964) (holding unconstitutional a legislative enactment making it a felony for a member of a Communist organization to apply for, use, or attempt to use a passport where means "more discriminately tailored to the constitutional liberties of individuals" were available).

In this case, the regulations promulgated by the Department of Justice afford a less drastic means of achieving the objective of complying with the non-refoulement obligation of FARRA, while promoting stable foreign relations with countries having a record for torture.

46

Specifically, 8 C.F.R. § 208.17(d) establishes a process for termination of deferral of removal based upon evidence "relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." 8 C.F.R. § 208.17(d). The Department of State is offered the opportunity to provide comments in connection with the application to terminate the deferral of removal. 8 C.F.R. § 208.17(d)(2). The IJ is then to make a *de novo* determination based upon the complete record, including the evidence submitted during the original hearing and the new evidence. 8 C.F.R. § 208.17(d)(3). Diplomatic assurances could be made part of the record on an application to terminate deferral of removal. Issues of confidentiality could be addressed by *in camera* proceedings.

The Government argues that it would be impossible to devise meaningful standards for effective review of the termination of deferral of removal based upon diplomatic assurances. The experience of the courts of other countries, however, serves to rebut the Government's contention. For instance, the Special Immigration Appeals Commission established by the United Kingdom identified the following as factors pertinent to the assessment of the reliability and sufficiency of a diplomatic assurance:

(I) The terms of the assurances must be such that, if they are fulfilled, the person returned will not be subjected to treatment contrary to Article 3;

(ii) The assurances must be given in good faith;

(iii) There must be a sound objective basis for believing that the assurances

47

will be fulfilled;

(iv) Fulfillment of the assurances must be capable of being verified.

BB v. Secretary of State for the Home Department, (2006) SC/39/2005 (Special Immigration Appeals Commission, Dec. 5, 2006).  In Mahjoub, supra, the court indicated that appropriate factors included the "'human rights record of the government giving the assurances, the government's record in complying with its assurances, and the capacity of the government to fulfill its assurances, particularly where there is doubt about the Government's ability to control its security forces.'" 2006 FC 1503 at ¶ 86.  The court also regarded as significant the existence of "an effective monitoring mechanism . . . ."  (Id. at ¶ 96.)

Our Government has identified factors that it says will be considered when evaluating diplomatic assurances, such as "the identity, position, or other information concerning the official relaying the assurances, and political or legal developments in the requesting state that would provide context for the assurances provided."  Response of the United States of America, List of issues to be considered during the examination of the second periodic report of the United States of America, http://www.state.gov/documents/organization/66172.pdf (last visited January 9, 2008). Other pertinent considerations include the requesting State's incentives and capacity to fulfill its assurances to the United States, as well as the importance of the requesting state maintaining an effective extradition relationship.  Also identified as a relevant factor is the

availability of "a monitoring arrangement."  Id.

A reviewing tribunal's role would be to assure that the pertinent factors were considered and that there was some evidence supporting the Executive Branch assessment.  This type of review is presently undertaken in connection with CAT claims adjudicated through the removal process. The Courts of Appeals do not re-weigh the evidence, but will overturn a denial of CAT relief where it is clear that relevant evidence about the risk of torture has been ignored.  See e.g., Zubeda v. Ashcroft, 333 F.3d 463, 477-80 (3d Cir. 2003).

It is unnecessary at this time to define the parameters of any review process.  As noted above, the regulations prescribe a process for termination of deferral of removal, and that process plainly would be adequate.  But that is not the only process that could be applied to satisfy the Fifth Amendment.  It is clear, however, that the "process" accorded Khouzam is not sufficient in that the risk of an erroneous determination is unacceptably high in relation to the important interests at stake.  It is also clear that additional procedural protections that would include giving Khouzam access to the diplomatic assurance and an opportunity to present his case to an impartial adjudicator would not be unduly burdensome.

Khouzam has not been given the requisite notice and opportunity to be heard with respect to the sufficiency of the Egyptian diplomatic assurance.  Accordingly, the Government's action in terminating the deferral of removal ordered by the Court of Appeals

49

for the Second Circuit due process and must be set aside.

### E.   Khouzam's Continuing Detention

Khouzam has now been held in detention for more than seven months since he was apprehended on the strength of a diplomatic assurance from Egypt.  In light of the government's refusal to expose the diplomatic assurances to the review of an impartial adjudicator, this Court has concluded that the Secretary of Homeland's termination of the court-ordered deferral of removal must be set aside.  As a result, Khouzam is now in the same position he occupied when Judge Cavanaugh of the District of New Jersey ordered his release under conditions of supervision: there is no significant likelihood of his removal in the reasonably foreseeable future.

In denying Khouzam's request for release made after he was taken into custody at the end of May of 2007, the relevant BICE official relied upon the termination of deferral of removal as supplying Khouzam with cause to flee, observing that Khouzam had fled Egypt to avoid prosecution.  He also relied upon the alleged conviction *in absentia* as a reason for concluding that Khouzam poses a danger to the community if released.  (Exhibit 2 to Government's Brief in Opp. to Mot. to Compel Release, Dkt. Entry 36.)  Neither rationale can withstand scrutiny.

At the time of his release in 2006, Khouzam knew that the Government was attempting to obtain an Egyptian diplomatic assurance to effect his removal.  (See Tr. of

Proceedings before Judge Cavanaugh at 10, attached as Exhibit 4 to Petitioner's Reply Brief in Supp. of Mot. to Compel Release, Dkt. Entry 40.)  He plainly had ample motivation during the period of his release to abscond, but did not do so.  It is undisputed that Khouzam was released into the community for more than one year without incident, reporting to BICE authorities as required.  This fact belies the finding of a flight risk.  See Madrane v. Hogan, No. 1:05-CV-2228, 2007 WL 3145956, at *13 (M.D. Pa., March 26, 2007).  Furthermore, while the Government characterizes his departure from Egypt as flight to avoid prosecution, the previous findings of the IJ, BIA, and federal appeals court support the inference that he fled to avoid torture.

The allegation of a conviction *in absentia* does not suffice to show a threat to the safety of the community.  Khouzam has presented an uncontested affidavit that such convictions are obtained routinely in Egypt based upon a review of a written file, and that such convictions are often overturned when the matter proceeds to a trial *de novo*.  (Aff. of Gamal Eid, Esq., attached as Exhibit 1 to Petitioner's Reply Brief in Supp. of Mot. to Compel Release, Dkt. Entry 40.)

Removal proceedings have concluded in this matter.  The Government cannot detain an inadmissible alien indefinitely once removal proceedings have ended.  Clark v. Martinez, 543 U.S. 371, 386 (2005).  There is no basis for finding a significant likelihood that Khouzam will be removed in the reasonably foreseeable future.  Accordingly, Khouzam's motion for

release shall be granted, subject to the same terms and conditions that governed his release ordered by Judge Cavanaugh on February 6, 2006.

## III. CONCLUSION

The Government violated FARRA by terminating the court-ordered deferral of removal without following a process that would have accorded Khouzam a meaningful opportunity to be heard and which would have afforded review by the applicable Court of Appeals. Even if FARRA had not required that termination of deferral of removal be preceded by a process culminating in judicial review, the Government denied Khouzam due process in failing to provide him with notice and a meaningful opportunity to be heard in connection with the Government's reliance upon an Egyptian diplomatic assurance. Accordingly, the Secretary of Homeland Security's decision terminating the deferral of removal must be set aside. Because there is no significant likelihood of the removal of Khouzam in the reasonably foreseeable future, and there are no other circumstances justifying his continuing detention, his motion for release under reasonable conditions of supervision will be granted. An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMEH SAMI S. KHOUZAM, | : | |
| Petitioner | : | |
| v. | : | 3:CV-07-0992 |
| | : | (JUDGE VANASKIE) |
| THOMAS H. HOGAN, ET AL., | : | |
| Respondents | : | |

## ORDER

**NOW, THIS 10th DAY OF JANUARY, 2007,** for the reasons set forth in the

foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. The Petition for a Writ of Habeas Corpus is **GRANTED,** and the decision of the

Secretary of Homeland Security to terminate the court-ordered deferral of removal of the

Petitioner is **VACATED.**

2. Petitioner's Motion for Release from Custody (Dkt. Entry 31) is **GRANTED.**

Petitioner shall be released forthwith from the custody of the Bureau of Immigration and

Customs Enforcement under reasonable conditions of supervision, including, without

limitation, that Petitioner report to the Bureau of Immigrations and Customs Enforcement

facilities in York County, Pennsylvania in accordance with applicable reporting requirements.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge