IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMER MOHAMMON, et al., ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-2386 (RBW) |
| ) | |
| GEORGE W. BUSH, et al., ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR ORDER BARRING RESPONDENTS FROM REPATRIATING PETITIONER TO TAJIKISTAN AND TO PROVIDE COUNSEL FOR PETITIONER THIRTY-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO TO ANY OTHER COUNTRY**

Petitioner Abdullah Bo Omer Hamza Yoyej, a detainee at Guantanamo Bay, Cuba,[1] seeks an order barring the respondents from repatriating the petitioner to Tajikistan and compelling respondents to provide thirty days' notice to the Court and to petitioner's counsel before transporting or removing petitioner from Guantanamo Bay for the purpose of transferring him to any third country. For the reasons explained below, respondents hereby oppose petitioner's motion.

---

[1] The motion is filed on behalf of a petitioner identified as Umar Hamzayavich Abdulayev, who is identified in the petition for habeas corpus as Abdullah Bo Omer Hamza Yoyej, *see* Pet. for Writ of Habeas Corpus ¶ 246, and whom the respondents have identified as the detainee with Internment Serial Number (ISN) 257, *see* Resp'ts' Status Report and Resp. to Court's June 27, 2006 Order (dkt. no. 109) Ex. D at 2.
   The petitioner's motion states that the same petitioner is also known as Omar LNU (Last Name Unknown). *See* Petitioner's Motion at 1. However, the respondents have identified petitioner Omar LNU as a different detainee identified by ISN 222. *See* Pet. for Writ of Habeas Corpus ¶ 21; Resp'ts' Status Report and Resp. to Court's June 27, 2006 Order (dkt. no. 109) Ex. D at 1. Respondents construe the motion as being filed only on behalf of petitioner Abdullah Bo Omer Hamza Yoyej (ISN 257), and not on behalf of petitioner Omar LNU (ISN 222).

The United States has compelling interests in not serving indefinitely as the world's jailer in circumstances where other countries are ready and willing to take responsibility for transferees in accordance with their own laws, and in being able to repatriate or transfer detainees when continued detention by the United States is no longer a military necessity or appropriate. Further, the United States has adopted policies and procedures to guard against the transfer of Guantanamo detainees where transfer would raise unacceptable concerns regarding a detainee's treatment by the receiving country. Because the Court lacks jurisdiction over cases such as petitioner's, the petitioner has no likelihood of success on the merits. Petitioner's supposition that he may be mistreated if he is transferred is speculative, and cannot form the basis for injunctive relief. Petitioner additionally fails to make an adequate showing on other factors required for the extraordinary injunctive relief he seeks, controlling the timing of the repatriation or transfer of an alien enemy combatant during an ongoing, global armed conflict where such an injunction would interfere with the Executive's conduct of war-making and foreign policy. Indeed, this Court rejected a similar motion for relief in *Almurbati v. Bush*, 366 F. Supp. 2d 72, 82 (D.D.C. 2005) (Walton, J.). Accordingly, petitioner's motion should be denied.

## BACKGROUND

The habeas corpus petition in this case was filed on December 21, 2005, on behalf of a number of detainees held at Guantanamo Bay, including Abdullah Bo Omer Hamza Yoyej and his next friend, Fawzi Khaled Abdullah Al Audha.[2] Petitioner was previously determined by a

---

[2] Respondents reserve the right to challenge Fawzi Khaled Abdullah Al Audha's standing to serve as a next friend in this case. *See Whitmore v. Arkansas*, 495 U.S. 149 (1990).

Combatant Status Review Tribunal ("CSRT") to be an enemy combatant. *See* Second Decl. of Karen L. Hecker ¶¶ 2–3 (attached as Exhibit 1). Petitioner supposes that, at some point in the future, respondents might transfer him to his home country of Tajikistan or another country in which he might be mistreated. Thus, although the very purpose of this proceeding is presumably to achieve his release from detention at Guantanamo Bay, petitioner has moved for an order preventing his removal to Tajikistan and requiring that he be given advance notice of any other transfer.

Aside from the speculative nature of petitioner's belief as to what might happen to him in connection with a transfer, the factual premises of his motion are incorrect. As described in the declarations attached hereto as Exhibits 2 & 3, attested to by Clint Williamson and Joseph Benkert, for any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Williamson Decl. ¶ 4; Benkert Decl. ¶¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. *Id*. If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Benkert Decl. ¶ 6; Williamson Decl. ¶ 5-6. Once DoD initially approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned. *Id*. Such discussions include an effort to seek assurances (in every transfer case in which continued detention by the government concerned is foreseen) that the United States Government considers necessary and appropriate with regard to the country in

question. These include assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer. *Id.* Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and ensures that assurances are tailored accordingly if the nation concerned is not a party or other circumstances warrant.[3] *Id.*

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Williamson Decl. ¶¶ 6-8; Benkert Decl. ¶¶ 6-7. Recommendations by the Department of State are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the Department of State's annual Country Reports on Human Rights Practices) and the relevant Department of State regional bureau, country desk, or U.S. Embassy.

---

[3] The particulars of whatever discussions there might be between the Executive Branch and foreign countries in any specific case – including this one – are closely held within appropriate Executive Branch channels. The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Williamson Decl. ¶ 9; Benkert Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Williamson Decl. ¶ 9; Benkert Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to this country's ability to conduct foreign relations. Williamson Decl. ¶ 9.

Williamson Decl. ¶ 7. When evaluating the adequacy of assurances, Department of State officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Williamson Decl. ¶ 8. In an appropriate case, the Department of State may consider various monitoring mechanisms for verifying that assurances are being honored. *Id.* If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Benkert Decl. ¶ 7; Williamson Decl. ¶ 8. Indeed, circumstances have arisen in the past where DoD decided not to transfer detainees to their country of origin because of mistreatment concerns. *Id.*

In sum, the Executive Branch employs an elaborate inter-agency process for evaluating the propriety of transfers of Guantanamo detainees and implementing the United States' policy not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. That process involves senior level officials and includes consideration of the detainee's particular circumstances, an informed and well-rounded analysis of the current situation on the ground in the prospective transferee country, the input of various Department of State offices with relevant knowledge, personal interactions and negotiations with senior officials of the prospective transferee government, and consideration of assurances provided by the prospective transferee country, as well as their sufficiency and any mechanisms for verifying them. *See* Williamson Decl. ¶ 7 & *passim.*

## ARGUMENT

Petitioner's motion should be denied because it fails to satisfy the requirements for a preliminary injunction. It is well-established that preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). The irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Petitioner's motion fails to make the showing required to justify the grant of injunctive relief.

***Petitioner Is Unlikely to Succeed On the Merits.*** Petitioner cannot demonstrate a substantial likelihood of success on the merits because § 7 of the MCA clearly deprives this Court of jurisdiction. The D.C. Circuit recently held that on a motion by a Guantanamo Bay detainee in a habeas case to enjoin a transfer, the court is to consider the motion in the context of the traditional four-part balancing test applicable to injunction motions, but made clear that the question of a petitioner's likelihood of establishing jurisdiction is an appropriate point to be considered in applying that test. *Belbacha v. Bush*, No. 07-5258 (Mar. 14, 2008). The D.C.

Circuit's opinion does not preclude the Court from denying the present motion based on the fact that the Court's lack of jurisdiction makes success on the merits unlikely. The Court of Appeals held only that while the district court considers whether it has jurisdiction over a detainee's petition for habeas corpus, the Court can act to preserve its jurisdiction. *See id.*, slip op. at 4.

On October 17, 2006, the MCA was enacted. The MCA amended the habeas statute, 28 U.S.C. § 2241, adding a subsection (e) to provide that "[n]o court, justice, or judge shall have jurisdiction" to consider either (1) habeas petitions filed by aliens detained by the United States determined to be enemy combatants or awaiting such a status determination, or (2) any other action "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" of an alien who is or was so detained, except for the exclusive review mechanism in the Court of Appeals created under the DTA for addressing the validity of the detention of such an alien.[4] *See* MCA § 7(a) (emphasis added). This new amendment to § 2241 took effect on the date of enactment and applies specifically "to all cases, without exception, pending on or after the date of the enactment of this Act which relates to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." *Id.* § 7(b).

On February 20, 2007, the Court of Appeals held in *Boumediene* that the MCA plainly applies to all cases filed by aliens detained as enemy combatants, including pending habeas petitions such as this one, and withdraws all District Court jurisdiction over such cases,

---

[4] *See* DTA § 1005(e)(2)-(3) (as amended by MCA §§ 9-10). Section 1005(e)(2) of the DTA, as amended, states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.

including both habeas and non-habeas claims. *See* 476 F.3d 981, 986-88 & n.1; *id.* at 994 ("Federal courts have no jurisdiction in these cases."). The Court of Appeals also held that the withdrawal of habeas jurisdiction over pending cases did not violate the Suspension Clause because the alien detainees held at Guantanamo have no constitutional rights and because the constitutional right to seek habeas review does not extend to aliens held at Guantanamo. *Id.* at 988-94. Consequently, the Court of Appeals (1) ordered that the district courts' decisions on appeal be vacated and (2) dismissed the cases on appeal for lack of jurisdiction. *Id.* at 994.[5]

The Supreme Court granted *certiorari* in *Boumediene* on June 29, 2007, *see Boumediene v. Bush*, 127 S. Ct. 3078 (June 29, 2007), and heard argument on December 5, 2007. However, in light of the Court of Appeals' decision in that case, this Court should conclude that petitioner is unlikely to establish this Court's jurisdiction over the subject matter of his petition.[6] For that

---

[5] Petitioner cites *Rasul v. Bush*, 542 U.S. 466 (2004), in support of an exercise of habeas corpus jurisdiction by this Court. This case does not support petitioner's position. The Supreme Court's interpretation of the federal habeas statute in *Rasul* was superseded by the enactment of the DTA and MCA, which withdrew habeas corpus jurisdiction over cases brought by aliens held as enemy combatants and created an exclusive review mechanism in the Court of Appeals.

[6] Even prior to enactment of the MCA, the DTA invested the Court of Appeals with the same "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." *See* DTA § 1005(e)(2)-(3). This investment of exclusive jurisdiction in the Court of Appeals, independent of the MCA, deprived the district court of jurisdiction in cases challenging the detention of enemy combatants. *See, e.g., Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); *Laing v. Ashcroft*, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75, 78-79 (D.C. Cir. 1984) (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals); *cf. id.* at 77 ("By lodging review of agency action in the Court of Appeals, Congress manifested an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power."). In any event, with the enactment of the MCA, as the D.C. Circuit made clear in *Boumediene*, district court jurisdiction

reason alone, the present motion should be denied.[7]

Even if the Court were to look beyond its lack of jurisdiction, the petitioner still would fail to show a substantial likelihood of success on the merits for several other reasons. As the Court of Appeals explained in *Boumediene*, aliens detained at Guantanamo do not have rights under the U.S. Constitution. *See* 476 F.3d at 988-94. To the extent petitioner might want to base his request for relief on the Geneva Conventions, the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT"), or the United Nations Convention Relating to the Status of Refugees ("Refugee Convention"), he could not do so. Neither the CAT nor the Refugee Convention gives rise to judicially enforceable rights. *See, e.g., Castellano-Chacon v. INS*, 341 F.3d 533, 544 (6th Cir. 2003) (Refugee Convention); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition); *see also Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 194 (D.D.C. 2005) (Bates, J.) (rejecting petitioner's argument that the Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as a legal basis for prohibiting or limiting transfer of wartime detainees to other countries). And section 5(a) of the MCA, which provides that "no person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or

___

has been unambiguously withdrawn.

[7] Nor is the D.C. Circuit's June 7, 2007, order in *Al Ginco v. Bush*, No. 06-5191, any reason to rule in favor of petitioner here. The *Al Ginco* order merely noted that the district court "may consider in the first instance respondents' motion to dismiss and petitioners' motions to stay and hold in abeyance," without saying what result the district court should reach with respect to either of the motions. The D.C. Circuit in *Al Ginco* presumably expected the district court to resolve the motions in a manner consistent with its caselaw, including, of course, the ruling in *Boumediene*, which held that district courts lack jurisdiction over actions challenging the detention of aliens held as enemy combatants.

other civil action or proceeding to which the United States, or a current or former officer . . . is a party as a source of rights" in any civil court proceeding, precludes petitioner's reliance on those Conventions as providing a basis for court relief in this matter. *See Boumediene*, 476 F.3d at 988 n.5 (sections 5(a) and 7 of the MCA preclude habeas jurisdiction over Geneva Conventions claims).

Further, even if some valid legal basis existed for petitioner's request for an injunction, the separation of powers would bar such relief. "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch." *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)); *see also Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959))[8]; *Almurbati v. Bush*, 366 F. Supp. 2d 72, 75 (D.D.C. 2005) (Walton, J.) (discussing the importance of deference to the Executive Branch in military, national security, and other foreign policy matters). If the Court were to entertain petitioner's

---

[8] In *Holmes*, U.S. citizen-servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. *citizens*, the district court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

claim to a right to have conditions placed on repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters. Judicial review of a transfer or repatriation decision would involve scrutiny or second-guessing of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments regarding the state of diplomatic relations with a foreign government, the reliability of information concerning and representations from a foreign government, the adequacy of assurances provided and a foreign government's capability to fulfill them. Williamson Decl. ¶¶ 8-12. Second-guessing in such matters by the courts or others could chill important sources of information and interfere with or undermine our ability to interact effectively with foreign governments, including our ability to obtain the cooperation of other nations in the war on terrorism. *See* Williamson Decl. ¶¶ 8-12; Benkert Decl. ¶ 8.[9]

Accordingly, there is no basis in law for an injunction barring the repatriation or transfer of an alien enemy combatant, such as petitioner, during wartime. Thus, petitioner does not have a sufficient likelihood of success to favor an injunction imposing restrictions on his repatriation or transfer.

***Petitioner has not Demonstrated Irreparable Injury.*** Petitioner also has not carried his burden to show irreparable injury that is "certain and great . . . actual and not theoretical,"

---

[9] It is certainly beyond argument that the courts of the United States would have no authority to interfere with any decision of a foreign sovereign nation regarding detention or prosecution of its own national being returned to it pursuant to its own laws. *See Worldwide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-65 (D.C. Cir. 2002) ("The act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory.") (internal quotation marks and citation omitted). *Cf., e.g., United States v. Kin-Hong*, 110 F.3d 103, 110–11 (1st Cir. 1997) (expressing concern about inquiring into fairness of foreign nation's judicial system under "rule of non-inquiry").

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), by merely speculating that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States may repatriate or transfer petitioner under circumstances where he might be tortured. Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there. Williamson and Benkert Decls., *passim*. To implement this policy, the Executive Branch employs an elaborate inter-agency process for evaluating the propriety of transfers of Guantanamo detainees that involves senior level officials and includes consideration of the detainee's particular circumstances, an informed and well-rounded analysis of the current situation on the ground in the prospective transferee country, the input of various Department of State offices with relevant knowledge, personal interactions and negotiations with senior officials of the prospective transferee government, and consideration of assurances provided by the prospective transferee country, as well as their sufficiency and any mechanisms for verifying them. *Id*. Further, a transfer will not take place where concerns about the treatment of a detainee after transfer cannot be satisfactorily resolved. *Id*. To conclude that an injunction placing conditions on an intended transfer of petitioner is nevertheless necessary would require the Court to conclude that the United States' policies and practices are somehow a sham or pretext. There is no valid basis for such an assumption. *Cf. Almurbati v. Bush*, 366 F. Supp. 2d 72, 78 (D.D.C. 2005) (Walton, J.) (holding that respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit").

Petitioner also mistakenly posits that if he is transferred to another country, such a transfer would "strip this Court of its habeas jurisdiction." *See* Petitioner's Motion at 2, 8. Petitioner is, in essence, suggesting that the Court should paradoxically order the detention of petitioner – detention that, by hypothesis, the detaining authority would otherwise end – to be prolonged for however long his particular case might last, solely to enable the Court to rule on its legality. It turns the idea of habeas corpus – the object of which is release from United States custody – on its head to argue that, purely to preserve the Court's ability to issue a ruling, the custody attacked should be indefinitely maintained.

Accordingly, petitioner has failed to demonstrate irreparable harm justifying an injunction restricting or placing conditions on repatriation or transfer of the petitioner.

***The Balance of Harms Warrants Denial of the Injunction.*** While petitioner suggests that respondents would not be harmed by an injunction restricting repatriation or transfer of the petitioner, *see* Petitioner's Motion at 7–8, in fact consideration of the equities and the harm that would flow from such an injunction warrant that petitioner's motion be denied.

Petitioner's requested injunction entails serious and unprecedented harms that compel that it be denied. As explained *supra*, allowing for the second-guessing of a determination to repatriate or transfer petitioner would involve Court intervention into sensitive diplomatic matters and would interfere with or undermine the government's ability to conduct foreign affairs, interact effectively with foreign governments, and obtain the cooperation of other nations in the war on terrorism. *See* Williamson Decl. ¶¶ 8-10, 12; Benkert Decl. ¶ 8. *See also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing

with other governments"). Constitutional and public interests favor allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions such as detention of enemy combatants for the duration of hostilities[10] and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility. As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. *See People's Mojahedin Org.*, 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

*Al-Anazi*, 370 F. Supp. 2d at 199; accord Order, *Attash v. Bush*, No. 05-cv-1592 (D.D.C. Sept. 1, 2005) (Lamberth, J.) (denying a motion for an injunction requiring advance notice of transfer based on the grounds stated in the *Al-Anazi* case).

Here, petitioner asks this Court to impose a condition on the repatriation or transfer of an alien enemy combatant held outside the United States during wartime. Separation of powers and other public interests warrant the rejection of petitioner's request. *See Hamdi*, 542 U.S. 507, 531 (2004) (plurality opinion) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them.").

* * *

Accordingly, petitioner has not satisfied the requirements for preliminary relief barring

---

[10] *See Hamdi*, 542 U.S. 507, 518-19 (2004) (plurality opinion).

transfer of the petitioner to Tajikistan and requiring advance notice of any other transfer of the petitioner.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for an order barring transfer of the petitioner to Tajikistan and requiring advance notice of any other transfer of the petitioner be denied.

Dated: March 14, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

   /s/ James C. Luh
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar 347518)
TERRY M. HENRY
JAMES J. SCHWARTZ
JEAN LIN
ROBERT J. KATERBERG
ANDREW I. WARDEN (IN Bar 23840-49)
NICHOLAS A. OLDHAM
JAMES C. LUH
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4938
Fax:  (202) 616-8460

Attorneys for Respondents