IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JABBAROV OYBEK JAMOLIVICH[1]<br>(ISN 452)<br>  Petitioner,<br><br>*v.*<br><br>GEORGE W. BUSH, *et al.*,<br>  Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No. 05-2386-RBW** |

**MOTION FOR ORDER BARRING RESPONDENTS FROM REPATRIATING
PETITIONER TO UZBEKISTAN AND TO PROVIDE COUNSEL FOR PETITIONER
THIRTY-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF
<u>PETITIONER FROM GUANTÁNAMO TO ANY OTHER COUNTRY</u>**

On March 19, 2008, this Court entered an Order (dkt. 421) requiring Respondents to provide 30 days advance notice to a *Mohammon* petitioner, Umar Hamzayavich Abdulayev, of any intended removal from Guantánamo to any other country and for Respondents to specify the receiving country.[2] Because the facts and circumstances of Petitioner Jabbarov's case are indistinguishable from those of Petitioner Abdulayev, Mr. Jabbarov moves this Court to grant him the same relief.

Accordingly, pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), Oybek Jamoldinivich

---

[1] Respondents incorrectly identified Petitioner placing his last name first. Petitioner's correct name is Oybek Jamoldinivich Jabbarov. He is referred to as "Mr. Jabbarov" in the instant motion and accompanying exhibits.
[2] The Court also held in abeyance Petitioner's request for an Order barring Petitioner's repatriation to his native country where he feared persecution.

Jabbarov, ISN 452, respectfully moves for an order requiring Respondents to bar Petitioner's repatriation to Uzbekistan and to provide counsel for Petitioner and the Court with advance notice of any other intended removal of Petitioner from Guantánamo Bay Naval Station in Cuba. Respondents notified Petitioner in February 2007 that he was "approved to leave Guantánamo, subject to the process for making appropriate diplomatic arrangements for his departure." On information and belief, Respondents have contemplated or are contemplating the removal of Mr. Jabbarov from Guantánamo to Uzbekistan, where he is likely to be subject to torture and imprisonment without due process of law. Petitioner requests this bar to repatriation and requirement of advance notice to enable his counsel to prevent any removal from Guantánamo to a country where he is likely to be tortured and to preserve the jurisdiction of the Court in this matter. Further, the transfer of Mr. Jabbarov would strip this Court of its habeas jurisdiction. Petitioner's counsel has conferred with counsel for Respondents regarding this motion, and counsel for Respondents will oppose.

## FACTUAL BACKGROUND

Mr. Jabbarov is a citizen of Uzbekistan who has been detained as an "enemy combatant" without charge or trial at Guantánamo Bay Naval Station in Cuba for nearly six years. As detailed in the habeas petition he has filed, his detention is in violation of the Constitution, treaties and laws of the United States. Petitioner has reason to fear he will be transferred to a country where he will be tortured and/or imprisoned without due process of law.

A.   Petitioner's Background and Capture

Mr. Jabbarov was born on January 2, 1978, in Chortok, a city outside of Namangan, Uzbekistan. Decl. of O. Jabbarov ¶4, attached as Ex. A. Mr. Jabbarov attended school until the

2

age of 15, when he began working in markets selling auto parts, clothes, beer, vodka, and cigarettes. *Id.* Mr. Jabbarov served in the Uzbek national army and was discharged in December 1998. *Id.* Having no other job prospects, he traveled to Tajikistan to work with his older brother selling merchandise they bought in Uzbekistan. *Id.*. Unfortunately, shortly after arriving in Tajikistan, Mr. Jabbarov's passport and identification papers disappeared. *Id.* ¶5. Mr. Jabbarov now suspects his brother was fleeing from Uzbek authorities and took Petitioner's passport and identification to prevent him from returning to Uzbekistan where he might be taken into custody by police to force his older brother to return *Id.*

Indeed, after a few months in Tajikistan, Petitioner's mother arrived to warn her sons not to return to Uzbekistan. Decl. of M. Mone ¶¶5e-f, attached as Ex. B. At the time, Mr. Jabbarov was being treated in a UN hospital in Hoyit, having contracted Hepatitis C during a blood drive in the Uzbek army. *Id.* ¶5d. Mr. Jabbarov's mother explained that the police in Chortok had been harassing her for months by coming to their house demanding to know where her two sons had gone. *Id.* ¶5e. She was also taken to the police station and interrogated. *Id.* Mr. Jabbarov and his brother did not understand why the police wanted to speak with them, but they knew whoever went back to Uzbekistan would wind up in jail. *Id.* ¶5f. They decided to stay and live in Tajikistan since it was not safe to return home. *Id.*

Soon after Mr. Jabbarov was discharged from the hospital, he met his wife, a fellow Uzbek who was living in Tajikistan, and they were married in the fall of 1999. Ex. A, ¶6. Unfortunately, towards the end of 1999, the Tajik government forcibly deported hundreds of Uzbek refugees, including Mr. Jabbarov and his family, into Afghanistan. *Id.* ¶7. Eventually they settled in Mazar-e-Sharif, Afghanistan. *Id.* ¶8. To support his family, Mr. Jabbarov

3

traveled to the villages and towns around Mazar-e-Sharif and Sherbergan buying and selling goats, chicken, and sheep. *Id.*

In June 2001, Mr. Jabbarov became separated from his family as they left with a group of Uzbek refugees for Kabul while Mr. Jabbarov was away selling livestock. *Id.* ¶9. He traveled to Kabul and spent approximately two months trying to locate his family, eventually finding them in a small village east of the capital. *Id.* By that time, fighting had broken out between the Northern Alliance and the Taliban, backed by Al-Qaeda. *Id.* ¶10; Ex. B ¶5j. Mr. Jabbarov decided it would be best for his family to return with him to Mazar-e-Sharif. *Id.* However, because his wife was now pregnant with their second child, he decided that she should stay near Kabul, along with his mother, while he found a place for them to live in Mazar-e-Sharif. *Id.*

Mr. Jabbarov was not able to get through to Mazar-e-Sharif due to the fighting, and he found himself stranded at a roadside teahouse, just outside of Kabul. Ex. A ¶10; Ex. B ¶5k. He stayed there for weeks, waiting for the fighting to subside so that civilian vehicles could resume safe travel and he could arrange for a ride north. *Id.* One day, soldiers fighting for the Northern Alliance came to the teahouse. Ex. A ¶11; Ex. B ¶5l. They questioned Mr. Jabbarov and he explained to the soldiers that he was not a fighter but a refugee from Uzbekistan trying to get to Mazar-e-Sharif. *Id.* The Afghan soldiers told Mr. Jabbarov they could give him a ride to Mazar-e-Sharif. *Id.*

Mr. Jabbarov got into a Toyota Truck with the Northern Alliance soldiers, but instead of driving Mr. Jabbarov to Mazar-e-Sharif, they brought him to Bagram Air Base where he was immediately taken into custody by U.S. forces. Ex. A ¶11; Ex. B ¶5m. Mr. Jabbarov believes he was the victim of the large cash rewards being offered by U.S. forces in exchange for

4

"foreign fighters." *Id.* Notably, Mr. Jabbarov was taken into U.S. custody around the same time as the U.S. military was blanketing Afghanistan and Pakistan with leaflets offering handsome bounties for the capture of individuals associated with Al-Qaeda. *See, e.g.,* Mark Denbeaux & Joshua Denbeaux, *Report on Guantánamo Detainees: A Profile of 517 Detainees through Analysis of Department of Defense Data*, available at http://law.shu.edu/news_guantanamo_report_final_2_08_06.pdf, at 14-15; Joseph Margulies, *Guantánamo and the Abuse of Presidential Power*, at 69 (Simon & Schuster 2006).

Mr. Jabbarov was held at Bagram for approximately three weeks, during which time an American in civilian clothes told him not to worry and that he would be released since the U.S. was looking for Arabs. Ex. A ¶12. Mr. Jabbarov was then taken to a prison run by the U.S. in Kandahar. *Id.* Mr. Jabbarov was visited by the ICRC and repeatedly told them that he did not want to be sent back to Uzbekistan. Ex. B ¶5o. In June 2002, Mr. Jabbarov was put on a plane and taken to Guantánamo. *Id.* ¶5p. Shortly after arrival, an FBI agent interrogated Mr. Jabbarov and told him "you're a free man; you're not a problem" and to be patient while diplomatic arrangements were made for his release. Ex. A ¶13.

B.  Petitioner's Well-Founded Fear of Persecution and Torture Should He Be Repatriated to Uzbekistan.

Mr. Jabbarov had a frightening encounter with Uzbek security officers who came to Guantánamo in September 2002 to interrogate Mr. Jabbarov and the other Uzbek detainees. Ex. A ¶2-3; Ex. B ¶5q-w. The Uzbek interrogators called Mr. Jabbarov a "wahhabi," which is a pejorative term broadly used by Uzbek authorities to describe individuals they view as radical Islamic extremists, and they disparaged his attempts at practicing Islam while in prison. Ex. B, ¶5q. They questioned Mr. Jabbarov about the Islamic Movement of Uzbekistan ("IMU"), but

5

Petitioner told them he did not know anything about the IMU. Ex. A ¶2; Ex. B ¶5r. The Uzbek officials promised to send Mr. Jabbarov to jail for six (6) months upon his return from Guantánamo for the crime of "illegally" crossing the border into Tajikistan without a visa. *Id.* They made it clear that if he agreed to cooperate he would be spared prison, telling Mr. Jabbarov: "If you work for the government, you won't go to jail; if you don't work, you will go to jail… If you work for us, no one will ever see your file; we'll throw your file into the fire." Ex. B ¶5r.

The Uzbek interrogators showed Mr. Jabbarov a photo array and asked him if he could identify any of the individuals pictured, but when he could not recognize any of the faces, one interrogator banged his fist on the table and told him menacingly, "when you go back to Uzbekistan, you will know these things." *Id.* ¶5s. Mr. Jabbarov understood the security officer to mean that they would torture him until he told them what they wanted to hear. *Id.* The Uzbek security officers also implied that they could harm his family. *Id.* ¶5t.

On the second day the interrogators returned with a series of statements for Mr. Jabbarov to sign. *Id.* ¶5u. One of the statements included language stating Mr. Jabbarov wanted to return to Uzbekistan. *Id.* ¶5v. Mr. Jabbarov refused to sign this particular statement, which infuriated one of the Uzbek officials, who cursed him and his family. *Id.* The Uzbek security officers told Mr. Jabbarov that they wanted to take him back to Uzbekistan but that the Americans would not release him. *Id.* Since then, Petitioner has lived in fear that the U.S. government will change its mind and send him back to Uzbekistan where he will be killed. Ex. A. ¶¶3, 16; Ex. B ¶5x. During their visit to Guantánamo, the Uzbek security officers also threatened other Uzbek detainees, telling one detainee they would be waiting for him when he got back to Uzbekistan with "one bullet for your forehead." Ex. B. ¶5w.

6

    C.    <u>Petitioner's Fear of Persecution and Torture Upon Repatriation to Uzbekistan Is Supported by the Findings of Human Rights Organizations.</u>

Mr. Jabbarov's chilling encounter with Uzbek security services at Guantánamo in September 2002 is entirely consistent with the deplorable human rights record of the government of Uzbekistan. In November 2007, Human Rights Watch ("HRW") released a 90-page report on torture in Uzbekistan, concluding that torture and ill-treatment is endemic to the Uzbek criminal justice system. *See "Nowhere To Turn: Torture and Ill-treatment in Uzbekistan,"* at 1, available at http://hrw.org/reports/2007/uzbekistan1107/. The report details the cycle of abuse in the Uzbek criminal justice system that starts at the time of an individual's detention and continues through conviction or beyond to compel confessions or other testimony. Common methods of torture and ill-treatment favored by the Uzbek authorities include beatings with truncheons and bottles filled with water, electric shock, asphyxiation with plastic bags and gas masks, sexual humiliation, and threats of physical harm to relatives. *Id* at 2.[3]

In its report, Human Rights Watch specifically recommended that other stakeholders and governments "refrain from returning refugees, asylum seekers, or any other individuals to Uzbekistan if they have a well-founded fear of persecution or if there are substantial grounds for believing that they would be in danger of being subjected to torture or other ill-treatment upon return." *Id.* at 71. They also recommended that other governments "do not seek or accept any diplomatic assurances on torture and ill-treatment from the Uzbek government." *Id.* In addition, the United Nations Committee Against Torture ("UNCAT") released a highly critical assessment of Uzbekistan's human rights record in November 2007, concluding that torture and ill-treatment

---

[3] There is also a well known case were Uzbek police boiled a man to death. *See "Uzbekistan: Two Brutal Deaths in Custody,"* Human Rights Watch, August 10, 2002, available at http://www.hrw.org/press/2002/08/uzbek081002.htm

remain widespread and continue to occur with impunity. *See "Uzbekistan: UN Body Finds Torture 'Routine'"* available at http://hrw.org/english/docs/2007/11/23/uzbeki17406.htm.

Uzbekistan's deplorable human rights record would prove no mere abstraction for Mr. Jabbarov should he be forcibly repatriated by the United States. Melissa Hooper is an American lawyer with extensive experience Uzbekistan. Dec. of M. Hooper, Ex. C ¶1-6. In November 2004 Attorney Hooper moved to Tashkent to manage the Public Defender Program of the American Bar Association ("ABA"). *Id.* ¶1. When the Tashkent ABA office was forced to close in 2006, she continued to implement and oversee the ABA's Uzbekistan programs from Almaty, Kazakhstan, until April 2007. *Id.* Attorney Hooper reviewed Petitioner's case at the request of undersigned counsel. *Id.* ¶6. According to Atty. Hooper, Mr. Jabbarov would likely be made a target and an example by the Uzbek government should he have the misfortune of being forcibly returned to Uzbekistan. *Id.* ¶45.

> "He would likely be charged immediately with the fabricated offense of illegally crossing a border and face a secret trial, or a public trial with a judge controlled by the [National Security Service ("NSS")]. If he was not immediately detained, he would probably be disappeared, and would simply show up in detention after experiencing maltreatment or torture for several weeks. In detention he would experience mistreatment and beatings designed to coerce his false confession, and his cooperation in naming others to be arrested. His refusal to be an informant would result in more beatings and imprisonment on the false charges. As a religious person, an individual from Namangan, and an alleged member of the IMU, he would be targeted with severe treatment in prison, even torture, throughout his sentence. His religiosity would likely cause the government to charge him with additional offenses, either at the time of his initial detention or during his time in prison. These additional charges will be used to imprison him for an indefinite period of time. The torture he would likely experience as his prison sentence continued could result in his death. Deaths in custody due to torture, especially deaths of religious persons, are occurring in Uzbekistan with increased regularity." *Id.*

D.  Petitioner's Fear of Persecution and Torture Upon Repatriation to Uzbekistan is Corroborated by the Words and Deeds of the United States government.

The U.S. Department of State, in its *2006 Country Report on Human Rights in Uzbekistan*, available at http://www.state.gov/g/drl/rls/hrrpt/2006/78848.htm, was very critical in its assessment of the human rights record of Uzbekistan.

> "Although the constitution and law prohibits such practices, police and officers of the National Security Service ("NSS") routinely tortured, beat, and otherwise mistreated detainees to obtain confessions or incriminating information. Police, prison officials, and the NSS allegedly used suffocation, electric shock, deprivation of food and water, and sexual abuse, with beating the most commonly reported method of abuse. Torture and abuse were common in prisons, pretrial facilities, and local police and security service precincts." *Id.* at 2.

The State Department report also described how the Uzbek government has targeted pious Muslims who seek to worship in any organized fashion not sanctioned (or co-opted) by the state.

> "Any religious service conducted by an unregistered religious organization is illegal." *Id.* at 11.

> "Most Muslims arrested for religious reasons were tried for anticonstitutional activity and participating in 'religious extremist, separatist, fundamentalist, or other banned organizations,' a charge that encompasses both political and religious extremism. The overwhelming majority of those arrested on this charge were accused of Hizb ut Tahrir membership [an outlawed extremist political movement]. The government also arrested members of other groups that it broadly labeled Wahhabi. Individuals arrested on suspicion of extremism often faced severe mistreatment, including torture, beatings, and particularly harsh prison conditions, and were typically sentenced to between 7 and 12 years in jail." *Id.* at 11-12.

> "In past years the government's campaign against extremists resulted in official suspicion of more religiously observant (yet nonextremist) persons, including frequent mosque attendees, bearded men, and veiled women." *Id.* at 12.

The State Department report also noted that "authorities treated individuals suspected of extreme Islamist political sympathies … more harshly than ordinary criminals. There were credible reports that investigators subjected [these] pretrial detainees … to particularly severe interrogation. After trial authorities reportedly used disciplinary and punitive measures,

9

including torture, more often with prisoners convicted of extremism than with ordinary inmates." *Id.* at 2.

With a record such is this it is no wonder that, according to published reports, the U.S. government, in the wake of the May 2005 Andijon massacre, decided <u>not</u> to return three Uzbek prisoners deemed eligible for release from Guantánamo home to Uzbekistan because of the Uzbek government's deplorable human rights record.  *See* Charlie Savage and Farah Stockman, *Repatriation of Uzbeks From Guantánamo Halted*, Boston Globe, June 11, 2005, at A1. However, recent events suggest a thaw in relations between the United States and Uzbekistan, despite the relatively insignificant steps the latter nation has taken with respect to improving human rights.  *See* Joanna Lillis, *Uzbekistan: Amid Thaw with West, Debate Over Sanctions Intensifies*, Eurasianet Insight, available at http:www.eurasianet.org/departments/insight/articles/eav032408.shtml.

The conclusions made by the State Department in its *2006 Country Report on Human Rights in Uzbekistan* are consistent with the findings of Human Rights Watch and other NGOs and only serve to re-enforce the concerns voiced by Mr. Jabbarov.[4]  Yet, despite the grave and obvious risk, Respondents refuse to rule out repatriation to Uzbekistan for Mr. Jabbarov nor will they give any indication as to whether they are engaged in negotiations with any other countries for his resettlement.  *See* e-mail correspondence between counsel for Petitioner and counsel for Respondents, attached hereto as Ex. D.

---

[4] Uzbekistan's human rights record has not improved much since 2006 in the assessment of the U.S. Department of State.  *See Remarks on the State Department's 2007 Country Reports on Human Rights Practices*, available at http://www.state.gov/g/drl/rls/rm/2008/102116.htm (listing Uzbekistan among the world's top ten "most systemic human rights violators").

10

This is particularly troubling for Mr. Jabbarov, since he fears being returned not only to Uzbekistan, but to any country in Central Asia, including Russia or any of the former Soviet republics, since doing so would be tantamount to sending him back to Uzbekistan. Ex. B ¶5y. Reports concerning the forcible repatriation of Uzbeks attempting to escape their homeland by fleeing to neighboring countries in Central Asia is well documented. *See, e.g., "Uzbekistan: UN Body Finds Torture 'Routine'"* available at http://hrw.org/english/docs/2007/11/23/uzbeki 17406.htm (noting UNCAT's particular concern over "reports of forcible return of recognized refugees and/or asylum seekers from neighboring countries" and the lack of information about their "conditions, treatment and whereabouts" in Uzbekistan); U.S. Department of State *2007 Country Report on Human Rights in Uzbekistan*, available at http://www.state.gov/g/drl/rls /hrrpt/2007/100623.htm ("The [Uzbek] government pressured other countries to return forcibly Uzbek refugees who were under the protection of the Office of the UN High Commissioner for Refugees …").

## ARGUMENT

"Among the rights universally proclaimed by all nations…is the right to be free of physical torture." *Filartiga v. Pen-Irala*, 630 F.2d 876, 890 (2d Cir. 1980). Indeed it is well-settled that the ban on torture is *jus cogens*, in other words, "a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted." *De Black v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992). This core and basic norm of international law "may well restrain our government in the same way the Constitution restrains it." *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 941 (D.C. Cir. 1988).

Pursuant to the Article 3 of the Convention Against Torture, a convention to which the

United States is a signatory, the Senate has ratified, and which has been implemented in the United States:

1.   No State shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2.   For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant consideration including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

Convention Against Torture, Art. 3, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

"Congress implemented this obligation of non-refoulement through [Foreign Affairs Reform and Restructuring Act ("FARRA")], which provides that it is 'the policy of the United States not to expel, extradite or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.'" *See Khouzam v. Hogan,* 3.CV-07-0992, Memorandum, slip op. at 14 (M.D. Pa. Jan. 10, 2008) (Dkt. Ent. #72) (quoting FARRA, Pub. L. No. 105-277, Div. G. Title XXII, § 2242(a), 112 Stat. 2681, 2681-822 (codified as note to 8 U.S.C. § 1231)). Further, under the All Writs Act, 28 U.S.C. § 1651(a), the Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA,* 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Such an injunction can "preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

Here, each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction: (1) Mr. Jabbarov will suffer irreparable harm if the injunction

is denied; (2) little to no harm will be suffered by Respondents if the injunction is granted; (3) Mr. Jabbarov is likely to succeed on the merits of his claims; and (4) there is a clear public interest in preventing the U.S. Government from violating clear international and domestic laws prohibiting re-foulement. *See Al Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Mr. Jabbarov stands to suffer immeasurable and irreparable bodily harm at the hands of the Uzbek government if he is repatriated by the U.S. government. Unfortunately, Mr. Jabbarov fits the very profile of someone who will face persecution, arrest, imprisonment, and torture at the hands of Uzbek authorities. Ex. C ¶42. While he would like to practice Islam freely, even the most basic acts of wearing a prayer cap, keeping a beard, and going to mosque in the Ferghana valley, where he is from, are viewed with grave suspicion by the Uzbek security services. *Id.* ¶¶16, 28.

Even worse, the stigma attached to his prolonged detention in Guantánamo will follow him home with dire consequences. *Id.* ¶¶41-47. The U.S. government has accused Mr. Jabbarov of being a member of the IMU, as well as supporting al Qaida and fighting for the Taliban -- all of which he denies and for which no credible evidence has ever been proffered. But these accusations are tantamount to a death sentence if Mr. Jabbarov should ever fall into the hands of the Uzbek authorities. *Id.* ¶¶45, 47. Having been branded by the United States as an alleged member of an outlawed extremist group that is especially loathed by the Uzbek government, Mr. Jabbarov should expect to face the harshest legal, even extra-judicial treatment if returned to his country. *Id.* ¶43-44.

Further, transfer to another country, even if "only" for continued imprisonment, also

13

circumvents Petitioner's right to adjudicate the legality of his detention in this Court. By contrast, Respondents, who have already held Petitioner for more than six years, are asked only to follow this nation's obligations under the Convention Against Torture and provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo to a country other than Uzbekistan.

Petitioner is likely to succeed on the merits of his underlying habeas petition. He has properly invoked the jurisdiction of this Court. *See Rasul v. Bush,* 124 S. Ct. 2686, 2698 (2004). Further, recent developments in the Supreme Court support this conclusion. The Court granted certiorari and heard argument in December 2007 in *Boumediene v. Bush,* 06-1195, after initially denying certiorari. 127 S. Ct. 3078. In addition, because the Supreme Court may rule in favor of the detainees, this Court has the right to protect its jurisdiction by barring Respondents from transferring Petitioner to the custody of another country.

Both this Court and the D.C. Circuit have already issued orders requiring Respondents to give Guantánamo prisoners and their counsel advance notice of any transfer from U.S. custody and staying such transfers in other cases. For example, in *Abdah v. Bush,* this Court granted the motion of Yemeni petitioners for 30 days' notice of an intended transfer of petitioners from Guantánamo. No. 04-1254, 2005 U.S. Dist. LEXIS 4942 (D.D.C. Mar. 29, 2005). Similarly, in *Rohullah v. Gates,* this Court ordered the government to give Rohullah's counsel 30 days' notice before they transfer him from Bagram Air Force Base to Afghan custody. No. 06-1707 (D.D.C. Nov. 3, 2007). In *Alhami v. Bush,* 05-359 (GK) (D.D.C. Oct. 2, 2007), this Court stayed the transfer of another Tunisian prisoner back to his home country. The D.C. Circuit stayed the transfer of Ahmed Belbacha to Algeria in order to preserve its jurisdiction over the case while it considers Belbacha's appeal, which was ultimately allowed. *Belbacha v. Bush,* 07-

5258 (D.C. Cir. Dec. 31, 2007).

Again in *Belbacha*, __ F.3d __, 2008 WL 680637 (D.C. Cir. March 14, 2008), the Court of Appeals for the D.C. Circuit specifically addressed preliminary injunctive relief and concluded that courts facing the same jurisdictional issues as those raised in *Boumediene v. Bush*, 476 F.3d. 981 (D.C. Cir. 2007), cert. granted, 127 S. Ct. 3078 (June 29, 2007) could consider such relief so long as moving parties satisfied the four-factor criteria for issuing preliminary injunctions.

Accordingly, on March 19, 2008, this Court granted Petitioner Abdulayev's Motion requiring Respondent's to provide the Court and counsel for Petitioner thirty-days notice of any intended removal of Abdulayev from Guantanamo to any other country and that Respondents must specify the receiving country. [dkt. 421]. In granting the motion, the Court ruled within it jurisdiction consistent with *Belbacha*. __ F.3d __, 2008 WL 680637 (D.C. Cir. March 14, 2008). The Court weighed the factors for preliminary injunctions, as it had previously done in *Almurbati v. Bush*, 366 F. Supp. 2d 72 (D.D.C. 2005), and concluded that Petitioner Abdulayev was likely to suffer irreparable harm if relief was not awarded. The facts from that case are indistinguishable from the facts here, except that Petitioner Abdulayev is from Tajikistan, while Petitioner Jabbarov is from Uzbekistan, a country with an even worse record for human rights abuse and widespread use of torture.

In any event, any such transfer would also violate basic international legal norms embodied in the Convention Against Torture.

Finally, public policy favors barring Respondents from transferring Petitioner Jabbarov to Uzbekistan and is consonant with the United States' obligation under our own law and our obligations under international law. In addition, there is a clear interest in allowing a federal

15

litigant to be provided with a meaningful opportunity to prevent his transfer to the custody of those who would torture him and/or detain him indefinitely.

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, this Court should grant Petitioner's motion to bar Respondents from repatriating Petitioner to Uzbekistan and to give Petitioner's counsel thirty-days' advance notice of any intended removal of Petitioner from Guantánamo to any other country, and grant Petitioner any such other relief the Court deems appropriate.

Respectfully submitted,
Counsel for Petitioner:

Date: April 29, 2008

  /s/ *Michael E. Mone, Jr.*
Michael E. Mone, Jr.
(MA BBO No. 634607)
Michael E. Mone
(MA BBO No. 351680)
ESDAILE, BARRETT & ESDAILE
75 Federal Street
Boston, MA  02110
(617) 482-0333
(617) 426-2978 (fax)

*Of Counsel*
Barbara J. Olshansky
Gitanjali S. Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499