## DECLARATION OF MELISSA HOOPER

1.      I am an American lawyer and a United States citizen.   I graduated from the University of California at Berkeley's Boalt Hall School of Law in 1997.  After completing a Soros Fellowship and clerking for a Federal District Court for two years, I practiced law in California for five years, representing foreign nationals on death row in post-conviction state and federal habeas appeals.  In November 2004 I moved to Tashkent, Uzbekistan, where I managed the Public Defender Program of the American Bar Association (ABA).  When the Tashkent ABA office was forced to close in 2006, I continued to implement and oversee the ABA's Uzbekistan programs from Almaty, Kazakhstan, until April 2007.

2.      I was hired by the ABA to manage programs in Uzbekistan that aimed to improve the skills of local criminal defense lawyers and increase access to counsel for indigent defendants.  Shortly after my arrival, however, I saw that the work of defense lawyers was a farce under the current regime.  President Karimov's repressive totalitarian government would in no way permit criminal defense lawyers to be on equal footing with the state, or even allow them to do their jobs properly, without risking arrest, interrogation, or worse. I saw that the fate of their clients, especially clients unpopular with the government, included regular exposure to torture for even perceived opposition or unproven law violations.  My work in Tashkent therefore shifted to address the human rights violations committed routinely – both within the criminal justice system as well as extra-judicially – as a means of "protecting the Uzbek state."

3.      In particular, I organized anti-torture workshops for lawyers and activists, developed trainings and materials for lawyers representing individuals charged with religious and political crimes, and assisted individual activists in obtaining independent, non-state-

1

sponsored counsel when they were charged with crimes related to their opposition – or perceived opposition -- to the government.   For two years, I worked with hundreds of criminal defense lawyers on issues related to improper detention, arrest, and interrogation, mistreatment and torture in detention, disappearances, and other human rights violations.  I trained and met with lawyers in the eight most populous regions of the country, including the capital of Tashkent and the most activist region of the country, the Ferghana Valley.

4.    I collaborated with members of international human rights and independent media organizations, such as Freedom House, Human Rights Watch, and Internews, to monitor trials of individuals charged with political and religious crimes, and to obtain independent counsel and other assistance for those charged.   I reported regularly to the ABA, the United States Department of Justice, the United States Department of State, and the United States Agency for International Development (USAID) regarding the deteriorating human rights situation in Uzbekistan and provided information to the British Embassy and the Swiss Embassy regarding individual cases as well as the general human rights situation.  I continued to work intensely with criminal defense lawyers and human rights workers in Uzbekistan to respond to human rights abuses until April 2007, when I returned to the United States.

5.    Since my return, I continue to follow the political situation within Uzbekistan through personal and professional contacts, as well as articles and news reports.  I am in contact with lawyers and human rights workers in the country, and receive weekly updates from a grassroots human rights collective in Tashkent called (in English) the Rapid Response Group.  I continue to consult with governmental and non-governmental organizations (NGOs) regarding developments within the legal system of Uzbekistan, and recently authored several chapters of a handbook on human rights in Uzbekistan. The handbook details the ways in which human rights

are blatantly violated by the government of Uzbekistan, and ways citizens and activists – and lawyers that represent them – can attempt to protect themselves from false charges, detentions, physical threats, and other forms of harm that are common. Freedom House will publish the handbook in 2008. I consult regularly on domestic and international legal matters involving Uzbeks and Uzbekistan.

6.      I have been asked by counsel for Mr. Oybek Jamoldinivich Jabbarov to provide information concerning the current political and legal situation in Uzbekistan. In particular, I was asked to comment on the Uzbek government's treatment of individuals who are perceived to be current or prior members of the Islamic Movement of Uzbekistan, and of individuals who practice Islam. I was further asked to detail what is likely to happen to Mr. Jabbarov if he is returned to Uzbekistan or any of the surrounding countries in Central Asia.

7.      Uzbekistan is an extremely repressive state that relies on the use of arbitrary detention practices and widespread torture to intimidate and control its citizenry. The most recent Country Report on Human Rights Practices for Uzbekistan, published by the United States Department of State in 2006, characterizes the state as an authoritarian regime wherein the centralized executive exercises nearly complete control over the other branches. Through the manipulation of a tightly controlled judiciary, the legal system is used as a tool of repression and control wielded by President Islam Karimov and the National Security Service. There is no freedom of religion, association, expression, or assembly. Independent journalists, even foreign journalists, are regularly harassed and imprisoned. Human rights defenders, religious persons, and members of opposition groups – including perceived members of these groups – are openly and continually targeted with repression, arrest, and very often torture. In 2006 and 2007,

Freedom House assigned Uzbekistan the lowest freedom rating possible on its Freedom Index: Not Free.

8.     The most recent election held in the country, the presidential election held on December 23, 2007, was a farce boldly implemented by President Islam Karimov, who has held power since the country gained independence in 1991.  Though his term was scheduled to end in 2005, a "popular" rigged vote of 91% in that year allegedly requested that he remain in power until 2007.  The presidential election, which by law is to be held in January, was put off until December of last year pursuant to another contrived outpouring of support.  The only candidates permitted to run against Karimov represented parties that differed only cosmetically from his own; all candidates publicly supported Karimov's candidacy over their own.

9.     It may be easiest to describe the legal system of Uzbekistan as an arm of the executive branch; its structure and substantive outcomes cannot be separated from the will of the executive branch or the enforcement arm of that branch, the National Security Service.  Essentially, as in many totalitarian regimes, the National Security Service (NSS) – the successor to the Soviet KGB – serves to control the population and strangle any dissent, criticism, or attempt to organize or civilly educate even small groups of citizens.  Arrests are commonly based on as little as the allegations of another citizen, or are the result of manufactured or planted evidence.  In many instances a neighbor or acquaintance of the targeted individual is pressured or bribed to make a false statement to police, which provides the basis for an arrest.  During unauthorized searches of an individual's home, police plant copies of banned religious literature as a means of charging an individual with religious or political crimes.  Police also commonly fabricate law violations in their records despite a complete absence of evidence of any crime.  That is to say, the police or NSS first choose whom they wish to arrest and charge, and then

4

determine on which charges the arrest will be based, not the other way around. The widespread,

and at times completely random, use of arrests without cause or disappearances leading to

incommunicado detention, are the government's calculated means of maintaining an extreme

level of fear, to ensure that no viable political opposition can exist or gain ground.

10.     Once an individual is arrested or detained in Uzbekistan, access to counsel is

entirely controlled by law enforcement, which regularly fails to inform family members or a

lawyer that the individual has even been taken into custody. Individuals may be kept in a

basement "jail" for days before anyone is notified that an arrest or detention occurred. The most

famous of these secret detention spots is the basement of the Tashkent Police Department – or

Ministry of the Interior. Interrogation without counsel is the norm, even while Uzbek law

provides otherwise. The overwhelming majority of criminal cases are "solved" through the use

of threats, coercion, and torture to obtain an extremely unreliable confession; nearly all cases

tried by prosecutors in Uzbekistan rely entirely on the defendant's so-called confession. Neither

the defendant nor his counsel has access to an investigator, the right to participate in the

investigation, the right to present expert testimony, or the right to have forensic evidence tested.

Indeed defense counsel is often arrested for interfering with an ongoing investigation if he

attempts to interview witnesses before trial.

11.     At trial, prosecutors wield complete power over judges, and have nearly perfect

conviction records in criminal cases nationwide. I personally witnessed a case in which

videotape evidence of torture of a juvenile was presented in a public trial. In response to defense

counsel's motion for an investigation of the torture allegations, the judge found no basis for an

investigation and no indication of torture; he baldly ignored the evidence that had just been

presented in plain view to a courtroom full of spectators. If a judge does not rule as dictated by

the NSS, the judge will lose his or her job, and may even be threatened with worse. Recently, an Uzbek judge fled the country and sought asylum at the UN because he feared retaliation after he dared to rule against the dictates of the NSS.

12.     Those most often targeted with this rough justice are individuals perceived to be against the government and those perceived to be religious – often one and the same. President Karimov's relationship with Islam and its followers is at best precarious, and at worst characterized by violence and brutality. His hardline policies grew out of the Soviet system, but also out of his own experience. In the early years of his presidency, a snub of religious leaders in the Ferghana Valley led to a widespread protest organized by a group called Adolat (Justice). To quell the demonstrations, Karimov agreed to meet with Islamic leaders there, and flew to the Valley immediately. The Adolat leaders presented demands for an Islamic center, the legalization of Islamic parties, and the establishment of an Islamic state in Uzbekistan. They spoke rudely to Karimov, who was also jostled by the crowd during the meeting. In response, Karimov acceded to the first demand, and promised to consider the others. However, after he was able to escape the confrontation and return to Tashkent, he had the NSS rout out all activists in the Ferghana Valley. Nearly seventy activists were arrested and the Islamic center in Namangan was closed. This humiliating confrontation was the defining moment in the development of President Karimov's relationship with political opposition couched in Islamic terms.

13.     Since the confrontation in Ferghana, the Karimov regime has sought to completely repress all expressions of Islam that are not expressly authorized, viewing independent religious practice as a fertile ground for political opposition. In the mid 1990s his administration justified this repression as an effort to preserve secularism. Beginning in 1998,

referring to the example of Tajikistan's civil war, it referred to the need to prevent terrorism. Today, the Uzbek government places its campaign against religious extremists within the context of the war on terror instituted in response to the events of September 11, 2001.

14.    As a result of Karimov's intense fear of any Islam-tinged political challenge, the government has, in recent years, imprisoned on "fundamentalism" charges thousands of individuals whose peaceful Islamic beliefs, practices, and affiliations fall outside strict government definitions or controls. Islamic study is restricted to a few designated and tightly-monitored institutions.  The call to prayer is banned.  The wearing of "religious clothing" in public is banned without further clarification, though the usual application of this provision is to prohibit the wearing of headscarves.  The teachings and sermons of imams must follow strict rules prescribed by state authorities, and must include regular statements of support for President Karimov.  Islamic religious officials are required to serve as government informants.  Any literature or publication that might be considered religious must be reviewed by the censorship agency of the Muslim Spiritual Board or the Committee on Religious Affairs, both government-run institutions, before publication.

15.    Anti-religion laws prohibiting proselytism have the effect of banning any discussion of religious matters, or any religious activity, not sanctioned by the government. Individuals who are not participating in a state-sanctioned Muslim prayer service cannot – without facing likely arrest – pray together in the same location, even if they do so in a private home.  They cannot openly discuss religious topics on the street or in a chaikhona, a teahouse used as a place for social gathering.  Reading religious literature or poetry, and listening to religious songs, other than those specifically prescribed by the state, is very risky behavior that provides cause for arrest.  The procedures for registering as a legal religious organization, which

7

would permit legal gatherings and discussion, are so onerous as to be impossible even with the use of bribes.

16.     The government fails to distinguish between those who advocate violence and those who peacefully express their religious beliefs, perceiving anyone who engages in independent practice as a threat and a fundamentalist – or "Wahhabist," a government misnomer used to describe an extremist who desires Islamic rule for Uzbekistan. Two common signs of "Wahhabism," according to authorities, are praying five times a day and wearing a beard. In 2006 several groups of two to nine men were put on trial for Wahhabism and participation in extremist religious organizations simply because they were devout Muslims who prayed regularly. As verified by both local and international NGOs, no evidence of any illegal activity was presented at the trials, while the court did rely on information about their regular religious activity in convicting them. Wearing a beard, while not prohibited by law, is exceedingly rare, even among Muslim men, because the government views it as the mark of a fundamentalist. Men who wear beards are regularly harassed, detained, and interrogated about their religious beliefs based solely on their appearance. Wearing a beard is understood as a sign of protest and opposition, and is considered a threat. In 2005, I witnessed bearded non-Muslim American tourists being harassed and interrogated by police solely because of their beards.

17.     Violations of religious laws has led to frequent arrests and persecution of even moderately religious persons. This is particularly true after the Andijan events of May 13, 2005. Many analysts suggest that the result of these policies has been only to increase support for banned religious organizations. Since most democratic or civil society avenues for expressing opposition to or criticism of the government have been completely shut off, citizens perceive these revolutionary or terrorist groups as the only opposition avenue available for expressing

8

discontent and obtaining relief.  In addition, the brutal treatment of individuals viewed as pious, religious, and non-violent, especially those working to alleviate the crushing poverty that is the result of Karimov's economic policies, contributes to a growing outrage.

18.     The government reserves its deepest hatred for members, or perceived members, of the Islamic Movement of Uzbekistan, the IMU.  The IMU, formed in 1997, is a jihadist group that the United States claims has links to Al Qaeda.  It grew directly out of Adolat, after the Adolat founders moved to Afghanistan and became radicalized.  The IMU has as its main purpose the violent overthrow of the Karimov regime.  It has made vague references to the establishment of an Islamic state in Uzbekistan, but has not made clear its intentions in this vein – as has another prohibited group, Hizb ut-Tahrir, which specifically seeks reestablishment of the Islamic caliphate that previously existed.  The IMU launched armed incursions into Uzbekistan in 1999 and 2000, engaged in kidnappings in Kyrgyzstan, and was blamed for bombings in Tashkent in 1999 and 2004.  The military leader, Juma Namangani, is believed to have been killed in Afghanistan in November 2001.

19.     The government relies on the IMU's prior activities – the bombings and kidnappings of 1999 and 2000 – to justify its truculent treatment of observant Muslims in the name of protecting Uzbekistan from extremists. However, most individuals arrested in pursuit of this goal are not charged with terrorism, and in many cases are not even charged with crimes related to their alleged religious or political activities.  In cases involving religion-based charges, evidence that a person prays five times a day is accepted in court as proof of an intent to overthrow the state, or proof that the individual is an extremist.  Where the arrestee is only moderately pious, and does not regularly pray or wear a beard, the use of "extremist" literature

planted by police or the NSS (often while other officers hold the person down) provides the evidence necessary for handing down a long prison sentence.

20.    Religious persons who become suspected members of extremist organizations such as the IMU have been forced to give confessions under torture, and their family members have been subjected to arrest, interrogation, and extortion.  While the government has always targeted individuals it suspects are members of extremist organizations, it stepped up repression in recent years.  The authorities followed the wave of 2004 bomb attacks – never claimed by the IMU– with a new crackdown against religious Muslims and alleged IMU members.

21.    The political situation in the country, already disastrous, became horrific in 2005 after a major clash between citizens and the government that occurred on May 13 of that year. On that day, in the city of Andijan, gunmen attacked government buildings, killed security officials, broke into the city prison, took over the local government (hokimiyat) building, and took several state officials hostage.  The trigger for the attacks was the trial of twenty-three respected local businessmen for religious extremism, charges widely viewed as false and unfair. At the time of the attacks, thousands began protesting poverty and government repression in a public square.  In response, government forces sealed off the square and started shooting indiscriminately, ambushing fleeing citizens and firing at them without warning.

22.    The government claimed that only 187 individuals died in the massacre at Andijan, and that all of them were either government soldiers sent in to quell the unrest, or terrorists.  The government claimed variously that the events were initiated by Hizb ut-Tahrir or the IMU and that the uprising was planned and carried out with the support and weapons-sponsorship of the United States Embassy, foreign NGOs, and foreign media including the BBC. Independent investigations conducted by Human Rights Watch produced an extremely different

picture from that presented by the government, one that involved soldiers opening fire on hundreds of fleeing men, women, and children in various regions throughout the city, with witnesses reporting seeing at least 800 bodies.

23. The clampdown that followed these events was immediate and severe. From the government's perspective, the Andijan events provided a rationale for arresting, interrogating, and torturing any individual perceived to be even slightly religious, any individual who affiliates with religious individuals, or any individual perceived to be critical of the government. In this way, the Uzbek government justified its own "war on terror." However, rather than seeking to secure the safety of citizens, its methods sought to insulate and protect the power and control of the administration.

24. After the bombings in 2004 and the Andijan events in 2005, a politically unpopular or religious person is much more likely to be characterized as a member of the IMU, viewed as a threat to the government, and targeted with severe punishment. Human Rights Watch documented 194 religious believers convicted between May and November 2005. In November 2006 the United States Department of State added Uzbekistan to its list of countries of "particular concern" for violations of religious freedom. At present, arrests are commonly based on actions as innocent as affiliating with individuals who independently study Islam, carrying a Koran, or transporting religious poetry. Wiretapping, monitoring of email traffic, and the use of NSS officers to shadow or monitor physical movements and contacts are all common methods applied to individuals perceived to be government threats. I witnessed evidence of this monitoring repeatedly when the NSS interrogated my colleagues using information gained from their emails or phone conversations.

25.    To better control the religious community, especially the community in the Ferghana Valley, the government instituted a number of new laws after Andijan. It severely limited the number of people permitted to make the Hajj pilgrimage to Mecca each year, a pilgrimage that every devout Muslim must make at least once. All Muslims making the Hajj must use government sanctioned transportation, which requires that bribes be made to local as well as national officials. The cost of this transportation has also been set at 200 times the minimum monthly wage, making it unaffordable to most. Intended pilgrims must obtain permission from a local governing body called the mahalla committee, from the NSS, and from a special Hajj Commission. This multi-layered permit system works to prohibit anyone "suspicious" or out of favor with the regime from even leaving the country. Muslims in the Ferghana Valley are also specifically prohibited from praying five times a day, as Islam requires. Any individual caught praying regularly is likely to be arrested and held in incommunicado detention for questioning about his "Wahhabi" activities.

26.    The government has also specifically targeted individuals from the Ferghana Valley, which includes the regions of Ferghana, Namangan, and Andijan, where the events of May 2005 took place. This area, in particular the region of Namangan, is considered to be the most devoutly Muslim in all of Uzbekistan. It is also considered to be the most activist region, due in no small part to the Adolat-led clash with Karimov, but also due to numerous skirmishes with the head of state that have occurred since. The recent uprising in 2005 only contributed to the government's desire to repress and control the region.

27.    Forum 18, an international NGO that focuses entirely on issues of religious freedom, reports that 2007 saw increased harassment of religious persons, as well as an increase in the application of harsh prison sentences for religious activity in Uzbekistan. At the same

12

time, Forum 18 has seen an intensification of raids on religious worship services, fines, confiscation of religious literature, and deportation of foreign citizens engaged in peaceful religious activity. In May 2007, regional representatives of the Spiritual Administration of Muslims were ordered by the government to provide or allow constant surveillance and observation of all officially registered Islamic organizations.

28.    Once an individual is determined by the NSS to be "religious" he poses a risk in the eyes of the government. The most common way of dealing with this risk is to arrest or illegally detain the individual, and using threats, coercion, or torture, to force him to renounce his opinions and inform on other "extremist" persons. These arrests are accomplished through various illegal means. Police very often plant prohibited religious literature or pamphlets on individuals in order to secure their arrest. They arrest individuals for carrying books that are deemed "banned" even though no such list of banned books or literature exists, making the decision regarding the offensive nature of the reading materials a completely subjective determination. For example, Gulbahor Turaeva, a woman critical of the government's factual assertions regarding Andijan, was arrested and imprisoned in January 2006 for possessing "banned" religious materials. The offending materials consisted entirely of books of poetry.

29.    Once convicted and serving their time, religious and political prisoners suffer particularly harsh treatment in a prison system known for terrible conditions and the rampant use of torture. The Jaslyk prison camp is notorious for its extremely harsh conditions of over-crowding, starvation, and ill-treatment of religious prisoners. Inmates, particularly those sentenced for their religious beliefs, are often subjected to abuse or torture, and Human Rights Watch has documented a number of torture-related deaths in custody during the last few years. Prisoners are forced to sign statements begging President Karimov for forgiveness, renouncing

their faith, and incriminating themselves as terrorists, which can add prison time to their sentence. A recent trend documented by the Rapid Response Group of the Human Rights Movement of Uzbekistan (a local government-monitoring organization) also shows the government charging religious persons with proselytizing in prison, or violating unknown and unstated prison rules, which enables the state to increase the prisoner's sentence at will. Thus, the government ensures that it can postpone the release of religious persons or opposition figures indefinitely.

30.    It is widely known that torture is part of the foundation on which the Uzbek criminal justice system, and penological system, are based. The country has made no visible progress toward ending or curtailing the use of torture in pretrial as well as post-conviction detention despite widespread condemnation of the abuses and despite specific recommendations put forth in 2002 by United Nations Special Rapporteur on Torture Theo Van Boven. Trial monitors for international organizations continue to witness, and I myself witnessed, the routine sentencing of defendants to long prison terms based solely or predominantly on confessions obtained through torture, coercion, and other illegal means. A HRW report issued in November 2007 confirmed that torture remains endemic to Uzbekistan's criminal justice system. The report noted that persons charged with membership in banned extremist groups, such as the IMU and Hizb ut-Tahrir, are particularly targeted.

31.    Common methods of torture and cruel and inhumane treatment include beatings with truncheons and bottles filled with water, beating of the feet, electric shock, asphyxiation with plastic bags and gas masks, sexual humiliation, and threats of physical harm to relatives. Torture begins shortly after arrest, during pretrial detention, but does not end at the time of conviction. Those convicted of "extremism" charges continue to face torture and ill-treatment

throughout their sentences. Three recent cases of deaths in custody, all of which occurred at an Andijan prison in the Ferghana Valley, and all of which were documented by the Rapid Response Group, demonstrate that the Uzbek government is willing to torture people to death.

32.    The tactics used by the Uzbek government on targeted groups has become more varied and more serious in recent years. An attorney working with my program represented a well-known opposition figure in 2006, Sanjar Umarov, head of the Sunshine Coalition of Uzbekistan. Upon visiting Mr. Umarov in prison, this advocate found him naked, shivering, babbling, and covered in his own feces. He had been tortured so badly that he was unable to assist in his defense. He was eventually sentenced to 10 years in prison on economic charges. In January 2006, Bakhtior Abdukhalilov was forcibly disappeared. Forty-two days later his wife determined he had been arrested and charged with religious extremism. Bakhtior Khamroev, the head of a human rights organization in Jizzakh, was beaten in his apartment in August 2006 in front of two British diplomats and then denied medical attention by the local hospital. In early 2006, Kodirali Nishanboev was invited to the police station to give a statement, but was immediately detained and beaten with water bottles for several days until he signed a confession stating that he was a member of Hizb ut-Tahrir. When it was time to take him to the investigation prison, the reception guards refused to admit him because he was "looking too bad" after the beatings. Two members of the Human Rights Society of Uzbekistan in Syrdarya, Azam Farmonov and Alisher Karamatov, were arrested in April 2006 and held in incommunicado detention for a week, where they reported being tortured with suffocation and beatings with truncheons. They were sentenced in June 2006 to nine years imprisonment based on charges of extortion. Jamshid Karimov, an independent journalist, disappeared in September 2006 after visiting his mother. He was found to have been forcibly committed to a psychiatric hospital in

October, due to his journalistic activities. Mr. Karimov's family were targeted with intimidation by local officials, and had their phone service terminated after they alerted international NGOs of his disappearance.

33.    The use of falsified religious charges continues to increase. In 2006 in the regions of Tashkent and Namangan, there were several group trials of alleged Wahhabis and extremists. In these cases, groups of six, eight, nine, or fourteen defendants were tried together without differentiating the facts applicable to each. In several instances, a badly tortured "leader" was shown to the other members of the group to coerce their confessions prior to trial. Some defendants' confessions were coerced when they watched other prisoners being raped and were told they were next.

34.    A well-known activist, Umida Niyazova, was detained in January 2007 for allegedly smuggling her laptop into the country while it contained extremist and fundamentalist materials. The materials were in fact interviews of individuals from the Ferghana Valley regarding the facts surrounding the Andijan events. After intense international pressure for her release, applied by the Council of Europe, the European Union, the United States, and a committee of international activists, writers, and scholars, the government presented her public denunciation of the work of all international organizations with whom she had formerly affiliated, a statement undoubtedly obtained through coercion and possibly torture. Ms. Niyazova was then sentenced to seven years in prison.

35.    One recent attack on a perceived threat appears to use tactics even more direct and dangerous. Playwright and theater director Mark Weil, an Uzbekistani of Russian descent, was beaten to death outside of his apartment in September 2007. While no confirmation of the killers' motives can be obtained in a country lacking any independent press or independent

judiciary, it is widely feared that his extremely popular plays, which were thinly-veiled attacks on government repression, led him to be the victim of a political killing. Uzbek human rights workers, and religious persons, including members of my own staff, have often faced bands of men hired by the government to beat them in order to prevent their attendance at meetings or demonstrations, or to threaten their human rights or religious activities. The government now appears to have dropped the veneer of legitimacy with which it covered prior attacks on real or perceived opponents. Now it is concerned more with stamping out all threats, at any cost.

36.    The Uzbek government has not confined itself to eradicating all perceived opposition or sources of support for opposition groups within the country. Rather, it has waged an underhanded campaign to arrest and forcibly return religious and political individuals in neighboring countries as well. The Kazakh Human Rights Bureau and Human Rights Watch reported on collaboration between the Kazakh security service and the Uzbek government to illegally arrest, kidnap, and kill individuals sought by the Uzbek government as religious extremists with ties to the Andijan events. In November 2005 nine Uzbek nationals seeking refuge from religious persecution were forcibly returned from Kazakhstan to Uzbekistan without any legal process, to face trial on allegations that they belonged to a "Wahhabi" religious movement. In December 2005, the husband of Nigora Hidoyatova, head of the unregistered Uzbek opposition party Ozod Dehqonlar (Free Farmers), was shot to death after escaping north to Kazakhstan. The Uzbek government has also forced family members of refugees that fled east to Kyrgyzstan after the Andijan events to accompany government officials to the refugee camp. At the camp they were forced to plead with relatives to return to Uzbekistan in order to prevent threats to the safety of their families.

37.    In particular, anyone with links to the IMU is targeted by the Uzbek security service if he is known to be within Central Asia.  In August 2006 an ethnic Uzbek religious leader living in Kyrgyzstan was shot and killed by Uzbek security forces because they said he was suspected of having ties to the IMU.  Two other individuals that the Uzbek government alleged were IMU members were also killed in the raid.  Abductions of Muslims by the Uzbek security service in the border regions of Kyrgyzstan and Tajikistan are frequent and well-known. Some victims simply disappear, and some resurface in Uzbek prisons after weeks or months.

38.    Very recently, on October 24, 2007, ethnic Uzbek journalist Alisher Saipov was shot and killed in the Kyrgyz border city of Osh after running the publication of an Uzbek oppositionist newspaper for several months.  The Uzbek security service was linked to the attacks by local and foreign human rights organizations after government-sponsored newspapers had labeled Saipov an "enemy of the state of Uzbekistan."  This killing seems to indicate that the Kyrgyz government has given the Uzbek security officials carte blanche to pursue its enemies across borders.

39.    Tajik officials also complain of stray bullets being shot across the Uzbek-Tajik border by Uzbek border guards.  Relations between Tajikistan and Uzbekistan have suffered much tension since each gained independence, with each alleging that the other is harboring terrorists and religious extremists.  Tajikistan has recently tried and convicted several Uzbeks on charges that they were members of the IMU based on little evidence and Soviet-style show trials. Uzbeks found living in the country have been arrested and charged with spying for Uzbekistan if they have not petitioned immediately for Tajik citizenship.

40.     In a sign of close cooperation between Russia and Uzbekistan, Russia's Federal Security Service announced in March 2006 that it had extradited to Uzbekistan 19 suspected members of Hizb ut-Tahrir for trials based on religious extremism.

**Oybek Jabbarov's Well-founded Fear of Persecution**

41.     Oybek Jabbarov was alleged to be a member of the IMU when he was brought to the United States and imprisoned at Guantánamo Bay.  As Mr. Jabbarov described to his attorney Michael Mone, and as related in Mr. Mone's declaration, Uzbek officials who interrogated him at Guantánamo saw his prayer cap and accused him of being a "Wahhabi" – using that word. Before the interrogation even began, he was ordered to remove the cap because it was a sign of Islamic religious belief.  He was told he would not be able to wear a prayer cap in Uzbekistan; he would not be able to pray.  Interrogators told him that if he returned to Uzbekistan he should be ready to go to prison, and intimated that his family was not safe either.

42.     Mr. Jabbarov fits the profile of someone who will face harsh treatment if returned to Uzbekistan.  He has been alleged to have associations with the IMU, and labeled an IMU member.  Even if he is released from Guantánamo without being charged, the Uzbek government will still view him as a member of the banned organization that the government seeks to eradicate.  He was seen by Uzbek interrogators wearing a prayer cap and acknowledged to them that he practices Islam.  They have branded him a religious extremist.   This tag will now travel with him if he returns to his country.  It is unlikely that he will ever be able to convince the government otherwise.

43.     Although the IMU has not engaged in any incursions since 2000, the government continues to blame the IMU for all religious extremist activities in the region, including the 2004

19

bombings in Tashkent.  Other evidence cited by journalists, however, tends to show that the IMU

may be losing steam and weakening to a point that it lacks the power to carry out any threatening

activities.  Yet, the government's hatred of the organization remains, and anyone in any way

affiliated with the IMU is more than likely to face imprisonment, torture, and even death.  Since

Uzbek interrogators at Guantánamo labeled Mr. Jabbarov a Wahhabi and a member of the IMU,

it is clear that they consider him a threat.

     44.     As a "Wahhabi" and an alleged member of a banned extremist organization

seeking the overthrow of the Uzbek government, an organization especially loathed by the

administration, Mr. Jabbarov should expect to face the harshest legal, and even extra-judicial

treatment if returned to his country.  Indeed, Uzbek interrogators already promised him that he

would be imprisoned for the alleged "crime" of leaving Uzbekistan and traveling to Tajikistan

without proper documentation – though no visa, not even an exit visa, is required for travel

between these two states.  Specifically, Mr. Jabbarov was told that he could be imprisoned for

six months for this "crime" unless he chooses to work for the interrogators.  In that case, they

said, they would throw his "file into the fire."  As Mr. Jabbarov's declaration states, he was

shown a photo array of individuals and asked to identify them.  The officers were tacitly asking

him to inform on others to attempt to save himself, a common NSS tactic.  When he denied

having information about any of them, the interrogator pounded the table with his fist, saying

"You will know these things when we get you back to Uzbekistan."  The officers told him that

they could catch his family – a statement Mr. Jabbarov clearly and reasonably understood as a

threat to harm them if he himself did not cooperate with the government.  All of these threats are

typical methods used by the NSS:  the fabrication of crimes; the use of threats and cruel

treatment to obtain information, even false information, implicating other people; the use of

threats and cruel treatment to obtain a confession, cooperation or the prisoner's participation as

an agent of the government; imprisonment for minor fabricated offenses that turns into

protracted jail time; and the use of torture or inhumane treatment in prison that includes threats

and harm to the prisoner's family and physical harm that may lead to death.

      45.     Should Mr. Jabbarov have the misfortune of being forcibly returned to Uzbekistan

by the United States, he would likely be made a target and an example by the Uzbek

government. He would likely be charged immediately with the fabricated offense of illegally

crossing a border and face a secret trial, or a public trial with a judge controlled by the NSS. If

he was not immediately detained, he would probably be disappeared, and would simply show up

in detention after experiencing maltreatment or torture for several weeks. In detention he would

experience mistreatment and beatings designed to coerce his false confession, and his

cooperation in naming others to be arrested. His refusal to be an informant would result in more

beatings and imprisonment on the false charges. As a religious person, an individual from

Namangan, and an alleged member of the IMU, he would be targeted with severe treatment in

prison, even torture, throughout his sentence. His religiosity would likely cause the government

to charge him with additional offenses, either at the time of his initial detention or during his

time in prison. These additional charges will be used to imprison him for an indefinite period of

time. The torture he would likely experience as his prison sentence continued could result in his

death. Deaths in custody due to torture, especially deaths of religious persons, are occurring in

Uzbekistan with increased regularity.

      46.     For these reasons, Mr. Jabbarov is likely to face severe persecution, in the form of

interrogations, disappearance, torture, and death, if he were returned to Uzbekistan or any

country near Uzbekistan. The Uzbek government is likely to cross local borders and use

connections with regional security service organizations to cause the imprisonment, torture, or death of any individual considered an affiliate of the IMU.  This is certainly true of Mr. Jabbarov, according to the statements made to him by Uzbek interrogators at Guantánamo Bay.

47.    It is my opinion that any individual who is perceived to have ties to a prohibited organization, such as the IMU, no matter how tenuous or unfounded those ties are shown to be, who returned to Uzbekistan after being held at Guantánamo Bay and interrogated by the Uzbek government, would very likely face persecution, including the deprivation of work and income, detention, arrest, interrogation, inhumane treatment, threats and harm to their family, torture, and possibly even death.  The likelihood that such a person will be targeted will increase greatly if he is a practicing Muslim who continues to practice his faith while in Uzbekistan, especially if he does so in the Ferghana Valley.   For these reasons, I believe Mr. Jabbarov possesses a well-founded fear of persecution and torture if he returns to Uzbekistan.

48.    I declare, under penalty of perjury, that the foregoing declaration is true and correct and was signed by me in San Francisco, California, on February 6, 2008.


_____
MELISSA HOOPER