**Michael Mone**

| | |
|---|---|
| **From:** | Henry, Terry (CIV) [Terry.Henry@usdoj.gov] |
| **Sent:** | Thursday, December 06, 2007 1:37 PM |
| **To:** | Michael Mone |
| **Subject:** | RE: Jabbarov (ISN 452) v. Gates (CADC 07-1176) |
| **Attachments:** | Transfer Declarations.pdf |

Dear Michael:

The policies and practices of the government with respect to transfers of Guantanamo detainees are generally set forth in the declarations of Ambassador Williamson and Deputy Assistant Secretary of Defense Benkert, which are attached and have been filed in numerous Guantanamo detainee cases. As indicated there, transfer matters can involve sensitive diplomatic issues and responsibilities; thus, the government typically is not in a position to comment on whether, in light of its policies, it is in a position to transfer Guantanamo detainees to any particular country.

Regards,

*Terry M. Henry*
*Senior Trial Counsel*
*Civil Division, Federal Programs Branch*
*U.S. Department of Justice*
*Tel. 202.514.4107*

The information in this transmittal (including attachments, if any) is intended only for the recipient(s) listed above and may contain information that is privileged and confidential. Any review, use, disclosure, distribution, or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately and destroy all copies of the transmittal. Your cooperation is appreciated.

---

**From:** Michael Mone [mailto:michaelmone@ebelaw.com]
**Sent:** Thursday, December 06, 2007 12:35 PM
**To:** Henry, Terry (CIV)
**Subject:** RE: Jabbarov (ISN 452) v. Gates (CADC 07-1176)

Dear Terry,

Thank you for your reply.

Am I to understand from your e-mail that you cannot tell me whether or not the United States believes it is more likely than not that my client will be tortured if he is repatriated to Uzbekistan? If it is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured, why can't you tell me how this policy applies to my client?

Regards,

Michael Mone

1/4/2008

**From:** Henry, Terry (CIV) [mailto:terry.henry@usdoj.gov]
**Sent:** Thursday, December 06, 2007 10:54 AM
**To:** Michael Mone
**Cc:** Subar, Judry (CIV); Warden, Andrew (CIV); Loeb, Robert (CIV)
**Subject:** RE: Jabbarov (ISN 452) v. Gates (CADC 07-1176)

Dear Michael,

Thank you for your e-mail below outlining concerns about repatriation or transfer of Mr. Jabbarov. As the government has indicated in various court filings, it is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. We are not in a position to provide the additional assurances and information requested in your e-mail. As I indicated to you in our prior telephone conversation, however, I am happy to forward information such as that contained in your e-mail to the State Department and Department of Defense for their appropriate consideration in arranging any transfer of Mr. Jabbarov out of United States custody, and I have, in fact, forwarded your e-mail below to State and DoD. To the extent you may obtain additional information that would be relevant to the issue of any transfer of Mr. Jabbarov out of United States custody, please feel free to forward it to me or the other Department of Justice counsel copied above representing the government in the habeas litigation (Jud Subar, Andrew Warden, and me) or the Detainee Treatment Act litigation (Bob Loeb).

Thanks very much.

Sincerely,

Terry M. Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel. 202.514.4107

The information in this transmittal (including attachments, if any) is intended only for the recipient(s) listed above and may contain information that is privileged and confidential. Any review, use, disclosure, distribution, or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately and destroy all copies of the transmittal. Your cooperation is appreciated.

---

**From:** Michael Mone [mailto:michaelmone@ebelaw.com]
**Sent:** Monday, December 03, 2007 12:31 PM
**To:** Henry, Terry (CIV)
**Subject:** Jabbarov (ISN 452) v. Gates (CADC 07-1176)

Dear Terry:

I write to follow-up on our telephone conversation from last month.

By way of review, I represent Oybek Jamaldinivich Jabbarov (ISN 452), an Uzbek national who has been in U.S. custody for six years. In February 2007, I received notice from OARDEC that my client was "approved to leave Guantánamo, subject to the process for making appropriate diplomatic arrangements for his departure."

On August 14, 2007, I was finally able to meet with my client for the first time and he expressed to me in no uncertain terms that he does not want to be repatriated to his native Uzbekistan because he is afraid he will be killed upon his return. Since then I have tried to find someone at the State Department who could tell me the status of any "diplomatic arrangements" or negotiations concerning my client's transfer and whether Uzbekistan was being

1/4/2008

considered as a receiving country. Eventually, I spoke with Brian Roraff, the Uzbek desk officer, who referred me to Attorney Steve Pomper, who referred me to you.

In our conversation, you suggested I outline my concerns in writing, and that you would forward them to the appropriate individuals for their consideration.

My concern is that the United States will transfer my client to Uzbekistan, or some other country in Central Asia where Uzbek security will be able to grab him, and that he will be placed under arrest, tortured, and killed.

According to my unclassified notes from that first meeting, Mr. Jabbarov described how he was visited by Uzbek security officials during his first few months in Guantánamo. These officials told him he would be going to jail for at least six months upon his return to Uzbekistan for the crime of "illegally" leaving the country in 1999 without a visa (a total fabrication since no visa was required to travel between Uzbekistan and Tajikistan at the time), unless he agreed to "work" with the Uzbek authorities. When my client was unable to identify any individuals pictured in a photo array, one Uzbek official pounded the table with his fist and told him menacingly, "when you go back to Uzbekistan, you will know these things." The implication was clear to my client: when he got back to Uzbekistan, they would beat and torture him until he told officers what they wanted to hear.

My client is well aware, based on his time spent growing up in the Ferghana Valley, of what happens to people who are arrested and jailed in Uzbekistan. Unfortunately, the U.S. government has accused Mr. Jabbarov of being a member of the Islamic Movement of Uzbekistan, as well as supporting al Qaida and fighting for the Taliban – none of which is true, but it might as well be a death sentence for my client if he should ever fall into the hands of the Uzbek authorities.

His fear upon being returned to Uzbekistan is well founded. The deplorable human rights record of President Karimov's regime is well known and well documented.

Just last month, Human Rights Watch ("HRW") released a 90-page report on torture in Uzbekistan, concluding that torture and ill-treatment is endemic to the Uzbek criminal justice system. See Nowhere To Turn: Torture and Ill-treatment in Uzbekistan available at http://hrw.org/reports/2007/uzbekistan1107/. The report details the cycle of abuse that starts at the time of an individual's detention and continues through conviction or beyond to compel confessions or other testimony. Common methods of torture and ill-treatment include beatings with truncheons and bottles filled with water, electric shock, asphyxiation with plastic bags and gas masks, sexual humiliation, and threats of physical harm to relatives. There is also a well known case were Uzbek police boiled a man to death.

In addition, Human Rights Watch specifically recommended that other stakeholders and governments "refrain from returning refugees, asylum seekers, or any other individuals to Uzbekistan if they have a well-founded fear of persecution or if there are substantial grounds for believing that they would be in danger of being subjected to torture or other ill-treatment upon return." They also recommended that other governments "do not seek or accept any diplomatic assurances on torture and ill-treatment from the Uzbek government." (See page 72 of the HRW report).

Two weeks ago, the United Nations Committee Against Torture ("UNCAT") meeting in Geneva issued a highly critical assessment of Uzbekistan's human rights record, concluding that torture and ill-treatment remain widespread and continue to occur with impunity. The committee also highlighted for particular concern "reports of forcible return of recognized refugees and/or asylum seekers from neighboring countries" and the lack of information about their "conditions, treatment and whereabouts" in Uzbekistan. See Uzbekistan: UN Body Finds Torture 'Routine' available at http://hrw.org/english/docs/2007/11/23/uzbeki17406.htm.

The concerns voiced by these and other NGOs only serve to re-enforce conclusions made by the State Department in its 2006 Country Report on Human Rights in Uzbekistan, available at http://www.state.gov/g/drl/rls/hrrpt/2006/78848.htm. According to State Department's report,

1/4/2008

"[a]lthough the constitution and law prohibits such practices, police and officers of the National Security Service ("NSS") routinely tortured, beat, and otherwise mistreated detainees to obtain confessions or incriminating information. Police, prison officials, and the NSS allegedly used suffocation, electric shock, deprivation of food and water, and sexual abuse, with beating the most commonly reported method of abuse. Torture and abuse were common in prisons, pretrial facilities, and local police and security service precincts."

The State Department report also noted that "authorities treated individuals suspected of extreme Islamist political sympathies … more harshly than ordinary criminals. There were credible reports that investigators subjected [these] pretrial detainees … to particularly severe interrogation. After trial authorities reportedly used disciplinary and punitive measures, including torture, more often with prisoners convicted of extremism than with ordinary inmates."

Given the record outlined above, it is inconceivable to me that the United States government would even consider the possibility of returning my client to Uzbekistan. Nevertheless, I seek assurances from the United States government that Mr. Jabbarov will not be returned to Uzbekistan or any other country in Central Asia. I seek assurances that my client will not be transferred to any other country that engages in torture. I request an update on the status of any diplomatic arrangements or negotiations concerning my client's transfer out of Guantánamo. I would also like to know what countries the U.S. is considering as a possible destination for my client upon his release from Guantánamo. Lastly, I would like to speak with someone who is involved in this process to discuss these issues and to determine how I may be of assistance.

Thank you for your attention to this matter. I look forward to hearing from you.

    Sincerely,

    Michael E. Mone, Jr.

1/4/2008