*CLEARED FOR PUBLIC FILING*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JABBAROV OYBEK JAMOLIVICH**[1] **(ISN 452)** **Petitioner,** *v.* **GEORGE W. BUSH, *et al.*,** **Respondents.** | **Civil Action No. 05-2386-RBW** |

**PETITIONER'S REPLY TO RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR ORDER BARRING REPATRIATION TO UZBEKISTAN AND TO PROVIDE THIRTY-DAYS' ADVANCE NOTICE OF ANY TRANSFER FROM GUANTÁNAMO BAY**

Now comes the Petitioner and through undersigned counsel files this reply in support of his motion for an order barring respondents from repatriating Petitioner to Uzbekistan and to provide counsel for Petitioner thirty-days' advance notice of any intended removal of Petitioner from Guantánamo to any other Country.

Contrary to Respondents' assertion, Jabbarov's claim that he will face mistreatment and irreparable injury upon his return to Uzbekistan is not merely speculative. It is based on a report by the U.S. Department of State outlining the deplorable human rights record of Uzbekistan[2]; the findings of the United Nations Committee Against Torture[3]; the conclusions

---

[1] Respondents incorrectly identified Petitioner placing his last name first. Petitioner's correct name is Oybek Jamoldinivich Jabbarov. He is referred to as "Jabbarov" in the instant reply.

[2] *See 2006 Country Report on Human Rights in Uzbekistan*, available at http://www.state.gov/g/drl/rls /hrrpt/2006/78848.htm.

[3] *See "Uzbekistan: UN Body Finds Torture 'Routine'"* available at http://hrw.org/english/docs/2007/11/23/uzbeki17406.htm.

of the UN Special Rapporteur on Torture[4]; the reporting of various human rights group[5]; and on the promise made by Uzbek interrogators to the Petitioner in September 2002 that he will be jailed upon his return to Uzbekistan unless he agrees to "work" for them. (Mot. Ex. A ¶ 2). Petitioner's claim is also based on the fact that respondents have already repatriated other detainees under circumstances where they have been mistreated and tortured.

**A. Petitioner's Motion for an Order Barring Repatriation to Uzbekistan and for 30-Days' Advance Notice Order Satisfies the Requirements Governing Preliminary Injunctions**

Jabbarov's petition satisfies the requirements for a preliminary injunction. In granting petitioner's motion for a 30-day notice order, this Court has held that the four requirements for injunctive relief "interrelate on a sliding scale and must be considered in relation to one another, for if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Abdah v. Bush*, No. 04-1254, 2005 U.S. Dist. LEXIS 4942 (D.D.C. Mar. 29, 2005) (quoting *Serono Lab. V. Shalala*, 332 U.S. App. D.C. 407, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)). Given that Jabbarov satisfies each of the requirements for the relief sought, the existence of concrete evidence supporting Jabbarov's claim that he will suffer the most severe and irreparable harm coupled with the virtually non-existent burden to Respondents militate in favor of a grant of the order barring Respondents from repatriating Jabbarov to Uzbekistan and requiring 30-days' notice of any intended transfer from Guantánamo.

**1. Jabbarov's petition has a substantial likelihood of success on the merits.**

Injunctive relief may be denied only for failure to show a likelihood of success on the

[4] *See Statement of the UN Special Rapporteur on Torture Manfred Nowak to the 2nd Session of the UN Human Rights Council, Geneva, September 20, 2006,* available at http://www.unhchr.ch/hurican/nsf/o/57A079661D6696A1C12571F10046A4E5?opendocuemnt ("[T]he practice of torture in Uzbekistan is systematic…").
[5] *See, e.g., "Nowhere To Turn: Torture and Ill-treatment in Uzbekistan,"* available at http://hrw.org/reports/2007/uzbekistan1107/.

merits "if there are no circumstances under which Petitioners could obtain an order preventing a contemplated transfer." *Id.* at *15. (emphasis added). The following sufficiently demonstrates that this is certainly not the case here.

Jabbarov has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). For the United States Government to remove Jabbarov to any country that would afford no due process of law would deprive him of all Due Process protections and defeat the Court's jurisdiction. Given the subsequent proceedings before the Supreme Court in *Boumediene*, D.C. Circuit law is not at all settled to the effect that Guantánamo detainees have no access to this Court or are deprived of all rights under the U.S. Constitution and under international law.

Furthermore, this Court has held that "transfer of Petitioners without notice and leave of court is forbidden by Fed. R. App. P. 23(a), which requires that pending review of a decision in a habeas corpus proceeding…the person having custody of the prisoner must not transfer custody to another unless transfer is directed in accordance with this rule." *Abdah*, No. 04-1254, at 15-16. The purpose of this rule is to "prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in which a habeas petition is pending." *Id.* at 16.

A finding by this Court that the transfer of Jabbarov to Uzbekistan would raise unacceptable concerns about his health and safety would be in keeping with the State Department's findings of Uzbek human rights abuses and would, therefore, not interfere with Executive authority. Both the 2006 and 2007 State Department Country Report on Human Rights for Uzbekistan paint a stark picture of the criminal justice system and the widespread use of torture, and in and of themselves, are sufficient to support a finding by this Court that

preliminary relief is warranted.

Furthermore, Respondents' concerns about the possibility of this Court interfering with foreign affairs are unfounded given that Respondents have not alleged that Uzbekistan has expressed any particular interest in the extradition of Jabbarov or any other Uzbekistan detainee. Transfer of detainees to countries "ready and willing to take responsibility," (Yoyej Opp, dkt. no. 419 at 2), appear to be motivated by nothing more than the desire to dispose of detainees upon a finding that "detention by the United States is no longer a military necessity or appropriate." Foreign relations consequently are not implicated in this decision.

**2. Jabbarov will suffer irreparable injury if he is transferred to Uzbekistan without advance notice.**

Contrary to Respondents' allegations, Jabbarov's claim that he will face severe abuse and mistreatment upon his return to Uzbekistan is not merely speculative. Petitioner's frightening encounter with Uzbek authorities in September 2002, raise immediate and concrete concerns as to the kinds of torture and abuse Jabbarov would expect were he to be forcibly returned to Uzbekistan. Mot. Ex. A ¶2-3; Ex. B ¶5q-w; Ex. C ¶42-47 ("As a 'Wahhabi' and an alleged member of a banned extremist organization seeking the overthrow of the Uzbek government, an organization especially loathed by the [Uzbek government], Mr. Jabbarov should expect to face the harshest legal, even extra-judicial treatment if returned to his country" (Ex. C ¶44)).

Respondents maintain that it is the policy of the United States not to repatriate or transfer a detainee to a country when there is reason to believe that "it is more likely than not that the individual will be tortured there." (Yoyej Opp, dkt. no. 419. at 16). However, the Respondents' decision to repatriate former Guantánamo detainees to countries with poor human rights records, including the use of torture and other ill-treatment, raises serious questions about the implementation of this policy. For example, in 2004, despite criticism from the State

Department concerning credible reports in Russia that "law enforcement personnel frequently engaged in torture, violence and other brutal or humiliating treatment and often did so with impunity," Respondents repatriated seven detainees to Russian. *See "The Stamp of Guantánamo - The Story of Seven Men Betrayed By Russia's Diplomatic Assurances to the United States,"* Human Rights Watch, available at http://www.hrw.org/reports/2007/russia0307/. After enduring months of imprisonment under harsh conditions, the Russian detainees were released from Guantánamo only to be further harassed, abused and persecuted by Russian authorities. The HRW report concluded:

> "But one fact remains blindingly clear and is extensively documented in this report: Russian law enforcement agents hounded and abused these seven hapless men almost continuously after their return from Guantánamo, ending finally in the arrest or flight of almost all of them. Some endured mistreatment in detention that amounted to torture. Whatever promises of fair treatment were made by the Russian authorities, they clearly have been broken."
>
> "The U.S. government has triply wronged these men: first by detaining them without due process, second by returning them to Russia in violation of international law, and third in failing to follow and protest their mistreatment by Russian authorities after their return. In this last aspect, the Russian government of course bears the greatest and most immediate responsibility. But by branding these seven men "terrorist suspects," the U.S. government certainly rendered them more vulnerable targets for Russian abuse."

*Id.* at 3-4.

In addition, on June 17, 2007, the United States repatriated Abdullah Bin Omar from Guantánamo to Tunisia, based on diplomatic assurances that he would be treated fairly. *See "Ill-Fated Homecomings: A Tunisian Case Study of Guantánamo Reparations,"* Human Rights Watch, September 2007, at 1-5, available athttp://hrw.org/reports/2007/tunisia0907/. *Id.* The United States government did not provide Mr. Bin Omar's counsel with any notice of the transfer, despite his repeated requests that they provide information about any possible transfer. *Id.* The United States government ignored counsels repeated requests to meet with Mr. Bin

Omar before any transfer. *Id.* On the very day two colleagues of Mr. Bin Omar's counsel arrived in Guantánamo Bay in an attempt to meet with Mr. Bin Omar, the United States government flew him out of Guantánamo Bay to Tunisia. *Id.*

Upon landing in Tunisia, the Tunisians replaced the blindfold with a hood. *Id.* He was interrogated for days at the Ministry of Interior in Tunis where officials slapped him, threatened him with the rape of his wife and daughters, and shook him awake every time he started to sleep. *Id.* He was then brought before the military court that had convicted him in absentia. *Id.* He contested his prior conviction and was placed in pre-trial detention and taken to a prison outside of Tunis. *Id.* Upon arrival, Mr. Bin Omar was placed in solitary confinement for five weeks in a room he called his "tomb." *Id.* He told his Tunisian lawyer that things were so bad he would rather be back in Guantánamo. *Id.* Mr. Bin Omar continues to languish in prison and suffer abuse, despite promises of humane treatment from the Tunisian government which the United States relied upon in repatriating Mr. Bin Omar to Tunisia. *Id.*

It is hard to imagine how the Respondents could possibly rely on the diplomatic assurances of the Uzbek regime. On April 24, 2008, the European Court of Human Rights, in the *Case of Ismoilov and Others v. Russia* (Application no. 2947/06), rejected the Russian government's attempt to extradite a group of Uzbek men in reliance on diplomatic assurances from Tashkent. Specifically, the court stated at page 34 of its ruling:

> "Given that the practice of torture in Uzbekistan is described by reputable international experts as systematic … the Court is not persuaded that the assurances from the Uzbek authorities offered a reliable guarantee against the risk of ill-treatment."

Finally, the merits of Jabbarov's transfer to Uzbekistan are not immediately at issue in this motion. Even if Jabbarov decided not to challenge a transfer to Uzbekistan, irreparable harm is almost certain to result from his inability to prepare for his return to his home country.

Without appropriate notice, he will be unable to arrange for representation in a potential host country or to notify his family of his release. He would be left helpless and completely at the mercy of local authorities without any support from his family or local counsel.

**3. Respondents will suffer virtually no harm if Jabbarov's motion is granted.**

If the court is dis-inclined at this juncture to grant an order barring respondents from repatriating Mr. Jabbarov to Uzbekistan, then at least the requirement of 30-days' advance notice of a transfer from Guantánamo Bay will leave open the opportunity to protect Petitioner's rights if threatened by complete and extinguishing prejudice. Furthermore, an order requiring 30-days' advance notice will enable Jabbarov to notify his family, possibly hire counsel in the country to which he will be transferred, and possibly seek injunctive relief if it is warranted. We fail to see how granting Jabbarov's request for 30-days' notice of an intended transfer in and of itself would undermine Executive authority in any way as claimed by Respondents.

**4. A balancing of interest militates in favor of granting Jabbarov's notice motion.**

While a transfer of Jabbarov without prior notice raises serious and concrete concerns about his health and safety, the burden on Respondents in providing such notice are minimal at the most. Beyond that, public policy favors an Order barring repatriation to Uzbekistan and requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioners from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant – properly before the Court and represented by counsel – be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

**CONCLUSION**

For the reasons discussed above, the motion should be granted.[6]

Respectfully submitted,
Counsel for Petitioner:

/s/ *Michael E. Mone, Jr.*

Date: May 14, 2008

Michael E. Mone, Jr.
(MA BBO No. 634607)
Michael E. Mone
(MA BBO No. 351680)
ESDAILE, BARRETT & ESDAILE
75 Federal Street
Boston, MA 02110
(617) 482-0333
(617) 426-2978 (fax)

*Of Counsel*
Barbara J. Olshansky
Gitanjali S. Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

[6] Respondents raise the issue that Mr. Jabbarov has a duplicative habeas petitition pending before this court (05-cv-2112(RBW). Petitioner fails to see how this could warrant, on the merits, a denial of the instant motion. Nevertheless, in an effort to promote judicial economy, Petitioner is simultaneously moving to dismiss his habeas petition docketed as 05-cv-2112 (RBW), as duplicative.