CLEARED FOR PUBLIC FILING

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )

SANAD ALI YISLAM AL-KAZIMI )
(SANAD ALI ALKALIEMI), )
                                 )
                                 )
           Petitioner, )
                                 )  Civil Action No: 05-2386 (RBW)
                                 )
                                 )  <u>For Referral To Magistrate Judge Kay</u>
      v. )
                                 )  Hearing Requested
GEORGE WALKER BUSH, *et al.*, )
                                 )
           Respondents. )
_____ )

### PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL RESPONDENTS' LAWYER, THE DEPARTMENT OF JUSTICE, TO COMPLY WITH THIS COURT'S PROTECTIVE ORDER AND END ITS PRACTICE OF BARRING MEMBERS OF PETITIONER'S COUNSEL FROM APPLYING FOR SECURITY CLEARANCE

Martha Rayner (NY-MR-1423)
LINCOLN SQUARE LEGAL SERVICES
Fordham University School of Law
33 W. 60th Street, 3rd Floor
New York, NY 10023

Laura Alvarez, Mary A. Cox,
Elizabeth Hume and Andrew Kutas
Law Interns, On the Brief

Counsel for Petitioner

TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................... 1

III. JURISDICTION ...................................................................................................... 7

IV. ARGUMENT ........................................................................................................... 9

    A. Respondents' Lawyer's Wholesale Practice Prohibiting Law Students from Applying
    for Security Clearance Violates The Clear Language and Purpose Of The Protective
    Order.............................................................................................................................. 9

        1. Respondents' Lawyer's Practice Wholly Disregards The Protective Order's
        Definition Of Petitioner's Counsel ..................................................................... 9

        2. Respondents' Lawyer's Practice Undermines the Presumption of "Need To Know"
        Established by the Protective Order .................................................................. 11

        3. Respondents' Lawyer's Practice Violates A Core Objective Of The Protective Order,
        Which Is To Limit Respondents' Lawyer's Interference In The Attorney-Client
        Relationship........................................................................................................ 12

    B. Respondents' Lawyer's Practice Interferes With The Composition Of Petitioner's
    Counsel Thereby Undermining Petitioner's Right To Counsel ......................................... 13

    C. The Reasons Set Forth By Respondents' Lawyers At The Department Of Justice To
    Justify Their Refusal to Process Security Clearance Applications From Law Students
    Are Patently Baseless ................................................................................................... 14

        1. The Department of Justice's Argument that Law Students Should not be Cleared
        Because Their Involvement is Short-term is Incorrect and Arbitrary ........................... 14

        2. The Department of Justice's Argument that Processing Applications from Law
        Students would be Excessively Burdensome is Inaccurate ....................................... 17

        3. The Department of Justice has no Basis for Arguing that Law Students are
        Inherently Untrustworthy ................................................................................... 18

    D. The Department of Justice Incorrectly Relies on *Department of the Navy v. Egan* to
    Justify its Refusal to Accept and Process Security Clearance Applications from Law
    Students ...................................................................................................................... 18

    E. In this Instance Respondents' Lawyer's Dual Roles as Adversary and Security
    Clearance Decision-maker is Improper and Prejudicial to Petitioner ................................ 21

V. CONCLUSION ....................................................................................................... 23

## I. PRELIMINARY STATEMENT

Petitioner Sanad Ali Al-Kazimi ("Petitioner") respectfully moves this Court for an order to compel respondents' lawyer, the Department of Justice ("DoJ"), to comply with the Protective Order's definition of "petitioner's counsel" and end its practice of refusing to accept and process security clearance applications from law student members of petitioner's counsel.

## II. FACTUAL BACKGROUND

Mr. Al-Kazimi is a citizen of Yemen who, on information and belief, was rendered from imprisonment in the United Arab Emirates ("UAE") to imprisonment in Afghanistan by the United States and then detained by respondents at the United States Naval Base at Guantánamo Bay, Cuba ("Guantánamo"). He is a husband and father of four and has been in United States custody or constructive custody for over five years. *See* Decl. of Martha Rayner, Esq. ¶ 6 (June 6, 2008), *infra* Exhibit A [hereinafter Rayner Decl.]. Mr. Al-Kazimi is one of approximately 270 who remain of the over 770 men who have been detained at Guantánamo since 2001.

Mr. Al-Kazimi was captured in the UAE in January of 2003, far removed in time from the start of the war with Afghanistan in October of 2001 and far removed in place from the theater of that war. Mr. Al-Kazimi was subjected to physical and psychological torture and then rendered into the direct custody of the United States, likely the CIA. The CIA transferred Mr. Al-Kazimi to Afghanistan where he was held in the "Prison of Darkness" and further tortured. Mr. Al-Kazimi was transferred to Guantánamo on or about September 20, 2004. *Id.*

Mr. Al-Kazimi is one of over 160 men who collectively petitioned for a Writ of Habeas Corpus, which was filed on December 12, 2005 (dkt. no. 1-1). This filing challenges the legal and factual basis for petitioner's prolonged, indefinite detention. *See id.* Counsel from the

International Justice Clinic at Fordham University School of Law filed a Notice of Appearance for Mr. Al-Kazimi on April 27, 2006 (dkt. no. 20).

On January 11, 2006, this Court ordered all action in *Mohammon* stayed pending the jurisdictional ruling of the District of Columbia Circuit Court (dkt. no. 6).  On January 31, 2007, an order of this Court denied without prejudice all pending motions in the *Mohammon* Petition "until such time as the District of Columbia Circuit resolves the question of this Court's jurisdiction to adjudicate these cases" and "administratively closed" all cases in the *Mohammon* Petition due to jurisdictional questions raised by the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2636-37 (2006).  *See* Order (Jan. 31, 2007) (dkt. no. 324).  Moving separately from his co-petitioners, Mr. Al-Kazimi partially appealed this order on February 8, 2007 (dkt. no 335).[1]  The court of appeals, on October 11, 2007, ultimately issued an order holding the appeal in abeyance pending the outcome of *Boumedienne v. Bush* and *Al Odah v. United States*, Nos. 06-1195 and 06-1196, *reh'g granted* (U.S. Jun. 29, 2007).  *See* Order, *Al Sanani v. Bumgarner*, No. 07-5039 (D.C. Cir. Oct. 11, 2007), *infra* Exhibit I.

Cases within the *Mohammon* Petition gained new life in March of 2008, with the decision of *Belbacha v. Bush*, No. 05-2349, 2008 U.S. App. LEXIS 5486 (D.C. Cir. Mar. 14, 2008).  Prior to the *Belbacha* ruling, on March 13, 2008, this Court issued an order denying without prejudice all motions currently pending before this Court "until such time as the United States Supreme Court and the United States Court of Appeals for the District of Columbia Circuit resolve the question of this Court's jurisdiction to adjudicate these cases" (dkt. no. 415).  The next day, however, the court of appeals handed down its opinion in *Belbacha*, determining that the district court has jurisdiction to hear Belbacha's request to bar his transfer to Nigeria.  In light of

---

[1] On November 30, 2006, Mr. Al-Kazimi moved before this Court for factual returns (dkt. no. 231).  As this Court's January 31, 2007 order denied this motion without prejudice, Mr. Al-Kazimi appealed the denial of his Motion for Factual Returns on February 8, 2007 (dkt. no. 335).

*Belbacha*, this Court vacated the March 13, 2008 order as to two petitioners from the

*Mohammon* Petition who sought orders preventing their repatriation to their respective home

countries. *See* Order (Mar. 14, 2008) (dkt. no. 416) and Order (Mar. 14, 2008) (dkt. no. 417).

Through these orders, this Court acknowledged that it retains jurisdiction to hear certain requests

for relief connected to these habeas matters. As explained in section III, this Court retains

jurisdiction to adjudicate the within motion.

Although petitioner has not received a factual return in this case, the unclassified CSRT

Record (included in Exhibit J), provided by the government in petitioner's Detainee Treatment

Act case (*See Al-Kazimi v. Gates*, No. 07-1526), states that Mr. Al-Kazimi's Combat Status

Review Tribunal ("CSRT") was held on November 20, 2004. At this time, the Tribunal

confirmed what respondents had already decided: he was properly designated as an "enemy

combatant." That decision, however, was largely based on classified information. An

examination of the Certified Index to the Record (included in Exhibit J) reveals that the CSRT

Record consists of 91 pages of evidence, 65 of which are classified. Petitioner did not participate

in the proceedings, and because the CSRT process prohibits assistance of counsel, Memorandum

from Gordon England, Deputy Secretary of Defense encl. 1 § F.(5) (Jul. 29, 2004), no witnesses

were presented nor were arguments made on behalf of petitioner.

Respondents' sole justification for its continued detention of petitioner is the CSRT

outcome. Despite the many years respondents have had to investigate, prepare and bring war

crimes charges or criminal charges against petitioner, that has not happened to date and there is

no indication that respondents have plans to do so. *See* Rayner Decl.*, supra*, at ¶ 6. Thus,

respondents continue to imprison petitioner indefinitely, based predominantly on classified

information.

Petitioner is represented by Lincoln Square Legal Services ("LSLS"), a non-profit legal services organization staffed by second and third year law students working under the direct supervision of clinical professors at Fordham University School of Law. *Id.* at ¶¶ 1, 7. Like many law firms, Lincoln Square Legal Services is composed of numerous specialized divisions including Community Economic Development, Criminal Defense, Housing, Immigration and Securities Arbitration, among others. *Id.* at ¶ 7. One of those divisions, the International Justice Clinic ("IJC"), represents petitioner and one other client[2] imprisoned at Guantánamo. *Id.* at ¶¶ 1, 8. IJC students, under the direct supervision of the clinic director, Martha Rayner, engage in all aspects of litigation, including conducting legal research; drafting legal pleadings, motions, and briefs; strategizing and making decisions in all aspects of the case; communicating with opposing counsel on all issues related to the case; and conducting fact investigations. *Id.* at ¶ 9. In any one semester, nine to ten law students participate in the clinic under the direct supervision of one full-time clinical professor and, on occasion, another professor on a part-time basis. *Id.* at ¶ 10. Though most students participate in the clinic for one semester, typically one or two students participate for a full academic year and in the past, one student engaged in Guantánamo related work for two years. *Id* at ¶ 10. Thus, like associates in law firms, students greatly outnumber supervisors, perform the vast majority of the legal work and participate in the work for varying lengths of time. *Id.* at ¶ 11.

Under the Protective Order that governs counsel access to clients and establishes procedures for the handling of classified information in these Guantánamo habeas matters, law student members of petitioner's legal team are included in the Protective Order's definition of

---

[2] Mohammed Abdul Rahman Al-Shimrani, a petitioner in a habeas filing, *Al-Shimrani v. Bush*, No. 07-5204 (D.C. Cir. Dec. 27, 2007) (remanding to the district court, No. 04-CV-02249), and a petitioner in a DTA matter, *Al-Shimrani v. Gates*, No. 07-1213 (D.C. Cir. filed July 12, 2007).

"counsel." *See In re Guantánamo Detainee Cases*, 344 F. Supp. 2d 174, 177 (D.D.C. 2004).[3]

"Petitioners' counsel" is defined as "an attorney who is employed or retained by or on behalf of a

petitioner for purposes of representing the petitioner in habeas corpus or other litigation in

federal court in the United States, as well as co-counsel, interpreters, translators, paralegals,

investigators and all other personnel or support staff employed or engaged to assist in the

litigation." *Id*. at 177 ¶ 12.[4]

 Under the Protective Order, members of petitioner's counsel are required to be security

cleared before accessing classified information involved in Guantánamo habeas cases. *Id.* at

178.  In addition, petitioner's counsel is presumed to have a "need to know" classified

information for their own clients' cases and for related cases, and "counsel for all petitioners in

these cases . . . may share and discuss among themselves classified information to the extent

necessary for the effective representation of their clients." *Id.* at 179–80.  Those members of

petitioner's counsel who do not hold the requisite security clearance are required to submit an

application to the DoJ Litigation Security Division. *Id.* at 184

 Respondents' lawyers at the DoJ have seized the prerogative to determine which

members of petitioner's counsel may *apply* for security clearance.  The Court Security Officer

("CSO") will accept and process an application for security clearance upon approval by

respondents' lawyers. *See* Rayner Decl., *supra*, at ¶ 16.  When respondents' lawyer sanctions

acceptance of an application, the CSO then submits the completed application to a unit of the

---

[3] The Protective Order in this case was entered on June 27, 2006 (dkt. no. 66).
[4] Exhibit A of the same document uses similar language to define counsel: "An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in the United States District Court for the District of Columbia and who is admitted, either generally or *pro hac vice*, in this Court. Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation." *In re Guantánamo Detainee Cases*, 344 F. Supp. 2d at 184 ¶ II.B.

DoJ independent from the DoJ unit representing respondents, which next processes the application and determines whether clearance will be granted.  *See id.*

Petitioner's counsel immediately sought clearance upon filing petitioner's Petition for a Writ of Habeas Corpus.  *See* E-mail exchange between Andrew I. Warden, Attorney, DoJ, and Nicholas E. Mitchell, Legal Intern, Lincoln Square Legal Services (Nov. 14–17, 2005), *infra* Exhibit B [hereinafter Nov. 2005 E-mail Exchange].  Petitioner's counsel sought to submit clearance applications for lawyers, law students and an administrative assistant.  In response, respondents' lawyer provided security clearance applications and green-lighted the processing of applications for all attorneys and the administrative assistant, but categorically refused to allow law students from even applying, stating:

> We cannot agree to authorize the three legal interns to have access to classified information or to the secure facility in the GTMO habeas litigation.  Given the issues and information involved in these cases, we are not in a position to routinely permit such access by law students, legal interns, summer associates, and the like.  The three legal interns, of course, may participate in non-classified aspects of the cases as appropriate.

*See id.*[5]

Petitioner's counsel ultimately submitted security clearance applications to the Court Security Officer for two attorneys, but held back submitting an application for the administrative assistant determining that her role on the legal team did not require access to classified information.  *See* Rayner Decl., *supra*, at ¶ 17.  When another professor joined the clinic several months later, respondents' lawyer permitted the Court Security Officer to process his application

---

[5] It appears that the practice of refusing to accept law student applications emanates from respondents' lawyers rather than from respondents. Respondents have in fact permitted law students to apply for and obtain clearance in connection with their work in representing military commission defendant, Salim Hamdan. Those students also utilized that clearance for travel to Guantánamo. *See* Letter from Fordham's International Justice Clinic and Yale's Allard K. Lowenstein International Human Rights Clinic to Andrew Warden, Attorney, DoJ (Apr. 30, 2008), *infra* Exhibit D [hereinafter Joint Letter].

for security clearance. *Id.* Thus, in almost three years, only three applications for security clearance have been processed for petitioner's counsel.[6]

Since then, respondents' lawyers have maintained their position barring all law student members of petitioner's counsel from applying for security clearance. In response to an inquiry whether the DoJ would allow law students to apply for security clearance in connection with petitioner's DTA matter pending in the circuit court, the DoJ lawyer assigned to that matter asserted: "As a matter of policy, the Government does not provide security clearances to law students in cases involving detainees at Guantánamo." Respondents' DTA lawyer then referred petitioner's counsel to respondents' habeas DoJ lawyer. *See* Feb. 13, 2008 E-mail, *supra* n. 1.

In response to DoJ's indefensible position, on April 30, 2008, petitioner's counsel sent a joint letter with the Yale clinic, to respondents' lawyers in these habeas matters, in an attempt to persuade respondents' lawyers to reconsider their position in light of the Protective Order, their misreading of precedent, the gross appearance of impropriety and factually inaccurate pragmatic reasons. *See* Joint Letter, *supra* n. 5. The DoJ has declined to change its practice. *See* E-mail from Andrew I. Warden, Attorney, DoJ, to Ramzi Kassem, Clinical Lecturer, Yale Law School (May 16, 2008), *infra* Exhibit E.

## III. JURISDICTION

This Court has jurisdiction to enforce the Habeas Protective Order that governs this case. *See In re Guantánamo Detainee Cases*, 344 F. Supp. 2d 174, 176 (D.D.C. 2004). While this Court's jurisdiction to hear Guantánamo detainees' habeas claims is being decided by the Supreme Court in *Boumediene*, this Court retains authority to enforce the Habeas Protective

---

[6] In fact, one of the professors has since left Fordham Law School, but continues to utilize his security clearance in these Guantánamo habeas matters on behalf of two prisoners represented by the Allard K. Lowenstein International Human Rights Clinic's National Litigation Project at Yale Law School (the "Yale clinic"). *See* Decl. of Ramzi Kassem ¶¶ 10–11 (June 6, 2008), *infra* Exhibit G [hereinafter Kassem Decl.].

Order.  *See Hicks v. Bush*, 452 F. Supp. 2d 88, 98 (D.D.C. 2006) ("District Courts retain

jurisdiction over aspects of the case that are not involved in the appeal.").  When the Supreme

Court considered whether the Detainee Treatment Act of 2005 stripped federal courts of

jurisdiction to grant writs of habeas corpus, this Court continued to enforce the Habeas

Protective Order.  *See Adem v. Bush,* 425 F. Supp. 2d 7, 20 (D.D.C. 2006).  This Court reasoned

that the Protective Order governs issues that are distinct from jurisdictional questions that were

being litigated.[7]  Furthermore, this Court held that it had a responsibility to ensure that access to

counsel was not impeded in cases in which habeas jurisdiction remained with this court.  *See*

*Doe v. Bush,* No. 05-CV-1704, 2006 U.S. Dist. LEXIS 62000, at *17 (D.D.C. May 11, 2006)

("[T]he need to resolve questions regarding the logistics of counsel access will remain in issue,

even if the D.C. Circuit and the Supreme Court determine that the DTA applies to those habeas

cases currently pending in the District Court.").  Similarly, while the Supreme Court decides

whether §7(a)(2) of the Military Commissions Act ("MCA") has stripped federal courts of power

to grant the writ of habeas corpus for Guantánamo detainees who have been deemed "enemy

combatants," 28 U.S.C. § 2241(e)(1), petitioner requires enforcement of the Protective Order.

This court retains jurisdiction to enforce the Protective Order.[8]

     The recent case, *Belbacha v. Bush,* 520 F.3d 452 (D.D.C. Mar. 14, 2008), provides

further support for this court's jurisdiction.  In *Belbacha,* the Court of Appeals for the District of

Columbia held that, where the Supreme Court grants certiorari to review the circuit court's

---

[7] *See id.* ("access to counsel issues pursuant to the Protective Order do not implicate any jurisdictional questions currently pending") ("enforcing terms of the Protective Order does not pose a danger of exceeding the Court's jurisdiction").

[8] *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal...divests the district court of its control *over those aspects of the case involved in the appeal")* (emphasis added).  District courts retain jurisdiction over aspects of the case that are not involved in the appeal.  *See, e.g., United States v. Queen*, 433 F.3d 1076, 1078 (8th Cir. 2006); *Sec. Indust. Ass'n v. Board of Governors of Fed. Reserve Sys.*, 628 F. Supp. 1438, 1440 n.1 (D.D.C. 1986) (district courts retain jurisdiction to issue orders regarding injunctions).  *See also* 20 James Wm. Moore, *Moore's Federal Practice,* § 303.32[2][c] (3d ed. 2006).

determination that a district court lacks jurisdiction, a district court can act to preserve the status

quo, using its authority under the All Writs Act, 28 U.S.C. § 1651. *Id.* at 457. Respondents have

conceded this point. *See* Resp'ts' Opp'n to Mot. to Reinstate Mot. to Order Access to Counsel at

4 (Apr. 3, 2008) (dkt. no. 426) ("That holding has no application in this case, however, where the

Court is not being asked to enter injunctive relief to prevent action that would altogether defeat

arguable jurisdiction or that would preserve the status quo." (referring to the D.C. Circuit's

holding in *Belbacha* and arguing that *Belbacha* did not apply in the matter at issue because

petitioner sought to alter the status quo)). Here, petitioner seeks preservation of the status quo

through enforcement of a pre-existing order—the Protective Order—which controls counsel

access and the handling of classified information in these Guantánamo habeas matters.

## IV. ARGUMENT

### A. Respondents' Lawyer's Wholesale Practice Prohibiting Law Students from Applying for Security Clearance Violates The Clear Language and Purpose Of The Protective Order

#### 1. Respondents' Lawyer's Practice Wholly Disregards The Protective Order's Definition Of Petitioner's Counsel

The Protective Order clearly defines "petitioner's counsel" as "an attorney who is

employed or retained by or on behalf of a petitioner for purposes of representing the petitioner in

habeas corpus or other litigation in federal court in the United States, as well as co-counsel,

interpreters, translators, paralegals, investigators and all other personnel or support staff

employed or engaged to assist in the litigation." *In re Guantánamo Detainee Cases*, 344 F.

Supp. 2d 174, 177 (D.D.C. 2004). Those members of Petitioner's counsel who do not have

security clearance must apply for clearance to the Court Security Officer Litigation Division in

order to access classified information. *See id.* at 179–80, 184.

In response to Petitioner's counsel's request for security clearance applications for students requiring access to classified information relevant to petitioner's case, respondents' lawyer stated: "Given the issues and information involved in these cases, we are not in a position to routinely permit such access by law students . . . .  The [legal] interns may, of course, participate in non-classified aspects of the cases as appropriate."  Nov. 2005 E-mail Exchange, *supra*.  Respondents' lawyer provided no explanation for distinguishing between law students and the attorney and administrative assistant members of petitioner's legal team.

Respondents' lawyer's email response is inconsistent with the plain language of the Protective Order.  Protective Orders should be interpreted with a plain meaning understanding of the language.  *See Adem v. Bush*, No. 05-723, 2006 U.S. Dist. LEXIS 24512, at *12 (D.D.C. Apr. 28, 2006) ("The starting point for interpreting a court order is the plain meaning of the text.").  In *Adem,* this Court found that respondents' lawyer, the DoJ, misconstrued the clear terms of the habeas Protective Order when it attempted to interpret two identical clauses as mandating that habeas counsel make two separate showings of authority to represent a detainee.  This Court held that a plain meaning interpretation of those identical clauses in tandem indicated that counsel make only one showing of authority.  Here, the terms are much simpler: law student staff members are "other personnel or support staff employed or engaged to assist in the litigation." There is no other way to interpret this language.  Since law students fall squarely within the plain meaning definition of counsel under the Protective Order, the DoJ's practice of barring all law students from applying for security clearance violates the Protective Order.

Petitioner does not ask this court to interfere in the DoJ's security clearance determinations.  This court may choose to defer to the DoJ regarding the outcome of a security clearance application, but it is fully this court's province to enforce its own Protective Order—an order that clearly defines counsel in these habeas proceedings, who have a need to apply for

security clearance.  The DoJ cannot be permitted to change or modify the definition of counsel under the Protective Order by imposing a self-created practice that categorically refuses applications from bona fide members of petitioner's counsel that unquestionably meet the requirements of this Court's Protective Order.[9]

### 2. Respondents' Lawyer's Practice Undermines the Presumption of "Need To Know" Established by the Protective Order

The Protective Order also provides that petitioner's counsel has a presumed "need to know" classified information related to a client's case and for related cases, and "counsel for all petitioners in these cases . . . may share and discuss among themselves classified information to the extent necessary for the effective representation of their clients."  *In re Guantánamo Detainee Cases,* 344 F. Supp. 2d at 179-80.  Respondents may only challenge the "need-to-know" for good cause shown, and that determination will be made on a case-by-case basis.  *Id.* at 178.  This presumption recognizes the critical role that classified information has in these habeas cases—it is essential to know and have access to such information.  Yet members of petitioner's counsel cannot "know" classified information without the requisite clearance.  Those who are part of petitioner's counsel, who do not have clearance, are required to submit an application for such.  *See id.* at 184 ("Counsel who does not currently possess a Secret clearance will be required to submit an application for clearance to the Department of Justice, Litigation Security Division.").  Thus, by blocking applications of bona fide members of petitioner's counsel from the clearance application process, the DoJ has determined, directly contrary to the Protective Order's presumption, that petitioner's counsel does *not* "need to know" classified information.

---

[9] The government's proposed Protective Order for the DTA matters sought substantial changes from the habeas Protective Order, *see* Respondent's Motion for Entry of Protective Order, *Bismullah v. Gates*, No. 06-1197 (D.D.C. Aug. 25, 2006), yet did not seek to amend the definition of counsel.  The DTA Protective Order adopts substantially the same definition as the habeas Protective Order.  *See* Protective Order at 2–3 ¶ 3c, *Bismullah*, No. 06-1197, (D.D.C. July 30, 2007) ("'Petitioner's Counsel' includes a lawyer who is employed or retained by or on behalf of a Detainee for purposes of representing the Detainee in this litigation, as well as co-counsel, interpreters, translators, paralegals, investigators, and all other personnel or support staff employed or engaged to assist in this litigation."

**3. Respondents' Lawyer's Practice Violates A Core Objective Of The Protective Order, Which Is To Limit Respondents' Lawyer's Interference In The Attorney-Client Relationship**

This Court has acted to limit respondents' lawyer's interference with establishing and maintaining the attorney-client relationship. *Id.* at 175–6, 179–80. The Protective Order is rooted in *Al Odah v. United States,* 346 F. Supp. 2d 1 (D.D.C. 2004), where this court held, *inter alia,* that the Department of Defense's lawyers at the DoJ did not have discretion to limit Guantánamo detainees' access to their lawyers by monitoring attorney-client meetings and engaging in post hoc review of meeting notes. This court found that such measures inappropriately burdened the attorney-client relationship and that national security considerations raised by respondents could be addressed in other ways. *See id.* at 9 ("After considering the Government's proposed procedures in light of their impact on the attorney-client relationship, the Court finds that the Government's proposed procedures inappropriately burden that relationship.") This Court proposed alternative measures that appropriately addressed respondents' national security concerns. *See id.* at 13–14. Those measures led to the creation of the Protective Order that governs the handling of classified information in this case. *See Adem v. Bush,* 425 F. Supp. 2d 7, 11 (D.D.C. 2006) ("*Al Odah* set the parameters for the final Amended Protective Order and Revised Access Procedures . . . .").

Critical to the protocol for handling classified information is the requirement that petitioner's counsel must apply for, cooperate with the processing of and be granted secret level clearance. DoJ's decision to use its gate-keeper role to prevent core members of petitioners' counsel from following the very protocol mapped out by the Protective Order significantly dilutes the resources that can be brought to petitioner's representation, which directly impacts on the attorney client relationship. By blocking members of petitioner's counsel from applying for security clearance, respondents' lawyer seeks to impose a burden on the attorney-client

relationship which the Protective Order never contemplated and, by defining counsel broadly, in fact prohibits.

**B. Respondents' Lawyer's Practice Interferes With The Composition Of Petitioner's Counsel Thereby Undermining Petitioner's Right To Counsel**

By refusing to accept applications for security clearance from law students, respondents' lawyers are violating the Protective Order's procedures governing access to counsel. The Protective Order is grounded in the principle established in *Al Odah,* wherein this Court held that Guantánamo detainees are entitled to the assistance of counsel because they face distinct obstacles in presenting their legal claims before this court. *See id.* at 20. The Protective Order thus protects and facilitates petitioner's right to counsel by establishing procedures that provide for petitioner's access to counsel and counsel's access to classified information relevant to petitioner's case.[10]

Respondents' lawyer's practice interferes with petitioner's right to counsel by diluting petitioner's legal team. Petitioner's counsel is comprised almost entirely of law students who participate in all aspects of litigation. Thus, a practice that prohibits *all students* from participating vastly undermines the effectiveness of petitioner's counsel. Students provide the bulk of the labor in petitioner's representation; students, like associates at large law firms, carry a high level of responsibility that is instrumental to the daily operations of the clinic. Respondents' lawyer's practice of prohibiting students from even applying for security clearance thus prevents the core of his legal team from being able to access the information and documents

---

[10] *See In re Guantánamo Detainee Cases*, 344 F. Supp. 2d 174, 175–76 (D.D.C. 2004) ("The purpose of this Protective Order is to establish the procedures that must be followed by all petitioners' counsel, their respective petitioner(s), all other counsel involved in these cases, translators for the parties, and all other individuals who receive access to classified national security information or documents, or other protected information or documents, in connection with these cases . . . .").

that purportedly form the basis for respondents' detention of petitioner. This undermines

petitioner's counsel's ability to provide the assistance of counsel to which petitioner is entitled.[11]

**C. The Reasons Set Forth By Respondents' Lawyers At The Department Of Justice To Justify Their Refusal to Process Security Clearance Applications From Law Students Are Patently Baseless**

Respondents' lawyers at the DoJ attempt to justify their practice of refusing applications

from students by making claims about the nature of law students that are utterly without basis in

fact or law. They claim that law students should not have access to security clearance because

their involvement is short-term, because processing the applications would be excessively

burdensome to the DoJ, and because law students are inherently untrustworthy. These

justifications are completely baseless and do not warrant credence by this Court.

**1. The Department of Justice's Argument that Law Students Should not be Cleared Because Their Involvement is Short-term is Incorrect and Arbitrary**

The DoJ lawyers base their practice, in part, on the mistaken assumption that law

students' involvement in Guantánamo cases will be short-term. *See* E-mail from Andrew I.

Warden, Attorney, DoJ, to Ramzi Kassem, et al., Clinical Lecturer, Yale Law School (Aug. 10,

2007), *infra* Exhibit F [hereinafter Aug. 10, 2007 E-mail] ("[T]he government is not providing

security clearances to law students, legal interns, summer associates, and the like, *people whose*

*involvement in the cases is likely to be short-term.*" (emphasis added)). Law students are not *per*

*se* short-term participants; some law school clinics permit students to participate in Guantánamo

litigation for two years or more.[12] While most students participate in the International Justice

---

[11] Moreover, DoJ's practice violates petitioner's due process rights. The Supreme Court has stated that prisoners "must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds*, 490 U.S. 401 (1987). For the reasons described herein, DoJ's policy clearly represents an unjustifiable practice.

[12] The clinical program at Yale Law School allows students to participate during their first year. Therefore, a Yale Law student might participate in Guantánamo litigation for over two years. See Kassem Decl., *supra* note 6, at ¶ 7.

Clinic for a semester, some students participate for a year. One Fordham law student participated in IJC clinic work for two years. *See* Rayner Decl., *supra*, at ¶ 10.

Moreover, the potentially short-term nature of law student involvement is not unique to law students. The realities of law firm life require that associates and paralegals may be removed from Guantánamo litigation after only a matter of months. As the Protective Order does not state that attorneys, paralegals or other non-lawyer staff must agree to participate in the litigation for a minimum period of time in order to apply for clearance, the ban on law student applications due to the potential brevity of involvement is completely arbitrary.

This justification is especially disingenuous because law students have been granted security clearance for participation in military commissions. In 2004 two Yale law students received security clearances and traveled to Guantánamo to work with civilian defense counsel representing Salim Ahmed Hamdan at his military commission. *See* Kassem Decl., *supra* n. 6, at ¶ 9. The DoD, DoJ's client in these habeas matters, did not prohibit the issuance of security clearances to these law students in the context of a military commission proceeding, even though their involvement in the case might have been short-term and even though the students presumably had access to even greater amounts of classified material than is available thus far in Guantánamo habeas matters. As there is no logical distinction between law students who represent clients in military commissions and law students who represent clients in habeas litigation, the DoJ's arguments against permitting law students to apply for clearance in the habeas context run aground. The inconsistency between the practice of one executive agency, a respondent in this matter, and another executive agency, the respondents' attorney in this matter, is inexplicable, thereby revealing DoJ's "short-term" justification for its practice to be disingenuous.

15

The profound weakness of DoJ's position shines bright in light of the fact that executive agencies routinely clear students for summer internships that are extremely short-term, normally lasting a maximum of 12 weeks. Such programs include: State Department Interns,[13] National Security Agency interns,[14] USAID interns,[15] National Geospatial-Intelligence Agency interns,[16] and interns working at the U.S. embassy in China.[17] In fact, there are such programs within the DoJ that require security clearances. The FBI Honors Internship is a summer program which requires applicants to obtain a Top Secret Clearance.[18] The existence of these programs undercuts the DoJ's claim that it will not consider security clearance applications for those whose involvement with classified information is likely to be short-term. The DoJ's policy of refusing to clear law students in the context of this habeas litigation is completely arbitrary.

Finally, DoJ's practice presupposes bad-faith on the part of law school clinical professors by assuming that professors would indiscriminately submit large numbers of students for clearance regardless of each student's individual circumstances, anticipated time in the clinic and counsel's resource needs. In fact, the opposite is true: composing an effective legal team to provide zealous representation to petitioner requires careful planning. Supervising professors would, of course, use the utmost discretion in determining which student or students need to have access to classified information and thus need to apply for security clearance.

---

[13] *See* U.S. Department of State: The Selection and Clearance Process, http://www.careers.state.gov/docs/4.0_Student_Clearance.pdf (last visited June 2, 2008).

[14] *See* Student Programs at National Security Agency (NSA), http://www.nsa.gov/careers/students_1.cfm (last visited June 2, 2008).

[15] *See* USAID: Careers - General Counsel Internships, http://www.usaid.gov/careers/gcintern.html (last visited June 2, 2008).

[16] *See* Visiting Scientist Program, National Geospatial-Intelligence Agency (NGA), Academic Intern Position, http://orise.orau.gov/sep/needs/files/NGA-2007-02.pdf (last visited June 2, 2008).

[17] *See* U.S. Embassy, China: Employment Opportunities, http://www.usembassy-china.org.cn/beijing/jobs/ptr/082505faq.html (last visited June 2, 2008).

[18] *See* FBI HONORS INTERNSHIP PROGRAM, http://www.fbijobs.gov/231.asp (last visited June 2, 2008).

**2. The Department of Justice's Argument that Processing Applications from Law Students would be Excessively Burdensome is Inaccurate**

The DoJ incorrectly argues that processing security clearance applications from law students would result in an undue burden on the DoJ's resources. *See* Aug. 10, 2007 E-mail, *supra* ("Given the issues and information involved in the Guantánamo cases, *as well as the burdens associated with processing clearances*, the government is not providing security clearances to law students, legal interns, summer associates, and the like . . . ." (emphasis added)). First, nation-wide, only four law school clinics represent clients in these Guantánamo habeas cases.[19] Thus, the potential pool of applicants is rather small. Second, as the security clearance process creates formidable burdens for petitioner's counsel in many respects, there are strong incentives to limit the number of students who apply. Fordham's clinic has already demonstrated great restraint by submitting far fewer security clearance applications than were green-lighted by DoJ at the start of this litigation. *See* Rayner Decl., *supra*, at ¶ 17. Petitioner's counsel does not intend to abuse the clearance process by submitting unnecessary applications for security clearance. Such conduct would not only cause unnecessary burdens to DoJ, but needlessly delay the processing of applications submitted by other counsel seeking clearance in these habeas matters. Third, the DoJ has proven that they have ample resources to process security clearance applications for students involved in the many summer internships mentioned above. If the DoJ has sufficient resources to process applications so that student interns may be cleared for a summer or semester, it cannot argue that clearing law students for habeas litigation is impractical. The DoJ has already cleared hundreds of attorneys and support personnel for

---

[19] Fordham University ("International Justice Clinic"), Yale University ("Balancing Civil Liberties with National Security After September 11"), University of Texas at Austin ("National Security and Human Rights Clinic"), American University ("International Human Rights Law Clinic").

participation in this habeas litigation.  The addition of a very limited number of law student

applications does not impose a significant strain on DoJ's resources.

### 3. The Department of Justice has no Basis for Arguing that Law Students are Inherently Untrustworthy

There is no factual or logical basis for the DoJ's argument that law students as a class are

not to be trusted with classified information.  *See* Nov. 2005 E-mail Exchange, *supra* ("We

cannot agree to authorize the three legal interns to have access to classified information or to the

secure facility in the GTMO habeas litigation.  *Given the issues and information involved in

these cases, we are not in a position to routinely permit such access by law students, legal

interns, summer associates, and the like.*" (emphasis added)).  This argument is particularly

perplexing as law students are of various backgrounds, ages, and experiences; it is illogical to

deem them categorically untrustworthy.  Moreover, one could reason that the level of academic

rigor and intense scrutiny necessary for admission to American law schools makes law students

*especially* trustworthy.  In any case, there is no one category of person under the Protective

Order's definition of "counsel" that is inherently more trustworthy than another.  The entire point

of the security clearance application process is to investigate and make an individualized

determination.  DoJ routinely green-lights clearance applications for paralegals, interpreters and

various other non-lawyer participants in other petitioners' legal teams, Rayner Decl., *supra*, at ¶

20; there is simply no reason to single out law students as somehow more suspect or less worthy

*to apply* than persons in other non-lawyer categories.

### D. The Department of Justice Incorrectly Relies on *Department of the Navy v. Egan* to Justify its Refusal to Accept and Process Security Clearance Applications from Law Students

The DoJ mistakenly relies on *Department of the Navy v. Egan,* 484 U.S. 518 (1988), for

the proposition that it has broad discretion in protecting classified national security information,

and that this discretion includes the power to preclude law students from applying for security clearance. *See* Aug. 10, 2007 E-mail, *supra* ("As you know, the Executive's authority to control access to classified information is well settled. *See Dept. of Navy v. Egan*, 484 U.S. 518, 527 (1988)."). *Egan* holds that the Executive has broad discretion to determine if an individual security clearance candidate is fit to be trusted with classified information. *See Egan,* 484 U.S. at 526–28. *Egan* does not grant the DoJ, in its role as client advocate, the same broad authority to prohibit the submission and processing of applications by their adversary's counsel. The granting of clearance is certainly a matter of national security, but who may apply for clearance is controlled by the Protective Order entered in this matter and is not controlled by the broad executive discretion applied in *Egan.*

Permitting eligible, law student members of petitioner's counsel to apply for security clearance is not a national security issue. Whether, however, they are granted such security clearance is an issue of national security—petitioner does not contest the exercise of executive discretion during the security clearance evaluation process. This Court should not permit respondents' lawyers to cast the issue of denying law students the ability to apply for clearance as one of national security, implying there are grave consequences at stake. This motion does not seek to undermine DoJ's discretion to determine whether an individual applicant, after processing and due consideration, merits security clearance.

The facts of *Egan* are very different from the facts at play in the case at hand. Egan was hired as a laborer at a naval facility that serviced a nuclear weapon submarine where *all* employees were required to obtain security clearances. *See id.* at 520. After processing Egan's application, the government denied security clearance because he had an extensive criminal record and a history of alcohol abuse. *See id.* at 521. Egan appealed this determination, *see id.* at 522; the Supreme Court upheld the denial of clearance, holding that the Executive has broad

authority to exercise its discretion in classifying and controlling access to national security information. *See id.* at 527. Unlike the issue at hand, Egan was permitted to apply for clearance but his application was denied after a thorough review process found him to be untrustworthy.

The relief sought by petitioner in the instant motion is dramatically different from the relief sought by *Egan*. Egan sought to reverse an executive agency's decision to deny clearance, whereas here, members of petitioner's counsel simply seek to *apply* for clearance. Moreover, the governing authority under which petitioner moves is quite dissimilar from the regulatory structure at play in *Egan*. The scheme governing Egan's clearance application and subsequent review was an administrative process followed by appeal to federal court. The authority governing the issue at hand here—who qualifies to apply for security clearance in these Guantánamo habeas matters—is regulated by the Protective Order. *Egan* simply does not support DoJ's grab for unfettered discretion; discretion which is squarely limited and controlled by the Protective Order.

Finally, *Egan*'s assertion that "no one has a 'right' to security clearance," *id.* at 528, does not undermine petitioner's position. The within motion does not seek a right to security clearance for law students or anyone else, for that matter. Rather, this motion seeks modest relief: an order prohibiting DoJ from barring the submission of security clearance applications to the Court Security Officer from bona fide members of petitioner's counsel. As members of petitioner's legal counsel, law students engaged in petitioner's case are permitted to apply for security clearance and DoJ's wholesale practice prohibiting such is in direct violation of the Protective Order.

**E. In this Instance Respondents' Lawyer's Dual Roles as Adversary and Security Clearance Decision-maker is Improper and Prejudicial to Petitioner**

Respondents' role of determining who may apply for security clearance conflicts with respondents' role as petitioner's adversary in this litigation and creates a risk of impropriety.[20] The DoJ is tasked with defending respondent, the DoD. In zealously advocating for the DoD, the DoJ is inclined to use any and all legal means to advantage the government and disadvantage petitioner. While in the role of advocate, DoJ lawyers have seized the role of determining who from petitioner's counsel may apply for security clearance. Through this security clearance gate-keeper role, the DoJ has defined the composition of petitioner's legal team, and in this case, has used the role to greatly undermine petitioner's counsel's ability to provide effective and zealous representation. Respondents have obtained this tactical advantage by imposing a practice that is unreasonable, irrational and utterly inconsistent with its own practices in other contexts.

The impropriety of government interference with the composition of its adversary's legal team was discussed in *United States v. Musa,* 833 F. Supp. 752 (E.D. Mo 1993). In *Musa,* the court considered measures to protect the dissemination of classified national security information. *See id.* at 753. The government proposed a Protective Order requiring the court to hold pretrial hearings to determine if supporting members of defense counsel's legal team (including secretaries and paralegals) were trustworthy to handle classified information. *See id.* at 755. The court disagreed with the government, stating that such hearings would "provide the potential for prosecutorial interference with the defendants' preparation of their defenses, or at least the appearance of the same, which should be avoided." *Id.* at 756. Rather, the court

---

[20] *See* Brian Z. Tamanaha, *A Critical Review of the Classified Information Procedures Act*, 13 Am. J. Crim. L. 277, 289-290 (1986) ("The potential for abuse in this situation is troubling regardless of whether the prosecution does in fact deliberately use this power to its advantage. The appearance of impropriety created by giving the Justice Department veto power over who will aid its opponent is enough to halt this policy." (referring to the Classified Information Procedures Act's requirement that the Department of Justice process security clearance applications for defense counsel)).

determined that such members of the legal team who sought access to classified information

must have their applications for security clearance processed by a neutral Court Security Officer.

*See id.*

The *Musa* court was adamant that the government should not be involved in the Court

Security Officer's decisions regarding applications for security clearance:

> [T]he Court Security Officer will be specifically directed to conduct the security
> clearances in such a manner that *no* disclosures regarding those clearances will be
> made to the prosecution team of attorneys or law enforcement agents involved in
> any way in this case, either of the identity of any persons on whom such
> clearances are being requested, or of any information obtained regarding such
> individuals.

*Id.* at 756.  The *Musa* court was so troubled by the prospect of the government's interference

with its adversary's security clearance determinations that the government was not even allowed

to know the *names* of the legal staff that sought clearance.  The court recognized the potential for

misconduct and prejudice that arises when the government has power to shape its adversary's

legal team.

*Musa* holds that the DoJ must not be involved in processing security clearance

applications for members of its adversary's legal team, because doing so would be prejudicial to

the DoJ's adversary.  Though respondents' lawyers at DoJ are not involved in processing

accepted applications or determining whether clearance will be granted, respondents' lawyers are

in charge of determining who among its adversary's counsel may apply.  The *Musa* court would

be quite troubled by the DoJ's dual role of adversary and security clearance gate-keeper in this

habeas litigation.  All of petitioner's inquiries about obtaining security clearances for law

students have been channeled to Andrew Warden—an attorney at the DoJ who represents

respondents in this litigation.  In response to petitioner's inquiries, Mr. Warden has repeatedly

stated that the DoJ categorically refuses to accept security clearance applications from students.

It seems that the DoJ has appointed Mr. Warden as the first and final arbiter on who may apply for security clearance. Mr. Warden thus determines which members of petitioner's legal team are privy to classified information and are therefore fully able to participate in petitioner's case, which is exactly the situation that the *Musa* court sought to avoid. Mr. Warden's role in undermining the effectiveness of petitioner's counsel creates a strong appearance of impropriety.

The concerns raised by the *Musa* court are fully addressed in the Protective Order. By clearly defining "petitioner's counsel," this court's Protective Order takes a measure of discretion out of the hands of DoJ, avoiding the appearance of impropriety. Law student members of petitioner's counsel, who are "other personnel . . . engaged to assist in the litigation," thus falling squarely within the Protective Order's definition of "counsel," and who are put forward by supervising professors exercising great care and restraint in this regard, should be provided with an application by DoJ for subsequent submission to the CSO.

## V. CONCLUSION

For the foregoing reasons, the Department of Justice is unjustifiably and unreasonably preventing law students involved in this litigation from applying for security clearance. Not only does this violate the clear language of the Protective Order, but it interferes with petitioner's counsel's ability to effectively assist petitioner in his habeas case before this court. This court must not permit respondents to continue to prejudice this litigation in this fashion.

WHEREFORE, petitioner requests that this court order respondents' lawyers to provide and process security clearance applications for such law student members of petitioner's counsel that a supervising attorney deems necessary for the effective representation of petitioner. *See* Proposed Order, *infra* Exhibit H.

Respectfully submitted,


_____/s/_____
Martha Rayner (NY-MR-1423)
LINCOLN SQUARE LEGAL SERVICES
Fordham University School of Law
33 W. 60th Street, 3rd Floor
New York, NY 10023
Tel: (212) 636-6934
Fax: (212) 636-6923

Laura Alvarez and Elizabeth Hume
Law Interns, On the Brief

Counsel for Petitioner