IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMER MOHAMMON, *et al.*, ) | |
| ) | |
| Petitioners/Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 05-2386 (RBW) |
| ) | |
| GEORGE W. BUSH, *et al.*, ) | |
| ) | |
| Respondents/Defendants. ) | |

**MOTION FOR A PRELIMINARY INJUNCTION
ORDERING RESPONDENTS TO CEASE
VIOLATIONS OF THE GENEVA CONVENTIONS AND TO
TREAT PETITIONER EL FALESTENY AS A PRISONER OF WAR**

INTRODUCTION

Petitioner Maher El Falesteny (ISN 519) has been imprisoned in Guantanamo for over six years. According to his jailers, at least since November 2006, he has been eligible for transfer: that is, he was no longer deemed to threaten either the United States or its allies.[1] (Ex. A.) Nonetheless, since that time, Petitioner has been held exclusively in Camps V and VI under conditions rankly contrary to Petitioner's status as a prisoner of war. At these camps he never

---

[1] Petitioner's counsel was not informed of this change in Petitioner's status until February 2007 when, in an effort to stave off emergency relief in the D.C. Circuit, Respondents suddenly announced that they need not produce a factual return for use in Petitioner's upcoming Annual Review Board hearing. According to Respondents, there would be no such hearing because Petitioner was "eligible for transfer," thus obviating the purpose of the scheduled hearing.

sees natural daylight, is kept in solitary confinement 22 hours of every day, cannot engage in group prayer or sports activities, is hampered in the exercise of religious activities, cannot communicate with other prisoners, and generally leads a wretched existence at the hands of his captors. (Declaration of Maher El Falesteny, Ex. B.) Petitioner has never borne arms against the United States or its allies.

The purpose of this motion is to end this violation of petitioner's rights under the Geneva Conventions.

<u>Petitioner's Status as a POW</u>. In *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2793-94 (2006), the Supreme Court held that the Geneva Conventions,[2] in particular, Common Article 3, applied to prisoners in Guantanamo. This ended the fiction created by two members[3] of our Circuit Court that the Conventions did not

---

[2] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31 ("First Geneva Convention" or "GCI"); Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85 ("Second Geneva Convention" or "GCII"); Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Third Geneva Convention" or "GCIII"); and Geneva Convention Relative to the Protection of Civilian Persons in Times of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Fourth Geneva Convention" or "GCIV"); (collectively "Geneva Conventions," "Conventions," or "GCs").

[3] Judge Williams dissented in *Hamdan* on this point, correctly concluding that the Conventions did apply to those captured in the war with Afghanistan. *See*
(continued...)

apply to prisoners at Guantanamo.[4] Under the Conventions, one falling into the hands of his enemy is presumed to be a prisoner of war unless and until properly determined to be in some other status.[5] GCIII Art. 3(1)(d), Art. 5. Thus, a prisoner can lose POW status *only* by a procedure prescribed by the Conventions themselves, namely a determination by a properly constituted tribunal of the detaining power that the individual is an "unlawful combatant." A properly constituted tribunal is one that satisfies certain rudimentary notions of fair play and reliability.

Petitioner has never been found to be an "unlawful combatant" and thus shifted out of his presumptive POW status. And certainly the operations of the CSRT and its enemy combatant designation do not suffice to effect such a change in status. This is not just a matter of reading the words of the Conventions and seeing that the CSRT procedures bear no resemblance to a fair determination

---

(continued...)

*Rumsfeld v. Hamdan*, 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., dissenting), *majority opinion rev'd* 126 S. Ct. 2749 (2006).

[4] Judge Randolph, relying on a footnote in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), which he believed to be that case's "alternate holding," wrote that the Conventions, even if they did apply (which he denied), governed military and executive, but not judicial, officers. *See* 415 F.3d at 39.

[5] Petitioner was in fact a civilian non-combatant. For this reason, holding him at all is unlawful. Until this matter is adjudicated, however, the Conventions require that he be treated as a prisoner of war.

or otherwise meet the requirements of Articles 3 or 5. The tribunal making such a determination must be a "competent tribunal" or a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." GCIII, Art. 3(1)(d). There is explicit judicial authority on this point.

After the passage of the Military Commissions Act of 2006 ("MCA"),[6] charges were brought against two prisoners, Hamdan and Khadr. Under the MCA's tribunal scheme (codified at 10 U.S.C. §§ 948a-950w), the tribunal hearing the charges has jurisdiction over "unlawful enemy combatants," not other persons. § 948d(a) (codified by MCA § 3). The question arose whether Hamdan and Khadr were unlawful combatants, so as to permit the proceeding to go forward, or remained POWs, never having properly been determined to be otherwise pursuant to Article 5 of the Third Geneva Convention.[7] The military

---

[6] Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006).

[7] That Article provides:

> The present Convention shall apply to the persons referred to in Article 4 from the time they fall into the power of the enemy and until their final release and repatriation.
>
> Should any doubt arise as to whether persons having committed a belligerent act and having fallen into the

(continued...)

trial courts concluded that they were disabled from proceeding because the defendants were unquestionably POWs under the Convention. Affirming this conclusion, the Court of Military Commission Review ("CMCR") separately examined whether the CSRT procedure and finding of enemy combatant status satisfied the Convention requirement that a shift in status from POW to unlawful combatant had occurred. *United States v. Khadr*, No. CMCR 07-001 (Sept. 27, 2007) (Ex. C). In examining this issue, the CMCR specifically applied the Geneva Convention terms as a rule of decision and based its conclusion of POW status squarely on the Convention and CSRT's ineffectiveness to nullify POW status owing to the CSRT's non-compliance with the requirements of the Convention. In particular, the court commented on the CSRT procedures: "Such lack of notice offends our most basic and fundamental notions of due process; therefore, *it also violates Common Article 3.*" *Id.* at 15 (emphasis added). Accordingly, the CMCR found that the accused had not been properly shifted from POW status to "unlawful combatant" status.

---

(continued...)

> hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protections of the present Convention until such time as their status has been determined by a competent tribunal.
>
> GCIII, Art. 5.

Judge Robertson in *Hamdan* had earlier reached the same result. 344 F. Supp. 2d 152 (D.D.C. 2004). There he concluded that the Convention provisions in question were self-executing and that Hamdan "must be given those protections until the 'competent tribunal' referred to in Article 5 concludes otherwise." 344 F. Supp. 2d at 165. Because Hamdan was to be tried by an improper tribunal given his presumptive prisoner of war status – and there was no Article 5 determination to the contrary – the court enjoined the military prosecution. The Supreme Court affirmed this result. 126 S. Ct. at 2798.

Thus Petitioner must be treated, at present, at least as well as a prisoner of war.

Under the Conventions, Petitioner is entitled to "be quartered under conditions as favorable as those for the forces of the Detaining Power who are billeted in the same area" and those conditions "shall in no case be prejudicial to their health." GCIII, Art. 25. Dormitory living is the norm. *Id.* Religious activities, including attendance at a "service of their faith" are likewise protected. *Id.*, Art. 34. While confinement may be imposed to maintain good order, as a general rule "prisoners of war may not be held in close confinement except where

necessary to safeguard their health and then only during the continuation of the circumstances which make such confinement necessary." *Id.*, Art. 21.[8]

It is undisputed that petitioner is not being held in such conditions. It follows that Respondents are gravely violating the Convention.

<u>Standards for the Grant of a Preliminary Injunction</u>. These are sufficiently familiar that we set them out in the margin.[9] The key component of the test here is likelihood of success on the merits. This part of the test includes jurisdiction, that is, the Court must be satisfied that it has jurisdiction over the case. The Court need not be certain of this because, like the other elements governing equitable discretion it is a "probability" test. [10]

---

[8] Even when confinement is ordered by a proper procedure, it may not last longer than 30 days and "[i]n no case shall disciplinary punishments be inhuman, brutal or dangerous to the health of prisoners of war." GCIII, Art. 89.

[9] Irreparable harm from continued unlawful detention is obvious. There is no public interest in continuing such a violation. Finally, there are Convention compliant facilities at Guantanamo not involving the solitary confinement regime of Camps V and VI. Hence, there is no burden to complying with the Convention.

[10] In *Belbacha v. Bush*, slip op., No 07-5258 (D.C. Cir. Mar. 14, 2008), the Court of Appeals held "that when the Supreme Court grants certiorari to review this court's determination that the district court lacks jurisdiction, a court can, pursuant to the All Writs Act, 28 U.S.C. § 1651, and during the pendency of the Supreme Court's review, act to preserve the status quo in other cases raising the same jurisdictional issue if a party satisfies the criteria for issuing a preliminary injunction." *Id.* at *7.

To be sure, MCA § 7 states, in no uncertain terms, that this Court no longer has *habeas* jurisdiction. And the Circuit, bidding fair to garner its third straight strike, has approved this result.[11] But the Supreme Court has granted *certiorari*, and the grant was not in the ordinary course but rather on rehearing. Thus five votes were needed, not the usual four. There are then five votes to void the *habeas* strip worked by section 7 of the MCA and that is the only plausible reason *certiorari* was granted.[12] In these circumstances, only a lawyer would insist that the Circuit decision in *Boumedienne* is good law and should be followed. In short, the Court has the most persuasive evidence possible that the "probability" of its having jurisdiction will be vindicated.[13]

Use of the Conventions as a Rule of Decision in this Case. That a treaty may inform a *habeas* case is apparent from the jurisdictional words of 28 U.S.C. § 2241 itself, which allows the writ where the prisoner " . . . is in custody in

---

[11] *Boumedienne v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted*, 127 S. Ct. 3078 (June 29, 2007).

[12] The question presented in the petition for certiorari was whether the MCA "validly stripped federal court jurisdiction over habeas petitions filed by foreign citizens imprisoned indefinitely . . . at Guantanamo Bay?" Pet. for a Writ of Certiorari, *Boumediene v. Bush*, No. 06-1195, 2007 WL 680794, at *i (U.S. filed Mar. 5, 2007).

[13] Even the Circuit realized in *Belbacha* that the unique circumstances of the grant of *certiorari* on rehearing supported the use of the All Writs Act to prevent harm to a detainee.

violation of the Constitution or laws or treaties of the United States." Indeed, it is a core part of *habeas* that treaty violations can form the basis for release of a prisoner, just as statutory or Constitutional violations could equally well serve. Apart from that, the military court affirming Khadr's Convention rights directly applied the Conventions as a rule of decision. And that court also noted that the Conventions, which have been signed by some 194 nations, "are generally viewed as self-executing treaties (*i.e.* ones which become effective without the necessity of implementing congressional action), form a part of American law, and are binding in the federal courts under the Supremacy Clause." *Khadr, supra* at 4, note 4. *See also Int'l Comm. for the Red Cross, Commentary: Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field*, 84 (1952). ("It should be possible in States which are parties to the Convention . . . for the rules of the Convention to be evoked before an appropriate national court by the protected person who has suffered a violation"); GCII Commentary at 92; GCIV Commentary at 79. However, the Court need not decide whether the Conventions are self-executing or not in this case, because they certainly can be applied in a proper case.[14]

---

[14] We direct the Court's attention to Judge Robertson's careful analysis in *Hamdan*: there, as here, he noted, "Hamdan has not asserted a 'private right of action' under the Third Geneva Convention." 344 F. Supp. 2d at 164. Petitioner
(continued...)

MCA § 5(a) purports to prohibit the invocation of the Geneva Conventions in *habeas* actions. 28 U.S.C. § 2241, note. But like the MCA's *habeas* strip itself, it is unlikely this language will survive the Supreme Court's decision in *Boumedienne*. Given the close tie between MCA § 5 and the *habeas* strip of MCA § 7, this possibility, without more, warrants using the Conventions in the present dire circumstances. In any event, this language does not disable the Court from looking at Convention requirements in fashioning interim *habeas* relief. And it requires no creation of an independent right of action, such as was found in *Asakura v. Seattle,* 265 U.S. 332 (1924). All that is needed is the application of the Conventions as a rule of decision in a case of which the Court is already properly seized.

While Congress certainly may regulate the jurisdiction of inferior courts and the appellate jurisdiction of the Supreme Court under specific Constitutional provisions, this authority is not unlimited. Separation of powers provides one such limit. Another is the historic scope of *habeas*, which may not be whittled down by legislation although, in special circumstance, it may temporarily be suspended. This is a necessary result of the Constitutional status of the Great

---

(continued...)
does not bring this motion pursuant to any such theory here.

Writ. We first address the separation of powers limit on legislative *habeas* tampering.

In *Klein v. United States*, 80 U.S. 128 (1871), the Supreme Court made clear that Congress' Constitutional authority to regulate the original and appellate jurisdiction of federal courts may not be employed as a subterfuge for nullifying other Constitutional provisions. There the Supreme Court voided legislation purporting to eliminate its jurisdiction over a certain class of cases – where the plaintiff had taken an oath of allegiance to the United States in order to qualify for a presidential pardon. In effect, had Congress used an enumerated power to invade and nullify the President's pardon power. The Supreme Court had no difficulty in striking down the law:

> It is evident from this statement that the denial of jurisdiction to this court, as well as to the Court of Claims, is founded solely on the application of a rule of decision, in causes pending, prescribed by Congress. The court has jurisdiction of the cause to a given point; but when it ascertains that a certain state of things exists, its jurisdiction is to cease and it is required to dismiss the cause for want of jurisdiction.
>
> It seems to us that this is not an exercise of the acknowledged power of Congress to make exceptions and prescribe regulations to the appellate power.

80 U.S. at 146.

Likewise here, there is no doubt that the Conventions remain a part of "American law" and have not been repudiated or breached by the United States.

-12-

That being the case, Congress' attempt to limit the use of the Conventions as a rule of decision in pending cases clearly interferes with the judicial function. Respondents cannot have it both ways. Either the Geneva Conventions are a vital part of the law of the United States, as both *Hamdan* and *Khadr* held, or they have been breached. As part of United States law, Congress cannot selectively define their applicability as it has sought to do.

But there is a deeper reason that Section 5(a) of the MCA fails. The basis of a treaty right to the writ can no more be legislatively eliminated than could a Constitutional basis. This follows from the nature of *habeas* and its Constitutional status in our law. The very same reasons that led five Supreme Court justices to grant the motion for rehearing and grant *certiorari* likewise compel the conclusion that Congress can no more eliminate a ground for *habeas* relief than it can suspend the Writ by providing an inadequate and foreshortened substitute remedy. By seeking to foreclose the availability of the *habeas* remedy with respect to a particular treaty, Congress has done exactly that.

## CONCLUSION

For the foregoing reasons the motion should be granted.

Respectfully submitted,

/s/ Stephen M. Truitt
_____

| | |
|---|---|
| Shayana Kadidal (DC # 454248) | Stephen M. Truitt (DC # 13235) |
| CENTER FOR CONSTITUTIONAL RIGHTS | 600 Fourteenth Street, N.W. |
| 666 Broadway, 7th Floor | Suite 500, Hamilton Square |
| New York, NY 10012 | Washington, DC  20005-2004 |
| Tel:  (212) 614-6439 | Tel: (202) 220-1452 |
| Fax:  (212) 614-6499 | Fax: (202) 220-1665 |
| | |
| Of Counsel for Petitioner | Charles H. Carpenter (DC # 432004) |
| | PEPPER HAMILTON LLP |
| | 600 Fourteenth Street, N.W. |
| | Suite 500, Hamilton Square |
| | Washington, DC  20005-2004 |
| | Tel: (202) 220-1507 |
| | Fax: (202) 220-1665 |
| | |
| | Christopher J. Huber |
| | PEPPER HAMILTON LLP |
| | 3000 Two Logan Square |
| | Eighteenth and Arch Streets |
| | Philadelphia, PA  19103-2799 |
| | Tel: (215) 981-4000 |
| | Fax: (215) 981-4750 |
| | |
| Dated:  June 2, 2008 | Counsel for Petitioner |

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of June, 2008, a copy of the foregoing Motion for a Preliminary Injunction Ordering Respondents to Cease Violations of the Geneva Conventions and to Treat Petitioner El Falesteny as a Prisoner of War was hand-delivered to the Court Security Officer who will serve the following person when the document has been determined unclassified:

> Andrew I. Warden
> Trial Attorney
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., NW, Room 6120
> Washington, DC 20530

  /s/ Stephen M. Truitt
  Stephen M. Truitt