**Exhibit C**

# UNITED STATES COURT OF MILITARY COMMISSION REVIEW

**Before**
**ROLPH, FRANCIS, HOLDEN**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**
**Appellant**

v.

**OMAR AHMED KHADR**
**Appellee**

**CMCR 07-001**
**Military Commission**
**Guantanamo Bay, Cuba**

**Military Judge:** Peter E. Brownback, III, JA, U.S. Army.

**For Appellant:** Francis A. Gilligan (argued); Major Jeffrey D. Groharing, JA, U.S. Army (on brief); Captain Keith A. Petty, JA, U.S. Army (on brief); Lieutenant Clay G. Trivett, Jr., JAGC, U.S. Navy (on brief).

**For Appellee:** Lieutenant Commander William C. Kuebler, JAGC, U.S. Navy (on brief; argued); Rebecca S. Snyder (on brief); Dennis Edney (on brief); Nathan Whitling (on brief; argued).[1]

**Amicus Curiae for Appellee:** Frank W. Fountain (on brief); Madeline Morris (Professor of Law, Duke University)(on brief); Stephen Bornick (Special Editorial Associate for Professor Morris)(on brief); Landon Zimmer (Special Editorial Associate for Professor Morris)(on brief); Allison Hester-Hadded (law student, Duke University)(on brief).

**September 24, 2007**

---

**OPINION OF THE COURT AND ACTION
ON APPEAL BY THE UNITED STATES
FILED PURSUANT TO 10 U.S.C. § 950d**

---

---

[1]  Mr. Edney and Mr. Whitling are both admitted to the bar in Canada and, upon motion, were authorized to appear as counsel for Mr. Khadr's appeal to argue *pro hac vice* pursuant to Rule 8(f) of our Rules of Practice.

*United States v. Khadr*
CMCR 07-001

ROLPH, Deputy Chief Judge:

In this appeal by the Government (hereinafter Appellant) we are called upon to interpret for the first time the jurisdictional provisions contained in *the Military Commissions Act of 2006* (hereinafter M.C.A.)[2] as they relate to the trial by military commission of a Canadian citizen, Omar Ahmed Khadr, Appellee (hereinafter Mr. Khadr). Mr. Khadr was captured on the battlefield in Afghanistan in 2002, is currently detained in Guantanamo Bay, Cuba, and was pending trial upon charges that were referred for trial before a military commission. This interlocutory appeal was taken after the military judge presiding over Mr. Khadr's trial dismissed all charges against him without prejudice on June 4, 2007. The military judge's ruling was based upon his *sua sponte* determination that the military commission lacked personal jurisdiction over Mr. Khadr. Where a court has no personal jurisdiction over an accused appearing before it, it is generally powerless to act. *See, e.g., Ryder v. United States*, 515 U.S. 177, 187 (1995)(Coast Guard Court of Criminal Appeals could not decide appeals because not properly appointed); *Solorio v. United States*, 483 U.S. 435, 442-451 (1987)(describing history of court-martial jurisdiction); *Reid v. Covert*, 354 U.S. 1, 32-36 (1957)(no court-martial jurisdiction over civilians accompanying the forces overseas); *Toth v. Quarles*, 350 U.S. 11, 22-23 (1955)(no court-martial jurisdiction over soldier discharged from service).

The basis for the military judge's ruling was Appellant's failure to properly determine Mr. Khadr's status as an "alien unlawful enemy combatant" before his Combatant Status Review Tribunal (C.S.R.T.), which the judge ruled was an indispensable prerequisite to the military commission's ability to exercise personal jurisdiction under the M.C.A. The military judge further ruled that "the military commission is not the proper authority, under the provisions of the M.C.A., to determine that Mr. Khadr is an unlawful enemy combatant in order to establish initial jurisdiction for this commission to try Mr. Khadr." *See* Military Judge's Order on Jurisdiction of June 4, 2007 at 1-2; Record at 21.

**Background**

Appellant charged Mr. Khadr with various offenses arising during the period from on or about June 2002 to on or about July 27, 2002. The allegations include murder of a U.S. Soldier in violation of the law of war; attempted murder of U.S. military or coalition forces by making and planting improvised explosive devices (IEDs) in violation of the law of war; conspiracy with Osama bin Laden, Ayman al Zawahiri and other members of al Qaeda, an international terrorist organization, to attack civilians, destroy property, and commit murder – all in violation of the law of war; providing material or resources in support of al Qaeda and international terrorism; and spying, in violation of 10 U.S.C. §§ 950v(b)(15); 950t; 950v(b)(28); 950v(b)(25); and 950v(b)(27) respectively. Each charge and specification alleged against Mr. Khadr asserts the jurisdictional claim that he is "a person subject to trial

[2] Pub. L. No. 109-366, 120 Stat. 2600 (October 17, 2006), codified at 10 U.S.C. §§ 948a-950w.

2

*United States v. Khadr*
CMCR 07-001

by military commission as an ***alien unlawful enemy combatant***." *See* Charge Sheet, Charges I-V (Appellate Exhibit (AE) 1 at 4-7) (emphasis added).

The record of trial, pleadings of the parties, and allied documents contain allegations that Mr. Khadr received one-on-one "private al Qaeda basic training" in Afghanistan during June 2002, consisting of instruction in the use of rocket propelled grenades, rifles, pistols, hand grenades, and various other explosives. *See* AE 1 at 6; AE 17. In July 2002, Mr. Khadr is also alleged to have participated in "land mine training," which involved the conversion of landmines to IEDs and their strategic placement as weapons to be deployed against U.S. military and coalition forces. *Id.* On or about July 27, 2002, at a compound near Abu Ykhiel, Afghanistan, Mr. Khadr is alleged to have been a member of a group of al Qaeda members that engaged U.S. military and coalition forces with small arms fire, killing two Afghan Militia Force members, and throwing a hand grenade which killed Sergeant First Class Christopher Speer, U.S. Army. *Id.* Mr. Khadr, though badly wounded in the engagement, was immediately treated on scene by U.S. military medical personnel. He was thereafter taken into custody, and ultimately transported to the U.S. detention facility located at Guantanamo Bay Naval Base, Cuba, where he presently remains.

On September 7, 2004, a three-member C.S.R.T. unanimously determined that Mr. Khadr was properly classified as an "enemy combatant" and an individual who was "a member of, or affiliated with al Qaeda," as defined by a memorandum issued by the Deputy Secretary of Defense on July 7, 2004. *See* Report of C.S.R.T. (AE 11 at 6).

## Appellate Jurisdiction and Standards of Review

The military judge's ruling in this case dismissing all charges without prejudice qualifies for appeal by Appellant under 10 U.S.C. § 950d(a)(A) in that it "terminates proceedings of the military commission with respect to a charge or specification." *See* Rule for Military Commission (R.M.C.) 908(a)(1), Manual for Military Commissions (M.M.C.)(2007). Appellant properly gave notice of appeal to the military judge on July 3, 2007,[3] and filed the appeal directly with this Court within the time limits established in our Rules of Practice. *See* Rule 22, Rules of Practice, Court of Military Commission Review (2007). In ruling upon this appeal, we may act only with respect to matters of law. 10 U.S.C. § 950d(c); R.M.C. 908(c)(2).

We have reviewed the military judge's factual determinations applying a highly deferential standard of review mandating that findings of fact not be

---

[3] The military judge's ruling became final for purposes of the notice provisions of 10 U.S.C. § 950d(a)(2)(b) on  June 29, 2007, the day the military judge denied Appellant's Motion for Reconsideration. *See United States v. Ibarra*, 502 U.S. 1, 6-7 (1991); *see also* Court of Military Commission Review Ruling on Appellant's Motion to Dismiss of September 19, 2007.

*United States v. Khadr*
CMCR 07-001

disturbed unless they are "clearly erroneous." *See Amadeo v. Zant*, 486 U.S. 214, 223 (1988); *United States v. Cabrera-Frattini*, 65 M.J. 241, 245 (C.A.A.F. 2007). Regarding all matters of law, we review the military judge's findings and conclusions *de novo*. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2001); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000); *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007).

## Combatant Status Generally

The determination of whether an individual captured on the battlefield is a "lawful" or "unlawful" enemy combatant carries with it significant legal consequences (both international and domestic) relating to the treatment owed that individual upon capture and ultimate criminal liability for participating in war-related activities associated with the armed conflict. The Third Geneva Convention Relative to the Treatment of Prisoners of War (GPW III) -- signed in 1949 and entered into force in 1950 following battlefield atrocities occurring during World War II -- sought to carefully define "lawful combatant" for all signatory nations. Geneva Convention Relative to the Treatment of Prisoners of War, August 12, 1949, 6 U.S.T. 3316, T.I.A.S. No. 3364, 75 U.N.T.S. 135, Art. 4.[4]  *See also* Hague Convention No. IV Respecting the Laws and Customs of War on Land, October 18, 1907, 36 Stat. 2277, T.S. No. 539 (Hague Regulations).

Article 4, GPW III makes it clear that lawful combatants will generally only include the regular armed forces of a party to the conflict, including "members of militias or volunteer corps forming part of such armed forces." Also included are members of other militia, volunteer corps, and organized resistance movements belonging to a State party to the conflict so long as they fulfill the following conditions:

1) They are under the command of an individual who is responsible for their subordinates;
2) They wear a fixed distinctive sign or symbol recognizable at a distance;
3) They carry their arms openly; and

---

[4]  The United States is a signatory nation to all four Geneva Conventions.  The Geneva Conventions are generally viewed as self-executing treaties (i.e., ones which become effective without the necessity of implementing congressional action), form a part of American law, and are binding in federal courts under the Supremacy Clause.  *See* U.S. Const. art VI, § 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land . . . .").  *United States v. Lindh*, 212 F. Supp. 2d 541, 553-54 (E.D. VA. 2002) (citing *United States v. Noriega*, 808 F. Supp. 791, 796 (S.D. Fla. 1990)).  The Geneva Conventions stand preeminent among the major treaties on the law of war.  *See Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 165 L. Ed. 2d 723 (2006)(citing "Geneva" 123 times in the opinion). The Geneva Conventions have been acceded to by 194 states. International Committee of the Red Cross, available at http://www.icrc.org/Web/Eng/siteeng0.nsf/htmlall/genevaconventions.  The United States implemented the Geneva Conventions via 18 U.S.C. § 2441, Pub. L. No. 104-192, 110 Stat. 2104 (1996).

*United States v. Khadr*
CMCR 07-001

4) They conduct their operations in accordance with the laws and customs of war.

This critical determination of "lawful" or "unlawful" combatant status is far more than simply a matter of semantics. Without any determination of lawful or unlawful status, classification as an "enemy combatant" is sufficient to justify a detaining power's continuing detention of an individual captured in battle or taken into custody in the course of ongoing hostilities. However, under the well recognized body of customary international law relating to armed conflict, and specific provisions of GPW III, lawful combatants enjoy "combatant immunity"[5] for their pre-capture acts of warfare, including the targeting, wounding, or killing of other human beings, provided those actions were performed in the context of ongoing hostilities against lawful military targets, and were not in violation of the law of war. *See Johnson v. Eisentrager,* 339 U.S. 763, 793 (1950)(Black, J. dissenting)("Legitimate 'acts of war,' however murderous, do not justify criminal conviction . . . . It is no 'crime' to be a soldier . . . .")(citing *Ex parte Quirin,* 317 U.S. 1, 30-31 (1942)("Mere membership in the armed forces could not under any circumstances create criminal liability . . . ."); *Lindh,* 212 F. Supp. 2d at 553 (citing Waldemar A. Solf & Edward R. Cummings, *A Survey of Penal Sanctions Under Protocol I to the Geneva Conventions of August 12, 1949,* 9 Case W. Res. J. Int'l L. 205, 212 (1977)). Lawful enemy combatants enjoy all the privileges afforded soldiers under the law of war, including combatant immunity and the protections of the Geneva Conventions if wounded or sick, and while being held as prisoners of war (POWs).[6] Additionally, lawful enemy combatants facing judicial proceedings for any of their actions in warfare that violate the law of war, or for post-capture offenses committed while they are POWs, are entitled to be tried by the same courts, and in accordance with the same procedures, that the detaining power would utilize to try members of its own armed forces (i.e., by court-martial for lawful enemy combatants held by the United States). *See* Arts. 84, 87 and 102, GPW III.

Indeed, GPW III codified many existing principles of customary international law and added numerous additional provisions, all aimed at protecting lawful combatants from being punished for their hostile actions prior to capture;[7] ensuring that POWs were treated and cared for humanely upon capture; and seeking to

---

[5] Also referred to as "belligerent privilege."

[6] *Lindh,* 212 F. Supp. 2d at 553-54; *see also* U.S. Army Judge Advocate General's Legal Center and School, Dept. of the Army, Operational Law Handbook 16 (2006)(hereinafter Army Op. Law Handbook).

[7] *See e.g.,* GPW III, Article 87 ("[POWs] may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed force of the said Power who have committed the same acts.") and Article 99 ("No [POW] may be tried or sentenced for an act which is not forbidden by the law of the Detaining Power or by international law, in force at the time the said act was committed."). These two Articles, when read together, have been interpreted to "make clear that a belligerent in war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war." *Lindh,* 212 F. Supp. 2d at 553.

*United States v. Khadr*
CMCR 07-001

guarantee the general welfare and well-being of POWs during the entire period they remained in captivity. *See* R.C. Hingorani, *Prisoners of War* 9 (1982). Accordingly, technical "crimes" committed by lawful combatants authorized to use force in the context of ongoing hostilities may not be prosecuted unless those offenses are unrelated to the conflict, or violate the law of war or international humanitarian law. *Lindh,* 212 F. Supp. 2d at 553; *See* John Cerone, *Status of Detainees in International Armed Conflict, and Their Protection in the Course of Criminal Proceedings,* The American Society of International Law, Jan. 2002. At the conclusion of the armed conflict, lawful combatants who are held as POWs are entitled to be safely and expeditiously repatriated to their nation of origin.[8]

Unlawful combatants, on the other hand, are not entitled to "combatant immunity" nor any of the protections generally afforded lawful combatants who become POWs. Unlawful combatants remain civilians and may properly be captured, detained by opposing military forces, and treated as criminals under the domestic law of the capturing nation for any and all unlawful combat actions. *Lindh,* 212 F. Supp. 2d at 554 (citing *Ex parte Quirin,* 317 U.S. at 30-31); *see* Army Op. Law Handbook 17.

> By universal agreement and practice, the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations and also between those who are lawful and unlawful combatants. Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.

*Ex parte Quirin,* 317 U.S. at 30. M.C.A. § 948b(f) addresses Common Article 3's application, stating, "A military commission established under this chapter is a regularly constituted court, affording all the necessary 'judicial guarantees which are recognized as indispensable by civilized peoples' for purposes of [C]ommon Article 3 of the Geneva Conventions."[9] Under the M.C.A., unlawful enemy combatants who

---

[8] *See* Articles 118 and 119, GPW III.

[9] Article 3, GPW – an Article common to all four Geneva Conventions – suggests that even unlawful combatants are entitled to be tried in a "regularly constituted court." The Supreme Court in *Hamdan* explained:

> Common Article 3, then, is applicable here and, . . . requires that Hamdan be tried by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people." 6 U.S.T., at 3320 (Art. 3, ¶ 1(d)). While the term "regularly constituted court" is not specifically defined in either Common Article 3 or its accompanying commentary, other sources have disclosed its core meaning. The commentary accompanying [Article 66 of the Fourth Geneva Convention] defines "'regularly constituted'" tribunals to include "ordinary military courts" and "definitely exclude[e] all special tribunals." GCIV Commentary 340 (defining the term "properly constituted" in Article 66, which the

6

*United States v. Khadr*
CMCR 07-001

engage in hostilities against the United States or its co-belligerents, or materially support such, are subject to trial by military commission for violations of the law of war and other offenses made triable by that statute. *See* §§ 948a(1)(A)(ii) and 948b(a).

The burden of raising the special defense that one is entitled to lawful combatant immunity rests upon the individual asserting the claim. *Lindh*, 212 F. Supp. 2d at 557-58. Once raised before a military commission, the burden then shifts to the prosecution to prove beyond a reasonable doubt that the defense does not exist. R.M.C. 916(b). Determining lawful and unlawful combatant status under existing international treaties, customary international law, case law precedent (both international and domestic), and the M.C.A. is a matter well within the professional capacity of a military judge.

It is against this legal backdrop that we now examine the significance of Mr. Khadr's 2004 C.S.R.T. classification as an "enemy combatant," the subsequent referral of criminal charges against him to a military commission, and the military judge's *sua sponte* dismissal of those charges without prejudice.

## Issues on Appeal

Appellant's appeal requires us to address two important issues. First, whether the military judge erred in ruling that Mr. Khadr's September, 2004 C.S.R.T. classification as an "enemy combatant" was insufficient to satisfy the congressionally mandated requirement, established in the M.C.A., that military commission jurisdiction shall exist solely over offenses committed by "alien unlawful enemy combatants," *see* M.C.A. §§ 948c and 948d(a). Second, if we answer the first question negatively, we must determine whether the military judge

---

commentary treats as "regularly constituted"); see also *Yamashita*, 327 U.S., at 44, 66 S. Ct. 340, 90 L. Ed. 499 (Rutledge, J., dissenting)(describing military commission as a court "specially constituted for a particular trial"). And one of the Red Cross' own treatises defines "regularly constituted court" as used in Common Article 3 to mean "established and organized in accordance with the laws and procedures already in force in a country." Int'l Comm. of Red Cross, 1 *Customary International Humanitarian* Law 355 (2005); *see also* GCIV Commentary 340 (observing that "ordinary military courts" will "be set up in accordance with the recognized principles governing the administration of justice").

*Hamdan*, 126 S.Ct. at 2797-98, 165 L. Ed. 2d at 778. Justices Breyer, Kennedy, Souter, and Ginsburg agreed in *Hamdan*, that those military commissions which generally adopt the structure and procedure of courts-martial, and are "conducted[] similarly to courts-martial" are regularly constituted military courts under United States law. *Hamdan*, 126 S. Ct. at 2803-04 (Souter, J., concurring in result). Notably, Justices Thomas, Alito, and Scalia agreed that the military commission at issue in Hamdan was a "regularly constituted tribunal" under Common Article 3, despite being substantially dissimilar from courts-martial. 126 S. Ct. at 2850-52, 165 L. Ed. 2d at 836-38 (Alito, J., dissenting). "If 'special' means anything in contradistinction to 'regular,' it would be in the sense of 'special' as 'relating to a single thing,' and 'regular' as 'uniform in course, practice or occurrence.' Webster's Third New International Dictionary 2186, 1913." 126 S. Ct. at 2852, 165 L. Ed. 2d at 838.

*United States v. Khadr*
CMCR 07-001

erred in ruling that neither the military commission nor the military judge were empowered under the M.C.A. to receive evidence, and thereafter assess Mr. Khadr's status as an "alien unlawful enemy combatant" for purposes of determining the commission's criminal jurisdiction over him.

### The M.C.A. and Mr. Khadr's C.S.R.T. Classification

Section 948d of the M.C.A. defines the jurisdictional limits of military commissions stating:

(a) JURISDICTION. A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an *alien unlawful enemy combatant* before, on, or after September 11, 2001.

(b) LAWFUL ENEMY COMBATANTS. *Military commissions under this chapter shall not have jurisdiction over lawful enemy combatants.* Lawful enemy combatants who violate the law of war are subject to chapter 47 of this title. Courts-martial established under that chapter shall have jurisdiction to try a lawful enemy combatant for any offense made punishable under this chapter.

(c) DETERMINATION OF UNLAWFUL ENEMY COMBATANT STATUS DISPOSITIVE. A finding, whether before, on, or after the date of the enactment of the Military Commissions Act of 2006, *by a Combatant Status Review Tribunal or another competent tribunal* established under the authority of the President or the Secretary of Defense that a person is *an unlawful enemy combatant is dispositive for purposes of jurisdiction for trial by military commission under this chapter.*

(d) PUNISHMENTS. A military commission under this chapter may, under such limitations as the Secretary of Defense may prescribe, adjudge any punishment not forbidden by this chapter, including the penalty of death when authorized under this chapter or the law of war.[10]

(italics added).

The military judge in this case dismissed all charges and specifications (without prejudice) against Mr. Khadr based upon his conclusion that the jurisdictional provisions of M.C.A. § 948d had not been met.[11] The judge correctly

---

[10] *See also* R.M.C. 103(a)(24).

[11] R.M.C. 201(b)(3) sets forth the specific requisites for military commission jurisdiction, which include:

(a) The military commission must be convened by an official empowered to convene it;

*United States v. Khadr*
CMCR 07-001

noted that the M.C.A. appeared to be clear in limiting jurisdiction for trial by military commission solely to *unlawful enemy combatants*,[12] and excluding from a commission's jurisdiction any *lawful enemy combatants*, who instead must be tried under the provisions of the Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq.*[13] We agree with the military judge that Mr. Khadr's 2004 C.S.R.T. classification as an "enemy combatant" failed to meet the M.C.A.'s jurisdictional requirements in that it did not establish that Mr. Khadr was in fact an "*unlawful enemy combatant*" to satisfy the jurisdictional prerequisite for trial by military commission.

Under M.C.A. § 948c, only an "alien unlawful enemy combatant is subject to trial by military commission." The M.C.A., in § 948a(1)(A), defines "unlawful enemy combatant" as follows:

> (i)  a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or
> (ii)  a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.[14]

Appellant contends Mr. Khadr's designation as an "enemy combatant" by his C.S.R.T. in 2004 was itself sufficient to establish the military commission's jurisdiction and that the military judge erred in ruling otherwise. In its motion asking the military judge to reconsider his dismissal action, Appellant argued that the judge failed to give proper consideration and deference to a White House

---

(b) The military commission must be composed in accordance with these rules with respect to number and qualifications of its personnel. As used here, "personnel" includes only the military judge and the members.
(c) Each charge before the military commission must be referred to it by a competent authority;
(d) The accused must be a person subject to military commission jurisdiction; and
(e) The offense must be subject to military commission jurisdiction.

[12] *See* M.C.A. § 948d(a). Mr. Khadr's status as an "alien" is not in dispute.

[13] *See* M.C.A. § 948d(b)(lawful combatants who violate the law of war are subject to the provisions of the Uniform Code of Military Justice; courts-martial shall have jurisdiction to try lawful combatants for any offense made punishable under the M.C.A.). *See also* Articles 84, 87 and 102, GPW III (mandating that lawful enemy combatants shall be tried by the same courts and procedures the detaining power would use to try members of its own armed forces).

[14] *See also* R.M.C. 103(a)(24).

*United States v. Khadr*
CMCR 07-001

memorandum signed by President Bush in February 2002[15] which, in Appellant's view, declared all members of the Taliban and al Qaeda to be "unlawful combatants" under the Geneva Conventions. *See* Prosecution Motion for Reconsideration of June 8, 2007 at 4-6; *see also* Brief on Behalf of Appellant at 5 ¶c. Appellant makes a similar argument regarding a July 2004 memorandum from the Deputy Secretary of Defense (then Mr. Paul Wolfowitz) to the Secretary of the Navy establishing the procedures to be employed for C.S.R.T.'s, and summarily declaring:

> For purposes of this Order, the term "enemy combatant" shall mean an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces. Each detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense.[16]

According to Appellant, Congress enacted the M.C.A. "fully aware" of the 2002 White House memorandum and the 2004 Wolfowitz memorandum, including the definitional provisions and declarations contained in both. Appellant argues that it was the "clear intent" of Congress to adopt the memoranda's categorical declarations of combatant status regarding members of the Taliban and al Qaeda, and that C.S.R.T. determinations of "enemy combatant" status made prior to the adoption of the M.C.A. are sufficient to establish military commission jurisdiction. *See* Brief on Behalf of Appellant at 11-14. To buttress these assertions, Appellant has directed us to R.M.C. 202(b), which discusses *in personam* military commission jurisdiction and declares, "[a] finding, whether before, on, or after the date of the enactment of the Military Commissions Act of 2006, by a [C.S.R.T.] or another competent tribunal established under the authority of the President or the Secretary of Defense that a person is an unlawful enemy combatant is dispositive for purposes of jurisdiction for trial by a military commission under the M.C.A." Appellant also highlights the following statement contained in the nonbinding Discussion to R.M.C. 202 regarding C.S.R.T. determinations:

> At the time of the enactment of the M.C.A., C.S.R.T. regulations provided that an individual should be deemed to be an "enemy combatant" if he "was part of or supporting al Qaeda or the Taliban, or associated forces engaged in armed conflict against the United States or its coalition partners." The United States previously

---

[15] *See* White House Memorandum, Humane Treatment of al Qaeda and Taliban Detainees 2 (February 7, 2002) available at http://www.washingtonpost.com/wp-srv/nation/documents/020702 bush.pdf (hereinafter White House memorandum) (AE 13).

[16] *See* Deputy Secretary of Defense Memorandum, Order Establishing C.S.R.T. 1 (July 7, 2004), available at http://www.globalsecurity.org/security/library/policy/dod/d20040707review.pdf. (hereinafter Wolfowitz memorandum) (AE 14).

*United States v. Khadr*
CMCR 07-001

determined that members of al Qaeda and the Taliban are unlawful combatants under the Geneva Conventions.

From the President's 2002 White House memorandum, the 2004 Wolfowitz memorandum, and this nonbinding Discussion to R.M.C. 202, we are now asked to categorically equate the administration's prior pronouncements regarding members of the Taliban and al Qaeda, and use of the term "enemy combatant" throughout the C.S.R.T. process, with "unlawful enemy combatant" as defined in the M.C.A., and attribute that extrapolation to the "clear intent" of Congress. In this regard, Appellant invites us to interpret the parenthetical language contained in M.C.A. § 948a(1)(A)(i) -- "including a person who is part of the Taliban, al Qaeda, or associated forces" -- as evidence that "Congress statutorily ratified the President's prior determination" and that "[t]his crucial parenthetical established, as a matter of statute, that a member of al Qaeda or the Taliban – without more – is an 'unlawful enemy combatant' who can be tried by military commission." Supplemental Brief on Behalf of Appellant at 5. In light of the plain language of the M.C.A., and applying common logic and reasoning, we decline to accept the Appellant's position. We believe the Congress, well aware of the fact that "trial by military commission is an extraordinary measure raising important questions about the balance of powers in our constitutional structure," *see Hamdan*, 126 S.Ct. at 2759, 165 L. Ed. 2d at 738-39 (citing *Ex parte Quirin*, 317 U.S. at 19), was abundantly clear in precisely establishing the jurisdictional prerequisites it intended to mandate prior to any criminal proceeding before such a commission could occur.

As with all matters of statutory interpretation, we look first and foremost to the language contained in the statute itself. *See Duncan v. Walker*, 533 U.S. 167, 172 (2001); *Williams v. Taylor,* 529 U.S. 420, 431 (2000). In doing so, we give the words contained in the text their ordinary meaning and interpret the statute in a manner that does not render words or phrases superfluous, unless no other reasonable interpretation can be made.[17] It is unequivocally clear to us from the plain language of the M.C.A. that Congress intended trials by military commission to be utilized solely and exclusively to try only "alien unlawful enemy combatants." The M.C.A.'s jurisdictional provisions (§§ 948c and 948d) and definitions section (§ 948a(1)(A)(i)) make this intent perfectly clear. So also does the M.C.A.'s express admonition in § 948d(b) that military commissions "shall not have jurisdiction to try a lawful enemy combatant." Congress further stated that a C.S.R.T.'s (or other competent tribunal's) determination that a person is an "unlawful enemy combatant" would be dispositive for purposes of establishing jurisdiction for trial by military commission. *See* M.C.A. § 948d(c).[18] No such statement is made regarding a prior

---

[17]  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant")(internal quotation marks and citations omitted); *Caminetti v. United States,* 242 U.S. 470, 453 (1917)(if a statute's language is plain and clear, "the sole function of the courts is to enforce it according to its terms").

[18]  Though Congress intended to create a "safe harbor" for C.S.R.T. determinations made prior to and after the M.C.A.'s enactment, this provision cannot be used to transform an "enemy

*United States v. Khadr*
CMCR 07-001

designation of a detainee as simply an "enemy combatant" and, in our opinion, such designation is not useful in resolving this ultimate issue of criminal jurisdiction under the M.C.A.

Congress was undoubtedly aware of the White House (2002) and Wolfowitz (2004) memoranda when they wrote and enacted the M.C.A. in 2006. This is yet another case where "Congress, in the proper exercise of its powers as an independent branch of government, and as part of a long tradition of legislative involvement in matters of military justice, has considered the subject of military tribunals and set limits on the exercise of the President's authority. Where a statute provides the conditions for the exercise of governmental power, its requirements are the result of a deliberative and reflective process engaging both of the political branches." *Hamdan*, 126 S.Ct. at 2799, 165 L. Ed. 2d at 781 (Kennedy J., concurring). Had Congress intended prior designations of detainees as mere "enemy combatants" to be sufficient to establish military commission jurisdiction, it was fully capable of saying this in the legislation. It did not. Indeed, neither the White House nor Wolfowitz memoranda are ever referenced in the M.C.A. In our opinion, Congress, clearly aware of the previously troubled military commission process -- and armed with affirmative guidance from the Supreme Court provided in the June, 2006 decision in *Hamdan v. Rumsfeld* -- sought to enact new, clear, and unequivocal legislation to unambiguously guide and successfully implement trials by military commissions.[19]

---

combatant" designation made for one purpose into a declaration of "unlawful enemy combatant" status for another. From the M.C.A.'s language, this "safe harbor" exists only for previously made "*unlawful* enemy combatant" designations (italics added). Congress intended that properly made individual C.S.R.T. determinations of "unlawful enemy combatant" status established by a preponderance of the evidence should be afforded great deference by the military commission. *See* R.M.C. 905(c)(1), 2(B). For purposes of resolving this Government appeal, we need not determine whether this "dispositive jurisdiction" provision deprives a military commission accused of a critical "judicial guarantee[ ] . . . recognized as indispensable by civilized people" under Common Article 3 of the Geneva Conventions (i.e., the right to affirmatively challenge the commission's *in personam* jurisdiction over him).

[19] The Supreme Court determined that the military commissions deviated substantially from regular court-martial practice without an adequate demonstration that procedures more similar to courts-martial were not practicable. *Hamdan*, 126 S. Ct. at 2792-93, 165 L. Ed. 2d 773-74. Article 36, UCMJ, 10 U.S.C. § 836 required either uniformity or justification for variation from UCMJ procedures, rendering those military commissions variations illegal. *Id.* The Court noted, "Prior to enactment of Article 36(b), [UCMJ] it may well have been the case that a deviation from the rules governing courts-martial would not have rendered the military commission "illegal." *Hamdan*, 126 S. Ct. at 2793 n. 54, 165 L. Ed. 2d 774 n. 54 (citations omitted). The M.C.A. 948b(d) explicitly ended the applicability of Article 36, UCMJ, to military commission proceedings stating:

(d) INAPPLICABILITY OF CERTAIN PROVISIONS.—
(1) The following provisions of this title shall not apply to trial by military commission under this chapter:
(A) Section 810 (article 10 of the Uniform Code of Military Justice), relating to speedy trial, including any rule of courts-martial relating to speedy trial.
(B) Sections 831(a), (b), and (d) (articles 31(a), (b), and (d) of the Uniform Code of Military Justice), relating to compulsory self-incrimination.
(C) Section 832 (article 32 of the Uniform Code of Military Justice), relating to pretrial investigation.

*United States v. Khadr*
CMCR 07-001

We find no support for Appellant's claim that Congress, through the M.C.A., created a "comprehensive system" which sought to embrace and adopt all prior C.S.R.T. determinations that resulted in "enemy combatant" status assignments, and summarily turn those designations into findings that persons so labeled could also properly be considered "unlawful enemy combatants." Similarly, we find no support for Appellant's position regarding the parenthetical language contained in § 948a(1)(A)(i) of the M.C.A. -- "including a person who is part of the Taliban, al Qaeda, or associated forces." We do not read this language as declaring that a member of the Taliban, al Qaeda, or associated forces is *per se* an "unlawful enemy combatant" for purposes of exercising criminal jurisdiction before a military commission. We read the parenthetical comment as simply elaborating upon the sentence immediately preceding it. That is, that a member of the Taliban, al Qaeda, or associated forces *who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents* will also qualify as an "unlawful enemy combatant" under the M.C.A. (emphasis added). This interpretation is consistent with § 948b of the M.C.A., which describes the general purpose of military commissions as existing "to try alien unlawful enemy combatants *engaged in hostilities against the United States* for violations of the law of war and other offenses triable by military commission." (italics added). Critical to this analysis is the understanding that -- unlike the White House and Wolfowitz memoranda, both of which declared "enemy combatant" status solely for purposes of continued detention of personnel captured during hostilities and applicability of the Geneva Conventions -- Congress in the M.C.A. was carefully and deliberately defining status for the express purpose of specifying the *in personam* criminal jurisdiction of military commission trials. In defining what was clearly intended to be limited jurisdiction, Congress also prescribed serious criminal sanctions for those members of this select group who were ultimately convicted by military commissions.[20]

Contrary to the claims in Appellant's briefs, the 2002 White House memorandum never affirmatively declared members of al Qaeda to be "unlawful enemy combatants." In the memorandum, the President simply stated, "I also accept the legal conclusion of the Department of Justice and determine that none of the provisions of Geneva apply to our conflict with al Qaeda in Afghanistan or elsewhere throughout the world because, among other reasons, al Qaeda is not a High Contracting Party to Geneva." White House memorandum at 1, ¶ 2a. The memorandum later states that "because Geneva does not apply to our conflict with al Qaeda, al Qaeda detainees . . . do not qualify as prisoners of war." *Id.* at 2, ¶ 2d. It is reasonable to assume that Congress would seek to affirmatively declare the circumstances under which individual members of al Qaeda could become "unlawful

---

(2) Other provisions of chapter 47 of this title shall apply to trial by military commission under this chapter only to the extent provided by this chapter.

[20] *See* § 948d(d) (a military commission may adjudge any penalty up to and including death, when authorized under the M.C.A. or the law of war).

*United States v. Khadr*
CMCR 07-001

enemy combatants" for purposes of exacting criminal liability under the M.C.A.. Limiting criminal responsibility solely to an individual (including a member of al Qaeda or the Taliban, or associated forces) who actually "engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents" appears to be the clear intent of Congress, and requires more than mere membership in an organization for criminal responsibility to attach. [21]

Regarding the Taliban, the 2002 White House memorandum pronounced "the provisions of Geneva will apply to our present conflict with the Taliban." *Id.* at ¶ 2b. However, it then declared that "the Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war under Article 4 of Geneva." *Id.* at ¶ 2d. This decision was based upon the Taliban's failure to comply with fundamental law of war requirements. [22]    Again, Congress, clearly aware of this language, appears to have decided that only a Taliban member who actually "engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents" should be subject to trial by military commission. To accept Appellant's interpretation would allow criminal jurisdiction at a military commission to attach to members of the Taliban or al Qaeda who had never engaged in or supported hostilities.

Finally, the 2002 White House memorandum concluded that Common Article 3 of the Geneva Conventions "does not apply to either al Qaeda or Taliban detainees." *Id.* at ¶ 2c.  The Supreme Court subsequently determined that legal conclusion was erroneous. *See Hamdan,* 126 S.Ct. at 2795-96, 165 L. Ed. 2d 776-78. [23]  Congress, clearly aware of the *Hamdan* decision when it drafted the M.C.A.,

---

[21]  Summary determinations of a group's unlawful combatant status would appear to violate the Supreme Court's ruling in *Hamdi v. Rumsfeld,* 541 U.S. 507, 533 (2004), which recognized the fundamental right to notice and an opportunity to be heard on matters affecting a detainee's "enemy combatant" status determination.  In *Hamdi,* Justice Souter suggested that U.S. Army regulations governing combatant status determinations, which were premised upon Article 5 of GPW III, would appear to preclude any "categorical pronouncement" regarding an individual's combatant status. *Id.* at 550 (Souter, J., concurring); *see also Rasul v. Bush,* 542 U.S. 466 (2004); § 948d(c) M.C.A. (requiring that "unlawful enemy combatant" status -- in order to be "dispositive" of jurisdiction -- be established by "a C.S.R.T. or another competent tribunal"); *see* Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739, § 1005. Appellant appears to concede the necessity of individualized combatant status determinations. *See* Reply Brief on Behalf of Appellant at 16.

[22]  *See* Press Release, White House Office of the Press Sec'y, White House Press Secretary Announcement of President Bush's Determination re Legal Status of Taliban and al Qaeda Detainees (February 7, 2002), available at http://www.state.gov/s/l/38727.htm ("The Taliban have not effectively distinguished themselves from the civilian population of Afghanistan.  Moreover, they have not conducted their operations in accordance with the laws and customs of war.  Instead, they have knowingly adopted and provided support to the unlawful terrorist objectives of the al Qaeda.").

[23]  The Supreme Court in *Hamdan* found that Common Article 3 of the Geneva Conventions was applicable to the conflict with al Qaeda because it was a conflict not of an international character occurring in the territory of one of the High Contracting Parties." *Hamdan,* 126 S.Ct. at 2795, 165

*United States v. Khadr*
CMCR 07-001

appears to have embraced the minimal safeguards guaranteed by Common Article 3 requiring that even "unlawful enemy combatants" be tried by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See* § 948b(f), M.C.A. (quoting Common Article 3 -- "A military commission established under this chapter is a regularly constituted court, affording all the necessary 'judicial guarantees which are recognized as indispensable by civilized peoples' for purposes of Common Article 3 of the Geneva Conventions"); *see also* Art. III, GPW III, ¶ 1(d). No serious legal authority would contest the notion that one of the most indispensable and important judicial guarantees among civilized nations honoring a tradition of due process and fundamental fairness is the right to adequate notice and an opportunity to be heard in regard to allegations which might result in criminal sanctions.[24] The M.C.A. did not exist until October 2006. Mr. Khadr could not have known at the time of his C.S.R.T. in 2004 that a determination of "enemy combatant" status pursuant to declarations contained in the 2002 White House memorandum, or definitions contained in the 2004 Wolfowitz memorandum, could dispositively qualify him two years after the fact for potential criminal liability before a military commission as an "unlawful enemy combatant." We need not speculate how Mr. Khadr's personal participation in his 2004 C.S.R.T. evaluation may have been impacted had he been on notice of the potential criminal liability the C.S.R.T.'s findings could impose upon him. Such lack of notice offends our most basic and fundamental notions of due process; therefore, it also violates Common Article 3.

The declared purpose of the C.S.R.T. process used to review the status of hundreds of foreign national detainees captured in Iraq and Afghanistan and currently held under Defense Department control at Guantanamo Bay Naval Base, Cuba -- including Mr. Khadr -- was solely to afford detainees "the opportunity to contest designation as an enemy combatant." Wolfowitz memorandum at 1. The Wolfowitz memorandum never discusses addressing the issue of "lawful" or "unlawful" enemy combatant status; nor does the memorandum from the Secretary of

---

L. Ed. 2d 776 (quoting Common Article 3). Among the minimal protections provided by Common Article 3 is the prohibition against "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 6 U.S.T. at 3320 (Art. 3 at P1(d)); *Hamdan*, 126 S. Ct. at 2797, 165 L. Ed. 2d at 779 (Stevens, J., concurring). The plurality opinion in *Hamdan* postulated that a regularly constituted court "must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law." *Id.; see also* Jack M. Beard, *The Geneva Boomerang: The Military Commissions Act of 2006 and U.S. Counterterror Operations,* Am. Jour. Int'l L. 58 (2006).

[24] Article 75 of Protocol I to the Geneva Conventions of 1949 articulates many of the fundamental guarantees "which are recognized as indispensable by civilized peoples." *See* Protocol I, Art. 75(4)(a)-(j). Although the United States has declined to ratify Protocol I as a whole, Article 75 has been accepted by our government "as an articulation of safeguards to which all persons in the hands of an enemy are entitled." *Hamdan,* at 2797, 165 L. Ed. 2d at 779 (quoting Taft, *The Law of Armed Conflict After 9/11; Some Salient Features,* 28 Yale J. Int'l L. 319, 322 (2003)(Stevens, J., concurring). Among the many rights set forth in Article 75 are notice and "opportunity to be heard" provisions. *See* Protocol I, Art. 75(4)(a) and (g).

*United States v. Khadr*
CMCR 07-001

the Navy implementing the C.S.R.T. process.[25] As far as we can discern, the C.S.R.T.s were never tasked with making that determination. Instead, they conducted non-adversarial proceedings aimed at deciding, by a preponderance of the evidence, whether each detainee met the criteria for designation as an "enemy combatant" under the definition in the Wolfowitz memorandum[26] to permit continued detention at Guantanamo Bay. *Id.* at 2. In doing so, Mr. Khadr's 2004 C.S.R.T. employed a less exacting standard than that contained in the M.C.A. for establishing "unlawful enemy combatant" status. A detainee could be classified as an "enemy combatant" under the C.S.R.T. definition simply by being a "part of" the Taliban or al Qaeda, without ever having engaged in or supported hostilities against the United States or its coalition partners. *Id.* While such a classification would certainly be appropriate for authorizing continued detention during ongoing hostilities, it does not address in any way the "lawful" or "unlawful" nature of the detained combatant's belligerency under the M.C.A. Congress never stated that mere membership in or affiliation with the Taliban, al Qaeda, or associated forces was a sufficient basis for declaring someone to be an "unlawful enemy combatant" for purposes of exercising criminal jurisdiction over that person.[27] In the M.C.A., military commission jurisdiction is limited solely to those who actually "*engaged* in hostilities or who . . . *purposefully and materially* supported hostilities. . . ." *See* § 948a(1)(A)(i)(emphasis added). While Mr. Khadr's C.S.R.T. may have had more than sufficient evidence before it to properly classify him as an "alien unlawful enemy combatant," it was not charged with making that determination, and could not have applied the definition established by Congress, as it did not come into existence until October 2006 -- two years later.

We will apply the clear and unambiguous jurisdictional language Congress provided in the M.C.A. Doing so, we affirm the military judge's conclusion that Mr. Khadr's C.S.R.T. classification in 2004 as an "enemy combatant" was insufficient to establish the military commission's criminal jurisdiction over him.

### The Military Commission's Authority to Determine "Unlawful Enemy Combatant" Status.

We next examine the military judge's determination that "the military commission is not the proper authority, under the provisions of the M.C.A., to determine that Mr. Khadr is an unlawful enemy combatant in order to establish

---

[25] *See* Secretary of the Navy memorandum of July 29, 2004 ("Implementation of Combatant Status Review Tribunal procedures for Enemy Combatants detained at Guantanamo Bay Naval Base, Cuba"), AE 21 at 1.

[26] *Id.* at Enclosure (1), ¶ B (An "enemy combatant" for purposes of this order shall mean an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.").

[27] *See* Protocol I, Art. 4(b)("no one shall be convicted of an offense except on the basis of individual penal responsibility").

*United States v. Khadr*
CMCR 07-001

initial jurisdiction for this commission to try Mr. Khadr." *See* Military Judge's
Order on Jurisdiction of June 4 2007 at 1-2; Record at 21.  A brief chronology of the
procedural evolution of this military commission illuminates the judge's ultimate
ruling:

| Date | Event |
|---|---|
| June-July 2002 | Mr. Khadr's alleged offenses take place. |
| July 27, 2002 | Mr. Khadr is captured in Afghanistan following being wounded in a firefight. |
| September 7, 2004 | Mr. Khadr's C.S.R.T. proceeding is held. He is determined to be an "enemy combatant" and "a member of, or affiliated with al Qaeda." |
| September 10, 2004 | Legal Sufficiency Review of Mr. Khadr's C.S.R.T. proceeding concludes he is properly classified as an "enemy combatant." |
| April 5, 2007 | Charges are sworn against Mr. Khadr. |
| April 24, 2007 | Charges are referred non-capital for trial before a military commission and served upon Mr. Khadr. |
| June 3, 2007 | Military judge conducts an R.M.C. 802[28] conference with counsel.  Military judge raises jurisdictional concerns based on Mr. Khadr's C.S.R.T. determination. |
| June 4, 2007 | Mr. Khadr's military commission meets at Guantanamo Bay, Cuba.  The military judge *sua sponte* raises issue of *in personam* jurisdiction and ultimately dismisses charges without prejudice for lack thereof. |
| June 8, 2007 | Appellant submits a Motion for Reconsideration to the military judge. |

---

[28]  R.M.C. 802 authorizes the military judge to conduct pretrial conferences with the parties to
"consider such matters as will promote a fair and expeditious trial."

*United States v. Khadr*
CMCR 07-001

| June 29, 2007 | Military judge issues a "Disposition" of Mr. Khadr's Motion for Reconsideration declining to reconsider his ruling. |
|---|---|
| July 3, 2007 | Appellant provides written notice to the military judge of intent to appeal ruling to Court of Military Commission Review. |
| July 4, 2007 | Appellant files interlocutory appeal with Court of Military Commission Review. |

After ruling that Mr. Khadr's C.S.R.T. classification as an "enemy combatant" was insufficient to establish the military commission's jurisdiction over him, the military judge went on to conclude that he was not empowered to independently decide the matter of *in personam* jurisdiction because "the M.C.A. requires [that] determination be made in advance for there to be jurisdiction to refer charges against the accused. This is what Congress directed, and the Military Judge lacks authority to ignore this mandate." Disposition of Prosecution Motion for Reconsideration (AE 23) at 4, ¶ (3)(a). After affirmatively concluding that neither he nor the military commission was authorized to render a determination on Mr. Khadr's "unlawful enemy combatant" status,[29] and that such a determination had to be made as a prerequisite to referral, the military judge faulted Appellant for not presenting proof at the military commission hearing of Mr. Khadr's unlawful enemy combatant status, or requesting a continuance to more thoroughly brief the issue. *Id.* at ¶¶ 3a(3) & 3b(1)-(3). In his ruling, he also categorically rejected "the implication that the prosecution was not allowed to present argument or evidence on jurisdiction." *Id.* at ¶ 3b. He then decided that the Military Commission did not have jurisdiction." *Id.* at ¶ 4a.[30]

We hold the military judge erred in two respects: first, in not affording Appellant the opportunity to present evidence in support of its position on the jurisdictional issue before the military commission; and second, in concluding that a C.S.R.T. (or another competent tribunal) determination of "unlawful enemy combatant" status was a prerequisite to referral of charges to a military commission, and that the military commission lacked the power to independently consider and decide this important jurisdictional matter under the M.C.A.

---

[29] The military judge expressly stated in his written disposition of the prosecution's Motion for Reconsideration that, "In this case, the prosecution was alerted [by the military judge] well ahead of time that it was going to be required to state in open court that there was a C.S.R.T. determination that the accused was an alien *unlawful* enemy combatant. Such a determination was not presented." *Id.* at ¶ 3.

[30] *See also id.* at ¶ f(7) where the judge concluded, "The Military Judge does not find that the Commission is a competent tribunal to establish initial jurisdiction."

*United States v. Khadr*
CMCR 07-001

**a. Admission of Evidence on the Motion to Dismiss.**

We review a military judge's decision in regard to admitting or excluding evidence utilizing an "abuse of discretion" standard. *United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 139 (1997). "The abuse of discretion standard of review recognizes that a judge has a range of choices [in such matters] and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004)(citing *United States v. Wallace*, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)); *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003). Applying this standard is also appropriate in reviewing a judge's decisions regarding evidence production during a motion hearing or at trial.

Both the record of trial and the military judge's actions and rulings in this case demonstrate that the prosecution was not afforded the opportunity to present evidence to establish the military commission's *in personam* jurisdiction over Mr. Khadr. Although the assistant prosecutor argued the military commission should interpret Mr. Khadr's 2004 C.S.R.T. "enemy combatant" classification as satisfying the M.C.A's jurisdictional language, he also articulated a clear alternative position on the record. *See* Record at 11-13.

> This court is competent to make such a determination [on *in personam* jurisdiction], and the government will prove the jurisdictional element at trial by a preponderance of the evidence. In the event, Your Honor, that you're not willing to go forward absent a finding of jurisdiction by a preponderance of the evidence, the government is willing to prove jurisdiction today.

Record at 12.[31] The assistant prosecutor then specifically listed the evidence the Government would present in support of Mr. Khadr's "unlawful enemy combatant" status, which, *inter alia,* included a videotape of Mr. Khadr "engaged in unlawful combat activities including wearing civilian attire and making and planting roadside bombs," admissions made by Mr. Khadr, and other statements that implicated him in conducting such unlawful activities. Record at 12.[32] The military judge did not allow the government to present their evidence and instead inquired whether "anyone thought about going back and doing new [combatant status] review tribunals." Record at 17. Then, after a very brief recess, the military judge

---

[31] *See also* Record at 15, ". . . the government would be willing to prove before the military commission that he is, in fact, an unlawful enemy combatant. And if the court is not willing to move forward without a jurisdictional determination, then we are willing to produce evidence proving his status today."

[32] Mil. Comm. R. Evidence 104(a) makes it clear that the military judge, when deciding preliminary questions relating to determining a military commission's jurisdiction, is not bound by the rules of evidence, except those with respect to privileges. *Accord* MANUAL FOR COURTS-MARTIAL, UNITED STATES, Mil. R. Evid. 104(a)

*United States v. Khadr*
CMCR 07-001

immediately announced his ruling on his own *sua sponte* motion, and dismissed the charges without prejudice. Record at 22.

We disagree with the military judge's statement in his ruling on the Motion for Reconsideration "that the prosecution did not make a formal offer of proof concerning any of the evidence which it now proposes be used." Disposition of Prosecution Motion for Reconsideration (AE 23) at 3, ¶ 3b(1). The record demonstrates Appellant offered and was ready to present evidence to affirmatively establish the military commission's jurisdiction over Mr. Khadr, but was summarily denied that opportunity. The record does not support the assertion that the military judge afforded the prosecution an opportunity to present evidence on the jurisdiction and that they failed to do so. Asking counsel whether they have "anything else to say" in oral argument upon a pending motion is not the equivalent of an invitation or offer to present evidence. *Id.* at ¶ 3b(3); *see e.g.,* Record at 15 – 16. Indeed, oral argument upon a motion should rarely take place at all prior to evidence regarding the factual matters in dispute first being adduced at the motion hearing.[33] Finally, if there was any genuine confusion on this matter at the initial session of Mr. Khadr's military commission, Appellant's subsequent Motion for Reconsideration made it clear the prosecution "was and remains fully prepared to present evidence that would clearly establish jurisdiction over the accused." Prosecution Motion for Reconsideration of June 8, 2007 at 7. For these reasons, and those addressed in the next section of this opinion, we find the military judge abused his discretion in deciding this critical jurisdictional matter without first fully considering both the admissibility and merits of evidence Appellant offered to present on this issue.

**b.  Ruling Concerning the Military Commission's Authority to Determine Jurisdiction.**

We also conclude that the military judge erred in ruling he lacked authority under the M.C.A. to determine whether Mr. Khadr is an "unlawful enemy combatant" for purposes of establishing the military commission's initial jurisdiction to try him. *See* Military Judge's "Order on Jurisdiction" of June 4, 2007 at 1-2; Record at 21. The unambiguous language of the M.C.A., in conjunction with a clear and compelling line of federal precedent on the issue of establishing jurisdiction in federal courts, convince us the military judge possessed the independent authority to decide this critical jurisdictional prerequisite. "[A] federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz,* 536 U.S. 622, 627 (2002). A military commission is no different. *See* R.M.C. 201(b)(3)("A military commission always has jurisdiction to determine whether it has jurisdiction.").

The military judge expressly acknowledged in his ruling upon the Motion for Reconsideration, "there is no express statutory directive that the government must

---

[33]   Arguments of counsel in motion hearings or at trial are not evidence. Instead, counsel may only properly argue factual issues based upon previously admitted evidence at trial or an agreed upon stipulation of fact.

United States v. Khadr
CMCR 07-001

establish jurisdiction before it is allowed to proceed with a Military Commission." *See* Disposition of Prosecution Motion for Reconsideration at 6, ¶ 4e(3). Nevertheless, the military judge concluded there were "clear and unambiguous indicia that Congress intended . . . initial jurisdiction be established before the mechanism set up by the M.C.A. was used in the case of a given person[.]" *Id.* He concluded the only avenue for establishing initial jurisdiction was through a prior determination of "unlawful enemy combatant status by a C.S.R.T. (or other competent tribunal)." *Id.* at 7, ¶ 4e(3)(c). While we agree with the military judge's view that Congress contemplated an initial assessment of an accused's "unlawful enemy combatant" status prior to referral of charges to a military commission, we disagree with his conclusion that the only avenue for the assessment is that delineated in M.C.A. § 948a(1)A(ii). *See* M.C.A. § 948a-d.

As previously noted, any alien unlawful enemy combatant engaged in hostilities against the United States or its co-belligerents is subject to trial by military commission for violations of the law of war and other offenses triable by military commission. *See* M.C.A. § 948a-d; R.M.C. 201(b)(1). This jurisdiction attaches upon the formal swearing of charges against an accused, after an individual subject to the Uniform Code of Military Justice avers under formal oath that the charges are "true in fact." *See* R.M.C. 202(c) and 307(b). Charges may then be referred for trial by military commission under R.M.C. 601 as long as "reasonable grounds [exist] to believe that an offense triable by a military commission has been committed and that the accused committed it." R.M.C. 601(d). The only relevant limitation upon referral of charges is the requirement in R.M.C. 406(b) that, *inter alia,* prior to referral, the charge(s) must be referred to the convening authority's legal officer for pretrial advice, and that individual must state his/her conclusion as to "whether a military commission would have jurisdiction over the accused and the offense." *See* R.M.C. 406(b)(3). All of these steps occurred in this case, and, as previously stated, each offense referred for trial against Mr. Khadr clearly alleges the express jurisdictional language used in the M.C.A., that he is "a person subject to trial by military commission as an *alien unlawful enemy combatant.*" AE 1 at 4-7 (emphasis added). We find that this facial compliance by the Government with all the pre-referral criteria contained in the Rules for Military Commissions, combined with an unambiguous allegation in the pleadings that Mr. Khadr is "a person subject to trial by military commission as an alien unlawful enemy combatant," entitled the military commission to initially and properly exercise *prima facie* personal jurisdiction over the accused until such time as that jurisdiction was challenged by a motion to dismiss for lack thereof, or proof of jurisdiction was lacking on the merits.

In our opinion, the M.C.A. is clear and deliberate in its creation of a bifurcated methodology for establishing an accused's "unlawful enemy combatant" status so as to permit that individual's trial before a military commission. These two methods are laid out in M.C.A. § 948a(1)A where an "unlawful enemy combatant" is defined as:

*United States v. Khadr*
CMCR 07-001

(i)  a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); *or*

(ii)  a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.

(emphasis added).  The disjunctive "or" between subsections (i) and (ii) clearly sets forth alternative approaches for establishing military commission jurisdiction.  *See In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996)("'[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings,' and a statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives.'")(quoting *Reiter v. Sonotone Corporation,* 442 U.S. 330, 339 (1979)).  The military judge did not apply the disjunctive separation of these two provisions, and erroneously interpreted the distinct provisions as if written in the conjunctive; that is, as if joined by the word "and" rather than "or."[34]  Such an interpretation would render subsection (i) nothing more than a definition in aid of a C.S.R.T. (or other competent tribunal) determination of combatant status under subsection (ii), and is contradictory to the statute's clear structure, wording, and overall intent.

Upon challenge, the first method by which the M.C.A. contemplates jurisdiction being established is by evidence being presented before the military judge factually establishing that an accused meets the definition of "unlawful enemy combatant" as contained in subsection (i).  *In personam* criminal jurisdiction over a criminal accused is generally a question of law to be decided by the military judge, and is usually resolved only after presentation of evidence supporting jurisdiction and entry of corresponding findings of fact.  *See United States v. Melanson,* 53 M.J. 1, 2 (C.A.A.F. 2000)("When an accused contests personal jurisdiction on appeal, we review that question of law *de novo,* accepting the military judge's findings of historical facts unless they are clearly erroneous or unsupported in the record."); *United States v. Ernest,* 32 M.J. 135, 136-37 (C.M.A. 1991)(twenty-four findings of fact entered by the trial court in determining whether to grant motion to dismiss for lack of personal jurisdiction); *United States v. Cline,* 26 M.J. 1005, 1007 (A.F.C.M.R. 1988)(returning record to trial court to more fully develop and analyze factual matters serving as basis for assertion of personal jurisdiction); *see also United States v. Anderson,* 472 F.3d 662, 666-67 (9th Cir. 2006)(determining personal jurisdiction in light of alleged violation of extradition treaty).  There is a

---

[34]  The military judge ruled, "A strict reading of the MCA would appear to require that, until such time as a CSRT (or other competent tribunal) makes a finding that a person is an unlawful enemy combatant, the provisions of the M.C.A. do not come into play and such person may not be charged, charges may not be referred to a military commission for trial, and the military commission has no jurisdiction to try him."  Order on Jurisdiction of 04 Jun 2007 at 1, ¶ 7; *see also* Disposition of Prosecution Motion for Reconsideration of 29 Jun 2007 at 4, ¶ 4(d)(3)(a-b).

*United States v. Khadr*
CMCR 07-001

long and well-developed tradition in U.S. federal courts and, specifically, throughout military court-martial jurisprudence of military judges deciding matters of personal jurisdiction. *See e.g., Solorio,* 483 U.S. 439, 450-51 (listing military cases where personal jurisdiction litigated); J. Horbaly, *Court-Martial Jurisdiction* 375-534 (1986)(unpublished dissertation, Yale Law School)(listing numerous cases involving court-martial litigation to determine jurisdiction); Department of the Army Pamphlet 27-173, *Legal Services Trial Procedure* 40-112 (Dec. 31, 2002). Congress, clearly aware of historical court-martial practice, and desiring that military commissions mirror this firmly rooted practice to the maximum extent practicable,[35] would not have deprived military commissions of the ability to independently decide personal jurisdiction absent an express statement of such intent. No such statement is contained anywhere in the M.C.A.

The military judge's reliance on M.C.A. § 948a(1)(A)(ii) for the proposition that a military commission itself cannot determine personal jurisdiction is misplaced. This provision supports Appellant's position rather than detracts from it. Although Congress assigned a jurisdictional "safe harbor" for prior C.S.R.T. (or other competent tribunal) determinations of "unlawful enemy combatant" status by statutorily deeming them "dispositive" of jurisdiction, it did not in any way preclude Appellant from proving jurisdiction before the military commission in the absence of such a determination. Indeed, the existence of a statutorily recognized path to achieve a "dispositive" determination of jurisdiction suggests that pretrial procedures and pleadings alleging jurisdiction should simply be viewed as "nondispositive."[36] Subsection (ii) does not eliminate traditional methods of proving jurisdiction before the commission itself. We agree with Appellant's suggestion that Congress, through subsection (ii), merely carved out an exception to the military commission's authority to itself determine jurisdictional matters. *See* Supplemental Brief on Behalf of Appellant at 12. As Appellant notes, subsection (ii) makes it clear that the military judge is not at liberty to revisit a C.S.R.T.'s (or other competent tribunal's) finding of "unlawful enemy combatant" status *when there is*

---

[35] *See* M.C.A. § 949a(a)(mandating that military commission procedures shall, to the extent practicable, "apply the principles of law and the rules of evidence in trial by general courts-martial."); *see also* M.C.A. § 948b(c)(stating that the procedures for military commissions "are based upon the procedures for trial by general courts-martial under . . . the Uniform Code of Military Justice.")

[36] M.C.A. § 948a(1)(A)(ii) appears simply to acknowledge the standards and definitions, enhanced procedural safeguards, and other general rights afforded a detainee through the C.S.R.T. process after passage of the *Detainee Treatment Act of 2005.* Of course, that Act was not in existence on the date Mr. Khadr's C.S.R.T. was conducted. Also, only C.S.R.T. (or other competent tribunal) determinations of "unlawful enemy combatant" status are considered dispositive of a military commission's personal jurisdiction over an accused detainee. No such determination has ever been rendered in this case. As mentioned earlier, the C.S.R.T. which considered Mr. Khadr's status classified him only as an "enemy combatant." Having rendered no determination of Mr. Khadr's "lawful" or "unlawful" status, the C.S.R.T. finding of "enemy combatant" status is not entitled to enter Congress' statutory "safe harbor." An "enemy combatant" finding is necessary for deciding whether to impose continuing detention upon an individual, but it is not dispositive for purposes of establishing military commission jurisdiction.

*United States v. Khadr*
CMCR 07-001

*such a finding. See* Appellant's Supplemental Brief in Response to Court's Request at Oral Argument at 7. However, nothing in the M.C.A. *requires* such a finding in order to establish military commission jurisdiction. Had they so intended, Congress could have clearly stated in the M.C.A. that the only way to establish military commission jurisdiction is through a prior C.S.R.T. (or other competent tribunal) determination of "unlawful enemy combatant" status. It did not. Accordingly, we may properly find -- as clearly indicated in the language of M.C.A. §§ 949a(a) and 948b(c) -- that Congress intended for military commissions to "apply the principles of law" and "the procedures for trial [routinely utilized] by general courts-martial . . . ." This would include the common procedures used before general courts-martial permitting military judges to hear evidence and decide factual and legal matters concerning the court's own jurisdiction over the accused appearing before it.

This view is supported in the Rules for Military Commissions, which provide exactly such procedures. R.M.C. 907(b) allows an accused to raise a "Motion to Dismiss for Lack of Jurisdiction," and recognizes lack of jurisdiction as a nonwaivable ground for dismissal of charges at any stage of the proceedings. R.M.C. 905c(2)(B) assigns the burden of persuasion to the prosecution on a motion to dismiss for lack of jurisdiction; R.M.C. 905c(1) sets that burden on any factual issue necessary to resolve the motion as "a preponderance of the evidence." Clearly, these rules contemplate potential litigation of personal jurisdictional issues by the military commission, and provide the procedures necessary to address such a challenge.[37] If the only avenue to achieve military commission jurisdiction was through a previously rendered C.S.R.T. (or other competent tribunal) determination of "unlawful enemy combatant" status, all of these rules would be superfluous, as "dispositive" jurisdiction would have attached before the fact.

The text, structure, and history of the M.C.A. demonstrate clearly that a military judge presiding over a military commission may determine both the factual issue of an accused's "unlawful enemy combatant status" and the corresponding legal issue of the military commission's *in personam* jurisdiction. A contrary interpretation would ignore the bifurcated structure of M.C.A. § 948(1)(A) and the long-standing history of military judges in general courts-martial finding jurisdictional facts by a preponderance of the evidence, and resolving pretrial motions to dismiss for lack of jurisdiction. The M.C.A. identifies two potential jurisdiction-establishing methodologies based upon an allegation of "unlawful enemy combatant" status. The first, reflected in § 948a(1)(A)(i), involves the clear delineation of the jurisdictional standard to be applied by a military commission in determining its own jurisdiction. The second, contained in § 948a(1)(A)(ii), involves a non-judicial related jurisdictional determination that is to be afforded "dispositive" deference by the military commission. Either method will allow the

---

[37] *See* R.M.C. 202(b), Discussion ("The M.C.A. does not require that an individual receive a status determination by a C.S.R.T. or other competent tribunal before the beginning of a military commission proceeding. If, however, the accused has not received such a determination, he may challenge the personal jurisdiction of the commission through a motion to dismiss.").

*United States v. Khadr*
CMCR 07-001

military commission's exercise of jurisdiction where "unlawful enemy combatant" status has been established by a preponderance of the evidence. This interpretation is consistent with the requirements of both the M.C.A. and with international law.[38] *See Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804)(acts of Congress will generally be construed in a manner so as not to violate international law, as we presume that Congress ordinarily seeks to comply with international law when legislating).

Because we find the military judge had the power and authority under subsection (i) of § 948a(1)(A) of the M.C.A. to hear evidence concerning, and to ultimately decide, Mr. Khadr's "unlawful enemy combatant" status, we need not address whether or not a military commission is "another competent tribunal" under subsection (ii) to make that decision.

### Conclusion

The military judge's ruling he lacked authority to hear evidence on, and ultimately decide, the matter of Mr. Khadr's "unlawful enemy combatant status" under the provisions of the M.C.A. is reversed. The record of trial is returned to the military judge, who shall, consistent with this opinion, conduct all proceedings necessary to determine the military commission's jurisdiction over Mr. Khadr.

Judge FRANCIS and Judge HOLDEN concur.

FOR THE COURT:

SEP 2 4 2007          LEROY F. FOREMAN
                      Clerk of Court

---

[38] *See e.g.,* Article 45(2) of Protocol I to the Geneva Conventions. That Article suggests that a detained individual who is not being held as a POW has the right to assert an entitlement to POW status before a judicial tribunal, and that judicial adjudication of combatant status shall occur before trial for any alleged substantive offense. Following the M.C.A. procedures, as we interpret them here, would allow an accused to assert a claim of POW (i.e., lawful combatant) status at a pretrial motion session before the military judge. This pretrial determination of status would be fully in accord with Article 45(2) of Protocol I.