(Slip Opinion)            OCTOBER  TERM,  2007                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BOUMEDIENE ET AL. *v.* BUSH, PRESIDENT OF THE UNITED STATES, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 06–1195.  Argued December 5, 2007—Decided June 12, 2008*

In the Authorization for Use of Military Force (AUMF), Congress em-
powered the President "to use all necessary and appropriate force
against those . . . he determines planned, authorized, committed, or
aided the terrorist attacks . . . on September 11, 2001." In *Hamdi* v.
*Rumsfeld*, 542 U. S. 507, 518, 588–589, five Justices recognized that
detaining individuals captured while fighting against the United
States in Afghanistan for the duration of that conflict was a funda-
mental and accepted incident to war.  Thereafter, the Defense De-
partment established Combatant Status Review Tribunals (CSRTs)
to determine whether individuals detained at the U. S. Naval Station
at Guantanamo Bay, Cuba, were "enemy combatants."

   Petitioners are aliens detained at Guantanamo after being cap-
tured in Afghanistan or elsewhere abroad and designated enemy
combatants by CSRTs.  Denying membership in the al Qaeda terror-
ist network that carried out the September 11 attacks and the Tali-
ban regime that supported al Qaeda, each petitioner sought a writ of
habeas corpus in the District Court, which ordered the cases dis-
missed for lack of jurisdiction because Guantanamo is outside sover-
eign U. S. territory.  The D. C. Circuit affirmed, but this Court re-
versed, holding that 28 U. S. C. §2241 extended statutory habeas
jurisdiction to Guantanamo. See *Rasul* v. *Bush*, 542 U. S. 466, 473.
Petitioners' cases were then consolidated into two proceedings.  In
the first, the district judge granted the Government's motion to dis-
miss, holding that the detainees had no rights that could be vindi-

———————

*Together with No. 06–1196, *Al Odah, Next Friend of Al Odah, et al.*
v. *United States et al.,* also on certiorari to the same court.

2                          BOUMEDIENE *v.* BUSH

                                 Syllabus

cated in a habeas action.  In the second, the judge held that the de-
tainees had due process rights.

   While appeals were pending, Congress passed the Detainee Treat-
ment Act of 2005 (DTA), §1005(e) of which amended 28 U. S. C. §2241
to provide that "no court, justice, or judge shall have jurisdiction to
. . . consider . . . an application for . . . habeas corpus filed by or on
behalf of an alien detained . . . at Guantanamo," and gave the D. C.
Court of Appeals "exclusive" jurisdiction to review CSRT decisions.
In *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 576–577, the Court held this
provision inapplicable to cases (like petitioners') pending when the
DTA was enacted.  Congress responded with the Military Commis-
sions Act of 2006 (MCA), §7(a) of which amended §2241(e)(1) to deny
jurisdiction with respect to habeas actions by detained aliens deter-
mined to be enemy combatants, while §2241(e)(2) denies jurisdiction
as to "any other action against the United States . . . relating to any
aspect of the detention, transfer, treatment, trial, or conditions of
confinement" of a detained alien determined to be an enemy combat-
ant.  MCA §7(b) provides that the 2241(e) amendments "shall take ef-
fect on the date of the enactment of this Act, and shall apply to all
cases, without exception, pending on or after [that] date . . . which re-
late to any aspect of the detention, transfer, treatment, trial, or con-
ditions of detention of an alien detained . . . since September 11,
2001."

   The D. C. Court of Appeals concluded that MCA §7 must be read to
strip from it, and all federal courts, jurisdiction to consider petition-
ers' habeas applications; that petitioners are not entitled to habeas or
the protections of the Suspension Clause,  U. S. Const., Art. I, §9,
cl. 2, which provides that "[t]he Privilege of the Writ of Habeas Cor-
pus shall not be suspended, unless when in Cases of Rebellion or In-
vasion the public Safety may require it"; and that it was therefore
unnecessary to consider whether the DTA provided an adequate and
effective substitute for habeas.

*Held:*

   1. MCA §7 denies the federal courts jurisdiction to hear habeas ac-
tions, like the instant cases, that were pending at the time of its en-
actment.  Section §7(b)'s effective date provision undoubtedly applies
to habeas actions, which, by definition, "relate to . . . detention"
within that section's meaning.  Petitioners argue to no avail that
§7(b) does not apply to a §2241(e)(1) habeas action, but only to "any
other action" under §2241(e)(2), because it largely repeats that sec-
tion's language.  The phrase "other action" in §2241(e)(2) cannot be
understood without referring back to §2241(e)(1), which explicitly
mentions the "writ of habeas corpus."  Because the two paragraphs'
structure implies that habeas is a type of action "relating to any as-

Syllabus

pect of . . . detention," etc., pending habeas actions are in the category of cases subject to the statute's jurisdictional bar. This is confirmed by the MCA's legislative history. Thus, if MCA §7 is valid, petitioners' cases must be dismissed. Pp. 5–8.

2. Petitioners have the constitutional privilege of habeas corpus. They are not barred from seeking the writ or invoking the Suspension Clause's protections because they have been designated as enemy combatants or because of their presence at Guantanamo. Pp. 8–41.

(a) A brief account of the writ's history and origins shows that protection for the habeas privilege was one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights; in the system the Framers conceived, the writ has a centrality that must inform proper interpretation of the Suspension Clause. That the Framers considered the writ a vital instrument for the protection of individual liberty is evident from the care taken in the Suspension Clause to specify the limited grounds for its suspension: The writ may be suspended only when public safety requires it in times of rebellion or invasion. The Clause is designed to protect against cyclical abuses of the writ by the Executive and Legislative Branches. It protects detainee rights by a means consistent with the Constitution's essential design, ensuring that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the "delicate balance of governance." *Hamdi, supra,* at 536. Separation-of-powers principles, and the history that influenced their design, inform the Clause's reach and purpose. Pp. 8–15.

(b) A diligent search of founding-era precedents and legal commentaries reveals no certain conclusions. None of the cases the parties cite reveal whether a common-law court would have granted, or refused to hear for lack of jurisdiction, a habeas petition by a prisoner deemed an enemy combatant, under a standard like the Defense Department's in these cases, and when held in a territory, like Guantanamo, over which the Government has total military and civil control. The evidence as to the writ's geographic scope at common law is informative, but, again, not dispositive. Petitioners argue that the site of their detention is analogous to two territories outside England to which the common-law writ ran, the exempt jurisdictions and India, but critical differences between these places and Guantanamo render these claims unpersuasive. The Government argues that Guantanamo is more closely analogous to Scotland and Hanover, where the writ did not run, but it is unclear whether the common-law courts lacked the power to issue the writ there, or whether they refrained from doing so for prudential reasons. The parties' arguments that the very lack of a precedent on point supports their respective

Syllabus

positions are premised upon the doubtful assumptions that the historical record is complete and that the common law, if properly understood, yields a definite answer to the questions before the Court. Pp. 15–22.

(c) The Suspension Clause has full effect at Guantanamo.  The Government's argument that the Clause affords petitioners no rights because the United States does not claim sovereignty over the naval station is rejected.  Pp. 22–42.

(i) The Court does not question the Government's position that Cuba maintains sovereignty, in the legal and technical sense, over Guantanamo, but it does not accept the Government's premise that *de jure* sovereignty is the touchstone of habeas jurisdiction.  Common-law habeas' history provides scant support for this proposition, and it is inconsistent with the Court's precedents and contrary to fundamental separation-of-powers principles.  Pp. 22–25.

(ii) Discussions of the Constitution's extraterritorial application in cases involving provisions other than the Suspension Clause undermine the Government's argument.  Fundamental questions regarding the Constitution's geographic scope first arose when the Nation acquired Hawaii and the noncontiguous Territories ceded by Spain after the Spanish-American War, and Congress discontinued its prior practice of extending constitutional rights to territories by statute.  In the so-called Insular Cases, the Court held that the Constitution had independent force in the territories that was not contingent upon acts of legislative grace.  See, *e.g., Dorr* v. *United States*, 195 U. S. 138.  Yet because of the difficulties and disruption inherent in transforming the former Spanish colonies' civil-law system into an Anglo-American system, the Court adopted the doctrine of territorial incorporation, under which the Constitution applies in full in incorporated Territories surely destined for statehood but only in part in unincorporated Territories.  See, *e.g., id.,* at 143.  Practical considerations likewise influenced the Court's analysis in *Reid* v. *Covert,* 354 U. S. 1, where, in applying the jury provisions of the Fifth and Sixth Amendments to American civilians being tried by the U. S. military abroad, both the plurality and the concurrences noted the relevance of practical considerations, related not to the petitioners' citizenship, but to the place of their confinement and trial.  Finally, in holding that habeas jurisdiction did not extend to enemy aliens, convicted of violating the laws of war, who were detained in a German prison during the Allied Powers' post-World War II occupation, the Court, in *Johnson* v. *Eisentrager*, 339 U. S. 763, stressed the practical difficulties of ordering the production of the prisoners, *id.*, at 779.  The Government's reading of *Eisentrager* as adopting a formalistic test for determining the Suspension Clause's reach is rejected because: (1) the

Syllabus

discussion of practical considerations in that case was integral to a part of the Court's opinion that came before it announced its holding, see *id.,* at 781; (2) it mentioned the concept of territorial sovereignty only twice in its opinion, in contrast to its significant discussion of practical barriers to the running of the writ; and (3) if the Government's reading were correct, the opinion would have marked not only a change in, but a complete repudiation of, the Insular Cases' (and later *Reid*'s) functional approach. A constricted reading of *Eisentrager* overlooks what the Court sees as a common thread uniting all these cases: The idea that extraterritoriality questions turn on objective factors and practical concerns, not formalism. Pp. 25–34.

(iii) The Government's sovereignty-based test raises troubling separation-of-powers concerns, which are illustrated by Guantanamo's political history. Although the United States has maintained complete and uninterrupted control of Guantanamo for over 100 years, the Government's view is that the Constitution has no effect there, at least as to noncitizens, because the United States disclaimed formal sovereignty in its 1903 lease with Cuba. The Nation's basic charter cannot be contracted away like this. The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply. To hold that the political branches may switch the Constitution on or off at will would lead to a regime in which they, not this Court, say "what the law is." *Marbury* v. *Madison,* 1 Cranch 137, 177. These concerns have particular bearing upon the Suspension Clause question here, for the habeas writ is itself an indispensable mechanism for monitoring the separation of powers. Pp. 34–36.

(iv) Based on *Eisentrager, supra,* at 777, and the Court's reasoning in its other extraterritoriality opinions, at least three factors are relevant in determining the Suspension Clause's reach: (1) the detainees' citizenship and status and the adequacy of the process through which that status was determined; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ. Application of this framework reveals, first, that petitioners' status is in dispute: They are not American citizens, but deny they are enemy combatants; and although they have been afforded some process in CSRT proceedings, there has been no *Eisentrager*–style trial by military commission for violations of the laws of war. Second, while the sites of petitioners' apprehension and detention weigh against finding they have Suspension Clause rights, there are critical differences between *Eisentrager*'s German prison, circa 1950, and the Guantanamo Naval Station in 2008, given the Government's absolute and indefinite control over the naval station. Third, although the

Syllabus

Court is sensitive to the financial and administrative costs of holding the Suspension Clause applicable in a case of military detention abroad, these factors are not dispositive because the Government presents no credible arguments that the military mission at Guantanamo would be compromised if habeas courts had jurisdiction. The situation in *Eisentrager* was far different, given the historical context and nature of the military's mission in post-War Germany. Pp. 36–41.

(d) Petitioners are therefore entitled to the habeas privilege, and if that privilege is to be denied them, Congress must act in accordance with the Suspension Clause's requirements. Cf. *Rasul,* 542 U. S., at 564. Pp. 41–42.

3. Because the DTA's procedures for reviewing detainees' status are not an adequate and effective substitute for the habeas writ, MCA §7 operates as an unconstitutional suspension of the writ. Pp. 42–64.

(a) Given its holding that the writ does not run to petitioners, the D. C. Circuit found it unnecessary to consider whether there was an adequate substitute for habeas. This Court usually remands for consideration of questions not decided below, but departure from this rule is appropriate in "exceptional" circumstances, see, *e.g., Cooper Industries, Inc.* v. *Aviall Services, Inc.*, 543 U. S. 157, 169, here, the grave separation-of-powers issues raised by these cases and the fact that petitioners have been denied meaningful access to a judicial forum for years. Pp. 42–44.

(b) Historically, Congress has taken care to avoid suspensions of the writ. For example, the statutes at issue in the Court's two leading cases addressing habeas substitutes, *Swain* v. *Pressley*, 430 U. S. 372, and *United States* v. *Hayman*, 342 U. S. 205, were attempts to streamline habeas relief, not to cut it back. Those cases provide little guidance here because, *inter alia,* the statutes in question gave the courts broad remedial powers to secure the historic office of the writ, and included saving clauses to preserve habeas review as an avenue of last resort. In contrast, Congress intended the DTA and the MCA to circumscribe habeas review, as is evident from the unequivocal nature of MCA §7's jurisdiction-stripping language, from the DTA's text limiting the Court of Appeals' jurisdiction to assessing whether the CSRT complied with the "standards and procedures specified by the Secretary of Defense," DTA §1005(e)(2)(C), and from the absence of a saving clause in either Act. That Congress intended to create a more limited procedure is also confirmed by the legislative history and by a comparison of the DTA and the habeas statute that would govern in MCA §7's absence, 28 U. S. C. §2241. In §2241, Congress authorized "any justice" or "circuit judge" to issue the writ, thereby accommodat-

Cite as: 553 U. S. ____ (2008)                7

Syllabus

ing the necessity for factfinding that will arise in some cases by al-
lowing the appellate judge or Justice to transfer the case to a district
court. See §2241(b). However, by granting the D. C. Circuit "exclu-
sive" jurisdiction over petitioners' cases, see DTA §1005(e)(2)(A),
Congress has foreclosed that option in these cases. Pp. 44–49.

 (c) This Court does not endeavor to offer a comprehensive sum-
mary of the requisites for an adequate habeas substitute. It is un-
controversial, however, that the habeas privilege entitles the prisoner
to a meaningful opportunity to demonstrate that he is being held pur-
suant to "the erroneous application or interpretation" of relevant law,
*INS* v. *St. Cyr*, 533 U. S. 289, 302, and the habeas court must have
the power to order the conditional release of an individual unlawfully
detained. But more may be required depending on the circum-
stances. Petitioners identify what they see as myriad deficiencies in
the CSRTs, the most relevant being the constraints upon the de-
tainee's ability to rebut the factual basis for the Government's asser-
tion that he is an enemy combatant. At the CSRT stage the detainee
has limited means to find or present evidence to challenge the Gov-
ernment's case, does not have the assistance of counsel, and may not
be aware of the most critical allegations that the Government relied
upon to order his detention. His opportunity to confront witnesses is
likely to be more theoretical than real, given that there are no limits
on the admission of hearsay. The Court therefore agrees with peti-
tioners that there is considerable risk of error in the tribunal's find-
ings of fact. And given that the consequence of error may be deten-
tion for the duration of hostilities that may last a generation or more,
the risk is too significant to ignore. Accordingly, for the habeas writ,
or its substitute, to function as an effective and meaningful remedy in
this context, the court conducting the collateral proceeding must have
some ability to correct any errors, to assess the sufficiency of the
Government's evidence, and to admit and consider relevant exculpa-
tory evidence that was not introduced during the earlier proceeding.
*In re Yamashita*, 327 U. S. 1, 5, 8, and *Ex parte Quirin*, 317 U. S. 1,
23–25, distinguished. Pp. 49–57.

 (d) Petitioners have met their burden of establishing that the
DTA review process is, on its face, an inadequate substitute for ha-
beas. Among the constitutional infirmities from which the DTA po-
tentially suffers are the absence of provisions allowing petitioners to
challenge the President's authority under the AUMF to detain them
indefinitely, to contest the CSRT's findings of fact, to supplement the
record on review with exculpatory evidence discovered after the
CSRT proceedings, and to request release. The statute cannot be
read to contain each of these constitutionally required procedures.
MCA §7 thus effects an unconstitutional suspension of the writ.

8                          BOUMEDIENE *v.* BUSH

Syllabus

There is no jurisdictional bar to the District Court's entertaining petitioners' claims. Pp. 57–64.

4. Nor are there prudential barriers to habeas review.  Pp. 64–70.

(a) Petitioners need not seek review of their CSRT determinations in the D. C. Circuit before proceeding with their habeas actions in the District Court.  If these cases involved detainees held for only a short time while awaiting their CSRT determinations, or were it probable that the Court of Appeals could complete a prompt review of their applications, the case for requiring temporary abstention or exhaustion of alternative remedies would be much stronger.  But these qualifications no longer pertain here.  In some instances six years have elapsed without the judicial oversight that habeas corpus or an adequate substitute demands.  To require these detainees to pursue the limited structure of DTA review before proceeding with habeas actions would be to require additional months, if not years, of delay.  This holding should not be read to imply that a habeas court should intervene the moment an enemy combatant steps foot in a territory where the writ runs.  Except in cases of undue delay, such as the present, federal courts should refrain from entertaining an enemy combatant's habeas petition at least until after the CSRT has had a chance to review his status.  Pp. 64–67.

(b) In effectuating today's holding, certain accommodations—including channeling future cases to a single district court and requiring that court to use its discretion to accommodate to the greatest extent possible the Government's legitimate interest in protecting sources and intelligence gathering methods—should be made to reduce the burden habeas proceedings will place on the military, without impermissibly diluting the writ's protections.  Pp. 67–68.

5. In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, the courts must accord proper deference to the political branches.  However, security subsists, too, in fidelity to freedom's first principles, chief among them being freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers.  Pp. 68–70.

476 F. 3d 981, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined.  SOUTER, J., filed a concurring opinion, in which GINSBURG and BREYER, JJ., joined.  ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, THOMAS, and ALITO, JJ., joined.  SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 06–1195 and 06–1196

————

LAKHDAR BOUMEDIENE, ET AL., PETITIONERS
06–1195    *v.*
GEORGE W. BUSH, PRESIDENT OF THE UNITED
STATES, ET AL.

KHALED A. F. AL ODAH, NEXT FRIEND OF FAWZI
KHALID ABDULLAH FAHAD AL ODAH, ET AL.,
PETITIONERS
06–1196    *v.*
UNITED STATES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 12, 2008]

JUSTICE KENNEDY delivered the opinion of the Court.

Petitioners are aliens designated as enemy combatants and detained at the United States Naval Station at Guantanamo Bay, Cuba. There are others detained there, also aliens, who are not parties to this suit.

Petitioners present a question not resolved by our earlier cases relating to the detention of aliens at Guantanamo: whether they have the constitutional privilege of habeas corpus, a privilege not to be withdrawn except in conformance with the Suspension Clause, Art. I, §9, cl. 2. We hold these petitioners do have the habeas corpus privilege. Congress has enacted a statute, the Detainee Treatment Act of 2005 (DTA), 119 Stat. 2739, that pro-

vides certain procedures for review of the detainees'
status. We hold that those procedures are not an ade-
quate and effective substitute for habeas corpus. There-
fore §7 of the Military Commissions Act of 2006 (MCA), 28
U. S. C. A. §2241(e) (Supp. 2007), operates as an unconsti-
tutional suspension of the writ. We do not address
whether the President has authority to detain these peti-
tioners nor do we hold that the writ must issue. These
and other questions regarding the legality of the detention
are to be resolved in the first instance by the District
Court.

I

Under the Authorization for Use of Military Force
(AUMF), §2(a), 115 Stat. 224, note following 50 U. S. C.
§1541 (2000 ed., Supp. V), the President is authorized "to
use all necessary and appropriate force against those
nations, organizations, or persons he determines planned,
authorized, committed, or aided the terrorist attacks that
occurred on September 11, 2001, or harbored such organi-
zations or persons, in order to prevent any future acts of
international terrorism against the United States by such
nations, organizations or persons."

In *Hamdi* v. *Rumsfeld*, 542 U. S. 507 (2004), five Mem-
bers of the Court recognized that detention of individuals
who fought against the United States in Afghanistan "for
the duration of the particular conflict in which they were
captured, is so fundamental and accepted an incident to
war as to be an exercise of the 'necessary and appropriate
force' Congress has authorized the President to use." *Id.*,
at 518 (plurality opinion of O'Connor, J.), *id.*, at 588–589
(THOMAS, J., dissenting). After *Hamdi*, the Deputy Secre-
tary of Defense established Combatant Status Review
Tribunals (CSRTs) to determine whether individuals
detained at Guantanamo were "enemy combatants," as the
Department defines that term. See App. to Pet. for Cert.

in No. 06–1195, p. 81a. A later memorandum established procedures to implement the CSRTs. See App. to Pet. for Cert. in No. 06–1196, p. 147. The Government maintains these procedures were designed to comply with the due process requirements identified by the plurality in *Hamdi.* See Brief for Respondents 10.

Interpreting the AUMF, the Department of Defense ordered the detention of these petitioners, and they were transferred to Guantanamo. Some of these individuals were apprehended on the battlefield in Afghanistan, others in places as far away from there as Bosnia and Gambia. All are foreign nationals, but none is a citizen of a nation now at war with the United States. Each denies he is a member of the al Qaeda terrorist network that carried out the September 11 attacks or of the Taliban regime that provided sanctuary for al Qaeda. Each petitioner appeared before a separate CSRT; was determined to be an enemy combatant; and has sought a writ of habeas corpus in the United States District Court for the District of Columbia.

The first actions commenced in February 2002. The District Court ordered the cases dismissed for lack of jurisdiction because the naval station is outside the sovereign territory of the United States. See *Rasul* v. *Bush*, 215 F. Supp. 2d 55 (2002). The Court of Appeals for the District of Columbia Circuit affirmed. See *Al Odah* v. *United States*, 321 F. 3d 1134, 1145 (2003). We granted certiorari and reversed, holding that 28 U. S. C. §2241 extended statutory habeas corpus jurisdiction to Guantanamo. See *Rasul* v. *Bush*, 542 U. S. 466, 473 (2004). The constitutional issue presented in the instant cases was not reached in *Rasul. Id.*, at 476.

After *Rasul*, petitioners' cases were consolidated and entertained in two separate proceedings. In the first set of cases, Judge Richard J. Leon granted the Government's motion to dismiss, holding that the detainees had no

rights that could be vindicated in a habeas corpus action. In the second set of cases Judge Joyce Hens Green reached the opposite conclusion, holding the detainees had rights under the Due Process Clause of the Fifth Amendment. See *Khalid* v. *Bush*, 355 F. Supp. 2d 311, 314 (DC 2005); *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (DC 2005).

While appeals were pending from the District Court decisions, Congress passed the DTA. Subsection (e) of §1005 of the DTA amended 28 U. S. C. §2241 to provide that "no court, justice, or judge shall have jurisdiction to hear or consider . . . an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." 119 Stat. 2742. Section 1005 further provides that the Court of Appeals for the District of Columbia Circuit shall have "exclusive" jurisdiction to review decisions of the CSRTs. *Ibid.*

In *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 576–577 (2006), the Court held this provision did not apply to cases (like petitioners') pending when the DTA was enacted. Congress responded by passing the MCA, 10 U. S. C. A. §948a *et seq.* (Supp. 2007), which again amended §2241. The text of the statutory amendment is discussed below. See Part II, *infra.* (Four Members of the *Hamdan* majority noted that "[n]othing prevent[ed] the President from returning to Congress to seek the authority he believes necessary." 548 U. S., at 636 (BREYER, J., concurring). The authority to which the concurring opinion referred was the authority to "create military commissions of the kind at issue" in the case. *Ibid.* Nothing in that opinion can be construed as an invitation for Congress to suspend the writ.)

Petitioners' cases were consolidated on appeal, and the parties filed supplemental briefs in light of our decision in *Hamdan.* The Court of Appeals' ruling, 476 F. 3d 981

Opinion of the Court

(CADC 2007), is the subject of our present review and today's decision.

The Court of Appeals concluded that MCA §7 must be read to strip from it, and all federal courts, jurisdiction to consider petitioners' habeas corpus applications, *id.*, at 987; that petitioners are not entitled to the privilege of the writ or the protections of the Suspension Clause, *id.*, at 990–991; and, as a result, that it was unnecessary to consider whether Congress provided an adequate and effective substitute for habeas corpus in the DTA.

We granted certiorari. 551 U. S. ___ (2007).

## II

As a threshold matter, we must decide whether MCA §7 denies the federal courts jurisdiction to hear habeas corpus actions pending at the time of its enactment. We hold the statute does deny that jurisdiction, so that, if the statute is valid, petitioners' cases must be dismissed.

As amended by the terms of the MCA, 28 U. S. C. A. §2241(e) (Supp. 2007) now provides:

"(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

"(2) Except as provided in [§§1005(e)(2) and (e)(3) of the DTA] no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting

Opinion of the Court

such determination."

Section 7(b) of the MCA provides the effective date for the amendment of §2241(e).  It states:

> "The amendment made by [MCA §7(a)] shall take ef-
> fect on the date of the enactment of this Act, and shall
> apply to all cases, without exception, pending on or af-
> ter the date of the enactment of this Act which relate
> to any aspect of the detention, transfer, treatment,
> trial, or conditions of detention of an alien detained by
> the United States since September 11, 2001."   120
> Stat. 2636.

There is little doubt that the effective date provision applies to habeas corpus actions.  Those actions, by defini-tion, are cases "which relate to . . . detention."  See Black's Law Dictionary 728 (8th ed. 2004) (defining habeas corpus as "[a] writ employed to bring a person before a court, most frequently to ensure that the party's imprisonment or detention is not illegal").  Petitioners argue, neverthe-less, that MCA §7(b) is not a sufficiently clear statement of congressional intent to strip the federal courts of jurisdic-tion in pending cases.  See *Ex parte Yerger*, 8 Wall. 85, 102–103 (1869).  We disagree.

Their argument is as follows: Section 2241(e)(1) refers to "a writ of habeas corpus."   The next paragraph, §2241(e)(2), refers to "any other action . . . relating to any aspect of the detention, transfer, treatment, trial, or condi-tions of confinement of an alien who . . . [has] been prop-erly detained as an enemy combatant or is awaiting such determination."   There are two separate paragraphs, the argument continues, so there must be two distinct classes of cases.  And the effective date subsection, MCA §7(b), it is said, refers only to the second class of cases, for it largely repeats the language of §2241(e)(2) by referring to "cases . . . which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an

alien detained by the United States."

Petitioners' textual argument would have more force were it not for the phrase "other action" in §2241(e)(2). The phrase cannot be understood without referring back to the paragraph that precedes it, §2241(e)(1), which explicitly mentions the term "writ of habeas corpus." The structure of the two paragraphs implies that habeas actions are a type of action "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained . . . as an enemy combatant." Pending habeas actions, then, are in the category of cases subject to the statute's jurisdictional bar.

We acknowledge, moreover, the litigation history that prompted Congress to enact the MCA. In *Hamdan* the Court found it unnecessary to address the petitioner's Suspension Clause arguments but noted the relevance of the clear statement rule in deciding whether Congress intended to reach pending habeas corpus cases. See 548 U. S., at 575 (Congress should "not be presumed to have effected such denial [of habeas relief] absent an unmistakably clear statement to the contrary"). This interpretive rule facilitates a dialogue between Congress and the Court. Cf. *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 206 (1991); H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1209–1210 (W. Eskridge & P. Frickey eds. 1994). If the Court invokes a clear statement rule to advise that certain statutory interpretations are favored in order to avoid constitutional difficulties, Congress can make an informed legislative choice either to amend the statute or to retain its existing text. If Congress amends, its intent must be respected even if a difficult constitutional question is presented. The usual presumption is that Members of Congress, in accord with their oath of office, considered the constitutional issue and determined

Opinion of the Court

the amended statute to be a lawful one; and the Judiciary, in light of that determination, proceeds to its own independent judgment on the constitutional question when required to do so in a proper case.

If this ongoing dialogue between and among the branches of Government is to be respected, we cannot ignore that the MCA was a direct response to *Hamdan*'s holding that the DTA's jurisdiction-stripping provision had no application to pending cases. The Court of Appeals was correct to take note of the legislative history when construing the statute, see 476 F. 3d, at 986, n. 2 (citing relevant floor statements); and we agree with its conclusion that the MCA deprives the federal courts of jurisdiction to entertain the habeas corpus actions now before us.

### III

In deciding the constitutional questions now presented we must determine whether petitioners are barred from seeking the writ or invoking the protections of the Suspension Clause either because of their status, *i.e.*, petitioners' designation by the Executive Branch as enemy combatants, or their physical location, *i.e.*, their presence at Guantanamo Bay. The Government contends that noncitizens designated as enemy combatants and detained in territory located outside our Nation's borders have no constitutional rights and no privilege of habeas corpus. Petitioners contend they do have cognizable constitutional rights and that Congress, in seeking to eliminate recourse to habeas corpus as a means to assert those rights, acted in violation of the Suspension Clause.

We begin with a brief account of the history and origins of the writ. Our account proceeds from two propositions. First, protection for the privilege of habeas corpus was one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights. In the system conceived by the Framers the writ had a centrality that

Opinion of the Court

must inform proper interpretation of the Suspension Clause. Second, to the extent there were settled precedents or legal commentaries in 1789 regarding the extraterritorial scope of the writ or its application to enemy aliens, those authorities can be instructive for the present cases.

A

The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom. Experience taught, however, that the common-law writ all too often had been insufficient to guard against the abuse of monarchial power. That history counseled the necessity for specific language in the Constitution to secure the writ and ensure its place in our legal system.

Magna Carta decreed that no man would be imprisoned contrary to the law of the land. Art. 39, in Sources of Our Liberties 17 (R. Perry & J. Cooper eds. 1959) ("No free man shall be taken or imprisoned or dispossessed, or outlawed, or banished, or in any way destroyed, nor will we go upon him, nor send upon him, except by the legal judgment of his peers or by the law of the land"). Important as the principle was, the Barons at Runnymede prescribed no specific legal process to enforce it. Holdsworth tells us, however, that gradually the writ of habeas corpus became the means by which the promise of Magna Carta was fulfilled. 9 W. Holdsworth, A History of English Law 112 (1926) (hereinafter Holdsworth).

The development was painstaking, even by the centuries-long measures of English constitutional history. The writ was known and used in some form at least as early as the reign of Edward I. *Id.*, at 108–125. Yet at the outset it was used to protect not the rights of citizens but those of the King and his courts. The early courts were considered

agents of the Crown, designed to assist the King in the
exercise of his power. See J. Baker, An Introduction to
English Legal History 38–39 (4th ed. 2002). Thus the
writ, while it would become part of the foundation of
liberty for the King's subjects, was in its earliest use a
mechanism for securing compliance with the King's
laws. See Halliday & White, The Suspension Clause:
English Text, Imperial Contexts, and American Impli-
cations, 94 Va. L. Rev. (forthcoming 2008) (hereinafter
Halliday & White) (manuscript, at 11, online at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=100
8252 (all Internet materials as visited June 9, 2008, and
available in Clerk of Court's case file) (noting that "concep-
tually the writ arose from a theory of power rather than a
theory of liberty")). Over time it became clear that by
issuing the writ of habeas corpus common-law courts
sought to enforce the King's prerogative to inquire into the
authority of a jailer to hold a prisoner. See M. Hale, Pre-
rogatives of the King 229 (D. Yale ed. 1976); 2 J. Story,
Commentaries on the Constitution of the United States
§1341, p. 237 (3d ed. 1858) (noting that the writ ran "into
all parts of the king's dominions; for it is said, that the
king is entitled, at all times, to have an account, why the
liberty of any of his subjects is restrained").

   Even so, from an early date it was understood that the
King, too, was subject to the law. As the writers said of
Magna Carta, "it means this, that the king is and shall be
below the law." 1 F. Pollock & F. Maitland, History of
English Law 173 (2d ed. 1909); see also 2 Bracton On the
Laws and Customs of England 33 (S. Thorne transl. 1968)
("The king must not be under man but under God and
under the law, because law makes the king"). And, by the
1600's, the writ was deemed less an instrument of the
King's power and more a restraint upon it. See Collings,
Habeas Corpus for Convicts—Constitutional Right or
Legislative Grace, 40 Calif. L. Rev. 335, 336 (1952) (noting

that by this point the writ was "the appropriate process for checking illegal imprisonment by public officials").

Still, the writ proved to be an imperfect check. Even when the importance of the writ was well understood in England, habeas relief often was denied by the courts or suspended by Parliament. Denial or suspension occurred in times of political unrest, to the anguish of the imprisoned and the outrage of those in sympathy with them.

A notable example from this period was *Darnel's Case*, 3 How. St. Tr. 1 (K. B. 1627). The events giving rise to the case began when, in a display of the Stuart penchant for authoritarian excess, Charles I demanded that Darnel and at least four others lend him money. Upon their refusal, they were imprisoned. The prisoners sought a writ of habeas corpus; and the King filed a return in the form of a warrant signed by the Attorney General. *Ibid*. The court held this was a sufficient answer and justified the subjects' continued imprisonment. *Id*., at 59.

There was an immediate outcry of protest. The House of Commons promptly passed the Petition of Right, 3 Car. 1, ch. 1 (1627), 5 Statutes of the Realm 23, 24 (reprint 1963), which condemned executive "imprison[ment] without any cause" shown, and declared that "no freeman in any such manner as is before mencioned [shall] be imprisoned or deteined." Yet a full legislative response was long delayed. The King soon began to abuse his authority again, and Parliament was dissolved. See W. Hall & R. Albion, A History of England and the British Empire 328 (3d ed. 1953) (hereinafter Hall & Albion). When Parliament reconvened in 1640, it sought to secure access to the writ by statute. The Act of 1640, 16 Car. 1, ch. 10, 5 Statutes of the Realm, at 110, expressly authorized use of the writ to test the legality of commitment by command or warrant of the King or the Privy Council. Civil strife and the Interregnum soon followed, and not until 1679 did Parliament try once more to secure the writ, this time through the

Opinion of the Court

Habeas Corpus Act of 1679, 31 Car. 2, ch. 2, *id.,* at 935.
The Act, which later would be described by Blackstone as
the "stable bulwark of our liberties," 1 W. Blackstone,
Commentaries *137 (hereinafter Blackstone), established
procedures for issuing the writ; and it was the model upon
which the habeas statutes of the 13 American Colonies
were based, see Collings, *supra*, at 338–339.

This history was known to the Framers.  It no doubt
confirmed their view that pendular swings to and away
from individual liberty were endemic to undivided, uncon-
trolled power.  The Framers' inherent distrust of govern-
mental power was the driving force behind the constitu-
tional    plan    that    allocated    powers    among    three
independent branches.  This design serves not only to
make Government accountable but also to secure individ-
ual liberty.  See *Loving* v. *United States*, 517 U. S. 748,
756 (1996) (noting that "[e]ven before the birth of this
country, separation of powers was known to be a defense
against tyranny"); cf. *Youngstown Sheet & Tube Co.* v.
*Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring)
("[T]he Constitution diffuses power the better to secure
liberty"); *Clinton* v. *City of New York*, 524 U. S. 417, 450
(1998) (KENNEDY, J., concurring) ("Liberty is always at
stake when one or more of the branches seek to transgress
the separation of powers").  Because the Constitution's
separation-of-powers structure, like the substantive guar-
antees of the Fifth and Fourteenth Amendments, see *Yick
Wo* v. *Hopkins*, 118 U. S. 356, 374 (1886), protects persons
as well as citizens, foreign nationals who have the privi-
lege of litigating in our courts can seek to enforce separa-
tion-of-powers principles, see, *e.g., INS* v. *Chadha*, 462
U. S. 919, 958–959 (1983).

That the Framers considered the writ a vital instrument
for the protection of individual liberty is evident from the
care taken to specify the limited grounds for its suspen-
sion: "The Privilege of the Writ of Habeas Corpus shall not

be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, §9, cl. 2; see Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425, 1509, n. 329 (1987) ("[T]he non-suspension clause is the original Constitution's most explicit reference to remedies"). The word "privilege" was used, perhaps, to avoid mentioning some rights to the exclusion of others. (Indeed, the only mention of the term "right" in the Constitution, as ratified, is in its clause giving Congress the power to protect the rights of authors and inventors. See Art. I, §8, cl. 8.)

Surviving accounts of the ratification debates provide additional evidence that the Framers deemed the writ to be an essential mechanism in the separation-of-powers scheme. In a critical exchange with Patrick Henry at the Virginia ratifying convention Edmund Randolph referred to the Suspension Clause as an "exception" to the "power given to Congress to regulate courts." See 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 460–464 (J. Elliot 2d ed. 1876) (hereinafter Elliot's Debates). A resolution passed by the New York ratifying convention made clear its understanding that the Clause not only protects against arbitrary suspensions of the writ but also guarantees an affirmative right to judicial inquiry into the causes of detention. See Resolution of the New York Ratifying Convention (July 26, 1788), in 1 Elliot's Debates 328 (noting the convention's understanding "[t]hat every person restrained of his liberty is entitled to an inquiry into the lawfulness of such restraint, and to a removal thereof if unlawful; and that such inquiry or removal ought not to be denied or delayed, except when, on account of public danger, the Congress shall suspend the privilege of the writ of *habeas corpus*"). Alexander Hamilton likewise explained that by providing the detainee a judicial forum to challenge detention, the writ preserves limited government. As he explained in

Opinion of the Court

The Federalist No. 84:

> "[T]he practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny. The observations of the judicious Blackstone . . . are well worthy of recital: 'To bereave a man of life . . . or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a *more dangerous engine* of arbitrary government.' And as a remedy for this fatal evil he is everywhere peculiarly emphatical in his encomiums on the *habeas corpus* act, which in one place he calls 'the BULWARK of the British Constitution.'" C. Rossiter ed., p. 512 (1961) (quoting 1 Blackstone \*136, 4 *id.,* at \*438).

Post-1789 habeas developments in England, though not bearing upon the Framers' intent, do verify their foresight. Those later events would underscore the need for structural barriers against arbitrary suspensions of the writ. Just as the writ had been vulnerable to executive and parliamentary encroachment on both sides of the Atlantic before the American Revolution, despite the Habeas Corpus Act of 1679, the writ was suspended with frequency in England during times of political unrest after 1789. Parliament suspended the writ for much of the period from 1792 to 1801, resulting in rampant arbitrary imprisonment. See Hall & Albion 550. Even as late as World War I, at least one prominent English jurist complained that the Defence of the Realm Act, 1914, 4 & 5 Geo. 5, ch. 29(1)(a), effectively had suspended the privilege of habeas corpus for any person suspected of "communicating with the enemy." See *King* v. *Halliday,* [1917] A. C. 260, 299

(Lord Shaw, dissenting); see generally A. Simpson, In the Highest Degree Odious: Detention Without Trial in Wartime Britain 6–7, 24–25 (1992).

In our own system the Suspension Clause is designed to protect against these cyclical abuses. The Clause protects the rights of the detained by a means consistent with the essential design of the Constitution. It ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the "delicate balance of governance" that is itself the surest safeguard of liberty. See *Hamdi,* 542 U. S., at 536 (plurality opinion). The Clause protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account. See *Preiser* v. *Rodriguez*, 411 U. S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody"); cf. *In re Jackson*, 15 Mich. 417, 439–440 (1867) (Cooley, J., concurring) ("The important fact to be observed in regard to the mode of procedure upon this [habeas] writ is, that it is directed to, and served upon, not the person confined, but his jailer"). The separation-of-powers doctrine, and the history that influenced its design, therefore must inform the reach and purpose of the Suspension Clause.

### B

The broad historical narrative of the writ and its function is central to our analysis, but we seek guidance as well from founding-era authorities addressing the specific question before us: whether foreign nationals, apprehended and detained in distant countries during a time of serious threats to our Nation's security, may assert the privilege of the writ and seek its protection. The Court has been careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments that define the present scope

Opinion of the Court

of the writ. See *INS* v. *St. Cyr*, 533 U. S. 289, 300–301 (2001). But the analysis may begin with precedents as of 1789, for the Court has said that "at the absolute minimum" the Clause protects the writ as it existed when the Constitution was drafted and ratified. *Id.*, at 301.

To support their arguments, the parties in these cases have examined historical sources to construct a view of the common-law writ as it existed in 1789—as have *amici* whose expertise in legal history the Court has relied upon in the past. See Brief for Legal Historians as *Amici Curiae; see also St. Cyr, supra*, at 302, n. 16. The Government argues the common-law writ ran only to those territories over which the Crown was sovereign. See Brief for Respondents 27. Petitioners argue that jurisdiction followed the King's officers. See Brief for Petitioner Boumediene et al. 11. Diligent search by all parties reveals no certain conclusions. In none of the cases cited do we find that a common-law court would or would not have granted, or refused to hear for lack of jurisdiction, a petition for a writ of habeas corpus brought by a prisoner deemed an enemy combatant, under a standard like the one the Department of Defense has used in these cases, and when held in a territory, like Guantanamo, over which the Government has total military and civil control.

We know that at common law a petitioner's status as an alien was not a categorical bar to habeas corpus relief. See, *e.g.*, *Sommersett's Case*, 20 How. St. Tr. 1, 80–82 (1772) (ordering an African slave freed upon finding the custodian's return insufficient); see generally *Khera* v. *Secretary of State for the Home Dept.*, [1984] A. C. 74, 111 ("Habeas corpus protection is often expressed as limited to 'British subjects.' Is it really limited to British nationals? Suffice it to say that the case law has given an emphatic 'no' to the question"). We know as well that common-law courts entertained habeas petitions brought by enemy aliens detained in England—"entertained" at least in the

Opinion of the Court

sense that the courts held hearings to determine the threshold question of entitlement to the writ. See *Case of Three Spanish Sailors*, 2 Black. W. 1324, 96 Eng. Rep. 775 (C. P. 1779); *King* v. *Schiever*, 2 Burr. 765, 97 Eng. Rep. 551 (K. B. 1759); *Du Castro's Case*, Fort. 195, 92 Eng. Rep. 816 (K. B. 1697).

In *Schiever* and the *Spanish Sailors*' case, the courts denied relief to the petitioners. Whether the holdings in these cases were jurisdictional or based upon the courts' ruling that the petitioners were detained lawfully as prisoners of war is unclear. See *Spanish Sailors*, *supra*, at 1324, 96 Eng. Rep., at 776; *Schiever*, *supra*, at 766, 97 Eng. Rep., at 552. In *Du Castro*'s *Case,* the court granted relief, but that case is not analogous to petitioners' because the prisoner there appears to have been detained in England. See Halliday & White 27, n. 72. To the extent these authorities suggest the common-law courts abstained altogether from matters involving prisoners of war, there was greater justification for doing so in the context of declared wars with other nation states. Judicial intervention might have complicated the military's ability to negotiate exchange of prisoners with the enemy, a wartime practice well known to the Framers. See Resolution of Mar. 30, 1778, 10 Journals of the Continental Congress 1774–1789, p. 295 (W. Ford ed. 1908) (directing General Washington not to exchange prisoners with the British unless the enemy agreed to exempt citizens from capture).

We find the evidence as to the geographic scope of the writ at common law informative but, again, not dispositive. Petitioners argue the site of their detention is analogous to two territories outside of England to which the writ did run: the so-called "exempt jurisdictions," like the Channel Islands; and (in former times) India. There are critical differences between these places and Guantanamo, however.

Opinion of the Court

As the Court noted in *Rasul,* 542 U. S., at 481–482, and
nn. 11–12, common-law courts granted habeas corpus
relief to prisoners detained in the exempt jurisdictions.
But these areas, while not in theory part of the realm of
England, were nonetheless under the Crown's control. See
2 H. Hallam, Constitutional History of England: From the
Accession of Henry VII to the Death of George II, pp. 232–
233 (reprint 1989). And there is some indication that
these jurisdictions were considered sovereign territory.
*King* v. *Cowle,* 2 Burr. 834, 854, 855, 97 Eng. Rep. 587,
599 (K. B. 1759) (describing one of the exempt jurisdic-
tions, Berwick-upon-Tweed, as under the "sovereign juris-
diction" and "subjection of the Crown of England"). Be-
cause the United States does not maintain formal
sovereignty over Guantanamo Bay, see Part IV, *infra,* the
naval station there and the exempt jurisdictions discussed
in the English authorities are not similarly situated.

Petitioners and their *amici* further rely on cases in
which British courts in India granted writs of habeas
corpus to noncitizens detained in territory over which the
Moghul Emperor retained formal sovereignty and control.
See *supra,* at 12–13; Brief for Legal Historians as *Amici
Curiae* 12–13. The analogy to the present cases breaks
down, however, because of the geographic location of the
courts in the Indian example. The Supreme Court of
Judicature (the British Court) sat in Calcutta; but no
federal court sits at Guantanamo. The Supreme Court of
Judicature was, moreover, a special court set up by Par-
liament to monitor certain conduct during the British Raj.
See Regulating Act of 1773, 13 Geo. 3, §§13–14. That it
had the power to issue the writ in nonsovereign territory
does not prove that common-law courts sitting in England
had the same power. If petitioners were to have the better
of the argument on this point, we would need some dem-
onstration of a consistent practice of common-law courts
sitting in England and entertaining petitions brought by

Opinion of the Court

alien prisoners detained abroad. We find little support for this conclusion.

The Government argues, in turn, that Guantanamo is more closely analogous to Scotland and Hanover, territories that were not part of England but nonetheless controlled by the English monarch (in his separate capacities as King of Scotland and Elector of Hanover). See *Cowle,* 2 Burr., at 856, 97 Eng. Rep., at 600. Lord Mansfield can be cited for the proposition that, at the time of the founding, English courts lacked the "power" to issue the writ to Scotland and Hanover, territories Lord Mansfield referred to as "foreign." *Ibid.* But what matters for our purposes is why common-law courts lacked this power. Given the English Crown's delicate and complicated relationships with Scotland and Hanover in the 1700's, we cannot disregard the possibility that the common-law courts' refusal to issue the writ to these places was motivated not by formal legal constructs but by what we would think of as prudential concerns. This appears to have been the case with regard to other British territories where the writ did not run. See 2 R. Chambers, A Course of Lectures on English Law 1767–1773, p. 8 (T. Curley ed. 1986) (quoting the view of Lord Mansfield in *Cowle* that "[n]otwithstanding the *power* which the judges have, yet where they cannot judge of the cause, or give relief upon it, they would not think *proper* to interpose; and therefore in the case of imprisonments in *Guernsey*, *Jersey*, *Minorca*, or the *plantations*, the most usual way is to complain to the *king in Council*" (internal quotation marks omitted)). And after the Act of Union in 1707, through which the kingdoms of England and Scotland were merged politically, Queen Anne and her successors, in their new capacity as sovereign of Great Britain, ruled the entire island as one kingdom. Accordingly, by the time Lord Mansfield penned his opinion in *Cowle* in 1759, Scotland was no longer a "foreign" country vis-à-vis England—at least not in the sense

20                    BOUMEDIENE *v.* BUSH

Opinion of the Court

in which Cuba is a foreign country vis-à-vis the United
States.

Scotland remained "foreign" in Lord Mansfield's day in
at least one important respect, however. Even after the
Act of Union, Scotland (like Hanover) continued to main-
tain its own laws and court system. See 1 Blackstone *98,
*109. Under these circumstances prudential considera-
tions would have weighed heavily when courts sitting in
England received habeas petitions from Scotland or the
Electorate. Common-law decisions withholding the writ
from prisoners detained in these places easily could be
explained as efforts to avoid either or both of two embar-
rassments: conflict with the judgments of another court of
competent jurisdiction; or the practical inability, by reason
of distance, of the English courts to enforce their judg-
ments outside their territorial jurisdiction. Cf. *Munaf* v.
*Geren*, *ante*, at 15 (opinion of the Court) (recognizing that
"'prudential concerns' . . . such as comity and the orderly
administration of criminal justice" affect the appropriate
exercise of habeas jurisdiction).

By the mid-19th century, British courts could issue the
writ to Canada, notwithstanding the fact that Canadian
courts also had the power to do so. See 9 Holdsworth 124
(citing *Ex parte Anderson*, 3 El. and El. 487 (1861)). This
might be seen as evidence that the existence of a separate
court system was no barrier to the running of the common-
law writ. The Canada of the 1800's, however, was in
many respects more analogous to the exempt jurisdictions
or to Ireland, where the writ ran, than to Scotland or
Hanover in the 1700's, where it did not. Unlike Scotland
and Hanover, Canada followed English law. See B.
Laskin, The British Tradition in Canadian Law 50–51
(1969).

In the end a categorical or formal conception of sover-
eignty does not provide a comprehensive or altogether
satisfactory explanation for the general understanding

Opinion of the Court

that prevailed when Lord Mansfield considered issuance of the writ outside England. In 1759 the writ did not run to Scotland but did run to Ireland, even though, at that point, Scotland and England had merged under the rule of a single sovereign, whereas the Crowns of Great Britain and Ireland remained separate (at least in theory). See *Cowle*, *supra*, at 856–857, 97 Eng. Rep., 600; 1 Blackstone *100–101. But there was at least one major difference between Scotland's and Ireland's relationship with England during this period that might explain why the writ ran to Ireland but not to Scotland. English law did not generally apply in Scotland (even after the Act of Union) but it did apply in Ireland. Blackstone put it as follows: "[A]s Scotland and England are now one and the same kingdom, and yet differ in their municipal laws; so England and Ireland are, on the other hand, distinct kingdoms, and yet in general agree in their laws." *Id.,* at *100. This distinction, and not formal notions of sovereignty, may well explain why the writ did not run to Scotland (and Hanover) but would run to Ireland.

The prudential barriers that may have prevented the English courts from issuing the writ to Scotland and Hanover are not relevant here. We have no reason to believe an order from a federal court would be disobeyed at Guantanamo. No Cuban court has jurisdiction to hear these petitioners' claims, and no law other than the laws of the United States applies at the naval station. The modern-day relations between the United States and Guantanamo thus differ in important respects from the 18th-century relations between England and the kingdoms of Scotland and Hanover. This is reason enough for us to discount the relevance of the Government's analogy.

Each side in the present matter argues that the very lack of a precedent on point supports its position. The Government points out there is no evidence that a court sitting in England granted habeas relief to an enemy alien

Opinion of the Court

detained abroad; petitioners respond there is no evidence
that a court refused to do so for lack of jurisdiction.

Both arguments are premised, however, upon the as-
sumption that the historical record is complete and that
the common law, if properly understood, yields a definite
answer to the questions before us. There are reasons to
doubt both assumptions. Recent scholarship points to the
inherent shortcomings in the historical record. See Halli-
day & White 14–15 (noting that most reports of 18th-
century habeas proceedings were not printed). And given
the unique status of Guantanamo Bay and the particular
dangers of terrorism in the modern age, the common-law
courts simply may not have confronted cases with close
parallels to this one. We decline, therefore, to infer too
much, one way or the other, from the lack of historical
evidence on point. Cf. *Brown* v. *Board of Education*, 347
U. S. 483, 489 (1954) (noting evidence concerning the
circumstances surrounding the adoption of the Fourteenth
Amendment, discussed in the parties' briefs and uncov-
ered through the Court's own investigation, "convince us
that, although these sources cast some light, it is not
enough to resolve the problem with which we are faced.
At best, they are inconclusive"); *Reid* v. *Covert*, 354 U. S.
1, 64 (1957) (Frankfurter, J., concurring in result) (argu-
ing constitutional adjudication should not be based upon
evidence that is "too episodic, too meager, to form a solid
basis in history, preceding and contemporaneous with the
framing of the Constitution").

IV

Drawing from its position that at common law the writ
ran only to territories over which the Crown was sover-
eign, the Government says the Suspension Clause affords
petitioners no rights because the United States does not
claim sovereignty over the place of detention.

Guantanamo Bay is not formally part of the United

Opinion of the Court

States. See DTA §1005(g), 119 Stat. 2743. And under the terms of the lease between the United States and Cuba, Cuba retains "ultimate sovereignty" over the territory while the United States exercises "complete jurisdiction and control." See Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U. S.-Cuba, Art. III, T. S. No. 418 (hereinafter 1903 Lease Agreement); *Rasul*, 542 U. S., at 471. Under the terms of the 1934 Treaty, however, Cuba effectively has no rights as a sovereign until the parties agree to modification of the 1903 Lease Agreement or the United States abandons the base. See Treaty Defining Relations with Cuba, May 29, 1934, U. S.-Cuba, Art. III, 48 Stat. 1683, T. S. No. 866.

The United States contends, nevertheless, that Guantanamo is not within its sovereign control. This was the Government's position well before the events of September 11, 2001. See, *e.g.*, Brief for Petitioners in *Sale* v. *Haitian Centers Council, Inc.*, O. T. 1992, No. 92–344, p. 31 (arguing that Guantanamo is territory "*outside* the United States"). And in other contexts the Court has held that questions of sovereignty are for the political branches to decide. See *Vermilya-Brown Co.* v. *Connell*, 335 U. S. 377, 380 (1948) ("[D]etermination of sovereignty over an area is for the legislative and executive departments"); see also *Jones* v. *United States*, 137 U. S. 202 (1890); *Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415, 420 (1839). Even if this were a treaty interpretation case that did not involve a political question, the President's construction of the lease agreement would be entitled to great respect. See *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 184–185 (1982).

We therefore do not question the Government's position that Cuba, not the United States, maintains sovereignty, in the legal and technical sense of the term, over Guantanamo Bay. But this does not end the analysis. Our cases do not hold it is improper for us to inquire into the

objective degree of control the Nation asserts over foreign territory. As commentators have noted, "'[s]overeignty' is a term used in many senses and is much abused." See 1 Restatement (Third) of Foreign Relations Law of the United States §206, Comment *b,* p. 94 (1986). When we have stated that sovereignty is a political question, we have referred not to sovereignty in the general, colloquial sense, meaning the exercise of dominion or power, see Webster's New International Dictionary 2406 (2d ed. 1934) ("sovereignty," definition 3), but sovereignty in the narrow, legal sense of the term, meaning a claim of right, see 1 Restatement (Third) of Foreign Relations, *supra,* §206, Comment *b,* at 94 (noting that sovereignty "implies a state's lawful control over its territory generally to the exclusion of other states, authority to govern in that territory, and authority to apply law there"). Indeed, it is not altogether uncommon for a territory to be under the *de jure* sovereignty of one nation, while under the plenary control, or practical sovereignty, of another. This condition can occur when the territory is seized during war, as Guantanamo was during the Spanish-American War. See, *e.g., Fleming* v. *Page,* 9 How. 603, 614 (1850) (noting that the port of Tampico, conquered by the United States during the war with Mexico, was "undoubtedly . . . subject to the sovereignty and dominion of the United States," but that it "does not follow that it was a part of the United States, or that it ceased to be a foreign country"); *King* v. *Earl of Crewe ex parte Sekgome,* [1910] 2 K. B. 576, 603–604 (C. A.) (opinion of Williams, L. J.) (arguing that the Bechuanaland Protectorate in South Africa was "under His Majesty's dominion in the sense of power and jurisdiction, but is not under his dominion in the sense of territorial dominion"). Accordingly, for purposes of our analysis, we accept the Government's position that Cuba, and not the United States, retains *de jure* sovereignty over Guantanamo Bay. As we did in *Rasul,* however, we take notice

of the obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory. See 542 U. S., at 480; *id.*, at 487 (KENNEDY, J., concurring in judgment).

Were we to hold that the present cases turn on the political question doctrine, we would be required first to accept the Government's premise that *de jure* sovereignty is the touchstone of habeas corpus jurisdiction. This premise, however, is unfounded. For the reasons indicated above, the history of common-law habeas corpus provides scant support for this proposition; and, for the reasons indicated below, that position would be inconsistent with our precedents and contrary to fundamental separation-of-powers principles.

A

The Court has discussed the issue of the Constitution's extraterritorial application on many occasions. These decisions undermine the Government's argument that, at least as applied to noncitizens, the Constitution necessarily stops where *de jure* sovereignty ends.

The Framers foresaw that the United States would expand and acquire new territories. See *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 542 (1828). Article IV, §3, cl. 1, grants Congress the power to admit new States. Clause 2 of the same section grants Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Save for a few notable (and notorious) exceptions, *e.g.*, *Dred Scott* v. *Sandford*, 19 How. 393 (1857), throughout most of our history there was little need to explore the outer boundaries of the Constitution's geographic reach. When Congress exercised its power to create new territories, it guaranteed constitutional protections to the inhabitants by statute. See, *e.g.*, An Act: to

Opinion of the Court

establish a Territorial Government for Utah, 9 Stat. 458
("[T]he Constitution and laws of the United States are
hereby extended over and declared to be in force in said
Territory of Utah"); Rev. Stat. §1891 ("The Constitution
and all laws of the United States which are not locally
inapplicable shall have the same force and effect within all
the organized Territories, and in every Territory hereafter
organized as elsewhere within the United States"); see
generally Burnett, *Untied* States: American Expansion
and Territorial Deannexation, 72 U. Chi. L. Rev. 797, 825–
827 (2005). In particular, there was no need to test the
limits of the Suspension Clause because, as early as 1789,
Congress extended the writ to the Territories. See Act of
Aug. 7, 1789, 1 Stat. 52 (reaffirming Art. II of Northwest
Ordinance of 1787, which provided that "[t]he inhabitants
of the said territory, shall always be entitled to the bene-
fits of the writ of habeas corpus").

Fundamental questions regarding the Constitution's
geographic scope first arose at the dawn of the 20th cen-
tury when the Nation acquired noncontiguous Territories:
Puerto Rico, Guam, and the Philippines—ceded to the
United States by Spain at the conclusion of the Spanish-
American War—and Hawaii—annexed by the United
States in 1898. At this point Congress chose to discon-
tinue its previous practice of extending constitutional
rights to the territories by statute. See, *e.g.*, An Act Tem-
porarily to provide for the administration of the affairs of
civil government in the Philippine Islands, and for other
purposes, 32 Stat. 692 (noting that Rev. Stat. §1891 did
not apply to the Philippines).

In a series of opinions later known as the Insular Cases,
the Court addressed whether the Constitution, by its own
force, applies in any territory that is not a State. See *De
Lima* v. *Bidwell*, 182 U. S. 1 (1901); *Dooley* v. *United
States*, 182 U. S. 222 (1901); *Armstrong* v. *United States*,
182 U. S. 243 (1901); *Downes* v. *Bidwell*, 182 U. S. 244

Opinion of the Court

(1901); *Hawaii* v. *Mankichi*, 190 U. S. 197 (1903); *Dorr* v. *United States*, 195 U. S. 138 (1904). The Court held that the Constitution has independent force in these territories, a force not contingent upon acts of legislative grace. Yet it took note of the difficulties inherent in that position.

Prior to their cession to the United States, the former Spanish colonies operated under a civil-law system, without experience in the various aspects of the Anglo-American legal tradition, for instance the use of grand and petit juries. At least with regard to the Philippines, a complete transformation of the prevailing legal culture would have been not only disruptive but also unnecessary, as the United States intended to grant independence to that Territory. See An Act To declare the purpose of the people of the United States as to the future political status of the people of the Philippine Islands, and to provide a more autonomous government for those islands (Jones Act), 39 Stat. 545 (noting that "it was never the intention of the people of the United States in the incipiency of the War with Spain to make it a war of conquest or for territorial aggrandizement" and that "it is, as it has always been, the purpose of the people of the United States to withdraw their sovereignty over the Philippine Islands and to recognize their independence as soon as a stable government can be established therein"). The Court thus was reluctant to risk the uncertainty and instability that could result from a rule that displaced altogether the existing legal systems in these newly acquired Territories. See *Downes*, *supra*, at 282 ("It is obvious that in the annexation of outlying and distant possessions grave questions will arise from differences of race, habits, laws and customs of the people, and from differences of soil, climate and production . . . ").

These considerations resulted in the doctrine of territorial incorporation, under which the Constitution applies in full in incorporated Territories surely destined for state-

Opinion of the Court

hood but only in part in unincorporated Territories. See
*Dorr*, *supra*, at 143 ("Until Congress shall see fit to incor-
porate territory ceded by treaty into the United States, . . .
the territory is to be governed under the power existing in
Congress to make laws for such territories and subject to
such constitutional restrictions upon the powers of that
body as are applicable to the situation"); *Downes*, *supra*, at
293 (White, J., concurring) ("[T]he determination of what
particular provision of the Constitution is applicable,
generally speaking, in all cases, involves an inquiry into
the situation of the territory and its relations to the
United States"). As the Court later made clear, "the real
issue in the *Insular Cases* was not whether the Constitu-
tion extended to the Philippines or Porto Rico when we
went there, but which of its provisions were applicable by
way of limitation upon the exercise of executive and legis-
lative power in dealing with new conditions and require-
ments." *Balzac* v. *Porto Rico*, 258 U. S. 298, 312 (1922). It
may well be that over time the ties between the United
States and any of its unincorporated Territories
strengthen in ways that are of constitutional significance.
Cf. *Torres* v. *Puerto Rico*, 442 U. S. 465, 475–476 (1979)
(Brennan, J., concurring in judgment) ("Whatever the
validity of the [Insular Cases] in the particular historical
context in which they were decided, those cases are clearly
not authority for questioning the application of the Fourth
Amendment—or any other provision of the Bill of Rights—
to the Commonwealth of Puerto Rico in the 1970's"). But,
as early as *Balzac* in 1922, the Court took for granted that
even in unincorporated Territories the Government of the
United States was bound to provide to noncitizen inhabi-
tants "guaranties of certain fundamental personal rights
declared in the Constitution." 258 U. S., at 312; see also
*Late Corp. of Church of Jesus Christ of Latter-day Saints*
v. *United States*, 136 U. S. 1, 44 (1890) ("Doubtless Con-
gress, in legislating for the Territories would be subject to

those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments"). Yet noting the inherent practical difficulties of enforcing all constitutional provisions "always and everywhere," *Balzac, supra*, at 312, the Court devised in the Insular Cases a doctrine that allowed it to use its power sparingly and where it would be most needed. This century-old doctrine informs our analysis in the present matter.

Practical considerations likewise influenced the Court's analysis a half-century later in *Reid*, 354 U. S. 1. The petitioners there, spouses of American servicemen, lived on American military bases in England and Japan. They were charged with crimes committed in those countries and tried before military courts, consistent with executive agreements the United States had entered into with the British and Japanese governments. *Id.*, at 15–16, and nn. 29–30 (plurality opinion). Because the petitioners were not themselves military personnel, they argued they were entitled to trial by jury.

Justice Black, writing for the plurality, contrasted the cases before him with the Insular Cases, which involved territories "with wholly dissimilar traditions and institutions" that Congress intended to govern only "temporarily." *Id.,* at 14. Justice Frankfurter argued that the "specific circumstances of each particular case" are relevant in determining the geographic scope of the Constitution. *Id.*, at 54 (opinion concurring in result). And Justice Harlan, who had joined an opinion reaching the opposite result in the case in the previous Term, *Reid* v. *Covert*, 351 U. S. 487 (1956), was most explicit in rejecting a "rigid and abstract rule" for determining where constitutional guarantees extend. *Reid,* 354 U. S., at 74 (opinion concurring in result). He read the Insular Cases to teach that whether a constitutional provision has extraterritorial effect depends upon the "particular circumstances, the

Opinion of the Court

practical necessities, and the possible alternatives which
Congress had before it" and, in particular, whether judi-
cial enforcement of the provision would be "impracticable
and anomalous." *Id.*, at 74–75; see also *United States* v.
*Verdugo-Urquidez*, 494 U. S. 259, 277–278 (1990)
(KENNEDY, J., concurring) (applying the "impracticable
and anomalous" extraterritoriality test in the Fourth
Amendment context).

That the petitioners in *Reid* were American citizens was
a key factor in the case and was central to the plurality's
conclusion that the Fifth and Sixth Amendments apply to
American civilians tried outside the United States. But
practical considerations, related not to the petitioners'
citizenship but to the place of their confinement and trial,
were relevant to each Member of the *Reid* majority. And
to Justices Harlan and Frankfurter (whose votes were
necessary to the Court's disposition) these considerations
were the decisive factors in the case.

Indeed the majority splintered on this very point. The
key disagreement between the plurality and the concur-
ring Justices in *Reid* was over the continued precedential
value of the Court's previous opinion in *In re Ross*, 140
U. S. 453 (1891), which the *Reid* Court understood as
holding that under some circumstances Americans abroad
have no right to indictment and trial by jury. The peti-
tioner in *Ross* was a sailor serving on an American mer-
chant vessel in Japanese waters who was tried before an
American consular tribunal for the murder of a fellow
crewman. 140 U. S., at 459, 479. The *Ross* Court held
that the petitioner, who was a British subject, had no
rights under the Fifth and Sixth Amendments. *Id.*, at 464.
The petitioner's citizenship played no role in the disposi-
tion of the case, however. The Court assumed (consistent
with the maritime custom of the time) that Ross had all
the rights of a similarly situated American citizen. *Id.*, at
479 (noting that Ross was "under the protection and sub-

ject to the laws of the United States equally with the seaman who was native born"). The Justices in *Reid* therefore properly understood *Ross* as standing for the proposition that, at least in some circumstances, the jury provisions of the Fifth and Sixth Amendments have no application to American citizens tried by American authorities abroad. See 354 U. S., at 11–12 (plurality opinion) (describing *Ross* as holding that "constitutional protections applied 'only to citizens and others within the United States . . . and not to residents or temporary sojourners abroad'" (quoting *Ross*, *supra*, at 464)); 354 U. S., at 64 (Frankfurter, J., concurring in result) (noting that the consular tribunals upheld in *Ross* "w[ere] based on long-established custom and they were justified as the best possible means for securing justice for the few Americans present in [foreign] countries"); 354 U. S., at 75 (Harlan, J., concurring in result) ("what *Ross* and the *Insular Cases* hold is that the particular local setting, the practical necessities, and the possible alternatives are relevant to a question of judgment, namely, whether jury trial *should* be deemed a necessary condition of the exercise of Congress' power to provide for the trial of Americans overseas").

The *Reid* plurality doubted that *Ross* was rightly decided, precisely because it believed the opinion was insufficiently protective of the rights of American citizens. See 354 U. S., at 10–12; see also *id.*, at 78 (Clark, J., dissenting) (noting that "four of my brothers would specifically overrule and two would impair the long-recognized vitality of an old and respected precedent in our law, the case of *In re Ross*, 140 U. S. 453 (1891)"). But Justices Harlan and Frankfurter, while willing to hold that the American citizen petitioners in the cases before them were entitled to the protections of Fifth and Sixth Amendments, were unwilling to overturn *Ross*. 354 U. S., at 64 (Frankfurter, J., concurring in result); *id.*, at 75 (Harlan, J., concurring

in result). Instead, the two concurring Justices distinguished *Ross* from the cases before them, not on the basis of the citizenship of the petitioners, but on practical considerations that made jury trial a more feasible option for them than it was for the petitioner in *Ross*. If citizenship had been the only relevant factor in the case, it would have been necessary for the Court to overturn *Ross*, something Justices Harlan and Frankfurter were unwilling to do. See *Verdugo-Urquidez*, *supra*, at 277 (KENNEDY, J., concurring) (noting that *Ross* had not been overruled).

Practical considerations weighed heavily as well in *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), where the Court addressed whether habeas corpus jurisdiction extended to enemy aliens who had been convicted of violating the laws of war. The prisoners were detained at Landsberg Prison in Germany during the Allied Powers' postwar occupation. The Court stressed the difficulties of ordering the Government to produce the prisoners in a habeas corpus proceeding. It "would require allocation of shipping space, guarding personnel, billeting and rations" and would damage the prestige of military commanders at a sensitive time. *Id.*, at 779. In considering these factors the Court sought to balance the constraints of military occupation with constitutional necessities. *Id.*, at 769–779; see *Rasul*, 542 U. S., at 475–476 (discussing the factors relevant to *Eisentrager*'s constitutional holding); 542 U. S., at 486 (KENNEDY, J., concurring in judgment) (same).

True, the Court in *Eisentrager* denied access to the writ, and it noted the prisoners "at no relevant time were within any territory over which the United States is sovereign, and [that] the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." 339 U. S., at 778. The Government seizes upon this language as proof positive that the *Eisentrager* Court adopted

Opinion of the Court

a formalistic, sovereignty-based test for determining the reach of the Suspension Clause. See Brief for Respondents 18–20. We reject this reading for three reasons.

First, we do not accept the idea that the above-quoted passage from *Eisentrager* is the only authoritative language in the opinion and that all the rest is dicta. The Court's further determinations, based on practical considerations, were integral to Part II of its opinion and came before the decision announced its holding. See 339 U. S., at 781.

Second, because the United States lacked both *de jure* sovereignty and plenary control over Landsberg Prison, see *infra*, at 34–35, it is far from clear that the *Eisentrager* Court used the term sovereignty only in the narrow technical sense and not to connote the degree of control the military asserted over the facility. See *supra*, at 21. The Justices who decided *Eisentrager* would have understood sovereignty as a multifaceted concept. See Black's Law Dictionary 1568 (4th ed. 1951) (defining "sovereignty" as "[t]he supreme, absolute, and uncontrollable power by which any independent state is governed"; "the international independence of a state, combined with the right and power of regulating its internal affairs without foreign dictation"; and "[t]he power to do everything in a state without accountability"); Ballentine's Law Dictionary with Pronunciations 1216 (2d ed. 1948) (defining "sovereignty" as "[t]hat public authority which commands in civil society, and orders and directs what each citizen is to perform to obtain the end of its institution"). In its principal brief in *Eisentrager*, the Government advocated a bright-line test for determining the scope of the writ, similar to the one it advocates in these cases. See Brief for Petitioners in *Johnson* v. *Eisentrager,* O. T. 1949, No. 306, pp. 74–75. Yet the Court mentioned the concept of territorial sovereignty only twice in its opinion. See *Eisentrager*, *supra*, at 778, 780. That the Court devoted a significant portion of

Opinion of the Court

Part II to a discussion of practical barriers to the running
of the writ suggests that the Court was not concerned
exclusively with the formal legal status of Landsberg
Prison but also with the objective degree of control the
United States asserted over it. Even if we assume the
*Eisentrager* Court considered the United States' lack of
formal legal sovereignty over Landsberg Prison as the
decisive factor in that case, its holding is not inconsistent
with a functional approach to questions of extraterritorial-
ity. The formal legal status of a given territory affects, at
least to some extent, the political branches' control over
that territory. *De jure* sovereignty is a factor that bears
upon which constitutional guarantees apply there.

Third, if the Government's reading of *Eisentrager* were
correct, the opinion would have marked not only a change
in, but a complete repudiation of, the Insular Cases' (and
later *Reid*'s) functional approach to questions of extrater-
ritoriality. We cannot accept the Government's view.
Nothing in *Eisentrager* says that *de jure* sovereignty is or
has ever been the only relevant consideration in determin-
ing the geographic reach of the Constitution or of habeas
corpus. Were that the case, there would be considerable
tension between *Eisentrager*, on the one hand, and the
Insular Cases and *Reid*, on the other. Our cases need not
be read to conflict in this manner. A constricted reading of
*Eisentrager* overlooks what we see as a common thread
uniting the Insular Cases, *Eisentrager*, and *Reid:* the idea
that questions of extraterritoriality turn on objective
factors and practical concerns, not formalism.

### B

The Government's formal sovereignty-based test raises
troubling separation-of-powers concerns as well. The
political history of Guantanamo illustrates the deficiencies
of this approach. The United States has maintained
complete and uninterrupted control of the bay for over 100

years.  At the close of the Spanish-American War, Spain ceded control over the entire island of Cuba to the United States and specifically "relinquishe[d] all claim[s] of sovereignty . . . and title."  See Treaty of Paris, Dec. 10, 1898, U. S.-Spain, Art. I, 30 Stat. 1755, T. S. No. 343.  From the date the treaty with Spain was signed until the Cuban Republic was established on May 20, 1902, the United States governed the territory "in trust" for the benefit of the Cuban people.  *Neely* v. *Henkel*, 180 U. S. 109, 120 (1901); H. Thomas, Cuba or The Pursuit of Freedom 436, 460 (1998).  And although it recognized, by entering into the 1903 Lease Agreement, that Cuba retained "ultimate sovereignty" over Guantanamo, the United States continued to maintain the same plenary control it had enjoyed since 1898.  Yet the Government's view is that the Constitution had no effect there, at least as to noncitizens, because the United States disclaimed sovereignty in the formal sense of the term.  The necessary implication of the argument is that by surrendering formal sovereignty over any unincorporated territory to a third party, while at the same time entering into a lease that grants total control over the territory back to the United States, it would be possible for the political branches to govern without legal constraint.

Our basic charter cannot be contracted away like this.  The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply.  Even when the United States acts outside its borders, its powers are not "absolute and unlimited" but are subject "to such restrictions as are expressed in the Constitution."  *Murphy* v. *Ramsey*, 114 U. S. 15, 44 (1885).  Abstaining from questions involving formal sovereignty and territorial governance is one thing.  To hold the political branches have the power to switch the Constitution on or off at will is quite another.  The former position reflects this Court's recogni-

Opinion of the Court

tion that certain matters requiring political judgments are best left to the political branches. The latter would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say "what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803).

These concerns have particular bearing upon the Suspension Clause question in the cases now before us, for the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers. The test for determining the scope of this provision must not be subject to manipulation by those whose power it is designed to restrain.

### C

As we recognized in *Rasul*, 542 U. S., at 476; *id.*, at 487 (KENNEDY, J., concurring in judgment), the outlines of a framework for determining the reach of the Suspension Clause are suggested by the factors the Court relied upon in *Eisentrager*. In addition to the practical concerns discussed above, the *Eisentrager* Court found relevant that each petitioner:

> "(a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States." 339 U. S., at 777.

Based on this language from *Eisentrager*, and the reasoning in our other extraterritoriality opinions, we conclude that at least three factors are relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the adequacy of the process

Opinion of the Court

through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

Applying this framework, we note at the onset that the status of these detainees is a matter of dispute. The petitioners, like those in *Eisentrager*, are not American citizens. But the petitioners in *Eisentrager* did not contest, it seems, the Court's assertion that they were "enemy alien[s]." *Ibid.* In the instant cases, by contrast, the detainees deny they are enemy combatants. They have been afforded some process in CSRT proceedings to determine their status; but, unlike in *Eisentrager, supra*, at 766, there has been no trial by military commission for violations of the laws of war. The difference is not trivial. The records from the *Eisentrager* trials suggest that, well before the petitioners brought their case to this Court, there had been a rigorous adversarial process to test the legality of their detention. The *Eisentrager* petitioners were charged by a bill of particulars that made detailed factual allegations against them. See 14 United Nations War Crimes Commission, Law Reports of Trials of War Criminals 8–10 (1949) (reprint 1997). To rebut the accusations, they were entitled to representation by counsel, allowed to introduce evidence on their own behalf, and permitted to cross-examine the prosecution's witnesses. See Memorandum by Command of Lt. Gen. Wedemeyer, Jan. 21, 1946 (establishing "Regulations Governing the Trial of War Criminals" in the China Theater), in Tr. of Record in *Johnson* v. *Eisentrager,* O. T. 1949, No. 306, pp. 34–40.

In comparison the procedural protections afforded to the detainees in the CSRT hearings are far more limited, and, we conclude, fall well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review. Although the detainee is assigned a

38    BOUMEDIENE *v.* BUSH

Opinion of the Court

"Personal Representative" to assist him during CSRT proceedings, the Secretary of the Navy's memorandum makes clear that person is not the detainee's lawyer or even his "advocate." See App. to Pet. for Cert. in No. 06–1196, at 155, 172. The Government's evidence is accorded a presumption of validity. *Id.*, at 159. The detainee is allowed to present "reasonably available" evidence, *id.*, at 155, but his ability to rebut the Government's evidence against him is limited by the circumstances of his confinement and his lack of counsel at this stage. And although the detainee can seek review of his status determination in the Court of Appeals, that review process cannot cure all defects in the earlier proceedings. See Part V, *infra.*

As to the second factor relevant to this analysis, the detainees here are similarly situated to the *Eisentrager* petitioners in that the sites of their apprehension and detention are technically outside the sovereign territory of the United States. As noted earlier, this is a factor that weighs against finding they have rights under the Suspension Clause. But there are critical differences between Landsberg Prison, circa 1950, and the United States Naval Station at Guantanamo Bay in 2008. Unlike its present control over the naval station, the United States' control over the prison in Germany was neither absolute nor indefinite. Like all parts of occupied Germany, the prison was under the jurisdiction of the combined Allied Forces. See Declaration Regarding the Defeat of Germany and the Assumption of Supreme Authority with Respect to Germany, June 5, 1945, U. S.-U. S. S. R.-U. K.-Fr., 60 Stat. 1649, T. I. A. S. No. 1520. The United States was therefore answerable to its Allies for all activities occurring there. Cf. *Hirota* v. *MacArthur*, 338 U. S. 197, 198 (1948) *(per curiam)* (military tribunal set up by Gen. Douglas MacArthur, acting as "the agent of the Allied Powers," was not a "tribunal of the United States"). The

Opinion of the Court

Allies had not planned a long-term occupation of Germany, nor did they intend to displace all German institutions even during the period of occupation. See Agreements Respecting Basic Principles for Merger of the Three Western German Zones of Occupation, and Other Matters, Apr. 8, 1949, U. S.-U. K.-Fr., Art. 1, 63 Stat. 2819, T. I. A. S. No. 2066 (establishing a governing framework "[d]uring the period in which it is necessary that the occupation continue" and expressing the desire "that the German people shall enjoy self-government to the maximum possible degree consistent with such occupation"). The Court's holding in *Eisentrager* was thus consistent with the Insular Cases, where it had held there was no need to extend full constitutional protections to territories the United States did not intend to govern indefinitely. Guantanamo Bay, on the other hand, is no transient possession. In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States. See *Rasul*, 542 U. S., at 480; *id.*, at 487 (KENNEDY, J., concurring in judgment).

As to the third factor, we recognize, as the Court did in *Eisentrager*, that there are costs to holding the Suspension Clause applicable in a case of military detention abroad. Habeas corpus proceedings may require expenditure of funds by the Government and may divert the attention of military personnel from other pressing tasks. While we are sensitive to these concerns, we do not find them dispositive. Compliance with any judicial process requires some incremental expenditure of resources. Yet civilian courts and the Armed Forces have functioned along side each other at various points in our history. See, *e.g., Duncan* v. *Kahanamoku*, 327 U. S. 304 (1946); *Ex parte Milligan*, 4 Wall. 2 (1866). The Government presents no credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims. And in light of

the plenary control the United States asserts over the base, none are apparent to us.

The situation in *Eisentrager* was far different, given the historical context and nature of the military's mission in post-War Germany. When hostilities in the European Theater came to an end, the United States became responsible for an occupation zone encompassing over 57,000 square miles with a population of 18 million. See Letter from President Truman to Secretary of State Byrnes, (Nov. 28, 1945), in 8 Documents on American Foreign Relations 257 (R. Dennett & R. Turner eds. 1948); Pollock, A Territorial Pattern for the Military Occupation of Germany, 38 Am. Pol. Sci. Rev. 970, 975 (1944). In addition to supervising massive reconstruction and aid efforts the American forces stationed in Germany faced potential security threats from a defeated enemy. In retrospect the post-War occupation may seem uneventful. But at the time *Eisentrager* was decided, the Court was right to be concerned about judicial interference with the military's efforts to contain "enemy elements, guerilla fighters, and 'were-wolves.'" 339 U. S., at 784.

Similar threats are not apparent here; nor does the Government argue that they are. The United States Naval Station at Guantanamo Bay consists of 45 square miles of land and water. The base has been used, at various points, to house migrants and refugees temporarily. At present, however, other than the detainees themselves, the only long-term residents are American military personnel, their families, and a small number of workers. See History of Guantanamo Bay online at https://www.cnic. navy.mil/Guantanamo/AboutGTMO/gtmohistorygeneral/ gtmohistgeneral. The detainees have been deemed enemies of the United States. At present, dangerous as they may be if released, they are contained in a secure prison facility located on an isolated and heavily fortified military base.

Opinion of the Court

There is no indication, furthermore, that adjudicating a habeas corpus petition would cause friction with the host government. No Cuban court has jurisdiction over American military personnel at Guantanamo or the enemy combatants detained there. While obligated to abide by the terms of the lease, the United States is, for all practical purposes, answerable to no other sovereign for its acts on the base. Were that not the case, or if the detention facility were located in an active theater of war, arguments that issuing the writ would be "impracticable or anomalous" would have more weight. See *Reid*, 354 U. S., at 74 (Harlan, J., concurring in result). Under the facts presented here, however, there are few practical barriers to the running of the writ. To the extent barriers arise, habeas corpus procedures likely can be modified to address them. See Part VI–B, *infra*.

It is true that before today the Court has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution. But the cases before us lack any precise historical parallel. They involve individuals detained by executive order for the duration of a conflict that, if measured from September 11, 2001, to the present, is already among the longest wars in American history. See Oxford Companion to American Military History 849 (1999). The detainees, moreover, are held in a territory that, while technically not part of the United States, is under the complete and total control of our Government. Under these circumstances the lack of a precedent on point is no barrier to our holding.

We hold that Art. I, §9, cl. 2, of the Constitution has full effect at Guantanamo Bay. If the privilege of habeas corpus is to be denied to the detainees now before us, Congress must act in accordance with the requirements of the Suspension Clause. Cf. *Hamdi,* 542 U. S., at 564 (SCALIA, J., dissenting) ("[I]ndefinite imprisonment on

reasonable suspicion is not an available option of treat-
ment for those accused of aiding the enemy, absent a
suspension of the writ"). This Court may not impose a *de
facto* suspension by abstaining from these controversies.
See *Hamdan*, 548 U. S., at 585, n. 16 ("[A]bstention is not
appropriate in cases . . . in which the legal challenge
'turn[s] on the status of the persons as to whom the mili-
tary asserted its power'" (quoting *Schlesinger* v. *Council-
man*, 420 U. S. 738, 759 (1975))). The MCA does not
purport to be a formal suspension of the writ; and the
Government, in its submissions to us, has not argued that
it is. Petitioners, therefore, are entitled to the privilege of
habeas corpus to challenge the legality of their detention.

V

In light of this holding the question becomes whether
the statute stripping jurisdiction to issue the writ avoids
the Suspension Clause mandate because Congress has
provided adequate substitute procedures for habeas cor-
pus. The Government submits there has been compliance
with the Suspension Clause because the DTA review
process in the Court of Appeals, see DTA §1005(e), pro-
vides an adequate substitute. Congress has granted that
court jurisdiction to consider

> "(i) whether the status determination of the [CSRT]
> . . . was consistent with the standards and procedures
> specified by the Secretary of Defense . . . and (ii) to the
> extent the Constitution and laws of the United States
> are applicable, whether the use of such standards and
> procedures to make the determination is consistent
> with the Constitution and laws of the United States."
> §1005(e)(2)(C), 119 Stat. 2742.

The Court of Appeals, having decided that the writ does
not run to the detainees in any event, found it unneces-
sary to consider whether an adequate substitute has been

Opinion of the Court

provided. In the ordinary course we would remand to the Court of Appeals to consider this question in the first instance. See *Youakim* v. *Miller*, 425 U. S. 231, 234 (1976) *(per curiam)*. It is well settled, however, that the Court's practice of declining to address issues left unresolved in earlier proceedings is not an inflexible rule. *Ibid.* Departure from the rule is appropriate in "exceptional" circumstances. See *Cooper Industries, Inc.* v. *Aviall Services, Inc.*, 543 U. S. 157, 169 (2004); *Duignan* v. *United States*, 274 U. S. 195, 200 (1927).

The gravity of the separation-of-powers issues raised by these cases and the fact that these detainees have been denied meaningful access to a judicial forum for a period of years render these cases exceptional. The parties before us have addressed the adequacy issue. While we would have found it informative to consider the reasoning of the Court of Appeals on this point, we must weigh that against the harms petitioners may endure from additional delay. And, given there are few precedents addressing what features an adequate substitute for habeas corpus must contain, in all likelihood a remand simply would delay ultimate resolution of the issue by this Court.

We do have the benefit of the Court of Appeals' construction of key provisions of the DTA. When we granted certiorari in these cases, we noted "it would be of material assistance to consult any decision" in the parallel DTA review proceedings pending in the Court of Appeals, specifically any rulings in the matter of *Bismullah* v. *Gates*. 551 U. S. ___ (2007). Although the Court of Appeals has yet to complete a DTA review proceeding, the three-judge panel in *Bismullah* has issued an interim order giving guidance as to what evidence can be made part of the record on review and what access the detainees can have to counsel and to classified information. See 501 F. 3d 178 (CADC) *(Bismullah I)*, reh'g denied, 503 F. 3d 137 (CADC 2007) *(Bismullah II)*. In that matter the full court denied

Opinion of the Court

the Government's motion for rehearing en banc, see *Bismullah* v. *Gates*, 514 F. 3d 1291 (CADC 2008) *(Bismullah III)*. The order denying rehearing was accompanied by five separate statements from members of the court, which offer differing views as to scope of the judicial review Congress intended these detainees to have. *Ibid.*

Under the circumstances we believe the costs of further delay substantially outweigh any benefits of remanding to the Court of Appeals to consider the issue it did not address in these cases.

A

Our case law does not contain extensive discussion of standards defining suspension of the writ or of circumstances under which suspension has occurred. This simply confirms the care Congress has taken throughout our Nation's history to preserve the writ and its function. Indeed, most of the major legislative enactments pertaining to habeas corpus have acted not to contract the writ's protection but to expand it or to hasten resolution of prisoners' claims. See, *e.g.*, Habeas Corpus Act of 1867, ch. 28, §1, 14 Stat. 385 (current version codified at 28 U. S. C. §2241 (2000 ed. and Supp. V) (extending the federal writ to state prisoners)); Cf. *Harris* v. *Nelson*, 394 U. S. 286, 299–300 (1969) (interpreting the All Writs Act, 28 U. S. C. §1651, to allow discovery in habeas corpus proceedings); *Peyton* v. *Rowe*, 391 U. S. 54, 64–65 (1968) (interpreting the then-existing version of §2241 to allow petitioner to proceed with his habeas corpus action, even though he had not yet begun to serve his sentence).

There are exceptions, of course. Title I of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §106, 110 Stat. 1220, contains certain gatekeeping provisions that restrict a prisoner's ability to bring new and repetitive claims in "second or successive" habeas corpus actions. We upheld these provisions against a Suspension

Clause challenge in *Felker* v. *Turpin*, 518 U. S. 651, 662–664 (1996). The provisions at issue in *Felker*, however, did not constitute a substantial departure from common-law habeas procedures. The provisions, for the most part, codified the longstanding abuse-of-the-writ doctrine. *Id.*, at 664; see also *McCleskey* v. *Zant*, 499 U. S. 467, 489 (1991). AEDPA applies, moreover, to federal, postconviction review after criminal proceedings in state court have taken place. As of this point, cases discussing the implementation of that statute give little helpful instruction (save perhaps by contrast) for the instant cases, where no trial has been held.

The two leading cases addressing habeas substitutes, *Swain* v. *Pressley*, 430 U. S. 372 (1977), and *United States* v. *Hayman*, 342 U. S. 205 (1952), likewise provide little guidance here. The statutes at issue were attempts to streamline habeas corpus relief, not to cut it back.

The statute discussed in *Hayman* was 28 U. S. C. §2255. It replaced traditional habeas corpus for federal prisoners (at least in the first instance) with a process that allowed the prisoner to file a motion with the sentencing court on the ground that his sentence was, *inter alia*, "'imposed in violation of the Constitution or laws of the United States.'" 342 U. S., at 207, n. 1. The purpose and effect of the statute was not to restrict access to the writ but to make postconviction proceedings more efficient. It directed claims not to the court that had territorial jurisdiction over the place of the petitioner's confinement but to the sentencing court, a court already familiar with the facts of the case. As the *Hayman* Court explained

> "Section 2255 . . . was passed at the instance of the Judicial Conference to meet practical difficulties that had arisen in administering the habeas corpus jurisdiction of the federal courts. Nowhere in the history of Section 2255 do we find any purpose to impinge

Opinion of the Court

> upon prisoners' rights of collateral attack upon their
> convictions.  On the contrary, the sole purpose was to
> minimize the difficulties encountered in habeas cor-
> pus hearings by affording the same rights in another
> and more convenient forum." *Id.*, at 219.

See also *Hill* v. *United States*, 368 U. S. 424, 427, 428, and
n. 5 (1962) (noting that §2255 provides a remedy in the
sentencing court that is "exactly commensurate" with the
pre-existing federal habeas corpus remedy).

The statute in *Swain*, D. C. Code Ann. §23–110(g)
(1973), applied to prisoners in custody under sentence of
the Superior Court of the District of Columbia.  Before
enactment of the District of Columbia Court Reform and
Criminal Procedure Act of 1970 (D. C. Court Reform Act),
84 Stat. 473, those prisoners could file habeas petitions in
the United States District Court for the District of Colum-
bia.  The Act, which was patterned on §2255, substituted a
new collateral process in the Superior Court for the pre-
existing habeas corpus procedure in the District Court.
See *Swain*, 430 U. S., at 374–378.  But, again, the purpose
and effect of the statute was to expedite consideration of
the prisoner's claims, not to delay or frustrate it.  See *id.*,
at 375, n. 4 (noting that the purpose of the D. C. Court
Reform Act was to "alleviate" administrative burdens on
the District Court).

That the statutes in *Hayman* and *Swain* were designed
to strengthen, rather than dilute, the writ's protections
was evident, furthermore, from this significant fact: Nei-
ther statute eliminated traditional habeas corpus relief.
In both cases the statute at issue had a saving clause,
providing that a writ of habeas corpus would be available
if the alternative process proved inadequate or ineffective.
*Swain*, *supra*, at 381; *Hayman*, *supra*, at 223.  The Court
placed explicit reliance upon these provisions in upholding
the statutes against constitutional challenges.  See *Swain*,

Opinion of the Court

*supra*, at 381 (noting that the provision "avoid[ed] any serious question about the constitutionality of the statute"); *Hayman, supra*, at 223 (noting that, because habeas remained available as a last resort, it was unnecessary to "reach constitutional questions").

Unlike in *Hayman* and *Swain*, here we confront statutes, the DTA and the MCA, that were intended to circumscribe habeas review. Congress' purpose is evident not only from the unequivocal nature of MCA §7's jurisdiction-stripping language, 28 U. S. C. A. §2241(e)(1) (Supp. 2007) ("No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus . . ."), but also from a comparison of the DTA to the statutes at issue in *Hayman* and *Swain*. When interpreting a statute, we examine related provisions in other parts of the U. S. Code. See, *e.g., West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 88–97 (1991); *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.*, 515 U. S. 687, 717–718 (1995) (SCALIA, J., dissenting); see generally W. Eskridge, P. Frickey, & E. Garrett, Cases and Materials on Legislation: Statutes and the Creation of Public Policy 1039 (3d ed. 2001). When Congress has intended to replace traditional habeas corpus with habeas-like substitutes, as was the case in *Hayman* and *Swain*, it has granted to the courts broad remedial powers to secure the historic office of the writ. In the §2255 context, for example, Congress has granted to the reviewing court power to "determine the issues and make findings of fact and conclusions of law" with respect to whether "the judgment [of conviction] was rendered without jurisdiction, or . . . the sentence imposed was not authorized by law or otherwise open to collateral attack." 28 U. S. C. A. §2255(b) (Supp. 2008). The D. C. Court Reform Act, the statute upheld in *Swain*, contained a similar provision. §23–110(g), 84 Stat. 609.

In contrast the DTA's jurisdictional grant is quite lim-

Opinion of the Court

ited.  The Court of Appeals has jurisdiction not to inquire into the legality of the detention generally but only to assess whether the CSRT complied with the "standards and procedures specified by the Secretary of Defense" and whether those standards and procedures are lawful.  DTA §1005(e)(2)(C), 119 Stat. 2742.  If Congress had envisioned DTA review as coextensive with traditional habeas corpus, it would not have drafted the statute in this manner.  Instead, it would have used language similar to what it used in the statutes at issue in *Hayman* and *Swain*.  Cf. *Russello* v. *United States*, 464 U. S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'" (quoting *United States* v. *Wong Kim Bo*, 472 F. 2d 720, 722 (CA5 1972))).  Unlike in *Hayman* and *Swain*, moreover, there has been no effort to preserve habeas corpus review as an avenue of last resort.  No saving clause exists in either the MCA or the DTA.  And MCA §7 eliminates habeas review for these petitioners.

The differences between the DTA and the habeas statute that would govern in MCA §7's absence, 28 U. S. C. §2241 (2000 ed. and Supp. V), are likewise telling.  In §2241 (2000 ed.) Congress confirmed the authority of "any justice" or "circuit judge" to issue the writ.  Cf. *Felker*, 518 U. S., at 660–661 (interpreting Title I of AEDPA to not strip from this Court the power to entertain original habeas corpus petitions).  That statute accommodates the necessity for factfinding that will arise in some cases by allowing the appellate judge or Justice to transfer the case to a district court of competent jurisdiction, whose institutional capacity for factfinding is superior to his or her own.  See 28 U. S. C. §2241(b).  By granting the Court of Appeals "exclusive" jurisdiction over petitioners' cases, see DTA §1005(e)(2)(A), 119 Stat. 2742, Congress has fore-

closed that option.  This choice indicates Congress in-
tended the Court of Appeals to have a more limited role in
enemy combatant status determinations than a district
court has in habeas corpus proceedings.  The DTA should
be interpreted to accord some latitude to the Court of
Appeals to fashion procedures necessary to make its re-
view function a meaningful one, but, if congressional
intent is to be respected, the procedures adopted cannot be
as extensive or as protective of the rights of the detainees
as they would be in a §2241 proceeding.  Otherwise there
would have been no, or very little, purpose for enacting the
DTA.

To the extent any doubt remains about Congress' intent,
the legislative history confirms what the plain text
strongly suggests: In passing the DTA Congress did not
intend to create a process that differs from traditional
habeas corpus process in name only.  It intended to create
a more limited procedure.  See, *e.g.*, 151 Cong. Rec. S14263
(Dec. 21, 2005) (statement of Sen. Graham) (noting that
the DTA "extinguish[es] these habeas and other actions in
order to effect a transfer of jurisdiction over these cases to
the DC Circuit Court" and agreeing that the bill "create[s]
in their place a very limited judicial review of certain
military administrative decisions"); *id.*, at S14268 (state-
ment of Sen. Kyl) ("It is important to note that the limited
judicial review authorized by paragraphs 2 and 3 of sub-
section (e) [of DTA §1005] are not habeas-corpus review.
It is a limited judicial review of its own nature").

It is against this background that we must interpret the
DTA and assess its adequacy as a substitute for habeas
corpus.  The present cases thus test the limits of the Sus-
pension Clause in ways that *Hayman* and *Swain* did not.

## B

We do not endeavor to offer a comprehensive summary
of the requisites for an adequate substitute for habeas

Opinion of the Court

corpus. We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to "the erroneous application or interpretation" of relevant law. *St. Cyr*, 533 U. S., at 302. And the habeas court must have the power to order the conditional release of an individual unlawfully detained—though release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted. See *Ex parte Bollman*, 4 Cranch 75, 136 (1807) (where imprisonment is unlawful, the court "can only direct [the prisoner] to be discharged"); R. Hurd, Treatise on the Right of Personal Liberty, and On the Writ of Habeas Corpus and the Practice Connected with It: With a View of the Law of Extradition of Fugitives 222 (2d ed. 1876) ("It cannot be denied where 'a probable ground is shown that the party is imprisoned without just cause, and therefore, hath a right to be delivered,' for the writ then becomes a 'writ of right, which may not be denied but ought to be granted to every man that is committed or detained in prison or otherwise restrained of his liberty'"). But see *Chessman* v. *Teets*, 354 U. S. 156, 165–166 (1957) (remanding in a habeas case for retrial within a "reasonable time"). These are the easily identified attributes of any constitutionally adequate habeas corpus proceeding. But, depending on the circumstances, more may be required.

Indeed, common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances. See 3 Blackstone *131 (describing habeas as "the great and efficacious writ, in all manner of illegal confinement"); see also *Schlup* v. *Delo*, 513 U. S. 298, 319 (1995) (Habeas "is, at its core, an equitable remedy"); *Jones* v. *Cunningham*, 371 U. S. 236, 243 (1963) (Habeas is not "a static, narrow, formalistic remedy; its scope has grown to achieve its

grand purpose"). It appears the common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention. Notably, the black-letter rule that prisoners could not controvert facts in the jailer's return was not followed (or at least not with consistency) in such cases. Hurd, *supra*, at 271 (noting that the general rule was "subject to exceptions" including cases of bail and impressment); Oakes, Legal History in the High Court—Habeas Corpus, 64 Mich. L. Rev. 451, 457 (1966) ("[W]hen a prisoner applied for habeas corpus before indictment or trial, some courts examined the written depositions on which he had been arrested or committed, and others even heard oral testimony to determine whether the evidence was sufficient to justifying holding him for trial" (footnotes omitted)); Fallon & Meltzer, Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror, 120 Harv. L. Rev. 2029, 2102 (2007) ("[T]he early practice was not consistent: courts occasionally permitted factual inquiries when no other opportunity for judicial review existed").

There is evidence from 19th-century American sources indicating that, even in States that accorded strong res judicata effect to prior adjudications, habeas courts in this country routinely allowed prisoners to introduce exculpatory evidence that was either unknown or previously unavailable to the prisoner. See, *e.g.*, *Ex parte Pattison*, 56 Miss. 161, 164 (1878) (noting that "[w]hile the former adjudication must be considered as conclusive on the testimony then adduced" "newly developed exculpatory evidence . . . may authorize the admission to bail"); *Ex parte Foster*, 5 Tex. Ct. App. 625, 644 (1879) (construing the State's habeas statute to allow for the introduction of new evidence "where important testimony has been obtained, which, though not newly discovered, or which, though known to [the petitioner], it was not in his power

to produce at the former hearing; [and] where the evidence was newly discovered"); *People* v. *Martin*, 7 N. Y. Leg. Obs. 49, 56 (1848) ("If in custody on criminal process before indictment, the prisoner has an absolute right to demand that the original depositions be looked into to see whether any crime is in fact imputed to him, and the inquiry will by no means be confined to the return. Facts out of the return may be gone into to ascertain whether the committing magistrate may not have arrived at an illogical conclusion upon the evidence given before him . . ."); see generally W. Church, Treatise on the Writ of Habeas Corpus §182, p. 235 1886) (hereinafter Church) (noting that habeas courts would "hear evidence anew if justice require it"). Justice McLean, on Circuit in 1855, expressed his view that a habeas court should consider a prior judgment conclusive "where there was clearly jurisdiction and a full and fair hearing; but that it might not be so considered when any of these requisites were wanting." *Ex parte Robinson*, 20 F. Cas. 969, 971, (No. 11,935) (CC Ohio 1855). To illustrate the circumstances in which the prior adjudication did not bind the habeas court, he gave the example of a case in which "[s]everal unimpeached witnesses" provided new evidence to exculpate the prisoner. *Ibid.*

The idea that the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings accords with our test for procedural adequacy in the due process context. See *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976) (noting that the Due Process Clause requires an assessment of, *inter alia*, "the risk of an erroneous deprivation of [a liberty interest;] and the probable value, if any, of additional or substitute procedural safeguards"). This principle has an established foundation in habeas corpus jurisprudence as well, as Chief Justice Marshall's opinion in *Ex parte Watkins*, 3 Pet. 193 (1830), demonstrates. Like the petitioner in *Swain*, Watkins sought a

writ of habeas corpus after being imprisoned pursuant to a judgment of a District of Columbia court. In holding that the judgment stood on "high ground," 3 Pet., at 209, the Chief Justice emphasized the character of the court that rendered the original judgment, noting it was a "court of record, having general jurisdiction over criminal cases." *Id.*, at 203. In contrast to "inferior" tribunals of limited jurisdiction, *ibid.*, courts of record had broad remedial powers, which gave the habeas court greater confidence in the judgment's validity. See generally Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 982–983 (1998).

Accordingly, where relief is sought from a sentence that resulted from the judgment of a court of record, as was the case in *Watkins* and indeed in most federal habeas cases, considerable deference is owed to the court that ordered confinement. See *Brown* v. *Allen*, 344 U. S. 443, 506 (1953) (opinion of Frankfurter, J.) (noting that a federal habeas court should accept a state court's factual findings unless "a vital flaw be found in the process of ascertaining such facts in the State court"). Likewise in those cases the prisoner should exhaust adequate alternative remedies before filing for the writ in federal court. See *Ex parte Royall*, 117 U. S. 241, 251–252 (1886) (requiring exhaustion of state collateral processes). Both aspects of federal habeas corpus review are justified because it can be assumed that, in the usual course, a court of record provides defendants with a fair, adversary proceeding. In cases involving state convictions this framework also respects federalism; and in federal cases it has added justification because the prisoner already has had a chance to seek review of his conviction in a federal forum through a direct appeal. The present cases fall outside these categories, however; for here the detention is by executive order.

Where a person is detained by executive order, rather than, say, after being tried and convicted in a court, the

54                    BOUMEDIENE *v.* BUSH

Opinion of the Court

need for collateral review is most pressing.  A criminal
conviction in the usual course occurs after a judicial hear-
ing before a tribunal disinterested in the outcome and
committed to procedures designed to ensure its own inde-
pendence.  These dynamics are not inherent in executive
detention orders or executive review procedures.  In this
context the need for habeas corpus is more urgent.  The
intended duration of the detention and the reasons for it
bear upon the precise scope of the inquiry.  Habeas corpus
proceedings need not resemble a criminal trial, even when
the detention is by executive order.  But the writ must be
effective.  The habeas court must have sufficient authority
to conduct a meaningful review of both the cause for de-
tention and the Executive's power to detain.

To determine the necessary scope of habeas corpus
review, therefore, we must assess the CSRT process, the
mechanism through which petitioners' designation as
enemy combatants became final.  Whether one character-
izes the CSRT process as direct review of the Executive's
battlefield determination that the detainee is an enemy
combatant—as the parties have and as we do—or as the
first step in the collateral review of a battlefield determi-
nation makes no difference in a proper analysis of whether
the procedures Congress put in place are an adequate
substitute for habeas corpus.  What matters is the sum
total of procedural protections afforded to the detainee at
all stages, direct and collateral.

Petitioners identify what they see as myriad deficiencies
in the CSRTs.  The most relevant for our purposes are the
constraints upon the detainee's ability to rebut the factual
basis for the Government's assertion that he is an enemy
combatant.  As already noted, see Part IV–C, *supra,* at the
CSRT stage the detainee has limited means to find or
present evidence to challenge the Government's case
against him.  He does not have the assistance of counsel
and may not be aware of the most critical allegations that

Opinion of the Court

the Government relied upon to order his detention. See App. to Pet. for Cert. in No. 06–1196, at 156, ¶F(8) (noting that the detainee can access only the "unclassified portion of the Government Information"). The detainee can confront witnesses that testify during the CSRT proceedings. *Id.*, at 144, ¶*g*(8). But given that there are in effect no limits on the admission of hearsay evidence—the only requirement is that the tribunal deem the evidence "relevant and helpful," *ibid.,* ¶*g*(9)—the detainee's opportunity to question witnesses is likely to be more theoretical than real.

The Government defends the CSRT process, arguing that it was designed to conform to the procedures suggested by the plurality in *Hamdi.* See 542 U. S., at 538. Setting aside the fact that the relevant language in *Hamdi* did not garner a majority of the Court, it does not control the matter at hand. None of the parties in *Hamdi* argued there had been a suspension of the writ. Nor could they. The §2241 habeas corpus process remained in place, *id.*, at 525. Accordingly, the plurality concentrated on whether the Executive had the authority to detain and, if so, what rights the detainee had under the Due Process Clause. True, there are places in the *Hamdi* plurality opinion where it is difficult to tell where its extrapolation of §2241 ends and its analysis of the petitioner's Due Process rights begins. But the Court had no occasion to define the necessary scope of habeas review, for Suspension Clause purposes, in the context of enemy combatant detentions. The closest the plurality came to doing so was in discussing whether, in light of separation-of-powers concerns, §2241 should be construed to forbid the District Court from inquiring beyond the affidavit Hamdi's custodian provided in answer to the detainee's habeas petition. The plurality answered this question with an emphatic "no." *Id.*, at 527 (labeling this argument as "extreme"); *id.*, at 535–536.

Even if we were to assume that the CSRTs satisfy due

Opinion of the Court

process standards, it would not end our inquiry. Habeas corpus is a collateral process that exists, in Justice Holmes' words, to "cu[t] through all forms and g[o] to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell." *Frank* v. *Mangum*, 237 U. S. 309, 346 (1915) (dissenting opinion). Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant. See 2 Chambers, Course of Lectures on English Law 1767–1773, at 6 ("Liberty may be violated either by arbitrary *imprisonment* without law or the appearance of law, or by a lawful magistrate for an unlawful reason"). This is so, as *Hayman* and *Swain* make clear, even where the prisoner is detained after a criminal trial conducted in full accordance with the protections of the Bill of Rights. Were this not the case, there would have been no reason for the Court to inquire into the adequacy of substitute habeas procedures in *Hayman* and *Swain*. That the prisoners were detained pursuant to the most rigorous proceedings imaginable, a full criminal trial, would have been enough to render any habeas substitute acceptable *per se*.

Although we make no judgment as to whether the CSRTs, as currently constituted, satisfy due process standards, we agree with petitioners that, even when all the parties involved in this process act with diligence and in good faith, there is considerable risk of error in the tribunal's findings of fact. This is a risk inherent in any process that, in the words of the former Chief Judge of the Court of Appeals, is "closed and accusatorial." See *Bismullah III*, 514 F. 3d, at 1296 (Ginsburg, C. J., concurring in denial of rehearing en banc). And given that the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more, this

Opinion of the Court

is a risk too significant to ignore.

For the writ of habeas corpus, or its substitute, to function as an effective and proper remedy in this context, the court that conducts the habeas proceeding must have the means to correct errors that occurred during the CSRT proceedings. This includes some authority to assess the sufficiency of the Government's evidence against the detainee. It also must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding. Federal habeas petitioners long have had the means to supplement the record on review, even in the postconviction habeas setting. See *Townsend* v. *Sain*, 372 U. S. 293, 313 (1963), overruled in part by *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 5 (1992). Here that opportunity is constitutionally required.

Consistent with the historic function and province of the writ, habeas corpus review may be more circumscribed if the underlying detention proceedings are more thorough than they were here. In two habeas cases involving enemy aliens tried for war crimes, *In re Yamashita*, 327 U. S. 1 (1946), and *Ex parte Quirin*, 317 U. S. 1 (1942), for example, this Court limited its review to determining whether the Executive had legal authority to try the petitioners by military commission. See *Yamashita, supra,* at 8 ("[O]n application for habeas corpus we are not concerned with the guilt or innocence of the petitioners. We consider here only the lawful power of the commission to try the petitioner for the offense charged"); *Quirin, supra,* at 25 ("We are not here concerned with any question of the guilt or innocence of petitioners"). Military courts are not courts of record. See *Watkins*, 3 Pet., at 209; Church 513. And the procedures used to try General Yamashita have been sharply criticized by Members of this Court. See *Hamdan*, 548 U. S., at 617; *Yamashita, supra,* at 41–81 (Rutledge, J., dissenting). We need not revisit these cases, however.

For on their own terms, the proceedings in *Yamashita* and *Quirin*, like those in *Eisentrager*, had an adversarial structure that is lacking here. See *Yamashita*, *supra*, at 5 (noting that General Yamashita was represented by six military lawyers and that "[t]hroughout the proceedings . . . defense counsel . . . demonstrated their professional skill and resourcefulness and their proper zeal for the defense with which they were charged"); *Quirin*, *supra*, at 23–24; Exec. Order No. 9185, 7 Fed. Reg. 5103 (1942) (appointing counsel to represent the German saboteurs).

The extent of the showing required of the Government in these cases is a matter to be determined. We need not explore it further at this stage. We do hold that when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release.

C

We now consider whether the DTA allows the Court of Appeals to conduct a proceeding meeting these standards. "[W]e are obligated to construe the statute to avoid [constitutional] problems" if it is "'fairly possible'" to do so. *St. Cyr*, 533 U. S., at 299–300 (quoting *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932)). There are limits to this principle, however. The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation. See *Clark* v. *Martinez*, 543 U. S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*"). We cannot ignore the text and purpose of a statute in order to save it.

The DTA does not explicitly empower the Court of Appeals to order the applicant in a DTA review proceeding released should the court find that the standards and procedures used at his CSRT hearing were insufficient to justify detention. This is troubling. Yet, for present purposes, we can assume congressional silence permits a constitutionally required remedy. In that case it would be possible to hold that a remedy of release is impliedly provided for. The DTA might be read, furthermore, to allow the petitioners to assert most, if not all, of the legal claims they seek to advance, including their most basic claim: that the President has no authority under the AUMF to detain them indefinitely. (Whether the President has such authority turns on whether the AUMF authorizes—and the Constitution permits—the indefinite detention of "enemy combatants" as the Department of Defense defines that term. Thus a challenge to the President's authority to detain is, in essence, a challenge to the Department's definition of enemy combatant, a "standard" used by the CSRTs in petitioners' cases.) At oral argument, the Solicitor General urged us to adopt both these constructions, if doing so would allow MCA §7 to remain intact. See Tr. of Oral Arg. 37, 53.

The absence of a release remedy and specific language allowing AUMF challenges are not the only constitutional infirmities from which the statute potentially suffers, however. The more difficult question is whether the DTA permits the Court of Appeals to make requisite findings of fact. The DTA enables petitioners to request "review" of their CSRT determination in the Court of Appeals, DTA §1005(e)(2)(B)(i), 119 Stat. 2742; but the "Scope of Review" provision confines the Court of Appeals' role to reviewing whether the CSRT followed the "standards and procedures" issued by the Department of Defense and assessing whether those "standards and procedures" are lawful. §1005(e)(C), *ibid.* Among these standards is "the require-

ment that the conclusion of the Tribunal be supported by a
preponderance of the evidence . . . allowing a rebuttable
presumption in favor of the Government's evidence."
§1005(e)(C)(i), *ibid.*

Assuming the DTA can be construed to allow the Court
of Appeals to review or correct the CSRT's factual deter-
minations, as opposed to merely certifying that the tribu-
nal applied the correct standard of proof, we see no way to
construe the statute to allow what is also constitutionally
required in this context: an opportunity for the detainee to
present relevant exculpatory evidence that was not made
part of the record in the earlier proceedings.

On its face the statute allows the Court of Appeals to
consider no evidence outside the CSRT record. In the
parallel litigation, however, the Court of Appeals deter-
mined that the DTA allows it to order the production of all
"'reasonably available information in the possession of the
U. S. Government bearing on the issue of whether the
detainee meets the criteria to be designated as an enemy
combatant,'" regardless of whether this evidence was put
before the CSRT. See *Bismullah I,* 501 F. 3d, at 180. The
Government, see Pet. for Cert. pending in *Gates* v. *Bismul-
lah,* No. 07–1054 (hereinafter *Bismullah* Pet.), with sup-
port from five members of the Court of Appeals, see *Bis-
mullah III,* 514 F. 3d, at 1299 (Henderson, J., dissenting
from denial of rehearing en banc); *id.,* at 1302 (opinion of
Randolph, J.) (same); *id.,* at 1306 (opinion of Brown, J.)
(same), disagrees with this interpretation. For present
purposes, however, we can assume that the Court of Ap-
peals was correct that the DTA allows introduction and
consideration of relevant exculpatory evidence that was
"reasonably available" to the Government at the time of
the CSRT but not made part of the record. Even so, the
DTA review proceeding falls short of being a constitution-
ally adequate substitute, for the detainee still would have
no opportunity to present evidence discovered after the

CSRT proceedings concluded.

Under the DTA the Court of Appeals has the power to review CSRT determinations by assessing the legality of standards and procedures. This implies the power to inquire into what happened at the CSRT hearing and, perhaps, to remedy certain deficiencies in that proceeding. But should the Court of Appeals determine that the CSRT followed appropriate and lawful standards and procedures, it will have reached the limits of its jurisdiction. There is no language in the DTA that can be construed to allow the Court of Appeals to admit and consider newly discovered evidence that could not have been made part of the CSRT record because it was unavailable to either the Government or the detainee when the CSRT made its findings. This evidence, however, may be critical to the detainee's argument that he is not an enemy combatant and there is no cause to detain him.

This is not a remote hypothetical. One of the petitioners, Mohamed Nechla, requested at his CSRT hearing that the Government contact his employer. The petitioner claimed the employer would corroborate Nechla's contention he had no affiliation with al Qaeda. Although the CSRT determined this testimony would be relevant, it also found the witness was not reasonably available to testify at the time of the hearing. Petitioner's counsel, however, now represents the witness is available to be heard. See Brief for Boumediene Petitioners 5. If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court. Even under the Court of Appeals' generous construction of the DTA, however, the evidence identified by Nechla would be inadmissible in a DTA review proceeding. The role of an Article III court in the exercise of its habeas corpus function cannot be circumscribed in this manner.

Opinion of the Court

By foreclosing consideration of evidence not presented or reasonably available to the detainee at the CSRT proceedings, the DTA disadvantages the detainee by limiting the scope of collateral review to a record that may not be accurate or complete. In other contexts, *e.g.*, in post-trial habeas cases where the prisoner already has had a full and fair opportunity to develop the factual predicate of his claims, similar limitations on the scope of habeas review may be appropriate. See *Williams* v. *Taylor*, 529 U. S. 420, 436–437 (2000) (noting that §2254 "does not equate prisoners who exercise diligence in pursuing their claims with those who do not"). In this context, however, where the underlying detention proceedings lack the necessary adversarial character, the detainee cannot be held responsible for all deficiencies in the record.

The Government does not make the alternative argument that the DTA allows for the introduction of previously unavailable exculpatory evidence on appeal. It does point out, however, that if a detainee obtains such evidence, he can request that the Deputy Secretary of Defense convene a new CSRT. See Supp. Brief for Respondents 4. Whatever the merits of this procedure, it is an insufficient replacement for the factual review these detainees are entitled to receive through habeas corpus. The Deputy Secretary's determination whether to initiate new proceedings is wholly a discretionary one. See Dept. of Defense, Office for the Administrative Review of the Detention of Enemy Combatants, Instruction 5421.1, Procedure for Review of "New Evidence" Relating to Enemy Combatant (EC) Status ¶5(d) (May 7, 2007) (Instruction 5421.1) ("The decision to convene a CSRT to reconsider the basis of the detainee's [enemy combatant] status in light of 'new evidence' is a matter vested in the unreviewable discretion of the [Deputy Secretary of Defense]"). And we see no way to construe the DTA to allow a detainee to challenge the Deputy Secretary's decision not to open a

Opinion of the Court

new CSRT pursuant to Instruction 5421.1. Congress directed the Secretary of Defense to devise procedures for considering new evidence, see DTA §1005(a)(3), but the detainee has no mechanism for ensuring that those procedures are followed. DTA §1005(e)(2)(C), 119 Stat. 2742, makes clear that the Court of Appeals' jurisdiction is "limited to consideration of . . . whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense . . . and . . . whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." DTA §1005(e)(2)(A), *ibid.,* further narrows the Court of Appeals' jurisdiction to reviewing "any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." The Deputy Secretary's determination whether to convene a new CSRT is not a "status determination of the Combatant Status Review Tribunal," much less a "final decision" of that body.

We do not imply DTA review would be a constitutionally sufficient replacement for habeas corpus but for these limitations on the detainee's ability to present exculpatory evidence. For even if it were possible, as a textual matter, to read into the statute each of the necessary procedures we have identified, we could not overlook the cumulative effect of our doing so. To hold that the detainees at Guantanamo may, under the DTA, challenge the President's legal authority to detain them, contest the CSRT's findings of fact, supplement the record on review with exculpatory evidence, and request an order of release would come close to reinstating the §2241 habeas corpus process Congress sought to deny them. The language of the statute, read in light of Congress' reasons for enacting it, cannot bear this interpretation. Petitioners have met their burden of establishing that the DTA review process

Opinion of the Court

is, on its face, an inadequate substitute for habeas corpus.

Although we do not hold that an adequate substitute must duplicate §2241 in all respects, it suffices that the Government has not established that the detainees' access to the statutory review provisions at issue is an adequate substitute for the writ of habeas corpus. MCA §7 thus effects an unconstitutional suspension of the writ. In view of our holding we need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement.

## VI

### A

In light of our conclusion that there is no jurisdictional bar to the District Court's entertaining petitioners' claims the question remains whether there are prudential barriers to habeas corpus review under these circumstances.

The Government argues petitioners must seek review of their CSRT determinations in the Court of Appeals before they can proceed with their habeas corpus actions in the District Court. As noted earlier, in other contexts and for prudential reasons this Court has required exhaustion of alternative remedies before a prisoner can seek federal habeas relief. Most of these cases were brought by prisoners in state custody, *e.g.*, *Ex parte Royall*, 117 U. S. 241, and thus involved federalism concerns that are not relevant here. But we have extended this rule to require defendants in courts-martial to exhaust their military appeals before proceeding with a federal habeas corpus action. See *Schlesinger*, 420 U. S., at 758.

The real risks, the real threats, of terrorist attacks are constant and not likely soon to abate. The ways to disrupt our life and laws are so many and unforeseen that the Court should not attempt even some general catalogue of crises that might occur. Certain principles are apparent, however. Practical considerations and exigent circum-

Opinion of the Court

stances inform the definition and reach of the law's writs, including habeas corpus. The cases and our tradition reflect this precept.

In cases involving foreign citizens detained abroad by the Executive, it likely would be both an impractical and unprecedented extension of judicial power to assume that habeas corpus would be available at the moment the prisoner is taken into custody. If and when habeas corpus jurisdiction applies, as it does in these cases, then proper deference can be accorded to reasonable procedures for screening and initial detention under lawful and proper conditions of confinement and treatment for a reasonable period of time. Domestic exigencies, furthermore, might also impose such onerous burdens on the Government that here, too, the Judicial Branch would be required to devise sensible rules for staying habeas corpus proceedings until the Government can comply with its requirements in a responsible way. Cf. *Ex parte Milligan*, 4 Wall., at 127 ("If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, *then*, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus over-thrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course"). Here, as is true with detainees apprehended abroad, a relevant consideration in determining the courts' role is whether there are suitable alternative processes in place to protect against the arbitrary exercise of governmental power.

The cases before us, however, do not involve detainees who have been held for a short period of time while await-ing their CSRT determinations. Were that the case, or were it probable that the Court of Appeals could complete a prompt review of their applications, the case for requir-

Opinion of the Court

ing temporary abstention or exhaustion of alternative remedies would be much stronger. These qualifications no longer pertain here. In some of these cases six years have elapsed without the judicial oversight that habeas corpus or an adequate substitute demands. And there has been no showing that the Executive faces such onerous burdens that it cannot respond to habeas corpus actions. To require these detainees to complete DTA review before proceeding with their habeas corpus actions would be to require additional months, if not years, of delay. The first DTA review applications were filed over a year ago, but no decisions on the merits have been issued. While some delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those who are held in custody. The detainees in these cases are entitled to a prompt habeas corpus hearing.

Our decision today holds only that the petitioners before us are entitled to seek the writ; that the DTA review procedures are an inadequate substitute for habeas corpus; and that the petitioners in these cases need not exhaust the review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court. The only law we identify as unconstitutional is MCA §7, 28 U. S. C. A. §2241(e) (Supp. 2007). Accordingly, both the DTA and the CSRT process remain intact. Our holding with regard to exhaustion should not be read to imply that a habeas court should intervene the moment an enemy combatant steps foot in a territory where the writ runs. The Executive is entitled to a reasonable period of time to determine a detainee's status before a court entertains that detainee's habeas corpus petition. The CSRT process is the mechanism Congress and the President set up to deal with these issues. Except in cases of undue delay, federal courts should refrain from entertaining an enemy combatant's habeas corpus petition at least until after the Department, acting via the CSRT, has had a chance to

Opinion of the Court

review his status.

### B

Although we hold that the DTA is not an adequate and effective substitute for habeas corpus, it does not follow that a habeas corpus court may disregard the dangers the detention in these cases was intended to prevent. *Felker*, *Swain*, and *Hayman* stand for the proposition that the Suspension Clause does not resist innovation in the field of habeas corpus. Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ.

In the DTA Congress sought to consolidate review of petitioners' claims in the Court of Appeals. Channeling future cases to one district court would no doubt reduce administrative burdens on the Government. This is a legitimate objective that might be advanced even without an amendment to §2241. If, in a future case, a detainee files a habeas petition in another judicial district in which a proper respondent can be served, see *Rumsfeld* v. *Padilla*, 542 U. S. 426, 435–436 (2004), the Government can move for change of venue to the court that will hear these petitioners' cases, the United States District Court for the District of Columbia. See 28 U. S. C. §1404(a); *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484, 499, n. 15 (1973).

Another of Congress' reasons for vesting exclusive jurisdiction in the Court of Appeals, perhaps, was to avoid the widespread dissemination of classified information. The Government has raised similar concerns here and elsewhere. See Brief for Respondents 55–56; *Bismullah* Pet. 30. We make no attempt to anticipate all of the evidentiary and access-to-counsel issues that will arise during the course of the detainees' habeas corpus proceedings. We recognize, however, that the Government has a legiti-

Opinion of the Court

mate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible. Cf. *United States* v. *Reynolds*, 345 U. S. 1, 10 (1953) (recognizing an evidentiary privilege in a civil damages case where "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged").

These and the other remaining questions are within the expertise and competence of the District Court to address in the first instance.

*      *      *

In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches. See *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936). Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people. The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security.

Officials charged with daily operational responsibility for our security may consider a judicial discourse on the history of the Habeas Corpus Act of 1679 and like matters to be far removed from the Nation's present, urgent concerns. Established legal doctrine, however, must be consulted for its teaching. Remote in time it may be; irrelevant to the present it is not. Security depends upon a sophisticated intelligence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles. Chief among these are free-

Opinion of the Court

dom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives.

Our opinion does not undermine the Executive's powers as Commander in Chief. On the contrary, the exercise of those powers is vindicated, not eroded, when confirmed by the Judicial Branch. Within the Constitution's separation-of-powers structure, few exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person. Some of these petitioners have been in custody for six years with no definitive judicial determination as to the legality of their detention. Their access to the writ is a necessity to determine the lawfulness of their status, even if, in the end, they do not obtain the relief they seek.

Because our Nation's past military conflicts have been of limited duration, it has been possible to leave the outer boundaries of war powers undefined. If, as some fear, terrorism continues to pose dangerous threats to us for years to come, the Court might not have this luxury. This result is not inevitable, however. The political branches, consistent with their independent obligations to interpret and uphold the Constitution, can engage in a genuine debate about how best to preserve constitutional values while protecting the Nation from terrorism. Cf. *Hamdan*, 548 U. S., at 636 (BREYER, J., concurring) ("[J]udicial insistence upon that consultation does not weaken our Nation's ability to deal with danger. To the contrary, that insistence strengthens the Nation's ability to determine—through democratic means—how best to do so").

It bears repeating that our opinion does not address the content of the law that governs petitioners' detention. That is a matter yet to be determined. We hold that peti-

70                    BOUMEDIENE *v.* BUSH

tioners may invoke the fundamental procedural protec-
tions of habeas corpus.  The laws and Constitution are
designed to survive, and remain in force, in extraordinary
times.  Liberty and security can be reconciled; and in our
system they are reconciled within the framework of the
law.  The Framers decided that habeas corpus, a right of
first importance, must be a part of that framework, a part
of that law.

The determination by the Court of Appeals that the
Suspension Clause and its protections are inapplicable to
petitioners was in error.  The judgment of the Court of
Appeals is reversed.  The cases are remanded to the Court
of Appeals with instructions that it remand the cases to
the District Court for proceedings consistent with this
opinion.

*It is so ordered.*

Cite as: 553 U. S. ____ (2008)          1

SOUTER, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 06–1195 and 06–1196

———————

LAKHDAR BOUMEDIENE, ET AL., PETITIONERS
06–1195            *v.*
GEORGE W. BUSH, PRESIDENT OF THE UNITED
STATES, ET AL.


KHALED A. F. AL ODAH, NEXT FRIEND OF FAWZI
KHALID ABDULLAH FAHAD AL ODAH, ET AL.,
PETITIONERS
06–1196            *v.*
UNITED STATES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 12, 2008]

JUSTICE SOUTER, with whom JUSTICE GINSBURG and
JUSTICE BREYER join, concurring.

I join the Court's opinion in its entirety and add this
afterword only to emphasize two things one might over-
look after reading the dissents.

Four years ago, this Court in *Rasul* v. *Bush*, 542 U. S.
466 (2004) held that statutory habeas jurisdiction ex-
tended to claims of foreign nationals imprisoned by the
United States at Guantanamo Bay, "to determine the
legality of the Executive's potentially indefinite detention"
of them, *id.,* at 485. Subsequent legislation eliminated the
statutory habeas jurisdiction over these claims, so that
now there must be constitutionally based jurisdiction or
none at all. JUSTICE SCALIA is thus correct that here, for
the first time, this Court holds there is (he says "confers")
constitutional habeas jurisdiction over aliens imprisoned

by the military outside an area of *de jure* national sover-
eignty, see *post,* at 1 (dissenting opinion). But no one who
reads the Court's opinion in *Rasul* could seriously doubt
that the jurisdictional question must be answered the
same way in purely constitutional cases, given the Court's
reliance on the historical background of habeas generally
in answering the statutory question. See, *e.g.,* 542 U. S.,
at 473, 481–483, and nn. 11–14. Indeed, the Court in
*Rasul* directly answered the very historical question that
JUSTICE SCALIA says is dispositive, see *post,* at 18; it wrote
that "[a]pplication of the habeas statute to persons de-
tained at [Guantanamo] is consistent with the historical
reach of the writ of habeas corpus," 542 U. S., at 481.
JUSTICE SCALIA dismisses the statement as dictum, see
*post,* at 21, but if dictum it was, it was dictum well consid-
ered, and it stated the view of five Members of this Court
on the historical scope of the writ. Of course, it takes more
than a quotation from *Rasul,* however much on point, to
resolve the constitutional issue before us here, which the
majority opinion has explored afresh in the detail it de-
serves. But whether one agrees or disagrees with today's
decision, it is no bolt out of the blue.

   A second fact insufficiently appreciated by the dissents
is the length of the disputed imprisonments, some of the
prisoners represented here today having been locked up
for six years, *ante,* at 66 (opinion of the Court). Hence the
hollow ring when the dissenters suggest that the Court is
somehow precipitating the judiciary into reviewing claims
that the military (subject to appeal to the Court of Appeals
for the District of Columbia Circuit) could handle within
some reasonable period of time. See, *e.g., post,* at 3 (opin-
ion of ROBERTS, C. J.) ("[T]he Court should have declined
to intervene until the D. C. Circuit had assessed the na-
ture and validity of the congressionally mandated proceed-
ings in a given detainee's case"); *post,* at 6 ("[I]t is not
necessary to consider the availability of the writ until the

SOUTER, J., concurring

statutory remedies have been shown to be inadequate");
*post,* at 8 ("[The Court] rushes to decide the fundamental
question of the reach of habeas corpus when the function-
ing of the DTA may make that decision entirely unneces-
sary"). These suggestions of judicial haste are all the more
out of place given the Court's realistic acknowledgment
that in periods of exigency the tempo of any habeas review
must reflect the immediate peril facing the country. See
*ante,* at 64–65.

It is in fact the very lapse of four years from the time
*Rasul* put everyone on notice that habeas process was
available to Guantanamo prisoners, and the lapse of six
years since some of these prisoners were captured and
incarcerated, that stand at odds with the repeated sugges-
tions of the dissenters that these cases should be seen as a
judicial victory in a contest for power between the Court
and the political branches. See *post,* at 2, 3, 28 (ROBERTS,
C. J., dissenting); *post,* at 5, 6, 17, 18, 25 (SCALIA, J., dis-
senting). The several answers to the charge of triumphal-
ism might start with a basic fact of Anglo-American con-
stitutional history: that the power, first of the Crown and
now of the Executive Branch of the United States, is nec-
essarily limited by habeas corpus jurisdiction to enquire
into the legality of executive detention. And one could
explain that in this Court's exercise of responsibility to
preserve habeas corpus something much more significant
is involved than pulling and hauling between the judicial
and political branches. Instead, though, it is enough to
repeat that some of these petitioners have spent six years
behind bars. After six years of sustained executive deten-
tions in Guantanamo, subject to habeas jurisdiction but
without any actual habeas scrutiny, today's decision is no
judicial victory, but an act of perseverance in trying to
make habeas review, and the obligation of the courts to
provide it, mean something of value both to prisoners and
to the Nation. See *ante,* at 69.

ROBERTS, C. J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 06–1195 and 06–1196

———————

LAKHDAR BOUMEDIENE, ET AL., PETITIONERS
06–1195          *v.*
GEORGE W. BUSH, PRESIDENT OF THE UNITED
STATES, ET AL.


KHALED A. F. AL ODAH, NEXT FRIEND OF FAWZI
KHALID ABDULLAH FAHAD AL ODAH, ET AL.,
PETITIONERS
06–1196          *v.*
UNITED STATES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 12, 2008]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Today the Court strikes down as inadequate the most generous set of procedural protections ever afforded aliens detained by this country as enemy combatants. The political branches crafted these procedures amidst an ongoing military conflict, after much careful investigation and thorough debate. The Court rejects them today out of hand, without bothering to say what due process rights the detainees possess, without explaining how the statute fails to vindicate those rights, and before a single petitioner has even attempted to avail himself of the law's operation. And to what effect? The majority merely replaces a review system designed by the people's representatives with a set of shapeless procedures to be defined by federal courts at some future date. One cannot help but

ROBERTS, C. J., dissenting

think, after surveying the modest practical results of the majority's ambitious opinion, that this decision is not really about the detainees at all, but about control of federal policy regarding enemy combatants.

The majority is adamant that the Guantanamo detainees are entitled to the protections of habeas corpus—its opinion begins by deciding that question. I regard the issue as a difficult one, primarily because of the unique and unusual jurisdictional status of Guantanamo Bay. I nonetheless agree with JUSTICE SCALIA's analysis of our precedents and the pertinent history of the writ, and accordingly join his dissent. The important point for me, however, is that the Court should have resolved these cases on other grounds. Habeas is most fundamentally a procedural right, a mechanism for contesting the legality of executive detention. The critical threshold question in these cases, prior to any inquiry about the writ's scope, is whether the system the political branches designed protects whatever rights the detainees may possess. If so, there is no need for any additional process, whether called "habeas" or something else.

Congress entrusted that threshold question in the first instance to the Court of Appeals for the District of Columbia Circuit, as the Constitution surely allows Congress to do. See Detainee Treatment Act of 2005 (DTA), §1005(e)(2)(A), 119 Stat. 2742. But before the D. C. Circuit has addressed the issue, the Court cashiers the statute, and without answering this critical threshold question itself. The Court does eventually get around to asking whether review under the DTA is, as the Court frames it, an "adequate substitute" for habeas, *ante,* at 42, but even then its opinion fails to determine what rights the detainees possess and whether the DTA system satisfies them. The majority instead compares the undefined DTA process to an equally undefined habeas right—one that is to be given shape only in the future by district courts on a case-by-

Roberts, C. J., dissenting

case basis. This whole approach is misguided.

It is also fruitless. How the detainees' claims will be decided now that the DTA is gone is anybody's guess. But the habeas process the Court mandates will most likely end up looking a lot like the DTA system it replaces, as the district court judges shaping it will have to reconcile review of the prisoners' detention with the undoubted need to protect the American people from the terrorist threat—precisely the challenge Congress undertook in drafting the DTA. All that today's opinion has done is shift responsibility for those sensitive foreign policy and national security decisions from the elected branches to the Federal Judiciary.

I believe the system the political branches constructed adequately protects any constitutional rights aliens captured abroad and detained as enemy combatants may enjoy. I therefore would dismiss these cases on that ground. With all respect for the contrary views of the majority, I must dissent.

I

The Court's opinion makes plain that certiorari to review these cases should never have been granted. As two Members of today's majority once recognized, "traditional rules governing our decision of constitutional questions and our practice of requiring the exhaustion of available remedies . . . make it appropriate to deny these petitions." *Boumediene* v. *Bush*, 549 U. S. ___ (2007) (slip op., at 1) (citation omitted) (statement of STEVENS and KENNEDY, JJ., respecting denial of certiorari). Just so. Given the posture in which these cases came to us, the Court should have declined to intervene until the D. C. Circuit had assessed the nature and validity of the congressionally mandated proceedings in a given detainee's case.

The political branches created a two-part, collateral review procedure for testing the legality of the prisoners'

ROBERTS, C. J., dissenting

detention: It begins with a hearing before a Combatant Status Review Tribunal (CSRT) followed by review in the D. C. Circuit. As part of that review, Congress authorized the D. C. Circuit to decide whether the CSRT proceedings are consistent with "the Constitution and laws of the United States." DTA §1005(e)(2)(C), 119 Stat. 2742. No petitioner, however, has invoked the D. C. Circuit review the statute specifies. See 476 F. 3d 981, 994, and n. 16 (CADC 2007); Brief for Federal Respondents 41–43. As a consequence, that court has had no occasion to decide whether the CSRT hearings, followed by review in the Court of Appeals, vindicate whatever constitutional and statutory rights petitioners may possess. See 476 F. 3d, at 994, and n. 16.

Remarkably, this Court does not require petitioners to exhaust their remedies under the statute; it does not wait to see whether those remedies will prove sufficient to protect petitioners' rights. Instead, it not only denies the D. C. Circuit the opportunity to assess the statute's remedies, it refuses to do so itself: the majority expressly declines to decide whether the CSRT procedures, coupled with Article III review, satisfy due process. See *ante*, at 54.

It is grossly premature to pronounce on the detainees' right to habeas without first assessing whether the remedies the DTA system provides vindicate whatever rights petitioners may claim. The plurality in *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 533 (2004), explained that the Constitution guaranteed an American *citizen* challenging his detention as an enemy combatant the right to "notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." The plurality specifically stated that constitutionally adequate collateral process could be provided "by an appropriately authorized and properly constituted military tribunal," given the "uncommon

potential to burden the Executive at a time of ongoing military conflict." *Id.*, at 533, 538. This point is directly pertinent here, for surely the Due Process Clause does not afford *non*-citizens in such circumstances greater protection than citizens are due.

If the CSRT procedures meet the minimal due process requirements outlined in *Hamdi*, and if an Article III court is available to ensure that these procedures are followed in future cases, see *id.,* at 536; *INS* v. *St. Cyr*, 533 U. S. 289, 304 (2001); *Heikkila* v. *Barber*, 345 U. S. 229, 236 (1953), there is no need to reach the Suspension Clause question. Detainees will have received all the process the Constitution could possibly require, whether that process is called "habeas" or something else. The question of the writ's reach need not be addressed.

This is why the Court should have required petitioners to exhaust their remedies under the statute. As we explained in *Gusik* v. *Schilder*, 340 U. S. 128, 132 (1950), "If an available procedure has not been employed to rectify the alleged error" petitioners complain of, "any interference by [a] federal court may be wholly needless. The procedure established to police the errors of the tribunal whose judgment is challenged may be adequate for the occasion." Because the majority refuses to assess whether the CSRTs comport with the Constitution, it ends up razing a system of collateral review that it admits may in fact satisfy the Due Process Clause and be "structurally sound." *Ante*, at 56. But if the collateral review procedures Congress has provided—CSRT review coupled with Article III scrutiny—are sound, interference by a federal habeas court may be entirely unnecessary.

The only way to know is to require petitioners to use the alternative procedures Congress designed. Mandating that the petitioners exhaust their statutory remedies "is in no sense a suspension of the writ of habeas corpus. It is merely a deferment of resort to the writ until other correc-

ROBERTS, C. J., dissenting

tive procedures are shown to be futile." *Gusik, supra*, at 132. So too here, it is not necessary to consider the availability of the writ until the statutory remedies have been shown to be inadequate to protect the detainees' rights. Cf. 28 U. S. C. §2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State"). Respect for the judgments of Congress—whose Members take the same oath we do to uphold the Constitution—requires no less.

In the absence of any assessment of the DTA's remedies, the question whether detainees are entitled to habeas is an entirely speculative one. Our precedents have long counseled us to avoid deciding such hypothetical questions of constitutional law. See *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such [questions are] unavoidable"); see also *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) (Constitutional questions should not be decided unless "'absolutely necessary to a decision of the case'" (quoting *Burton* v. *United States*, 196 U. S. 283, 295 (1905))). This is a "fundamental rule of judicial restraint." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 157 (1984).

The Court acknowledges that "the ordinary course" would be not to decide the constitutionality of the DTA at this stage, but abandons that "ordinary course" in light of the "gravity" of the constitutional issues presented and the prospect of additional delay. *Ante*, at 43. It is, however, precisely when the issues presented are grave that adherence to the ordinary course is most important. A principle applied only when unimportant is not much of a principle at all, and charges of judicial activism are most effectively

rebutted when courts can fairly argue they are following normal practices.

The Court is also concerned that requiring petitioners to pursue "DTA review before proceeding with their habeas corpus actions" could involve additional delay. *Ante*, at 66. The nature of the habeas remedy the Court instructs lower courts to craft on remand, however, is far more unsettled than the process Congress provided in the DTA. See *ante*, at 69 ("[O]ur opinion does not address the content of the law that governs petitioners' detention. That is a matter yet to be determined"). There is no reason to suppose that review according to procedures the Federal Judiciary will design, case by case, will proceed any faster than the DTA process petitioners disdained.

On the contrary, the system the Court has launched (and directs lower courts to elaborate) promises to take longer. The Court assures us that before bringing their habeas petitions, detainees must usually complete the CSRT process. See *ante*, at 66. Then they may seek review in federal district court. Either success or failure there will surely result in an appeal to the D. C. Circuit— exactly where judicial review *starts* under Congress's system. The effect of the Court's decision is to add additional layers of quite possibly redundant review. And because nobody knows how these new layers of "habeas" review will operate, or what new procedures they will require, their contours will undoubtedly be subject to fresh bouts of litigation. If the majority were truly concerned about delay, it would have required petitioners to use the DTA process that has been available to them for 2½ years, with its Article III review in the D. C. Circuit. That system might well have provided petitioners all the relief to which they are entitled long before the Court's newly installed habeas review could hope to do so.[1]

_____

[1] In light of the foregoing, the concurrence is wrong to suggest that I

ROBERTS, C. J., dissenting

The Court's refusal to require petitioners to exhaust the remedies provided by Congress violates the "traditional rules governing our decision of constitutional questions." *Boumediene*, 549 U. S., at ___ (slip op., at 1) (statement of STEVENS and KENNEDY, JJ., respecting denial of certiorari). The Court's disrespect for these rules makes its decision an awkward business. It rushes to decide the fundamental question of the reach of habeas corpus when the functioning of the DTA may make that decision entirely unnecessary, and it does so with scant idea of how DTA judicial review will actually operate.

## II

The majority's overreaching is particularly egregious given the weakness of its objections to the DTA. Simply put, the Court's opinion fails on its own terms. The majority strikes down the statute because it is not an "adequate substitute" for habeas review, *ante*, at 42, but fails to show what rights the detainees have that cannot be vindicated by the DTA system.

Because the central purpose of habeas corpus is to test the legality of executive detention, the writ requires most fundamentally an Article III court able to hear the pris-

---

"insufficiently appreciat[e]" the issue of delay in these cases. See *ante*, at 2 (opinion of SOUTER, J.). This Court issued its decisions in *Rasul* v. *Bush*, 542 U. S. 466, and *Hamdi* v. *Rumsfeld* 542 U. S. 507, in 2004. The concurrence makes it sound as if the political branches have done nothing in the interim. In fact, Congress responded 18 months later by enacting the DTA. Congress cannot be faulted for taking that time to consider how best to accommodate both the detainees' interests and the need to keep the American people safe. Since the DTA became law, petitioners have steadfastly refused to avail themselves of the statute's review mechanisms. It is unfair to complain that the DTA system involves too much delay when petitioners have consistently refused to use it, preferring to litigate instead. Today's decision obligating district courts to craft new procedures to replace those in the DTA will only prolong the process—and delay relief.

ROBERTS, C. J., dissenting

oner's claims and, when necessary, order release. See *Brown* v. *Allen*, 344 U. S. 443, 533 (1953) (Jackson, J., concurring in result). Beyond that, the process a given prisoner is entitled to receive depends on the circumstances and the rights of the prisoner. See *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976). After much hemming and hawing, the majority appears to concede that the DTA provides an Article III court competent to order release. See *ante*, at 61. The only issue in dispute is the process the Guantanamo prisoners are entitled to use to test the legality of their detention. *Hamdi* concluded that American citizens detained as enemy combatants are entitled to only limited process, and that much of that process could be supplied by a military tribunal, with review to follow in an Article III court. That is precisely the system we have here. It is adequate to vindicate whatever due process rights petitioners may have.

A

The Court reaches the opposite conclusion partly because it misreads the statute. The majority appears not to understand how the review system it invalidates actually works—specifically, how CSRT review and review by the D. C. Circuit fit together. After briefly acknowledging in its recitation of the facts that the Government designed the CSRTs "to comply with the due process requirements identified by the plurality in *Hamdi*," *ante*, at 3, the Court proceeds to dismiss the tribunal proceedings as no more than a suspect method used by the Executive for determining the status of the detainees in the first instance, see *ante*, at 43. This leads the Court to treat the review the DTA provides in the D. C. Circuit as the only opportunity detainees have to challenge their status determination. See *ante*, at 49.

The Court attempts to explain its glancing treatment of the CSRTs by arguing that "[w]hether one characterizes

Roberts, C. J., dissenting

the CSRT process as direct review of the Executive's bat-
tlefield determination . . . or as the first step in the collat-
eral review of a battlefield determination makes no differ-
ence." *Ante*, at 54. First of all, the majority is quite wrong
to dismiss the Executive's determination of detainee
status as no more than a "battlefield" judgment, as if it
were somehow provisional and made in great haste. In
fact, detainees are designated "enemy combatants" only
after "multiple levels of review by military officers and
officials of the Department of Defense." Memorandum of
the Secretary of the Navy, Implementation of Combatant
Status Review Tribunal Procedures for Enemy Combat-
ants Detained at Guantanamo Bay Naval Base (July 29,
2004), App. J to Pet. for Cert. in No. 06–1196, p. 150 (here-
inafter Implementation Memo).

The majority is equally wrong to characterize the
CSRTs as part of that initial determination process. They
are instead a means for detainees to *challenge* the Gov-
ernment's determination. The Executive designed the
CSRTs to mirror Army Regulation 190–8, see Brief for
Federal Respondents 48, the very procedural model the
plurality in *Hamdi* said provided the type of process an
enemy combatant could expect from a habeas court, see
542 U. S., at 538 (plurality opinion). The CSRTs operate
much as habeas courts would if hearing the detainee's
collateral challenge for the first time: They gather evi-
dence, call witnesses, take testimony, and render a deci-
sion on the legality of the Government's detention. See
Implementation Memo, App. J to Pet. for Cert. in No. 06–
1196, at 153–162. If the CSRT finds a particular detainee
has been improperly held, it can order release. See *id.*, at
164.

The majority insists that even if "the CSRTs satisf[ied]
due process standards," full habeas review would still be
necessary, because habeas is a collateral remedy available
even to prisoners "detained pursuant to the most rigorous

ROBERTS, C. J., dissenting

proceedings imaginable." *Ante*, at 55, 56. This comment makes sense only if the CSRTs are incorrectly viewed as a method used by the Executive for determining the prisoners' status, and not as themselves part of the collateral review to test the validity of that determination. See *Gusik*, 340 U. S., at 132. The majority can deprecate the importance of the CSRTs only by treating them as something they are not.

The use of a military tribunal such as the CSRTs to review the aliens' detention should be familiar to this Court in light of the *Hamdi* plurality, which said that the due process rights enjoyed by *American citizens* detained as enemy combatants could be vindicated "by an appropriately authorized and properly constituted military tribunal." 542 U. S., at 538. The DTA represents Congress' considered attempt to provide the accused alien combatants detained at Guantanamo a constitutionally adequate opportunity to contest their detentions before just such a tribunal.

But Congress went further in the DTA. CSRT review is just the first tier of collateral review in the DTA system. The statute provides additional review in an Article III court. Given the rationale of today's decision, it is well worth recalling exactly what the DTA provides in this respect. The statute directs the D. C. Circuit to consider whether a particular alien's status determination "was consistent with the standards and procedures specified by the Secretary of Defense" *and* "whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." DTA §1005(e)(2)(C), 119 Stat. 2742. That is, a *court* determines whether the CSRT procedures are constitutional, and a *court* determines whether those procedures were followed in a particular case.

In short, the *Hamdi* plurality concluded that this type of review would be enough to satisfy due process, even for

ROBERTS, C. J., dissenting

citizens.  See 542 U. S., at 538.  Congress followed the
Court's lead, only to find itself the victim of a constitu-
tional bait and switch.

*Hamdi* merits scant attention from the Court—a re-
markable omission, as *Hamdi* bears directly on the issues
before us.  The majority attempts to dismiss *Hamdi*'s
relevance by arguing that because the availability of
§2241 federal habeas was never in doubt in that case, "the
Court had no occasion to define the necessary scope of
habeas review . . . in the context of enemy combatant
detentions." *Ante*, at 55.  Hardly.  *Hamdi* was all about
the scope of habeas review in the context of enemy com-
batant detentions.  The petitioner, an American citizen
held within the United States as an enemy combatant,
invoked the writ to challenge his detention.  542 U. S., at
510–511.  After "a careful examination both of the writ . . .
and of the Due Process Clause," this Court enunciated the
"basic process" the Constitution entitled Hamdi to expect
from a habeas court under §2241.  *Id.*, at 525, 534.  That
process consisted of the right to "receive notice of the
factual basis for his classification, and a fair opportunity
to rebut the Government's factual assertions before a
neutral decisionmaker."  *Id.*, at 533.  In light of the Gov-
ernment's national security responsibilities, the plurality
found the process could be "tailored to alleviate [the]
uncommon potential to burden the Executive at a time of
ongoing military conflict."  *Ibid.*  For example, the Gov-
ernment could rely on hearsay and could claim a presump-
tion in favor of its own evidence.  See *id.*, at 533–534.

*Hamdi* further suggested that this "basic process" on
collateral review could be provided by a military tribunal.
It pointed to prisoner-of-war tribunals as a model that
would satisfy the Constitution's requirements.  See *id.*, at
538.  Only "[i]n the *absence* of such process" before a mili-
tary tribunal, the Court held, would Article III courts need
to conduct full-dress habeas proceedings to "ensure that

Roberts, C. J., dissenting

the minimum requirements of due process are achieved." *Ibid.* (emphasis added). And even then, the petitioner would be entitled to no more process than he would have received from a properly constituted military review panel, given his limited due process rights and the Government's weighty interests. See *id.*, at 533–534, 538.

Contrary to the majority, *Hamdi* is of pressing relevance because it establishes the procedures American *citizens* detained as enemy combatants can expect from a habeas court proceeding under §2241. The DTA system of military tribunal hearings followed by Article III review looks a lot like the procedure *Hamdi* blessed. If nothing else, it is plain from the design of the DTA that Congress, the President, and this Nation's military leaders have made a good-faith effort to follow our precedent.

The Court, however, will not take "yes" for an answer. The majority contends that "[i]f Congress had envisioned DTA review as coextensive with traditional habeas corpus," it would have granted the D. C. Circuit far broader review authority. *Ante*, at 48. Maybe so, but that comment reveals the majority's misunderstanding. "[T]raditional habeas corpus" takes *no* account of what *Hamdi* recognized as the "uncommon potential to burden the Executive at a time of ongoing military conflict." 542 U. S., at 533. Besides, Congress and the Executive did not envision "DTA review"— by which I assume the Court means D. C. Circuit review, see *ante*, at 48—as the detainees' only opportunity to challenge their detentions. Instead, the political branches crafted CSRT *and* D. C. Circuit review to operate together, with the goal of providing noncitizen detainees the level of collateral process *Hamdi* said would satisfy the due process rights of American citizens. See Brief for Federal Respondents 48–53.

## B

Given the statutory scheme the political branches

14                BOUMEDIENE *v.* BUSH

Roberts, C. J., dissenting

adopted, and given *Hamdi*, it simply will not do for the
majority to dismiss the CSRT procedures as "far more
limited" than those used in military trials, and therefore
beneath the level of process "that would eliminate the
need for habeas corpus review." *Ante*, at 37. The question
is not how much process the CSRTs provide in comparison
to other modes of adjudication. The question is whether
the CSRT procedures—coupled with the judicial review
specified by the DTA—provide the "basic process" *Hamdi*
said the Constitution affords American citizens detained
as enemy combatants. See 542 U. S., at 534.

By virtue of its refusal to allow the D. C. Circuit to
assess petitioners' statutory remedies, and by virtue of its
own refusal to consider, at the outset, the fit between
those remedies and due process, the majority now finds
itself in the position of evaluating whether the DTA sys-
tem is an adequate substitute for habeas review without
knowing what rights either habeas or the DTA is supposed
to protect. The majority attempts to elide this problem by
holding that petitioners have a right to habeas corpus and
then comparing the DTA against the "historic office" of the
writ. *Ante*, at 47. But habeas is, as the majority acknowl-
edges, a flexible remedy rather than a substantive right.
Its "precise application . . . change[s] depending upon the
circumstances." *Ante*, at 50. The shape of habeas review
ultimately depends on the nature of the rights a petitioner
may assert. See, *e.g., Reid* v. *Covert*, 354 U. S. 1, 75 (1957)
(Harlan, J., concurring in result) ("[T]he question of which
specific safeguards of the Constitution are appropriately to
be applied in a particular context . . . can be reduced to the
issue of what process is 'due' a defendant in the particular
circumstances of a particular case").

The scope of federal habeas review is traditionally more
limited in some contexts than in others, depending on the
status of the detainee and the rights he may assert. See
*St. Cyr*, 533 U. S., at 306 ("In [immigration cases], other

ROBERTS, C. J., dissenting

than the question whether there was some evidence to support the [deportation] order, the courts generally did not review factual determinations made by the Executive" (footnote omitted)); *Burns* v. *Wilson*, 346 U. S. 137, 139 (1953) (plurality opinion) ("[I]n military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civil cases"); *In re Yamashita*, 327 U. S. 1, 8 (1946) ("The courts may inquire whether the detention complained of is within the authority of those detaining the petitioner.  If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review"); *Ex parte Quirin*, 317 U. S. 1, 25 (1942) (federal habeas review of military commission verdict limited to determining commission's jurisdiction).

   Declaring that petitioners have a right to habeas in no way excuses the Court from explaining why the DTA does not protect whatever due process or statutory rights petitioners may have.  Because if the DTA provides a means for vindicating petitioners' rights, it is necessarily an adequate substitute for habeas corpus.  See *Swain* v. *Pressley*, 430 U. S. 372, 381 (1977); *United States* v. *Hayman*, 342 U. S. 205, 223 (1952).

   For my part, I will assume that any due process rights petitioners may possess are no greater than those of American citizens detained as enemy combatants.  It is worth noting again that the *Hamdi* controlling opinion said the Constitution guarantees citizen detainees only "basic" procedural rights, and that the process for securing those rights can "be tailored to alleviate [the] uncommon potential to burden the Executive at a time of ongoing military conflict."  542 U. S., at 533.  The majority, however, objects that "the procedural protections afforded to the detainees in the CSRT hearings are . . . limited." *Ante*, at 37.  But the evidentiary and other limitations the Court complains of reflect the nature of the issue in contest, namely, the status of aliens captured by our Armed Forces

Roberts, C. J., dissenting

abroad and alleged to be enemy combatants. Contrary to the repeated suggestions of the majority, DTA review need not parallel the habeas privileges enjoyed by noncombatant American citizens, as set out in 28 U. S. C. §2241 (2000 ed. and Supp V). Cf. *ante*, at 46–47. It need only provide process adequate for noncitizens detained as alleged combatants.

To what basic process are these detainees due as habeas petitioners? We have said that "at the absolute minimum," the Suspension Clause protects the writ "'as it existed in 1789.'" *St. Cyr, supra*, at 301 (quoting *Felker* v. *Turpin*, 518 U. S. 651, 663–664 (1996)). The majority admits that a number of historical authorities suggest that at the time of the Constitution's ratification, "common-law courts abstained altogether from matters involving prisoners of war." *Ante*, at 17. If this is accurate, the process provided prisoners under the DTA is plainly more than sufficient—it allows alleged combatants to challenge both the factual and legal bases of their detentions.

Assuming the constitutional baseline is more robust, the DTA still provides adequate process, and by the majority's own standards. Today's Court opines that the Suspension Clause guarantees prisoners such as the detainees "a meaningful opportunity to demonstrate that [they are] being held pursuant to the erroneous application or interpretation of relevant law." *Ante*, at 50 (internal quotation marks omitted). Further, the Court holds that to be an adequate substitute, any tribunal reviewing the detainees' cases "must have the power to order the conditional release of an individual unlawfully detained." *Ibid*. The DTA system—CSRT review of the Executive's determination followed by D. C. Circuit review for sufficiency of the evidence and the constitutionality of the CSRT process—meets these criteria.

Roberts, C. J., dissenting

## C

At the CSRT stage, every petitioner has the right to present evidence that he has been wrongfully detained. This includes the right to call witnesses who are reasonably available, question witnesses called by the tribunal, introduce documentary evidence, and testify before the tribunal. See Implementation Memo, App. J to Pet. for Cert. in No. 06–1196, at 154–156, 158–159, 161.

While the Court concedes detainees may confront all witnesses called before the tribunal, it suggests this right is "more theoretical than real" because "there are in effect no limits on the admission of hearsay evidence." *Ante*, at 55. The Court further complains that petitioners lack "the assistance of counsel," and—given the limits on their access to classified information—"may not be aware of the most critical allegations" against them. *Ante*, at 54. None of these complaints is persuasive.

Detainees not only have the opportunity to confront any witness who appears before the tribunal, they may call witnesses of their own. The Implementation Memo requires only that detainees' witnesses be "reasonably available," App. J to Pet. for Cert. in No. 06–1196, at 155, a requirement drawn from Army Regulation 190–8, ch. 1, §1–6(*e*)(6), and entirely consistent with the Government's interest in avoiding "a futile search for evidence" that might burden warmaking responsibilities, *Hamdi*, *supra*, at 532. The dangerous mission assigned to our forces abroad is to fight terrorists, not serve subpoenas. The Court is correct that some forms of hearsay evidence are admissible before the CSRT, but *Hamdi* expressly approved this use of hearsay by habeas courts. 542 U. S., at 533–534 ("Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government").

As to classified information, while detainees are not permitted access to it themselves, the Implementation

ROBERTS, C. J., dissenting

Memo provides each detainee with a "Personal Representative" who may review classified documents at the CSRT stage and summarize them for the detainee. Implementation Memo, *supra*, at 152, 154–155, 156; Brief for Federal Respondents 54–55. The prisoner's counsel enjoys the same privilege on appeal before the D. C. Circuit. That is more access to classified material for alleged alien enemy combatants than ever before provided. I am not aware of a single instance—and certainly the majority cites none— in which detainees such as petitioners have been provided access to classified material in *any* form. Indeed, prisoners of war who challenge their status determinations under the Geneva Convention are afforded no such access, see Army Regulation 190–8, ch. 1, §§1–6(*e*)(3) and (5), and the prisoner-of-war model is the one *Hamdi* cited as consistent with the demands of due process for *citizens*, see 542 U. S., at 538.

What alternative does the Court propose? Allow free access to classified information and ignore the risk the prisoner may eventually convey what he learns to parties hostile to this country, with deadly consequences for those who helped apprehend the detainee? If the Court can design a better system for communicating to detainees the substance of any classified information relevant to their cases, without fatally compromising national security interests and sources, the majority should come forward with it. Instead, the majority fobs that vexing question off on district courts to answer down the road.

Prisoners of war are not permitted access to classified information, and neither are they permitted access to counsel, another supposed failing of the CSRT process. And yet the Guantanamo detainees are hardly denied all legal assistance. They are provided a "Personal Representative" who, as previously noted, may access classified information, help the detainee arrange for witnesses, assist the detainee's preparation of his case, and even aid

ROBERTS, C. J., dissenting

the detainee in presenting his evidence to the tribunal. See Implementation Memo, *supra*, at 161. The provision for a personal representative on this order is one of several ways in which the CSRT procedures are *more* generous than those provided prisoners of war under Army Regulation 190–8.

Keep in mind that all this is just at the CSRT stage. Detainees receive additional process before the D. C. Circuit, including full access to appellate counsel and the right to challenge the factual and legal bases of their detentions. DTA §1005(e)(2)(C) empowers the Court of Appeals to determine not only whether the CSRT observed the "procedures specified by the Secretary of Defense," but also "whether the use of such standards and procedures . . . is consistent with the Constitution and laws of the United States." 119 Stat. 2742. These provisions permit detainees to dispute the sufficiency of the evidence against them. They allow detainees to challenge a CSRT panel's interpretation of any relevant law, and even the constitutionality of the CSRT proceedings themselves. This includes, as the Solicitor General acknowledges, the ability to dispute the Government's right to detain alleged combatants in the first place, and to dispute the Government's definition of "enemy combatant." Brief for Federal Respondents 59. All this before an Article III court—plainly a neutral decisionmaker.

All told, the DTA provides the prisoners held at Guantanamo Bay adequate opportunity to contest the bases of their detentions, which is all habeas corpus need allow. The DTA provides more opportunity and more process, in fact, than that afforded prisoners of war or any other alleged enemy combatants in history.

### D

Despite these guarantees, the Court finds the DTA system an inadequate habeas substitute, for one central

20                    BOUMEDIENE *v.* BUSH

ROBERTS, C. J., dissenting

reason: Detainees are unable to introduce at the appeal
stage exculpatory evidence discovered after the conclusion
of their CSRT proceedings.  See *ante*, at 58.  The Court
hints darkly that the DTA may suffer from other infirmi-
ties, see *ante*, at 63 ("We do not imply DTA review would
be a constitutionally sufficient replacement for habeas
corpus but for these limitations on the detainee's ability to
present exculpatory evidence"), but it does not bother to
name them, making a response a bit difficult.  As it
stands, I can only assume the Court regards the supposed
defect it did identify as the gravest of the lot.

If this is the most the Court can muster, the ice beneath
its feet is thin indeed.  As noted, the CSRT procedures
provide ample opportunity for detainees to introduce
exculpatory evidence—whether documentary in nature or
from live witnesses—before the military tribunals.  See
*infra*, at 21–23; Implementation Memo, App. J to Pet. for
Cert. in No. 06–196, at 155–156.  And if their ability to
introduce such evidence is denied contrary to the Consti-
tution or laws of the United States, the D. C. Circuit has
the authority to say so on review.

Nevertheless, the Court asks us to imagine an instance
in which evidence is discovered *after* the CSRT panel
renders its decision, but *before* the Court of Appeals re-
views the detainee's case.  This scenario, which of course
has not yet come to pass as no review in the D. C. Circuit
has occurred, provides no basis for rejecting the DTA as a
habeas substitute.  While the majority is correct that the
DTA does not contemplate the introduction of "newly
discovered" evidence before the Court of Appeals, petition-
ers and the Solicitor General agree that the DTA *does*
permit the D. C. Circuit to remand a detainee's case for a
new CSRT determination.  Brief for Petitioner Boumedi-
ene et al. in No. 06–1195, at 30; Brief for Federal Respon-
dents 60–61.  In the event a detainee alleges that he has
obtained new and persuasive exculpatory evidence that

ROBERTS, C. J., dissenting

would have been considered by the tribunal below had it only been available, the D. C. Circuit could readily remand the case to the tribunal to allow that body to consider the evidence in the first instance. The Court of Appeals could later review any new or reinstated decision in light of the supplemented record.

If that sort of procedure sounds familiar, it should. Federal appellate courts reviewing factual determinations follow just such a procedure in a variety of circumstances. See, *e.g., United States* v. *White*, 492 F. 3d 380, 413 (CA6 2007) (remanding new-evidence claim to the district court for a *Brady* evidentiary hearing); *Avila* v. *Roe*, 298 F. 3d 750, 754 (CA9 2002) (remanding habeas claim to the district court for evidentiary hearing to clarify factual record); *United States* v. *Leone*, 215 F. 3d 253, 256 (CA2 2000) (observing that when faced on direct appeal with an underdeveloped claim for ineffective assistance of counsel, the appellate court may remand to the district court for necessary factfinding).

A remand is not the only relief available for detainees caught in the Court's hypothetical conundrum. The DTA expressly directs the Secretary of Defense to "provide for periodic review of any new evidence that may become available relating to the enemy combatant status of a detainee." DTA §1005(a)(3). Regulations issued by the Department of Defense provide that when a detainee puts forward new, material evidence "not previously presented to the detainee's CSRT," the Deputy Secretary of Defense "'will direct that a CSRT convene to reconsider the basis of the detainee's . . . status in light of the new information.'" Office for the Administrative Review of the Detention of Enemy Combatants, Instruction 5421.1, Procedure for Review of "New Evidence" Relating to Enemy Combatant (EC) Status ¶¶4(a)(1), 5(b) (May 7, 2007); Brief for Federal Respondents 56, n. 30. Pursuant to DTA §1005(e)(2)(A), the resulting CSRT determination is again reviewable in

ROBERTS, C. J., dissenting

full by the D. C. Circuit.[2]

In addition, DTA §1005(d)(1) further requires the Department of Defense to conduct a yearly review of the status of each prisoner. See 119 Stat. 2741. The Deputy Secretary of Defense has promulgated concomitant regulations establishing an Administrative Review Board to assess "annually the need to continue to detain each enemy combatant." Deputy Secretary of Defense Order OSD 06942–04 (May 11, 2004), App. K to Pet. for Cert. in No. 06–1196, p. 189. In the words of the implementing order, the purpose of this annual review is to afford every detainee the opportunity "to explain why he is no longer a threat to the United States" and should be released. *Ibid*. The Board's findings are forwarded to a presidentially appointed, Senate-confirmed civilian within the Department of Defense whom the Secretary of Defense has designated to administer the review process. This designated civilian official has the authority to order release upon the Board's recommendation. *Id.*, at 201.

The Court's hand wringing over the DTA's treatment of later-discovered exculpatory evidence is the most it has to show after a roving search for constitutionally problematic scenarios. But "[t]he delicate power of pronouncing an Act of Congress unconstitutional," we have said, "is not to be exercised with reference to hypothetical cases thus imagined." *United States* v. *Raines*, 362 U. S. 17, 22 (1960). The Court today invents a sort of reverse facial challenge

---

[2]The Court wonders what might happen if the detainee puts forward new material evidence but the Deputy Secretary refuses to convene a new CSRT. See *ante*, at 62–63. The answer is that the detainee can petition the D. C. Circuit for review. The DTA directs that the procedures for review of new evidence be included among "[t]he procedures submitted under paragraph (1)(A)" governing CSRT review of enemy combatant status §1405(a)(3), 119 Stat. 3476. It is undisputed that the D. C. Circuit has statutory authority to review and enforce these procedures. See DTA §1005(e)(2)(C)(i), *id.,* at 2742.

ROBERTS, C. J., dissenting

and applies it with gusto: If there is *any* scenario in which the statute *might* be constitutionally infirm, the law must be struck down. Cf. *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) ("A facial challenge . . . must establish that no set of circumstances exists under which the Act would be valid"); see also *Washington* v. *Glucksberg*, 521 U. S. 702, 739–740, and n. 7 (1997) (STEVENS, J., concurring in judgments) (facial challenge must fail where the statute has "'plainly legitimate sweep'" (quoting *Broadrick* v. *Oklahoma*, 413 U. S. 601, 615 (1973))). The Court's new method of constitutional adjudication only underscores its failure to follow our usual procedures and require petitioners to demonstrate that *they* have been harmed by the statute they challenge. In the absence of such a concrete showing, the Court is unable to imagine a plausible hypothetical in which the DTA is unconstitutional.

### E

The Court's second criterion for an adequate substitute is the "power to order the conditional release of an individual unlawfully detained." *Ante*, at 50. As the Court basically admits, the DTA can be read to permit the D. C. Circuit to order release in light of our traditional principles of construing statutes to avoid difficult constitutional issues, when reasonably possible. See *ante*, at 56–57.

The Solicitor General concedes that remedial authority of some sort must be implied in the statute, given that the DTA—like the general habeas law itself, see 28 U. S. C. §2243—provides no express remedy of any kind. Brief for Federal Respondents 60–61. The parties agree that at the least, the DTA empowers the D. C. Circuit to remand a prisoner's case to the CSRT with instructions to perform a new status assessment. Brief for Petitioner Boumediene et al. in No. 06–1195, at 30; Brief for Federal Respondents 60–61. To avoid constitutional infirmity, it is reasonable to imply more, see *Ashwander*, 297 U. S., at 348 (Brandeis,

ROBERTS, C. J., dissenting

J., concurring) ("When the validity of an act of the Congress is drawn in question . . . it is a cardinal principle that this Court will . . . ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided" (internal quotation marks omitted)); see also *St. Cyr*, 533 U. S., at 299–300, especially in view of the Solicitor General's concession at oral argument and in his Supplemental Brief that authority to release might be read in the statute, see Tr. of Oral Arg. 37; Supplemental Brief for Federal Respondents 9.

The Court grudgingly suggests that "Congress' silence on the question of remedies suggests acquiescence to any constitutionally required remedy." *Ante*, at 58. But the argument in favor of statutorily authorized release is stronger than that. The DTA's parallels to 28 U. S. C. §2243 on this score are noteworthy. By way of remedy, the general federal habeas statute provides only that the court, having heard and determined the facts, shall "dispose of the matter as law and justice require." *Ibid*. We have long held, and no party here disputes, that this includes the power to order release. See *Wilkinson* v. *Dotson*, 544 U. S. 74, 79 (2005) ("[T]he writ's history makes clear that it traditionally has been accepted as the specific instrument to obtain release from [unlawful] confinement" (internal quotation marks omitted)).

The DTA can be similarly read. Because Congress substituted DTA review for habeas corpus and because the "unique purpose" of the writ is "to release the applicant . . . from unlawful confinement," *Allen* v. *McCurry*, 449 U. S. 90, 98, n. 12 (1980), DTA §1005(e)(2) can and should be read to confer on the Court of Appeals the authority to order release in appropriate circumstances. Section 1005(e)(2)(D) plainly contemplates release, addressing the effect "release of [an] alien from the custody of the Department of Defense" will have on the jurisdiction of the court. 119 Stat. 2742–2743. This reading avoids

ROBERTS, C. J., dissenting

serious constitutional difficulty and is consistent with the
text of the statute.

The D. C. Circuit can thus order release, the CSRTs can
order release, and the head of the Administrative Review
Boards can, at the recommendation of those panels, order
release. These multiple release provisions within the DTA
system more than satisfy the majority's requirement that
any tribunal substituting for a habeas court have the
authority to release the prisoner.

The basis for the Court's contrary conclusion is summed
up in the following sentence near the end of its opinion:
"To hold that the detainees at Guantanamo may, under
the DTA, challenge the President's legal authority to
detain them, contest the CSRT's findings of fact, supple-
ment the record on review with newly discovered or previ-
ously unavailable evidence, and request an order of re-
lease would come close to reinstating the §2241 habeas
corpus process Congress sought to deny them." *Ante*, at
63. In other words, any interpretation of the statute that
would make it an adequate substitute for habeas must be
rejected, because Congress could not possibly have in-
tended to enact an adequate substitute for habeas. The
Court could have saved itself a lot of trouble if it had
simply announced this Catch-22 approach at the begin-
ning rather than the end of its opinion.

### III

For all its eloquence about the detainees' right to the
writ, the Court makes no effort to elaborate how exactly
the remedy it prescribes will differ from the procedural
protections detainees enjoy under the DTA. The Court
objects to the detainees' limited access to witnesses and
classified material, but proposes no alternatives of its own.
Indeed, it simply ignores the many difficult questions its
holding presents. What, for example, will become of the
CSRT process? The majority says federal courts should

*generally* refrain from entertaining detainee challenges until after the petitioner's CSRT proceeding has finished. See *ante*, at 66 ("[e]xcept in cases of undue delay"). But to what deference, if any, is that CSRT determination entitled?

There are other problems. Take witness availability. What makes the majority think witnesses will become magically available when the review procedure is labeled "habeas"? Will the location of most of these witnesses change—will they suddenly become easily susceptible to service of process? Or will subpoenas issued by American habeas courts run to Basra? And if they did, how would they be enforced? Speaking of witnesses, will detainees be able to call active-duty military officers as witnesses? If not, why not?

The majority has no answers for these difficulties. What it does say leaves open the distinct possibility that its "habeas" remedy will, when all is said and done, end up looking a great deal like the DTA review it rejects. See *ante*, at 66 (opinion of the court) ("We recognize, however, that the Government has a legitimate interest in protecting sources and methods of intelligence gathering, and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible"). But "[t]he role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy." *Landon* v. *Plasencia*, 459 U. S. 21, 34–35 (1982).

The majority rests its decision on abstract and hypothetical concerns. Step back and consider what, in the real world, Congress and the Executive have actually granted aliens captured by our Armed Forces overseas and found to be enemy combatants:

- The right to hear the bases of the charges against

ROBERTS, C. J., dissenting

them, including a summary of any classified evidence.
- The ability to challenge the bases of their detention before military tribunals modeled after Geneva Convention procedures. Some 38 detainees have been released as a result of this process. Brief for Federal Respondents 57, 60.
- The right, before the CSRT, to testify, introduce evidence, call witnesses, question those the Government calls, and secure release, if and when appropriate.
- The right to the aid of a personal representative in arranging and presenting their cases before a CSRT.
- Before the D. C. Circuit, the right to employ counsel, challenge the factual record, contest the lower tribunal's legal determinations, ensure compliance with the Constitution and laws, and secure release, if any errors below establish their entitlement to such relief.

In sum, the DTA satisfies the majority's own criteria for assessing adequacy. This statutory scheme provides the combatants held at Guantanamo greater procedural protections than have ever been afforded alleged enemy detainees—whether citizens or aliens—in our national history.

*　　*　　*

So who has won? Not the detainees. The Court's analysis leaves them with only the prospect of further litigation to determine the content of their new habeas right, followed by further litigation to resolve their particular cases, followed by further litigation before the D. C. Circuit—where they could have started had they invoked the DTA procedure. Not Congress, whose attempt to "determine—through democratic means—how best" to balance the

28                    BOUMEDIENE *v.* BUSH

ROBERTS, C. J., dissenting

security of the American people with the detainees' liberty
interests, see *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 636
(2006) (BREYER, J., concurring), has been unceremoniously
brushed aside.   Not the Great Writ, whose majesty is
hardly enhanced by its extension to a jurisdictionally
quirky outpost, with no tangible benefit to anyone.   Not the
rule of law, unless by that is meant the rule of lawyers,
who will now arguably have a greater role than military
and intelligence officials in shaping policy for alien enemy
combatants.   And certainly not the American people, who
today lose a bit more control over the conduct of this Na-
tion's foreign policy to unelected, politically unaccountable
judges.

    I respectfully dissent.

Cite as: 553 U. S. ____ (2008)          1

SCALIA, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 06–1195 and 06–1196

————————

LAKHDAR BOUMEDIENE, ET AL., PETITIONERS
06–1195          *v.*
GEORGE W. BUSH, PRESIDENT OF THE UNITED
STATES, ET AL.


KHALED A. F. AL ODAH, NEXT FRIEND OF FAWZI
KHALID ABDULLAH FAHAD AL ODAH, ET AL.,
PETITIONERS
06–1196          *v.*
UNITED STATES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 12, 2008]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Today, for the first time in our Nation's history, the Court confers a constitutional right to habeas corpus on alien enemies detained abroad by our military forces in the course of an ongoing war. THE CHIEF JUSTICE's dissent, which I join, shows that the procedures prescribed by Congress in the Detainee Treatment Act provide the essential protections that habeas corpus guarantees; there has thus been no suspension of the writ, and no basis exists for judicial intervention beyond what the Act allows. My problem with today's opinion is more fundamental still: The writ of habeas corpus does not, and never has, run in favor of aliens abroad; the Suspension Clause thus has no application, and the Court's intervention in this military matter is entirely *ultra vires.*

2                BOUMEDIENE *v.* BUSH

SCALIA, J., dissenting

I shall devote most of what will be a lengthy opinion to the legal errors contained in the opinion of the Court. Contrary to my usual practice, however, I think it appropriate to begin with a description of the disastrous consequences of what the Court has done today.

I

America is at war with radical Islamists. The enemy began by killing Americans and American allies abroad: 241 at the Marine barracks in Lebanon, 19 at the Khobar Towers in Dhahran, 224 at our embassies in Dar es Salaam and Nairobi, and 17 on the USS Cole in Yemen. See National Commission on Terrorist Attacks upon the United States, The 9/11 Commission Report, pp. 60–61, 70, 190 (2004). On September 11, 2001, the enemy brought the battle to American soil, killing 2,749 at the Twin Towers in New York City, 184 at the Pentagon in Washington, D. C., and 40 in Pennsylvania. See *id.*, at 552, n. 9. It has threatened further attacks against our homeland; one need only walk about buttressed and barricaded Washington, or board a plane anywhere in the country, to know that the threat is a serious one. Our Armed Forces are now in the field against the enemy, in Afghanistan and Iraq. Last week, 13 of our countrymen in arms were killed.

The game of bait-and-switch that today's opinion plays upon the Nation's Commander in Chief will make the war harder on us. It will almost certainly cause more Americans to be killed. That consequence would be tolerable if necessary to preserve a time-honored legal principle vital to our constitutional Republic. But it is this Court's blatant *abandonment* of such a principle that produces the decision today. The President relied on our settled precedent in *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), when he established the prison at Guantanamo Bay for enemy aliens. Citing that case, the President's Office of Legal

Counsel advised him "that the great weight of legal authority indicates that a federal district court could not properly exercise habeas jurisdiction over an alien detained at [Guantanamo Bay]." Memorandum from Patrick F. Philbin and John C. Yoo, Deputy Assistant Attorneys General, Office of Legal Counsel, to William J. Haynes II, General Counsel, Dept. of Defense (Dec. 28, 2001). Had the law been otherwise, the military surely would not have transported prisoners there, but would have kept them in Afghanistan, transferred them to another of our foreign military bases, or turned them over to allies for detention. Those other facilities might well have been worse for the detainees themselves.

In the long term, then, the Court's decision today accomplishes little, except perhaps to reduce the well-being of enemy combatants that the Court ostensibly seeks to protect. In the short term, however, the decision is devastating. At least 30 of those prisoners hitherto released from Guantanamo Bay have returned to the battlefield. See S. Rep. No. 110–90, pt. 7, p. 13 (2007) (Minority Views of Sens. Kyl, Sessions, Graham, Cornyn, and Coburn) (hereinafter Minority Report). Some have been captured or killed. See *ibid.;* see also Mintz, Released Detainees Rejoining the Fight, Washington Post, Oct. 22, 2004, pp. A1, A12. But others have succeeded in carrying on their atrocities against innocent civilians. In one case, a detainee released from Guantanamo Bay masterminded the kidnapping of two Chinese dam workers, one of whom was later shot to death when used as a human shield against Pakistani commandoes. See Khan & Lancaster, Pakistanis Rescue Hostage; 2nd Dies, Washington Post, Oct. 15, 2004, p. A18. Another former detainee promptly resumed his post as a senior Taliban commander and murdered a United Nations engineer and three Afghan soldiers. Mintz, *supra.* Still another murdered an Afghan judge. See Minority Report 13. It was reported only last

4                        BOUMEDIENE *v.* BUSH

month that a released detainee carried out a suicide bomb-
ing against Iraqi soldiers in Mosul, Iraq.  See White, Ex-
Guantanamo Detainee Joined Iraq Suicide Attack, Wash-
ington Post, May 8, 2008, p. A18.

These, mind you, were detainees whom *the military* had
concluded were not enemy combatants.  Their return to
the kill illustrates the incredible difficulty of assessing
who is and who is not an enemy combatant in a foreign
theater of operations where the environment does not lend
itself to rigorous evidence collection.  Astoundingly, the
Court today raises the bar, requiring military officials to
appear before civilian courts and defend their decisions
under procedural and evidentiary rules that go beyond
what Congress has specified.  As THE CHIEF JUSTICE's
dissent makes clear, we have no idea what those proce-
dural and evidentiary rules are, but they will be deter-
mined by civil courts and (in the Court's contemplation at
least) will be more detainee-friendly than those now ap-
plied, since otherwise there would no reason to hold the
congressionally prescribed procedures unconstitutional.  If
they impose a higher standard of proof (from foreign bat-
tlefields) than the current procedures require, the number
of the enemy returned to combat will obviously increase.

But even when the military has evidence that it can
bring forward, it is often foolhardy to release that evidence
to the attorneys representing our enemies.  And one esca-
lation of procedures that the Court *is* clear about is afford-
ing the detainees increased access to witnesses (perhaps
troops serving in Afghanistan?) and to classified informa-
tion.  See *ante*, at 54–55.  During the 1995 prosecution of
Omar Abdel Rahman, federal prosecutors gave the names
of 200 unindicted co-conspirators to the "Blind Sheik's"
defense lawyers; that information was in the hands of
Osama Bin Laden within two weeks.  See Minority Report
14–15.  In another case, trial testimony revealed to the
enemy that the United States had been monitoring their

Scalia, J., dissenting

cellular network, whereupon they promptly stopped using it, enabling more of them to evade capture and continue their atrocities. See *id.*, at 15.

And today it is not just the military that the Court elbows aside. A mere two Terms ago in *Hamdan* v. *Rumsfeld*, 548 U. S. 557 (2006), when the Court held (quite amazingly) that the Detainee Treatment Act of 2005 had not stripped habeas jurisdiction over Guantanamo petitioners' claims, four Members of today's five-Justice majority joined an opinion saying the following:

> "Nothing prevents the President from returning to Congress to seek the authority [for trial by military commission] he believes necessary.
>
> "Where, as here, no emergency prevents consultation with Congress, judicial insistence upon that consultation does not weaken our Nation's ability to deal with danger. To the contrary, that insistence strengthens the Nation's ability to determine—through democratic means—how best to do so. The Constitution places its faith in those democratic means." *Id.,* at 636 (Breyer, J., concurring).[1]

Turns out they were just kidding. For in response, Congress, at the President's request, quickly enacted the Military Commissions Act, emphatically reasserting that it did not want these prisoners filing habeas petitions. It is therefore clear that Congress and the Executive—*both* political branches—have determined that limiting the role

---

[1] Even today, the Court cannot resist striking a pose of faux deference to Congress and the President. Citing the above quoted passage, the Court says: "The political branches, consistent with their independent obligations to interpret and uphold the Constitution, can engage in a genuine debate about how best to preserve constitutional values while protecting the Nation from terrorism." *Ante*, at 69. Indeed. What the Court apparently means is that the political branches can debate, after which the Third Branch will decide.

6                    BOUMEDIENE *v.* BUSH

SCALIA, J., dissenting

of civilian courts in adjudicating whether prisoners captured abroad are properly detained is important to success in the war that some 190,000 of our men and women are now fighting.  As the Solicitor General argued, "the Military Commissions Act and the Detainee Treatment Act . . . represent an effort by the political branches to strike an appropriate balance between the need to preserve liberty and the need to accommodate the weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States."  Brief for Respondents 10–11 (internal quotation marks omitted).

But it does not matter.  The Court today decrees that no good reason to accept the judgment of the other two branches is "apparent."  *Ante,* at 40.  "The Government," it declares, "presents no credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims."  *Id.,* at 39.  What competence does the Court have to second-guess the judgment of Congress and the President on such a point?  None whatever.  But the Court blunders in nonetheless.  Henceforth, as today's opinion makes unnervingly clear, how to handle enemy prisoners in this war will ultimately lie with the branch that knows least about the national security concerns that the subject entails.

## II
### A

The Suspension Clause of the Constitution provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  Art. I, §9, cl. 2.  As a court of law operating under a written Constitution, our role is to determine whether there is a conflict between that Clause and the Military Commissions Act.  A conflict

arises only if the Suspension Clause preserves the privilege of the writ for aliens held by the United States military as enemy combatants at the base in Guantanamo Bay, located within the sovereign territory of Cuba.

We have frequently stated that we owe great deference to Congress's view that a law it has passed is constitutional. See, *e.g.*, *Department of Labor* v. *Triplett*, 494 U. S. 715, 721 (1990); *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 32 (1963); see also *American Communications Assn.* v. *Douds*, 339 U. S. 382, 435 (1950) (Jackson, J., concurring in part and dissenting in part). That is especially so in the area of foreign and military affairs; "perhaps in no other area has the Court accorded Congress greater deference." *Rostker* v. *Goldberg*, 453 U. S. 57, 64–65 (1981). Indeed, we accord great deference even when the President acts alone in this area. See *Department of Navy* v. *Egan*, 484 U. S. 518, 529–530 (1988); *Regan* v. *Wald*, 468 U. S. 222, 243 (1984).

In light of those principles of deference, the Court's conclusion that "the common law [does not] yiel[d] a definite answer to the questions before us," *ante*, at 22, leaves it no choice but to affirm the Court of Appeals. The writ as preserved in the Constitution could not possibly extend farther than the common law provided when that Clause was written. See Part III, *infra*. The Court admits that it cannot determine whether the writ historically extended to aliens held abroad, and it concedes (necessarily) that Guantanamo Bay lies outside the sovereign territory of the United States. See *ante*, at 22–23; *Rasul* v. *Bush*, 542 U. S. 466, 500–501 (2004) (Scalia, J., dissenting). Together, these two concessions establish that it is (in the Court's view) perfectly ambiguous whether the common-law writ would have provided a remedy for these petitioners. If that is so, the Court has no basis to strike down the Military Commissions Act, and must leave undisturbed

SCALIA, J., dissenting

the considered judgment of the coequal branches.[2]

How, then, does the Court weave a clear constitutional prohibition out of pure interpretive equipoise? The Court resorts to "fundamental separation-of-powers principles" to interpret the Suspension Clause. *Ante,* at 25. According to the Court, because "the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers," the test of its extraterritorial reach "must not be subject to manipulation by those whose power it is designed to restrain." *Ante,* at 36.

That approach distorts the nature of the separation of powers and its role in the constitutional structure. The "fundamental separation-of-powers principles" that the Constitution embodies are to be derived not from some judicially imagined matrix, but from the sum total of the individual separation-of-powers provisions that the Constitution sets forth. Only by considering them one-by-one does the full shape of the *Constitution's* separation-of-powers principles emerge. It is nonsensical to interpret those provisions themselves in light of some general "separation-of-powers principles" dreamed up by the Court. Rather, they must be interpreted to mean what they were understood to mean when the people ratified them. And if the understood scope of the writ of habeas corpus was "designed to restrain" (as the Court says) the actions of the Executive, the understood *limits* upon that

---

[2]The opinion seeks to avoid this straightforward conclusion by saying that the Court has been "careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments that define the present scope of the writ." *Ante,* at 15–16 (citing *INS* v. *St. Cyr,* 533 U. S. 289 300–301 (2001)). But not foreclosing the possibility that they have expanded is not the same as demonstrating (or at least holding without demonstration, which seems to suffice for today's majority) that they have expanded. The Court must either hold that the Suspension Clause has "expanded" in its application to aliens abroad, or acknowledge that it has no basis to set aside the actions of Congress and the President. It does neither.

Scalia, J., dissenting

scope were (as the Court seems not to grasp) just as much "designed to restrain" the incursions of the Third Branch. "Manipulation" of the territorial reach of the writ by the Judiciary poses just as much a threat to the proper separation of powers as "manipulation" by the Executive. As I will show below, manipulation is what is afoot here. The understood limits upon the writ deny our jurisdiction over the habeas petitions brought by these enemy aliens, and entrust the President with the crucial wartime determinations about their status and continued confinement.

B

The Court purports to derive from our precedents a "functional" test for the extraterritorial reach of the writ, *ante*, at 34, which shows that the Military Commissions Act unconstitutionally restricts the scope of habeas. That is remarkable because the most pertinent of those precedents, *Johnson* v. *Eisentrager*, 339 U. S. 763, conclusively establishes the opposite. There we were confronted with the claims of 21 Germans held at Landsberg Prison, an American military facility located in the American Zone of occupation in postwar Germany. They had been captured in China, and an American military commission sitting there had convicted them of war crimes—collaborating with the Japanese after Germany's surrender. *Id.*, at 765–766. Like the petitioners here, the Germans claimed that their detentions violated the Constitution and international law, and sought a writ of habeas corpus. Writing for the Court, Justice Jackson held that American courts lacked habeas jurisdiction:

"We are cited to *[sic]* no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does any-

thing in our statutes." *Id.*, at 768.

Justice Jackson then elaborated on the historical scope of the writ:

> "The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. . . .
>
> "But, in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act." *Id.*, at 770–771.

Lest there be any doubt about the primacy of territorial sovereignty in determining the jurisdiction of a habeas court over an alien, Justice Jackson distinguished two cases in which aliens had been permitted to seek habeas relief, on the ground that the prisoners in those cases were in custody within the sovereign territory of the United States. *Id.*, at 779–780 (discussing *Ex parte Quirin*, 317 U. S. 1 (1942), and *In re Yamashita*, 327 U. S. 1 (1946)). "By reason of our sovereignty at that time over [the Philippines]," Jackson wrote, "Yamashita stood much as did Quirin before American courts." 339 U. S., at 780.

*Eisentrager* thus held—*held* beyond any doubt—that the Constitution does not ensure habeas for aliens held by the United States in areas over which our Government is not sovereign.[3]

---

[3] In its failed attempt to distinguish *Eisentrager*, the Court comes up with the notion that "*de jure* sovereignty" is simply an additional factor that can be added to (presumably) "*de facto* sovereignty" (*i.e.,* practical control) to determine the availability of habeas for aliens, but that it is not a necessary factor, whereas *de facto* sovereignty is. It is perhaps in this *de facto* sense, the Court speculates, that *Eisentrager* found "sovereignty" lacking. See *ante*, at 23–25. If that were so, one would have expected *Eisentrager* to explain in some detail why the United States

SCALIA, J., dissenting

The Court would have us believe that *Eisentrager* rested on "[p]ractical considerations," such as the "difficulties of ordering the Government to produce the prisoners in a habeas corpus proceeding." *Ante*, at 32. Formal sovereignty, says the Court, is merely one consideration "that bears upon which constitutional guarantees apply" in a given location. *Ante*, at 34. This is a sheer rewriting of the case. *Eisentrager* mentioned practical concerns, to be sure—but not for the purpose of determining *under what circumstances* American courts could issue writs of habeas corpus for aliens abroad. It cited them to support *its holding* that the Constitution does not empower courts to issue writs of habeas corpus to aliens abroad *in any circumstances*. As Justice Black accurately said in dissent, "the Court's opinion inescapably denies courts power to afford the least bit of protection for any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared." 339 U. S., at 796.

The Court also tries to change *Eisentrager* into a "func-

———————

did not have practical control over the American zone of occupation. It did not (and probably could not). Of course this novel *de facto-de jure* approach does not explain why the writ never issued to Scotland, which was assuredly within the *de facto* control of the English crown. See *infra*, at 22.

To support its holding that *de facto* sovereignty is relevant to the reach of habeas corpus, the Court cites our decision in *Fleming* v. *Page*, 9 How. 603 (1850), a case about the application of a customs statute to a foreign port occupied by U. S. forces. See *ante*, at 24. The case used the phrase "subject to the sovereignty and dominion of the United States" to refer to the United States' practical control over a "foreign country." 9 How., at 614. But *Fleming* went on to explain that because the port remained part of the "enemy's country," even though under U. S. military occupation, "its subjugation did not compel the United States, while they held it, to regard it as part of their dominions, nor to give to it any form of civil government, nor to extend to it our laws." *Id.*, at 618. If *Fleming* is relevant to these cases at all, it undermines the Court's holding.

tional" test by quoting a paragraph that lists the charac-
teristics of the German petitioners:

> "To support [the] assumption [of a constitutional right
> to habeas corpus] we must hold that a prisoner of our
> military authorities is constitutionally entitled to the
> writ, even though he (a) is an enemy alien; (b) has
> never been or resided in the United States; (c) was
> captured outside of our territory and there held in
> military custody as a prisoner of war; (d) was tried
> and convicted by a Military Commission sitting out-
> side the United States; (e) for offenses against laws of
> war committed outside the United States; (f) and is at
> all times imprisoned outside the United States." *Id.*,
> at 777 (quoted in part, *ante*, at 36).

But that paragraph is introduced by a sentence stating
that "[t]he foregoing demonstrates *how much further we
must go* if we are to invest these enemy aliens, resident,
captured and imprisoned abroad, with standing to demand
access to our courts." 339 U. S., at 777 (emphasis added).
How much further than *what*? Further than the rule set
forth in the prior section of the opinion, which said that "in
extending constitutional protections beyond the citizenry,
the Court has been at pains to point out that it was the
alien's presence within its territorial jurisdiction that gave
the Judiciary power to act." *Id.*, at 771. In other words,
the characteristics of the German prisoners were set forth,
not in application of some "functional" test, but to show
that the case before the Court represented an *a fortiori*
application of the ordinary rule. That is reaffirmed by the
sentences that immediately follow the listing of the Ger-
mans' characteristics:

> "We have pointed out that the privilege of litigation
> has been extended to aliens, whether friendly or en-
> emy, only because permitting their presence in the
> country implied protection. No such basis can be in-

SCALIA, J., dissenting

voked here, for these prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." *Id.*, at 777–778.

*Eisentrager* nowhere mentions a "functional" test, and the notion that it is based upon such a principle is patently false.[4]

The Court also reasons that *Eisentrager* must be read as a "functional" opinion because of our prior decisions in the Insular Cases. See *ante*, at 26–29. It cites our statement in *Balzac* v. *Porto Rico*, 258 U. S. 298, 312 (1922), that "'the real issue in the *Insular Cases* was not whether the Constitution extended to the Philippines or Porto Rico when we went there, but which of its provisions were

_____

[4] JUSTICE SOUTER's concurrence relies on our decision four Terms ago in *Rasul* v. *Bush*, 542 U. S. 466 (2004), where the Court interpreted the habeas statute to extend to aliens held at Guantanamo Bay. He thinks that "no one who reads the Court's opinion in *Rasul* could seriously doubt that the jurisdictional question must be answered the same way in purely constitutional cases." *Ante*, at 1–2. But *Rasul* was devoted primarily to an explanation of why *Eisentrager*'s statutory holding no longer controlled given our subsequent decision in *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484 (1973). See *Rasul*, *supra*, at 475–479. And the opinion of the Court today—which JUSTICE SOUTER joins—expressly rejects the historical evidence cited in *Rasul* to support its conclusion about the reach of habeas corpus. Compare *id.*, at 481–482, with *ante*, at 18. Moreover, even if one were to accept as true what JUSTICE SOUTER calls *Rasul*'s "well-considered" dictum, that does not explain why *Eisentrager*'s constitutional holding must be overruled or how it can be distinguished. (After all, *Rasul* distinguished *Eisentrager*'s statutory holding on a ground inapplicable to its constitutional holding.) In other words, even if the Court were to conclude that *Eisentrager*'s rule was incorrect as an original matter, the Court would have to explain the justification for departing from that precedent. It therefore cannot possibly be true that *Rasul* controls this case, as JUSTICE SOUTER suggests.

applicable by way of limitation upon the exercise of execu-
tive and legislative power in dealing with new conditions
and requirements.'" *Ante*, at 28. But the Court conven-
iently omits *Balzac*'s predicate to that statement: "The
Constitution of the United States is in force in Porto Rico
as it is wherever and whenever the *sovereign power* of that
government is exerted."   258 U. S., at 312 (emphasis
added).  The Insular Cases all concerned territories ac-
quired by Congress under its Article IV authority and
indisputably part of the sovereign territory of the United
States.  See *United States* v. *Verdugo-Urquidez*, 494 U. S.
259, 268 (1990); *Reid* v. *Covert*, 354 U. S. 1, 13 (1957)
(plurality opinion of Black, J.).  None of the Insular Cases
stands for the proposition that aliens located outside U. S.
sovereign territory have constitutional rights, and *Eisen-
trager* held just the opposite with respect to habeas corpus.
As I have said, *Eisentrager* distinguished *Yamashita* on
the ground of "our sovereignty [over the Philippines]," 339
U. S., at 780.

The Court also relies on the "[p]ractical considerations"
that influenced our decision in *Reid* v. *Covert, supra*.  See
*ante*, at 29–32.  But all the Justices in the majority except
Justice Frankfurter limited their analysis to the rights of
*citizens* abroad.  See *Reid, supra*, at 5–6 (plurality opinion
of Black, J.); *id.*, at 74–75 (Harlan, J., concurring in re-
sult).  (Frankfurter limited his analysis to the even nar-
rower class of civilian dependents of American military
personnel abroad, see *id.*, at 45 (opinion concurring in
result).)  In trying to wring some kind of support out of
*Reid* for today's novel holding, the Court resorts to a chain
of logic that does not hold.  The members of the *Reid*
majority, the Court says, were divided over whether *In re
Ross*, 140 U. S. 453 (1891), which had (according to the
Court) held that under certain circumstances American
citizens abroad do not have indictment and jury-trial
rights, should be overruled.  In the Court's view, the *Reid*

SCALIA, J., dissenting

plurality would have overruled *Ross*, but Justices Frankfurter and Harlan preferred to distinguish it. The upshot: "If citizenship had been the only relevant factor in the case, it would have been necessary for the Court to overturn *Ross*, something Justices Harlan and Frankfurter were unwilling to do." *Ante*, at 32. What, exactly, is this point supposed to prove? To say that "practical considerations" determine the precise content of the constitutional protections American citizens enjoy when they are abroad is quite different from saying that "practical considerations" determine whether aliens abroad enjoy any constitutional protections whatever, including habeas. In other words, merely because citizenship is not a *sufficient* factor to extend constitutional rights abroad does not mean that it is not a *necessary* one.

The Court tries to reconcile *Eisentrager* with its holding today by pointing out that in postwar Germany, the United States was "answerable to its Allies" and did not "pla[n] a long-term occupation." *Ante*, at 38, 39. Those factors were not mentioned in *Eisentrager*. Worse still, it is impossible to see how they relate to the Court's asserted purpose in creating this "functional" test—namely, to ensure a judicial inquiry into detention and prevent the political branches from acting with impunity. Can it possibly be that the Court trusts the political branches more when they are beholden to foreign powers than when they act alone?

After transforming the *a fortiori* elements discussed above into a "functional" test, the Court is still left with the difficulty that most of those elements exist here as well with regard to all the detainees. To make the application of the newly crafted "functional" test produce a different result in the present cases, the Court must rely upon factors (d) and (e): The Germans had been tried by a military commission for violations of the laws of war; the present petitioners, by contrast, have been tried by a

16                BOUMEDIENE *v.* BUSH

Combatant Status Review Tribunal (CSRT) whose proce-
dural protections, according to the Court's *ipse dixit*, "fall
well short of the procedures and adversarial mechanisms
that would eliminate the need for habeas corpus review."
*Ante*, at 37.  But no one looking for "functional" equiva-
lents would put *Eisentrager* and the present cases in the
same category, much less place the present cases in a
preferred category.  The difference between them cries out
for lesser procedures in the present cases.  The prisoners
in *Eisentrager* were *prosecuted* for crimes after the cessa-
tion of hostilities; the prisoners here are enemy combat-
ants *detained* during an ongoing conflict.  See *Hamdi* v.
*Rumsfeld*, 542 U. S. 507, 538 (2004) (plurality opinion)
(suggesting, as an adequate substitute for habeas corpus,
the use of a tribunal akin to a CSRT to authorize the
detention of *American citizens* as enemy combatants dur-
ing the course of the present conflict).

  The category of prisoner comparable to these detainees
are not the *Eisentrager* criminal defendants, but the more
than 400,000 prisoners of war detained in the United
States alone during World War II.  Not a single one was
accorded the right to have his detention validated by a
habeas corpus action in federal court—and that despite
the fact that they were present on U. S. soil.  See Bradley,
The Military Commissions Act, Habeas Corpus, and the
Geneva Conventions, 101 Am. J. Int'l L. 322, 338 (2007).
The Court's analysis produces a crazy result: Whereas
those convicted and sentenced to death for war crimes are
without judicial remedy, all enemy combatants detained
during a war, at least insofar as they are confined in an
area away from the battlefield over which the United
States exercises "absolute and indefinite" control, may
seek a writ of habeas corpus in federal court.  And, as an
even more bizarre implication from the Court's reasoning,
those prisoners whom the military plans to try by full-
dress Commission at a future date may file habeas peti-

Scalia, J., dissenting

tions and secure release before their trials take place.

There is simply no support for the Court's assertion that constitutional rights extend to aliens held outside U. S. sovereign territory, see *Verdugo-Urquidez*, 494 U. S., at 271, and *Eisentrager* could not be clearer that the privilege of habeas corpus does not extend to aliens abroad. By blatantly distorting *Eisentrager*, the Court avoids the difficulty of explaining why it should be overruled. See *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 854–855 (1992) (identifying *stare decisis* factors). The rule that aliens abroad are not constitutionally entitled to habeas corpus has not proved unworkable in practice; if anything, it is the Court's "functional" test that does not (and never will) provide clear guidance for the future. *Eisentrager* forms a coherent whole with the accepted proposition that aliens abroad have no substantive rights under our Constitution. Since it was announced, no relevant factual premises have changed. It has engendered considerable reliance on the part of our military. And, as the Court acknowledges, text and history do not clearly compel a contrary ruling. It is a sad day for the rule of law when such an important constitutional precedent is discarded without an *apologia*, much less an apology.

C

What drives today's decision is neither the meaning of the Suspension Clause, nor the principles of our precedents, but rather an inflated notion of judicial supremacy. The Court says that if the extraterritorial applicability of the Suspension Clause turned on formal notions of sovereignty, "it would be possible for the political branches to govern without legal constraint" in areas beyond the sovereign territory of the United States. *Ante*, at 35. That cannot be, the Court says, because it is the duty of this Court to say what the law is. *Id.*, at 35–36. It would be

difficult to imagine a more question-begging analysis. "The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies *properly before them*." *United States* v. *Raines*, 362 U. S. 17, 20–21 (1960) (citing *Marbury* v. *Madison*, 1 Cranch 137 (1803); emphasis added). Our power "to say what the law is" is circumscribed by the limits of our statutorily and constitutionally conferred jurisdiction. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 573–578 (1992). And that is precisely the question in these cases: whether the Constitution confers habeas jurisdiction on federal courts to decide petitioners' claims. It is both irrational and arrogant to say that the answer must be yes, because otherwise we would not be supreme.

But so long as there are *some* places to which habeas does not run—so long as the Court's new "functional" test will not be satisfied *in every case*—then there will be circumstances in which "it would be possible for the political branches to govern without legal constraint." Or, to put it more impartially, areas in which the legal determinations of the *other* branches will be (shudder!) *supreme.* In other words, judicial supremacy is not really assured by the constitutional rule that the Court creates. The gap between rationale and rule leads me to conclude that the Court's ultimate, unexpressed goal is to preserve the power to review the confinement of enemy prisoners held by the Executive anywhere in the world. The "functional" test usefully evades the precedential landmine of *Eisentrager* but is so inherently subjective that it clears a wide path for the Court to traverse in the years to come.

### III

Putting aside the conclusive precedent of *Eisentrager*, it is clear that the original understanding of the Suspension Clause was that habeas corpus was not available to aliens

SCALIA, J., dissenting

abroad, as Judge Randolph's thorough opinion for the court below detailed.  See 476 F. 3d 981, 988–990 (CADC 2007).

The Suspension Clause reads: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U. S. Const., Art. I, §9, cl. 2.  The proper course of constitutional interpretation is to give the text the meaning it was understood to have at the time of its adoption by the people.  See, *e.g.*, *Crawford* v. *Washington*, 541 U. S. 36, 54 (2004).  That course is especially demanded when (as here) the Constitution limits the power of Congress to infringe upon a pre-existing common-law right.  The nature of the writ of habeas corpus that cannot be suspended must be defined by the common-law writ that was available at the time of the founding.  See *McNally* v. *Hill*, 293 U. S. 131, 135–136 (1934); see also *INS* v. *St. Cyr*, 533 U. S. 289, 342 (2001) (SCALIA, J., dissenting); *D'Oench, Duhme & Co.* v. *FDIC*, 315 U. S. 447, 471, n. 9 (1942) (Jackson, J., concurring).

It is entirely clear that, at English common law, the writ of habeas corpus did not extend beyond the sovereign territory of the Crown.  To be sure, the writ had an "extraordinary territorial ambit," because it was a so-called "prerogative writ," which, unlike other writs, could extend beyond the realm of England to other places where the Crown was sovereign.  R. Sharpe, The Law of Habeas Corpus 188 (2d ed. 1989) (hereinafter Sharpe); see also Note on the Power of the English Courts to Issue the Writ of Habeas to Places Within the Dominions of the Crown, But Out of England, and On the Position of Scotland in Relation to that Power, 8 Jurid. Rev. 157 (1896) (hereinafter Note on Habeas); *King* v. *Cowle*, 2 Burr. 834, 855–856, 97 Eng. Rep. 587, 599 (K. B. 1759).

But prerogative writs could not issue to foreign countries, even for British subjects; they were confined to the

Scalia, J., dissenting

King's dominions—those areas over which the Crown was sovereign. See Sharpe 188; 2 R. Chambers, A Course of Lectures on the English Law 1767–1773, pp. 7–8 (Curley ed. 1986); 3 W. Blackstone, Commentaries on the Laws of England 131 (1768) (hereinafter Blackstone). Thus, the writ has never extended to Scotland, which, although united to England when James I succeeded to the English throne in 1603, was considered a foreign dominion under a different Crown—that of the King of Scotland. Sharpe 191; Note on Habeas 158.[5] That is why Lord Mansfield wrote that "[t]o foreign dominions, which belong to a prince who succeeds to the throne of England, this Court has no power to send any writ of any kind. We cannot send a habeas corpus to Scotland . . . ." *Cowle*, *supra*, at 856, 97 Eng. Rep., at 599–600.

The common-law writ was codified by the Habeas Corpus Act of 1679, which "stood alongside Magna Charta and the English Bill of Rights of 1689 as a towering common law lighthouse of liberty—a beacon by which framing lawyers in America consciously steered their course." Amar, Sixth Amendment First Principles, 84 Geo. L. J. 641, 663 (1996). The writ was established in the Colonies beginning in the 1690's and at least one colony adopted the 1679 Act almost verbatim. See Dept. of Political Science, Okla. State Univ., Research Reports, No. 1, R. Walker, The American Reception of the Writ of Liberty 12–16 (1961). Section XI of the Act stated where the writ could run. It "may be directed and run into any county palatine, the cinque-ports, or other privileged places within the kingdom of England, dominion of Wales, or town of Berwick upon Tweed, and the islands of Jersey or Guernsey." 31 Car. 2, ch. 2. The cinque-ports and county palatine were so-called "exempt jurisdictions"—franchises

———————

[5] My dissent in *Rasul* v. *Bush,* 542 U. S. 466, 503 (2004), mistakenly included Scotland among the places to which the writ could run.

granted by the Crown in which local authorities would manage municipal affairs, including the court system, but over which the Crown maintained ultimate sovereignty. See 3 Blackstone 78–79. The other places listed—Wales, Berwick-upon-Tweed, Jersey, and Guernsey—were territories of the Crown even though not part England proper. See *Cowle, supra,* at 853–854, 97 Eng. Rep., at 598 (Wales and Berwick-upon-Tweed); 1 Blackstone 104 (Jersey and Guernsey); Sharpe 192 (same).

The Act did not extend the writ elsewhere, even though the existence of other places to which British prisoners could be sent was recognized by the Act. The possibility of evading judicial review through such spiriting-away was eliminated, not by expanding the writ abroad, but by forbidding (in Article XII of the Act) the shipment of prisoners to places where the writ did not run or where its execution would be difficult. See 31 Car. 2, ch. 2; see generally Nutting, The Most Wholesome Law—The Habeas Corpus Act of 1679, 65 Am. Hist. Rev. 527 (1960).

The Habeas Corpus Act, then, confirms the consensus view of scholars and jurists that the writ did not run outside the sovereign territory of the Crown. The Court says that the idea that "jurisdiction followed the King's officers" is an equally credible view. *Ante,* at 16. It is not credible at all. The only support the Court cites for it is a page in Boumediene's brief, which in turn cites this Court's dicta in *Rasul,* 542 U. S., at 482, mischaracterizing Lord Mansfield's statement that the writ ran to any place that was "under the subjection of the Crown," *Cowle, supra,* at 856, 97 Eng. Rep., at 599. It is clear that Lord Mansfield was saying that the writ extended outside the realm of England proper, not outside the sovereign territory of the Crown.[6]

———————

[6]The dicta in *Rasul* also cited *Ex parte Mwenya,* [1960] 1 Q. B. 241, (C. A.), but as I explained in dissent, "[e]ach judge [in *Mwenya*] made

22                  BOUMEDIENE *v.* BUSH

The Court dismisses the example of Scotland on the grounds that Scotland had its own judicial system and that the writ could not, as a practical matter, have been enforced there. *Ante*, at 20. Those explanations are totally unpersuasive. The existence of a separate court system was never a basis for denying the power of a court to issue the writ. See 9 W. Holdsworth, A History of English Law 124 (3d ed. 1944) (citing *Ex parte Anderson*, 3 El. and El. 487 (1861)). And as for logistical problems, the same difficulties were present for places like the Channel Islands, where the writ did run. The Court attempts to draw an analogy between the prudential limitations on issuing the writ to such remote areas within the sovereign territory of the Crown and the jurisdictional prohibition on issuing the writ to Scotland. See *ante*, at 19–20. But the very authority that the Court cites, Lord Mansfield, expressly distinguished between these two concepts, stating that English courts had the "power" to send the writ to places within the Crown's sovereignty, the "only question" being the "propriety," while they had "no power to send any writ of any kind" to Scotland and other "foreign dominions." *Cowle, supra*, at 856, 97 Eng. Rep., at 599–600. The writ did not run to Scotland because, even after the Union, "Scotland remained a foreign dominion of the prince who succeeded to the English throne," and "union did not extend the prerogative of the English crown to Scotland." Sharpe 191; see also Sir Matthew Hale's The Prerogatives of the King 19 (D. Yale ed. 1976).[7]

———————

clear that the detainee's status as a subject was material to the resolution of the case," 542 U. S., at 504.

[7] The Court also argues that the fact that the writ could run to Ireland, even though it was ruled under a "separate" crown, shows that formal sovereignty was not the touchstone of habeas jurisdiction. *Ante*, at 21. The passage from Blackstone that the Court cites, however, describes Ireland as "a dependent, subordinate kingdom" that was part of the "king's dominions." 1 Blackstone 98, 100 (internal quotation

SCALIA, J., dissenting

In sum, *all* available historical evidence points to the conclusion that the writ would not have been available at common law for aliens captured and held outside the sovereign territory of the Crown. Despite three opening briefs, three reply briefs, and support from a legion of *amici,* petitioners have failed to identify a single case in the history of Anglo-American law that supports their claim to jurisdiction. The Court finds it significant that there is no recorded case *denying* jurisdiction to such prisoners either. See *ante,* at 21–22. But a case standing for the remarkable proposition that the writ could issue to a foreign land would surely have been reported, whereas a case denying such a writ for lack of jurisdiction would likely not. At a minimum, the absence of a reported case either way leaves unrefuted the voluminous commentary stating that habeas was confined to the dominions of the Crown.

What history teaches is confirmed by the nature of the limitations that the Constitution places upon suspension of the common-law writ. It can be suspended only "in Cases of Rebellion or Invasion." Art. I, §9, cl. 2. The latter case (invasion) is plainly limited to the territory of the United States; and while it is conceivable that a rebellion could be mounted by American citizens abroad, surely the overwhelming majority of its occurrences would be domestic. If the extraterritorial scope of habeas turned on flexible, "functional" considerations, as the Court holds, why would the Constitution limit its suspension almost entirely to instances of domestic crisis? Surely there is an even greater justification for suspension in foreign lands where the United States might hold prisoners of war

———————
marks omitted). And Lord Mansfield's opinion in *Cowle* plainly understood Ireland to be "a dominion of the Crown of England," in contrast to the "foreign dominio[n]" of Scotland, and thought that distinction dispositive of the question of habeas jurisdiction. *Cowle, supra,* at 856, 97 Eng. Rep., at 599–600.

24          BOUMEDIENE *v.* BUSH

during an ongoing conflict. And correspondingly, there is less threat to liberty when the Government suspends the writ's (supposed) application in foreign lands, where even on the most extreme view prisoners are entitled to fewer constitutional rights. It makes no sense, therefore, for the Constitution generally to forbid suspension of the writ abroad if indeed the writ has application there.

It may be objected that the foregoing analysis proves too much, since this Court has already suggested that the writ of habeas corpus *does* run abroad for the benefit of United States citizens. "[T]he position that United States citizens throughout the world may be entitled to habeas corpus rights . . . is precisely the position that this Court adopted in *Eisentrager*, see 339 U. S., at 769–770, even while holding that aliens abroad did not have habeas corpus rights." *Rasul*, 542 U. S*.,* at 501, 502 (Scalia, J., dissenting) (emphasis deleted). The reason for that divergence is not difficult to discern. The common-law writ, as received into the law of the new constitutional Republic, took on such changes as were demanded by a system in which rule is derived from the consent of the governed, and in which citizens (not "subjects") are afforded defined protections against the Government. As Justice Story wrote for the Court,

> "The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation." *Van Ness* v. *Pacard*, 2 Pet. 137, 144 (1829).

See also Hall, The Common Law: An Account of its Reception in the United States, 4 Vand. L. Rev. 791 (1951). It accords with that principle to say, as the plurality opinion said in *Reid:* "When the Government reaches out to punish

Scalia, J., dissenting

a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." 354 U. S., at 6; see also *Verdugo-Urquidez*, 494 U. S., at 269–270. On that analysis, "[t]he distinction between citizens and aliens follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Id.*, at 275 (Kennedy, J., concurring).

In sum, because I conclude that the text and history of the Suspension Clause provide no basis for our jurisdiction, I would affirm the Court of Appeals even if *Eisentrager* did not govern these cases.

\*    \*    \*

Today the Court warps our Constitution in a way that goes beyond the narrow issue of the reach of the Suspension Clause, invoking judicially brainstormed separation-of-powers principles to establish a manipulable "functional" test for the extraterritorial reach of habeas corpus (and, no doubt, for the extraterritorial reach of other constitutional protections as well). It blatantly misdescribes important precedents, most conspicuously Justice Jackson's opinion for the Court in *Johnson* v. *Eisentrager*. It breaks a chain of precedent as old as the common law that prohibits judicial inquiry into detentions of aliens abroad absent statutory authorization. And, most tragically, it sets our military commanders the impossible task of proving to a civilian court, under whatever standards this Court devises in the future, that evidence supports the confinement of each and every enemy prisoner.

The Nation will live to regret what the Court has done today. I dissent.