Filed with Court Security Office 7/3/08
Cleared for Public Filing 7/7/08

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH)<br><br>Civil Action No. 05-CV-2386 (RBW) |
| ABDUL AZIZ NAJI,<br>a/k/a AZIZ ABDUL NAJI,<br><br>*Petitioner,*<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>*Respondents.* | CIVIL ACTION NO. 05-CV-2386 (RBW) |

**SUBSTANTIVE MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO**

Counsel for Petitioner respectfully submits this *substantive* motion and requests that it be heard before Judge Walton.

1.     Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner (ISN #744) respectfully moves for an immediate order requiring Respondents to provide counsel for Petitioner and the Court with thirty (30) days' advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba. Within the past two days, Respondents have transferred two Algerian detainees from Guantanamo to Algeria, which is also Petitioner's home country and, upon information and belief, Respondents have

contemplated or are contemplating removal of Petitioner from Guantánamo to Algeria or other foreign territories. Petitioner has significant reason to believe that such a transfer could result in his being subjected to torture or indefinite imprisonment without due process of law.

2.   In support of this request, Petitioner relies on the statement of facts set forth below and on the reasons set forth in his *Motion for Order Requiring Respondents to Provide Counsel for Petitioner and the Court with 60 Days' Advance Notice before any Intended Transfer of Petitioner from Guantanamo and Notice Regarding Decision Not to File DTA Petition*, filed with this Court on August 7, 2007 (Attachment 1). Petitioner is requesting the advance notice to enable his counsel to contest any such removal from Guantánamo and preserve the jurisdiction of the Court in this matter.

## STATEMENT OF FACTS

3.   Petitioner is a citizen of Algeria who has been detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba since 2002. As detailed in the *habeas* petition he has filed, he denies being an "enemy combatant" and contends he is being detained in violation of the Constitution, treaties, and laws of the United States.

4.   On June 12, 2008, the U.S. Supreme Court reversed the decision of the United States Court of Appeals for the District of Columbia Circuit, ruling that prisoners at Guantánamo have *habeas corpus* rights protected under the U.S. Constitution; the review procedures of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 ("DTA") are not an adequate substitute for *habeas corpus*; and the Military Commissions Act of 2006, Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2636-37 (2006) ("MCA"), insofar as it purported to strip the courts of *habeas corpus* jurisdiction, was unconstitutional. *Boumediene v. Bush*, ___ S.Ct. ___, 2008 WL 2369628 (June 12, 2008). The Supreme Court stated that it was now up to the District Courts to

resolve questions regarding "the legality of . . . detention" of Guantánamo detainees. Id. at *8. The Supreme Court stated that the "detainees in these cases are entitled to a prompt habeas corpus hearing." Id. at *44.

5. Petitioner has significant reason to fear he will be transferred to a country where he will be tortured and/or detained indefinitely without due process of law, particularly his native Algeria, a country known to treat repatriated prisoners harshly, having codified the right to hold such a person without charges up to 20 years in Article 87 of the Algerian criminal code.

6. According to Western diplomats and intelligence sources, since Sept. 11, 2001, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities. These people have been taken to countries such as Egypt, Pakistan, Afghanistan, and Kuwait, where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States. *See, e.g.,* Hearings of the Foreign Affairs Subcommittee on International Organizations, Human Rights, and Oversight on the Hearings and Briefings on The Use of Diplomatic Assurances in Renditions, June, 2008. Chairman Delahunt's panel heard testimony on a number of specific cases of rendition to torture, including but not limited to the case of Maher Arar, a Canadian of Syrian origin who was stopped at JFK Airport and on the basis of assurances that he would not be tortured, was sent to Syria. Mr. Arar was subsequently tortured during his one year detention there. A newly released report from the Department of Homeland Security's Inspector General raises fresh questions about the sufficiency of those assurances. According to State Department reports, torture has been widely used on prisoners in a number of Middle Eastern countries. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional tes-

timony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations.").

7.      By way of example, Guantánamo detainee Mamdouh Habib was rendered to Egypt by the United States. During his six months in Egyptian custody, Mr. Habib was allegedly tortured without mercy:

> He said that he was beaten frequently with blunt instruments, including an object that he likened to an electric "cattle prod." And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs. . . . Habib said that he was shackled and forced to stand in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles, and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture* at [¶ 54.] The credibility of Mr. Habib's account is bolstered by the State Department, which has consistently identified the Egyptian government as a practitioner of torture. In a report released on February 28, 2005, for example, the State Department found that "there were numerous, credible reports that security forces tortured and mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent." Dep't of State, *Country Reports on Human Rights Practices, Egypt 2004*, at http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, § 1(c).

## ARGUMENT

8.      Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the

status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

9.  Each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (i) Petitioner will suffer irreparable harm if the injunction is denied; (ii) no harm will be suffered by Respondents if the injunction is granted; (iii) Petitioner is likely to succeed on the merits of his claims; and (iv) there is a clear public interest in preventing the U. S. government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

  i) Petitioner stands to suffer immeasurable and irreparable harm – from to torture to possible death – at the hands of a foreign government. Transfer to another country, even if "only" for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality of their detention in this Court, per *Boumedienne*.

  ii) By contrast, Respondents, who have already held Petitioner for over six years, are asked only to provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo. Respondents can suffer no conceivable harm from complying with such a request.

  iii) Petitioner is likely to succeed on the merits of his claims. Petitioner has properly invoked the jurisdiction of this Court under *Boumediene,* and for the U. S. government to remove Petitioner to a country that would afford no such protections would be to flout *Boumedienne* and defeat the jurisdiction the Supreme Court just affirmed. Under such circumstances, a preemptive transfer would also violate basic international legal norms embodied

not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

iv) Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant – properly before the Court, represented by counsel, and wishing to implement the judicial branch's admonition that the other two branches no longer unconstitutionally deny him his day in court – be provided a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

10. For the reasons discussed above, the motion for an order requiring Respondents to provide counsel for Petitioner and the Court with thirty (30) days' advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base should be granted.

Respectfully submitted,                                    Dated: July 3, 2008

Counsel for Petitioner:

_____                                    J. Wells Dixon
Ellen Lubell, Esq.                                        (Pursuant to LCvR83-2(g))
                                                          CENTER FOR CONSTUTIONAL
_____                                    RIGHTS
Doris Tennant, Esq.                                       666 Broadway, 7th Fl.
                                                          New York, NY 10012
TENNANT LUBELL, LLC                                       Tel: (212) 614-6439
288 Walnut St., Suite 500                                 Fax: (212)614-6499
Newton, MA  02460
Tel: (617) 969-9610
Fax: (617) 969-9611

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing instrument has been served on Respondents through the Court Security Officer in accordance with the Standard Protective Orders:

Mr. Terry Henry
US DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7226
Washington, DC 20529-0001

/s/ Ellen Lubell

Dated:  July 3, 2008