IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| IN RE:                                ) | Misc. No. 08-442 (TFH) |
| ) | |
| GUANTANAMO BAY                        ) | Civil Action Nos. |
| DETAINEE LITIGATION                   ) | 05-CV-1347(GK), |
| ) | 05-CV-2386 (RBW), |
| ) | 08-CV-0987 (JDB) |
| _____ ) | |

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO
PETITIONERS' MOTIONS FOR PRELIMINARY INJUNCTION
REQUIRING ADVANCE NOTICE OF
<u>TRANSFER OR RELEASE FROM GUANTANAMO BAY</u>**

Respondents hereby oppose the motions of petitioners in these cases for a preliminary

injunction requiring respondents to provide the Court and petitioners' counsel with advance

notice before any transfer or release of the petitioner-detainees from Guantanamo Bay, Cuba

("Guantanamo").[1]  For the reasons that follow, the motions should be denied.[2]  Not only is

jurisdiction to provide the requested relief lacking, the recent unanimous decision of the Supreme

Court in *Munaf v. Geren*, ___ U.S. ___ 128 S. Ct. 2207 (June 12, 2008), demonstrates that this

Court cannot grant the requested injunction in these *habeas corpus* actions without

impermissibly intruding on the powers constitutionally entrusted to the Executive Branch and

involving itself in foreign policy determinations not appropriate for the judiciary.

---

[1] *See Dokhan v. Bush*, No. 08-CV-0987 (JDB) (dkt. no. 2, dated Jun. 17, 2008);
*Mohammon v. Bush* (Petitioners Ghaffar & Noori), No. 05-CV-2386 (RBW) (dkt. no. 451, filed
Jun. 23, 2008); *Mohammed v. Bush*, No. 05-CV-1347 (GK) (dkt. no. 31, filed Jun. 30, 2008);
*Mohammon v. Bush* (Petitioner Naji), No. 05-CV-2386 (RBW) (dkt. no. 473, filed Jul. 3, 2008).

[2] Because these motions involve the same legal issues, respondents are providing this
consolidated response.  The advance notice of transfer issue raised in these motions, and likely to
be raised in numerous other forthcoming motions, should be resolved in a coordinated fashion
for the Guantanamo Bay detainee cases.

**BACKGROUND**

These *habeas corpus* petitions were on behalf of individuals[3] currently detained as enemy combatants at Guantanamo.[4]  Petitioners suppose that, at some point in the future, respondents might transfer petitioners to their home countries or another country where they might be mistreated.  Thus, although the very purpose of this proceeding is necessarily to achieve the detainees' release from detention at Guantanamo, petitioners have moved for an order that would require advance notice of any transfer, which might then be used to delay or prevent entirely such a release from United States' custody.

Aside from the speculative nature of petitioner's belief as to what might happen to them in connection with a transfer, the factual premises of their motions are incorrect.  As described in the declarations attached hereto as Exhibits 1 & 2, attested to by Ambassador Clint Williamson and Deputy Assistant Secretary of Defense for Detainee Affairs Sandra Hodgkinson, where appropriate, the United States transfers Guantanamo detainees to the control of other countries, typically a detainee's country of citizenship.  For any transfer, a key concern of the United States is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Williamson Decl. ¶¶ 2-4; Hodgkinson Decl. ¶¶ 3-7.  It is the

---

[3] Respondents reserve the right challenge the standing of next-friend petitioners in these cases to serve as next friends, as appropriate.  *See Whitmore v. Arkansas*, 495 U.S. 149 (1990).  For example, with respect to purported next friend Sami Al Hajj in *Dokhan v. Bush*, No. 08-CV-0987 (JDB), although "[t]he burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court," neither the petition in the case nor its exhibit demonstrates the necessary "significant relationship," between Sami Al Hajj and the detainee for whom he purports to act as "next friend."  *Id.* at 164; *Dokhan* Petition (dkt. no. 1).

[4] Petitioners in these cases (ISNs 281, 311, 317, 584, and 744) were previously determined by Combatant Status Review Tribunals ("CSRTs") to be enemy combatants.  *See* Second Decl. of Karen L. Hecker ¶¶ 2–3 (attached as Exhibit 3).

policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. *Id*. ¶ 6; Williamson Decl. ¶ 4. If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Hodgkinson Decl. ¶ 6; Williamson Decl. ¶¶ 5-6. Once the Department of Defense initially approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned. *Id*. Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate with regard to the country in question. In every transfer case in which continued detention or other security measures by the transferee government are foreseen, such assurances include assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.[5] *Id*. Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), and ensures

---

[5] In appropriate cases of transfers of Guantanamo detainees, the dialogue between the United States and a receiving government will include efforts to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Hodgkinson Decl. ¶ 5. In all cases where a transfer is consummated, however, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. *Id*. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. *Id.*

that assurances are tailored accordingly if the nation concerned is not a party or other

circumstances warrant. *Id.*[6]

      The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government, including, where applicable, evaluation of foreign government

assurances, involves senior level officials and takes into account a number of considerations,

including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country and the individual concerned; and any concerns regarding torture that may

arise. Williamson Decl. ¶¶ 6-8; Hodgkinson Decl. ¶¶ 6-7. Recommendations by the Department

of State are developed through a process involving the Bureau of Democracy, Human Rights, and

Labor (which drafts the Department of State's annual Country Reports on Human Rights

Practices) and the relevant Department of State regional bureau, country desk, or U.S. Embassy.

Williamson Decl. ¶ 7. When evaluating the adequacy of assurances, Department of State

officials consider the identity, position, or other information concerning the official relaying the

assurances; political or legal developments in the foreign country concerned that provide context

for the assurances; and the foreign government's incentives and capacity to fulfill its assurances

---

[6] The particulars of whatever discussions there might be between the Executive Branch and foreign countries in any specific case of a proposed transfer of a Guantanamo detainee are closely held within appropriate Executive Branch channels. The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Williamson Decl. ¶ 9. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Williamson Decl. ¶¶ 9-11; *see* Hodgkinson Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to this country's ability to conduct foreign relations. Williamson Decl. ¶¶ 9-11.

to the United States.  Williamson Decl. ¶ 8.  In an appropriate case, the Department of State may

consider various monitoring mechanisms for verifying that assurances are being honored.  *Id.*  If

a case were to arise in which the assurances obtained from the receiving government were not

sufficient when balanced against treatment concerns, the United States would not transfer a

detainee to the control of that government unless the concerns were satisfactorily resolved.

Hodgkinson Decl. ¶ 7; Williamson Decl. ¶ 8.  Indeed, circumstances have arisen in the past

where the Defense Department decided not to transfer detainees to their country of origin

because of mistreatment concerns.  Hodgkinson Decl. ¶ 7; Williamson Decl. ¶ 8.

    In sum, the Executive Branch employs an elaborate inter-agency process for evaluating

the propriety of transfers of Guantanamo detainees and implementing the United States' policy

not to repatriate or transfer a detainee to a country where the United States believes it is more

likely than not that the individual will be tortured.  That process involves senior level officials

and includes consideration of the detainee's particular circumstances, an informed and

well-rounded analysis of the current situation on the ground in the prospective transferee country,

the input of various Department of State offices with relevant knowledge, personal interactions

and negotiations with senior officials of the prospective transferee government, and consideration

of assurances provided by the prospective transferee country, as well as their sufficiency and any

mechanisms for verifying them.

## **ARGUMENT**

I.    **NOTWITHSTANDING *BOUMEDIENE*, SECTION 7 OF THE MCA DEPRIVES THIS COURT OF JURISDICTION TO CONSIDER ANY CHALLENGE OTHER THAN TO THE CORE HABEAS INQUIRY OVER THE LAWFULNESS OF DETENTION.**

Petitioners are not entitled to their requested relief because the Military Commissions Act

of 2006 ("MCA"), Pub. L. No. 109-366, § 7(a), 120 Stat . 2600 (codified at 28 U.S.C. § 2241(e)),

legitimately withdraws court jurisdiction to provide relief concerning any transfer of a detainee

from Guantanamo notwithstanding the Supreme Court's decision in *Boumediene v. Bush*, 128

S. Ct. 2229 (June 12, 2008).  Thus, the Court should deny petitioners' motion without even

considering the traditional balancing test for obtaining preliminary injunctive relief.

Through § 7 of the MCA, Congress expressly withdrew from this Court's jurisdiction two

independent and enumerated types of actions that individuals detained by the United States as

enemy combatants could bring.  Specifically, Congress carved out of this Court's jurisdiction

claims concerning statutory habeas corpus generally:

> No court, justice, or judge shall have jurisdiction to hear or consider an
> application for a writ of habeas corpus filed by or on behalf of an alien detained
> by the United States who has been determined by the United States to have been
> properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(1).  Congress separately withdrew federal court jurisdiction concerning any

other aspects of the detention outside of the core habeas function, such that:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other
> action against the United States or its agents relating to *any aspect of the*
> *detention, transfer, treatment, trial, or conditions of confinement of an alien* who
> is or was detained by the United States and has been determined by the United
> States to have been properly detained as an enemy combatant . . . .

28 U.S.C. § 2241(e)(2) (emphasis added).  Under the recent decision in *Boumediene*, it is clear that the Supreme Court did not invalidate the MCA except to the extent that it precluded courts from exercising core habeas functions, *i.e.*, challenging the legality of the detention itself. Petitioners' claims here indisputably fall outside the *Boumediene* holding because they do not concern the core habeas function.  They do not challenge the legality of petitioners' detention, but rather raise an ancillary issue related to the potential transfer of petitioners out of United States' custody.  Jurisdiction, therefore, is lacking, and petitioners' motions must be denied.

A.    ***Boumediene* Did Not Invalidate The MCA Except To The Extent That It Precluded Courts From Exercising Core Habeas Functions.**

In *Boumediene*, the Supreme Court held that Guantanamo Bay detainees have a constitutional right to seek *habeas corpus* protected by the Suspension Clause, and that, as applied to detainees who are being held on the basis of an enemy combatant determination by a Combatant Status Review Tribunal ("CSRT") and whose habeas challenge goes to the legality of their detention, section 7 operates as an unconstitutional suspension of the writ.  This holding is limited in two important respects.

First, *Boumediene* holds that the first part of § 7 of the MCA, 28 U.S.C. § 2241(e)(1), is unconstitutional in some circumstances, but only insofar as it denies habeas review to detainees who have available to them only the CSRT process and their who raise a core habeas challenge, *i.e.*, to challenge the legality of their *detention*.  *See Boumediene*, 128 S. Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power *to detain*.") (emphasis added).  Put another way, to the extent a petitioner seeks habeas relief concerning collateral or ancillary issues not directly

- 7 -

connected to the legality of detention, *Boumediene*'s holding does not invalidate the jurisdiction

limiting provision of § 2241(e)(1).  The result in *Boumediene* thus can be read not as a facial

invalidation of § 2241(e)(1), but an invalidation of § 2241(e)(1) only as applied to the particular

factual situation presented, as it was never established that "no set of circumstances exists under

which [§ 7] would be valid."  *See United States v. Salerno*, 481 U.S. 739, 745 (1987).  Indeed, it

is indisputable that the challenge presented by the *Boumediene* petitioners was not the right to

raise a habeas challenge to some ancillary issue, such as the petitioners here seek to do, but rather

to challenge to the legality to the fact of their detention at all.  *See Ayotte v. Planned Parenthood*,

546 U.S. 320, 328-29 (2006) ("[T]he 'normal rule' is that 'partial, rather than facial, invalidation

is the required course,' such that a 'statute may . . . be declared invalid to the extent that it

reaches too far, but otherwise left intact.'").

Indeed, with regard to how much of § 2241(e)(1) remains operative following

*Boumediene*, a reviewing court has an obligation to preserve as much of a statute as is legally

permissible.  Thus, "a court should refrain from invalidating more of the statute than is

necessary," and "whenever an act of Congress contains unobjectionable provisions separable

from those found to be unconstitutional, it is the duty of [the] court to so declare, and to maintain

the act in so far as it is valid."  *Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992) (quoting *Regan

v. Time*, 468 U.S. 641, 652 (1984) (plurality opinion).  Thus, because Acts of Congress are valid

to the extent they operate constitutionally, the Court's holding must be applied with an eye to

"limit[ing] the solution to the problem."  *Ayotte*, 546 U.S. at 328-39.  At bottom, because the

problem alleged in *Boumediene* as to § 2241(e)(1) concerned only a core habeas challenge to the

legality of detention made by a petitioner with access only to the CSRT process, and not to an

ancillary issue not dealing with the legality of detention and related to a possible future transfer

out of United States' custody, § 2241(e)(1) remains operative here and removes jurisdiction with

regard to the instant challenge.

Second, *Boumediene*'s holding does not invalidate the second part of § 7.  Indeed, the

Court expressly noted that it was not deciding whether Guantanamo detainees have a

constitutional right to bring non-core habeas claims, such as conditions of confinement claims –

one type of claim barred by § 2241(e)(2).  *See Boumediene*, 128 S. Ct. at 2274 ("[W]e need not

discuss the reach of the writ with respect to claims of unlawful conditions of treatment or

confinement.").  But even after *Boumediene*, Congress' withdrawal of federal court jurisdiction

over "any other action . . . relating to any aspect of the detention, transfer, treatment, trial, or

conditions of confinement" remains operative to deprive this Court of jurisdiction over

petitioners' claims here, which are ancillary to the core habeas issue.

The Supreme Court's rationale for invalidating § 2241(e)(1), as applied, has no

application to § 2241(e)(2).  The *Boumediene* majority discusses the detainees' constitutional

right to bring only core *habeas* actions – challenging the lawfulness of detention – as opposed to

the broader class of "any other action . . . relating to any aspect of the detention."  *See, e.g.*,

*Boumediene*, 128 S. Ct. at 2262 ("Petitioners, therefore, are entitled to the privilege of habeas

corpus *to challenge the legality of their detention*.") (emphasis added).  Unlike § 2241(e)(1),

however, § 2241(e)(2) does not impair the Guantanamo detainees' ability to pursue a writ of

*habeas corpus*.  Rather, it expressly limits *other* types of actions that Guantanamo detainees

might bring.  Indeed, the Court explicitly distinguished between habeas actions governed by

§ 2241(e)(1), and *other*, *non-habeas* actions governed by § 2241(e)(2), by recognizing that "[t]he

- 9 -

structure of the two paragraphs [i.e. (e)(1) and (e)(2)] implies that habeas actions are a type of action 'relating to an aspect of the detention, transfer, treatment, trial, or conditions of confinement;'" that is, habeas actions are merely one type of action within the broader set of actions "relating to an aspect of . . . detention." *See id.* at 2243.  Because § 2241(e)(2) addresses "other action[s]" and not any constitutional habeas right the detainees may hold, the Suspension Clause provides no basis for invalidating it.

Additional evidence that *Boumediene* did not reach § 2241(e)(2) comes from the Court's discussion of what is constitutionally required in habeas proceedings.  That discussion does not suggest that Guantanamo detainees have a right to challenge "other action[s]" related to "aspects" of their detention.  Instead, the Court's discussion is phrased in terms limiting a detainee's habeas action narrowly to a challenge of his status or custody.  *See*, *e.g.*, *Boumediene*, 128 S. Ct. at 2266 ("We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law."); *id.* at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain."); *id.* at 2273 (detainee must have opportunity to present "reasonably available evidence demonstrating there is no basis for his continued detention").  None of the language suggests that a petitioner's *constitutional* habeas rights include a right to challenge any other aspect related to their detention beyond its legality.  Thus, the Court's holding that the Suspension Clause requires invalidation of § 7 of the MCA as

applied to aliens detained at Guantanamo should be read to apply only to the first part of § 7, *i.e.,* § 2241(e)(1), and only as discussed above.[7]

A contrary conclusion would require this Court to conclude that while the Supreme Court *expressly* held that § 2241(e)(1) is unconstitutional as applied to Guantanamo detainees who have only had the benefit of CSRT procedures, it determined *sub silentio* the constitutionality of 28 U.S.C. § 2241(e)(2).  But if the Court had intended to pass on § 2241(e)(2)'s constitutionality, the only rationale that might have supported that conclusion would have been if the Court had determined that conditions of confinement claims are encompassed in the detainees' constitutional right to habeas, so that elimination of jurisdiction over those claims jeopardized their constitutional habeas right.  But, as noted above, the Court expressly stated that it was *not* deciding that issue.[8]  *See Boumediene*, 128 S. Ct. at 2274.

_____

[7]  Although the Court's opinion refers generally to § 7, without identifying a particular subsection of 28 U.S.C. § 2241(e), *see, e.g., Boumediene*, 128 S. Ct. at 2274 ("MCA § 7 thus effects an unconstitutional suspension of the writ."); *id.* at 2274 ("The only law we identify as unconstitutional is MCA §7, 28 U.S.C.A. § 2241(e) (Supp. 2007)"), that is an insufficient basis for construing the Court's opinion to invalidate *all* of § 7.  This is particularly so because the Court's rationale for invalidating § 2241(e)(1) has no application to § 2241(e)(2).  In fact, at one point in its opinion, the Court seems to acknowledge that its reference generally to § 7 is simply short-hand for referring to § 2241(e)(1).  *See id.* at 2265 (stating that § 7 is the source of the relevant "jurisdiction-stripping language," but citing specifically to subsection § 2241(e)(1)).

[8]  Moreover, the fact that the constitutionality of § 2241(e)(2) was never challenged in *Boumediene* further supports the argument that the Court's holding does not invalidate that provision.  *See Belbacha* v. *Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) ("In [the court of appeals' decision in] *Boumediene* we held that § 7(a)(1) [28 U.S.C. § 2241(e)(1)] of the MCA does not violate the Suspension Clause of the Constitution").  It would be odd to interpret the Court's decision in *Boumediene* as not only having reached the constitutionality of § 2241(e)(2), *sua sponte* and for the first time on appeal, but also to have determined that the provision is unconstitutional without any explanation as to why.

- 11 -

While the continuing vitality of § 2242(e)(2) is therefore clear, if any doubt remained as noted above, the Court must consider its duty to preserve as much of a statute as is constitutional. *See Tilton* v. *Richardson*, 403 U.S. 672, 684 (1971) ("'The unconstitutionality of a part of an act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the Legislature would not have enacted those provisions which are within its power . . . the invalid part may be dropped if what is left is fully operative as a law.'")). Indeed, because § 2241(e)(2) is severable, there is no obstacle to continuing to apply that provision, despite the *Boumediene* Court's holding that § 2241(e)(1) cannot validly withdraw the privilege of the writ of *habeas corpus* as applied to detainees at Guantanamo who have only the benefit of CSRT procedures. *See Ayotte*, 546 U.S. at 330 ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?").[9] Section 2241(e)(2) is thus severable and should remain in force. *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678, 685 (1987) ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have

_____

[9] The text and history of § 7 of the MCA demonstrate that Congress surely intended § 2241(e)(2) to survive, even if the elimination of habeas jurisdiction in § 2241(e)(1) could not. In enacting the MCA, Congress sought to eliminate jurisdiction over ancillary issues, precisely to prevent the Executive Branch from having to divert significant resources during the duration of an armed conflict to respond to those claims. *See, e.g.*, 152 Cong Rec. S10403 (daily ed. Sept. 28, 2006) (Sen. Cornyn) ("[O]nce . . . section 7 is effective, Congress will finally accomplish what it sought to do through the [Detainee Treatment Act ("DTA")] last year. It will finally get the lawyers out of Guantanamo Bay. It will substitute the blizzard of litigation instigated by *Rasul v. Bush* with a narrow DC Circuit-only review of the [CSRT] hearings."); 152 *id.* at S10367 (Sen. Graham) (citing one petitioner's motion for preliminary injunction regarding conditions of confinement as an examples of a claim that should be barred); *see also* 151 *id.* at 12656–57 (daily ed. Nov. 10, 2005) (Sen. Graham) (noting that DTA was intended to limit detainees' right to "challenge their status"); 151 *id.* at S12659-60 (Sen. Kyl) (stating that DTA would grant detainees "substantial rights to contest their status but not the right to clog up Federal courts" with medical malpractice claims and complaints about food).

enacted"); *News America Pub., Inc.* v. *F.C.C.*, 844 F.2d 800, 802 (D.C. Cir. 1988) (presumption is in favor of severability).

Accordingly, pursuant to § 7 of the MCA, this Court has no jurisdiction to hear or consider the petitioners' challenges to aspects of their detention short of the lawfulness of their detention, including claims related to potential transfer of petitioner.

### B.  The Right to Seek a Writ of *Habeas Corpus* Recognized in *Boumediene* Does Not Encompass a Right to Ancillary Relief Concerning Transfer.

Section 2241(e)(1) still validly removes jurisdiction of issues ancillary to and beyond the core habeas function of challenging legality of detention and § 2241(e)(2) remains fully operative.  Consequently, there is no federal court jurisdiction over "any other action" concerning "any aspect" of petitioners' detention, transfer, treatment or confinement, including petitioners' claim for advance notice of any transfer, except insofar as such claims may be constitutionally protected under *Boumediene*'s interpretation of the Suspension Clause.  Therefore, under § 2241(e)(1) as applied to petitioners' claim for relief and under § 2241(e)(2), petitioners cannot state cognizable habeas claims unless their constitutional right to *habeas corpus* encompasses those claims.

The elimination of jurisdiction over petitioners' claims regarding notice of transfer, however, could not constitute a Suspension Clause violation because they do not go to the core of habeas – legality of detention – addressed by the Supreme Court in *Boumediene*.  A habeas action has historically been understood as a vehicle for challenging one thing only – the fact of detention or its duration.  Nothing else.  That is, the Great Writ concerns only relief that, if granted, will result in the petitioner's *release* from confinement, not with other ancillary issues.

- 13 -

Petitioners' claims here, seeking advance notice of transfer out of United States' custody, do not seek release from confinement and are not part of core habeas.  Indeed, as explained in detail *infra* § II.A., the Supreme Court determined unanimously in the *Munaf* case, decided the same day as *Boumediene*, that the type of relief sought by the petitioner in that case – shelter from release from United States' custody to the custody of another sovereign the petitioner found objectionable – was not appropriately awardable in habeas.  *See Munaf*, 128 S. Ct. at 2226-28.  Likewise here, petitioners' requests for relief aimed at challenging any future transfer of petitioners out of United States' custody are neither appropriate nor core habeas relief.  Jurisdiction is therefore lacking to consider petitioners' requests.

* * *

Accordingly, it is beyond the power of this Court to grant petitioners' requested injunction, and the Court need not even consider the traditional balancing test in denying petitioners' motions.  As explained below, however, that balancing test simply reinforces the conclusion that petitioners' motion must be denied.

## II. PETITIONER IS NOT ENTITLED TO THE REQUESTED INJUNCTION UNDER THE TRADITIONAL BALANCING TEST FOR SUCH RELIEF.

As the Supreme Court very recently reaffirmed, "a preliminary injunction is an 'extraordinary and drastic remedy,'" that "is never awarded as of right."  *Munaf*, 128 S. Ct. at 2219 (quoting 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE & PROCEDURE § 2948 at 129 (2d ed. 1995), and citing *Yakus v. United States*, 321 U. S. 414, 440 (1944)).  Such an injunction should not be granted unless the movant, by a clear showing, carries the burden of persuasion.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d

251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must

'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer

irreparable injury if the injunction is not granted, 3) that an injunction would not substantially

injure other interested parties, and 4) that the public interest would be furthered by the

injunction.'" *Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

Especially in light of the Supreme Court's recent unanimous statements in *Munaf*, petitioners

here cannot make these necessary showings, even if the Court otherwise had jurisdiction to issue

such relief (which it does not).

> ### A.    Petitioners Fail to Show Likelihood of Success with Respect to an Injunction Concerning Transfer.

A primary hurdle petitioners must overcome to obtain relief in this case related to any

transfer is that they must demonstrate that they are likely to succeed in preventing a transfer from

Guantanamo. As recently explained by a unanimous Supreme Court, the likelihood of success

showing is essential. Merely because a matter presents "serious, substantial, [or] difficult"

questions that give rise to "fair ground for litigation" is insufficient to support preliminary

injunctive relief. *See Munaf*, 128 S. Ct. at 2219.

Here, at bottom, each petitioner seeks to second-guess, in connection with his potential

future transfer, the Executive Branch determination that he is not likely to be tortured in the

country to which he would be transferred. That is the sole purpose in seeking advance notice of

any such transfer. Yet, the Supreme Court unanimously rejected such a role for the judiciary in

*Munaf*, concluding that "it is for the political branches, not the judiciary to assess practices in

foreign countries and to determine national policy in light of those assessments." *Id.* at 2225. Thus, even in the face of allegations presenting "serious concern" of potential torture, such "concern is to be addressed by the political branches, not the judiciary." *Id.* Where, as here, the United States Government has a policy of not transferring an individual to another country when the United States believes that it is more likely than not that the individual will be tortured, there is simply no role for judicial supervision of such transfers and, thus, no authority to require notice of such transfers.

Further, whatever the merits of petitioners' substantive claims that they are wrongfully detained, it is not the likelihood of success on *those* claims that matters for purposes of the instant motion for preliminary injunction. Rather, as two Judges of this Court (who previously reached opposite outcomes on the bottom line of whether to require advance notice of transfer) have agreed, the likelihood of success analysis must focus on the legal basis for petitioner to obtain an order preventing *termination* of detention by the United States in the manner described in the declarations submitted herewith. *See Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 194 (D.D.C. 2005) (Bates, J.) ("[T]he presence of a sound basis to challenge the legality of one's *detention* does not at all imply that there exists a sound basis to challenge the legality of one's *transfer*. Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their *transfer* from Guantanamo, not to their *detention* at Guantanamo) (emphasis in original); *Abdah v. Bush*, No. 04-CV-1254 (HHK), 2005 WL 711814, at *4 (D.D.C. Mar. 29, 2005) ("*if* there are no circumstances under which Petitioners could obtain a court order preventing a contemplated *transfer*, a preliminary injunction should not be granted") (second emphasis added). As explained below, petitioners

cannot demonstrate a likelihood of success with respect to relief related to any transfer.  No legal

basis exists for such relief whether under the MCA or under the Court's *habeas* jurisdiction in

the wake of *Boumediene* (including as explained *supra* § I), or otherwise.

> **1.    The Right to Seek a Writ of *Habeas Corpus* Recognized in *Boumediene* Does Not Encompass a Right to Relief Related to Transfer.**

Even if the Supreme Court had invalidated § 7 of the MCA in its entirety and all of its

applications (which it did not), the petitioners would not be entitled to their requested relief

related to transfer.  Relief setting conditions on a detainee's transfer out of United States' custody

cannot be properly awarded in the context of these habeas cases; such relief would violate the

Constitution's separation of powers.

An injunction such as petitioners seek, conditioning any transfer of a detainee out of

Guantanamo on advance notice of such transfer so that petitioners can attempt to delay or prevent

the transfer, would undermine the President's constitutional authority as Commander-in-Chief to

capture individuals in armed conflict, detain them as enemy combatants, and, upon determining

that they are no longer enemy combatants or that it is otherwise appropriate, to release them.  *See*

*Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion) ("The capture and detention of

lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal

agreement and practice,' are 'important incident[s] of war.'") (quoting *Ex parte Quirin*, 317 U.S.

1, 28 (1942)); Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)

(recognizing that President has "authority under the Constitution to take action to deter and

prevent acts of international terrorism against the United States," and authorizing him "to use all

necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided" the September 11 attacks).

In addition, separation of powers considerations are implicated in the requested relief in light of the United States' policy not to repatriate or transfer a detainee to a country when the United States believes that it is more likely than not that the individual will be tortured. *See supra* at 2-5; *see also Munaf*, 128 S. Ct. at 2226 (noting the Solicitor General's statement "that it is the policy of the United States *not* to transfer an individual in circumstances where torture is likely to result"). In implementing this policy the United States routinely engages in sensitive negotiations with other nations when deciding whether to transfer an enemy combatant detainee. Williamson Decl. ¶¶ 9-12. In this context, the requested advance notice requirement itself, as well as the prospect of judicial review implicit in that requirement, causes a separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. *See id.* ¶ 12; *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). The requested injunction would not only potentially hamper the Executive in timely execution of the foreign policy decision to make a transfer, but it unquestionably envisions the possibility that such a decision could not be implemented without judicial acquiescence or approval.

Although petitioners purport to merely seek notice of an impending transfer, it is undisputed that the sole reason they seek such notice is to enable them, after the Executive has decided to transfer the detainee, to seek an order blocking that transfer. The only reason they give for wanting to block such a transfer is their belief that it may be "to a place where [the

detainee] is likely to be tortured." *Dokhan*, No. 08-0987 (JDB), Motion at 13; *accord*

*Mohammed*, No. 05-1347 (GK), Motion at 2-4; *Mohammon* (Naji), No. 05-2386 (RBW), Motion

at 3-4; *Mohammon* (Ghaffar & Noori), No. 05-2386 (RBW) Motion at 10.   But, as noted above,

it is uncontested that the United States has a policy *not* to repatriate or transfer a detainee to a

country when the United States believes that it is more likely than not that the individual will be

tortured.  Thus, for this Court to grant ultimate relief from transfer, it must necessarily conclude

that the Executive may potentially err in its determination regarding the likelihood of torture by a

receiving government.  A unanimous Supreme Court recently held in *Munaf*, however, that it is

inappropriate to use injunctive relief in the habeas context as a means to second-guess such an

Executive determination.

> *Munaf* (decided the same day as *Boumediene*) involved a habeas petition in this Court

brought by a United States citizen to prevent his transfer from the custody of United States forces

part of the Multinational Force-Iraq ("MNF-I") to Iraqi custody.  After concluding that habeas

jurisdiction existed in the case, the Court nonetheless determined that there was no authority

constraining petitioner's release from MNF-I custody.  The Court emphasized that "[h]abeas is at

its core a remedy for unlawful detention. . . . The typical remedy is, of course, release." *Munaf*,

128 S. Ct. at 2221 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)); *see

also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he traditional function of the writ is to

secure release from illegal custody.") (cited in *Munaf*, 128 S. Ct. at 2221).  Accordingly, the

Court determined that the type of relief sought by the petitioner in that case – shelter from release

from United States' custody to the custody of another sovereign the petitioner found

objectionable – was not appropriate.  *See Munaf*, 128 S. Ct. at 2228 ("Habeas corpus does not

require the United States to shelter such fugitives from the criminal justice system of the

sovereign with authority to prosecute them.").    Further, in response to the complaint of the

petitioner in that case that his transfer might result in mistreatment at the hands of the Iraqi

government, the Court, after noting the United States' policy not transfer an individual to another

country when the United States believes that it is more likely than not that the individual will be

tortured, concluded:

> The Judiciary is not suited to second-guess such determinations –
> determinations that would require federal courts to pass judgment
> on foreign justice systems and undermine the Government's ability
> to speak with one voice in this area.  *See* The Federalist No. 42, p.
> 279 (J. Cooke ed. 1961) (J. Madison) ("If we are to be one nation
> in any respect, it clearly ought to be in respect to other nations").
> In contrast, the political branches are well situated to consider
> sensitive foreign policy issues, such as whether there is a serious
> prospect of torture at the hands of an ally, and what to do about it if
> there is.

*Munaf*, 128 S. Ct. at 2226; *accord id.* at 2225 ("Even with respect to claims that detainees would

be denied constitutional rights if transferred, we have recognized that it is for the political

branches, not the judiciary, to assess practices in foreign countries and to determine national

policy in light of those assessments.").[10]   Accordingly, the Court concluded that the injunction in

_____

[10] Not only is this type of judicial inquiry inappropriate under our constitutionally
separated powers, but, as a practical matter, such an inquiry, to the extent it involved disclosure
of diplomatic dialogue with a receiving country, could chill important sources of information and
interfere with the ability of the United States to interact effectively with foreign governments.
Williamson Decl. ¶¶ 9-12; Hodgkinson Decl. ¶ 8.  In particular, the foreign government in
question, as well as other governments, would likely be reluctant to communicate frankly with
the United States in the future concerning torture and mistreatment concerns.  Williamson Decl.
¶¶ 9-11.  This chilling effect would jeopardize the ability of the Executive to deal effectively with
other nations in this area.  *Id.* ¶¶ 9-12; Hodgkinson Decl. ¶ 8.

that case, which interfered with the ability of the forces detaining petitioner to release him to

another sovereign, was improper.[11]

Petitioners essentially assert that they are likely to prevail on the merits with respect to

the requested relief because this Court has jurisdiction. *See Dokhan*, No. 08-0987 (JDB), Motion

at 12; *accord Mohammed*, No. 05-1347 (GK), Motion at 5-6; *Mohammon* (Naji), No. 05-2386

---

[11] The Supreme Court's conclusion in *Munaf* is fully consistent with the District of Columbia Circuit's longstanding prohibition against judicial interference with the Executive's foreign policy decisions. *See, e.g., Joo v. Japan*, 413 F.3d 45, 52-53 (D.C. Cir. 2005) (adjudication that "'would undo'" Executive's judgment in foreign policy "would be imprudent to a degree beyond our power"); *Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) ("pass[ing] judgment on the policy-based decision of the executive" in foreign policy "is not the stuff of adjudication"); *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.") (citing *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)); *see also Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959)).

Similarly, the Supreme Court's conclusion in *Munaf* is consistent with the Rule of Non-Inquiry developed in the extradition context, under which courts have eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (quoting *Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983)); *accord Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) ("The interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced. . . . It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."); *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch") (internal quotation marks omitted). *See also Al-Anazi*, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference").

(RBW), Motion at 5; *Mohammon* (Ghaffar & Noori), No. 05-2386 (RBW) Motion at 10.  This is

almost precisely the contention rejected in *Munaf*, however.  Indeed, jurisdiction is distinct from

the merits, and, therefore, that this Court may have habeas jurisdiction says nothing whatsoever

about petitioners' likelihood of success on the merits of their claim.  The key point here is that

the existence of habeas jurisdiction, by itself, is clearly not an appropriate legal rationale for an

order forbidding, except on conditions, the transfer or repatriation of an individual detained at

Guantanamo, because relinquishment from United States custody (which occurs in every such

transfer or repatriation) represents the full extent of relief that petitioners could obtain from a

habeas petition.  *See Munaf*, 128 S. Ct. at 2221; *see also Al-Anazi*, 370 F. Supp. 2d at 198

("Every habeas petition, including this one, is ultimately about obtaining release from detention .

. . and where, as here, the United States will relinquish custody of the detainee to the home

government there is nothing more the Court could provide to petitioners.") (citation omitted).[12]

Indeed, it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas

petitions, and ultimately determine that the United States may no longer detain the petitioners,

---

[12] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  *Al-Marri v. Bush*, No. 04-CV-2035 (GK), 2005 WL 774843, at *3 n.8 (D.D.C. Apr. 4, 2005).  Whatever petitioners may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  Indeed, the Supreme Court rejected a similar argument in *Munaf*.  128 S. Ct. at 2223 ("[H]abeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign . . . .").  The courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.  *Munaf*, 128 S. Ct. at 2211, 2220 (barring interference with foreign sovereign's exclusive jurisdiction to "'punish offenses against its laws committed within its borders") (quoting *Wilson v. Girard*, 354 U.S. 524, 529 (1957)).

the parties and the Court would find themselves in precisely the same position in which they find

themselves now – with the respondents taking steps to transfer those individuals out of United

States control, and the petitioners compelled to come forward with some legal or evidentiary

basis to prevent transfer to an 'undesirable' country."  *Al-Anazi*, 370 F. Supp. 2d at 196.

Accordingly, this Court cannot grant the requested injunction without transgressing

constitutional separation of powers, including by laying the groundwork to engage in an inquiry

that the Supreme Court has clearly held belongs to the political branches and not the judiciary.

For this reason, it is beyond the power of this Court to grant the requested injunction, and

petitioners have no likelihood of success on their claim for such relief.

> **2.      The Other Legal Bases Offered by Petitioners to Support Injunctive Relief Does No Support Such Relief.**

Petitioners' primary source of legal authority for their alleged ability to challenge the

location to which they may be transferred is the Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment ("CAT"),[13] which prohibits the return of an

individual to country that may torture them.  The CAT is implemented in the United States by the

Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), Pub. L. No. 105-277,

---

[13] Some petitioners also briefly mention Common Article 3 of the Geneva Conventions and the International Covenant on Civil and Political Rights ("ICCPR") as purported legal bases for an order requiring advance notice of a transfer.  *See Mohammed*, No. 05-1347 (GK), Motion at 5-6; *Mohammon* (Naji), No. 05-2386 (RBW), Motion at 5-6.  Those treaties, however, do not give rise to privately enforceable rights and cannot serve as a legal basis for petitioners' requested relief.  *See Sosa  v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004) (ICCPR does not "itself create obligations enforceable in the federal courts"); MCA § 5(a) (codified at 28 U.S.C. § 2241 (note)) (no person may invoke the Geneva Conventions as "a source of rights" in any civil court proceeding to which "the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party").  *See also Medellin v. Texas*, ___ U.S. ___, 128 S. Ct. 1346, 1357 & n.3 (2008) (noting presumption that treaties do not provide private parties with judicially enforceable rights).

§ 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), and one detainee, Mr. Dokhan, has

invoked that statute. *See Dokhan v. Bush*, No. 08-0987 (JDB), Motion at 7-10; *id.* at 12

(asserting as the sole legal basis for challenging transfer "FARRA and the basic international

legal norms embodied in the Convention Against Torture"). This basis for relief must be rejected

for two reasons. First, no FARR Act claim can be considered at this stage because the petitions

do not invoke that statute. *See Munaf*, 128 S. Ct. at 2226.[14] Second, even if the petitions had

raised claims under the FARR Act, that statute does not provide jurisdiction to adjudicate such

claims. The FARR Act expressly provides that "nothing in this section shall be construed as

providing any court jurisdiction to consider or review claims raised under the Convention

[Against Torture] or this section, or any other determination made with respect to the application

of the policy set forth in subsection (a) [prohibiting the return of persons when there are

substantial grounds for believing they will be tortured], except as part of the review of a final

order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C.

§ 1252)." *See* FARR Act § 2242(d). This case does not involve a final order of removal under

§ 242 of the Immigration and Nationality Act, however, and neither the FARR Act nor the

regulations thereunder (8 C.F.R. §§ 1208.16-1208.18) create jurisdiction to review any CAT

claims in the circumstances presented here. *See Mironescu v. Costner*, 480 F.3d 664, 672 (4th

Cir. 2007), *cert. dismissed*, 128 S. Ct. 976 (2008); *Al-Anazi*, 370 F. Supp. 2d at 194; *see also*

---

[14] The petitions invoke the Due Process Clause, but the Supreme Court has made clear
that this Clause does not provide a free-ranging protection from allegedly unlawful transfer
whenever the government seizes someone, even when, as is not the case here, the person seized
is a citizen of the United States. *See Munaf*, 128 S. Ct. at 2222.

- 24 -

*Munaf*, 128 S. Ct. at 2226 n.6 (dictum); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition).

* * *

Thus, there is no basis in law for an injunction requiring that petitioners' counsel and this Court be given advance notice of any upcoming transfer or release. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of transfer in general (and the likelihood of torture in particular) for that of the appropriate Executive Branch officials.

**B.    Petitioners' Request for Relief Must Be Denied Because Petitioners Fail to <u>Show Irreparable Injury.</u>**

Petitioners' request for relief must also fail because petitioners cannot demonstrate the irreparable injury necessary to obtain such relief. Petitioners here allege two types of harm to the detainee: (1) the possibility of torture by authorities in the country to which they may be transferred and (2) the "circumvent[ion of the detainee's] . . . right to adjudicate the legality of his detention and his status as an 'enemy combatant.'" *Dokhan*, No. 08-0987 (JDB), Motion at 11; *accord Mohammed*, No. 05-1347 (GK), Motion at 5-6; *Mohammon* (Naji), No. 05-2386 (RBW), Motion at 5; *Mohammon* (Ghaffar & Noori), No. 05-2386 (RBW) Motion at 10. Neither alleged potential harm justifies granting the requested injunction.

- 25 -

      **1.**      **Irreparable Harm Cannot Be Shown in Light of Undisputed Government Policies and Practices.**

In order to satisfy the irreparable harm prong of the preliminary injunction test, a petitioner must demonstrate irreparable injury that is "'certain and great; it must be actual and not theoretical.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted; emphasis in original). This "high standard," *id.*, is plainly not met by petitioners' speculation that they may suffer harm in various countries they believe they may be transferred to by the United States. As the Supreme Court has recently made clear, generalized allegations of the potential for mistreatment, in the face of United States' policy not to transfer an individual where the Government believes it is more likely than not the individual would be tortured, are wholly insufficient. *See Munaf*, 128 S. Ct. at 2226 ("Petitioners here allege only *the possibility* of mistreatment in a prison facility [of the transferee government].") (emphasis added). Indeed, the Court noted approvingly in *Munaf* that the United States, despite having concerns regarding "some sectors of the Iraqi government," had concluded that the specific department of the Iraqi government to which transfer would be made and the specific facilities in which petitioner would be held by that department were not likely to result in the petitioner being tortured. *Id.*

The Supreme Court's discussion in *Munaf* is relevant not only to show that petitioners' general claims with respect to torture are insufficient, but also to show that such claims cannot overcome the Executive Branch's representations regarding the steps its takes to ensure against torture by any transferee governments. Here, as in *Munaf*, the record clearly demonstrates that it is United States' policy not to repatriate or transfer a detainee to a country when the United States believes that it is more likely than not that the individual will be tortured. *See supra* at 2-5; *see Munaf*, 128 S. Ct. at 2226 (noting the Solicitor General's statement "that it is the policy of the United States *not* to transfer and individual in circumstances where torture is likely to result"). This policy is implemented by expert Executive agencies through a process that contains several levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary would require the Court to assume, without evidence, that the United States' policy and practice regarding transfers is meaningless and that the detainee may likely be tortured in the foreign country to which he is ultimately sent; any such conclusion would necessarily require a finding that the United States may potentially err in its determination regarding the likelihood of torture by a receiving government. But, as noted above, it is inappropriate for the judiciary to "second-guess such determinations." *Id.*; *accord id.* at 2225 ("Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments."). In the face of the undisputed governmental policy regarding transfers, petitioners' general claims of potential mistreatment in connection with a future transfer do not meet the "high standard" of irreparable harm necessary to obtain an injunction.

## 2.     The Fact that a Transfer Would Moot the Petitions Does Not Constitute Irreparable Harm.

Petitioners also argue that a preliminary injunction requiring advance notice is necessary in order to "'protect'" the Court's jurisdiction, reasoning that a transfer would "circumvent [the detainee's] right to adjudicate the legality of his detention." *See Dokhan*, No. 08-0987 (JDB), Motion at 11; *accord Mohammed*, No. 05-1347 (GK), Motion at 5-6; *Mohammon* (Naji), No. 05-2386 (RBW), Motion at 5; *Mohammon* (Ghaffar & Noori), No. 05-2386 (RBW) Motion at 10. Again, this argument is foreclosed by the Supreme Court's recent opinion in *Munaf*. The Court held that the district court had jurisdiction over Munaf's habeas corpus petition, *Munaf*, 128 S. Ct. at 2218, and it was clear that a transfer effectively would have mooted that petition. Nonetheless, the Court concluded that the district court erred in entering an injunction. *Id.* at 2220.[15] Given *Munaf*, the mere preservation of jurisdiction over a habeas petition cannot provide a basis for enjoining the release of a person from United States custody and transfer to another country and, thus, for requiring notice of such release.

Indeed, such a preservation of jurisdiction argument in face of release from United States custody would make no sense, because "habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release." *Munaf*, 128 S. Ct. at 2221 (citations omitted); *accord id.* at 2223 (referring to release as "the quintessential habeas

---

[15]  At any rate, any argument that petitioners are motivated by a desire to preserve the Court's jurisdiction for its own sake is completely undermined by other statements by petitioners that they, for example, do not oppose transfer generally, but only "to a place where [the detainee] is likely to be tortured." *Dokhan*, No. 08-0987 (JDB), Motion at 13; *see also Mohammon* (Ghaffar & Noori), No. 05-2386 (RBW) Motion at 10 ("While Petitioners, of course, do not wish to hinder any effort to free them from an indefinite imprisonment, they are concerned that they will be removed to a country where they may be tortured or persecuted.").

remedy"). Where "the last thing petitioners want is simple release" to another country, *id*. at

2221, (and thus they seek notice so as to be able to challenge any release), their challenge is not

cognizable in habeas. Any right to challenge the legality of one's detention through a habeas

proceeding cannot reasonably extend so far as to require that detention be continued, after the

Executive determines that the military rationales for enemy combatant detention no longer

warrant such custody, for no reason other than to be able to test the legitimacy of detention the

Executive no longer is interested in maintaining. As one Judge of this Court stated, "Every

habeas petition, including this one, is ultimately about obtaining release from detention, and

where, as here, the United States will relinquish custody of the detainee to the home government

there is nothing more the Court could provide to petitioners." *Al-Anazi*, 370 F. Supp. 2d at 198

(citation omitted).

That release from United States custody will give petitioners all the relief they can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

States, former detainees may be taken into custody and detained in the receiving country based

on that country's independent interests and determinations. As respondents' declarations make

clear, when the Department of Defense transfers Guantanamo detainees to the control of other

governments, the detainees are no longer subject to the custody or control of the United States,

and any subsequent confinement in the receiving country is based on the receiving government's

independent decision, based on its domestic laws, that the individual should be detained.

Hodgkinson Decl. ¶ 5. Indeed, even if the United States transfers a detainee to his home

government with the understanding that, from the United States' perspective, he can be released,

the home government may well subsequently take any law enforcement or investigatory action

against the former detainee that it may deem appropriate under its laws.  This is as it should be,

given the "exclusive and absolute" jurisdiction of a nation within its own territory.  *Schooner*

*Exchange v. McFaddon*, 7 U.S. (Cranch) 116, 136 (1812).  Habeas is not a means through which

detainees may "requir[e] the United States to shelter them from [a] sovereign government

seeking to have them answer for alleged crimes committed within that sovereign's borders."

*Munaf*, 128 S. Ct. at 2221; *see id.* at 2228.  For this reason, "'[h]abeas corpus has been held not

to be a valid means of inquiry into the treatment the relator is anticipated to receive in the

requesting state.'"  *Id.* at 2225 (quoting M. Bassiouni, INTERNATIONAL EXTRADITION: UNITED

STATES LAW AND PRACTICE 921 (2007)); *see supra* § II.A.  The Court, therefore, should reject

petitioners' suggestion that the possibility of future detention another country based on that

country's independent interests and determinations constitutes potential irreparable injury

warranting an injunction in this *habeas corpus* action.

> **C.    The Requested Injunction Would Substantially Injure Other Interested Parties by Trampling on the Separation of Powers and Harming the Foreign Policy Interests of the United States.**

An injunction requiring advance notice of a transfer from Guantanamo foreshadows

judicial review of and intervention in decisions regarding the release and transfer of detainees.

As explained *supra*, such judicial intervention not only curbs the political branches' discretionary

authority in determining when to release individuals who have been detained as enemy

combatants, but also impairs the Government's ability to speak with one voice on behalf of the

Nation in discussing release or transfers with foreign nations.  As *Munaf* held, "[t]he Judiciary is

not suited to second-guess such determinations – determinations that would require federal courts

to pass judgment on foreign judicial systems and undermine the Government's ability to speak

with one voice in this area."  128 S. Ct. at 2226; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments").  Even if such judicial review did not ultimately result in an injunction against release or transfer, inquiry into the United States' dialogue with foreign nations and into the terms of a release or transfer, and any assurances that may have been obtained, would cause serious harm.  *See* Williamson Decl. ¶¶ 9-11.  Further, such an advance notice requirement would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding transfers inherently contingent upon the effective acquiescence of the Judiciary.  Such a requirement at best would delay, and at worst could prevent, the transfer of aliens held by the Executive in connection with ongoing armed conflict.  These harms weigh heavily against entry of a preliminary injunction.

> **D.      An Injunction Would Disserve the Public Interest**.

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants during hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.  As a general matter, the public interest requires that courts be "'reluctant to intrude upon the authority of the Executive in military and national security affairs.'"  *Munaf*, 128 S. Ct. at 2218 (quoting *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988)).  As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these

detainees.  *See People's Mojahedin Org.*, 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

*Al-Anazi*, 370 F. Supp. 2d at 199.  *See also Munaf*, 128 S. Ct. at 2225 ("Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.").  Here, as well, the public interest disfavors an injunction interfering with the transfer of detainees by making such transfers subject to conditions.

## **CONCLUSION**

For the foregoing reasons, respondents respectfully request that petitioners' motion for preliminary injunction be denied.

Dated: July 9, 2008                     Respectfully submitted,

                                        GREGORY G. KATSAS
                                        Assistant Attorney General

                                        JOHN C. O'QUINN
                                        Deputy Assistant Attorney General


                                        [*signature block continued on next page*]

_/s/ Terry M. Henry_
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR
TERRY M. HENRY
ANDREW I. WARDEN
PAUL E. AHERN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107

Attorneys for Respondents