FILED WITH THE
COURT SECURITY OFFICER
CSO: CHOGARTY
DATE: 1-22-07

[No Oral Argument Set]

# UNITED STATES COURT OF APPEALS
# DISTRICT OF COLUMBIA CIRCUIT

HUZAIFA PARHAT, *et al.*,

    Petitioners/Plaintiffs,

v.

ROBERT M. GATES,

    Respondent/Defendant.

Case No. 06-1397

## JANUARY 20, 2007 DECLARATION OF SABIN WILLETT

Pursuant to 28 U.S.C. § 1746, I declare that the following is true and correct:

1. My name is Sabin Willett.

2. I am a partner of Bingham McCutchen LLP, counsel to the Petitioners in this case.

3. On January 14, 2007, I traveled to Guantanamo Bay. In meetings that took place from January 15-18, I learned from our clients facts that bear urgently on the merits of the Petitioners' pending motion to expedite and the Respondents' pending cross-motion for a stay.

4. In light of the circumstances of our clients' imprisonment, it was impossible for counsel to learn of these facts prior to the base visit, and, as this

-1-

declaration will show, the core facts took place after the filing of the petition in this matter.

5. In light of the base rules relative to attorney meetings and the virtual impossibility and extreme time delays inherent in mail communication, it was infeasible to draw up declarations for the clients to execute. In any event, after five years of confinement under cruel conditions, and many false assurances of imminent release, our clients exhibit signs of paranoia and mistrust of all Americans, and decline to sign any writing. Accordingly, I make this declaration on the basis of their statements made to me during out meetings.

6. On January 15, 2007, I met with petitioner Abdusemet.

7. On January 16, 2007, I met with petitioner Khalid.

8. On January 17, 2007, I met with our client Abdulnasser, a Uighur prisoner who shortly will file a petition under the Detainee Treatment Act and seek to consolidate the same with the *Parhat* petition. Abdulnasser was a habeas petitioner before Judge Urbina in 2005. He is one of the thirteen Uighurs now held at Guantanamo Bay whose circumstances, as far as the record shows, are in all material respects identical with those of each other and the five Uighur men who previously have been declared by the military to be noncombatants.

9. On January 18, 2007, I met with the petitioner Sab'r Osman.

-2-

10. Pursuant to the protective order in place in Petitioners' underlying *habeas* case, all conversations with Petitioners must be regarded as classified until and unless unclassified by the Privilege Review Team. Accordingly, I am preparing this declaration in the Secure Facility and will file it under seal.

11. Pursuant to the protective order, my notes of each client meeting were collected by our base escort, and are not available to me as I prepare this declaration in the secure facility. I was permitted to review all of the notes in Guantanamo on January 18, 2007, and make this declaration on the morning of January 20, 2007 on the basis of my best memory.

*Transfer to Camp 6*

12. Each of our clients advised us that he had been moved into Camp 6 in December, 2006. Two advised that they believed they were moved in approximately mid-December. Two thought they had been moved in late December.

13. Our firm had no notice of these transfers until our meetings from Respondents.

*Conditions at Camp 6*

14. I was admitted to Camp 6 for client visits, in small interrogation rooms, on January 17 (Abdulnasser) and January 18 (Sab'r). Camp 6 is an

imposing concrete structure, with no windows visible in the main façade. It is surrounded by multiple fences and cleared areas, and checkpoints guarded by MPs.

15. Each client described, in substantially similar terms, the new regimen of his life in Camp 6. Each client is housed alone in a cell. The cell walls, ceiling, and floor are solid metal. Each cell contains a bed, toilet, sink, and metal mirror. No cell admits any natural light or air. There are no windows or openings in the walls, floor, or ceiling, except strips of glass approximately four inches wide by twenty-four inches high in and adjacent to the metal door of the cell. The glass gives a view of an interior corridor where MPs are stationed, and of a clock.

16. Khalid described a metal panel in the door that may be opened by guards in order to shackle the prisoner, hand in a meal, or receive trash. The rooms are illuminated by bright fluorescent lights that come on and off outside the prisoner's control. All ventilation comes through an HVAC system that the clients described as both loud and cold. (After years in Guantanamo, our clients appear to be comfortable in a warmer ambient temperature than am I. During Abdusemet's meeting, which occurred outside Camp 6, he requested that the air conditioner be turned down, and appeared to be comfortable in a temperature I found uncomfortably warm. He advised they he has no control over the temperature I Camp 6).

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

17. Except as described below, the clients advised that they are never permitted to leave the cell. Inside the cell, the HVAC system, and the banging of doors in the facility resounding through the cell door, create a noisy and stressful environment. Each client advised that, when in the cell, he is unable to communicate with any adjoining cell through the walls. Petitioners advised that there is a small gap between the door and floor. By crouching at the door and yelling, they are able to communicate basic messages, such as "Are you all right?" but it is impossible to converse. Abdusemet, Khalid and Abdulnasser all said that they have great difficulty sleeping, and are frequently awakened by banging or shouts of MPs.

18. Inside the cell, the clients have no access to any reading material except the Koran. Once a week, an MP arrives with the "library" books, but there are few books in Uighur. Sab'r advised that they are the same books the Petitioners read more than four years ago. They have no access to magazines or newspapers. They have, of course, no television, radio, telephone or way to communicate with the outside world. They have no family visits. All meals are consumed alone, inside the cell. All prayer occurs alone, inside the cell. The prisoners are constantly watched by MPs, as they sleep, as they eat, as they defecate. Neither in the cell nor in rec time do the prisoners ever see another living thing, except MPs and the other five men in the "pod," that is, the area where the

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

cell is located. Except for being held by gloved-MPs during transfers, they never touch another living thing. They never see, smell, or touch plants, soil, the sea, or any creature except insects.

19. Once in each twenty-four hour period, MPs advise the prisoner that it is "rec time," and he may come to "rec" for a two-hour period. Two clients advised that, on alternate days, this will occur during the night. Two advised that daytime rec occurs only once in *three* days. All said that the invitation to night-time rec frequently is made after 11 p.m., when the prisoner is asleep, and has been made as late as 2 a.m, according to Abdusemet and Khalid. All four petitioners advised that they typically decline rec when the opportunity is afforded at the late hour.

20. Our base escorts granted my request to speak with a senior officer within the Staff JAG at JTF GTMO. The officer confirmed the day/night regimen, advising that it was a function of the number of prisoners in Camp 6 and the available rec space.

21. Participating in rec involves the following process. The prisoner stands inside the cell door. An MP opens the hatch, reaches in and shackles hands and feet. The door is opened, and the prisoner is then led by two MPs through a series of metal doors that are remotely and electronically locked. The prisoner is held by the upper arm by MPs who wear rubber gloves. The space is close and

confined. As he is being led the prisoner is sometimes able to see into the doors of the five other cells in his pod, and see who is in the cell. Each of the men I met said that the transfer process can take as little as five minutes, or as much as twenty, depending whether the MPs at the various security doors are able to reach someone in the control room by radio. (I was led through doors of this kind during the two days in which I was permitted to meet clients in interrogation rooms within Camp 6. There was considerable confusion about door security, and we and our escorts on several occasions were "stranded" waiting for doors to lock or unlock). The prisoner is then led into the rec area, where he is unshackled and left for two hours. Following "rec," the prisoner is re-shackled and led back to his cell. On the way back to his cell, he is permitted to shower. Once a week, he exchanges his clothing after showering for clean clothing. Our clients advised that during the invitation to evening rec, frequently they are pressured by MPs simply to take the shower and avoid the hassle of the transfers, and frequently they agree.

22. I requested permission from MPs to view the rec area, but permission was denied. The rec area was described by the Petitioners as a rectangular area, approximately 15 meters by four meters, floored with concrete, and surrounded on all sides by concrete walls two stories or more in height. On top of the space are two levels of fencing or barbed-wire material. The rec area in turn is divided by chain link fence into five sub-areas of approximately three by four meters. Each

-7-

prisoner is released into one of the five sub-areas and unshackled. Several Petitioners said that the sub-areas contains a soccer ball. The Petitioner may kick the ball alone. He spends rec time alone. He may, however, converse with the prisoners in the other four sub-areas. One of our clients (I believe it was Khalid) advised that it is an offense to reach through the fence to touch one's neighbor. Sab'r advised that he was offered a board game by MPs during rec. When he asked how we could play the game with an opponent through the fence, the MP did not respond.

23. On days with daytime "rec time," the clients said they spend 22 hours alone in their cell. When rec time is at night, they typically spend twenty-four hours alone in the cell.

24. Rec time affords the Petitioner his only exposure to the outside air. When rec occurs during the day, it affords the Petitioner his only exposure to natural light. However, the height of the walls and the timing of rec makes exposure to direct sunlight infrequent. Abdulsemet said he had only seen the sun four or five times since mid-December. Sab'r said he had only seen the sun two or three times. (This was my seventh visit to Guantanamo. Even in January, bright sunlight has been the norm on each of my visits). Each petitioner expressed an urgent desire for sunlight and fresh air.

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

25. Abdusemet described his day as follows. Alone, he rises at about five-thirty to wash (in the sink) and pray, then returns to his bed. Breakfast arrives through the hatch at about 7. He eats alone, then returns the trash through the hatch to the MPs. Sometimes he kneels and places his mouth to the small gap between door and floor and tries to shout a greeting. Then he sits on his bed for four to six hours. He tries to read the Koran. At mid-day he washes and prays. He sits on the bed, waiting for lunch, which arrives at about one. He eats and returns the trash through the hatch. Then he sits on his bed for the afternoon, or paces. He converses with no one. He tries to read the Koran. He prays. Sometimes he hears voices in his head. When dinner arrives, he eats the dinner and returns the trash through the hatch. Then he sits on the bunk, or paces until the evening prayer. He prays. He tries to sleep. He may hear the voices. He hears the banging of doors and the rumble of the HVAC. In the middle of the night, an MP raps on the door, asking if he wants "rec time." He says, "Just the shower." Half asleep, he stands at the door and is shackled. He is led to the shower area. On the way he peers into the doors on the pod, but at night the lights are off. He showers, and then is led back to the cell. He stands at the door while he is unshackled through the hatch. He returns to bed.

26. The next day, he repeats this, except that rec time occurs during the afternoon, and he participates in it.

-9-

*Former Conditions of Confinement*

27. Each Petitioner and Abdulnasser stated that he was advised by U.S. interrogators, in the spring of 2003, that his interrogation was complete, that he was "innocent," and that he was on the "doorstep," or "gateway" to leaving. At that time, each was transferred to Camp 4. In Camp 4, the Uighurs lived communally in bunk houses surrounded by a fence. Within this small penned area, they could freely go in or out doors at any time during the day or night. They were not shackled. They ate communally at an outdoor picnic table under a tent or roof-cover. They were permitted rec time in a far larger space, and men were permitted to play soccer with each other during rec. There was no restriction on their conversation together.

28. For reasons that remain unclear to me, many of the Uighurs were later dispersed to other camps, including Camps 1, 2, and 3. Abdusemet advised that one such move was made because one of the Uighurs, who had lost a leg and did not have a prosthesis, was moved to one of the camps where, in his small caged cell, he could get himself to the toilet. Various clients have advised me that, out of solidarity, other Uighurs went with him. I am not aware of the reasons for the other transfers.

29. Conditions in Camps 1, 2 and 3 were described by clients as far more restrictive than in Camp 4. Clients were confined to cages within cell blocks.

-10-

However, the cage construction permitted them to see, speak to, hear, pray with, and console each other throughout the day and night. They were never alone, except in cases where they were disciplined for perceived infractions of camp rules. The construction of the camps and the timing of rec gave them far more access to sunlight and air, they said.

*Impact on Clients of Camp 6.*

30. The January 15 meeting was my third meeting with Abdusemet. In previous meetings, he had struck me as a kindly man, quite gentle, pleasant in affect, calm, and prone to smile and laugh. On January 15 he appeared extremely anxious. His foot tapped the floor uncontrollably. His affect was deeply sad. He refused offers of the food we had brought. He appeared to be in despair.

31. He said Camp 6 was "the dungeon above the ground." He said that when they led him into Camp 6, he recalled a movie he had once seen about a Nazi concentration camp, "a place where, when they take you in, you never come out."

32. As to who was present in Camp 6, he knew the identities only of the other five men in his pod, who did not include Khalid or Sab'r. These were the only prisoners he had seen since his arrival. When I met Khalid the next day, he too, said he was aware only of the presence of the other men in his pod. He said he did not know that Abdusemet was in Camp 6. Various of our four interviews, we

-11-

were advised that the Petitioners Hammad, Huzaifa, Jalalladin, and Abdusabour were also in Camp 6.

33. Abdusemet asked us to communicate a message from one of the other Uighurs on his pod to his wife: "Tell her to remarry. She should consider me dead."

34. Abdusemet asked me, "What did we do? Why do they hate us so much?"

35. Khalid said he was deeply lonely. He said he had never experienced such isolation. He said nothing at Guantanamo or Kandahar had ever been this bad.

36. Abdulnasser said he felt as though he were living underground, "in tunnels." He said he knew the building was above ground, but that it felt underground. He said our visit was "a single ray of light in a place of darkness."

37. Khalid and Sab'r advised that Petitioner Hammad was on their pod and had been on a hunger strike to protest the isolation of Camp 6. On January 18, Sab'r said that the hunger strike had been "eight or nine days," and that when he saw Hammad (while Sab'r was being led to rec time), Hammad looked very thin and weak. He said he that one of the men had said in rec time that Hammad had been visited to be "given a shot."

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

38. I did not meet Hammad. While traveling on Friday, I was advised by my colleagues that they had met Hammad. In light of the provisions of the protective order, they were not able to communicate more than that.

39. Abdusemet, Khalid and Abdulnasser said they had been visited by a "doctor," to ask, whether they were mentally stable. Following these visits, according to Abdulnasser (who understands some English), MPs taunted him with statements like, "Are you going crazy yet?"

40. During our visit, I witnessed one MP taunt Abdulnasser, as we were being escorted away for lunch break. "I've got my eyes on you," he said. "Don't you start partying!"

41. Abdusemet advised that one of the other Uighurs on his block was "hearing voices," and had been shouting out indiscriminately. Abdusemet said the man had been punished by being required to wear the orange jumpsuit.

42. Abdusemet said, "I am starting to hear voices, sometimes. There is no one to talk to all day in my cell and I hear these voices."

*Situation Regarding ARBs*

43. We asked each of our clients about the Annual Review Board process. We asked whether they had been invited to participate, had participated, or had received a notice regarding results. Abdusemet and Khalid advised that they had never received notice of any annual review board, nor any invitation to participate

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

in one, nor had participated in one, nor received its results. Sab'r said that he was aware of some of the Uighurs who had been "invited out," but had declined to attend.

44. Abdulnasser advised that he had been invited to participate in an ARB while he was in Camp 1 (he said he was held there from mid-2005 through mid-2006). He said he declined because he knew the translation was poor. He said that he received a notice about one week later. The notice was in English. There was no Uighur translation. I have observed that Abdulnasser reads some English. He said that the notice said that it had been determined that he was not a threat to the United States. He kept the notice until mid-summer, 2006, when, following the suicides on the base, all of his papers were removed by MPs. Abdulnasser said that his best memory was that he had he received the notice in approximately October, 2005.

45. Counsel have never been advised by Respondents of this result, nor received any record of any ARB proceeding with respect to any of the Petitioners.

46. I have studied all available CSRT records concerning Abdulnasser and the Petitioners. There is no substantial difference in the records as to their pre-Guantanamo activities.

*Statements Regarding Iraq*

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

47.  Khalid said that after the Chinese interrogated him in 2002, he was very angry with the American interrogators, because previously they had assured him that his family details, which he had freely shared with them, would never be shared with China. The Chinese had then had his interrogation file when they interrogated him.

48.  Khalid said the U.S. interrogators appeared upset that the episode had taken place. He said they explained that, "We need them to support us in attacking Iraq, and in exchange we had to give them your pictures."

49.  Abdusemet described a similar encounter with U.S. interrogators after the Chinese visited him in September, 2002. He said he advised the interrogator that he felt betrayed and no longer wished to speak to the Americans. He said that the interrogator apologized to him, and explained that the order that the Chinese be permitted to the base "was not his fault," that it "came from very high in Washington." Abdusemet said it was explained to him that there were "five very powerful countries in the United Nations," that "China was one of them," and that they "had to do this" so that "China was support America in invading Iraq."

50.  Sab'r said that interrogators explained to him that "it was necessary to have the big countries support in the invasion of Iraq and China was one of them."

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762

I declare this 20th day of January, 2007, under penalty of perjury that the foregoing is true and correct.

_____
Sabin Willett

DCDOCS/674673.1
LITDOCS/668022.1/0999997-0000928762