UNCLASSIFIED//FOR PUBLIC RELEASE



FILED WITH THE
COURT SECURITY OFFICER
CSO: _A Strgm x_
DATE: _7/2/01_

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TOFIQ NASSER AWAD AL BIHANI, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-2386 |
| ) | |
| BARACK H. OBAMA, ) | |
| President of the United States, et al., ) | |
| ) | |
| Respondents. ) | |

### MEMORANDUM OPINION

On July 22, 2009, the Court heard oral argument on the merits of the evidentiary

objections filed by Tofiq Nasser Awad Al Bihani (ISN 893) with respect to the sources of

evidence cited by the government in support of its proposed findings of fact regarding the

petitioner.[1] After considering the parties' written submissions and oral arguments,[2] the Court

concluded that it had to defer its consideration of the petitioner's objections to the introduction

into evidence of certain intelligence and interrogation reports cited by the government, overrule

---

[1] In addition to the President, who is named as a respondent in his official capacity, the petitioner names various government officials as additional respondents in his habeas corpus petition. A motion is currently pending before Judge Thomas F. Hogan of this Court to clarify whether the Secretary of Defense is the only proper respondent in this case. Because Judge Hogan has not yet resolved that motion, and for ease of reference, the Court refers to the respondents collectively as the "government" for purposes of this memorandum opinion.

[2] In addition to the oral representations made by the parties at the hearing held on July 22, the Court considered the following documents in reaching its oral rulings issued that same date and in reaching its written decision today: (1) the Statement of Material Facts Not in Dispute filed by the government (the "Gov't's Facts"), (2) the Respondents' Motion and Memorandum to Admit Hearsay Evidence (the "Gov't's Mem."), (3) the Petitioner's Opposition to Admissibility of Evidence Contained in Respondent[s'] Proposed Factual Findings in the Matter of [Tofiq] Al-Bihani (ISN 893), (4) the Brief in Support of Petitioner's Opposition to Admissibility of Evidence Contained in Respondent[s'] Proposed Factual Findings in the Matter of [Tofiq] Al-Bihani (ISN 893) (the "Pet'r's Mem."), (5) the Respondents' Reply to Petitioner's Evidentiary Objections (the "Gov't's Reply"), and (6) Petitioner Al-Bihani's (ISN 893) Sur[-]reply to Respondents['] Reply to Petitioner's Evidentiary Objections (the "Pet'r's Sur-reply").



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

████████████████

the petitioner's objections to the use of any statements made by certain detainees regarding the

petitioner, and sustain the petitioner's objection to the introduction into evidence of a translation

of a letter written by the petitioner during the course of his captivity at the Guantanamo Bay

Naval Base in Guantánamo Bay, Cuba.  The Court issued oral rulings to that effect at the close of

the hearing.  Having reflected on those rulings over the preceding weeks, and in light of the

memorandum opinion subsequently issued by the Court styled <u>Bostan v. Obama</u>, Civil Action

Nos. 05-883 (RBW), 05-2386 (RBW), 2009 WL 2516296, ___ F. Supp. 2d ___ (D.D.C. Aug. 19,

2009) (Walton, J.), the Court writes separately to supplement and, in some instances, amend its

oral rulings.

## I. Background

The following facts are alleged in the government's proposed findings of fact and sources

of evidence.  "The petitioner is a ████████ [citizen] currently detained at [the] Guantanamo Bay

Naval Base" in Guantánamo Bay, Cuba.  Gov't's Facts ¶ 1.  He was allegedly ████████████

████████████████████████████████████████████████████████████████████████

████████ <u>Id.</u> ¶ 2.  The petitioner allegedly ████████████████████████████████ <u>id.</u>

¶ 4, and ████████████████████████████████████████ <u>id.</u> ¶ 3.

████████████████████████████████████████ <u>id.</u> ¶ 5, the petitioner allegedly

████████████████████████████████████████████████████████████████

████████ <u>id.</u> ¶ 6.  Thereafter, ████████████████████████ [the petitioner allegedly] ████

████████████████████████ <u>id.</u> ¶ 8, where he ████████████████████████ <u>id.</u> ¶ 10.[3]

---

[3] As represented by the government, "[t]he Taliban guesthouse is a known transit point for al-Qaida recruits en route to Afghanistan."  Gov't's Facts ¶ 9.  "Guesthouses in Pakistan and Afghanistan were places of lodging used by the Taliban and al-Qaida to provide safe haven to training recruits and fighters, and to provide meeting venues for al-Qaida leadership."  <u>Id.</u> ¶ 13.  Further, "[t]hese guesthouses were not available to the public[,] but [instead] were reserved for those associated with the Taliban and al-Qaida."  <u>Id.</u>

████████████████  2

UNCLASSIFIED//FOR PUBLIC RELEASE

Allegedly, ███████████████ id. ¶ 11, ████████████████████

███████████ id. ¶ 12. ████████████████████████

██████████████████████ Id.

Upon arriving in Kandahar, the petitioner allegedly ██████████

█████████████████ Id. ¶ 14. According to the government, ████████████

███████████████████████████ Id. ¶ 15. █████

████████████████████████████████████

███████████████████████████ Id. ████████

██████████████████████████████████

██████ Id. ¶ 16.

Also ████████████████████████████

████████████████████████████████████

██████████████████████████ Id. ¶ 17. The al-Farouq training

camp, allegedly "al-Qaida's primary military training facility in Afghanistan," id. ¶ 20, was

allegedly operated by ████████████████ a senior al-Qaida operative," id. ¶ 21. ██████

████████████████████████████ id. ¶ 19, the petitioner

purportedly ████████████████████████████

████████████████████████████████

Id. ¶ 22.

████████████████████████████████

████████████████████████████████

██████████████ Id. ¶ 26. ███████████████

████████████████████████████████

████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



Id. ¶ 25.

Id. ¶ 28.

id. ¶ 29,

id. ¶ 27.

id. ¶ 24, where

id. ¶ 23.  There, the petitioner allegedly received training in

Id. ¶ 24.

Id. ¶ 31.  The petitioner also allegedly

Id. ¶ 32.

Id. ¶ 30.

Id. ¶ 35.

id.,                                          id. ¶ 36.  He allegedly

id. ¶ 38,

id. ¶ 37.  The petitioner allegedly

4

UNCLASSIFIED//FOR PUBLIC RELEASE



id. ¶ 39, ███████████ id. ¶ 40.

Id. ¶ 41.

id. ¶ 42.

id. ¶ 43.

id. ¶ 44. ███████████ id. ¶ 45.

The government alleges that the petitioner has made numerous custodial statements implicating himself as a high-level member of al-Qaida.  For example, the petitioner allegedly



id. ¶ 49,

████████ id. ¶ 51, and that ███████████ id. ¶ 52.

He allegedly ███████████ id. ¶ 53, and " ███████████ " id. ¶ 54.

"Moreover, ███████████

███████████ " id. ¶ 55, and the petitioner allegedly ███████████

███████████

id. ¶ 57.

"[The petitioner allegedly] also provided detailed information ███████████

5



Id. ¶ 58. Further, the petitioner has allegedly admitted ██████████ ██████████████████████████████████████████████████ id. ¶ 47, and ████████████████████████████████████ id. ¶ 34. Specifically, the petitioner has allegedly stated that his ██████████████████████████████ ██████████████████████████████ Id. ¶ 48. Finally, the petitioner has allegedly stated on multiple occasions that ██████████████████████ id. ¶ 61, ████████████████ id. ¶ 59, ████ id. ¶ 60.

On June 12, 2009, the undersigned member of the Court amended the case management order governing these proceedings with respect to those habeas corpus petitions filed by detainees at the Guantanamo Bay Naval Base with habeas corpus petitions pending before this member of the Court to establish a format for determining the admissibility of the evidence relied upon by the government prior to any factfinding hearing on the merits of the petitions.[4] Specifically, the Court determined, over the government's objection, that it would consider questions of admissibility regarding the government's evidence prior to holding any evidentiary hearings in the detainee cases before it because the government's evidence, if held to be inadmissible in part or in whole, might not suffice to establish even a prima facie case for military detention under the standard set forth by this member of the Court in Gherebi v. Obama, 609 F. Supp. 2d 43 (D.D.C. 2009) (Walton, J.). The Court therefore established a framework by which the government would identify which sources of evidence it intended to rely upon at any evidentiary hearing on the merits of the petitioner's detention, the individual petitioners would file their objections to any evidence cited, and the Court would resolve such objections before

---

[4] The Court initially ordered this amendment on June 4, 2009, but reconsidered and eventually vacated that order upon request from the government.

6

UNCLASSIFIED//FOR PUBLIC RELEASE

████████████████

determining whether the government's case was strong enough to require rebuttal evidence from the individual petitioners.

As directed by the Court, the government has filed a statement of proposed facts listing the sources of evidence relied upon in this case with respect to each factual assertion.  The government has also submitted a lengthy memorandum of law in support of the admissibility of those sources into evidence.  In that memorandum of law, it argues that, pursuant to Hamdi v. Rumsfeld, 542 U.S. 507 (2004), and Boumediene v. Bush, ___ U.S. ___, 128 S. Ct. 2229 (2008), "hearsay information contained in the regularly prepared intelligence reports that are relied upon in these cases should be deemed sufficiently reliable to be admitted, unless sufficient credible evidence at the merits hearing establishes that the information is unreliable," Gov't's Mem. at 3.  It further advocates that, "[i]n evaluating whether to credit hearsay, the Court should reject general allegations that the reported information is inaccurate or unreliable, including unsupported challenges to the reliability of sources." Id. at 4.  Instead, it suggests that, "to demonstrate that hearsay evidence in an intelligence report should not be credited, petitioners should be required to offer credible evidence rebutting the reliability of a document." Id.

The government also devotes considerable energy to explaining the function of and justifying its reliance on the various hearsay documents attached to the petitioner's factual return.  As explained by the government, there are "two categories of information" upon which it principally relies: "(1) intelligence reports[] and (2) reports of interviews with the petitioner[] and others." Id. at 4.  With respect to the latter category of evidence, the government asserts that "military interrogation reports are relied upon to develop accurate information that may be fed into the broader intelligence cycle," and that "there is no reason to doubt that 'public officials perform their duties without motive or interest other than to submit accurate and fair reports.'"

████████████████        7

UNCLASSIFIED//FOR PUBLIC RELEASE

Id. at 14 (quoting Espinoza v. INS, 45 F.3d 308, 310 (9th Cir. 1995)).  Further, given that "the

admissions contained in such reports are admissible in ordinary civil or criminal trials," the

government contends that "[t]hey should certainly be admissible in the special circumstances of

these habeas proceedings." Id.  "Likewise," it argues that "a detainee's inculpatory statements

against another petitioner will often also implicate the detainee who is making the statement,"

and should therefore "be presumptively reliable according to the same principles that provide for

the admissibility of statements against interest." Id. at 15.

The government avers that "[m]any of the principles described above apply equally to

intelligence reports where such reports reflect the statements of another detainee." Id.  As for

those reports where the source is confidential, the government suggests that the Court can

evaluate the source's reliability "based on other evidence in the record." Id.  Additionally, the

government contends that intelligence reports should be admitted into evidence as a general

matter "because intelligence collectors from the [Defense Intelligence Agency] and the [Central

Intelligence Agency (the 'CIA')] are trained to consider carefully the reliability and credibility of

their human sources." Id. at 16.  Moreover, "[b]efore collected intelligence is processed into an

intelligence report . . . , analysts in a collecting agency . . . process the information for

dissemination to and use by other members of the intelligence community, including intelligence

analysts," who rely on the reports "to prepare broader intelligence assessments." Id. at 17.

The petitioner objects to the introduction of almost every source of evidence cited by the

government in its proposed statement of facts.  In support of his objections, the petitioner asserts

that the government's reliance on Hamdi is misplaced because that case merely "recogni[zed]

that [the United States is] at war and that the exigencies of war need to be practically factored

[into] how this case proceeds," and did not extend "an open invitation [to the government] to use

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████

hearsay whenever [it] might think it helpful, convenient, or easier than putting on witnesses."

Pet'r's Mem. at 4.  The petitioner further argues that statements attributed to him in reports

prepared by interrogators at Guantánamo Bay should not be admitted into evidence because they

are (1) unsworn statements (2) by declarants that are not even identified, much less subject to

cross-examination, (3) recording recollections "made some unidentified period after the fact" (4)

of statements made to these unidentified declarants "by [] unidentified interpreter[s], of unknown

skill and qualifications, . . . who [are] also not subject to cross[-]examination," (5) purportedly

reflecting statements made by the petitioner in response to unknown questions (6) without any

contemporaneous documentation in either English or Arabic (7) that have not been adopted by

the petitioner (8) where the petitioner is available to testify and willing to be subject to cross-

examination.  Id. at 5–6.  He also argues that statements made by other detainees should be

excluded for these same reasons.  Id. at 10.  Finally, the petitioner argues that statements

allegedly made by ████████ should be excluded because that witness has made inconsistent

statements and is therefore unreliable.  Id.

The government counters in its reply memorandum that the petitioner's "suggested

blanket exclusion" is inconsistent with Hamdi and Boumediene, and notes that another member

of this Court rejected such an approach.  See Resp'ts' Reply at 1–2 (citing Khiali-Gul v. Obama,

Civil Action No. 05-877 (JR), slip op. at 3 (D.D.C. Apr. 22, 2009) (attached as Exhibit A to

Resp'ts' Mem.)).  It reiterates that "the various intelligence reports relied on by the [government]

serve a critical intelligence purpose and therefore need to be as accurate as possible."  Id. at 2.

Further, the government attests that all of the linguists employed by the Federal Bureau of

Investigation (the "FBI") and the Joint Task Force-Guantanamo must satisfy certain criteria that

are sufficiently stringent to assure the reliability of their interpretations.  Id.  Finally, the

███████████

UNCLASS███████████

government argues that any inconsistencies in the statements made by ███████ should go to the weight to be accorded to those statements, not their admissibility. Id. at 6–7.

Without obtaining prior leave from the Court, the petitioner submitted a sur-reply on the evening of July 21, 2009.[5] In his sur-reply, the petitioner argues, based on the expert opinion of a linguistics professor retained by the petitioner, that the competency requirements for interpreters delineated by the government in its reply brief do not suffice to ensure that the interpreter can translate complicated information from Modern Standard Arabic into English and vice versa, and that competency in Modern Standard Arabic does not necessarily indicate a proficiency in the colloquial Arabic spoken by the petitioner. Pet'r's Sur-reply at 1–3. He therefore concludes that "'it cannot be presumed that Arabic interpretation in the interrogation of detainees, whether performed by a native speaker of Arabic or an American with some command of [Modern Standard Arabic], was fully accurate or reliable.'" Id. at 3 (quoting id., Ex. A (Declaration of Karin C. Ryding, Ph.D., Concerning Arabic Interpretation Issues (the "Ryding Decl.")) ¶ 32).

As noted above, the Court declined to issue a final ruling on the petitioner's objections regarding the use of intelligence and interrogation reports purporting to relate statements allegedly made by the petitioner. Hr'g Tr. 31:17–20, July 22, 2009. Instead, the Court directed the government to identify the interrogators who obtained the statements and produced the reports in question, and to submit affidavits or declarations from those interrogators explaining, at a minimum, the practices generally employed by each interrogator to assure the accuracy of

---

[5] The order amending Judge Hogan's case management order issued by this member of the Court on June 12 did not provide for the filing of sur-replies by petitioners objecting to the admission of evidence cited in the government's proposed factual findings. Nevertheless, given the unique circumstances of this case as well as the government's failure to object to the filing of this document at the hearing held on July 22, the Court will consider the merits of the petitioner's sur-reply.

███████████ 10

UNCLASSIFIED//FOR PUBLIC RELEASE

██████████████

the information contained in his or her reports, id. at 31:20–32:21, 35:15–20, and why it would

constitute an undue burden on the government to call the interrogators as witnesses, id. at 32:22–

35:14, 35:20–25.

However, the Court found this issue to be less crucial with respect to intelligence and

interrogation reports purporting to relate statements allegedly made by third-party witnesses like

█████, id. at 71:8, and further found that ████████ statements were sufficiently reliable for

the admission of those reports into evidence, id. at 66:21–68:2.  The Court also concluded that

there was "a sufficient threshold" showing by the government that the interpretations provided

by interpreters at Guantánamo Bay were reliable for those interpretations to be admitted into

evidence.  Id. at 36:1–18.  Finally, the Court concluded that the translation of a letter allegedly

written by the petitioner to one of his brothers could not be admitted into evidence because the

government had not demonstrated that the translation of the letter was sufficiently reliable to

merit the admissibility of the letter.  Id. at 73:13–74:4, 74:11–16, 76:7–10.

More recently, the Court issued its memorandum opinion in Bostan, in which it

delineated the standard of review this member of the Court would employ in assessing the

petitioners' challenges to the admissibility of hearsay relied upon by the government as a source

of evidence in its proposed factual findings.  In that memorandum opinion, the Court reiterated

its commitment to enforcing the two-prong standard for the admissibility of hearsay established

by Judge Hogan in his case management order issued on November 6, 2008, under which the

government must establish both that the proffered hearsay is reliable and that requiring it to

substitute a non-hearsay alternative would be unduly burdensome or interfere with the

government's national security interests.  See id. at *2 ("[T]his member of the Court concurs

with Judge Hogan as to how the government's legitimate national security interests and the

11

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████████

petitioner's compelling interest in securing his freedom should be balanced.").[6] The Court also

"elaborated" on the meaning of the term "undue burden," explaining that (1) "[w]here the

government is unable to produce non-hearsay evidence due to its own administrative or

bureaucratic errors or lack of resources to amass such evidence, it cannot rely upon its shortage

of resources or its own mistakes as justification for the use of hearsay," (2) "it is no excuse for

the government's lawyers to assert that there are too many habeas corpus petitions pending

before the Court or too few resources allocated to the Department of Justice to compel fidelity to

the centuries-old proscription against the use of [unreliable] hearsay," id., (3) "the government

will need to demonstrate why the use of non-hearsay alternatives would be unduly burdensome

to the government . . . through the use of statements made under oath by persons with personal

knowledge of the matter about which their representations relate," and (4) "the undue burden

standard . . . does not mean . . . that hearsay proffered by the government must be admitted into

evidence because that is all the evidence that the government has available to it," id. at *3.

Finally, the Court "reject[ed] the broader reading of Hamdi and Boumediene advanced by the

government," id., declined to follow the rules of evidence employed in the administrative

proceedings created by the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680

(2005), Bostan, 2009 WL 2516296, at *4, or adopt the reasoning of Khiali-Gul, id. at *4–5, and

---

[6] In his case management order, Judge Hogan ruled that the petitioner could move for the admission of hearsay into evidence as well using the same criteria, In re Guantanamo Bay Detainee Litig., Misc. No. 08-442 (TFH), 2008 WL 4858241, at *3 (D.D.C. Nov. 6, 2008); however, the Supreme Court mentioned only the possibility of considering hearsay proffered by the government in Hamdi and Boumediene, see Hamdi, 542 U.S. 507, 533–34 (2004) (plurality opinion) (suggesting that "[h]earsay . . . [might] need to be accepted as the most reliable evidence from the [g]overnment" in a habeas corpus proceeding concerning the military detention of an alleged member of an enemy armed force); Boumediene v. Bush, ___ U.S. ___, ___, 128 S. Ct. 2229 (2008) (noting the government's "legitimate interest in protecting sources and methods of intelligence gathering," and expressing its expectation "that [this] Court will use its discretion to accommodate this interest to the greatest extent possible"). It is therefore unclear to the Court whether the petitioner should be permitted to introduce otherwise inadmissible hearsay in this case under any circumstances, let alone the circumstances delineated above with respect to the government. But as this issue is not yet before the Court, it need not be considered at this time and thus will be deferred to a later date (assuming it ever arises at all).

███████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

refused to "defer questions of admissibility until all the government's evidence has been considered on the theory that the reliability of a particular piece of evidence will generally depend on how it fits within the evidence as a whole," id. at *5 (internal citation and quotation marks omitted).

In a footnote appended to its memorandum opinion in Bostan, the Court noted that it would issue orders applying the general principles articulated in that decision to specific evidentiary disputes in both Bostan and in the petitioner's case. Id. at 6 n.6. The Court has resisted the urge to reduce its oral rulings to writing in the past out of both practical concerns about the strain placed on the Court's resources by the issuance of numerous written opinions and a concern (in some ways borne out by the government's response to the Court's analysis in Bostan) that a written opinion might complicate rather than clarify the Court's position on these matters. However, the instant dispute between the parties has important ramifications for every other Guantánamo Bay detainee with an active habeas corpus petition pending before this member of the Court. Even more important, the Court is convinced that its oral rulings require further explanation and, in some instances, reconsideration. The Court has therefore revisited this particular dispute so that it can set forth guiding principles for future evidentiary disputes between the government and petitioners appearing before this member of the Court and apply those principles to this dispute in a deliberate and systematic manner.

## II. Standard of Review

The standard of review governing the petitioner's evidentiary objections is that articulated by the Court in Bostan. As the Court explained in that case,

> [F]or all of the active habeas corpus petitions pending before this member of the Court, the government must establish that any proffered hearsay evidence is admissible either (1) under the Federal Rules of Evidence, as modified by 28 U.S.C. § 2246, or (2)

13

UNCLASSIFIED//FOR PUBLIC RELEASE

> by demonstrating that (a) the proffered hearsay is reliable and (b) that the provision of non-hearsay evidence would unduly burden the government . . . or interfere with the government's ability to protect national security.

Id. at *6. Further, the Court ruled that "the more significant a fact the government seeks to establish through the use of hearsay is, the heavier its burden will [have to] be to justify the Court's consideration of hearsay as a substitute for its non-hearsay alternative." Id. at *2.

### III. Legal Analysis

The sole question presented by the petitioner's objections is whether the hearsay proffered by the government in this case may be admitted into evidence under the standards for admissibility delineated above. By the Court's reckoning, there are at least three levels of hearsay that it must address separately: (1) the initial statements allegedly made by various detainees at Guantánamo Bay, whether they were statements made by the petitioner himself or by other detainees purporting to function as witnesses against him, (2) the interpretations of those statements provided by interpreters at the Guantanamo Bay Naval Base, and (3) the memorialization of those translated statements by interrogators. The Court considers each of these levels of hearsay in turn.

A.    First Level of Hearsay: Detainee Statements

The threshold question before the Court with respect to the issue of admissibility is whether the statements purportedly made by the petitioner and other detainees at Guantánamo Bay are admissible assuming that the alleged statements are reliably represented in their subsequent iterations. Insofar as the petitioner's own statements are concerned, this is a non-issue: pursuant to Federal Rule of Evidence 801, "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement." Fed. R. Evid.

14

IED//FOR PUBLIC RELEASE

UNCLAS████████████

801(d)(2).[7] Thus, any statements made by the petitioner are admissible under the Federal Rules of Evidence and can be used by the government in this case.

The situation is more complicated with respect to statements made by other detainees that the government seeks to use against the petitioner. The government suggests that statements by various detainees inculpating the petitioner necessarily inculpate the declarants as well and therefore should be considered as statements against their interest under Federal Rule of Evidence 804. But that exception only applies when the declarant is unavailable to testify within the meaning of the rule, Fed. R. Evid. 804(b)(3),[8] and the government has not even attempted to demonstrate unavailability on the part of the various detainees who allegedly inculpated the petitioner. Moreover, for Rule 804(b)(3) to apply, the statement in question must be "truly self-inculpatory," a "fact-intensive inquiry" that "require[s] careful examination of all the circumstances surrounding the [seemingly inculpating] activity involved." Williamson v. United States, 512 U.S. 594, 604 (1994). The manner in which the alleged statements at issue here have been presented to the Court—namely, as comments in an interrogation report prepared by an unknown interrogator observing unknown recordation and recordkeeping practices, see part

---

[7] At the hearing on the petitioner's evidentiary objections held on July 22, the petitioner argued that certain statements allegedly made by the petitioner indicating that various high-level members of Al-Qaeda shared important technical information with the petitioner should be excluded as unduly prejudicial under Federal Rule of Evidence 403 because the government has not verified the truth of the information allegedly provided to the petitioner. Hr'g Tr. 56:1–59:15, July 22, 2009. The Court overruled this objection, reasoning that any statement indicating contact between the petitioner and high-level members of Al-Qaeda would itself be probative of the ultimate question of whether the petitioner was a member of the armed forces of an enemy force. Id. 61:12–62:6. In any event, it is difficult to imagine how the government could be expected to verify the accuracy of the allegations considering the nature and objectives of the al-Qaeda organization and its membership.

[8] Rule 804 defines "[u]navailability as a witness" to include the following situations: (1) the witness "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement," (2) the witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so," (3) the witness "testifies to a lack of memory of the subject matter of the declarant's statement," (4) the witness "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity," or (5) the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████████

III.C, infra—make such a determination on the record before it impossible.  The Court therefore

concludes that, at least on the record currently before it, any statements made by other detainees

at the Guantanamo Bay Naval Base do not qualify for admission into evidence under the hearsay

exception for statements against interest.[9]

These deficiencies notwithstanding, the government argues that, at least with respect to

████████[10] the statements subject to the petitioner's objections should be admitted into evidence

because they are "detailed about the training [the p]etitioner received" and "are largely consistent

with other facts."  Gov't's Reply at 7.  After weighing the arguments of the parties on this issue

at the hearing on the merits of the petitioner's evidentiary objections held on July 22, the Court,

"with some reluctanc[e]," Hr'g Tr. 67:23, July 22, 2009, agreed with the government that ████

████████ statements were generally reliable, id. at 67:23–24, reasoning that "there [was] a

sufficient amount of information by way of detail" in his statements, id. at 67:12–13, "[a]nd[,] at

least on some points[,] corroboration of that information sufficient to provide him with a basic

---

[9] Conceivably, the government could establish the applicability of Rule 804(b)(3) to the statements at issue by demonstrating through either witness testimony or, if necessary and appropriate, written statements prepared under oath that (1) the detainees in question are unavailable to testify within the meaning of Rule 804(a) and (2) the inculpatory statements made by the detainees are truly self-inculpatory, keeping in mind that the rule "does not allow the admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."  Williamson, 512 U.S. at 600–601; see also 28 U.S.C. § 2246 ("On application for a writ of habeas corpus, evidence may be taken orally or by deposition or, in the discretion of the judge, by affidavit.").  But see Herrera v. Collins, 506 U.S. 390, 417 (1993) (describing the process of admitting affidavits into evidence as "disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations").  The Court's ruling on this point is therefore without prejudice to the admission of the statements at issue under Rule 804(b)(3) provided the requirements of the rule are satisfied.

[10] Consistent with its position that the burden should be placed on the petitioner to demonstrate the unreliability of its proffered hearsay, the government does not address the reliability of any of the statements made by detainees other than the petitioner and ██████  This approach does not, however, accord with the Court's ruling in Bostan.  See Bostan, 2009 WL 2516296, at *2 (reiterating the adherence of this member of the Court to the two-prong standard for the admission into evidence of hearsay enunciated by Judge Hogan in his case management order, under which the proponent of hearsay must "establish[] that the hearsay evidence is reliable and that the provision of non-hearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security" (internal citation and quotation marks omitted)).  It is therefore incumbent upon the government to establish that inculpatory statements allegedly made by detainees other than the petitioner or ██████ are also admissible under the standard governing the admission of hearsay into evidence in this case.

███████████   16

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASS ███████████

threshold credibility to conclude that his hearsay statements . . . can be relied upon by the government," id. at 67:13–18.

Upon further reflection, this conclusion requires clarification and to some extent modification. First, having given the matter further consideration, the Court is convinced that it erred in ascribing general reliability to ██████ statements based upon the level of detail provided in those statements. To be sure, the level of detail provided in a specific statement may have some impact on the credibility of the substance of the statement once it is found to be reliable, but that does not provide any assistance in determining whether the form in which this information is presented is sufficiently reliable for the substance of the statement to be considered in the first instance. Absent extrinsic evidence establishing the reliability of a statement's source, the latter question can only be answered by assessing the circumstances surrounding the issuance of the statement to determine whether the context of the statement's utterance makes it inherently reliable (like admissions by a party-opponent or statements against interest). Here, and as noted above, the circumstances surrounding the alleged issuance of the statements at issue are too vague to permit a conclusion that the statements made by ██████ are inherently reliable.

Similarly, the existence of evidence corroborating a specific statement made by a declarant, while obviously relevant to the Court's assessment of the credibility of the substance of the statement at the merits stage, does not assist the Court in determining the reliability of the form (i.e., an utterance by the detainee) in which that information is presented. To the extent that the information within the statement mirrors the corroborating evidence, its admission into the record would be redundant, and to the extent it differs from the corroborating evidence, it is no

███████████

17

UNC███████████████SE

longer corroborated and therefore has no external indicia of reliability.[11]  Thus, the Court

misspoke when it concluded that ███████ statements could be admitted into evidence based in

part on the existence of "some" evidence corroborating those statements, id. at 67:13, and

subsequently when it stated in Bostan that "corroborating evidence can be used to establish

reliability if that corroborating evidence is itself reliable," Bostan, 2009 WL 2516296, at *6.

Instead, what the Court intended to convey in Bostan and should have said at the hearing

on the merits of the petitioner's evidentiary objections is that independently admissible evidence

can be used to assess whether the source of a particular statement is sufficiently reliable in

general to permit the admission of any statements by that source into evidence.  This

modification of the Court's earlier rulings carries two important consequences.  First, it is not

enough to demonstrate, as the government has attempted to do in this case, that the statement in

question is consistent with other statements made by other declarants of unknown reliability.

Rather, the government must establish that the putatively corroborative evidence is both

---

[11]  A simple example illustrates the difficulties and dangers of evaluating the reliability of particular statements by recourse to extrinsic evidence.  Assume that an office supervisor is told by one of his employees that a second employee has been stealing from the company till.  The supervisor believes that the first employee is reliable, but is not convinced that he has enough evidence to fire the second employee based solely upon the first employee's representations.  Then he receives an anonymous note repeating word-for-word the allegations of the first employee. Under the government's preferred approach, the supervisor could conclude that the allegations set forth in the anonymous note is reliable because the statement of the first employee is reliable, and then use this "corroborating" evidence to conclude that there is now sufficient evidence to fire the allegedly misbehaving second employee.  The problem, of course, is that the note could have been prepared by the first employee, by someone who heard about these allegations from the first employee, by someone who overheard the discussion between the first employee and the supervisor, etc.  Without any indication as to the source of the anonymous note, the supervisor could not discern whether the note is independently accurate (and therefore truly corroborative) or simply a reiteration of the statements he has already heard from the first employee.

    In other words, when a piece of otherwise unreliable hearsay is deemed to be "reliable" solely because there is other, reliable evidence to the same effect, the otherwise unreliable hearsay loses its capacity to corroborate the reliable evidence—in effect, it becomes simply a duplicate of the reliable evidence in a different form.  Further, the otherwise unreliable evidence, while having no probative effect, will doubtless create the illusion that the admissible evidence has been corroborated by the otherwise inadmissible evidence even though the otherwise inadmissible evidence, having no indicia of reliability of its own, cannot corroborate anything.  This danger of confusion is inherent in the kind of evidentiary bootstrapping proposed by the government, and ultimately is the reason why the Court finds the government's proposal wanting.

███████████    18

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████████████

admissible and establishes the factual matter that purportedly establishes the source's reliability.

In other words, for the government to show that a source of hearsay is reliable, it must establish

that the statements provided by that source are, in general, factually accurate by a preponderance

of the evidence, not just that there is some other evidence in the government's possession that

coincides with the statement of the source in question.[12]

Second, as a general matter, it will not suffice for the government to establish that a

source of hearsay provided accurate information on one or two isolated occasions. Rather, for

the Court to determine (in the absence of any intrinsic indicia of reliability) that a particular

source is generally reliable, such that any statements made by that source are presumptively

reliable as well, the government will, absent unusual circumstances, need to demonstrate a

pattern of accuracy in the source's statements. The existence of a pattern of accurate statements

made by the source would suggest that he is generally reliable, which, in turn, would suggest that

any specific statements made by the source of the statement would be generally reliable as well.

In summary, for the government to establish the reliability of otherwise inadmissible

hearsay, the government will need to demonstrate (1) that the circumstances surrounding the

creation of the hearsay are such that the hearsay is inherently reliable or (2) that the source of the

hearsay is generally reliable, thereby giving rise to a presumption of reliability as to any hearsay

statements provided created by that source. With respect to detainee sources like ██████ this

means that the government will need to prove by a preponderance of the evidence that the

---

[12] The method by which the government would establish the general accuracy of a particular source's statements
will of course vary from case to case, but the Court would expect that the government could, for example, at least
provide a written statement under oath from a relevant member of the intelligence community attesting to personal
knowledge of the accuracy of a source's statements (assuming, of course, that such knowledge exists). Regardless
of the precise method employed by the government, the bottom line is that the government will need to establish the
reliability of its detainee sources in the same way that it would establish the reliability of any other source: by
providing evidence that gives the Court reason to believe the information provided by the detainee is generally
accurate.

███████████████   19

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCL█████████████SE
█████████████

information provided by that source is generally accurate, and it will need to make that showing on the basis of admissible evidence, not other hearsay from other detainees of unknown reliability. This is the only means by which the government will be able to introduce otherwise inadmissible statements allegedly made by other detainees at Guantánamo Bay into evidence.

Having clarified the parameters under which this Court will consider hearsay proffered by the government, the Court cannot determine at this time whether the statements allegedly made by ██████ can be admitted into evidence. The government has not even attempted to establish the reliability of any statements allegedly made by detainees other than the petitioner and ██████ and, as set forth in greater detail below, it is far from certain that statements made by the petitioner can be admitted into evidence due to the fact that they were memorialized in interrogation reports. It is also unclear to the Court whether the petitioner's statements, standing alone, would establish that any of ██████ statements are actually correct, let alone that there is a discernible pattern of accuracy to his statements. Accordingly, the Court will direct the parties to provide additional argument on this issue in the form of supplemental memoranda of law and oral argument at the next hearing in this case.[13]

B.    Second Level of Hearsay: Interpreters' Interpretations

At least for those statements allegedly made by the petitioner while detained at the Guantanamo Bay Naval Base, the Court must proceed to the second level of hearsay regarding these statements; i.e., the interpretation of the statements from their original language and dialect into English by government or contracted interpreters. The government does not suggest that these interpretations satisfy the requirements for admissibility under the Federal Rules of

---

[13] Because it is not yet clear whether any of the detainee statements at issue (other than the petitioner's alleged admissions) are sufficiently reliable to warrant admission into evidence, the Court need not consider at this time whether it would constitute an undue burden for the government to call the detainees (to the extent they are available to testify within the meaning of Rule 804) as witnesses at the merits stage of this proceeding.

20

███████████████

Evidence. See Gov't's Mem. at 5 (arguing only that reports "prepared according to FBI

requirements" must satisfy the "criteria for using reliable interpreters"); Gov't's Reply at 4

(arguing only that the petitioner "offers nothing to undermine the reliability of the reported

admissions at issue here").  Consequently, the Court must once again assess whether the hearsay

proffered by the government in the form of interpreters' interpretations of statements allegedly

made by the petitioner (and, perhaps, other detainees such as ███████) are sufficiently reliable

to justify their admission into evidence and whether it would be unduly burdensome or

detrimental to the government's interest in national security to require a non-hearsay alternative

to the documented interpretations.

      1.    Reliability

      With respect to the question of reliability, the government has submitted two declarations

in support of its position that interpretations provided by interpreters at the Guantanamo Bay

Naval Base are sufficiently reliable to warrant their admission into evidence.  The first is a

declaration from Margaret R. Gulotta, "the Section Chief of the Language Services

Section . . . of the National Security Branch, Directorate of Intelligence, Intelligence Operation

Branch of the [FBI]," Gov't's Mem., Ex. 5 (Declaration of Margaret R. Gulotta, Nov. 5, 2008

(the "Gulotta Decl.")) ¶ 1, regarding the qualifications of interpreters employed by the FBI.  The

second is a declaration by Paul B. Rester, "the Director of the Joint Intelligence Group . . . at

[the] Joint Task Force[-]Guantanamo" and the person "responsible for managing and overseeing

interrogation operations at [the Joint Task Force-Guantanamo]."  Gov't's Reply, Ex. A

(Declaration of Paul B. Rester, July 20, 2009) ¶ 1.  The petitioner counters these declarations

with one of his own provided by Karen C. Ryding, "Professor Emerita of Arabic linguistics in

███████████████    21

U ████████████ LEASE

the Department of Arabic and Islamic Studies at Georgetown University" and the former "head of Arabic training at the State Department's Foreign Service Institute." Ryding Decl. ¶ 1.

Having carefully reviewed the declarations provided by the parties, the Court is mostly satisfied with its oral ruling that the interpretations provided by interpreters at the Guantanamo Bay Naval Base are sufficiently reliable to warrant their admission into evidence. This point is nearly indisputable with respect to interpreters employed by the FBI. As explained by Section Chief Gulotta in her declaration, "FBI language specialists used by the FBI during interviews must pass a battery of tests, [including] language proficiency tests and a background check," and "[t]he FBI monitors the performance of FBI language specialists through a program of periodic quality control reviews." Gulotta Decl. ¶ 3. These same standards apply to contract language specialists. Id. And while "FBI agents may use qualified linguists employed by other agencies of the United States [g]overnment[,] . . . [a]ny outside linguist used by the FBI is subject to the FBI's quality control policy," and "when the FBI requests linguists from the Department of Defense or other [United States] [i]ntelligence [c]ommunity . . . [c]omponents, [it] requests a minimal language proficiency and security clearance." Id. ¶ 4.

The situation is more complicated with respect to non-FBI interpreters. In his declaration, Director Rester explains that there are two categories of interpreters at the Guantanamo Bay Naval Base: non-native speakers; i.e., individuals who are not from the same country or region as the detainee subject to interrogation, "typically individuals who have previously served in the United States military with multiple assignments . . . utilizing the non-native language skills they now employ at Guantanamo," and native speakers; i.e., individuals from the same country or region as the detainee subject to interrogation. Rester Decl. ¶ 7. "Non-native/prior military linguists tend to bring a better understanding of the [Department of

22

UNCLASSIFIED//FOR PUBLIC RELEASE



Defense] mission," whereas "[n]ative speakers . . . may not bring that same understanding, but [can] bring the cultural insight and linguistic expertise expected of a professional native linguist." Id. This variation in background is apparently reflected in the qualifications of the interpreters at Guantánamo Bay: of the 95 total linguists used by the Joint Task Force-Guantanamo, 52 linguists "fall under a contract that requires an International Language Roundtable Score (['[]ILR[']]) . . . of a minimum of 4 in the target language in reading, writing[,] and listening, and a minimum score of 2+ in English prior to being hired," while "[t]he remaining 43 linguists . . . must have a rating of at least 3+ in reading, writing, and listening in the target language[] and a minimum rating of 3 in reading, writing, and listening in English prior to being hired." Id. ¶ 2.

The Court is satisfied that those interpreters with minimum scores of 3+ in a target language and 3 in English are sufficiently reliable to permit the admission of their interpretations into evidence. As explained by Director Rester:

> To be certified as an ILR Level 3 (professional working proficiency) the individual[] (a) is able to speak the language with sufficient structural accuracy and vocabulary to participate effectively in most conversations on practical, social, and professional topics[,] (b) is able to discuss particular interests and special fields of competence with reasonable ease[,] (c) has comprehension which is quite complete for a normal rate of speech[,] (d) has a general vocabulary which is broad enough that he or she rarely has to grope for a word[,] and (e) has an accent which may be obviously foreign[,] has a good control of grammar[,] and whose errors virtually never interfere with understanding and rarely disturb the native speaker.

Id. ¶ 4.

An interpreter with "a professional working proficiency" in both the target language and English, being "able . . . to participate effectively in most conversations on practical, social, and professional topics" and "discuss particular interests and special fields of competence with

UNCLASSIFIED//FOR PUBLIC RELEASE

███████████

reasonable ease" will be able to reliably interpret statements made by a detainee. This does not

mean that interpretations provided by an interpreter with these qualifications will always be free

from error: as Dr. Ryding notes in her declaration in support of the petitioner's objection to the

admissibility of interpretations of detainee statements, "[i]nterpretation between spoken Arabic

and spoken English is particularly challenging . . . because spoken Arabic is not a single

language," Ryding Decl. ¶ 8, and "Americans who learned Arabic at [a] university or the

Defense Language Institute are usually taught [Modern Standard Arabic]," id. ¶ 18, "a

modernized version of classical Arabic" that "very few Arabs, including educated Arabs,

employ . . . for purposes of daily speech," id. ¶ 10. But given that any errors made by an

interpreter with a minimum score of 3 in the target language would "virtually never interfere

with [the] understanding" of the original statement and would "rarely disturb the native speaker,"

Rester Decl. ¶4, such errors, if present, would tend to cast doubt on the accuracy of the disputed

portion of the interpreter's interpretation, not the reliability of the translation as a whole.[14]

However, the situation is different for those interpreters who have a minimum

proficiency of 4 in the target language but only a minimum score of 2+ in English. According to

Director Rester:

> To be certified as an ILR Level 2[] (limited working
> proficiency)[,] the individual[] (a) is able to satisfy <u>routine</u> social
> demands and limited work requirements[,] (b) can handle with
> confidence <u>most</u> basic social situations[,] including introductions
> and casual conversations about current events, work, family, and
> autobiographical information[,] (c) can handle <u>limited</u> work
> requirements, <u>needing help</u> in handling any complications or
> difficulties[, and] can get <u>the gist of most</u> conversations on non-

---

[14] The Court has previously cautioned the government that if a detainee disputes the accuracy of an interpretation, the Court will both credit such testimony absent evidence to the contrary and prohibit the introduction of any evidence regarding the background and credentials of the interpreter who provided the interpretation at issue if such information was not disclosed to the petitioner in discovery. Consequently, the government proceeds at its own peril in failing to provide such information to the petitioners through the discovery process in cases pending before this member of the Court.

24

UN███████████ASE

technical subjects (i.e., topics which require no specialized knowledge)[,] (d) has a speaking vocabulary sufficient to respond <u>simply</u> with some circumlocutions[,] (e) has an accent which, though <u>often quite faulty</u>, is intelligible[,] and (f) can <u>usually</u> handle elementary constructions quite accurately[,] but <u>does not have thorough or confident control</u> of the grammar.

Rester Decl. ¶ 3 (emphasis added).

These qualifications do not suggest reliability on the part of an interpreter with respect to any topics other than those arising in "basic social situations." <u>Id.</u> An interpreter who can only "get the gist of most conversations on non-technical subjects" and "respond simply with some circumlocutions," and who "need[s] help in handling any complications or difficulties," will likely struggle to accurately interpret any questions asked by an interrogator on any technical or factually dense matters raised in detainee interrogations. <u>Id.</u> And without a "thorough or confident control of the grammar" of English, <u>id.</u>, it is difficult to envision an interpretation of a narrative provided by a detainee regarding such matters that is not riddled with errors in multiple respects. The English-speaking skills of an interpreter with a minimum score of 2+ on the ILR's scale are simply not sufficient to ensure that any complex statements rendered in English by such an interpreter are reliable.

The government would doubtless argue that any deficiencies in the English-speaking skills of an interpreter with a 2+ score in English are offset by the interpreter's minimum score of 4 in the target language, which indicates, <u>inter alia</u>, that the interpreter "is able to use the language fluently and accurately on all levels normally pertinent to professional needs." <u>Id.</u> ¶ 5. But as Dr. Ryding points out, "for interpretation to be reliable, [the] interpreter must be fully fluent [(or at least proficient)] in the languages spoken by both participants in the dialogue." Ryding Decl. ¶ 6. An interpreter who is nominally capable of understanding and articulating topics concerning "special fields of competence with reasonable ease," Rester Decl. ¶ 4, can be

UNCLASSIFIED//FOR PUBLIC RELEASE

U███████████████EASE

expected to accurately convey the sort of information provided by detainees to an English speaker at least most of the time, but an interpreter who lacks "control of the [English] grammar," id. ¶ 3, cannot be expected to accurately relay any complicated or technical information in English at all regardless of the interpreter's skill in the target language.

Nor does it matter that the interpreters in question have a minimum score in English of 2+ as opposed to 2. "In the ILR ratings, the designation 0+, 1+, 2+, etc.[,] [is] assigned when proficiency substantially exceeds one skill level and does not fully meet the criteria for the next level." Id. ¶ 6. The criteria for a score of 3 includes the ability "to participate effectively in most conversations on practical, social, and professional topics" and "discuss particular interests and special fields of competence with reasonable ease." Id. ¶ 4. An interpreter who lacks these skills cannot be relied upon to accurately interpret any questions asked by an interrogator or answers provided by a detainee except where those questions and answers concern straightforward, non-technical matters. Accordingly, the Court cannot admit into evidence interpretations provided by interpreters with a 2+ score in English except with respect to basic information provided by the detainee.

To recap, interpretations provided by interpreters employed by the FBI and interpretations provided by interpreters at the Joint Task Force-Guantanamo with minimum ILR scores of 3+ in the target language and 3 in English are sufficiently reliable to be admitted into evidence. Interpretations provided by interpreters at the Joint Task Force-Guantanamo with English scores of 2+ are not unless the matter subject to interpretation is of the sort that a person with an ILR score of 2+ would reasonably be able to understand and articulate in English (i.e., "basic social situations[,] including introductions and casual conversations about current events, work, family, and autobiographical information"). Id. ¶ 3. As the proponent of the

███████████████     26

UNCLASSIFIED//FOR PUBLIC RELEASE

interpretations rendered in this case, it is the government's burden to establish by preponderance

that the interpreter in question has the qualifications necessary for his interpretations to be

considered reliable.  To the extent the government fails to satisfy this burden, its proffered

interpretations of statements allegedly made by the petitioner (or any other detainee that would

otherwise be admitted into evidence) cannot be admitted into evidence.

     2.   <u>Undue Burden</u>

     The applicability of the undue burden prong of the Court's hearsay standard is more

straightforward.  The strictness of the requirement varies in relation to the nature of the hearsay

proffered and the centrality of that hearsay to the proponent's case.  <u>Bostan</u>, 2009 WL 2516296,

at *2.  Here, the petitioner does not argue that any specific statement allegedly made by the

petitioner (or any other detainee) was mistranslated, much less that this mistranslation is

dispositive to the government's case.  Nor is there any perceivable benefit to subjecting the

interpreters used during the petitioner's (or other detainees') interrogations to cross-examination

given the substance of the Court's ruling on the question of reliability.  The government's

representation that it would be unduly burdensome as a general matter to force it to identify and

produce the interpreter for each of its proffered interpretations is therefore sufficient in this

circumstance to permit the use of hearsay assuming it is reliable within the parameters of the

Court's prior analysis.

C.   <u>Final Level of Hearsay: Interrogation Reports</u>

     The final level of hearsay requiring the Court's attention is the actual memorialization of

the interpreter's interpretation of the petitioner's (or other detainees') alleged statements in the

interrogation reports that have been proffered by the government.  These reports consist of four

types of documents: field documents, or "FD-302s," prepared by FBI agents "to summarize an

UNCLASSIFIED//FOR PUBLIC RELEASE

UNC ███████████████ SE

interview," "Form 40s," also known as "FM 40s," which are used by the Criminal Investigation

Task Force "to record investigation activity, such as witness interviews," summary interrogation

reports ("SIRs") "written by the interrogator after an interrogation session," which "contains all

the details of the interrogation session, including date and time, language used, interrogation

approach, and an evaluation of the detainee regarding his deception and cooperation," as well as

"all the intelligence gathered from the session," Gov't's Mem., Ex. 1 (Declaration of ███████

███████████████, Sept. 19, 2008) at 7, and intelligence information reports ("IIRs"), "the

main [Department of Defense] reporting vehicle for the [human intelligence] information used

by [the Defense Intelligence Agency] and military services," id. at 6.  The Court has to this point

abstained from opining on the reliability of such reports and will continue to do so here.  Instead,

the Court writes only to memorialize and, where necessary, clarify its prior rulings regarding the

undue burden prong of the Court's hearsay standard.

      As the Court has stated both orally and in its memorandum opinion in Bostan, the

government cannot satisfy the undue burden prong by simply making representations to that

effect.  Bostan, 2009 WL 2516296, at *3.  Instead, the government must establish by a

preponderance that it will be subject to an undue burden if the government is compelled to use a

non-hearsay substitute for its proffered hearsay evidence.  In the context of detainee statements,

for the government to introduce into evidence the various interrogation reports containing

statements allegedly made by the petitioner, it must establish not only that it would create an

undue burden for the government to call the various interrogators who drafted the reports as

witnesses at the merits phase of this proceeding, but also that it would create an undue burden for

the government to procure affidavits or declarations from these interrogators setting forth the

information that would otherwise be elicited on direct examination (e.g., the process used to

███████████████        28

create the interrogation reports, the circumstances surrounding the interrogation, and the

substance of the petitioner's alleged statements (as interpreted by the interpreter)).

The situation is different with respect to interrogators who interviewed other detainees.

As the Court explained at the close of the hearing on the merits of the petitioner's evidentiary

objections held on July 22, the statements allegedly made by other detainees are less crucial to

the government's case; thus, the Court need not apply the undue burden prong with the same

level of scrutiny where these statements are concerned.  Of course, the Court may eventually

conclude that the reports regarding the interrogation of other detainees lack sufficient indicia of

reliability to be admitted into evidence, in which case the failure of the government to call the

interrogators who created the reports or at least submit sworn statements approximating their

testimony would preclude the Court's consideration of the substance of those reports.  But that is

a risk the government will have to bear if it chooses not to supplement its proffered hearsay

submitted to this point.

As for the question of reliability, the Court has indicated on multiple occasions that it has

serious concerns on that front, and has further indicated that the government may be able to

ameliorate those concerns through the submission of individualized affidavits or declarations of

the sort described above or, as a last resort, through the submission of a global affidavit

describing the process used by interrogators (other than FBI agents, for whom the procedures

guiding their conduct has already been provided) to reduce what was said and the observations

made during interrogations into their written reports.  The Court has also indicated a willingness

to afford the government a reasonable amount of time to provide this information, and will do so

in the order effectuating the requirements demanded by the Court's conclusions in this

memorandum opinion.  Once those supplemental materials have been submitted (or the deadline

29



for their submission has expired without supplementation from the government), the Court will proceed to the question of reliability of any interrogation reports the government seeks to admit into evidence.

## IV. Conclusion

Since the issuance of the Court's memorandum opinion in <u>Bostan</u>, the government has repeatedly requested that the Court provide more specific guidance as to what sort of information must be provided for the government's proffered hearsay to be admitted into evidence. This memorandum opinion represents the Court's first attempt to provide such guidance. While certain questions remain unresolved (e.g., whether it would constitute an undue burden on the government to compel the government to call detainees at the Guantanamo Bay Naval Base as witnesses rather than allow the government to use hearsay statements allegedly made by those detainees, whether interrogation reports prepared by various government agents are sufficiently reliable to be admitted into evidence, etc.), the basic parameters for the admissibility of evidence are set forth above in about as much detail as the Court is capable of providing.

Thus, to introduce the alleged statements of detainees other than the petitioner into evidence, the government will need to establish by a preponderance that the source of the statement generally provides accurate information. To introduce the interpretation of that statement made by the interpreter at that detainee's interrogation, the government will need to establish by a preponderance that the interpreter was employed by the FBI or had an ILR score of at least 3+ in the target language and 3 in English, or that the statement subject to interpretation concerned the kind of basic information that an interpreter with an ILR score of 2+ in English could be expected to reliably interpret. And to introduce the memorialization of the interpreter's interpretation of a detainee's alleged statement in the form of interrogation reports,

30

RELEASE

the government will need to demonstrate as a threshold matter that it would constitute an undue

burden to require the government to call the interrogators who prepared those reports as

witnesses or, failing that, to produce detailed affidavits or declarations containing the same

information that would have been elicited by the government on direct examination had the

interrogators been called to the witness stand. If the government does not meet these

requirements, the proffered hearsay will not be admitted into evidence.

The Court recognizes that its ruling imposes numerous obligations on the government's

counsel, and that it may take the government some time to satisfy those obligations. The Court

will therefore provide the government with four weeks to file supplemental memoranda of law

addressing the applicability of the Court's various rulings to the proffered evidence at hand along

with any additional affidavits or declarations necessary to support the government's position

regarding the admissibility of that evidence. The Court will permit the petitioner an opportunity

to respond to any supplemental filings by the government within two weeks of such filing.

Finally, the Court will schedule a second hearing on the merits of the petitioner's evidentiary

objections on October 27, 2009, at 3:30 p.m. for further oral argument in light of the Court's

ruling and any supplemental filings by the parties, at the conclusion of which the Court will

hopefully be able to make its final rulings regarding the admissibility of the government's

proffered hearsay in this case.

**SO ORDERED** this _8th_ day of September, 2009.

REGGIE B. WALTON
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE