

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| ABD AL RAHMAN ABDU ABU AL GHAYTH SULAYMAN, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. 05-2386 (RBW) |
| BARACK H. OBAMA, President of the United States, et al., | ) ) ) | |
| Respondents. | ) ) | |

## MEMORANDUM OPINION

Currently before the Court is the petition of Abd Al Rahman Abdu Abu Al Ghayth Sulayman (ISN 223)[1] for a writ of habeas corpus, arguing that he should be released from the United States detention facility in Guantanamo Bay, Cuba, because his detention is not authorized under the Authorization for the Use of Military Force (the "AUMF"), Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). Petition for a Writ of Habeas Corpus ¶ 344. Not surprisingly, the government opposes the petitioner's habeas petition on the grounds that he was "part of" either the Taliban or al-Qaeda, thereby rendering him detainable under the AUMF. Hearing Transcript ("Hr'g Tr.") at 11:4-5, May 3, 2010. After carefully considering the evidence presented by both parties and the arguments of counsel during the merits hearing that commenced on May 3, 2010, as well as the various documents that have been filed by the parties

---

[1] "ISN" is the acronym for "Internment Serial Number." Al-Harbi v. Obama, Civil Action No. 05-2479 (HHK), 2010 WL 2398883, at *3 n.2 (D.D.C. May 13, 2010). Each of the detainees currently housed in Guantanamo Bay has been assigned an ISN. Id.

in this matter and the exhibits attached to these filings,[2] the Court concludes for the following reasons that the petitioner's petition for a writ of habeas corpus must be denied.

## I. Background

The following facts are not in dispute. The petitioner is a Yemeni national who grew up and attended school in Taiz, Yemen. Pre-Trial Stmt. at 6. He completed high school at some point in either 1999 or 2000. See Hr'g Tr. at 284:21-23 (argument by the government that the petitioner graduated from high school in 1999); id. at 481:3-9 (testimony by the petitioner that he graduated from high school in the "sixth . . . or seventh month" in 2000). While living in Yemen, the petitioner "did not have a full-time occupation"; rather, he "assisted his father in his father's carpentry business." Pre-Trial Stmt. at 6.

Although the exact date is contested, the petitioner was approached at a mosque in Taiz by an individual named Abu Khulud, who suggested that the petitioner travel to Afghanistan where he could own a home and possibly find a wife as well. Hr'g Tr. at 293:15-20, 485:16-486:7. The petitioner and Khulud met again on at least one additional occasion, id. 294:3-8, 547:1-4, and ultimately the petitioner agreed with Khulud's suggestion that he travel to Afghanistan, id. at 294:5-8, 546:3-5. Khulud then provided the petitioner with a passport, an airplane ticket to Afghanistan, and $100.00. Id. at 297:1-3, 546:11-21. At some point shortly after his meetings with Khulud, the petitioner boarded a plane and traveled to Karachi, Pakistan. Pre-Trial Stmt. at 7.

---

[2] In addition to the evidence and arguments presented by the parties at the merits hearing, the Court considered the following documents in reaching its decision: (1) the government's Factual Return; (2) the Respondents' Proposed Factual Findings and Evidence on Which They Intend to Rely In Making Their Case-in-Chief for the Lawful Detention of Petitioner Sulayman (ISN 223); (3) the petitioner's Traverse; and 4) the parties' Joint Pre-Trial Statement (the "Pre-Trial Stmt.").

Once he arrived in Karachi, the petitioner took a bus to Quetta, Pakistan, id., where he visited the Daftur guesthouse for an hour, Hr'g Tr. at 335:1-6, 352:13-18. From there, the petitioner left for Kandahar, Afghanistan, Pre-Trial Stmt. at 7, where he stayed at a guesthouse that both the petitioner and the government have referred to as an "Arab house." Hr'g Tr. at 339:6-9, 491:17. After staying at this house for at least seven days, id. at 339:6-9, 491:25-492:2, the petitioner left Kandahar and made his way to Kabul, Afghanistan, at which point he stayed at a guesthouse owned by a man named Hamza Al Qa'eity, Hr'g Tr. at 343:1-2, 494:15-23; Pre-Trial Stmt. at 7. The petitioner stayed at Al Qa'eity's guesthouse for at least seven months, Hr'g Tr. at 350:6-7, 495:18-19, without being required to pay for his housing, id. 549:25-550:3. He was also provided food at the home without cost. Id. at 549:23-25.

While staying at the Al Qa'eity guesthouse, the petitioner visited a location approximately twenty kilometers north of Kabul that he described as a "recreational place." Id. at 499:13-23; cf. id. at 391:11-15. While in this area, the petitioner fired a "PK" machine gun belonging to an individual named Farhan. Hr'g Tr. at 503:13-20 (the petitioner testified that he saw a weapon called a "PK" that belonged to an "individual named Farhan," which the petitioner fired once); cf. id. at 392:10-16 (assertion by the government that the petitioner was "trained" on a "PK machine gun" by a Pakistani named Farhan). After some time at this location, the petitioner returned back to the Al Qa'eity home. Id. at 506:23-507:17.

The petitioner remained at the Al Qa'eity guesthouse until after the United States was attacked on September 11, 2001, at which point the petitioner left the house and returned to the area north of Kabul where he had been earlier. Pre-Trial Stmt. at 7; see also Hr'g Tr. 508:8-23. After several days, the petitioner made his way towards Jalalabad, Afghanistan, and ultimately into the mountains outside of Jalalabad. Hr'g Tr. at 407:24-408-2, 509:11-510:23. Eventually,

3

the petitioner entered Pakistan, and in approximately late December 2001, he was taken into custody by Pakistani authorities. Pre-Trial Stmt. at 7. Pakistani law enforcement eventually transferred custody of the petitioner to the United States military, who then transferred the petitioner to Guantanamo Bay in February 2002. Id.

Along with numerous other detainees, the petitioner filed the petition now before the Court on December 21, 2005, seeking release from Guantanamo Bay on the grounds that, inter alia, the United States government violated his due process rights under the United States Constitution and the Geneva Conventions. See Petition for Writ of Habeas Corpus ¶¶ 378, 382, 386. Having "serious questions concerning whether this Court retain[ed] jurisdiction" as a result of Congress's attempt to strip this Court of jurisdiction in passing the Military Commissions Act of 2006, Pub. L. No. 109-336, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241) (the "2006 MCA"), the Court stayed these cases until the question of jurisdiction was resolved on appellate review. Order, Jabbarov v. Bush, Civil Action No. 05-2386 (RBW) at 1 (D.D.C. Jan. 31, 2007). The Court later lifted the stay after the Supreme Court issued its opinion in Boumediene v. Bush, 553 U.S. 723, 128 S. Ct. 2229 (2008), in which the Supreme Court held that non-United States citizens detained at Guantanamo Bay are constitutionally entitled to seek habeas relief and that the 2006 MCA's jurisdiction-stripping provision was "an unconstitutional suspension of the writ." Id. at 2274.

In light of the Boumediene decision, the members of this Court on July 1, 2008, "resolved by Executive Session to designate" the Honorable Thomas F. Hogan of this Court "to coordinate and manage proceedings in all cases involving petitioners presently detained in Guantanamo Bay, Cuba." Order, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) at 1 (D.D.C. July 2, 2008). After carefully considering the positions of the various

parties in these cases, Judge Hogan issued a case management order on November 6, 2008, which laid out the procedural and substantive contours for resolving these habeas petitions.[3] Pursuant to this order, the government then filed its Factual Return in this case on November 25, 2008, in which it produced the evidence that it seeks to rely upon in this proceeding to justify the petitioner's detention. In turn, the petitioner responded to the evidence proffered by the government in his Traverse, which he filed on July 23, 2009. As further requested by this member of the Court in the June 12, 2009 supplement to the case management order, the government filed its Proposed Factual Findings and Sources of Evidence on January 8, 2010. With all discovery having been completed and the matter having been fully briefed, the Court commenced a hearing on May 3, 2010, to consider the merits of the petitioner's petition for a writ of habeas corpus.

## II. Standard of Review

The ultimate question to be resolved in regards to the petitioner's habeas petition is whether the government's detention of the petitioner is lawful under the AUMF. While the Supreme Court in Boumediene held that individuals detained by the government at Guantanamo Bay "were entitled to the privilege of habeas corpus to challenge the legality of their detention," Boumediene, 128 S. Ct. at 2262, it also concluded that "[t]he extent of the showing required of the Government in these cases [was] a matter [left] to be determined" in future proceedings," id. at 2271.

This member of the Court attempted to resolve this threshold legal question in Gherebi v. Obama, 609 F. Supp. 2d 43 (D.D.C. 2009). After analyzing the international laws of war, this member of the Court concluded that "the President may detain anyone who is a member of the

---

[3] Judge Hogan subsequently amended his case management order on December 16, 2008, and this member of the Court issued several amendments to the order on December 19, 2008, February 19, 2009, and June 12, 2009.

'armed forces' of an organization that he determines planned, authorized, committed, or aided" the September 11, 2001 attacks, "any member of the 'armed forces' of an organization harboring the members of such an organization," id. at 67 (citation and internal quotation marks omitted), and any civilian who "take[s] a direct part in the hostilities," id. at 69. The Court acknowledged the difficulty in discerning membership in the "armed forces" of the enemy, as "the organizations that the President is authorized to target under the AUMF do not . . . issue membership cards or uniforms." Id. at 68 (citation and internal quotation marks omitted). Nonetheless, the Court noted that one "distinguishing characteristic[] of an 'armed force' is the notion that the group in question be organized . . . under a command responsible . . . for the conduct of its subordinates." Id. (citation and internal quotation marks omitted). Thus, for the government to justify the detention of a detainee under the AUMF, the Court held that the government must establish more than "mere sympathy" for an enemy organization on the part of the detainee; rather, the government must prove that the detainee has "some sort of 'structured' role in the 'hierarchy' of the enemy force," id. (internal quotation marks omitted), or that he directly participated in the hostilities, id. at 68-69.

Gherebi was substantially rejected sub silento, however, by the District of Columbia Circuit in Al-Bihani v. Obama, 590 F.3d 866 (D.C. Cir. 2010) ("Al-Bihani I"). In Al-Bihani I, the petitioner relied on the international laws of war in arguing that his detention was unlawful because he was essentially a "civilian contractor," and, pursuant to the laws of war, he could not be detained because anyone not "belonging to an official state military is a civilian, and civilians . . . must commit a direct hostile act, such as firing a weapon in combat, before they can be lawfully detained." Id. at 871. The circuit rejected this argument, reasoning that "[t]here is no indication" from Congress that it "intended the international laws of war to act as extra-textual

6

limiting principles for the President's war powers under the AUMF." Id. Rather, the circuit concluded that the appropriate sources for determining the scope of the President's authority under the AUMF to detain an individual "are the sources courts always look to: the text of relevant statutes and controlling domestic caselaw." Id. at 871-72.

Turning to those sources, the District of Columbia Circuit concluded that "[t]he statutes authorizing the use of force and detention not only grant the government power to craft a workable legal standard to identify individuals it can detain, but also cabin the application of these definitions." Id. at 872. The circuit then turned to the 2006 MCA, as well as the Military Commissions Act of 2009, sec. 1802, §§ 948a(7), 948b(a), 948c, Pub. L. No. 111-84, tit. XVIII, 123 Stat. 2190, 2575-76 (the "2009 MCA"), both of which it found "illuminating in th[e] case [before it] because the government's detention authority logically covers a category of persons no narrower than is covered by its military commission authority." Id. As the circuit observed, "[t]he 2006 MCA authorized the trial of an individual 'who engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawfully enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces),'" id. (quoting 2006 MCA § 948(1)(A)(i)), while the 2009 MCA authorized the trial of "unprivileged enemy combatants," which included those persons who "purposefully and materially supported hostilities against the United States or its coalition partners," id. (quoting 2009 MCA §§ 948a(7), 948b(a), 948(c)). Applying these definitions to the appellant in that case, the circuit upheld the lower court's denial of the writ of habeas corpus, concluding that the appellant, who admitted that he "accompan[ied] the brigade on the battlefield, carr[ied] a brigade-issued weapon, cook[ed] for the unit, and retreat[ed] and surrender[ed] under brigade orders," fell within the scope of individuals detainable under the AUMF as illuminated by the

2006 and 2009 versions of the MCA. Id. at 872-73. Notably, the circuit also observed that even if it were to assume that the petitioner was a "civilian contractor," his act of providing "traditional food operations essential to a fighting force and the carrying of arms," was sufficient to meet the "'purposefully and materially supported' language of both versions of the MCA." Id.

Subsequent decisions of the District of Columbia Circuit have also provided guidance on the showing necessary for the government to justify detention under the AUMF. In Awad v. Obama, ___ F.3d ___, ___, 2010 WL 2292400, at *10 (D.C. Cir. June 12, 2010), the circuit rejected the appellant's argument that "there must be a specific factual finding that he was part of the 'command structure' of al Qaeda," noting that "[n]owhere in the AUMF is there a mention of command structure." While proof that "a detainee was part of the 'command structure' of al Qaeda [would] satisf[y] the requirement to show that he was 'part of' al Qaeda," the circuit concluded that the government could also rely on other "ways . . . to prove that a detainee is 'part of' al Qaeda." Id. The circuit then issued its decision in Bensayah v. Obama, ___ F.3d ___, ___, 2010 WL 2640626, at *5 (D.C. Cir. June 28, 2010), it which that panel observed that it would be "impossible to provide an exhaustive list of criteria for determining whether an individual is 'part of' al Qaeda." Nonetheless, the panel in that case noted that whatever the outer bounds of the government's detention authority might be, it is clear that "the purely independent conduct of a freelancer is not enough." Id.

Thus, under the law of this circuit, the government may establish the lawfulness of the petitioner's detention by showing that he "engaged in hostilities . . . against the United States," that he "purposefully and materially supported hostilities against the United States or its coalition partners," or that he "is part of the Taliban, al Qaeda, or associated forces." Al-Bihani, 590 F.3d at 871. And, the determination of whether an individual is "part of" the Taliban, al Qaeda, or

associated forces is one that "must be made on a case-by-case basis by using a functional rather than a formal approach." Bensayah, ___ F.3d at ___, 2010 WL 2640626, at *5. Moreover, the government may seek to justify detention by making a showing that the detainee was part of the "command structure" of either the Taliban, al Qaeda, or their associated forces, yet it is not necessary for the government to make such a showing.[4] Awad, ___ F.3d at ___, 2010 WL 2292400, at *10. But, the government must do more than just prove that the detainee was an "independent . . . freelancer." Bensayah, ___ F.3d at ___, 2010 WL 2640626 at *5.

Finally, as for the burden of proof required to justify detention, the District of Columbia Circuit has approved in several decisions the standard adopted from the case management order, see, e.g., Awad, ___ F.3d at ___, 2010 WL 2292400, at *9 (citing Al-Bihani I, 590 F.3d at 878) ("We have already explicitly held that a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay."), to wit, that the government has the burden of persuading the Court that the petitioner is detainable under the AUMF by a preponderance of the evidence.[5] Case Management Order, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C. November 6, 2008). This means that the government must convince the Court "to believe that the existence of a fact is more

---

[4] Given that the government can justify detention by showing that a detainee was part of the "command structure" of enemy forces, this Court's decision in Gherebi can still be relied upon as a basis for ordering detention, provided that it does not conflict with the precedent of the District of Columbia Circuit.

[5] While the District of Columbia Circuit has held that the imposition of a preponderance of the evidence standard is constitutionally permissible in these Guantanamo Bay detainee habeas cases, it has left open the question of whether a lower standard of proof could constitutionally suffice as well. Al-Bihani I, 590 F.3d at 878 n.4. In Al-Adahi v. Obama, ___ F.3d ___, 2010 WL 2756551, at *2 (D.C. Cir. July 13, 2010), the circuit most recently expressed skepticism about the proposition that the preponderance of the evidence standard is constitutionally required in these habeas cases, noting that it was not "aware of [any] precedents in the eighteenth[-]century English courts [that] adopted a preponderance standard," and that "[e]ven in later statutory habeas cases in this country," the government generally did not have the burden of establishing lawful detention by a preponderance of the evidence. See id. (observing that the standard of proof applied in various habeas proceedings ranged from "some evidence to support the order" to "probable cause"). However, given that the government in this case has established the lawfulness of the petitioner's detention by a preponderance of the evidence, the Court need not resolve the question left open by the circuit.

probable than its nonexistence." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993). Accordingly, the government has the initial burden of producing evidence in support of its claim for detention, and should the government produce evidence sufficient to establish a prima facie case for detention, then the burden of producing evidence to rebut the government's case shifts to the petitioner. See Hamdi v. Rumsfeld, 542 U.S. 507, 534 (2004) (observing that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria," and that such a "burden-shifting scheme" would not offend the Constitution). After both parties have presented all of their evidence, the Court must weigh the evidence to determine whether the government has met its burden of showing that its evidence "is . . . more convincing than the evidence . . . offered in opposition to it." Greenwich Collieries v. Dir., Office of Workers' Comp. Programs, 990 F.2d 730, 736 (3d Cir. 1993). If the government is successful in making this showing, then the Court must deny the habeas petition. But, where the petitioner's evidence demonstrates that his version of the facts is more likely to be true, or where "the evidence is evenly balanced," the Court must rule in favor of the petitioner. Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 281 (1994).

### III. Legal Analysis

The government contends that it has legal justification under the AUMF to detain the petitioner because it has reliable evidence that (1) he attended an al-Qaida-affiliated training camp, specifically the Tarnak Farms camp; (2) he was recruited by an al-Qaida or Taliban operative who facilitated his travel to Afghanistan so that he could join the Taliban, al-Qaida, or their associated forces; (3) he stayed at al-Qaida and Taliban-associated guesthouses during his

10

travels to, and time in, Afghanistan; (4) he served as a Taliban guard or interrogator at the Taliban's Sarpoza prison in Kandahar, Afghanistan; (5) he traveled to an area at or near the front lines in Afghanistan; and (6) he was captured on or near the battlefield at Tora Bora. Pre-Trial Stmt. at 23. In support of its case-in-chief, the government offers the following types of documents: (1) field documents, or "FD-302s," which are prepared by Federal Bureau of Investigation (the "FBI") agents to summarize an interview"; (2) "Form 40s," also known as "FM-40s," which are used by the Department of Defense Criminal Investigation Task Force (the "CITF") "to record investigation activity, such as witness interviews"; (3) "summary interrogation reports," also known as "SIRs," which are █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Government's Exhibits (the "Gov't's Exhibits"), Ex. 1 (Declaration of Intelligence Officer ██████████████████████ (Sept. 19, 2008) (the ██████████████ Decl.")) at 7; (4) "intelligence information reports," also known as "IIRs," which are "the main [Department of Defense] vehicle for the [human intelligence] information used by [the Defense Intelligence Agency] and military services," id. at 6; (5) "memorandum for record," also known as a "MFR," which for all intents and purposes "is the functional equivalent of the [SIR]," Gov't's Exhibits, Ex. 25 (Declaration of Paul Rester (Dec. 2, 2009) ¶ 6; and (6) █████████████████████

████████████████████████████████████████████████████

██████████████████ Gov't's Exhibits, Ex. 1 ██████████████ Decl.) at 7. Given that all these documents contain hearsay in one form or another, the government has the burden of presenting its hearsay "in a form, or with sufficient additional information, that permits the . . .

11

[C]ourt to assess its reliability." Parhat v. Gates, 532 F.3d 834, 849 (D.C. Cir. 2008). And with regards to what might constitute "sufficient . . . information" to help the Court assess the reliability of the government's evidence, this member of the Court issued three extensive opinions on this subject. An overview, therefore, is essential for setting forth the analytical framework for determining whether this Court should ascribe any probative weight to the evidence proffered by the government.

To be sure, the use of hearsay evidence in habeas corpus proceedings is nothing extraordinary, as 28 U.S.C. § 2246 (2006) explicitly contemplates the admission into the evidentiary record of sworn out-of-court statements in considering an applicant's habeas petition.[6] See id. (providing for the admission of deposition testimony or affidavits in a habeas proceeding). What is unique about these Guantanamo Bay detainee habeas cases, however, is the guidance from the Supreme Court that it may be necessary for this Court to relax the prohibitions on hearsay to presumably accept unsworn out-of-court statements, such as those statements contained in interrogation and intelligence reports that the government seeks to rely upon in this case (and the many other Guantanamo Bay habeas cases that are before this Court). See Hamdi, 542 U.S. at 533-34 (noting that "[h]earsay . . . [might] need to be accepted as the most reliable evidence from the [g]overnment in" these habeas corpus proceedings); Awad, ___ F.3d at ___, 2010 WL 2292400, at *2-*3, *8 (concluding that the district court did not commit clear error in its factual findings when it relied upon, inter alia, an interrogation report); Barhoumi v. Obama, ___ F.3d ___, ___, 2010 WL 2553540, at *5 (D.C. Cir. June 11, 2010)

---

[6] 28 U.S.C. § 2246 states the following:

> On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit. If affidavits are admitted any party shall have the right to propound written interrogatories to the affiants, or to file answering affidavits.

(finding no error by the district court in relying upon statements taken from a diary). As the Supreme Court observed in <u>Boumediene</u>, the government has a "legitimate interest in protecting sources and methods of intelligence gathering," and a district court, therefore, is expected to "use its discretion to accommodate this interest to the greatest extent possible." <u>Boumediene</u>, 128 S. Ct. at 2276. Having been tasked by the Supreme Court with developing procedures that will allow it to "assess the sufficiency of the Government's evidence," <u>id.</u> at 2270, the members of this Court turned to Judge Hogan to conduct "a nuanced inquiry to determine [the standards by which] hearsay proffered by the government should be introduced into evidence," <u>Bostan v. Obama</u>, 662 F. Supp. 2d 1, 4 (D.D.C. 2009) (Walton, J.) ("<u>Bostan I</u>").

In his November 6, 2008 case management order, Judge Hogan developed a two-pronged analysis that would guide the members of this Court in determining whether to "admit and consider hearsay evidence that is material and relevant to the legality of the petitioner's detention." Case Management Order, <u>In re Guantanamo Bay Detainee Litig.</u>, Miscellaneous Action No. 08-442 (TFH), at 5 (D.D.C. Nov. 6, 2008). Specifically, Judge Hogan determined that the government's hearsay evidence is admissible provided that (1) the evidence is reliable, and (2) "that the provision of nonhearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security." <u>Id.</u> The case management order also provided that the individual judges on this Court could "alter the framework based on the particular facts and circumstances of their individual cases." <u>Id.</u> at 2 n.1.

Building on Judge Hogan's framework, this member of the Court amended the case management order on June 12, 2009, to establish a format for determining the admissibility of the evidence relied upon by the government prior to any evidentiary hearing on the merits of those habeas petitions pending before this member of the Court. Specifically, the Court ruled,

13

over the government's objection, that it would consider questions of admissibility regarding the government's evidence prior to any evidentiary hearings because the government's evidence, if held to be inadmissible in part or in whole, may be insufficient to establish a prima facie case for lawful detention under the AUMF. The Court's framework, therefore, directed the government to identify the sources of evidence it intended to rely upon at any evidentiary hearing, to which the individual petitioners would then have an opportunity to file their objections to any evidence proffered, and the Court would resolve such objections before determining whether the government's case was strong enough to require rebuttal evidence from individual petitioners.

This member of the Court then issued the first of three opinions which provided extensive analysis on the standards it would employ for assessing the admissibility of the government's hearsay evidence it would employ. The first decision issued by the Court was <u>Bostan I</u>, in which this member of the Court held that the government must establish the admissibility of its hearsay evidence by showing (1) that the evidence is admissible "under the Federal Rules of Evidence, as modified by 28 U.S.C. § 2246," or (2) that "the proffered hearsay is reliable and . . . that the provision of non-hearsay evidence would unduly burden the government . . . or interfere with the government's ability to protect national security." <u>Bostan I</u>, 662 F. Supp. 2d at 8. The Court also "elaborated" on the meaning of the "undue burden" requirement in the second prong of Judge Hogan's standard, noting that "[w]here the government is unable to produce non-hearsay evidence due to its own administrative or bureaucratic errors or lack of resources to amass such evidence, it cannot rely upon the shortage of resources or its own mistakes as justification for the use of hearsay." <u>Id.</u> at 4. The Court also concluded that "it is no excuse for the government's lawyers to assert that there are too many habeas corpus petitions pending before the Court or too few resources allocated to the Department of Justice to compel fidelity to the centuries-old

proscription against the use of [unreliable] hearsay," id. at 4, that "the government will need to demonstrate why the use of non-hearsay alternatives would be unduly burdensome to the government . . . through the use of statements made under oath by persons with personal knowledge of the matter about which their representations relate," and that "the undue burden standard . . . does not mean . . . that hearsay proffered by the government must be admitted into evidence because that is all the evidence that the government has available to it," id. at 5. The Court also reiterated its commitment to the format set forth in its June 12, 2009 order for considering the admissibility of the government's hearsay evidence, rejecting calls by the government "to adopt a blanket presumption that the hearsay proffered by the government in each of its cases before this member of the Court is admissible," as well as to "look at all of the government's hearsay in context before determining the admissibility of individual pieces of evidence." Id. at 8 (internal quotation marks omitted).

Soon after the issuance of Bostan I, the Court opined further on the admissibility of the government's hearsay evidence in Al-Bihani v. Obama, 662 F. Supp. 2d 9 (D.D.C. 2009) ("Al-Bihani II"). There, the Court explained that, generally speaking, each piece of evidence proffered by the government has the potential to provide three levels of hearsay—the source's original statement, the interpretation of those statements from the source's native language into English, and the memorialization of those translated statements in a written report. Id. at 17. The Court further noted that the government must show that each level of hearsay satisfies the two-prong standard for admissibility set forth in Judge Hogan's case management order and explicated in Bostan I. Al-Bihani II, 662 F. Supp. 2d at 16-17.

With regards to the first level of potential hearsay—the statements of the source—the Court observed that "insofar as the petitioner's own statements are concerned, this is a non

15

issue," as those statements are considered "party admissions" that are admissible under the Federal Rules of Evidence. Id. at 17; see Fed. R. Evid. 801(d)(2) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement."). As for statements made by other sources, the Court concluded that it will admit hearsay statements by the government that are otherwise inadmissible under the Federal Rules of Evidence or Section 2246 if the government can demonstrate that "(1) that the circumstances surrounding the creation of the hearsay are such that the hearsay is inherently reliable[,] or (2) that the source of the hearsay is generally reliable, thereby giving rise to a presumption of reliability as to any hearsay statements provided by that source." Al-Bihani II, 662 F. Supp. 2d at 20. In order for the Court to assess the reliability of a source, the Court explained that

> it is not enough to demonstrate . . . that the statement in question is consistent with other statements made by other declarants of unknown reliability. Rather, the government must establish that the putatively corroborative evidence is both admissible and establishes the factual matter that purportedly establishes the source's reliability. In other words, for the government to show that a source of hearsay is reliable, it must establish that the statements provided by that source are, in general, factually accurate by a preponderance of the evidence, not just that there is some other evidence in the government's possession that coincides with the statement of the source in question.[7]

---

[7] The Court acknowledges the District of Columbia Circuit's rejection of the proposition that "two pieces of evidence, each unreliable when viewed alone, cannot ever corroborate each other." Bensayah, ___ F.3d at ___, 2010 WL 2640626, at *6 (citing United States v. Laws, 808 F.2d 92, 100-03 (D.C. Cir. 1986)). In Laws, however, one of the factors that the circuit considered in concluding that two affidavits, each independently unreliable standing alone, could corroborate one another was the fact that the sources of those affidavits were not associated with one another. Laws, 808 F.2d at 103. In regards to the Guantanamo Bay detainee habeas cases, the fact that the sources of the interrogation and intelligence reports that the government seeks to rely upon are all detained in the same location, thereby making it likely that the sources have associated with one another, continues to give the Court concern about the "evidentiary bootstrapping" discussed in Al-Bihani II, i.e., that two similar statements made by two different people are ultimately derived from one unreliable source, thereby making both statements unreliable. See Al-Bihani II, 662 F. Supp. 2d at 19 n.11.

Nonetheless, given the precedent of this circuit, the Court (should this issue even arise) will entertain the government's utilization of two pieces of unreliable evidence to corroborate each other, provided that the government can assuage the Court's concerns identified in Al-Bihani II.

Id. To meet this standard, the Court cautioned that "it will not suffice for the government to establish that a source of hearsay provided accurate information on one or two isolated occasions." Id. Rather, the government is required to show, "absent unusual circumstances, . . . a pattern of accuracy in the source's statements." Id. By establishing this pattern of accuracy, the Court would be satisfied that the source is "generally reliable, which, in turn, would suggest that any specific statements made by the source of the statement would be generally reliable as well." Id.

As to the second level of potential hearsay—the interpretation from the source's native language to English—the Court explained that interpretations rendered by interpreters who are either employed by the FBI, or obtained an International Language Roundtable ("ILR") score "of 3+ in a target language and 3 in English[,] are sufficiently reliable to permit the admission of their interpretations into evidence." Id. at 22. For those interpreters not employed by the FBI or who obtained an ILR score of 2+ in English, however, the Court concluded that they lack sufficient credentials "to ensure that any complex statements rendered in English by such an interpreter are reliable." Id. at 24. Accordingly, the Court concluded that it would not admit "into evidence interpretations provided by interpreters with a 2+ score in English except with respect to basic information provided by the detainee."[8] Id.

_____

[8] A point of clarification is necessary here. In Al-Bihani II, the Court wrote that interpretations by interpreters who obtained an ILR score of 2+ are unreliable "with respect to any topics other than those arising in 'basic social situations.'" Al-Bihani, 674 F. Supp. 2d at 24 (emphasis added); see also id. at 24-25 (concluding that interpreters with an English score of 2+ on the ILR scale can be found only to provide translations "of the sort that a person with an ILR score of 2+ would reasonably be able to understand and articulate in English (i.e., 'basic social situations[,] including introductions and casual conversations about current events, work, family, and autobiographical information)" (emphasis added)). Upon further review of the declaration relied upon in that opinion, however, the Court now believes that its observations in Al-Bihani were overly narrow. In that declaration, which has also been submitted by the government in the present case, Paul Rester, the Director of the Joint Intelligence Group at the Joint Task Force Guantanamo, stated that an interpreter with an ILR score of 2+ in English can handle more than just "basic social situations"; in fact, these interpreters also "can get the gist of most conversations on non-technical subjects (i.e., topics which require no specialized knowledge)," and that they can render interpretations that requires no more than "handl[ing] elementary constructions" and utilizing a "speaking
(continued . . . )

Lastly, Al-Bihani II addressed the issue of assessing the reliability of the third level of potential hearsay—the memorialization of a source's interpreted statements in an interrogation or intelligence report. The Court expressed "serious concerns" regarding the reliability of interrogation reports prepared by unknown interrogators under unknown circumstances, but in response to the government's assertion in that case that it would be unduly burdensome for the government to call in the various interrogators who authored the reports that the government sought to rely upon, the Court ruled that the government must establish that

> not only . . . would [it] create an undue burden for the government to call the various interrogators who drafted the reports as witnesses at the merits phase of this proceeding, but also that it would create an undue burden for the government to procure affidavits or declarations from these interrogators setting forth the information that would otherwise be elicited on direct examination (e.g., the process used to create the interrogation reports, the circumstances surrounding the interrogation, and the substance of the petitioner's alleged statements (as interpreted by the interpreter)).

Id. at 26. As an alternative of "last resort," the Court opined that the government could establish the reliability of its interrogation reports "through the submission of a global affidavit describing the process used by interrogators . . . to reduce what was said and the observations made during interrogations into their written reports." Id. As for statements made by sources other than the petitioner, the Court concluded that, at least in the factual context of Al-Bihani II, it need not "apply the undue burden prong with the same level of scrutiny" because those statements were "less crucial to the government's case." Id. The Court cautioned, however, that even with respect to statements made by other sources, it might "eventually conclude that the reports regarding the interrogation of other detainees lack sufficient indicia of reliability to be admitted

(. . . continued)
vocabulary sufficient to respond simply with some circumlocutions." Gov't's Exhibits, Ex. 137 (Declaration of Director Paul Rester (July 20, 2009)) ¶ 3. Thus, where the government seeks to rely upon hearsay that is translated by an interpreter with an ILR score of 2+ in English, the Court will not limit itself to crediting only those statements that would arise in "basic social situations," so long as the interpreted statements that the government seeks to rely upon fall within the competency of that interpreter.

18

into evidence," which would mean that "the failure of the government to call the interrogators who created the reports or at least submit sworn statements approximating their testimony would preclude the Court's consideration of the substance of these reports." Id.

The last opinion in the Court's trilogy of decisions on the admissibility of hearsay is Bostan v. Obama, 674 F. Supp. 2d 9 (D.D.C. 2009) ("Bostan II"). In that case, the Court refused to accept the argument raised by the petitioner that intelligence reports were inadmissible per se because "[r]aw intelligence is essentially unusable until analyzed by a trained source intelligence analyst." Id. at 24. The Court concluded that the more prudent approach would be to "consider the admissibility of the government's proffered intelligence reports on a case-by-case basis rather than reject the reports out of hand," id. at 25, because the Court has the capability "to assess the general reliability of the source providing the intelligence in question as well as the circumstances surrounding that intelligence provided that the government supplements its evidentiary submissions with the information needed to permit such a determination," id. at 24-25.

The Court also addressed in Bostan II the admissibility of statements that are alleged by the petitioner to be the product of coercion. The Court observed that "[i]n a typical case," coerced statements are inadmissible under the Due Process Clause of the Fifth Amendment "not because such confessions are unlikely to be true[,] but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system," id. (quoting Rogers v. Richmond, 365 U.S. 534, 540-42 (1961)), and "because declarations procured by torture are not premises from which a civilized forum will infer guilt," id. (quoting Lyons v. Oklahoma, 322 U.S. 596, 605 (1944)). However, the Court concluded that it could not refuse to consider coerced statements made by

19

detainees on constitutional grounds because "[t]he detainees at Guantanamo Bay . . . have no due process rights." Id. at 29 (citing Kiyemba v. Obama, 555 F.3d 1022, 1026-27 (D.C. Cir. 2009)). But notwithstanding the lack of due process protections accorded those individuals detained at Guantanamo Bay, the Court recognized that statements resulting from coercion may nonetheless be disregarded due to the "likelihood that the [statements are] untrue." Id. at 30 (quoting United States v. Karake, 443 F. Supp. 2d 8, 50-51 (D.D.C. 2006), in turn quoting Linkletter v. Walker, 381 U.S. 618, 638 (1965)). Under this basis for exclusion, the Court concluded that the admissibility of these statements would be determined on a case-by-case basis because "it is at least conceivable that the government could establish either that a specific witness . . . consistently produced accurate information even when subjected to coercive tactics, or that certain techniques employed by the government, even if coercive, are generally successful in producing reliable information." Id.

While this member of the Court thought it prudent to set forth guiding principles for determining whether evidence should be admitted into the record before considering what weight to ascribe to that evidence, the District of Columbia Circuit thought otherwise. In Al-Bihani I, the circuit concluded that "the question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits." Al-Bihani I, 590 F.3d at 879 (emphasis added). But

---

[9] It should be noted here that the District of Columbia Circuit's recent decision in Awad could be construed to suggest that this Court's procedure for determining the admissibility of the government's hearsay evidence before proceeding to a merits hearing was correct. In that decision, the circuit concluded that "hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable." Awad, ___ F.3d at ___, 2010 WL 2292400, at *5 (emphasis added). Unlike Al-Bihani, in which the circuit seemingly concluded that the admissibility of the government's hearsay evidence is mandatory, see Al-Bihani I, 590 F.3d at 879 (concluding that the government's hearsay evidence "is always admissible"), the language used by the circuit in Awad appears to suggest that the admissibility of the government's hearsay evidence is conditional on whether the evidence is reliable, as this member of the Court concluded in its June 12, 2009 order amending the case management order.

(continued . . . )

20

notwithstanding the fact that the Court's energies are to be no longer directed at the question of admissibility, the practical impact of Al-Bihani on the consideration the Court must give to hearsay evidence brought before it is quite minimal. For evidence that normally would be admissible in a habeas proceeding, i.e., evidence admissible under the Federal Rules of Evidence, as modified by 28 U.S.C. § 2246, the Al-Bihani decision has little effect, as that evidence was admissible even under the old standards set by this member of the Court. But with regards to hearsay evidence to which the government would have needed to meet the requirements set forth in Bostan I, Al-Bihani II, and Bostan II, the reality is that the principles annunciated in these decisions, while no longer useful for determining evidentiary admissibility, are still illuminating for the purpose of determining the probative value of each piece of hearsay evidence that the government seeks to rely upon to justify a petitioner's detention. As the Court noted in Bostan I,

> [w]hether the assessment of a piece of hearsay's evidentiary worth is made at a preliminary hearing on the admissibility of proffered evidence or at the close of merits proceedings after being provisionally admitted into the record, the bottom line is that hearsay of no evidentiary worth will not be considered when the Court makes its factual findings.

Bostan I, 662 F. Supp. 2d at 7. Thus, as was made clear to the parties in the Merits Hearing Procedures Order issued on February 16, 2010, the Court will continue to apply the principles set forth in Bostan I, Al-Bihani II, and Bostan II in determining whether the government has

---

(. . . continued)

Notwithstanding the Awad court's seeming endorsement of this Court's approach for assessing the admissibility of the government's hearsay evidence, the Court concludes for two reasons that the Awad court did not intend to disturb the Al-Bihani panel's directive to this Court to admit all of the government's hearsay evidence into the record. First, in support of its observations regarding the admissibility of hearsay evidence, the Awad panel cited the Al-Bihani decision and, in the parenthetical following that citation, quoted the language from that decision that the government's hearsay evidence "is always admissible." Awad, ___ F.3d at ___, 2010 WL 2292400, at *5. Second, it is well-settled that a three-judge panel of the District of Columbia Circuit is "without authority to overturn a decision by a prior panel of [the circuit]." La. Pub. Serv. Comm'n v. FERC, 522 F.3d 378, 390 (D.C. Cir. 2008). For these reasons, the Court concludes that the circuit's ruling in Al-Bihani regarding the admissibility of the government's hearsay evidence remains controlling precedent.

provided the Court with sufficient indicia of reliability for each hearsay statement that it seeks to rely upon.[10]

The upshot from all of these decisions is that for each hearsay statement that the government seeks to rely upon in this proceeding that is not otherwise admissible under the Federal Rules of Evidence or 28 U.S.C. § 2246, it must establish the reliability of those statements by making the following showing: (1) that with regards to the specific statements that the government seeks to rely upon, those statements "were made under circumstances that render them intrinsically reliable or were made by reliable sources"; (2) that "with respect to statements crucial to the government's case, that it would be unduly burdensome to call the sources as witnesses or provide declarations under oath in lieu of live testimony"; (3) "that the statements purportedly made by these sources were interpreted by a reliable interpreter," e.g., "an interpreter who works for the FBI or who has an ILR score of at least 3 in English," unless the statement being interpreted is one "that a person with an ILR score of 2+ would reasonably be able to understand and articulate in English"; and (4) "that the interpreted statements were recorded by the interrogator in a manner that is reliable," and that in cases involving statements crucial to the government's case, such a showing be made by the interrogator's live testimony, the submission of "a declaration or affidavit approximating such testimony," or, "as a last resort, . . . a global affidavit describing the process used by interrogators," unless the government can show that it

---

[10] In Al-Bihani II and Bostan II, this member of the Court left open the question whether Judge Hogan's two-prong standard should be applied to determine whether otherwise inadmissible evidence proffered by the petitioner should be admitted into the record, given that "the Supreme Court mentioned only the possibility of considering hearsay proffered by the government in Hamdi and Boumediene." Al-Bihani II, 662 F. Supp. 2d at 16 n.6 (citing Hamdi, 542 U.S. at 533-34 (plurality opinion) and Boumediene, 128 S. Ct. at 2276); Bostan II, 674 F. Supp. 2d at 30 n.11. And, in light of Al-Bihani I, the question becomes whether Judge Hogan's standard, as supplemented by this member of the Court's decisions, should control in assessing the reliability of the petitioner's proffered hearsay evidence. In light of the fact that the petitioner's otherwise inadmissible hearsay evidence does not materially undercut the government's case for the petitioner's lawful detention under the AUMF, the Court will assume that such evidence is admissible and continue to defer on the question left open in Al-Bihani II and Bostan II.

22

would be an undue burden to comply with this requirement. Al-Bihani I, 662 F. Supp. 2d at 17-26. If the government cannot meet at least one of these four requirements with respect to each document that it seeks to rely upon in justifying the petitioner's detention, then the Court will not ascribe any probative weight to that evidence absent compelling reasons to the contrary.

Applying these standards here, the Court has concerns that much of the hearsay proffered by the government is unreliable. As to many of the intelligence reports that it relies upon—IIR 2 340 6308 02, IIR 2 340 6576 02, and IIR 6 034 0349 04, to name a few—there is nothing in the record regarding the qualifications of the interpreters used in those interrogations to render a reliable interpretation. There are other intelligence reports—for example, IIR 2 340 6576 02 and IIR 2 340 6308 02—in which the government has failed to provide foundational evidence that those statements "were made under circumstances that render them intrinsically reliable or were made by reliable sources." Bostan II, 674 F. Supp. 2d at 28 (citation omitted). But whether there are compelling reasons for the Court to nonetheless find this evidence reliable is a question that need not be resolved here because the government has made the requisite prima facie showing of reliability with regards to two documents—one labeled ISN 223 FD-302 and dated April 17, 2002 (the "April 17, 2002 FD-302"), and the other labeled ISN 223 FM-40 and dated August 19, 2004 (the "August 19, 2004 FM-40")—and these two documents, when weighed against the petitioner's testimony and the hearsay evidence relied upon by the petitioner, are sufficient to convince the Court that the government is authorized to detain the petitioner under the AUMF.

As discussed above, the Court must assess the reliability of these two government proffered documents at three distinct levels. The first level is the source of the underlying statements; in this case, the source of the statements contained in these two documents is the

petitioner himself. Thus, these statements do not constitute hearsay under the Federal Rules of Evidence, as "[t]he statement is [being] offered against a party and is . . . the party's own statement." Fed. R. Evid. 801(d)(2)(A). As to the second level of this analysis regarding these two documents—the interpretation of the statement—the government has already established the reliability of the April 17, 2002 FD-302, as the interpreter used in that interview was employed by the FBI. See Al-Bihani, 662 F. Supp. 2d at 24 (concluding that "interpretations provided by interpreters employed by the FBI . . . are sufficiently reliable"). Furthermore, the government has established the reliability of the interpreter used during the August 19, 2004 interview that was memorialized in the FM-40, as the interpreter used in that session—named ███████████ obtained an ILR score of 3 in English. Gov't's Exhibits, Ex. 136 (Affidavit of ███████████ Director of Program Control of Linguist and Operational Technical Support Division) at 4. And as for the last level of the Court's analysis—the interrogator's memorialization of the statement—the government has provided affidavits from the respective interrogators utilized to record the petitioner's interpreted statements in both documents. In each of those affidavits, the interrogators discuss the manner in which they recorded the statements. With regards to the April 17, 2002 FD-302, the government provides the declaration of FBI Special Agent ███████ ██████ who represented under oath that the report was "prepared . . . in accordance with the practices, policies[,] and procedures of the FBI,"[11] Gov't's Exhibits, Ex. 16 (Declaration of FBI Special Agent ███████████ (Nov. 18, 2009)) ¶ 7(a), that the report "was prepared near the

---

[11] The government also provided the declaration of ███████████, a Supervisory Special Agent with the FBI, who explained the procedures for drafting FD-302s in slightly more detail. He notes that for each interview session, an agent records his notes "on a separate FD-302, with limited exceptions for extended interviews or a series of related interviews, for which composite FD-302s may be prepared." Gov't's Exhibits, Ex. 17 (Declaration of FBI Supervisory Special Agent ███████████ (the ███████ Decl.")) ¶ 5. He also represents to the Court that "[a]gents must review draft or dictated FD-302s for accuracy[,] and initial them once the accuracy of the FD-302s has been certified." Id.

time of the interview, usually within five (5) days of the interview,"[12] id. ¶ 7(c), and that the report "represents an accurate summary of the interview [he] conducted," id. ¶ 7(d). As for the August 19, 2004 FM-40, the government provides the declaration of ████████████ an FBI Special Agent assigned to the CITF when he interviewed the petitioner. In that declaration, Special Agent ██████ represents that the report was drafted within twenty-four hours of his interview, Gov't's Exhibits, Ex. 13 (Declaration of Special Agent ███████████ (Dec. 16, 2009)) ¶ 4, that he took "detailed notes during the course of [his] interview[]," that "[a]ll relevant information from [his] notes [were] included in the FM-40s that [he] drafted," and that he "shared drafts of [his] reports with other agents who [also] attended the interview, id. ¶ 5. He also attests that the petitioner "had no specific medical or physical complaints," id. ¶ 6, that he "did not observe . . . any physical or mental symptoms that would lead [him] to question the voluntary nature of [the petitioner's] statements to [him]," id. ¶ 16, and that ██████ "did not witness any outward manifestation that the will of [the petitioner] had been overborne by either [his] detention or the circumstances of [his] interview," id. ¶ 17.[13] Based on the foundational

---

[12] As Special Agent ███████ notes in his declaration, "[t]he date of dictation, or the date the initial draft was prepared by the agent, is provided in the lower left corner of the FD-302[, while t]he date of the final FD-302 is provided in the upper right corner." Gov't's Exhibits, Ex. 17 (████████ Decl.) ¶ 5. A review of these dates on the April 17, 2002 FD-302 confirm that this document was finalized on the same day as the interrogation. See Gov't's Exhibits, Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 1.

[13] To be clear, the petitioner does assert that he was subjected to abuse, deceptive interrogation techniques, and poor living conditions during his detention in Guantanamo Bay. See Hr'g Tr. at 313:7-11 (assertion by the petitioner that he was housed "in a dinky little cell for eight years, and suffering as [one] would imagine ███1,2,5

355:16-18 (assertion by the petitioner that the interrogators used the "futility" approach while questioning him█1, ██████████████████████████2, ██████ 516:16-519:15 (testimony by the petitioner regarding the abuse that he purportedly suffered upon his capture in Pakistan). And, the petitioner suggests that in at least one document, which is labeled ████████ ███████ the statements attributed to him were not reliable because he was subjected to heavy abuse at the hands of his captors. Hr'g Tr. at 67:1-6, May 17, 2010 (arguing that his testimony "denies" the statements reported in ████████ and that the statements were made "when he was subject to this terrible treatment that he has testified to"). But notwithstanding his contentions about the reliability of ███████—which the Court does not rely upon in reaching its decision today—the petitioner does not argue that the abuse he was purportedly subjected to rendered his other statements to interrogators unreliable; to the contrary, he argues that despite the government's purportedly
(continued . . . )

evidence described above, the Court finds that the government has sufficiently established the reliability of these two documents.

Having conducted a thorough reliability assessment of these two documents, the Court must now consider the statements made in these documents, the petitioner's testimony, and any of the evidence proffered by the petitioner in deciding what facts to credit in this case, what reasonable inferences can be drawn from those facts, and whether the government has demonstrated that these facts and the inferences that can be reasonably drawn from them, taken together, are sufficient to support a finding that the petitioner is detainable under the AUMF. As discussed below, the Court does conclude that the government, by a preponderance of the evidence, has established the following facts which, along with the reasonable inferences that can be drawn from those facts, establishes the lawfulness of the petitioner's detention, namely, (1) that a Taliban operative encouraged and facilitated the petitioner's travel to Afghanistan (via Pakistan) by providing him with money, a passport, and an airplane ticket; (2) that the petitioner either visited or stayed at several guesthouses affiliated with the Taliban; and (3) that the petitioner traveled to, and remained in, an area near the front lines of armed conflict in Afghanistan.[14] The Court's analysis with regard to each fact is set forth below.

---

(. . . continued)
abusive treatment, he continually provided consistent and truthful answers to the interrogator's questions. See id. at 354:9-13 (referencing language in Government's Exhibit 46 that the interrogato█1,2,5█
█████████████████████████████████████████████ and the use of various interrogation methods, "[b]ut [that] he maintained his original story" nonetheless); id. at 322:5-8 ("[T]he fact that he has repeated this story over and over again is at least an indication that he's telling the truth, and not that he's trying to cover something up."). Thus, even assuming that the petitioner was in fact subjected to physical abuse, difficult living conditions, and coercive interview techniques, the Court need not consider the impact of that treatment on the reliability of his statements as reflected in the April 17, 2002 FD-302 and August 19, 2004 FM-40 that the Court relies on in reaching its decision.

[14] Because the Court concludes that these facts are sufficient to justify the petitioner's detention under the AUMF, the Court will not address whether the government has sufficiently proven that the petitioner was present at the Tarnak Farms camp, that the petitioner served as a Taliban guard or interrogator at the Sarpoza prison in Kandahar, Afghanistan, or that he was present at Tora Bora in late 2001.

26

1. The Petitioner's Recruitment by a Taliban Operative.

Based on the April 17, 2002 FD-302, the August 19, 2004 FM-40, and the petitioner's testimony, the Court concludes that there is ample evidence in the record to support a finding that the petitioner's travel to Afghanistan was facilitated by a Taliban operative. As noted above, the parties have stipulated to the fact that the petitioner's travel in 2000 or 2001 to Afghanistan was facilitated by Khulud, and that he provided the petitioner with a passport, an airline ticket, and $100.00. Pre-Trial Stmt. at 7; see also Hr'g Tr. 488:23-24, 491:3-13 (testimony by the petitioner that Khulud provided him with a Yemeni passport, one-way airplane ticket, and $100,000). Furthermore, Khulud's affiliation with the Taliban also does not appear to be at dispute, as the petitioner has made several statements suggesting as much. See Gov't's Exhibits, Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 1 (statement by the petitioner that "based solely on [Khulud's] offer," he believed that Khulud "was associated with the Taliban"), Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 1 (memorializing statement by the petitioner that "he has his suspicions" that Khulud "was a Taliban recruiter"); Hr'g Tr. at 544:11-13 (testimony from the petitioner that at the time of his recruitment, Khulud claimed the ability to "get [the petitioner] a house from the Taliban[]"); id. at 327:16-18 (acknowledgement by petitioner's counsel that the petitioner was told that "the Taliban would supply these things").

Notwithstanding the fact that the petitioner was recruited (and ultimately persuaded) to travel to Afghanistan by a Taliban operative, the petitioner contends that this fact is immaterial because Khulud "did not tell [him] . . . that he was expected to go . . . fight with the Taliban or to join the Taliban," Hr'g Tr. 327:20-24, nor did Khulud mention anything regarding "training on weapons" or "fighting the United States or its allies," Hr'g Tr. at 487:21-25; see also Gov't's Exhibits, Ex. 85 (ISN 223 SIR 2 ▮▮▮▮▮▮ at 1 (statement by the petitioner that "jihad was

never mentioned before or during his trip to Afghanistan" (internal quotation marks omitted)). Rather, the petitioner maintains that Khulud simply offered him the opportunity to find a job, a wife, and a house, see Gov't's Exhibits, Ex. 46 (ISN 223 MFR ██████████) at 2 (statement by the petitioner that Khulud "recruited" him to "travel to [Afghanistan] to search for a wife and job"); id., Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 1 (statement by the petitioner that Khulud "offered to arrange a trip to Afghanistan for [the petitioner] so that he could find a wife and home"); id., ████████████████████████████████████████████

████████████████████████████████████████████

id., Ex. 35 (ISN 223 FD-302 (May 28, 2002)) at 1 (statement by the petitioner that he heard from Khulud "that he could get a house for free and a job"); id., Ex. 47 (ISN 223 MFR ██████ ██████) at 2 (assertion by the petitioner that he had been told by Khulud "that if he were an Arab in [Afghanistan], he would be able to build a life"); id., Ex. 77 (ISN 223 FM-40 (Feb. 13, 2004)) at 1 (statement by the petitioner that he traveled to Afghanistan "because there were no opportunities for him in Yemen"); Petitioner's Exhibits (the "Pet'r's Exhibits"), Ex. 220 (ISN 223 SIR ██████████) at 2 (statement by the petitioner that Khulud "encouraged him to go to Afghanistan by telling him that the Taliban gives Arabs money and a house"), and that Khulud's offer formed the sole motivation for the petitioner's travel to Afghanistan, see Gov't's Exhibits, Ex. 46 (ISN 223 MFR ██████████) at 2 (statement by the petitioner that his "decision to travel to" Afghanistan was motivated solely by his desire to find a "bride, house, and job"); id., Ex. 35 (ISN 223 FD-302 (May 28, 2002)) at 1 (statement by the petitioner that "one of [his] goals while in Afghanistan was to find a wife"); Pet'r's Exhibits, Ex. 212 (Records of Combatant Status Review Tribunal Hearing for ISN 223 (Oct. 12, 2004)) at 3 (reflecting an affirmative answer by the petitioner at his CSRT proceeding that his "original intent was to go to

28

Afghanistan to find a wife," and that he asserted it was "incorrect" to say that he "went to Afghanistan to join the Taliban"). The petitioner argues that given his consistent position on this point, the Court should find his story credible and, therefore, accept his position that he traveled to Afghanistan for entirely innocuous purposes and not with the intent to join the ranks of the Taliban. Hr'g Tr. at 322:5-8.

To be sure, the Court acknowledges that the petitioner has taken a consistent position that the motivating factor for his travel to Afghanistan was to find a job, a wife, and a home. But at the same time, the petitioner also admitted to interrogators that "he never really looked" for "a wife, job, or home in Afghanistan," and that in fact "he wasn't really that interested in trying to find a job," even though "he didn't have any money." Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 2 (emphasis added). If it is true that the petitioner would go through the effort of traveling to another country for the purpose of finding a wife, job, or home, then it would appear to the Court that the petitioner would have made at least a minimal effort towards achieving his goals. But the record reflects no such effort, and the petitioner admits that no such effort was made. The Court finds, therefore, that his stated purpose of traveling to Afghanistan is not worthy of belief, no matter how many times he has repeated it. Consistent he may be, credible he is not.

Now that the Court has discredited the petitioner's asserted motivation for traveling to Afghanistan, it is still left with the question of what exactly was the petitioner's motive. The fact that a Taliban operative facilitated the petitioner's travel to Afghanistan is not enough, standing alone, to persuade the Court that it is more likely than not the petitioner intended to travel to Afghanistan for the purpose of becoming a "part of" the Taliban. However, considering the fact that the petitioner was recruited by a Taliban operative, coupled with all of the other evidence

(which the Court will discuss below) that the petitioner stayed at guesthouses where other Taliban fighters resided, and that he traveled to an area near the battle lines where other Taliban fighters were located, the Court is convinced that the most reasonable inference to draw from the evidence is that the petitioner's motive for traveling to Afghanistan was due, at least in part, to his desire to be a "part of" the Taliban. The reasons underlying the Court's inference will be elucidated in its discussion below.

2. The Petitioner's Presence at Taliban-Affiliated Guesthouses

The government and petitioner do not dispute that the petitioner visited or stayed at three different guesthouses during his time in Pakistan and Afghanistan. As the record in this case reflects, the petitioner admitted to visiting the Daftur guesthouse for an hour, Hr'g Tr. at 335:4-6, 352:13-18, before going to Kandahar to stay at an "Arab house," id. at 339:6-9, 491:17. After staying at this second guesthouse for approximately a week, id. at 491:25-492:2; see also id. at 339:6-9, he traveled to the Al Qa'eity guesthouse, where he stayed for seven months without paying for room and board, id. at 495:18-19; see also id. at 350:6-7. Thus, the dispute here is not whether he visited or stayed at these three guesthouses, but whether the Court should conclude that his actions are a reflection of someone who is a "part of" the Taliban.

In support of its case for detention, the government proffers the September 19, 2008 declaration of ▮▮▮▮▮▮▮ a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Gov't's Exhibits, Ex. 5 (Declaration of Senior Intelligence Analyst ▮▮▮▮▮▮▮▮ (Sept. 19, 2008) (the ▮▮▮▮ Decl.")) at 1. ▮▮▮▮▮▮▮ asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ served as

training camp facilitation hubs █████████████████████████████ stations

for frontline fighters associated with al-Qaida and the Taliban." Id. In particular, ███████

provides background on the "Arab house"—as noted above, a guesthouse that the petitioner

admitted residing for at least one week—in which he notes that this venue was a ███████

████████████████████████████████ and that the guesthouse "was used as

a transition point ███████████████ for individuals going to train at various training

camps." Id. at 3.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Not to be outdone of course, the petitioner provides his own declaration from ████████

████████ "a Professor of Political Science at the University of Richmond" who has "studied

Yemeni history and culture" for approximately thirty years. Pet'r's Exhibits, Ex. 298

(Declaration of ████████████ (May 26, 2009) (the ████████ Decl.")) ¶ 2. She asserts that

"there is nothing inherently suspicious or sinister about . . . stay[ing] in guesthouses" in Pakistan

or Afghanistan." Id. ¶ 15. She also claims that some guesthouses provide "free room and

31

board," and that while "[g]uests may sometime[s] perform household chores or errands" in exchange for the accommodations, "such reciprocities are by no means required or expected." Id. ¶ 18(c). She also notes that at some guesthouses, individuals can stay there "from . . . overnight to weeks or even months." Id. ¶ 19(d). Finally, she opines that "[e]ven if there were criminals staying at the same guest houses as [the p]etitioner," this would not implicate the petitioner in any wrongdoing because "[p]eople come and go . . . . [and t]hey might or might not converse, socialize, exchange stories, or otherwise engage with one another, or with the [other] patron[s] of the establishment." Id. ¶ 19(d).

Although both parties have introduced their respective declarations to explain the significance of the petitioner's presence at these guesthouses, the Court finds that who prevails is not reduced to a battle of the experts. Rather, this appears to be a case of comparing apples and oranges. ███████ descriptions of guesthouses are more geared towards the traditional bed-down facility, or what she refers to as a "non-profit youth hostel or YMCA," Pet'r's Exhibits, Ex. 298 (█████ Decl.) ¶ 18(c), ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████ And on the one hand, because there is surely a need for hostel-like accommodations in a "fairly popular destination[]" for Yemenis, such as Afghanistan, Pet'r's Exhibits, Ex. 298 (█████ Decl.) ¶ 15, ██████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ there is no reason for the Court to conclude that both types of guesthouses do not exist in Pakistan and Afghanistan. Thus, the Court need not take issue with the representations made by the three declarants in assessing the significance of one's presence at a guesthouse.

32

The question becomes, however, whether the aforementioned guesthouses where the petitioner stayed are comparable to the type described by▇▇▇▇▇▇▇▇▇, or to those described by the government's declarants. And the answer to that question is manifested in the petitioner's statements, which convinces the Court that these guesthouses are of the variety described by▇▇ ▇▇ and ▇▇▇▇▇▇ and, more significantly, that at least two of these guesthouses provided living quarters for individuals who, on behalf of the Taliban, were engaged in hostilities against the Northern Alliance. The petitioner told interrogators that during his stay at an "Arab house," he observed Afghan guards at the house, and that these guards "had weapons stored in a small room of the house." Gov't's Exhibits, Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 1. This description of the Arab house is fairly consistent with the description provided by▇▇▇▇▇▇ who repesents that Arab fighters were housed at this location. Id., Ex. 5 (▇▇ Decl.) at 3. As for the Al Qa'eity guesthouse, the petitioner told interrogators that he observed "[p]eople . . . coming and going . . . and some of them had hand guns." Id., Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 2. While the "coming and going" from a guesthouse with guns in tow is hardly incriminating evidence by itself, the details provided by the petitioner during his August 19, 2004 interview with the CITF provides additional context to his observation. During that interview, he told interrogators that "[t]he owner of the house, [Hamza] Al Qaeity . . . , made regular trips to the front lines to fight with the Taliban,"[15] and that "a number of other guests at

---

[15] The petitioner contradicted this statement during his testimony at the merits hearing, asserting that he "didn't see" Al Qa'eity "go to the front line with the Taliban," nor did he see "[o]ther individuals at Hamz[a]'s house . . . go up to [the] front lines." Hr'g Tr. at 554:9-14. The petitioner, however, never refuted or retracted the statement he made to interrogators on August 19, 2004 that he did, in fact, observe occupants of the Al Qa'eity guesthouse, including Al Qa'eity himself, traveling to the front lines of battle. Weighing the self-serving nature of the petitioner's testimony against his damaging statements to CITF interrogators, the Court concludes that his testimony cannot be credited. Cf. Williamson v. United States, 512 U.S. 594, 599 (1994) (explaining that the underlying common-sense rationale behind admitting hearsay statements against interest is that "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true").

the house would also travel to the front lines to fight with the Taliban."[16] Id., Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 1. Based on the petitioner's own admissions, the only reasonable conclusion that the Court can reach is that the petitioner was not staying at "a non-profit hostel" or YMCA, Pet'r's Exhibits, Ex. 298 (█████ Decl.) ¶ 18(c), but rather, he was staying at a █ station[] for frontline fighters associated with al Qaeda or the Taliban," Gov't's Exhibits, Ex. 5 (█████ Decl.) at 1.

In reaching this conclusion, the Court finds compelling █████████ observation █████ ████████████████████████████████████████ Without resorting to anything other than common sense, the Court finds it implausible that guesthouses being operated for the benefit of Taliban fighters engaged in warfare are simultaneously providing charitable lodging to strangers in need, as the petitioner suggests. See, e.g., Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 1 (statement by the petitioner that he could stay at the Al Qa'eity guesthouse for free because, inter alia, "it [is] a Yemeni and Arab tradition to offer food and shelter to others"). Such a finding would necessarily require the Court to illogically infer that the Taliban had a practice of exposing its fighters to potentially deadly covert operations by the Northern Alliance (a Taliban antagonist) or its affiliates; for instance, the Northern Alliance's efforts to compromise the Taliban's political and military operatives would surely be enhanced if it could infiltrate the Al Qa'eity guesthouse with one of its members under the guise of an indigent wayfarer, thereby positioning that member to kill all of the unsuspecting inhabitants with ease. The Court declines to accept that the enemy would be so

---

[16] In that regard, the petitioner's reliance on a statement by ISN 1457 that the Al Qa'eity guesthouse "was run by a Yemeni who opposed al-Qaida" is misplaced. Pet'r's Exhibits, Ex. 283 (IIR 6 034 0059 05 █████████ at 9. Even assuming the statement by ISN 1457 is true, it is hardly inconsistent with the petitioner's assertion that Al Qa'eity fought regularly with the Taliban.

willing to expose themselves to such danger. Thus, the Court concludes that the petitioner could not have resided at the "Arab house" and Al Qa'eity guesthouse without having earned the trust of the Taliban. Cf. Al-Adahi, ___ F.3d at ___, 2010 WL 2756551, at *6 (observing that the detainee's "move to an al-Qaida guesthouse, a staging area for recruits heading for a military training camp, makes it more likely—indeed, very likely—that [he] was himself a recruit"). To that end, the Court will simply not credit any evidence proffered by the petitioner that would suggest otherwise.[17] See Pet'r's Exhibits, Ex. 304 (ISN 695 SIR█████████ at 1 (statement by ISN 695 that Al Qa'eity "allowed the lower floor" of his guesthouse "to be used for charity"); id., Ex. 305 (ISN 695 SIR█████████ at 2 (statement by ISN 695 that, inter alia, Al Qa'eity had a "practice of allowing . . . foreign guests to stay at his home").

As for the petitioner's claims that he received free room and board for seven months, even though he had "no responsibilities" at the guesthouse, Gov't's Exhibits, Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 2, and that all he did was sit around the guesthouse "read[ing] the Qu'ran[,] . . . . eating, drinking[,] . . . . [and] sleeping," Hr'g Tr. 498:15-20, the Court finds his account to be farfetched. It is nonsensical to think that the proprietor of a guesthouse who, along with other inhabitants, was engaged in warfare with the Northern Alliance would allow a complete stranger to freeload for such a lengthy period of time during active hostilities. Rather, the more likely conclusion to be drawn from the petitioner's extended stay at the Al Qa'eity guesthouse is that he provided Al Qa'eity (or the Taliban) with some form of assistance in exchange for his seven months of room and board.

---

[17] Along those same lines, the Court finds the petitioner's statement to interrogators that "he didn't know there would be Taliban, or Taliban sympathizers, at the [Al Qa'eity] house until he actually arrived there" to be suspect, Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 1, given the implausibility that the petitioner would somehow end up at the doorstep of the Al Qa'eity guesthouse (and be admitted to that house no less) unless both he and its inhabitants had some appreciation of who each were dealing with.

One event that sheds light on exactly what form of assistance the petitioner provided to Al Qa'eity was his visit to an area that he described as a "recreational place." Specifically, according to the petitioner, he visited a "recreational place" during his stay at the Al Qa'eity guesthouse that is purportedly "known as the safe place or the safe village." Id. 499:13-502:6. The petitioner further testified that this area was located "about 20[]kilometers away from Kabul," id. at 502:1-2, and that during his approximate one-week stay in the "recreational place" before returning to the Al Qa'eity house, id. at 506:23-25, 507:15-17, an individual by the name of Farhan allowed the petitioner to borrow his PK rifle and fire several rounds into a wall, id. at 503:12-20. Thereafter, at some point ▌2�█████████████████████████▌, the petitioner acknowledged that he returned back to the "recreational place" after followers of Northern Alliance Commander Ahmad Shah Massoud began "killing Arabs [for] revenge," id. at 508:8-23, and after "the [United States] began bombing operations in Afghanistan," Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 2.

The Court will explore the significance of the petitioner's visit to this purported "recreational place" in the next section. Suffice it to say, however, that based on his own admissions, his visit to this area was hardly a frolic to an oasis of tranquility located in a country which is an active theater of war. To the contrary, the evidence supports that this area was part of the war zone, and the fact that the petitioner traveled there during his stay at the Al Qa'eity guesthouse speaks volumes about the consideration the petitioner provided to Al Qa'eity (and the Taliban) in exchange for his stay at the guesthouse.

3. The Petitioner's Presence Near the Battle Lines

The petitioner also told interrogators in 2002 and 2004 that he visited the "recreational place" that he described in his testimony at the merits hearing. Specifically, he told FBI

36

interrogators during his April 17, 2002 interview that he had visited an area "approximately 20 kilometers north of Kabul," and that he traveled to this area "[w]hen Arabs began being attacked in the streets of Kabul" by followers of General Massoud. Gov't's Exhibits, Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 2. He later explained in his August 19, 2004 interview with the CITF that this location "was safer . . . than back at the [Al Qa'eity] house." Id., Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 2. These statements are consistent with the petitioner's testimony, which as noted above he testified that the "recreational place" he visited was located "about 20[]kilometers away from Kabul," Hr'g Tr. at 502:1-2, that he stayed at this location for approximately a week before returning to the Al Qa'eity house, id. at 506:23-25, 507:15-17, and that he returned to the "recreational place" following attacks on Arabs by loyal followers of General Massoud, id. at 508:8-23.

However, one serious discrepancy exists between the description that the petitioner provided during his testimony and that which was provided to CITF interrogators on August 19, 2004. While he testified that the area he visited was nothing more than a "recreational place," or "safe village," he also told CITF interrogators that this location was a "staging area[] approximately 10-20 [kilometers] behind the front lines" for "fighters [to] make final preparations prior to going into battle at the front." Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 2. Thus, he admitted to CITF interrogators that he was in the presence of other Taliban fighters in this area as they were preparing for battle. The reasons for the change in the petitioner's story are not reflected in the record, and as the Court explained above, where the record reflects one statement that is entirely self-serving, and another inculpatory statement that likely would not have been uttered unless it was true, there is logical reason for the Court to credit the latter statement. See supra n.14. And it will do so here. The Court therefore credits

the petitioner's description of the area located "about 20[]kilometers away from Kabul," Hr'g Tr. at 502:1-2, as "a staging area" for fighters near the battle zone. Furthermore, by the petitioner's own admissions he traveled to this "staging area" on two occasions: once while he was residing at the Al Qa'eity house, and another time when he left the Al Qa'eity house after the attacks by the followers of General Massoud following his assassination.

The Court finds that the petitioner's presence at the "staging area" is by itself highly probative evidence of the petitioner's status as "part of" the Taliban. Similar to the Court's reasoning regarding the petitioner's stay at Taliban-affiliated guesthouses, the Court simply cannot fathom a situation whereby Taliban fighters would allow an individual to infiltrate their posts near a battle zone unless that person was understood to be a "part of" the Taliban. Again, by concluding otherwise, the Court would be accepting the proposition that the Taliban would expose themselves, at minimum, to a covert attack by opposing forces which could potentially have a dramatic impact on the Taliban's military effectiveness. And again, the Court refuses to believe that the Taliban would act so imprudently in conducting its military operations.

But the evidence in the record does not simply place the petitioner at the "staging area" on several occasions; rather, the record reflects admissions by the petitioner that he took possession of a powerful weapon during each of his visits to the "staging area." As noted above, the petitioner took possession of a PK rifle from an individual named Farhan during his first visit to the "staging area." Id. at 503:12-20. And, during his April 17, 2002 interview with the FBI, he told interrogators that as he was leaving the "staging area" for the "mountains close to the Pakistan border," he took possession of a Kalashnikov rifle from an individual named Asem,

38

who kept a hand gun for himself.[18] Gov't's Exhibits, Ex. 34 (ISN 223 FD-302 (Apr. 17, 2002)) at 2. These facts suggest that the individuals at the "staging area" trusted the petitioner enough to allow him to take possession of their firearms.[19] More importantly, these facts suggest that these individuals trusted the petitioner because he was loyal to their cause.

The petitioner, however, attempts to frame these facts in an innocuous light. With regards to his first visit to the "staging area," the petitioner claims that he "felt bored" and needed to go to "a recreational place . . . where there [is] . . . a river or trees and stuff like this." Hr'g Tr. 501:22-25. As for his explanation as to why he took possession of Farhan's rifle, he testified that he just "wanted to shoot [it] for pleasure," and posited that "it is considered a very silly kind of weapon . . . in Yemen." Id. at 504:2-9. As for his second visit to the area, he refers to the statement reflected in the August 19, 2004 FM-40 that "he [never] had any intention of actually engaging in combat" at the "staging area," and that he merely went to area because "it was safer there than back at the [Al Qa'eity] house," Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 1; see also Hr'g Tr. 416:21-25 (citing the August 19, 2004 FM-40), and that he merely took the AK-47 rifle because "there were wild animals" in the mountains of Jalalabad,

---

[18] Although this account differs slightly from the one he provided during his August 19, 2004 interview with the CITF, in which he told the interrogators that "just prior to departing for the [staging area], an unknown individual gave [the petitioner] an AK-47 for 'self-protection,'" Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 2 (emphasis added), the bottom line is that the petitioner admits that he was in possession of a powerful AK-47 rifle while present at the staging area.

Additionally, the petitioner also told CITF interrogators that he "receive[ed] rudimentary training on the operation of an 82mm mortar." Id. In an attempt to explain his prior statement, the petitioner proffered a statement that he made at his CSRT hearing in which he said his "intention was not to get trained," and that he was "there . . . wasting some time[, and] I just moved the mortar left and right." Pet'r's Exhibits, Ex. 212 (Testimony of the Petitioner Before the CSRT) at 4. Even accepting the petitioner's claims that he merely "moved the mortar left and right," the Court still has difficulty believing that the fighters present at the "staging area" would have allowed the petitioner to even have access to a powerful piece of weaponry unless they trusted him and, more importantly, considered him to be a "part of" their membership.

[19] Indeed, that trust is manifested in the fact that Asem, when deciding whether to give the petitioner the Kalashnikov rifle or the hand gun, provided the petitioner with the far more dangerous and deadly weapon of the two.

and that he "took the weapon . . . to protect [himself] until" they reached their destination in the mountains, Hr'g Tr. 514:21-25.

The Court refuses to buy in on the petitioner's explanations. As noted above, it would be beyond any sense of reason for the Court to conclude that the Taliban would allow a noncombatant to be present in a "staging area" while other fighters preparing to head into battle. But even assuming that the Taliban would inexplicably allow a complete stranger to infiltrate a location near the battle lines, the Court finds it wholly implausible that a fighter in this area would provide a person of unknown loyalty to his cause with a weapon (and, in one instance, allow that individual to fire rounds in his presence).[20] The petitioner's attempt to convince the Court that no nefarious inferences should be drawn from his presence and actions at the "staging area" is therefore hard to buy.[21] See Al-Warafi v. Obama, ___ F. Supp. 2d ___, ___, 2010 WL 1404001, at *8 (D.D.C. Mar. 24, 2010) (Lamberth, J.) ("It is inconceivable that the Taliban would allow an outsider to stay at their front line camp just to see what the fighting was like. An outsider whose trustworthiness and loyalty are unknown poses a threat to a military camp.").

---

[20] Along the same lines, the Court also concludes that it is more likely than not that the petitioner took possession of these weapons from a Taliban (or Taliban-affiliated) fighter. Given the Court's deep skepticism of the notion that a complete stranger would be permitted to knowingly possess a deadly weapon while being permitted to stay in a fighting force's camp near the front lines, the logical result of that reasoning is that the two individuals who allowed the petitioner to take possession of their weapons were more likely than not to have been a "part of" the Taliban fighting force.

[21] Even assuming that the petitioner did not engage in actual hostilities against the Northern Alliance, the United States, or its allies, this fact would not render his detention unlawful. After all, as the District of Columbia Circuit has observed, an individual's possession of a weapon while on the battlefield, regardless of whether he fired the weapon, is highly probative evidence that he is a "part of" the Taliban. See Al-Bihani, 590 U.S. at 872-73 (citing admissions by the appellant that he had "accompan[ied] the brigade on the battlefield" and "carr[ied] a brigade-issued weapon" as evidence that he was a "part of" a troop that was supporting the Taliban); id. at 869 (noting that the appellant was found not to have "fired" his weapon "in combat"). Thus, whether the petitioner actually fought in battle on behalf of the Taliban does little to mitigate the impact of the Court's finding that he was near the front line on two occasions, each time having possessed a firearm.

40

Thus, based on the evidence presented by the parties in this case, the Court concludes that the government has proffered more than enough evidence to establish that the petitioner traveled to an area near the front lines on at least two occasions, and that in both instances he took possession of a firearm from an individual who was also likely "part of" the Taliban. And, for the reasons explained above, the most reasonable inference that the Court can draw from these facts is that there was a mutual understanding amongst all who were present at the "staging area" that the petitioner was a one of them. The Court, therefore, concludes that these facts present overwhelming, if not definitive, evidence that the petitioner was a "part of" the Taliban armed forces.[22]

---

[22] The government also alleges that the petitioner's receipt of a Casio watch from an individual at the "staging area" is further evidence of the petitioner's affiliation with the Taliban. Specifically, the government asserts that the "petitioner had in his possession the Casio F-91W" watch at the time of his capture 2████ Hr'g Tr. at 577:6-8. In support of its argument, the government offers the declaration of 3████, an Intelligence Officer for the Defense Intelligence Agency, who concludes, inter alia, that 1████ Gov't's Exhibits, Ex. 8 (Declaration of DIA Intelligence Officer 3████ (Sept. 19, 2008)) at 5.

To be sure, the District of Columbia Circuit observed in one case that the possession of such a watch could be a factor in determining whether a detainee is "part of" the Taliban or al-Qaeda. See Al-Adahi, ___ F.3d at ___, 2010 WL 2756551, at *7 (finding it significant that at the time of his capture, the detainee was "wearing a Casio model favored by al-Qaida leaders," given that he was also someone "who had met with [Osama] bin Laden, had stayed in an al-Qaida guesthouse, and had trained in an al-Qaida camp"). And here, the petitioner admitted that he was in possession of a Casio watch at the time of his capture. Gov't's Exhibits, Ex. 39 (ISN 223 FM-40 (Aug. 19, 2004)) at 2, Hr'g Tr. 507:21-508:2. There is no evidence in the record, however, that the Casio watch in the petitioner's possession at the time of his capture was the F-91W model, as opposed to the hundreds of other models manufactured by Casio for which the government has provided no evidence that such models are used by terrorists 2████ See generally Casio Worldwide, http://world.casio.com. Thus, the Court would have to determine whether other record evidence—e.g., that the petitioner provided "absolutely conflicting stories about how he came into possession of [the] watch," Hr'g Tr. at 579:25-580:1—is sufficient to establish that it is more likely than not that the petitioner did, in fact, possess the F-91W model at the time of his capture. But given the ample amount of evidence in the record to support the petitioner's detention under the AUMF, the Court need not reach a conclusion on this point.

Likewise, the Court finds it unnecessary here to consider the government's claims that the petitioner was captured in Pakistan without a passport on his person.

4. <u>On Balance, the Government Has Met its Burden of Proof That the Petitioner's Detention is Lawful Under the AUMF</u>

In sum, the Court finds that the government has met its burden of proving that the petitioner was recruited by a Taliban operative, that the petitioner visited or stayed at several Taliban-affiliated guesthouses following his recruitment, and that the petitioner was present near the front lines of battle on two occasions, each time having taken possession of a deadly piece of weaponry from a fighter stationed at that location. Furthermore, the Court must "reject[ the petitioner's] attempt to put an innocuous gloss over these . . . facts," <u>Al Odah v. U.S.</u>, ___ F.3d ___, ___, 2010 WL 2679752, at *7 (D.C. Cir. June 30, 2010), as the facts do not support the petitioner's version of events, no matter now many times he repeats it. Rather, a thorough assessment of the evidence presented by both parties leaves the Court with the unmistakable impression that, more likely than not, the petitioner was recruited to be, and ultimately became, a "part of" the Taliban forces. The petitioner is, therefore, lawfully detained under the AUMF.

## IV. Conclusion

"Once the government has established by a preponderance of the evidence that [the petitioner] was 'part of' al Qaeda and Taliban forces, the requirements of the AUMF are satisfied and the government has the authority to detain [the petitioner]." <u>Id.</u> at ___, 2010 WL 2679752, at *9. The government has provided more than sufficient evidence—most in the form of the petitioner's own admissions—to satisfy its burden of establishing the lawfulness of the petitioner's detention, and the evidence put forth by the petitioner in rebuttal fails to convince the Court otherwise. Accordingly, the petitioner's petition for a writ of habeas corpus must be denied.

**SO ORDERED** this 20th day of July, 2010.[23]

REGGIE B. WALTON
United States District Judge

---

[23] An order will accompany this memorandum opinion, denying the petitioner's petition for a writ of habeas corpus.