UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO: [signature]
DATE: [date]

TOFFIQ NASSER AWAD AL-BIHANI,

Petitioner,

v.

BARACK H. OBAMA,
President of the United States, et al.,

Respondents.

Civil Action No. 05-2386 (RBW)

**MEMORANDUM OPINION**

Currently before the Court is the petition of Toffiq Nasser Awad Al-Bihani (ISN 893)[1] for a writ of habeas corpus, in which he argues that he should be released from the United States detention facility in Guantanamo Bay, Cuba, because his detention is not authorized under the Authorization for the Use of Military Force (the "AUMF"), Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). Petition for a Writ of Habeas Corpus ¶ 344. Not surprisingly, the government opposes the petitioner's habeas petition on the grounds that he was "part of" al-Qaeda, thereby rendering him detainable under the AUMF. June 16, 2010 Hearing Transcript ("Hr'g Tr.") at 46:18-20, June 16, 2010. After carefully considering the evidence presented by both parties and the arguments of counsel during the merits hearing that commenced on June 16, 2010, and concluded on June 17, 2010, as well as the various documents that have been filed by the parties

[1] "ISN" is the acronym for "Internment Serial Number." Al-Harbi v. Obama, Civil Action No. 05-2479 (HHK), 2010 WL 2398883, at *3 n.2 (D.D.C. May 13, 2010). Each of the detainees currently housed in Guantanamo Bay has been assigned an ISN. Id.

in this matter and the exhibits attached to these filings,[2] the Court concludes for the following reasons that the petitioner's petition for a writ of habeas corpus must be denied.

## I. Background

The following facts are derived from the petitioner's testimony at the merits hearing, his declaration, and the stipulated facts contained in the Joint Pre-Trial Statement. The petitioner is a Yemeni national, id. at 100:3-4, who was born in 1972, Gov't's Exhibits, Ex. 50 (Declaration of Toffiq Al-Bihani ("Al-Bihani Decl.")) ¶ 1, and raised in Saudi Arabia, Hr'g Tr. 99:12-17. The petitioner was one of twelve children in his immediate family, see id. at 100:20-101:2, one sibling being his older brother, Mansour, "also known as Assam al-Tabuki," Joint Stmt. at 6. During the time he resided in Saudi Arabia, the petitioner was abusing various drugs, including alcohol, Hr'g Tr. at 107:17, marijuana, hashish, crystal methamphetamine, and depression pills, id. at 108:21-23; see also Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 6 (statement by the petitioner that he had "been a regular user of hash[ish] and other narcotic drugs throughout [his] life"). The petitioner began to "increase[ his] intake of alcohol and drugs," Hr'g Tr. at 107:14-17, when his fiancée ended their engagement due to her concerns that "she would fall out of grace with her father if she married a Yemeni against his wishes," Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 7.

At this point, which was around the spring of 2000, Mansour suggested that the petitioner travel to Chechnya to fight the Russians. Id. ¶ 12. Mansour "was an experienced fighter who fought against the Russians in Chechnya," and who "had close relationships with senior Chechen fighters and other individuals who were engaged in training men to fight in Chechnya and in

[2] In addition to the evidence and arguments presented by the parties at the merits hearing, the Court considered the following documents in reaching its decision: (1) the government's Factual Return; (2) the petitioner's Traverse; and (3) the parties' Joint Pre-Trial Statement (the "Joint Stmt.").

other countries." Joint Stmt. at 6. Motivated by his desire to prepare for jihad in Chechnya, Joint Stmt. at 6, the petitioner agreed to travel to Afghanistan with Mansour, see Hr'g Tr. at 107:21-23, who "provid[ed] funding for the trip" and coordinated the petitioner's lodging and jihad training logistics, Joint Stmt. at 6; see also Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 13 (statement by the petitioner that "Mansour got [him] a passport and made travel arrangements for [him] to travel to Afghanistan during the summer of 2000"). The petitioner then left for Karachi, Pakistan. Id. ¶ 14.

Upon his arrival in Karachi, the petitioner stayed at a hotel for approximately one week, id., after which he boarded a train and traveled to Quetta, Pakistan, where he "stayed at a guesthouse run by Dawood the Afghani," Joint Stmt. at 7. The petitioner then traveled to Kandahar, Afghanistan, where he first stayed at the al Nebras guesthouse before moving to the 1 1 guesthouse. Id. The 1 guesthouse was operated "by a man named Katab[,] who was a jihad fighter that . . . Mans[o]ur had fought with in Chechnya." Id. The petitioner knew at the time he stayed at these guesthouses that they "were run by, or had ties to, al-Qaida." Id. at 6.

The petitioner then began training at the al-Farouq training camp, where he "received, at a minimum, weapons training." Id. at 7; see also Hr'g Tr. at 116:22-25 (testimony by the petitioner that he "trained on the pistol and [Kalashnikov rifle] and the Becca" while at al-Farouq). Although he was enrolled at al-Farouq for approximately five months, he only "received approximately two months of training," Joint Stmt. at 7, because he would train for approximately "a week or two weeks" before feigning illness in order to leave and "do hashish or tobacco," Hr'g Tr. at 112:6-10. While he was away from the camp, the petitioner would travel to Kandahar to stay at the 1 guesthouse, after which he would return to al-Farouq. Id. at 112:6-11. He repeated this cycle several times. Id. at 112:12. Towards the end of his time at al-

Farouq, the trainers at the camp informed him that he was "not ready physically because [he] keep[s] leaving and going back." Id. at 112:15-17. The trainers purportedly concluded that he was of "no use," and "they kick[ed him] out of the camp." Id. at 112:17-19. Nonetheless, the petitioner admits that he "became[,] and was part of[,] al Qaida at least during the five[-]month period he was training at al-Farouq." Joint Stmt. at 7.

While the petitioner claimed that he was no longer welcomed at al-Farouq, he testified at the merits hearing that his separation from the camp was mutual. Specifically, he claims that Mansour "came to al[-Farouq]," at which point he told Mansour that he was "done" and that he "want[ed] to go back home." Id. at 112:20-22. Mansour then told the petitioner that they would go to Chechnya for additional military training. Id. at 112:24-25; 119:25-120:2. Mansour also asked the petitioner to "be patient" until he procured a passport, after which he promised the petitioner that he would find a way for the both of them to leave Afghanistan. Id. at 120:14-16.

Soon thereafter, "[i]n approximately July 2001," the petitioner left al-Farouq with Mansour, Joint Stmt. at 7, and "went to the Hassan Guesthouse in Kandahar" before returning to the [1] guesthouse, where he stayed for approximately a month, id. at 8; but see Hr'g Tr. 123:8-9 (testimony by the petitioner that he stayed at the [1] guesthouse after leaving al-Farouq "for about two weeks, about three weeks"). In August 2001, the petitioner left Kandahar and traveled to Kabul, where he stayed with Hamza Al Qa'eity for approximately one to two weeks. Joint Stmt. at 8. The petitioner described the Al Qa'eity guesthouse "as one that jihad fighters used as a transition point." Id. The petitioner then traveled to Jalalabad to visit several of Mansour's friends in the area. Hr'g Tr. at 123:19-22. The petitioner subsequently traveled to and from these locations. See id. at 123:22-25 (testimony by the petitioner that he stayed in Jalalabad, then he "went back to Kabul . . . then back to Kandahar"). At one point, the brothers

left Kandahar "to go to a photography shop" located in Kabul "to get passport pictures taken to go to Chechnya." Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 20. As they were driving into Kabul, they approached "a roadblock or checkpoint," at which the petitioner "learned about the September 11, 2001 attacks," Hr'g Tr. at 124:3-5, from several Taliban guards at that post, id. at 152:16-19.

The petitioner then "returned to Kandahar in mid to late October[] 2001[,] and stayed at [the] [redacted] guesthouse for another month." Joint Stmt. at 8. Towards the end of his stay at the [redacted] guesthouse, "the fighting . . . got too intense," id., and the situation became "dire," Hr'g Tr. at 156:15. The petitioner then left Kabul with Mansour and headed to Jalalabad. Id. at 124:21-22. Upon their arrival in Jalalabad, "the Pakistani military [was] surrounding the border," id. at 124:23-25, and thus the petitioner was advised by Mansour's friends to return to Kandahar, id. at 124:25-125:1. At that point, Al Qa'eity "managed to get a tractor-trailer truck . . . to carry a group of people across the border into Quetta." Gov't's Exhibits, Ex. 50 (Al Bihani Decl.) ¶ 24. The only people that were allowed to board the truck were those "who appeared sick or injured," id.; see also Hr'g Tr. at 156:15-16 (testimony by the petitioner that there were efforts to "get the wounded and the sick out"), and therefore Mansour was able to board the truck "because he was ill," Hr'g Tr. at 156:16-17, while the petitioner could not, Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 24. Thus, the petitioner embarked on a journey "with a group of other men who were . . . fleeing Afghanistan into Iran." Joint Stmt. at 8.

That journey began when the petitioner left Kandahar and traveled to Zormat, Afghanistan, because he had heard a "rumor . . . that [people] could walk across the Pakistani border" there. Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 25. The petitioner then headed to Waziristan, Pakistan, and after passing several small towns, he stayed with a Pakistani man who

gave him food and water. Id. ¶ 26. That same man then took the petitioner to Lahore, Pakistan, id. ¶ 26, where he stayed "for two weeks" with "an Arab family," id. ¶ 27. While in Lahore, the petitioner testified that he "spoke with [a] Pakistani person there who owns the home," Hr'g Tr. at 158:9-10, and was told that "he would [rejoin] Mans[o]ur and Hamza [Al'Qaiety]," Joint Stmt. at 9. After his stay in Lahore, the petitioner took the train to Quetta, Pakistan, id. at 8, before taking a bus to Baluchistan, Pakistan, which is located at the Pakistan-Iran border, id. at 7; see also Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 28. The petitioner then crossed the Pakistan-Iran border by bus and traveled to an area near Zahedan, Iran, Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 29, and "went to the [bus] driver's house," id. ¶ 30.

The petitioner stayed at the bus driver's house for about an hour and a half. Id. ¶ 30. The driver then drove the petitioner to the home of an Iranian family, and during his stay there, Al Qa'eity arrived to pick up the petitioner to reunite him with Mansour. Id. ¶ 31. At that exact time, however, [redacted] descended on the house and apprehended the petitioner. He was flown to Afghanistan, id. ¶ 34, and ultimately, the petitioner was transferred to United States custody and taken to Guantanamo Bay, id. ¶ 35.

Along with numerous other detainees, the petitioner filed the petition now before the Court on December 21, 2005, seeking release from Guantanamo Bay on the grounds that, inter alia, his detention by the United States government violates his due process rights under the United States Constitution and the Geneva Conventions. See Petition for Writ of Habeas Corpus ¶¶ 378, 382, 386. Having "serious questions concerning whether this Court retain[ed] jurisdiction" as a result of Congress's attempt to strip this Court of jurisdiction in passing the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241) (the "2006 MCA"), the Court stayed the proceedings in these cases until the

question of jurisdiction was resolved on appellate review. Order, Jabbarov v. Bush, Civil Action No. 05-2386 (RBW) at 1 (D.D.C. Jan. 31, 2007). The Court later lifted the stay after the Supreme Court issued its opinion in Boumediene v. Bush, 553 U.S. 723, 128 S. Ct. 2229 (2008), in which the Supreme Court held that non-United States citizens detained at Guantanamo Bay are constitutionally entitled to seek habeas relief and that the 2006 MCA's jurisdiction-stripping provision was "an unconstitutional suspension of the writ." Id. at 2274.

In light of the Boumediene decision, the members of this Court on July 1, 2008, "resolved by Executive Session to designate" the Honorable Thomas F. Hogan of this Court "to coordinate and manage proceedings in all cases involving petitioners presently detained in Guantanamo Bay, Cuba." Order, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) at 1 (D.D.C. July 2, 2008). After carefully considering the positions of the various parties in these cases, Judge Hogan issued a case management order on November 6, 2008, which outlined the procedural and substantive contours for resolving these habeas petitions.[3] Pursuant to this order, the government then filed its Factual Return in this case on November 25, 2008, in which it proffered the evidence that it intends to rely upon in this proceeding to justify the petitioner's detention. In turn, the petitioner responded to the evidence proffered by the government in his Traverse, which he filed on May 4, 2009. With all discovery having been completed and the matter having been fully briefed, the Court commenced a hearing on June 16, 2010, to consider the merits of the petitioner's petition for a writ of habeas corpus.

## II. Standard of Review

The ultimate question to be resolved in regards to the petitioner's habeas petition is whether the government's detention of the petitioner is lawful under the AUMF. While the

[3] Judge Hogan subsequently amended his case management order on December 16, 2008, and this member of the Court issued several amendments to the order on December 19, 2008, February 19, 2009, and June 12, 2009.

Supreme Court in Boumediene held that individuals detained by the government at Guantanamo Bay were "entitled to the privilege of habeas corpus to challenge the legality of their detention," Boumediene, 128 S. Ct. at 2262, it also concluded that "[t]he extent of the showing required of the Government in these cases [was] a matter [left] to be determined" in future proceedings," id. at 2271. The development of the detention standard in these Guantanamo Bay habeas cases was thoroughly explored by this Court in its recent decision in Sulayman v. Obama, ___ F. Supp. 2d ___, 2010 WL 3069568 (D.D.C. 2010) (Walton, J.), and it need not repeat that analysis here. Suffice it to say that

> under the law of this circuit, the government may establish the lawfulness of the petitioner's detention by showing that he "engaged in hostilities . . . against the United States," that he "purposefully and materially supported hostilities against the United States or its coalition partners," or that he "is part of the Taliban, al Qaeda, or associated forces." And, the determination of whether an individual is "part of" the Taliban, al Qaeda, or associated forces is one that "must be made on a case-by-case basis by using a functional rather than a formal approach." Moreover, the government may seek to justify detention by making a showing that the detainee was part of the "command structure" of either the Taliban, al Qaeda, or their associated forces, yet it is not necessary for the government to make such a showing. But, the government must do more than just prove that the detainee was an "independent . . . freelancer."

Id. at ___, 2010 WL 3069568, at *5 (internal citations omitted).

As for the burden of proof required to justify detention, the Court noted in Sulayman that the standard set forth in Judge Hogan's case management order—"to wit, that the government has the burden of persuading the Court that the petitioner is detainable under the AUMF by a preponderance of the evidence"—has been accepted by the District of Columbia Circuit.[4] Id.;

[4] As the Court observed in Sulayman, the District of Columbia Circuit has "left open the question of whether a lower standard of proof could constitutionally suffice as well." ___ F. Supp. 2d at ___, 2010 WL 3069568, at *5 n.5 (citing Al-Bihani, 590 F.3d at 878 n.4.); see also Al-Adahi v. Obama, ___ F.3d ___, ___, 2010 WL 2756551, at *2 (D.C. Cir. July 13, 2010) (noting that it was not "aware of [any] precedents in the eighteenth[-]century English courts [that] adopted a preponderance standard," and that the standard of proof applied in various habeas proceedings ranged from "some evidence to support the order" to "probable cause"). However, given that the (continued . . . )

see also Awad v. Obama, 608 F.3d 1, 10 (D.C. Cir. 2010) (citing Al-Bihani v. Obama, 590 F.3d 866, 878 (D.C. Cir. 2010)) ("We have already explicitly held that a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay."). This means that the government must convince the Court "to believe that the existence of a fact is more probable than its nonexistence." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (internal quotation marks omitted). Accordingly, the government has the initial burden of producing evidence in support of its claim for detention, and should the government produce evidence sufficient to establish a prima facie case for detention, then the burden of producing evidence to rebut the government's case shifts to the petitioner. See Hamdi v. Rumsfeld, 542 U.S. 507, 534 (2004) (observing that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria," and that such a "burden-shifting scheme" would not offend the Constitution). After both parties have presented all of their evidence, the Court must weigh the evidence to determine whether the government has met its burden of showing that its evidence "is . . . more convincing than the evidence . . . offered in opposition to it." Greenwich Collieries v. Dir., Office of Workers' Comp. Programs, 990 F.2d 730, 736 (3d Cir. 1993). If the government is successful in making this showing, then the Court must deny the habeas petition. But, where the petitioner's evidence demonstrates that his version of the facts is more likely to be true, or where "the evidence is evenly balanced," the Court must

(. . . continued)
government in this case has established the lawfulness of the petitioner's detention by a preponderance of the evidence, the Court need not resolve the standard of proof question left open by the circuit.

rule in favor of the petitioner. Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 281 (1994).

**III. Legal Analysis**

As noted above, the Court is tasked with determining whether the government has met its burden of proving by a preponderance of the evidence that the petitioner was "part of" al-Qaeda or the Taliban at the time of his apprehension. The government has established—indeed, the petitioner has conceded—that he was "part of" al-Qaeda for at least the time period between February 2001 until July 2001 because of his participation in military training while at the al-Farouq training camp. Joint Stmt. at 7. Furthermore, the petitioner's admissions that he continued to stay at al-Qaeda-affiliated guesthouses and associate with al-Qaeda or Taliban operatives after leaving al-Farouq, id. at 7-8, and that he was apprehended at a house in Iran along with Hamza Al Qa'eity, id. at 9, an individual who the petitioner admits operated a guesthouse "that jihad fighters used as a transition point," id. at 8, constitutes evidence that, at least on its face and taken as a whole, supports the government's theory that the petitioner had no intention of cutting his ties to al-Qaeda, and that he in fact was "part of" al-Qaeda at the time of his capture. See Al-Bihani, 590 F.3d at 873 n.2 (noting in dicta that evidence to support a finding that a non-citizen's visit to an al-Qaeda-affiliated guesthouse "would seem to overwhelmingly, if not definitively, justify the government's detention"); Al-Adahi, ___ F.3d at ___, 2010 WL 2756551, at *6 (concluding that the detainee's "voluntary decision to move to an al-Qaida guesthouse . . . makes it more likely . . . that [he] was . . . a recruit"); cf. Barhoumi v. Obama, 609 F.3d 416, 418, 425 (D.C. Cir. 2010) (finding detainee's capture alongside a "reputed terrorist leader" to be probative evidence that he was "part of" that leader's organization).

Thus, given that the government has met its burden of establishing a prima facie case that supports the lawfulness of the petitioner's detention,[5] the burden now shifts to the petitioner to produce evidence to rebut the government's case. Because the petitioner has already admitted to once having been "part of" al-Qaeda, to rebut the government's evidence he must demonstrate that "he was no longer part of [al-Qaeda] at the time of his capture by showing that he took affirmative actions to abandon his membership." Khalifh v. Obama, Civil Action No. 05-1189 (JR), 2010 WL 2382925, at *2 (D.D.C. May 28, 2010) (citing Al Ginco v. Obama, 626 F. Supp. 2d 123, 128 (D.D.C. 2009) (Leon, J.) (concluding that "a prior relationship between a detainee and al Qaeda . . . can be sufficiently vitiated by the passage of time, intervening events, or both, such that the detainee could no longer be considered . . . 'part of' [al-Qaeda] at the time he was taken into custody")). In his attempt to meet this burden, the petitioner testified that he had no real desire to engage in jihad while in Afghanistan, see Hr'g Tr. at 125:23-24 (testimony that jihad "was not really in the back of [his] mind" while in Afghanistan), and that upon leaving al-Farouq, he wanted to leave Afghanistan for Pakistan in order to "depart from the Pakistani airport to Saudi Arabia," id. at 127:5-6, but that he remained in Afghanistan with Mansour

[5] The government also relies on numerous summary interrogation reports and intelligence information reports in its case-in-chief. These interrogation reports contain unsworn hearsay statements "that [are] not otherwise admissible under the Federal Rules of Evidence or 28 U.S.C. § 2246 [(2006)]," and thus the government has the burden of "establish[ing] the reliability of those statements" under the two-prong standard set forth by Judge Hogan in his case management order, as supplemented by the decisions issued by the undersigned member of this Court and thoroughly discussed in Sulayman. ___ F. Supp. 2d at ___, 2010 WL 3069568, at *11. But the Court need not assess whether the government has presented its hearsay "in a form . . . that permits the . . . [C]ourt to assess its reliability," Parhat v. Gates, 532 F.3d 834, 849 (D.C. Cir. 2008), because as the Court discusses below, the government's case for detention can be made based on the stipulated facts, the petitioner's sworn declaration, and his testimony.

As for any hearsay evidence that the petitioner relies upon in support of his case-in-chief, this member of the Court observed in Sulayman that there remains an open question as to whether the prohibitions against the admission of hearsay evidence should be relaxed for the petitioner's proffered hearsay evidence, given that "the Supreme Court mentioned only the possibility of considering hearsay proffered by the government in Hamdi and Boumediene." Sulayman, ___ F. Supp. 2d at ___, 2010 WL 3069568, at *11 n.10 (citations omitted and emphasis added). But here, the petitioner does not rely on any hearsay evidence to rebut the stipulated facts, the petitioner's declaration, or his testimony, and thus there is no need for the Court to address this open question.

because he was "scared" about being captured at the Afghanistan-Pakistan border, see id. at 120:8-11 (testimony that he was told by Mansour about "gangsters . . . , drug dealers[, and] the police [who] might capture" him at the border, "and that [he] might spend the rest of [his] life in prison"); id. at 126:7-9 ("And truly I was a scared individual. You know I use[d] to be scared [of] . . . drug dealers, [of] . . . the police, [and of] people that are out there watching the roads."), and because Mansour assured him that they would attempt to enter Iran in order "to make it to Saudi Arabia or Yemen," id. at 124:19-20. As the Court discusses below, however, the petitioner's testimony, the stipulated facts, and his sworn declaration, when viewed collectively, reveal material inconsistencies that undermine his assertions and overall credibility as a witness.

Of significance to the Court's assessment of the petitioner's credibility are his inconsistent statements regarding his motivation for traveling to Afghanistan, and his desire to engage in jihad while in Afghanistan. At the merits hearing, he testified that his travel to Afghanistan, and his attendance at al-Farouq, were motivated by nothing more than his desire to "change [his] lifestyle," and that he "wanted to forget about the problems [he] had," Hr'g Tr. at 111:22-112:1, presumably regarding the end of his relationship with his fiancée or his illicit drug use. He also testified that when he traveled to Afghanistan, he "didn't even know he was going to fight," id. at 110:10-12, and that he "didn't have any idea or any clue of fighting anyone," id. at 110:17-19. In fact, he testified that Mansour convinced him to go to Chechnya to "go there [and] help the children [and the] women[,] instead of staying [in Saudi Arabia and] doing drugs," id. at 107:18-20, and that the purpose of going to Afghanistan to get trained was so that if "something happens [he will] be able to defend [himself]," id. at 107:22-25. Yet, the petitioner stipulated in the Joint Pre-Trial Statement that "[t]he purpose of [his] travel to Afghanistan was to train to fight jihad in Chechnya." Joint Stmt. at 6 (emphasis added). This acknowledgement

is buttressed by the petitioner's own declaration, in which he states that Mansour asked him to go to Chechnya because "it was better for [him] to die on the battlefields . . . fighting the Russians than to die of a drug overdose or a broken heart in Saudi Arabia," Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 12 (emphasis added), and that Mansour decided that the petitioner needed training because he "had never been trained to fight jihad," id. ¶ 13 (emphasis added). Thus, on the one hand the petitioner asserts that he "didn't have any idea or any clue" that the purpose of his travel was to engage in warfare, while on the other hand he admits that he traveled to Afghanistan to prepare for jihad. The petitioner's statements cannot be reconciled, and in "[w]eighing the self-serving nature of the petitioner's testimony against" his prior inculpatory statements, "the Court concludes that his testimony cannot be credited." Sulayman, ___ F. Supp. 2d at ___, 2010 WL 3069568, at *16 n.15 (citing Williamson v. United States, 512 U.S. 594, 599 (1994)). The Court, therefore, rejects the petitioner's attempt to "put an innocuous gloss over" his motivations for traveling to Afghanistan.[6] Al Odah v. United States, 611 F.3d 8, 15 (D.C. Cir. 2010).

Even without the inconsistency noted above, the Court does not accept the petitioner's claim that he desired to travel to Pakistan after leaving al-Farouq, but that he remained in Afghanistan because Mansour had "scared" him away from crossing the Afghanistan-Pakistan border prior to the September 11, 2001 attacks. See Hr'g Tr. at 120:8-11, 126:7-9. After all, the petitioner stated in his declaration that in making his way to Afghanistan from Saudi Arabia, he

[6] Even assuming that the catalyst behind the petitioner's travel to Afghanistan was to prepare for battle in Chechnya, and not against the United States, this fact has no material effect on whether the government can detain the petitioner. Nothing in the AUMF, as construed by this Court and the District of Columbia Circuit, requires an individual to be "part of" al-Qaeda and to have also engaged in hostile aggression, or to have desired to engage in such conduct, against the United States in order to be rendered detainable. To the contrary, the circuit in Al-Adahi dismissed the significance of a detainee's motive for affiliating himself with al-Qaeda because "the significant points are that al-Qaida was intent on attacking the United States and its allies, that [Osama] bin Laden had issued a fatwa announcing that every Muslim had a duty to kill Americans, and that [the detainee] voluntarily affiliated himself with al-Qaida." ___ F.3d at ___, 2010 WL 2756551, at *6.

left Quetta, Pakistan in a taxi and crossed the border into Kandahar, Afghanistan, Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 14. Thus, if he experienced no complications using public transportation to travel into Afghanistan from Pakistan earlier, then there is no reason to believe that the petitioner could not have utilized that same mode of transportation to return back to Pakistan after he left al-Farouq. Furthermore, the petitioner's excuse for remaining in Afghanistan prior to the September 11, 2001 attacks becomes even more difficult to accept considering that he was able to cross the Afghanistan-Pakistan border without the assistance of his brother after September 11, 2001, see Joint Stmt. at 8 ("In going from Afghanistan to Iran, [the p]etitioner traveled from . . . Zormat, Afghanistan . . . to Waziristan, Pakistan); Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 25 (statement by the petitioner that he was able to travel to Waziristan by car and then by walking), which he readily admitted was at a time when "the Pakistani military [was] surrounding the border," Hr'g Tr. at 124:21-25; see also Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 22 (stating that he and Mansour tried to cross into Pakistan following the September 11, 2001 attacks, "[b]ut all of the gates were under strict security"). In other words, the petitioner, despite his purported fear of being captured by "street gangsters, drug dealers[,] and . . . . the police," and that he "might spend the rest of [his] life in prison," Hr'g Tr. at 120:8-13, demonstrated the ability to cross the border at a time when, by his own description, the risk of being apprehended and detained was much greater than it had been prior to the attacks of September 11, 2001, when he had been able to cross the border in a taxi. Thus, if the petitioner truly wanted to cross the Afghanistan-Pakistan border in order to return to Saudi Arabia or Yemen, he had ample opportunities to do so. But because he did not seize those opportunities, the Court is left with the impression that the petitioner had no real desire to travel to Pakistan. See Al Odah, 611 F.3d at 16 (finding no error in the Court's reliance on an

incuplatory finding that when the detainee "had a choice to head out of the country or to stay, he consistently chose to remain in Afghanistan following directions of a member of the Taliban").

Indeed, not only do the petitioner's statements demonstrate a lack of any genuine effort to return to Saudi Arabia or Yemen, his statements reveal that his intent all along after leaving al-Farouq was to accompany Mansour to Chechnya. Specifically, the petitioner testified that upon Mansour's arrival at al-Farouq in July 2001, Mansour informed him that they would go to Chechnya for further training, Hr'g Tr. at 119:25-120:1; Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 18, to which he simply told Mansour that "the most important thing is you get me out of [al-Farouq]," Hr'g Tr. at 120:1-2. Mansour then asked the petitioner to "be patient" while he procured his passport, and that he would lead the petitioner out of Afghanistan. Id. at 120:14-16. The petitioner ultimately departed with his brother, and they proceeded to visit and stay at various al-Qaeda affiliated guesthouses. See Joint Stmt. at 7-8 (stipulating that "[i]n approximately July 2001," the petitioner "went to the Hassan Guesthouse in Kandahar" before returning to the [redacted] guesthouse, where he stayed for approximately a month). Immediately prior to the September 11, 2001 attacks, the brothers traveled to Kabul for the purpose of going "to a photography shop" so that Mansour could "get passport pictures taken to go to Chechnya." Gov't's Exhibits, Ex. 50 (Al-Bihani Decl.) ¶ 20 (emphasis added). Thus, based on these statements by the petitioner, it is clear that he was fully aware of Mansour's intent to take him to Chechnya for further training, that the petitioner nonetheless remained with his brother knowing that Mansour desired to take him to Chechnya, and that the petitioner had knowledge of the affirmative steps that Mansour was taking to travel to Chechnya. The Court, therefore, has no doubt that despite the petitioner's claim that he desired to cross the border into

Pakistan so that he could return to Saudi Arabia, his real intention for remaining in Afghanistan was to accompany Mansour to Chechnya for further military training.[7]

In sum, the Court finds that the petitioner's version of the events leading up to his detention, as construed by the Court from a collective evaluation of his testimony, his declaration, and the stipulated facts in this case, reveals numerous material inconsistencies that completely undermine his credibility. In fact, the inherent incongruity in the petitioner's account strongly suggests that he is providing "false exculpatory statements" to conceal his association with al-Qaeda, and such statements "are evidence—often strong evidence—of guilt." Al Adahi, ___ F.3d at ___, 2010 WL 2756551, at *5. Without any credible evidence in the record that rebuts the petitioner's numerous inculpatory statements that independently have the force of proving by a preponderance of the evidence that the petitioner was "part of" al-Qaeda, the Court concludes that the government has satisfied its burden of establishing the lawfulness of the petitioner's detention under the AUMF.[8]

[7] Because the Court finds that the petitioner had no intent to travel to Pakistan upon leaving al-Farouq, the Court does not credit the petitioner's claims that he attempted to procure an "exit document" from a Pakistani cook that would allow him to depart from "the Pakistani airport to Saudi Arabia." Hr'g Tr. 127:5-6; see also id. at 127:14-23 (describing purported conversation with a Pakistani cook regarding an "exit document" that would allow the petitioner to depart Pakistan).

[8] The petitioner also argues that his failure to complete the basic training at al-Farouq is substantial and persuasive evidence that he was not "part of" al-Qaeda after leaving al-Farouq 1,3



1,3

1,3

1,3 he "had to make it through [al-Farouq] before [he was] trusted . . . by al[-]Qaeda," Hr'g Tr. at 72:3-6. This argument is without merit. To be sure, the Court has serious questions about the petitioner's claim that he failed to complete the basic training at al-Farouq because, as discussed above, his overall credibility as a witness is utterly non-existent. But even assuming that the petitioner did not become a member of al-Qaeda due to his failure to complete the training curriculum at al-Farouq, this fact alone is not dispositive on the question of whether the government may detain him under the AUMF because there may be other avenues one may take to become a member of the organization. For instance, one could fight on behalf of, and thus be "part of," al-Qaeda without even having attended an al-Qaeda training camp. 1,3

1,3

(continued . . . )

## IV. Conclusion

As counsel for the petitioner candidly acknowledged at the merits hearing, "the most effective way to lie is to mix truth and falsehood." Hr'g Tr. at 214:16-18; see also Williamson, 512 U.S. at 599-600 (observing that "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-incuplatory nature"). The Court agrees and finds that the petitioner did just that—his inculpatory admissions regarding his desire to prepare for jihad, that he received training at the al-Farouq training camp, and that he continued to associate himself with al-Qaeda operatives while going to and from various al-Qaeda-affiliated guesthouses—are credible, while his attempt to place "an innocuous gloss over these . . . facts," Al Odah, 611 F.3d at 15, by stating that he had no intention of engaging in jihad upon arriving in Afghanistan, and that he intended to travel back to Saudi Arabia or Yemen upon leaving al-Farouq, fails to have the ring of truth. Accordingly, from the testimony presented by the petitioner at the merits hearing, his declaration, and the stipulations agreed to in the Joint Pre-Trial Statement, the Court concludes that the government has provided more than enough evidence to satisfy its burden of establishing the lawfulness of the petitioner's detention under the AUMF. And, because the petitioner has failed to meet his burden of

---

(. . . continued)
[1,3 redacted]

[1,3 redacted] And here, where the petitioner knew that Mansour desired to take him to Chechnya for additional military training, and he accompanied Mansour throughout Afghanistan fully aware of his brother's intent to procure a passport that would allow for their entry into Chechnya, combined with the petitioner's continued stays at al-Qaeda-affiliated guesthouses and his continued association with al-Qaeda operatives after leaving al-Farouq, there is overwhelming evidence from which the Court concludes that regardless of whether the petitioner completed the training at al-Farouq, he became, and was perceived by others to be, "part of" al-Qaeda. See Awad, 608 F.3d at 9 (upholding the district court's conclusion that detainee was "part of" al-Qaeda because, inter alia, it found compelling the detainee's intention to "join the fight against U.S. and allied forces," along with "additional evidence of conduct consistent with an effectuation of that intent").

producing evidence sufficient to rebut the government's prima facie showing, the petitioner's petition for a writ of habeas corpus must be denied.

**SO ORDERED** this 22nd day of September, 2010.[9]

REGGIE B. WALTON
United States District Judge

[9] An order will accompany this memorandum opinion, denying the petitioner's petition for a writ of habeas corpus.